IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____ :
                                    :
 Major G. Tillery,                  :          Docket No. :
                                    :
            Petitioner *Pro Se,*    :
                                    :
            v.                      :
                                    :
Kenneth Eason, Acting Superintendent, :
State Correctional Institution at Chester, :
                                    :
            Respondent.             :
_____ :

**HABEAS PETITION COVER SHEET
(LOCAL RULE OF CIVIL PROCEDURE 9.4)**

Major G. Tillery
AM 9786
Petitioner *Pro Se*
SCI Chester
500 E. 4th Street
Chester, PA 19013

1

Pursuant to Local Rule of Civil Procedure 9.4(1), Petitioner sets forth the following as a cover sheet to this petition.

| | |
|---|---|
| Petitioner's Full Name : | Major George Tillery |
| Prisoner No. : | AM 9786 |
| Person Having Custody of Petitioner : | Kenneth Eason, Acting Superintendent, SCI Chester |
| Petitioner's Address : | Major G. Tillery<br>SCI Chester<br>500 E. 4th Street<br>Chester, PA 19013 |
| Name of Trial Judge : | Hon. John A. Geisz |
| Court Term and Bills of Information : | Philadelphia County Court of Common Pleas, Criminal Division, March Term 1984, Bills of Information: 568, 570, 571, 573, 574 |
| Docket No. : | CP-51-CR-0305681-1984 |
| Plea : | Not Guilty |
| Trial : | Jury trial, verdict on May 29, 1985 |
| Charges of Which Petitioner Was Convicted : | First-degree murder, criminal conspiracy, possessing instruments of crime generally, aggravated assault |
| Sentence : | Life imprisonment (bill 570: first-degree |

1

|                                                  |                                                                                                                                                                                          |
|--------------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                                                  | murder) <br> 1-2 years (bill 568: poss. inst. of crime, concurrent with bill 570) <br> 5-10 years (bill 574: crim. conspiracy, concurrent with bill 570) <br> 5-10 years (bill 573: agg. assault, consecutive to bill 570) |
| Did Petitioner Testify at Trial :                | No                                                                                                                                                                                       |
| Did Petitioner Testify at Any Post-Trial Hearing : | No                                                                                                                                                                                     |
| Direct Appeal :                                  | Superior Court of Pennsylvania <br> 3297 PHL 1986 <br> Filed December 12, 1986 <br> Affirmed May 30, 1989 <br><br> Supreme Court of Pennsylvania <br> Denial of *Allocatur* March 5, 1990 |
| First PCRA Proceeding :                          | Philadelphia County Court of Common Pleas, Criminal Division, March Term 1984, Bills of Information: 568, 570, 571, 573, 574 <br> Filed Sept. 16, 1996 <br> Relief denied Jan. 13, 1998 <br><br> Superior Court of Pennsylvania <br> 523 PHL 1998 <br> Filed February 18, 1998 <br> Affirmed Apr. 21, 1999 <br><br> Supreme Court of Pennsylvania <br> Denial of *Allocatur* Aug. 18, 1999 |
| First Federal Habeas Petition (*pro se*) :       | United States District Court for the Eastern District of Pennsylvania <br> 2:99-cv-065160-BWK                                                                                            |

2

Pa 114

|  | Filed Dec. 22, 1999 |
|  | Relief denied July 29, 2003 |

United States Court of Appeals for the
Third Circuit
No. 00-3818
Interlocutory appeal
Appeal filed Nov. 22, 2000
Certificate of Appealability granted Feb.
28, 2002
Order clarified Aug. 21, 2002

United States Court of Appeals for the
Third Circuit
No. 03-3616
Appeal filed Sept. 2, 2003
Relief denied July 29, 2005

Second PCRA Proceeding (*pro se*) :

Philadelphia County Court of Common
Pleas, Criminal Division, March Term
1984, Bills of Information: 568, 570,
571, 573, 574
Filed Aug. 13, 2007
Relief denied Sept. 9, 2008

Superior Court of Pennsylvania
2937 EDA 2008
Notice of Appeal filed Oct. 1, 2008
Affirmed July 15, 2009

Supreme Court of Pennsylvania
497 EAL 2009
Petition filed Aug. 4, 2009
Denial of *Allocatur* Dec. 9, 2009

Third PCRA Proceeding :

Philadelphia County Court of Common
Pleas, Criminal Division, March Term
1984, Bills of Information: 568, 570,
571, 573, 574
Filed June 15, 2016

3

Relief denied Sept. 26, 2016

Superior Court of Pennsylvania
3270 EDA 2016
Notice of Appeal filed Oct. 20, 2016
Relief denied June 11, 2018

Supreme Court of Pennsylvania
420 EAL 2018
Petition filed Sept. 10, 2018
Denial of *Allocatur* Feb. 6, 2019

No petition for certiorari was filed.

Attorneys Who Represented
Petitioner:

Trial Counsel :

Joseph Santaguida
Law Offices of Joseph Santaguida
121 S. Broad St.
Philadelphia, PA 19102

Counsel on Direct Appeal :

James S. Bruno
150 S. Easton Rd.
Glenside, PA 19038

Counsel on First PCRA :

Richard P. Hunter, Jr.
522 Lincoln Hill Rd.
Newtown, PA 18940

Counsel on Second PCRA :

Brian J. McMonagel
McMonagel, Perri, McHugh, Mischak
and Davis
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103
(Letter Brief in opposition to Motion to
Dismiss in PCRA court only)

Counsel on Third PCRA

Stephen P. Patrizio

4

Pa 116

(appeals only):                         1500 JFK Boulevard, Suite 1205
                                        Philadelphia, PA 19102

Counsel on First Federal Habeas
Petition :                              Edward H. Wiley (E.D. PA)
                                        160 Regency Cir.
                                        Bala-Cynwyd, PA 19004

                                        Michael J. Confusione (3rd Circuit)
                                        309 Fellowship Rd., Suite 200
                                        Mt. Laurel, NJ 08054

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                :

Major G. Tillery,                    :        Docket No. :

                                :

               Petitioner *Pro Se,*   :

                                :

                 v.             :

                                :

Kenneth Eason, Acting Superintendent,  :
State Correctional Institution at Chester,  :

                                :

                Respondent.     :
_____:

### SECOND PETITION FOR RELIEF PURSUANT TO 28 U.S.C. § 2254
### AND
### CONSOLIDATED INITIAL MEMORANDUM OF LAW

Major G. Tillery
AM 9786
Petitioner *Pro Se*
SCI Chester
500 E. 4th Street
Chester, PA 19013

Petitioner, MAJOR G. TILLERY, hereby petitions for habeas corpus relief pursuant to 28 U.S.C. § 2241 *et seq.* and the Constitution of the United States.

Pursuant to this Court's Local Rule of Civil Procedure 9.3(a), Petitioner has filled out form PAE AO 241. However, all the information in that form is duplicated and expanded upon in this Consolidated Petition and Initial Memorandum of Law (including cover sheet pursuant to this Court's Local Rule of Civil Procedure 9.4(1)). Accordingly, Petitioner respectfully requests that the Court construe both this document and PAE AO 241 together as his Petition, and refer to this document as its primary reference.

i

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................1

II. ELIGIBILITY AND BASES FOR RELIEF...................................3

III. PROCEDURAL HISTORY ...........................................................4

IV. RELATED PENDING LITIGATION ...........................................8

V. STATEMENT OF FACTS .............................................................9

    A.  Background ...............................................................................9

    B.  Besides Emanuel Claitt's Testimony, No Direct Evidence Exists Against Tillery ...................................................................11

    C.  The Declarations of Emanuel Claitt........................................14

    D.  The Declaration of Robert Mickens........................................25

    E.  Corroborative Evidence: Helen Ellis, Denise ("De De") Certain and the Roundhouse Logs ......................................................32

    F.  Specific Instances of Prosecutorial Misconduct Shown By Claitt's and Mickens' Declarations ..........................................37

    G.  Plea Agreements and Open Charges Suppressed by the Commonwealth..............................................................59

VI. CLAIMS FOR RELIEF................................................................91

CLAIM I:
PETITIONER IS FACTUALLY INNOCENT OF THIS OFFENSE. HIS CONVICTION AND SENTENCE REPRESENT A FUNDAMENTAL

ii

MISCARRIAGE OF JUSTICE AND ARE THE RESULT OF GROSS PROSECUTORIAL MISCONDUCT. AT A MINIMUM, HIS SHOWING OF INNOCENCE PERMITS REVIEW OF OTHERWISE PROCEDURALLY BARRED CLAIMS. ......................................................92

    A. Petitioner Is Entitled to Habeas Corpus Relief Because He Is Innocent ................................................................................................96

CLAIM II:
THE COMMONWEALTH MANUFACTURED FALSE INCULPATORY EVIDENCE AND SUPPRESSED MATERIAL, EXCULPATORY EVIDENCE IN VIOLATION OF DUE PROCESS .....................................98

    A. The Commonwealth Manufactured False Inculpatory Evidence and Knowingly Used Perjured Testimony to Secure a Conviction ............99

    B. The Commonwealth Suppressed Material Exculpatory and Impeachment Evidence ..................................................................109

VII. ARGUMENT ..........................................................................................114

    A. Petitioner Has Never Received Any Hearing on the Merits of These Claims ....................................................................................................114

    B. Petitioner Meets the Requirements of 28 U.S.C. § 2244 (b)(2)............125

    C. Petitioner Satisfies an Equitable Exception to 28 U.S.C. § 2244(d) ...138

CONCLUSION AND REQUEST FOR RELIEF ...........................................146

# I.     INTRODUCTION

This is a case of factual innocence and gross prosecutorial misconduct violating petitioner's right to due process and a fair trial. Newly discovered evidence proves that the Commonwealth of Pennsylvania intentionally manufactured and presented false evidence, and suppressed impeachment and exculpatory evidence, in order to convict Major Tillery for a murder he did not commit.

In 1985, petitioner, Major Tillery, was convicted of first-degree murder for the shootings of Joseph Hollis and John Pickens on October 22, 1976 in a poolroom in North Philadelphia, following which Joseph Hollis died. Tillery was sentenced to life imprisonment without the possibility of parole. He is now 69 years old and has been imprisoned for almost thirty-seven years, approximately twenty of which were spent in solitary confinement.

No physical evidence linked Tillery to the murder. None of the evidence recovered from the poolroom was linked to him. The central evidence against Tillery was the testimony of Emanuel Claitt, a serial, professional jailhouse informant who became an alleged eyewitness to the shootings while incarcerated, four years after the shootings took place, in 1980. The Commonwealth's other fact

1

witness, Robert Mickens, was allegedly a lookout on the street and heard shots from inside the poolroom.

In the sworn declarations attached to this Petition, Claitt and Mickens both state, for the first time, that their trial testimony was entirely false, that their testimony was scripted and coached by the Commonwealth, and that neither were in or near the poolroom where the shooting took place on October 22, 1976. Nor do they have any personal knowledge of the shootings of Hollis and Pickens, or the events allegedly leading up to the shooting.

As detailed in their declarations and in this Petition, Claitt and Mickens were coerced into providing their testimony with threats of prison time on open charges. The Commonwealth concealed this coercion, along with multiple plea deals offered to both witnesses. Furthermore, the Commonwealth *completely suppressed* the existence of a set of open robbery charges for Claitt, whose dates closely track the dates of Tillery's case and which the Commonwealth eventually dismissed.

Claitt and Mickens corroborate each other regarding the practices employed by homicide detectives and prosecutors to obtain their false statements and present their perjured trial testimony. As they both relate, Detectives Lawrence Gerrard and Ernest Gilbert, among others, permitted Claitt and Mickens to have private

2

sexual visits with girlfriends in the Police Administration Building (PAB) interview rooms. This is not the first time that Detectives Gerrard and Gilbert have been found engaging in identical misconduct. *Commonwealth v. Lester,* 572 A.2d 694 (Pa. Super. 1990) (voluntary manslaughter; reversal and new trial).

Petitioner is factually innocent of the crimes for which he was convicted. The declarations of Emanuel Claitt and Robert Mickens nullify the *entirety* of the evidence against Tillery at trial. They show that the Commonwealth committed gross prosecutorial misconduct and convicted him with intentionally manufactured, perjured testimony. He prays this Court, in the interests of justice, to:

1)     Grant him an evidentiary hearing and discovery;

2)     Reverse his conviction;

3)     Bar re-trial, and

4)     Order his immediate release.

## II.    ELIGIBILITY AND BASES FOR RELIEF

1.     Petitioner's claims are based on his actual innocence, and on violations of his right to due process of law under the Fourteenth Amendment to the United States Constitution. As such, Mr. Tillery is eligible for relief under the federal habeas corpus statute.

3

## III.   PROCEDURAL HISTORY

2.      Petitioner, Major G. Tillery ("Tillery") was arrested and charged with murder in the first degree for the shooting death of Joseph Hollis, criminal conspiracy, possessing instruments of crime generally and aggravated assault under Philadelphia County, Pennsylvania docket number CP-51-CR-0305681-1984. His trial took place from May 2 - May 29, 1985**.** On May 29, 1985, Tillery was convicted on all counts. On December 9, 1986, Tillery was sentenced to life imprisonment without the possibility of parole on the first degree murder conviction, to run concurrently with a 1-2 year sentence on possession of instruments of crime generally and concurrently with a 5-10 year sentence on criminal conspiracy. A 5-10 year sentence on aggravated assault was to run consecutively to the life sentence. Tillery was represented at trial by attorney Joseph Santaguida.

3.      On direct appeal, the Superior Court of Pennsylvania affirmed Tillery's conviction on May 30, 1999. *Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum), *allocatur denied, Commonwealth v. Tillery,* 593 A.2d 841 (Pa. Mar. 5, 1990).

4

Exhibit "P". Tillery was represented on his direct appeals by attorney James S. Bruno.

 4. Petitioner filed his first PCRA petition in the Court of Common Pleas (CCP) of Philadelphia County on September 20, 1996. The petition claimed ineffective assistance of trial counsel, Joseph Santaguida, on the basis that Santaguida had an actual conflict of interest because he had previously represented John Pickens, one of the alleged victims in Tillery's case, during the Commonwealth's case against Tillery's alleged co-conspirator, William Franklin. The CCP denied the petition on timeliness grounds on January 13, 1998.

 5. The Superior Court of Pennsylvania affirmed on appeal on April 21, 1999. *Commonwealth v. Tillery,* No. 523 Philadelphia 1998, 738 A.2d 1055 (Pa. Super. 1999) (unpublished memorandum), *allocatur denied, Commonwealth v. Tillery*, 742 A.2d 674 (Pa. Aug. 18, 1999). Exhibit "R". Petitioner was represented on his first PCRA petition by Richard P. Hunter.

 6. Petitioner filed a *pro se* petition for habeas corpus relief in this Court on December 22, 1999. *Tillery v. Horn*, 2:99-cv-065160-BWK (E.D. Pa.). This petition also alleged ineffective assistance of his trial counsel, Joseph Santaguida, as the first PCRA petition had.

7.     Initially, the District Court affirmed the magistrate judge's report and denied a hearing on October 30, 2000. The Court of Appeals granted a certificate of appealability on February 28, 2002 and clarified that its remand was for the purposes of a hearing on August 21, 2002. *Tillery v. Horn,* No. 00-3818 (3d Cir. 2002). Evidentiary hearings were held on April 23, 2003 and May 28, 2003, during which Tillery and Santaguida both testified. The District Court then denied relief on July 29, 2003. Exhibit "S".

8.     Petitioner was represented in the District Court by Edward H. Wiley, who was appointed following remand from the Court of Appeals (No. 00-3818) on August 21, 2002.

9.     Following the denial of relief on July 29, 2003, the Court of Appeals affirmed the District Court on July 29, 2005. *Tillery v. Horn,* 142 F. App'x. 66 (3rd Cir. 2005) (No. 03-3616). Exhibit "T". Tillery was represented in the Court of Appeals by Michael J. Confusione.

10.     On August 13, 2007, Tillery filed a second PCRA petition *pro se* in the Court of Common Pleas of Philadelphia County, with a *Brady* claim based on court records, including trial testimony in other cases, which provided information that Claitt was promised a sentence of "less than 10 years" and that Mickens had

6

obtained parole assistance. Exhibit "U". The petition was dismissed by the Court of Common Pleas on September 9, 2008 on timeliness grounds.

11.     The Superior Court of Pennsylvania affirmed on appeal on July 15, 2009. *Commonwealth v. Tillery,* 981 A.2d 937 (Pa. Super. 2009) (unpublished memorandum), *allocatur denied*, *Commonwealth v. Tillery,* 985 A.2d 972 (Pa. Dec. 9, 2009). Exhibit "V".

12.     On June 15, 2016, Tillery filed a third PCRA petition *pro se* in the Court of Common Pleas of Philadelphia County. Exhibits "W", "X". This PCRA petition was dismissed by the Court of Common Pleas on September 26, 2016 on timeliness grounds.

13.     The Superior Court of Pennsylvania affirmed on appeal on June 11, 2018. *Commonwealth v. Tillery*, 193 A.3d 1063 (Pa. Super. 2018) (unpublished memorandum), *allocatur denied, Commonwealth v. Tillery,* 201 A.3d 729 (Pa. Feb. 6, 2019). Exhibits "Y", "Z". Tillery's Application for Reconsideration of the Denial of Allowance of Appeal was denied on May 1, 2019. Tillery was represented by Stephen P. Patrizio on the appeal.

14.     Petitioner remains imprisoned at SCI Chester, serving a sentence of life without the possibility of parole.

## IV.   RELATED PENDING LITIGATION

15.     Petitioner's alleged co-conspirator, William Franklin ("Franklin"), was tried from November - December 1980 for murder in the first degree, criminal conspiracy, possessing instruments of crime generally and aggravated assault under Philadelphia County, Pennsylvania docket number CP-51-CR-0527851-1980. On December 5, 1980, Franklin was convicted on all counts. Franklin was sentenced to life imprisonment without the possibility of parole on July 7, 1982.

16.     Franklin filed a PCRA petition in the Court of Common Pleas of Philadelphia County on July 18, 2016, docket number CP-51-CR-0605611-1980. Franklin's petition was also dismissed by the Court of Common Pleas on September 12, 2017 on timeliness grounds.

17.     The Superior Court of Pennsylvania reversed on appeal and remanded to the PCRA court for an evidentiary hearing on November 16, 2018. *Commonwealth v. Franklin,* 201 A.3d 854 (Pa. Super. 2018) (unpublished memorandum) (Exhibit "AA").

8

18.     Both Tillery's and Franklin's PCRA petitions and subsequent appeals were based on Claitt's declaration,[1] and made the same argument: for purposes of the timeliness exceptions to the PCRA, 42 Pa. C. S. § 9545(b)(1)(i) and (ii), due diligence does not require the petitioner to seek out and interview Commonwealth witnesses known to have committed perjury at trial, nor is the petitioner required the make the unreasonable assumption that the Commonwealth improperly permitted those witnesses to commit perjury. *Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014); *Commonwealth v. Davis,* 836 A.2d 125 (Pa. Super. 2003), *Commonwealth v. Loner,* 836 A.2d 125 (Pa. Super. 2003); *Commonwealth v. McCracken*, 659 A.2d 541 (Pa. 1995).

## V.     STATEMENT OF FACTS

### A.     Background

19.   A summary of the events of October 22, 1976, explaining the role of Emanuel Claitt ("Claitt"), was provided by the Superior Court of Pennsylvania on his direct appeal.

"The facts of this [case] have a rather long and tortuous past. At approximately 10:00 p.m. on October 22, 1976, Philadelphia police received

---

[1]   Robert Mickens was not a witness at Franklin's trial. Thus, Franklin's PCRA petition was entirely based on the declaration of Emanuel Claitt.

9

a call to [an] address at Huntingdon and Warnock Streets in North Philadelphia. At that corner, they broke down the locked door of a poolroom operated by William Franklin and discovered the dead body of John Hollis [sic]. A medical examination later revealed that Hollis died of a gunshot wound to the trunk of his body. Inside the poolroom, the police found live and spent .38 caliber ammunition and a set of car keys. Around the corner from the poolroom at 2527 North 11th Street, police officers found John Pickens bleeding from a gunshot wound. He was treated at a hospital and survived his injuries. Both Pickens and Hollis were shot by different guns.

For more than three years, the shooting of Pickens and Hollis remained unsolved. However, in the spring of 1980, police detectives investigating the homicide of Samuel Goodwin visited a Philadelphia prison to determine if Emanual [sic] Claitt, an inmate who had known Goodwin, could provide any information about Goodwin's death. The information Claitt provided went far beyond the Goodwin case. Claitt described in detail the operation of what he labeled the "black mafia", a crime syndicate run by black Muslims in Philadelphia. His information described a vivid picture of the events culminating with the shootings of Pickens and Hollis.

[The Superior Court's summary of Claitt's testimony is reproduced *infra*.]

Based on Claitt's information, the police obtained a warrant on May 23, 1980 for appellant's arrest. However, for three years the police were not able to serve the warrant because appellant could not be located. A detective in California finally arrested appellant in November, 1983. Appellant was returned to Philadelphia on December 8, 1983, to stand trial for the aforementioned charges."

- *Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563 A.2d 195, pp. 2-5 (Pa. Super. 1989) (unpublished memorandum) (Exhibit "P").

10

Pa 131

**B.    Besides Emanuel Claitt's Testimony, No Direct Evidence Exists Against Tillery**

20.    As the Superior Court acknowledges, the case rested entirely on Emanuel Claitt's testimony.

21.    No physical evidence from the scene, of any sort, was presented as evidence against Tillery.

22.    No fingerprints were taken at the scene of the shooting. NT 10:83.[2]

23.    The "set of car keys" described in the Superior Court's summary (*Id.,* p. 2) were actually identified at the scene. The keys belonged to Fred Rainey, who was known to the Philadelphia police. Despite this, Rainey was never charged for the shootings. NT 13:12.

24.    Eighteen hundred dollars was recovered from the scene of the shooting. The money was later released to Alfred Clark. NT 13:31.

25.    Alfred Clark, who Claitt described as "the leader of the North Philadelphia branch" of the Philadelphia "black mafia", was detained by police in a car stop shortly after the shooting. Clark was never charged, either. NT 13:43-44.

---

[2]    Petitioner indicates trial transcript pages in the format NT xx:yy. The number following NT (xx) is the date, in May 1985, of the testimony. The number following the colon (yy) is the page number.

26.     A large plastic bag containing drugs, coats, a hat and glasses were also found in the poolroom. None of this evidence was linked to Tillery. NT 13:8; 13:33.

27.     The surviving victim, John Pickens, made a statement to a homicide detective while in the hospital, and also made a written statement. Exhibit "E". Pickens stated that "Dave" and "Rickie" committed the shooting. No charges were brought against Tillery, nor were they brought against anybody else, as a result of Pickens' statement. NT 13:56-57. Pickens did not name Tillery, and affirmatively denied that William Franklin, Tillery's alleged co-conspirator, was involved when shown Franklin's police photo.

28.     Pickens was not a witness at William Franklin's trial in November-December 1980. Nor was he a witness at Tillery's trial in May 1985. The Commonwealth never subpoenaed Pickens as a witness at Tillery's trial at all.[3]

_____

[3]     During preparation for his trial, Tillery requested that his trial attorney, Joseph Santaguida, locate John Pickens as a witness. Santaguida did not do so, nor did he request a missing witness charge. Pet'r's 1st PCRA Pet., 1996, p. 3 (Exhibit "Q"); Pet'r's Br., *Tillery v. Horn,* 142 F. App'x. 66 (3rd Cir. 2005) (No. 03-3616).
        Petitioner later learnt that, during William Franklin's trial, Santaguida had advised John Pickens not to testify on Fifth Amendment self-incrimination grounds. During Franklin's trial, Santaguida had stated that Pickens could not be located.

29.     Despite the existence of physical evidence linking other individuals to the shooting, the detention of Alfred Clark shortly afterwards, and the failure of John Pickens to identify either Tillery or Franklin, no individuals were charged and the case remained "unsolved" until April/May 1980, when homicide detectives questioned Claitt, who was in jail for a parole violation and had 28 open charges against him. It was only after Claitt made a written statement, on May 20, 1980, that an arrest warrant was issued for Tillery.

30.     Between January 1980 and May 1985, Claitt provided information to and/or testified for the Commonwealth against six other defendants: William Franklin, Fred Rainey, Robert Lark, James Brand, George Rose and Larry Frazier.

31.     Petitioner's arrest took place more than seven years following the original shooting. His alleged co-conspirator, William Franklin, was tried five years before Tillery, in November-December 1980.

---

Santaguida's advice to Pickens not to testify on the basis of self-incrimination was the basis for Tillery's first PCRA petition and first federal habeas petition, which claimed ineffective assistance of counsel and an actual conflict of interest. Exhibits "Q", "S", "T". These claims are not raised in the instant petition. However, Petitioner explains this history to emphasize that he *assiduously pursued* the issue of presenting Pickens, at his own trial, as an exculpatory witness.

13

32.     The prosecutor at Tillery's trial, Barbara Christie, secured Robert

Mickens ("Mickens"), also a jailhouse informant, to testify as a corroborating

witness. He alleged role was as a lookout on the street at the time of the shootings;

he testified that he spoke with Tillery outside the poolroom and heard shots while

standing watch outside.

33.     The evidence against Tillery consisted entirely of the testimony of

Emanuel Claitt and Robert Mickens. The only direct evidence supporting the

Commonwealth's claim that Tillery committed the shooting came from Emanuel

Claitt.

## C.     The Declarations of Emanuel Claitt

### 1.     Claitt's Trial Testimony

34.     The Superior Court's summary of Claitt's testimony follows. As

discussed following the summary, Claitt's testimony is false, and the summary is

also an inaccurate summary of the trial testimony in several respects. Tillery does

not concede the veracity of these facts; he reproduces this summary solely to

provide context for the declarations which follow.

> "Claitt testified that from 1976 until 1980, he engaged in drug dealing and
> extortion as a member of the Philadelphia "black mafia". The organization
> divided the city into sections for business purposes. Alfred Clark was the
> leader of the North Philadelphia branch. He held the rank of first lieutenant

14

and had 'the last word for all business in the city. Sylvester White directed the West Philadelphia branch. John Pickens also dealt drugs in West Philadelphia. During the [1970s], appellant held the rank of first lieutenant and 'had control of the entire city as far as methamphetamines is concerned . . . ' Claitt received his heroin supply from Clark and his methamphetamine supply from appellant. Clark and appellant were partners in the heroin and methamphetamine trade. Claitt characterized appellant as Clark's 'right hand man'.

On the night of October 20, 1976, Claitt, Clark, appellant, James Ravenell and [Fred] Rainey met at the home of Dana Goodman at 59th and Woodbine Streets to discuss a disagreement between Goodwin and Pickens over drug selling in West Philadelphia. Pickens arrived with Hollis and argued with Clark about a transaction in which Clark disposed of drugs claimed by Pickens at the expense of Pickens. During the argument, Hollis called Clark a 'gangster'. He then grabbed Clark by the collar, took out a pistol, slapped Clark in the face with the gun and pointed it at Clark as if he were about to shoot. Pickens stopped Hollis from firing the weapon, but appellant said that Hollis 'would have to die for what he did'. Although White was not present, Clark said he would talk to him and arrange a meeting at Franklin's poolroom to settle the dispute.

Thereafter, a group consisting of Clark, Claitt, Rainey, Ravenell and appellant met White at a mosque at 13th Street and Susquehanna Avenue in North Philadelphia. The group then drove to Franklin's poolroom. When they arrived at the poolroom, appellant accused White of setting up the earlier incident and demanded a meeting on Friday, October 22, 1976, to which White was to bring Pickens and Hollis. White agreed to the demand.

On the evening of Friday, October 22, 1976, Clark met the group outside the mosque. Clark made everyone surrender their weapons because a peaceful meeting was planned. The group then drove to the poolroom at Huntingdon and Warnock Streets. When they arrived, Clark instructed Claitt to remove two more guns from the group and then guard the door. Additionally, appellant arranged for one of his couriers, Robert Mickens, to watch outside the poolhall for police.

15

Inside the poolhall, appellant and Franklin sat at opposite ends of a table. Appellant told Hollis to apologize, but Hollis refused. Following a nod to Franklin, Appellant reached under the table and pulled out a gun. Franklin also reached under the table and pulled out a weapon. Appellant then shot Hollis in the back. When Pickens protested, appellant shot Hollis again and Franklin then shot Pickens. Pickens proceeded to run through a locked door shattering the glass.

William Arnold arrived immediately after the shootings and discovered Pickens holding his stomach. Pickens had collapsed from the wound. Arnold helped him to a house at 2527 North 11th Street where the police found him."

- *Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563 A.2d 195, pp. 3-5 (Pa. Super. 1989) (unpublished memorandum) (Exhibit "P").

35.    Claitt testified at trial that he first spoke to police in "Spring 1980". NT 14:8. He later narrowed this timeframe to April-May 1980. NT 14:78. He testified that sometime after March 18, 1980 and before May 20, 1980, he was questioned by a homicide detective named Brassey regarding the murder of Samuel Goodwin. NT 14:11-14. He was told that he was under investigation for the murder, "and [Goodwin's] death, like, somewhat touched me, you know." NT 14:13. Claitt "felt kind of bad about [the detective] accusing me of that." *Id.*

36.    On May 20, 1980, Claitt gave a written statement to Detective Lawrence Gerrard, inculpating Tillery and William Franklin. NT 15:8. He testified that he made no agreement with the police prior to making that statement. NT

16

14:10-11, 78; 15-11. He specifically denied that there was any agreement for leniency on open cases, and also denied that he discussed any sort of leniency on open cases with his attorney. NT 15:13-14. He was impeached with a statement from Franklin's trial, in which he had been asked whether he was hoping for a deal and had responded "[e]ventually I was looking for something." Claitt denied this testimony from Franklin's trial; he testified that he never hoped for any deal when he made his statements to police. NT 15:11.

37.     Under cross-examination, Claitt eventually admitted that his attorney was "sure that my punishment would be tempered with some type mercy behind me coming forth." NT 15:14.

38.     Petitioner has unable to obtain a copy of Claitt's May 20, 1980 written statement. Further discovery will be necessary to locate a copy.

### 2.     Claitt's Declaration of May 4, 2016

39.     Emanuel Claitt made a verified declaration, under penalty of perjury, on May 4, 2016. Along with Robert Mickens' declaration, it led to the filing of Petitioner's third PCRA petition. It states:

> "I submit this declaration stating that I lied when I testified at the trial of Major Tillery in May 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.

I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.

I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.

I was in prison in 1980 on serious charges and I was approached by Philadelphia detectives Larry Gerrard and Ernest Gilbert. They threatened to charge me with the murder of Samuel Goodwin. I had eight or nine open cases, at least three of them were felonies with a lot of years of prison time.

I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder.

Detectives and prosecutors ADA Lynn Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Lynn Ross, Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted to arrest him. So Franklin was tried in December 1980 and I falsely testified against

18

William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed for another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This argument supposedly took place in the home of Dana Goodman. I testified that Major Tillery was there and after an argument and pistol slapping of Clark by Hollis, Major Tillery said that 'Hollis would have to die for what he did'.

This was not true. I was not at any such meeting and I didn't have any personal knowledge of this supposed argument and threat made by Major Tillery.

I also testified at Major Tillery's trial that after the argument in Goodman's house a group that included me as well as Clark and Major Tillery met at a mosque in North Philadelphia and drove a few blocks to a poolroom owned by William Franklin to demand Sylvester White, the head of the West Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this actually happened.

I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified that I heard gunshots in the pool hall, saw Pickens and Hollins [sic] shot and that Major Tillery and Franklin were in the pool hall and that they were the shooters.

19

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the 'black mafia' and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and froth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified that I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on the front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie, Len Ross, Roger King interviewed me, and worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

20

Pa 141

After Major Tillery's trial I was told I hadn't done good enough, that I 'straddled the fence'. In 1989 I was convicted of felony charges and spent 13 1/2 years in prison for something I didn't do and [for which I was] framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors."

### 3.    Claitt's Declaration of June 3, 2016

40.    Emanuel Claitt made a supplemental verified declaration, under

penalty of perjury, on June 3, 2016. It states:

"I submit this supplemental declaration about my false, manufactured testimony against Major Tillery and William Franklin in the November 1980 and May 1985 trials for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved [in] or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge of the shootings at the poolroom on October 22, 1976, that I wasn't there then or at the argument at Dana Goodman's house or meetings before the October 22, 1976 shootings.

For example: In our meetings I said ["]you know I wasn't there - you have to fill in the blanks.["] Detectives Gerard [sic], Gilbert, Lubiejewski, Lt. Shelton and ADA Ross would tell me, "you've got to say it this way." I was told "we've got to bring him down - you've got to help us." That meant I should lie. Barbara Christie told me: "You're the best. You should have been a lawyer." That meant I knew how to lie.

The prosecutor against William Franklin in 1980 was Lynn Ross. I met with him as well as ADAs who worked with Barbara Christie soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert and Lubiejewski. I met with ADA Roger King who also had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door, She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact I got one and a half-years [sic].

22

Pa 143

When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true.

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was 'open' and that there were no agreements about leniency and sentencing.

She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to. But my testimony that there was no plea deal was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing/firebombing in 1979 and 1980 that I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at these trials and that my false testimony was manufactured by the ADAs and police until now. It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors."

41.     Emanuel Claitt subsequently affirmed the contents of both

declarations in a video recording dated August 3, 2016. A copy of the recording is

appended to this petition. Exhibit "C".

42.     Emanuel Claitt now states that the entirety of his trial testimony was false. The Commonwealth manufactured all of Claitt's substantive testimony, including the events of October 22, 1976, the meetings leading up to the shooting, as well as Tillery's alleged attack on Claitt after the trial of William Franklin, which was invented to ascribe a retaliatory motive to Tillery.

43.     Claitt was also instructed to lie about his plea agreements with the Commonwealth. He testified that he had no deal regarding his open charges, when in fact the robbery charges from his arrest of April 13, 1983 were later dismissed, and his robbery charges from May 1980, which were never disclosed to the defense at all, were also later dismissed. Claitt also made an undisclosed deal with the Commonwealth to receive reduced time on the charges to which he pled guilty on November 28, 1980. These charges and deals are detailed below in Part G of this Petition ("Plea Agreements and Open Charges Suppressed by the Commonwealth").

44.     Claitt also testified, falsely, that he had no meetings with Assistant District Attorney Barbara Christie except prior to Tillery's trial. In fact, ADA Christie threatened him with charges in the murder of Samuel Goodwin, as well as additional charges.

45.     Claitt states that he received numerous sexual visits as an inducement for his false testimony, and that he was used by the Commonwealth to pressure Mickens into testifying falsely.

46.     All these facts are new, were not previously known to Petitioner, and have never been asserted in any prior proceeding besides his third PCRA petition in 2016.

## D.     The Declaration of Robert Mickens

### 1.     Mickens' Trial Testimony

47.     Robert Mickens was not a witness at William Franklin's trial in 1980. He became a prosecution witness against Tillery in a statement given to detectives on September 26, 1984, eight years after the shootings. He became a prosecution witness after he had originally agreed to be a witness for Tillery.

48.     Mickens was arrested on February 28, 1984 on charges of robbery and rape,  and faced twenty-five years of imprisonment if convicted.

49.     On September 26, 1984, Mickens gave a written statement in which he stated that he ran into Alfred Clark, Major Tillery and William Franklin on the steps of the poolroom on the night of the shooting. In the statement, Mickens stated that Alfred Clark asked him "where [he] was gone at," and Clark then said "we are supposed to be having a meeting here and a couple of guys are supposed to be

coming from West Philly." Alfred then said, "You know how the police is if they see all these cars out here - they will start asking questions and knocking on doors." Clark then "asked me to look out to see if the police came and if they did to tap on the glass." Exhibit "I".

50.     In April 1985, a month before Tillery's trial in May 1985, Assistant District Attorney Barbara Christie met with Mickens. NT 21:109. Mickens looked over the statement, "corrected all errors that [he] made," and then signed his initials. *Id.* At this meeting, Mickens changed his statement to say that **Major Tillery,** instead of Alfred Clark, had asked him "where [he] was gone at," and that Tillery, not Clark, had said "we are supposed to be having a meeting here and a couple of guys are supposed to be coming from West Philly," and that Tillery, instead of Clark, said, "[y]ou know how the police is if they see all these cars out here - they will start asking questions and knocking on doors." Statement of Mickens, Sept. 26, 1980, p. 2 (Exhibit "I").

51.     At the time Mickens made these alleged "corrections" to his statement at ADA Barbara Christie's behest, Alfred Clark was already dead. Statement of Mickens, Sept. 26, 1984, p. 5 (Exhibit "I").

26

52. Mickens testified at trial that he made the corrections of his own accord, and that nobody had coached him to make them. NT 21:115.

53. Mickens testified that while walking down the street in front of the poolroom at approximately 9:45 p.m. on the night of the shooting, he was asked by Tillery to be an outside "lookout" to watch for patrolling police cars. NT 21:36.

54. Mickens testified that Tillery was on the poolroom steps with Franklin and Alfred Clark. NT 21:35-60. He testified that Tillery asked him "can I look out for the police. Because they was having a meeting there. Couple of people coming in from West Philly . . . I told him I would look out. He said if the police came, to tap on the glass of the poolroom." NT 21:36.

55. In Mickens' written statement of September 26, 1980, he stated that Alfred Clark had told him to tap on the glass of the poolroom if police came. Statement of Mickens, Sept. 26, 1980, p. 2 (Exhibit "I").

56. Mickens testified that he did not witness, and did not know, what happened inside the poolroom, but "some time after," heard gunshots. NT 21:97.

57. Mickens also testified that he was asked to, and agreed to be, an alibi witness for Tillery back in 1976, a few days after the shootings. NT 21:15. He originally testified that he did it to keep Tillery's friendship, but later testified that he did it because he was in fear for his life if he refused. NT 21:19, 58.

27

58.     Mickens was a surprise witness for the Commonwealth, kept secret from Tillery via a protective order pursuant to then-Pennsylvania Rule of Criminal Procedure 305(F), until he was called to the witness stand. The basis for the protective order was that Mickens feared retaliation from Tillery if his identity as a prosecution witness was disclosed. The Commonwealth disclosed Mickens' September 24, 1984 statement just minutes before he testified.

59.     Petitioner objected to the *in camera* proceeding which led to the protective order, on the grounds that there was no basis for a finding that Mickens needed protection from Tillery. The court overruled the objection and preserved the record of the ex parte petition. NT 21:2-13.

### 2.      Mickens' Declaration of April 18, 2016

60.     Robert Mickens gave a verified declaration on April 18, 2016, under penalty of perjury. It states:

"In May 1985 I falsely testified as a witness for the Philadelphia County District Attorney in the prosecution of Major George Tillery (CP-51-CR-0305681-1984) on murder charges.

The testimony I gave at that trial was false, manufactured by the prosecutor, Assistant District Attorney Barbara Christie.

I was coerced and promised favors if I falsely testified against Major Tillery.

28

Pa 149

I was arrested on February 28, 1984 on charges of robbery and rape and faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I 'worked with [her] on the Major Tillery case' she 'guaranteed' I wouldn't be sent upstate on my robbery and rape case and would be "protected".

ADA Christie and her homicide detectives, John Cimino and James McNeshy, repeatedly brought me in for questioning on a number of robbery and murder cases, asking me to become a prosecution witness against Major Tillery.

On one occasion ADA Christie showed me what looked like a paper signed by Major Tillery saying that I was going to be an alibi witness for him. I told her I was.

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men.

When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known 'snitch'. I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who [had] already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but [was] never taken from the van.

29

Pa 150

Claitt told me I was 'pretty hemmed up' and that Major Tillery was a 'slime', that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the false grounds that I needed a protective order to protect me from Major Tillery.

That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis [sic]. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the shooting of John Hollis [sic] and John Pickens. That was totally false. My entire testimony was scripted and rehearsed by ADA Barbara Christie.

I agreed to give this false testimony because I was I [sic] promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my own guilt for falsely testifying against Major Tillery and my fear of retaliation by the prosecution and police.

30

Much in my life has changed. I want to make amends for falsely testifying against Major Tillery. I am willing and ready to be a witness in any proceeding brought to challenge his conviction."

61.     Robert Mickens states that his trial testimony was "totally false," and that his "entire testimony was scripted and rehearsed by ADA Barbara Christie". He never saw Tillery, Alfred Clark, William Franklin or anybody else near the poolroom on the evening of October 22, 1976. The entire narrative he provided in his written statement of September 26, 1984 was false.

62.     Mickens also lied about his plea agreements with the Commonwealth. He testified at trial that he had an "open plea" on his rape and robbery charges. In fact, he had an agreement with the Commonwealth that he would do no prison time. After Tillery's trial, Mickens received probation.

63.     Mickens also states that he received sexual visits as an inducement to testify falsely. Like Claitt, he recounts being in a police van with Claitt so that Claitt could put pressure on him to testify against Tillery.

64.     All these facts are new, were not previously known to Petitioner, and have never been asserted in any prior proceeding besides his third PCRA petition in 2016.

### E. Corroborative Evidence: Helen Ellis, Denise ("De De") Certain and the Roundhouse Logs

65.     Rachel Wolkenstein, an attorney assisting Tillery, executed a

declaration on September 6, 2016 in which she stated:

> "I am an attorney at law, admitted to practice in the State of New York since 1974, residing in Brooklyn, NY.
>
> This declaration is submitted in support of the Supplemental Petition filed by Petitioner.
>
> Since approximately February 2015, I have assisted Major Tillery *pro bono*, in his efforts to overturn his conviction, to obtain and review his court records, and those of the witnesses against him, to conduct limited investigation and help him find *pro bono* legal representation in upcoming legal proceedings. In April 2016 I had [a] phone call with Robert Mickens in which he said that he would provide an affidavit and was willing to testify on behalf of Major Tillery.
>
> We met on April 18, 2016 and for the first time [he] described why he had lied when he testified against Major Tillery at his trial. Robert Mickens recounted to me the combination of threats and favors he received from detectives and prosecutors to coerce and induce him to testify falsely. He described how the prosecutors coached him to answer questions about what he supposedly saw on the night of the shootings and to deny he received any plea deals.
>
> I typed up the key points of what he told me. This was reviewed by Mr. Mickens and he signed his verified declaration that same day.
>
> Mr. Mickens disclosed why his false testimony was sought by the prosecution and police and how it was obtained. He disclosed the van ride with Emanuel Claitt between the Roundhouse and the county prison on State Road during which Mr. Claitt pushed him to testify against Major Tillery.

32

Mr. Mickens also disclosed that homicide detectives arranged for his girlfriend to join him in the Roundhouse for a sexual encounter. Mr. Mickens was quite emotional in describing this and expressed pain and regret about his role in Major Tillery's conviction.

It was a surprise when shortly after this a lead resulted in learning that Emanuel Claitt, whose testimony was the sole evidence against Major Tillery, was willing to meet and indicated that he needed to finally tell the truth about his false testimony against Major Tillery and William Franklin, who was the co-defendant in the case and was tried three years earlier than Petitioner.

I met with Emanuel Claitt on May 3, 2016 and he told me that his trial testimony against Major Tillery and William Franklin was totally false, that he [Claitt] wasn't even in or near the poolroom that night and he had no personal knowledge of the [sic] who shot Joseph Hollis and John Pickens. Emanuel Claitt described the process of the detectives and prosecutors obtaining his false statement and preparing him to testify. I took notes in speaking with Mr. Claitt and met him the next morning, May 4, 2016 with a typed up declaration. He made some corrections and signed the declaration under penalty of perjury. I spoke with him again on the phone and in person on June 3, 2016 and he signed a supplemental declaration.

I met with Emanuel Claitt again on August 3, 2016. During this meeting he gave me the names of three of the women who he had sex with while in police custody. One woman, Barbara Claitt[,] is deceased. He also told me that Helen Ellis, who is the mother of three of his children, saw him in the Roundhouse a number of times for the purposes of having sex. A third woman, Denise Certain ('De De') was another woman who he saw at the Roundhouse.

On August 3, 2016, Emanuel Claitt agreed to be videotaped. I taped Emanuel Claitt as he reaffirmed his sworn declarations and read a statement that is a composite of his two verified declarations. This videotape is submitted as an exhibit to the Supplemental Declaration. [citation omitted.]

I located Helen Ellis on August 4, 2016 outside her home and spoke with her briefly. She acknowledged that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him.

Based on the information received from Emanuel Claitt, I located Denise Certain.

With the information received from Robert Mickens, that included being put in a police van alone with Emanuel Claitt to give Claitt the opportunity to persuade Mickens to falsely testify against Major Tillery, and that homicide detectives had facilitated sexual encounters for both men with their respective girlfriends in the Roundhouse, I attempted to obtain documentary corroborative evidence.

This included research in public records and the filing of requests pursuant to the RTKL for: Roundhouse log-in records for periods from 1980 through 1985, covering Emanuel Claitt's and Robert Mickens' periods of incarceration; and prisoner transport records between the PAB building and the detention center on State Road; and regarding Robert Mickens, transport records between the Northhampton County prison and Philadelphia in late 1984-1985. These requests were denied, appealed and reviewed. Both the Philadelphia Police Department and Northhampton County state they have searched and cannot locate these records and were likely not retained . . .

I learned of other murder convictions from the same years (mid-80s) that involved the same detectives as those who worked with Emanuel Claitt, Det. Lawrence Gerrard and Ernest Gilbert and a similar *modus operandi* in obtaining convictions - providing sexual favors to prisoner informants.

On August 25, 2016[,] I visited Andre Harvey, a lifer imprisoned at SCI Graterford, and he gave me documents that he had acquired when he challenged his conviction in a 1995 PCRA, in part on grounds that the prosecution witnesses against him had been provided sexual favors to falsely testify against him. Detectives Gerrard and Gilbert were central to that.

34

Andre Harvey gave me copies of the 17 pages of 'sign-in and out logs at the Roundhouse' secured by his then investigator Paul J. Paris. This was just 17 pages of 80 from the period of June 1 - December 31, 1983. In looking over those pages, I saw that on page 192, the log-in sheet for December 14, 1983, Emanuel Claitt signed in under Det. Gilbert and his girlfriend Denise Certain signed in under Det. Gerrard. Andre Harvey said that he doesn't have any other portion of the Roundhouse log in sheets.

On behalf of Petitioner, Major Tillery, I am continuing in the search for additional records that corroborate the Commonwealth misconduct that permeates the conviction of Major Tillery for crimes he did not commit on August 3, 2016."

66.     A copy of the Police Administration Building (PAB) log-in sheet for December 14, 1983, provided to Tillery by Andre Harvey, is attached to this Petition. Exhibit "G".

67.     In the PAB log book for December 14, 1983, Detective Lawrence Gerrard signed "Manny Claitt" into the homicide interview room at 8:50 a.m. No exit time is provided. At 11:45 a.m., "Denise Certain" was signed into the homicide interview room, leaving at 1:30 p.m., establishing overlapping visiting times. Exhibit "G".

68.     This is not the first time that Detectives Gerrard and Gilbert have been found engaging in identical misconduct. *Commonwealth v. Lester,* 572 A.2d 694 (Pa. Super. 1990) (voluntary manslaughter; reversal and new trial).

69.     The Declaration of Ms. Wolkenstein establishes the following:

- Emanuel Claitt stated (Declaration, May 4, 2016) that "I was allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation." The Wolkenstein Declaration gives the identities of three of these women.

- Two of the women named by Claitt, Helen Ellis and Denise Certain, verify his account. Helen Ellis admits to the sexual visits, and Denise Certain's signature is in the PAB log book, verifying that they were, in fact, admitted to the PAB interview rooms by detectives to have sex with Emanuel Claitt. They thus confirm that police wrongly provided sexual incentives to induce Claitt to testify falsely. This misconduct was not disclosed to Tillery.

- The Roundhouse logs provided by Andre Harvey verify that, on December 14, 1983, Denise Certain did, in fact, visit Emanuel Claitt for sex.

- The evidence provided by Ellis, Certain and Harvey supports Mickens' statement that:

"I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an

36

interview room in the police headquarters so that we could have sex."
- Declaration of Robert Mickens, April 18, 2016 (Exhibit "D").

- Tillery has assiduously attempted, using public records searches, to
  obtain additional documentary evidence corroborating both the sexual
  inducements offered by police and the police's placement of Claitt
  with Mickens to pressure Mickens into testifying falsely against
  Tillery.

x.    All these facts are new, were not previously known to Petitioner, and
have never been asserted in any prior proceeding besides his third PCRA petition
in 2016.

## F.    Specific Instances of Prosecutorial Misconduct Shown By Claitt's and Mickens' Declarations

70.    The declarations of Claitt and Mickens nullify the entirety of the
Commonwealth's evidence against Tillery at trial. The two were the only alleged
fact witnesses, and Claitt supplied the only direct testimony that Tillery committed
the shooting. However, for purposes of clarity and to assist the court's assessment
of the extensive prosecutorial misconduct in this case, Tillery enumerates specific
instances of trial testimony which these declarations, on their face, now
demonstrate to have been false.

37

71.    In addition to knowingly permitting false testimony, the

Commonwealth committed intentional prosecutorial misconduct by vouching for

the veracity of this perjured testimony, as well as affirmatively representing, during

hearings, sidebar conferences and in opening and closing statements, that the

evidence was reliable and that there were no agreements for leniency between the

Commonwealth, Claitt and Mickens.

72.    These instances are not exhaustive but rather illustrative. The

testimony of Claitt and Mickens will reveal additional instances of perjury and

prosecutorial misconduct.

### 1.    The Commonwealth Solicited Perjured Testimony Concerning the Circumstances Leading to Claitt's Statement to Police

73.    Claitt testified at trial that he was questioned by a homicide detective

named Brassey concerning the circumstances of Samuel Goodwin's death in April-

May 1980. Claitt "felt kind of bad" on learning of Goodwin's death and revealed

information, which he initially claimed to have obtained from third parties, [4]

_____

[4]    Claitt initially testified that he told police he had obtained the information about the Hollis/Pickens shooting from third parties. On cross-examination, he denied that he had said this, and claimed he stated from the very beginning that he had personally witnessed the shootings. NT 14:13, 16:8-10.

38

concerning the death of Goodwin, and also supplied information regarding the

shooting of Hollis and Pickens:

> "Q.    Why did you talk to the police in 1980?
> A.    Well, homicide detective by the name of Brassey came to visit me at the institution, Philadelphia Detention Center and he was questioning me in reference to a killing of Samuel Goodwin who was a friend of mine.
>
> . . .
>
> Q.    All right. And what if anything - continue, please. You say a detective came to question you concerning the death of Samuel Goodwin. How was - when was Mister Goodwin killed? Do you know?
> A.    March 18th, 1980.
>
> Q.    All right. Continue, Mr. Claitt.
> A.    He came and questioned me as to say that he had heard - they had heard a homicide as far as their informants were concerned. That I knew the incident and the things that occurred to bring about Samuel Goodwin's death, which at the time I said to him that - that he was wrong in accusing me and whereever he got this information. They were wrong.
>
> And he said to me, he said that, well, I'm the one. I'm under investigation for it. And he wanted me to know that - you know, that they were going to get to the bottom of it.
>
> So during the discussion, I had told him, you know, like, Mister Goodwin was a close friend of mine and his death, like, **somewhat touched me** that, you know. **I felt kind of bad** about him accusing me of that.
>
> But I did let him know at that time - I said, you accusing me which you know I'm not - not the guilty one. And I told him information regarding who was responsible for Goodwin's death.
>
> . . .

39

Q. Okay. During the course of that conversation, or contact, did you have occasion to further speak to the police concerning your knowledge of the death of Joseph Hollis?

A. Yes.

Q. All right. And what if anything caused you to speak to the police at that time in the Spring of 1980 concerning the death of Joseph Hollis and any other matters you spoke to them about?

A. Well, the reason was I told the detective after telling him about I had nothing to do with the Goodwin incident and I knew who was responsible. He asked me did I want to come down and talk to his lieutenant in detail about the incident that I knew about which I mentioned that **I knew and seen a witness** shoot to death Joseph Hollis in the poolroom October 27th - 22nd, 1976.

And he asked me did I want to come down and talk to his lieutenant about it. I told him that I would - I would like to talk about the incident but I wanted to have - confer with my lawyers first.

Q. And did you do so?

A. Yes, I did."

- Direct examination of Emanuel Claitt, NT 14:11-14 (emphasis added)

74. Claitt also testified that, prior to his written statement to the police in April-May 1980, he had no agreement for leniency with the police or the District Attorney's office. NT 14:9-10, 14:78.

75. Contrary to his trial testimony, Claitt did not spontaneously volunteer information about Samuel Goodwin out of altruism, or because he "felt kind of bad". In actuality, Claitt was approached by detectives Larry Gerrard and Ernest

40

Pa 161

Gilbert while "in prison in 1980 on serious charges." Declaration of Emanuel Claitt, May 4, 2017 (Exhibit "A"). Claitt was not simply told that he was merely "under investigation", following which he had an attack of conscience because Samuel Goodwin was his friend. In actuality, Detectives Gerrard and Gilbert "threatened to charge [Claitt] with the murder of Samuel Goodwin." *Id.*

76. The police targeted Tillery during their interrogations of Claitt. Detectives Gerrard and Gilbert "really wanted information to get Major Tillery for murder." *Id.* Claitt was "threatened that [he] would get maximum prison time if [he] didn't cooperate to get Tillery and Franklin". *Id.*

77. Claitt states that "prosecutors ADA Leonard Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges *and I wouldn't be charged in the murder of Samuel Goodwin . . .*" Declaration of Claitt, May 4, 2016 (emphasis added) (Exhibit "A").

78. At Tillery's trial, Claitt testified that he had never spoken to ADA Barbara Christie before Tillery's trial. NT 16:101. On cross examination, he was impeached using his testimony in an unrelated case (Philip Frazier) in which he had testified that he had, in fact, spoken with Christie before. In response, Claitt

admitted that he had spoken with Christie in 1982, but claimed that their conversation never concerned Tillery's case. NT 16:101-102.

79.     In fact, Claitt did meet with Barbara Christie concerning Tillery's trial at the very beginning, in April-May 1980 when he was incarcerated for a parole violation. Christie had an agreement with him that he would not get state time in his charges (see Part G, below, on plea deals) and she agreed not to charge Claitt in the murder of Samuel Goodwin. Declaration of Emanuel Claitt, May 4, 2017 (Exhibit "A").

80.     ADAs Christie, Ross and King also coached Claitt on what to say during the trial. Claitt stated during those meetings "you know I wasn't there - you have to fill in the blanks." Declaration of Emanuel Claitt, June 3, 2016 (Exhibit "B").

### 2.     The Commonwealth Suppressed an Attempted Recantation by Emanuel Claitt

81.     Emanuel Claitt states that he attempted to recant his false testimony after Franklin's trial. He was threatened by Lieutenant Bill Shelton, who stated that "[Claitt] would be framed on another murder" if he recanted. (Declaration, May 4, 2016.)

82.     Claitt's attempted recantation of his perjured testimony was not

disclosed to Tillery prior to trial.

### 3.     The Commonwealth Solicited Perjured Testimony Concerning Mickens' Meetings With ADA Barbara Christie

83.     Robert Mickens was arrested on February 28, 1984 on charges of

robbery and rape,  and faced twenty-five years of imprisonment if convicted.

84.     On September 26, 1984, Mickens gave a written statement in which

he stated that he ran into Alfred Clark, Major Tillery and William Franklin on the

steps of the poolroom on the night of the shooting. In the statement, Mickens stated

that Alfred Clark asked him "where [he] was gone at," and Clark then said "we are

supposed to be having a meeting here and a couple of guys are supposed to be

coming from West Philly." Alfred then said, "You know how the police is if they

see all these cars out here - they will start asking questions and knocking on

doors." Clark then "asked me to look out to see if the police came and if they did to

tap on the glass." Exhibit "I".

85.     In April 1985, a month before Tillery's trial in May 1985, Assistant

District Attorney Barbara Christie met with Mickens. NT 21:109. Mickens looked

over the statement, "corrected all errors that [he] made," and then signed his initials.

*Id.* At this meeting, Mickens changed his statement to say that **Major Tillery,**

instead of Alfred Clark, had asked him "where [he] was gone at," and that Tillery, not Clark, had said "we are supposed to be having a meeting here and a couple of guys are supposed to be coming from West Philly," and that Tillery, instead of Clark, said, "[y]ou know how the police is if they see all these cars out here - they will start asking questions and knocking on doors." Statement of Mickens, Sept. 26, 1980, p. 2 (Exhibit "I").

86.    At the time Mickens made these alleged "corrections" to his statement at ADA Barbara Christie's behest, Alfred Clark was already dead. Statement of Mickens, Sept. 26, 1984, p. 5 (Exhibit "I").

87.    Mickens testified at trial that he made the corrections of his own accord, and that nobody had coached him to make them, despite the presence of ADA Christie. NT 21:115.

88.    Mickens also testified that, between his arrest in February 1984 and his statement in September 1984, he was not talking to the police about any information concerning homicides. NT 21:102.

89.    Mickens testified that, in May of 1984, he had received "a threatening notice", not related to Tillery's case. After receiving this notice, he "took it to the administration and they put me in protective custody." NT 21:100.

90.    Four months later, allegedly because of "rumors going around that [he] was talking to the police about different murder cases," he decided to speak to the police, in September 1984, concerning a number of murder cases, including the murder of Joseph Hollis, leading to his statement. NT 21:100-101.

91.    Mickens testified that, between February and September 1984, he spoke to Tillery while they were both incarcerated on "D" block, that Tillery said that he didn't believe the rumors were true, and that Mickens stated that he was not speaking to the police. NT 21:104. At this point, Mickens gave an ambiguous answer when questioned by ADA Christie:

"Q.    With regard to those rumors, what did you say to the defendant were you  testifying concerning, other than matters - what did you tell the defendant about these rumors [that you were talking to the police]?
A.    I told him I wasn't.

Q.    And were you at that time?
A.    *I had - I had speak to the police.*

Q.    All right . . ."

- Redirect examination of Mickens, NT 21:107-108 (emphasis added)

92.    In fact, as Mickens now states, he was already talking to the police during the period from February - September 1984. The police were specifically

45

targeting Tillery, and threatened Mickens with jail time on his open charges, as

well as making promises of leniency to him. As Mickens relates:

> "[Following my arrest on February 28, 1984 on robbery and rape charges,]
> ADA Christie told me that if I 'worked with [her] on the Major Tillery case'
> *she 'guaranteed' I wouldn't be sent upstate on my robbery and rape case and
> would be 'protected.'*
>
> ADA Christie and her homicide detectives, John Cimino and James
> McNeshy, repeatedly brought me in for questioning on a number of robbery
> and murder cases, asking me to become a prosecution witness against Major
> Tillery. On one occasion ADA Christie showed me what looked like a paper
> signed by Major Tillery saying that I was going to be an alibi witness for
> him. I told her I was."
>
> - Declaration of Robert Mickens, Apr. 18, 2016 (emphasis added) (Exhibit
> "D")

93.     Mickens did not spontaneously decide that he was going to speak to

the police in September 1984. His testimony at trial that he spontaneously decided

to approach the police was false. He was approached by ADA Christie and the

police with the specific objective of convincing him not to testify as an alibi

witness for Major, and to turn him into a witness for the Commonwealth.

94.     Mickens made an agreement with police and prosecutors that he

would receive protection, leniency on his robbery and rape charges and visits for

sex in exchange for testifying against Tillery. These meetings and the terms of the

46

agreement were not disclosed to Tillery. Mickens falsely testified at trial, with the

knowledge of ADA Christie, that he decided to come forward sponateneously.

### 4. The Commonwealth Suppressed Evidence That Claitt, On Behalf of the Commonwealth, Pressured Mickens

95.    Claitt states that, before Tillery's trial, "detectives instructed me to

persuade Robert Mickens to become a witness against Major Tillery. I was put in a

police van to ride alone with Mickens back and forth from homicide up to the

county holding prison on State Street, to make it clear to Mickens that he really

had no choice, except to testify against Major Tillery." Declaration of Emanuel

Claitt, June 3, 2016 (Exhibit "B").

96.    Mickens confirms this account:

"I was brought down from Easton, supposedly to meet with the homicide
detectives from Philadelphia. Instead I was put in a police van with Emanuel
Claitt, who [had] already testified against Major Tillery's co-defendant. I
rode back and forth from police headquarters to the county prison on State
Street with Claitt, but never taken from the van.

Claitt told me that I was 'pretty hemmed up' and that Major Tillery was a
'slime', that Major Tillery had been spreading the word that I was a snitch
and that I should testify against Major Tillery."

 - Declaration of Robert Mickens, April 18, 2016 (Exhibit "D").

97.     Claitt confirms that he lied at trial concerning his relationship with Mickens. He states "I knew Robert Mickens before [the trial] and lied at Major Tillery's trial when I testified I had never met or spoken with him."

98.     The Commonwealth was aware that Claitt had pressured Mickens into testifying falsely against Tillery. The fiction that Mickens was at risk for being a snitch was maintained by the Commonwealth in its application for a protective order under then-Pennsylvania Rule of Criminal Procedure 305(F), which prevented Mickens' identity from being disclosed until immediately before he was called as a witness.

99.     The Commonwealth was aware, at the time it applied for a protective order, that the order was based on false grounds. It concealed this information from Tillery, along with the fact Claitt was acquainted with Mickens and that they had themselves *instructed* Claitt to pressure Mickens into testifying.

### 5.     The Commonwealth Suppressed Evidence of Illegal Sexual Visits Permitted to Claitt and Mickens as Inducements to Testify

100.     Claitt states that police detectives and prosecutors arranged for sexual visits in exchange for his testimony, both in Tillery's case and other cases:

> "I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my

48

cooperation. Detective Larry [Lawrence] Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Roger King, Lynn [Leonard] Ross and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms."

- Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

101.   Claitt provided the names of three of the women who were involved in the sexual visits. One woman, Barbara Claitt, is deceased. Two of the women named by Claitt, Helen Ellis and Denise Certain, verify his account. Helen Ellis admits to the sexual visits, and Denise Certain's signature is in the PAB log book, verifying that they were, in fact, admitted to the PAB interview rooms by detectives to have sex with Emanuel Claitt.

102.   Petitioner was provided with pages from the Roundhouse log books from June 1- December 31, 1983 by Andre Harvey, an inmate imprisoned at SCI Graterford who had raised the same claims concerning wrongful sexual visitation provided to witnesses. In the pages he provided for December 14, 1983, Detective Lawrence Gerrard signed "Manny Claitt" into the homicide interview room at 8:50 a.m. No exit time is provided. At 11:45 a.m., "Denise Certain" was signed into the homicide interview room. She left at 1:30 p.m., establishing overlapping visiting times. Exhibit "G".

103.   Mickens stated that "I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex. Declaration of Robert Mickens, April 18, 2016 (Exhibit "D").

104.   The period of time that Mickens states Judy Faust was permitted to visit him corresponds to the length of Denise Certain's visit on December 14, 1983.

105.   No information about the wrongful sexual incentives provided to Claitt and Mickens was disclosed to Tillery by the Commonwealth.

### 6.   The October 20, 1976 Meeting, at Which Petitioner Allegedly Said "Hollis Would Have to Die", Never Happened

106.   At trial, Claitt testifed about an alleged meeting on the night of October 20, 1976 at the home of Dana Goodman, at 59th and Woodbine Streets, at which Alfred Clark got into an argument with Hollis and Pickens and was pistol-whipped by Hollis, leading Tillery to state that "Hollis would have to die for what he did."

107.   This meeting never happened. Claitt states that "I was not at any such meeting and I didn't have any personal knowledge of this supposed argument and

50

threat made by Major Tillery." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

### 7. The Conversation Between Alfred Clark and Sylvester White, Setting Up the October 22, 1976 Meeting, Never Happened

108.   At trial, Claitt testified that a group consisting of Alfred Clark, Sylvester White, Emanuel Claitt, Fred Rainey, James Ravenell and Petitioner met at a mosque in North Philadelphia and drove a few blocks to Franklin's poolroom. At the poolroom, Clark accused White of setting up the earlier pistol-whipping and demanded a meeting on October 22, 1976 at the poolroom.

109.   This meeting never happened. Claitt states: "None of this testimony [concerning the meeting at the mosque] was true. I had no involvement, if any of this actually happened." Declaration of Claitt, May 4, 2016 (Exhibit "A").

### 8. Emanuel Claitt Was Not Present During the Shooting on October 22, 1976

110.   Claitt states that his entire testimony concerning his presence at the scene of the shooting was false:

"I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard gunshots in the pool hall, saw Pickens and Hollins [sic] shot and that Major Tillery and Franklin were in the pool hall

and that they were the shooters."

- Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

111.   Claitt was not present at the shooting. The shooting did not transpire the way he described at trial, and Claitt certainly had no idea whether Petitioner was present at the poolhall on October 22, 1976.

### 9.   Robert Mickens Was Not Present During the Shooting on October 22, 1976

112.   Mickens states that his entire testimony concerning his presence at the scene of the shooting was false: "At trial I falsely testified that I was a look-out during the shooting of John Hollis [sic] and John Pickens. That was totally false. My entire testimony was *scripted* and rehearsed by ADA Barbara Christie." Declaration of Mickens, April 18, 2016 (emphasis added) (Exhibit "D").

113.   On September 26, 1984, Mickens gave a written statement in which he stated that he ran into Alfred Clark, Major Tillery and William Franklin on the steps of the poolroom on the night of the shooting. As previously noted, Mickens states that the entirety of his September 26, 1984 statement (as corrected under ADA Christie's direction in April 1985), along with the entirety of his trial testimony, was fabricated by the Commonwealth. Mickens was not asked to be a

52

lookout near the poolroom by Major Tillery, Alfred Clark, William Franklin or anybody else at all. He was not even present at the poolroom on October 22, 1976, and certainly did not hear any shots ring out in the poolroom.

114.   The Commonwealth knew, at trial, that Mickens' testimony was false. ADA Barbara Christie created the perjured testimony that Mickens would provide at trial.

**10.   The Commonwealth Solicited Perjured Testimony Concerning Petitioner's Involvement in the Firebombing of Frank Henderson's House**

115.   Claitt states that he "falsely accused Major Tillery of placing a fire bomb on the front porch of Frank Henderson on Church Lane." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A"). He states that "it was a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing/firebombing in 1979 and 1980 and that I testified to in August 1985." Declaration of Emanuel Claitt, June 3, 2016 (Exhibit "B").

53

### 11. The Commonwealth Solicited Perjured Testimony Concerning Petitioner's Attack on Claitt in 1982

116.    At trial, Claitt testified that, after testifying in William Franklin's trial, he was released on parole. Following his release, he alleged that Tillery attempted to shoot him in 1982:

> "Q.    Okay. And under what circumstances did you run into Mister Tillery or he into you on that occasion?
> A.    Well, I had come to the intersection of - of Kimball and Nedro Avenue
>
> . . .
>
> And I was going there to meet a gentleman by the name of Donald Lattimere who was an associate of mine in the drug world.
> Upon my arrival there, I had a female in a 1981 Fleetwood of mine and when I pulled up on the corner near the telephone booth, I left my car running and as I got out to meet Donald on the corner, a friend of mine sig - signalled me to go back.
>
> [Tillery counsel objected on hearsay grounds.]
>
> Q.    Without telling us, interpreting the signal, what if anything did you then do or see?
> A.    Well, in the direction that he waved his - this person waved their hand, I looked in that direction, to - to see Tillery getting - getting out his car and he was running in a gesture where - where he had a gun in his hand but down, pointed down and he was, like, trying to creep up on me from across the street near Church Lane.
>
> Q.    And so, what if anything did you do about this sighting that you made?
> A.    Well, when - when I see that, by that time, I had got in my car and I had left my car running and I just proceeded to just get away from

54

Pa 175

where Tillery was coming. And as I was driving off, which I - I
pushed down on the accelerator very hard because I realized that he
had a gun in his hand and I realized that I - he had knowledge of my
testimony against him on a murder charge at a preliminary hearing
against his codefendant but -"

- Direct examination of Emanuel Claitt, NT 14:90-92

117.   Claitt now admits that "It was also a total fabrication that Major

Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early

1983." [5] The incident was invented to depict Tillery supposedly retaliating against

Claitt after the conviction of William Franklin.

## 12.   The Commonwealth Misrepresented the Grounds for the Protective Order Concealing Mickens' Identity

118.   When Tillery's counsel was first made aware that Robert Mickens was

going to be a prosecution witness, immediately prior to Mickens testifying, Judge

John A. Geisz held a hearing in chambers to hear objections to the protective order

under then-Pennsylvania Rule of Criminal Procedure 305(F). During that hearing,

Assistant District Attorney Barbara Christie represented that Robert Mickens

feared retaliation from Tillery for providing testimony against him.

---

[5]   At trial Claitt claimed this attack took place in 1982. NT 14:90. In his
declaration, he states "early 1983".

119. During trial, Mickens testified on cross-examination that "[w]hen I was in prison I told [Major Tillery] I was going to do it [testify as an alibi witness for Tillery] because I was in fear of my life." NT 21:58.

120. In his declaration, Mickens states that the protective order was based on false grounds:

> "My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the false grounds that I needed a protective order to protect me from Major Tillery.
>
> That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis [sic]. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery."
>
> - Declaration of Robert Mickens, April 18, 2016 (Exhibit "D")

121. Assistant District Attorney Barbara Christie affirmatively and knowingly misrepresented that Mickens feared retaliation from Tillery at trial. ADA Christie also misrepresented that Mickens feared retaliation at the Rule 305(F) hearing.

122. The Commonwealth also knew, at the time Mickens testified, that he did not actually fear retaliation from Tillery, and that this was a pretext for the protective order. The Commonwealth did not correct Mickens' testimony.

56

### 13.    The Commonwealth Knew That Neither Claitt Nor Mickens Had Direct Knowledge of the Shooting

123.    The Commonwealth actively coached Claitt and Mickens to provide false testimony inculpating Tillery. This included both their substantive testimony and testimony concerning plea deals and inducements offered to Claitt and Mickens.

124.    Claitt states that:

"My testimony was made up while questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie, Len Ross and Roger King interviewed me, and worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder."

- Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

x.    He later clarified the content of these meetings:

"The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the shootings at the poolroom on October 22, 1976, that I wasn't there then or at the argument at Dana Goodman's house or meetings before the October 22, 1976 shootings. For example, in our meeting I said **["]you know I wasn't there - you have to fill in the blanks.["]** Detectives Gerrard, Gilbert, Det. Lubiejewski and ADA Lynn Ross would tell me - "you've got to say it this

57

Pa 178

way." I was told - "we've got to bring him down - you've got to help us."
**That meant I should lie.** Barbara Christie told me, "Your the best. You
should have been a lawyer." **That meant I knew how to lie.**"

- Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit
"B").

125.   Mickens states that "My entire testimony was scripted and rehearsed

by ADA Barbara Christie." Declaration of Robert Mickens, April 18, 2016

(Exhibit "D").

126.   Claitt further states that "It was also a lie, known to ADAs Ross,

Christie, King that Major Tillery and George Rose were involved in

bombing/firebombing in 1979 and 1980 that I testified to in August 1985."

Declaration of Emanuel Claitt, June 3, 2016 (Exhibit "B").

127.   Claitt relates that he was instructed to lie about his plea deals:

"ADA Christie coached me how to answer the defense attorney's questions
about whether I had plea deals or any agreements for leniency in sentencing
for all the charges I faced back in 1980 when I first gave a statement about
the shootings of Hollis and Pickens and since then. ADA Christie coached
me on this like ADA Lynn Ross did before I testified against William
Franklin.

Back in 1980 when I testified at Franklin trial I lie when I said that the only
plea agreement was that my sentences on three cases would run concurrently.
But I had been promised the DA's recommendation to receive no more than
10 years. In fact I got one and a half-years. When I was questioned about
this at Major Tillery's case I repeated the lie that I had no plea deal about
length of sentencing. ADA Christie knew that wasn't true.

58

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was "open" and that there were no agreements about leniency and sentencing. She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to. But my testimony that there was no plea deal was a lie and ADA Christie knew that. **She told me the robbery charges & other charges would be nolle prossed. And they were."**

- Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit "B").

## G.   Plea Agreements and Open Charges Suppressed by the Commonwealth

128.   As the discussion below explains, the Commonwealth intentionally concealed the plea deals which it made with Claitt and Mickens and coached them to testify falsely about those deals. It also intentionally concealed the very existence of charges which undermined Claitt's credibility.

129.   Claitt testified, and Assistant District Attorney Barbara Christie repeatedly emphasized, that when Claitt spoke to police in April/May 1980, and gave his written statement to police on May 20, 1980, he had no expectation of favorable treatment. ADA Christie stated during her closing argument, and repeated during hearings, that Claitt had "no deal," and no expectation of any deal, up to the time of Tillery's trial.

130.   In fact, the Commonwealth made the following deals with Claitt:

- The Commonwealth *completely suppressed* disclosure of robbery charges ("May 1980 robbery charges") for conduct which took place immediately prior to Claitt's incarceration in 1980 for a parole violation. The arrest for these charges took place *immediately prior* to Claitt's written statement inculpating Tillery, and the complaint was filed immediately prior to William Franklin's trial. After Tillery's trial, all these charges were nolle prossed. The Commonwealth suppressed both the charges themselves and the agreement with Claitt to dismiss the charges.

- The Commonwealth suppressed disclosure of its agreement with Claitt to nolle pross a second set of robbery charges ("1983 robbery charges"). Claitt and ADA Christie represented that there was "no deal" on these robbery charges and that Claitt would have to go to trial. In fact, after Tillery's trial, the Commonwealth nolle prossed these robbery charges.

- Claitt testified that he had made an "open plea", with no recommendation, on three charges from a group of five separate cases ("1978-1980 charges"). The judge in that case, who was aware of

60

Claitt's informant status, gave Claitt a 1 1/2 year minimum sentence

on charges for which Claitt faced 25-50 years, pursuant to an

agreement Claitt made with the Commonwealth.

## 1.     Emanuel Claitt

Relevant extracts from the trial record are reproduced below, showing the

assertions made by Claitt and ADA Barbara Christie with respect to the deals Claitt

had.

> "Q.    Mister Claitt - according - this incident [the shooting] happened in
> 1976, is that correct?
> A.    Right. October 19 - 22nd, 1976.
>
> Q.    And I think yesterday you told us that for 4 years after this incident
> you never told the police anything about it, is that correct?
> A.    Yes, sir.
>
> Q.    And in [April/May] 1980, when you finally mentioned something to
> the police, you were in prison, correct?
> A.    Yes, sir.
>
> Q.    **And at that time you had 8 open cases, didn't you?**
> A.    **I don't think it was 8. I'm not sure, not the count.**
>
> Q.    Now, Judge, excuse me. This is going to have to be a little difficult
> because I have to search through but would the Court indulge me.
>
> (Pause.)
>
> Q.    Now, you testified in this matter once before, did you not, in the trial
> of William Franklin?

61

A.    Yes, I did.

Q.    And you remember at that time being asked certain questions by a lawyer?

A.    Yeah, I recall.

Q.    Something like this where you testified and answered questions?

A.    I answered many questions, yes, sir.

Q.    And that was what, a couple years ago, wasn't it?

A.    1980. That would be 4 to 5 years ago, right.

Q.    And do you think that your member was a little better about 1980 and about 1978 and 1976, was better then than it is now or do you think it was - it's better now?

A.    Well, I would think as time goes by my memory might be a little off as far as specifics but, you know, I remember things that occured back then.

Q.    Right. But you say your memory is probably a little sharper back then. Is that correct?

A.    I didn't - I didn't say that.

Q.    Well, you think your memory is - would be a little better today?

A.    No. I said as time goes on -

Q.    You get fuzzier. So if you get fuzzier as time goes on, 4 years ago it had to be a little sharper than it is today, correct?

A.    Yes. Somewhat.

Q.    And at that time do you remember - this is on Chapter 3 or Volume 3 on Page 88. **You were asked a question** - this is the top of the page. **And you had 8 open charges on you. Isn't that right? Answer: That's right.** Do you remember that question and answer?

62

A.  No. I don't recall - I recall the question but as far as the answer to the exact number of times, I don't recall that I said 8.

Q.  Well, you didn't lie then. Were you lying?
A.  Well - no, I didn't - I didn't lie. I told you when you asked me the question that you said 8 and I said well, I don't know the exact number.

Q.  **So if you said 8 then it probably was 8, correct?**

   Miss Christie: Your Honor, objection to probabilities.

Q.  **Well, it was 8 then, wasn't it?**

   The Court:   Objection overruled.

A.  **If I said 8 back then, then I was - then it must - would have - must have been."**

- Cross-examination of Emanuel Claitt, NT 15:3-6 (emphasis added).


131.   Emanuel Claitt actually did not have "8 open charges" in May 1980, when he allegedly decided to speak to police because he "felt kind of bad" about the murder of Samuel Goodwin.

132.   In May 1980, Emanuel Claitt had **twenty-eight open charges.**

133.   He lied about his twenty-eight charges at Franklin's trial. Under cross-examination, he repeated the lie in Tillery's trial.

134.   Claitt and ADA Barbara Christie also lied about his plea agreements with the Commonwealth:

"Q.   . . . At some point after [1982], did you have occasion to be returned to custody for any reason?
A.     Yes.

Q.     Okay. And when, approximately, and under what circumstances were you -
A.     April 21st, 1983, for charges of robbery and aggravated assault.

Q.     All right. And are those charges outsanding today?
A.     Those charges are **pending before Judge Chiovero** in Courtroom 453.

Q.     All right.
A.     **His open charges that I have yet to be tried for.**

Q.     All right. And do you have any agreement or understanding with any member of the Commonwealth concerning - or District Attorney's office, concerning the disposition of those open charges?
A.     Well, as to agreement, they - the District Attorney merely mentioned that they had did all the - all they were going to do for me at that point but they would do is make Judge Chiovero aware - in the event I got convicted of the charge, they would make him aware of my cooperation with the District Attorney's office in reference to the trials I have testified and the trials have yet still to testify in the very near future."

- Direct examination of Emanuel Claitt, NT 14:93-94 (emphasis added).

" . . . The witness has to testify to his understanding of the agreement.

And now the witness has indicated that **there is no agreement,** hasn't been any agreement with regard to sentencing on the open robbery. **There is no agreement**. **He goes to trial on that.**

And his understanding of any agreement he has with the Commonwealth is

64

that the Commonwealth will make the Parole Board aware of his cooperation in this and the other cases."

- Barbara Christie, sidebar conference in chambers, NT 14:96 (emphasis added).


". . . Claitt talked to the police in May of 1980, **with no deal** but with a great desire, great desire for protection for himself and his family, particularly after he went public in court and testified in June of 1980 at a preliminary hearing December of 1980 at the Franklin trial.

Yes, Claitt was in and out of custody. He pled guilty to 3 crimes. He stood trial on 2 and **he awaits trial on a third.**"

**-** Closing Statement of Barbara Christie, NT 28:90-91 (emphasis added).


135.   In fact, Claitt never went to trial on the robbery charges discussed above (the 1983 robbery charges), on which he allegedly awaited trial with no agreement regarding sentencing. The Commonwealth nolle prossed all those charges on December 16, 1987.

136.   Furthermore, the Commonwealth completely suppressed the existence of 13 open charges (the May 1980 robbery charges) for conspiracy, aggravated assault, robbery and firearms offenses (among other charges) for which Claitt was arrested on May 16, 1980: **four days** before Claitt provided his written statement to police inculpating Tillery and Franklin on May 20, 1980. Claitt was charged for this robbery in November 1980, the **month of Franklin's trial**.

137. **<u>These thirteen charges were never mentioned, in any form, by Claitt, never mentioned by ADA Barbara Christie during trial, and never disclosed to the defense.</u>**

138. The defense thus did not know, at trial, that Claitt had been arrested on thirteen felony charges **<u>four days</u>** before he gave his written statement to police inculpating Tillery, and for which he was charged during the month of Franklin's trial. Tillery's counsel was forced to cross-examine Claitt and accuse him of making a deal for leniency using solely Claitt's testimony that he made "open pleas" to his existing charges, with no expectation of consideration, and with only knowledge of the robbery charges (the 1983 robbery charges) that Claitt testified to, as opposed to the second, separate set of robbery charges (the May 1980 robbery charges) which the Commonwealth also nolle prossed, but which also closely track the dates of Claitt's involvement in Tillery and Franklin's trials.

139. The Commonwealth nolle prossed all thirteen charges (the May 1980 robbery charges) shortly after Franklin's sentencing, on April 13, 1982.

140. The Commonwealth suppressed the very existence of charges whose timing would have undermined Claitt's credibility and wrecked the cases against

66

Franklin and Tillery. The Commonwealth also suppressed its deal with Claitt to dismiss those charges.

141.  The Commonwealth knowingly permitted perjured testimony concerning the number and nature of Claitt's charges, and the plea deals Claitt had, to be presented to the jury. The Commonwealth affirmatively represented that all of Claitt's charges had been accounted for in its closing statement. Assistant District Attorney Barbara Christie intentionally, affirmatively and repeatedly represented that Claitt "**had no deal**". This was completely false.

142.  Petitioner now documents Claitt's criminal charges which are relevant to this case, cross-referenced with the relevant testimony, corroborating evidence, and the actual disposition of the charges.

## Overview of Claitt's Charges

143.   The charges against Claitt which are relevant to Tillery's trial are

below, with significant dates inserted.

| Arrest or Event Date | Docket Nos. | No. Charges | Summary of Offenses / Event | Judge |
|---|---|---|---|---|
| 5/8/1975 | CP-51-CR-1222231-1975 | 6 | Firearms offenses | Kubacki |
| 11/30/1978 4/7/1979 1/5/1980 5/2/1980 8/8/1980 | CP-51-CR-0810671-1980 CP-51-CR-0813281-1980 CP-51-CR-0813281-1980 CP-51-CR-0510241-1980 CP-51-CR-0820931-1980 | 2 | Drug charges Auto theft Drugs/Firearms Auto theft Firebombing | Katz |
| April 1980 | | | Incarcerated for probation violation | Kubacki |
| **5/16/1980** | CP-51-CR-1107131-1980 | 13 | Robbery, aggravated assault, firearms offenses **(UNDISCLOSED)** | Anderson |
| 5/20/1980 | | | Claitt gives written statement inculpating Tillery | |
| **6/4/1980** | | | **Franklin's preliminary hearing** | |
| 7/9/1980 | | | Montgomery County auto theft charges | |

68

| Arrest or Event Date | Docket Nos. | No. Charges | Summary of Offenses / Event | Judge |
|---|---|---|---|---|
| 9/10/1980 | CP-51-CR-0916561-1980 | 3 | Assault | Ivanoski |
| **11/7/1980** | | | Anderson complaint filed **(UNDISCLOSED)** | |
| **November 1980** | | | **Franklin's trial** | |
| 1/5/1981 | | | ADA Ross letter to Judge Katz | |
| **9/17/1981** | | | Sentencing on Katz charges **(UNDISCLOSED)** | Katz |
| **4/13/1982** | | | Anderson charges nolle prossed **(UNDISCLOSED)** | |
| 11/22/1982 | | | Claitt released on parole | Katz |
| 4/13/1983 | CP-51-CR-0537641-1983 | 8 | Robbery | Chiovero |
| 4/13/1983 | | | Incarceration for probation violation | Katz |
| 1/31/1984 | | | Gordon letter to Parole Board | |
| 2/18/1984 | | | DA Rendell letter to Judge Chiovero | |
| **2/29/1984** | | | **Tillery's preliminary hearing;** Claitt released on parole | |
| 9/19/1984 | | | Claitt incarcerated for parole violation | |
| 10/25/1984 | | | Brodkin letter to Parole Board | |

69

| Arrest or Event Date | Docket Nos. | No. Charges | Summary of Offenses / Event | Judge |
|---|---|---|---|---|
| **12/16/1987** | | | Chiovero charges nolle prossed **(UNDISCLOSED)** | |
| 9/10/1989 | CP-51-CR-0513651-1989 | 8 | Robbery | Guarino |

144.    A summary of Claitt's charges, along with the available docket sheets, are attached to this petition. Exhibit "J". Some docket sheets are unavailable, and will require discovery to obtain.

145.    In May 1980, the charges for arrest dates 4/7/1979, 1/6/1980, 5/2/1980 and 5/16/1980 were open, for a total of twenty-eight open charges.[6]

146.    Claitt accumulated nineteen extra charges between May 1980 and Tillery's trial in May 1985, for a total of forty-seven charges.

147.    Claitt was arrested on thirteen charges, including robbery, on May 16, 1980 (Docket No. CP-51-CR-1107131-1980). These charges were never disclosed to the defense at all.

---

[6]    The count of charges on the Claitt's summary sheet shows 26 open charges, but there are an additional two charges for the arrest on 1/5/1980. Docket No. MC-51-CR-1234881-1979 (Exhibit "J").

70

148.   Claitt was arrested on eight charges, including robbery, on April 13, 1983 (Docket No. CP-51-CR-0537641-1983). These charges were nolle prossed, despite the Commonwealth's representation that Claitt would stand trial on them.

## May 8, 1975: Firearms Offenses (Judge Kubacki)

149.   Claitt was arrested on May 8, 1975 and charged with possession of firearms by a felon, carrying firearms without a license, carrying firearms in a public street or place, providing a firearm to a minor, possessing instruments of crime and possessing a prohibited offensive weapon.[7] Exhibit "J".

150.   Claitt pled guilty to possession of firearms by a felon and carrying firearms in a public street or place on July 12, 1976. The Hon. Stanley L. Kubacki sentenced Claitt to 5 years' probation. Docket No. CP-51-CR-1222231-1975 (Exhibit "J").

151.   At trial, Claitt stated that he "was incarcerated for a probation violation," presumably on this 5 year probation, and "was visited by a homicide detective" in April 1980. NT 14:8. Claitt testified that was still incarcerated for a probation violation on this charge in June 1980. NT 14:79.

152.    Claitt testified that on June 4, 1980 - immediately following the preliminary hearing in William Franklin's trial - the Commonwealth appeared before Judge Kubacki, following which Claitt's detainer was lifted. NT 14:81, 15:15. Claitt was released on his own recognizance, on $11,000 bail.

153.    Claitt testified that, in April and May 1980, at the time he gave his initial statement to the police, he had no agreement with the police. NT 14:10-11, 78; 15:11.

154.    Claitt later testified that the understanding "that I had [with the Commonwealth] was that I was being released, you know, only on - on bail but I would have to go and, you know, fight the cases on my own with me and my attorney, with no - no helping from the District Attorney's office." NT 14:82-83.

155.    ADA Barbara Christie stated in her closing statement that Claitt had given his statement "with no deal but with a great desire" for protection. She stated that even *after* Claitt had testified at the preliminary hearing and at trial in the Franklin case, in 1980, there was no deal. NT 28:90-91.

156.    ADA Barbara Christie stated in chambers that "[Claitt's]

---

7    Claitt's summary sheet shows that there was only one charge, but there were actually three. Docket No. MC-51-CR-0505311-1975 (Exhibit "J").

understanding of any agreement he has with the Commonwealth [in Tillery's case] is that the Commonwealth will make the Parole Board aware of his cooperation in this and the other cases." NT 14:96.

157.   ADA Christie affirmatively stated that there was "no deal" for Claitt's testimony in Tillery's trial. She also affirmatively stated that Claitt's deal was only limited to the Commonwealth informing the Parole Board of his cooperation.

## November 30, 1978  Drug Charges; April 7, 1979 Auto Theft; January 5, 1980 Drug Charges; May 2, 1980 Auto Theft; August 8, 1980 Firebombing Charges (Judge Katz)

158.   Claitt was arrested on November 30, 1978 for two charges, for drug possession and manufacture, including a sale of heroin to a DEA agent. Charges were filed on March 31, 1979. Docket No. CP-51-CR-0810671-1980 (Exhibit "J").

159.   On April 7, 1979, Claitt was arrested and charged with theft, receiving stolen property and unauthorized use of an automobile (3 charges).[8] Exhibit "J".

160.   On January 5, 1980, Claitt was arrested and charged with drug possession, drug possession with intent to manufacture, criminal conspiracy, possessing instruments of crime, prohibited offensive weapons, carrying firearms

without a license, and carrying firearms in a public place (7 charges).[9] Docket No.

CP-51-CR-0813281-1980 (Exhibit "J").

161.   On May 2, 1980, Claitt was arrested and charged with three charges of

auto theft.[10] Docket No. CP-51-CR-0510241-1980 (Exhibit "J").

162.   On August 8, 1980, Claitt was arrested and charged with 8 charges

including attempted arson, criminal mischief, firearms offenses, risking catastrophe

and criminal conspiracy, for his alleged participation in a firebombing case in

which Tillery was a codefendant. Docket No. CP-51-CR-0820931-1980 (Exhibit

"J").

163.   With respect to the firebombing charges, Claitt now states "I . . .

falsely accused Major Tillery of placing a fire bomb on the front porch of Frank

Henderson on Church Lane," and that "[i]t was also a lie, known to ADAs Ross,

Christie, King that Major Tillery and George Rose were involved in

---

[8]   Petitioner has been unable to locate the Common Pleas docket sheet, Docket No. CP-51-CR-0408091-1979. It is likely archived.

[9]   Claitt's summary sheet shows that there were five charges, but there were actually seven. Docket No. MC-51-CR-1234881-1979 (Exhibit "J").

[10]   Petitioner has been unable to obtain the docket sheet. It is listed as archived in Claitt's court summary.

74

bombing/firebombing that I testified to in August 1985." Declaration of Claitt, May 4, 2016 and June 3, 2016 (Exhibits "A", "B").

164.    Claitt pled guilty to the two drug charges (Docket No. CP-51-CR-0810671-1980) and one charge of drug possession (Docket No. CP-51-CR-0813281-1980) on November 28, 1980 before the Hon. Leon Katz. NT 14:83.

165.    On January 5, 1981, Assistant District Attorney Leonard Ross wrote a letter to Judge Katz, describing Claitt's role as an informant in six separate homicides, along with his providing "background information" concerning the "drug traffic in Philadelphia." Exhibit "J".

166.    The sentencing hearing before Judge Katz took place on September 17, 1981. The sentencing involved five docket numbers: the November 30, 1978 drug charges (2 charges - Docket Nos. CP-51-CR-0810671-1980 and MC-51-CR-0330461-1979), the April 7, 1979 auto theft charges (3 charges - Docket No. CP-51-CR-0408091-1979 ), the January 6, 1980 firearms charges (7 charges - Docket Nos. CP-51-CR-0813281-1980 and MC-51-CR-1234881-1979), the May 2, 1980 auto theft charges (3 charges - Docket No. CP-51-CR-0510241-1980) and the August 8, 1980 firebombing charges (8 charges - Docket No. CP-51-CR-0820931-1980)

167.   ADA Ross explicitly stated, at this hearing, that the charges before

Judge Katz were all the charges pending against Claitt in Pennsylvania County.

Sentencing Hearing Transcript, Sept. 17, 1981, p. 5 (Exhibit "L"). **This was false.**

*See* Docket No. CP-51-CR-1107131-1980 (the May 1980 robbery charges, which

were open at the time).

168.   ADA Ross represented at the hearing that "Mr. Cliatt [sic] has

continued his cooperation." Sentencing Hearing Transcript, Sept. 17, 1981, p. 6

(Exhibit "L"). The court stated:

> "The recommendation of the pre-sentence investigator is incarceration. And,
> if it were not, *if it were not for the cooperation extended to the*
> *Commonwealth*, I would think that full justification that this defendant
> should receive a maximum sentence of seven and a half to fifteen years on
> the drug charge, namely 1067, manufacture sale, and delivery of drugs. Not
> that I'm minimizing the other changes, such as the conspiracy to fire bomb
> the house and the possession of the drugs.
>
> However, *I'm taking that into consideration* because I think, in the field of
> law enforcement, that there are many times when we cannot prosecute career
> criminals or criminals who commit acts of violence without the cooperation
> of either co-defendants or others who have information. And that's, I think,
> what is present in this case."
>
>  - Sentencing Hearing Transcript, Sept. 17, 1981, p. 31 (emphasis added)
> (Exhibit "L").

169.   Judge Katz took Claitt's cooperation "into consideration" in making

his sentence. Later, Claitt testified at Tillary's trial that this was an "open plea". NT

14:5, 86. He testified that Leonard Ross's only request was for the court to impose concurrent sentences. NT 14:6.

170.   Claitt was sentenced on three charges: 1 1/2 - 7 years and 6-12 months sentences on the two drug charges he pled to on November 28, 1980, and 1-5 years for attempted arson. The sentences ran concurrently. Sentencing Hearing Transcript, Sept. 17, 1981, p. 36 (Exhibit "L"). He received a one and a half year minimum sentence for charges on which he faced 25-50 years.

171.   All other charges from Claitt's arrests, including all the auto theft and firearms charges, were nolle prossed by the Commonwealth.

172.   Even though his sentence was supposed to be 1 1/2 years, Claitt was released on parole on November 22, 1982, a little more than a year after sentencing. NT 14:89.

173.  Claitt now states:

"ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens . . . Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. **But I had been promised the DA's recommendation to receive no more than 10 years.** In fact I got one and a half-years. When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true."

77

- Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit "B").

174.   On June 6, 2014, the Commonwealth filed a motion to vacate the bail judgment in this case.

175.   In his declaration, Claitt states "[i]n 2014 I was given help by the prosecution in getting all my bond judgments dismissed for cases going back over 23 years." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

## May 16, 1980: Robbery, Assault, Firearms Offenses (Judge Anderson)

176.   Claitt was arrested on May 16, 1980 and charged on November 7, 1980 with 13 charges including robbery, aggravated assault, reckless endangerment, terroristic threats, criminal conspiracy, carrying firearms without a license, carrying firearms in a public place and possessing instruments of crime before the Hon. Levy Anderson. Docket No. CP-51-CR-1107131-1980; Exhibit "J".

177.   May 16, 1980, the arrest date on the docket, was **four days** before Claitt gave his written statement to police inculpating Franklin and Tillery.

178.   The date that the offenses occurred was April 5, 1980 - immediately prior to the period which Claitt states he was incarcerated on his parole violation, April 1980, for the firearms charges originally before Judge Kubacki. NT 14:8, 79.

78

179.   November 1980, the date on the docket when the complaint was filed, was the month of Franklin's trial. Following the appearance of Assistant District Attorney Leonard Ross before Judge Anderson, Claitt made bail and signed his own bond. Claitt testified in Franklin's trial as the main witness on December 3, 1980.

180.   Assistant District Attorney Leonard Ross is the same prosecutor who appeared before Judge Katz at Claitt's sentencing hearing the next year, on September 17, 1981 and falsely represented to Judge Katz that "all the cases pending against [Claitt] are completed in Philadelphia County" as a result of Katz's sentencing. Sentencing Hearing Transcript, Sept. 17, 1981, p. 5; Exhibit "L".

181.   These 13 charges before Judge Anderson were **never disclosed to the defense**, despite the fact that their timing closely corresponds to the important dates in this case, particularly **the date of Claitt's initial written statement on May 20, 1980**.

182.   All 13 charges were nolle prossed by the Commonwealth on April 13, 1982.

183.   Claitt testified that, in April and May 1980, at the time he gave his initial written statement to the police, he had no agreement with the police. NT 14:10-11, 78; 15:11.

184.   Claitt later testified that the understanding "that I had [with the Commonwealth] was that I was being released, you know, only on - on bail but I would have to go and, you know, fight the cases on my own with me and my attorney, with no - no helping from the District Attorney's office." NT 14:82-83.

185.   Claitt now states "[i]n exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials . . . I was promised no state time for crimes I did commit if I lied." Declaration of Claitt, May 4, 2016. "[ADA Christie] told me *the robbery charges and other charges would be nolle prossed*. And they were." Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit "B").

186.   During the cross-examination of Claitt, Tillery's counsel stated:

"So all these things that happened to you, people kill people in front of you, people confess murders to you, and you keep on going to court to testify, right? It's easy. Commit a crime, go to jail, tell on somebody, get out. Commit a crime, go back to jail . . . tell on somebody, get out."

- Cross-examination of Emanuel Claitt, NT 15:26

187.   Petitioner's counsel was unable, at trial, to cite Claitt's deal with the Commonwealth to nolle pross these 13 robbery charges, four days after his arrest,

80

as an example of how Claitt would "[c]ommit a crime, go to jail, tell on somebody, get out. Commit a crime, go back to jail . . . tell on somebody, get out."

188.   ADA Barbara Christie stated in her closing statement that Claitt had given his statement "with no deal but with a great desire" for protection. She stated that even *after* Claitt testified at the preliminary hearing and at trial in the Franklin case, in 1980, there was no deal. NT 28:90-91.

189.   In fact, Claitt did have a deal. The deal was that his robbery charges would be dismissed in exchange for his perjured testimony in the cases of Franklin and Tillery - a deal which was actually fulfilled after Franklin's trial.

190.   These offenses took place immediately prior to Claitt's incarceration. The arrest took place immediately before he gave his written statement. The complaint was filed immediately before he testified in William Franklin's trial. The charges were then dismissed after the trial ended. These charges could never have been disclosed to the defense without completely undermining the Commonwealth's case.

191.   On June 6, 2014, the Commonwealth filed a motion to vacate the bail judgment in this case.

192.    In his declaration, Claitt states "[i]n 2014 I was given help by the prosecution in getting all my bond judgments dismissed for cases going back over 23 years." Declaration of Emanuel Claitt, May 4, 2016; Exhibit "A".

## July 9, 1980: Montgomery County Auto Theft Charges

193.    On July 9, 1980, a month after William Franklin's preliminary hearing and a month after the Commonwealth obtained Claitt's release on bail on June 4, 1980, Claitt was arrested and incarcerated again in Montgomery County for auto theft, on a separate set of charges from his two auto theft cases in Philadelphia County. NT 14:81.

## September 10, 1980: Assault (Judge Ivanoski)

194.    On September 10, 1980, Claitt was arrested and charged with five charges of assault and reckless endangerment before the Hon. Leonard A. Ivanoski.[11] Docket Nos. CP-51-CR-0916561-1980, MC-51-CR-0910651-1980;

---

[11]    Petitioner has been unable to locate docket no. CP-51-CR-0916561-1980. Claitt's summary sheet shows three charges, but there were actually five. Docket No. MC-51-CR-0910651-1980 (Exhibit "J").

(Exhibit "J").

195.    Claitt was found not guilty on these charges on December 5, 1980.

**April 13, 1983: Robbery (Judge Chiovero)**

196.    On April 13, 1983, Claitt was arrested and charged on April 21, 1983 with 8 charges including robbery, criminal conspiracy and firearms offenses before the Hon. John J. Chiovero.[12]  Docket No. CP-51-CR-0537641-1983 (Exhibit "J").

197.    The robbery arrest caused him to be in violation of parole from the pleas before Judge Katz, so Claitt was incarcerated again. NT 14:93.

198.    On April 13, 1983, Claitt was arrested and charged with robbery, aggravated assault and firearms offenses (8 charges - Docket No. CP-15-CR-0537641-1983). He was charged on April 21, 1983. NT 14:93.

199.    On January 31, 1984, Arnold Gordon, the Chief of the Philadelphia District Attorney Homicide Unit, wrote a letter to the Parole Board requesting that the Board lift Claitt's detainer. Gordon stated that "Mr. Claitt will not be available as a witness" in Tillery's preliminary hearing unless he was released on bail, and

_____

[12]   Petitioner has been unable to locate these docket numbers. CP-51-CR-0537641-1983 is listed as archived in Claitt's case summary.

stated "*[h]e does not seek any promises or consideration with respect to his open charges.*" (emphasis in original) (Exhibit "M").

200.   On February 18, 1984, Edward Rendell, the District Attorney of Philadelphia, wrote a letter to Judge Chiovero concerning Claitt's bail in his robbery case, for which he had been arrested on April 13, 1982. Rendell requested that Judge Chiovero permit Claitt's release on bail. Exhibit "N".

201.   On February 29, 1984 - *immediately after Tillery's preliminary hearing* - Claitt was released despite his parole violation. He signed his own bond.

202.   On September 19, 1984, Claitt was re-incarcerated for a parole violation. ADA Barbara Christie stated in chambers that Claitt reported to his parole officer with a knife in his sock. NT 14:97.

203.   On October 25, 1984, Jeffrey Brodkin, Assistant Chief of the Philadelphia District Attorney Homicide Unit, wrote to the Parole Board requesting that Claitt's parole be continued. Exhibit "O". Claitt was scheduled for a hearing on his parole violation on November 3, 1984.

204.   At trial, Claitt testified that at his sentencing hearing before Judge Katz, on September 17, 1981, "we worked an agreement whereas I pled guilty to the 3 charges and all open indictments I would have to face in court alone - to fight

the case alone." NT 14:7. He testified that he "would have to go and, you know,

fight the cases on my own with me and my attorney, with no - no helping from the

District Attorney's office." NT 14:83.

205.   Claitt testified that, specifically with respect to the charges before

Judge Chiovero, "I have no agreement at all." He testified that "[t]he case is still

pending[,]" and that he "[expected] to be tried by a jury." NT 14:7.

206.   Claitt then proceeded to contradict his previous testimony, stating:

> "Well, as to agreement, they - the District Attorney merely mentioned that
> they had did all the - all they were going to do for me at that point but they
> would do is make Judge Chiovero aware - in the event I got convicted of the
> charge, they would make him aware of my cooperation with the District
> Attorney's office in reference to the trials I have testified and the trials that
> have yet still to testify in the very near future."

> - Direct Examination of Emanuel Claitt, NT 14:94.

207.   In chambers, Assistant District Attorney Barbara Christie then stated

that "there is no agreement, hasn't been any agreement with regard to sentencing on

the open robbery. **There is no agreement. He goes to trial on that.**" NT 14:94

(emphasis added). She then stated that "[Claitt's] understanding of any agreement

he has with the Commonwealth is that the Commonwealth will make the Parole

Board aware of his cooperation in this and the other cases." *Id.*

208.    Claitt never went to trial on this robbery case at all. The

Commonwealth **nolle prossed all eight charges on December 16, 1987.**

209.    Claitt now states "[i]n exchange for my false testimony many of my

cases were not prosecuted. I got probation. I was sentenced to just 18 months for

fire bombing and was protected when I was arrested between the time of Franklin's

and Tillery's trials." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

210.    Claitt further states:

" I was scheduled to go to trial on my robbery case soon after the Tillery trial
was over. ADA Christie coached me to stick to saying that the robbery case
was 'open' and that there were no agreements about leniency and sentencing.

She coached me to just say I knew the judge would be told about my
cooperation in Major Tillery's case and other cases. That's what I stuck to.
But my testimony that there was no plea deal was a lie and ADA Christie
knew that. *She told me the robbery charge and other charges would be nolle
prossed. And they were.*"

 -Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit
"B").

211.    The Commonwealth instructed Claitt to lie about its agreement with

him to nolle pross his robbery charges.

**May 1, 1989: Robbery (Judge Guarino)**

212.   After Tillery's trial, Claitt was arrested on May 1, 1989 and charged with 8 charges including robbery, reckless endangerment, weapons charges, assault and criminal conspiracy. Docket No. CP-51-CR-0513651-1989 (Exhibit "J").

213.   Claitt pled guilty to robbery, the weapons charges and criminal conspiracy on October 23, 1991. He received 1-2 years on the weapons charges, 5-10 years on the robbery and 1-2 years on the criminal conspiracy.

214.   Claitt states "[a]fter Major Tillery's trial I was told I hadn't done good enough, that I 'straddled the fence'. In 1989 I was convicted of felony charges and spent 13 1/2 years in prison . . ." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

**2.      Letters Written on Behalf of Emanuel Claitt**

215.   Petitioner summarizes here, for clarity, the various *known* letters written on behalf of Claitt by the Commonwealth. Tillery anticipates that discovery will reveal additional letters.

216.   On January 5, 1981, Assistant District Attorney Leonard Ross wrote a letter to Judge Katz, describing Claitt's role as an informant in six separate homicides, along with his providing "background information" concerning the "drug traffic in Philadelphia." Exhibit "K".

87

217. As noted by Claitt, this letter was written shortly following the trial of William Franklin. During this period, Claitt "tried to recant but Lt. Shelton threatened me and said I would be framed on another murder." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

218. By way of explaining Claitt's value to the Commonwealth to the Judge Katz, the letter from ADA Ross mentions that Claitt provided "information regarding other homicides," including homicides allegedly committed by Robert Lark and George Rose, as well the homicide of Philadelphia police officer Ernest Davis, as well as Claitt's participation as a witness in the preliminary hearings of George Rose and James Brand for firebombing.

219. Judge Katz also took the cooperation detailed in Ross' letter into account during Claitt's sentencing hearing on September 17, 1981. Sentencing Hearing Transcript, Sept. 17, 1981, p. 6 (Exhibit "L").

220. On January 31, 1984, Arnold Gordon, the Chief of the Philadelphia District Attorney Homicide Unit, wrote a letter to the Parole Board requesting that the Board lift Claitt's detainer. Gordon stated that "Mr. Claitt will not be available as a witness" in Tillery's preliminary hearing unless he was released on bail, and stated "*[h]e does not seek any promises or consideration with respect to his open*

88

*charges.*" (emphasis in original) (Exhibit "M").

221.   On February 18, 1984, Edward Rendell, the District Attorney of Philadelphia, wrote a letter to Judge Chiovero concerning Claitt's bail in his robbery case, for which he had been arrested on April 13, 1982. Rendell requested that Judge Chiovero permit Claitt's release on bail. Exhibit "N".

222.   On October 25, 1984, Jeffrey Brodkin, Assistant Chief of the Philadelphia District Attorney Homicide Unit, wrote to the Parole Board requesting that Claitt's parole be continued. Exhibit "O". Claitt was scheduled for a hearing on his parole violation on November 3, 1984.

### 3.   Robert Mickens

223.   In February 1984, Robert Mickens was arrested on rape, assault and robbery charges and remained incarcerated through Tillery's trial in May 1985. NT 21:23, 54.

224.   On May 16, 1985, Mickens pled guilty to criminal conspiracy and rape before the Hon. Eugene Clarke, Jr. He was scheduled to be sentenced on July 18, 1985. NT 21:24.

225.   Mickens testified that it was an "open plea" with no plea bargaining. NT 21:24. He testified that his sentence would be up to the judge. NT 21:25.

226.   Mickens was advised that he could get 10-20 years on the rape charge, 5-10 years for conspiracy and that his sentences could run concurrently or consecutively. NT 21:26.

227.   Mickens testified that his only "understanding" with the Commonwealth was that the Commonwealth would let Judge Clark know about his cooperation, and that his other charges would be nolle prossed. NT 21:26.

228.   In her closing statement, Assistant District Attorney Barbara Christie stated that Mickens "awaits sentence on a guilty plea to a rape charge and conspiracy. That could net him 15 to 30 years at the decision and discretion of the sentencing judge." NT 28:91.

229.   In fact, Mickens now states that "ADA Christie told me that if I 'worked with [her] on the Major Tillery case' she 'guaranteed' I wouldn't be sent upstate on my robbery and rape case and would be 'protected." He states that "I agree to give . . . false testimony because I was . . . promised no prison time on the rape and robbery charges and that I would be protected by the prosecution." Declaration of Robert Mickens, April 18, 2016.

230.   Mickens pled guilty and was sentenced before Judge Clark on October 10, 1985, after Tillery's trial. He received probation.

90

231.   The deal between Mickens and the Commonwealth was not disclosed to Tillery.

## VI.   CLAIMS FOR RELIEF

232.   The above quoted declarations, along with the corroborating evidence, show that Major Tillery is an innocent man. They show that Tillery was the victim of gross prosecutorial misconduct. The Commonwealth suppressed exculpatory evidence, knowingly permitted perjured testimony to stand uncorrected, and, indeed, intentionally fabricated the entirety of the eyewitness testimony in his case.

233.   The following claims for relief represent constitutional challenges to Petitioner's conviction which have been fairly presented to and exhausted in the state courts. They were presented in Tillery's third PCRA petition in 2016, for which the Supreme Court of Pennsylvania denied *allocatur* on February 6, 2019. *Commonwealth v. Tillery,* 201 A.3d 729 (Pa. 2019).

## CLAIM I

**PETITIONER IS FACTUALLY INNOCENT OF THIS OFFENSE. HIS CONVICTION AND SENTENCE REPRESENT A FUNDAMENTAL MISCARRIAGE OF JUSTICE AND ARE THE RESULT OF GROSS PROSECUTORIAL MISCONDUCT. AT A MINIMUM, HIS SHOWING OF INNOCENCE PERMITS REVIEW OF OTHERWISE PROCEDURALLY BARRED CLAIMS.**

234. Petitioner was framed for murder by the Commonwealth. In order to secure Tillery's conviction for a murder which took place nine years prior to his trial, and in which there was no physical evidence linking Tillery to the shooting, the Commonwealth manufactured a false narrative to be delivered by Emanuel Claitt, a serial, professional jailhouse informant.

235. Claitt was the only direct eyewitness to the shooting. In order to increase the apparent credibility of his account, the Commonwealth instructed Claitt to testify falsely about additional events allegedly inculpating Tillery. These included Tillery's participation in a meeting which purportedly took place on October 20, 1976, two days before the shooting, Tillery's involvement in setting up the meeting at the poolhall on October 22, 1976, and Tillery's attack on Claitt in 1982, supposedly in retaliation for Claitt's testimony in the trial of William Franklin.

92

236. Sometime in 1980, Claitt was incarcerated for a parole violation on firearms charges to which he had pled guilty in July 12, 1976. NT 14:79; Docket Nos. CP-51-CR-1222231-1975, MC-51-CR-0505311-1975 (Exhibit "J").

237. While he was incarcerated on the parole violation, Claitt was approached by Detectives Larry Gerrard and Ernest Gilbert, who threatened to charge him with the murder of Samuel Goodwin. The detectives "really wanted information to get Major Tillery for murder." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

238. To put extra pressure on Claitt, the Commonwealth arrested him for robbery on May 16, 1980, based on conduct which took place immediately prior to his incarceration in April, 1980 (the May 1980 robbery charges). Docket No. CP-51-CR-1107131-1980 (Exhibit "J").

239. Claitt was also approached by Assistant District Attorneys Leonard Ross and Barbara Christie. They promised Claitt leniency on his twenty-eight open cases. They also threatened him with charges in the murder of Samuel Goodwin. Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

240. Four days after his arrest, on May 20, 1980, Claitt gave a written statement inculpating Tillery and Franklin.

241.   The Commonwealth manufactured Claitt's entire statement and subsequent testimony. Claitt told ADA Christie "you know I wasn't there - you have to fill in the blanks." Declaration of Emanuel Claitt, June 3, 2016 (Exhibit "B").

242.   In exchange for his perjured testimony, Claitt received:

1)     An agreement from the Comonwealth to nolle pross the 13 robbery charges from May 16, 1980 (the May 1980 robbery charges), whose existence was never disclosed to the defense at all;

2)     An agreement from the Commonwealth to nolle pross the 8 robbery charges from April 13, 1983 (the 1983 robbery charges);

3)     An agreement from the Commonwealth for reduced sentencing, on September 17, 1981, on the charges Claitt pled guilty to (the 1978-1980 charges).

243.   As an added inducement to testify falsely, the Commonwealth permitted Claitt to receive visits for sex in the Police Administration Building (PAB) interview rooms and in hotel rooms with Barbara Claitt, Helen Ellis and Denise Certain, as well as other women.

94

244.   Following William Franklin's trial in November 1980, Claitt attempted to recant his testimony, but was threatened with being charged with murder by Lt. Bill Shelton.

245.   Robert Mickens was arrested on February 28, 1984 on charges of robbery and rape,  and faced twenty-five years of imprisonment if convicted.

246.   Following his arrest on February 28, 1984, Mickens met with ADA Barbara Christie. Christie promised him leniency on his charges if he agreed to be a witness against Tillery.

247.   On September 26, 1984, Mickens gave a statement to police inculpating Tillery and William Franklin. He subsequently modified this statement, at ADA Christie's direction, to further inculpate Tillery by ascribing statements by Alfred Clark, instructing Mickens to act as a lookout, to Tillery instead.

248.   Mickens was also permitted visits for sex by the Commonwealth in exchange for his perjured testimony.

249.   Prior to Tillery's trial, at the Commonwealth's direction, Claitt was placed in a police van with Mickens. The van drove back and forth between the police station and the county prison on State Street, while Claitt pressured Mickens and told him that he had no choice but to testify against Tillery.

250. In exchange for his perjured testimony, Mickens received an agreement that he would do no jail time on his robbery and rape charges. He pled guilty and received probation on October 10, 1985.

251. There was no physical evidence, of any sort, indicating Tillery's role in the shooting on October 22, 1976.

252. The entirety of the testimony inculpating Tillery was manufactured by the Commonwealth.

253. Petitioner re-alleges and incorporates herein by reference each and every allegation in the Introduction, Statement of Facts and other Claims for Relief in this Petition.

## A. Petitioner Is Entitled to Habeas Corpus Relief Because He Is Innocent

254. Innocence constitutes a substantive ground upon which to relieve Tillery of his unconstitutional incarceration. *See, e.g., House v. Bell,* 547 U.S. 518 (2006) (remanding capital case for evidentiary development on whether petitioner was actually innocent; the petitioner was subsequently exonerated); *Kuhlman v. Wilson,* 477 U.S. 436, 452 (1986) ("a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for

96

which he was incarcerated."); *In re Winship,* 397 U.S. 358, 364 (1970) ("It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."), *but see, McQuiggin v. Perkins*, 589 U.S. 383, 392 (2013).

255. Chief Justice Rehnquist, writing for the plurality in *Herrera v. Collins,* 506 U.S. 390 (1993), stated that the showing required to obtain habeas relief in actual innocence claims is a "truly persuasive demonstration of innocence." *Id.* at 417. Such a showing would require an "extraordinarily high burden." *Id. See also House,* 547 U.S. at 554.

256. As demonstrated above, Tillery has proven his actual innocence to this demanding standard. The declarations of Claitt and Mickens demonstrate that the entirety of the evidence produced at trial against Tillery was false, and in point of fact, that there is no evidence showing Tillery was present during the events of the shooting, or that he was involved in any of the events leading up to the shooting at all. In accordance with the Fourteenth Amendment's guarantee of Due Process, Tillery's convictions and sentence must be vacated. At a minimum, Tillery has made a sufficient showing of his innocence to obtain an evidentiary hearing on this issue.

97

## CLAIM II

**THE COMMONWEALTH MANUFACTURED FALSE INCULPATORY EVIDENCE AND SUPPRESSED MATERIAL, EXCULPATORY EVIDENCE IN VIOLATION OF DUE PROCESS**

257.   The Commonwealth violated Tillery's constitutional right to due process, right to a fair trial, and the right to present a defense by withholding from him and his counsel material, exculpatory evidence, including impeachment evidence, in violation of his rights as guaranteed by the Fourteenth Amendment to the United States Constitution. Furthermore, the Commonwealth manufactured the substantive content of Claitt and Mickens' testimony, and allowed the perjured, scripted testimony thus produced to stand uncorrected.

258.   The suppression of material exculpatory or impeachment evidence violates due process. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)). The suppression of favorable, material evidence, by itself and regardless of good faith or bad faith of the prosecution, is a *Brady* violation. *Id.* at 153. However, the rule of *Brady* encompasses two separate scenarios, with different standards of materiality. The first involves cases where the government merely fails to disclose exculpatory or impeachment evidence. The second, involving a greater degree of wrongdoing, involves cases "where

98

previously undisclosed evidence reveal[s] that the prosecution introduced trial

testimony that it knew or should have known was perjured . . ." *Kyles v. Whitley,*

514 U.S. 419, 433 (1995) (citing *United States v. Agurs,* 427 U.S. 97 (1976)).

259.   A "stricter standard of materiality" applies to *Brady* claims involving

the knowing use of perjured testimony, also known as a *Napue* claim. *United

States v. Agurs,* 427 U.S. 97, 103 (1976) (citing *Napue v. Illinois,* 360 U.S. 264

(1959)).

260.   Petitioner re-alleges and incorporates herein by reference each and

every allegation in the Introduction, Statement of Facts and other Claims for Relief

in this Petition.

### A.   The Commonwealth Manufactured False Inculpatory Evidence and Knowingly Used Perjured Testimony to Secure a Conviction

261.   The Supreme Court has long held that a conviction obtained through

use of false evidence, known to be false by government representatives, violates

the Fourteenth Amendment. *Mooney v. Holohan,* 294 U.S. 103 (1935). Such

claims fall within the ambit of *Brady. United States v. Agurs,* 427 U.S. 97, 103

(1976). However, because a conviction obtained by the knowing use of perjured

testimony is fundamentally unfair, and because such claims involve prosecutorial

misconduct, a "strict standard of materiality" applies, and the conviction "must be

set aside if there is *any* reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (citing *Giglio v. United States,* 405 U.S. 150 (1972); *Napue v. Illinois,* 360 U.S. 264, 271 (1959)) (emphasis added).

262.   This materiality standard differs from the standard when exculpatory evidence is merely suppressed. "[T]he materiality standard for false testimony is lower, more favorable to the defendant, and hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." *Haskell v. Superintendent Greene SCI,* 866 F.3d 139, 152 (3d Cir. 2017) (quoting *United States v. Clay,* 720 F.3d 1021, 1026 (8th Cir. 2013)).

263.   In the Third Circuit, to make out a constitutional violation based on the knowing use of perjured testimony, the petitioner must show that 1) the testimony was perjured; 2) the government knew or should have known of the perjury; 3) the testimony stood uncorrected; and 4) there is any reasonable likelihood that the false testimony could have affected the verdict. *Lambert v. Blackwell,* 387 F.3d 210, 242 (3d Cir. 2004). *But see Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017) (citing *Lambert*) (". . . any reasonable likelihood that the false testimony could have *affected the judgment of the jury*.") (emphasis added).

100

264.  Due diligence, on the petitioner's part, plays no part in the analysis of a *Brady* claim. *Banks v. Dretke,* 540 U.S. 668 (2004); *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 289-93 (3d Cir. 2016).

### 1.  The Testimony of Claitt and Mickens Was Perjured

265.  As detailed above, newly discovered evidence shows that the entirety of the substantive evidence against Tillery was false. Tillery was never at the poolhall on October 22, 1976, nor was he involved in any of the events leading up to the shooting, as described by Claitt and Mickens.

266.  Mickens' written statement of September 26, 1984 was entirely fabricated, as were his corrections to the statement in April 1984, which were made to further inculpate Tillery.

267.  The Commonwealth manufactured Claitt's account of Tillery attempting to shoot him in 1982 in retaliation for Claitt's testimony in the trial of William Franklin.

268.  Claitt's account of how he came to give a statement inculpating Tillery was false. Claitt did not spontaneously give his statement; he was threatened by the Commonwealth with being charged in the murder of Samuel Goodwin as well as other charges. All this was completely undisclosed to the defense.

269.   Neither Claitt nor Mickens testified at trial that they had told the Commonwealth they were not actually present at the poolhall on October 22, 1976.

270.   Claitt testified that he had "no deal" on the April 13, 1983 robbery charges (the 1983 robbery charges) and that he had an "open plea" on the charges for which he was sentenced on September 17, 1981 (the 1978-1980 charges). This was false. He had a deal to have the 1983 robbery charges dismissed, and a deal for reduced time on the 1978-1980 charges.

271.   Neither Claitt nor the Commonwealth disclosed that Claitt had a deal to have the May 16, 1980 robbery charges (the May 1980 robbery charges) dismissed. In fact, neither Claitt nor the Commonwealth disclosed the existence of the May 1980 at all.

272.   Mickens testified that he had an "open plea" on the rape and robbery charges to which he pled guilty on May 16, 1985. This was false. Mickens had an agreement that he would receive zero jail time.

273.   Claitt testified, falsely, to Tillery's involvement in the firebombing of Frank Henderson's home.

274.   Mickens testified, falsely, that he feared retaliation from Tillery for testifying against him.

102

275.   Neither Claitt nor Mickens testified that, at the behest of the Commonwealth, Claitt had been placed in a police van to influence and coerce Mickens.

276.   Neither Claitt nor Mickens testified that, as an inducement to testify falsely, the Commonwealth permitted both sexual liaisons in the Police Administration Building (PAB) homicide interview rooms and in hotel rooms.

## 2.   The Commonwealth Knew, or Should Have Known, of the Perjury

277.   The central claim of this Petition is that the Commonwealth fabricated the entirety of the case against Tillery. Both Claitt and Mickens state that their testimony was scripted by the Commonwealth.

278.   In his declaration, Claitt stated, "prosecutors ADA Leonard Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin . . ." Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A").

279.   The Commonwealth knew that Claitt's testimony was false, since it manufactured the testimony. ADAs Barbara Christie, Lynn Ross and Roger King

coached Claitt on what to say during the trial. Claitt stated, during those meetings, "you know I wasn't there - you have to fill in the blanks." Declaration of Emanuel Claitt, June 3, 2016 (Exhibit "B").

280.   Mickens likewise stated, "At trial I falsely testified that I was a look-out during the shooting of John Hollis [sic] and John Pickens. That was totally false. My entire testimony was *scripted* and rehearsed by ADA Barbara Christie." Declaration of Mickens, April 18, 2016 (emphasis added) (Exhibit "D").

281.   Both Claitt and Mickens state that the Commonwealth instructed them both on the content of their substantive testimony, as well as how to testify, falsely, regarding their agreements for leniency with the Commonwealth.

### 3.    The Perjured Testimony Stood Uncorrected

282.   The lies told by Claitt and Mickens were not corrected at trial. Assistant District Attorney Barbara Christie made no attempt to correct any of the substantive testimony of Claitt or Mickens, or their testimony regarding their agreements for leniency with the Commonwealth, her meetings with them, or the coercion and incentives they received.

283.   Furthermore, Assistant District Attorney Barbara Christie repeated these lies and vouched for them, both at sidebar and in her closing statement. She

104

stated that there was "no deal" with Claitt, beyond securing his release on bail and intervening with the Parole Board. NT 14:96, 28:90-91. This was false. Although ADA Christie represented that Claitt would go to trial on the April 13, 1983 robbery charges, the Commonwealth had an agreement that Claitt would do no time. ADA Christie also had a deal with Claitt that he would do no time on the May 16, 1980 robbery charges. The existence of those charges was never disclosed to the defense at all. *Id.* Finally, ADA Christie represented that Claitt made an "open plea" on September 17, 1981 (the 1978-1980 charges), when in fact there was an agreement that Claitt would receive no more than 10 years. *Id.*

284. ADA Christie stated in closing that Mickens also made an "open plea" on his rape and robbery charges. This was not true; Mickens had an agreement that he would receive zero jail time.

### 4. The False Testimony Affected the Judgment of the Jury

285. As noted previously, the central claim of this Petition is that the Commonwealth fabricated the entirety of the testimony used to convict Tillery. There was no physical evidence inculpating Tillery. Without the false testimony of Claitt and Mickens, there would have been no evidence to convict at all.

286. Petitioner emphasizes here that disclosure of *any* of the falsehoods

enumerated by Claitt and Mickens, standing alone, would have been sufficient to "affect the judgment of the jury", to the standard of *Napue*. Given that the constitutional standard is whether there was "any reasonable likelihood that the false testimony could have *affected the judgment of the jury*," *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citations omitted) (emphasis added), it is clear that "affecting the verdict" cannot mean that the perjured testimony would have compelled a different result, since that would be a more demanding standard than even a regular *Brady* claim, whereas the Supreme Court has made clear that a *Napue* claim is evaluated to a less demanding standard. *Id.* at 104; *see also Haskell v. Superintendent Greene SCI*, 866 F.3d at 151 (". . . the First and Sixth Circuits note that . . . perjured testimony faces a lower bar than suppression claims. [citations omitted]. But to us that seems to be a feature, not a bug.")

287.   Regardless of the governing standard, the Third Circuit has explained that when a key witness testifies, falsely, that they received no consideration for their testimony, this alone suffices to make out a *Napue* claim. *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 145-47 (3d Cir. 2017) (citing *Napue* and *Giglio v. United States*, 405 U.S. 150 (1972)).

288.   This case is on all fours with *Haskell.* And if it could be on all fours

106

twice it would be, because the perjury here far surpasses *Haskell* in scope. Exactly like the petitioner in *Haskell*, Claitt denied that he received any consideration for his perjured testimony beyond release on bail. NT 14:82-83. He was extensively cross-examined on this point, and consistently denied any consideration. NT 15:3-26. And like in *Haskell*, the prosecutor vouched for Claitt in the closing argument, stating explicitly that Claitt gave his testimony "with no deal but with a great desire, great desire for protection for himself and his family." NT 28:90-91. Lastly, Claitt was not one key witness out of a cavalcade of supporting witnesses who provided ambiguous, but arguably supportive, direct testimony: here, Claitt was the *only* fact witness who directly implicated Tillery.

289.    The failure to disclosure that, contrary to his testimony, Claitt actually gave his testimony in exchange for zero prison time on open robbery charges - either the May 1980 or 1983 robbery charges - standing alone, compels reversal. Likewise, failing to disclose Claitt's deal on 1978-1980 charges, standing alone, compels reversal. Finally, the complete and intentional failure to disclose the very existence of the May 1980 robbery charges, whose dates closely track the relevant dates in this case, by itself compels reversal. *Haskell,* 866 F.3d at 145-147; *Napue,* 360 U.S. at 264-67 (key witness falsely testified they received no consideration for their testimony); *Giglio,* 405 U.S. at 152-155 (same).

290.   Likewise, the leniency promised to Mickens and the fact that he received zero prison time, the fact that the Commonwealth was in communication with him seven months prior to the date he gave his written statement, and the misrepresentations of the Commonwealth with respect to Mickens' protective order, by themselves, are sufficient to compel reversal.

291.   The revelation of the sex-for-false-testimony inducements organized by Detectives Gerrard and Gilbert, standing alone, are also sufficient to compel reversal. *See also Commonwealth v. Lester,* 572 A.2d 694 (Pa. Super. 1990) (reversal and new trial).

292.   Over and above all the aforementioned grounds, the falsification of the substantive testimony of Claitt and Mickens is far greater in scope than the mere non-disclosure of a plea deal for testimony. It involves the conscious manufacture of the substantive content of the testimony: the scenario the Supreme Court resolved in *Mooney v. Holohan,* 294 U.S. 103 (1935). Each element of the perjured substantive testimony, standing alone, compels reversal.

108

### B. The Commonwealth Suppressed Material Exculpatory and Impeachment Evidence

293.    Even in cases in which the prosecution did not know of perjury being committed by a witness, due process requires the prosecution to disclose evidence favorable to the defense. *Banks v. Dretke,* 540 U.S. 668 (2004). The suppression of exculpatory or impeachment evidence by the prosecution, by itself, with or without a request from the defense, constitutes a violation of due process. *United States v. Agurs,* 427 U.S. 97, 104-108 (1976) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)).

294.    There are three elements to the establishment of a *Brady* claim involving prosecutorial misconduct: 1) The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) The evidence must have been suppressed by the state, either willfully or inadvertently; and 3) Prejudice must have resulted. *Banks,* 540 U.S. at 691. For purposes of this analysis, "prejudice" requires a finding of *Brady* materiality. *Id.* at 698. Thus, under *Banks,* the analysis of a *Brady* claim which does not involve the knowing use of perjured testimony by the prosecution involves an analysis of *Brady* materiality, as opposed to the "strict standard of materiality" of *Napue*.

295.   The allegations in this Petition closely track *Banks*. In *Banks,* a witness' trial testimony had been "intensively coached by prosecutors and law enforcement officers", and a police informant "testified, untruthfully, that he never gave the police any statement and, indeed, had not talked to any police officer about the case until a few days before the trial." *Id.* at 675. The Supreme Court held in *Banks* that "[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696.

296.   Similarly, in this case, both Claitt and Mickens were intensively coached by prosecutors and police, and both witnesses lied about the extent and nature of their contacts with prosecutors, Claitt going as far as to deny that he had previously met with ADA Christie. NT 16:101-102.

297.   For purposes of establishing the elements above, the first two, favorability to the accused and suppression by the state, are covered by the *Napue* analysis above. Tillery discusses the prejudice/materiality element separately below.

### 1.     The Cumulative Improperly Withheld Evidence Would Have Resulted in a Different Outcome at Trial

298.    For a *Brady* claim which does not implicate *Napue*, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)). This is a more difficult standard to meet than a *Napue* claim. *Agurs,* 427 U.S. at 103.

299.    In assessing materiality, the court considers how effective counsel could have proceeded in the absence of the due process violations both at the trial and in pre-trial investigation. *Kyles,* 514 U.S. at 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *Bagley,* 473 U.S. at 676 (materiality analysis considers whether suppressed information, "if disclosed and *used effectively*" *by the defense*, would have made a difference); *id.* at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the

111

course that the defense at the trial would have taken had the defense not been misled").

300.   It is not necessary to show by a preponderance of the evidence that a different verdict would have resulted; the petitioner need only show that the new evidence "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435.

301.   When considering whether evidence that has improperly been withheld from the defense is material and requires vacation of a conviction, a court must consider all of the evidence as a whole. The evidence must be considered not only on its own merits, but in terms of what the evidence would have meant for the investigation of the case and preparation for trial. Even if withheld evidence might have been deemed inadmissible, it may still have had value in leading to other admissible evidence, supporting a discovery request or in finding additional witnesses. *Id.* at 421 (materiality "turns on the cumulative effect of all such evidence suppressed by the government").

302.   There is no doubt that the falsity of the substantive testimony at trial, if disclosed, would have compelled a different verdict, since there would have been no evidence to convict if the falsity of the testimony was known.

303.   Claitt's agreements for leniency with the Commonwealth would also, by themselves, have been powerful impeachment evidence, sufficient to undermine confidence in the verdict. Tillery's counsel was unable, at trial, to refute Claitt's claim that he was required to go to trial on the April 13, 1983 robbery charges. The disclosure of the Commonwealth's agreement to dismiss the charges would have undermined Claitt's story that he gave his statement to police on May 20, 1980 without any inducement to testify falsely, and that he did so only "out of a great desire for protection for himself and his family." Closing Statement of Barbara Christie, NT 28:90-91.

304.   Likewise, the disclosure of the May 16, 1980 charges would have destroyed Claitt's credibility as a witness, if the defense had been aware of them. The Commonwealth hid these charges for good reason - they closely track the dates of Claitt's participation in Franklin's trial.

305.   The details of Claitt's open plea on the 1978-1980 charges, Mickens' agreement for the Commonwealth, the Commonwealth's placing Claitt in a police van with Mickens to pressure him and the sex-for-false testimony inducements organized by Detectives Gerrard and Gilbert, each standing alone, would also be sufficient to show that Claitt and Mickens' original statements were not spontaneous, undermining confidence in the verdict.

306. The Commonwealth manufactured and knowingly used perjured testimony in Tillery's trial. Each allegation of perjured testimony, collectively and standing alone, satisfies the "strict standard of materiality" of *Napue*. These allegations would also have refuted the key contentions of the Commonwealth, which were that Claitt and Mickens testified without promises of leniency, out of a fear of retaliation from Tillery and a desire for protection from him. They place the case in a different light, and are sufficient to undermine confidence in the verdict.

## VII. ARGUMENT

### A. PETITIONER HAS NEVER RECEIVED ANY HEARING ON THE MERITS OF THESE CLAIMS

307. The claims in this Petition are identical to those in Tillery's third, 2016 PCRA petition, which was also based on the declarations of Emanuel Claitt and Robert Mickens, and was filed within 60 days following the declaration of Robert Mickens, as required by the PCRA. 42 Pa. Cons. Stat. § 9545(b)(2) (2016) (amended eff. Dec. 24, 2018 to change the filing period to 1 year).

308. Petitioner's 2016 PCRA petition was dismissed on timeliness grounds by the Court of Common Pleas. On appeal, the Superior Court of Pennsylvania affirmed the dismissal. *Commonwealth v. Tillery*, 193 A.3d 1063 (Pa. Super. 2018)

114

(unpublished memorandum); *Id.,* Court of Common Pleas Opinion Under Pa. R. App. P. 1925(a) (Exhibits "Y", "Z").

309. Under Pennsylvania law, the timeliness requirements of the PCRA are jurisdictional, and are questions of law which are reviewed *de novo. Commonwealth v. Fahy,* 959 A. 2d 312, 316 (Pa. 2008). A court "may not address the merits of the issues raised in a petition if it is not timely filed." *Commonwealth v. Abu-Jamal,* 941 A.2d.1263, 1267-68 (Pa. 2008) (citation omitted). If a PCRA court does hold a hearing on the merits, deference may be given to the PCRA court on purely factual issues, but any finding requiring the application of law to facts is still reviewed *de novo. Fahy,* at 316 (citing *Commonwealth v. Reaves,* 923 A.2d 1119, 1124 (Pa. 2007)).

310. Tillery's PCRA petition was summarily dismissed by the PCRA court on timeliness grounds under Pa. R. Crim. P. Rule 907. Not only was there no determination of the merits of his claim; there has been no factfinding, of any sort, on his petition at all.

311. Petitioner's alleged co-defendant, William Franklin, initially suffered the same fate. His petition, which was based on the same evidence as Tillery's, was

dismissed by the PCRA court on timeliness grounds on September 12, 2017.[13] The PCRA court also made credibility determinations, finding that "the claims of misconduct were so 'outlandish' and 'unreliable' as to permit a credibility based dismissal with an evidentiary hearing." *Commonwealth v. Franklin,* 201 A.3d 854, p. 8 (Pa. Super. 2018) (unpublished memorandum) (Exhibit "AA").

312.    Despite this, the Superior Court of Pennsylvania reversed and remanded for an evidentiary hearing.  *Commonwealth v. Franklin,* 201 A.3d 854 (Pa. Super. 2018) (unpublished memorandum) (Exhibit "AA").

313.    There is no further backstop if Tillery is not permitted to present the merits of his claims to this Court. Tillery has consistently maintained his innocence from the date of his conviction. Below, Tillery briefly discusses the dismissal of his 2016 PCRA petition.

## 1.    The Dismissal of Petitioner's 2016 PCRA Petition

314.    Petitioner recognizes that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v Richey,* 546 U.S. 74, 76

---

[13]   Robert Mickens was not a witness at Franklin's trial. Thus, Franklin's PCRA petition was entirely based on the declaration of Emanuel Claitt, and he received relief on Claitt's declaration alone.

(2005). However, in order to explain that Franklin's PCRA raised *exactly the same* arguments, Tillery briefly describes the dismissal of his PCRA petition.

315.  Petitioner raised both the "governmental interference" and "newly discovered fact" exceptions to the timeliness bar. In support of those exceptions, he made two arguments that his PCRA petition was timely.

316.  First, Tillery argued that *Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014), *Commonwealth v. Davis,* 86 A.3d 883 (Pa. Super. 2014), *Commonwealth v. Loner*, 836 A.2d 125 (Pa. Super. 2003) and *Commonwealth v. McCracken*, 659 A.2d 541 (Pa. 1995) stood for the proposition that due diligence does not require a petitioner to investigate and contact known, lying witnesses, even if the petitioner knows the witnesses are lying because of petitioner's innocence. In particular, Tillery relied on *Medina,* 92 A.3d at 1217-19:

> ". . . we note that in *Commonwealth v. Loner* [citation omitted],  this Court explicitly rejected the Commonwealth's argument that recantation testimony could have been discovered through the exercise of due diligence where a defendant was not present at the scene of the crime, and thus, had reason to believe a witness testifying to the contrary was lying. *Id.* at 137 n.5 (stating, *'we reject the Commonwealth's assertion that the victim's recantation in this case is not truly after-discovered evidence because [the a]ppellant knew prior to trial that the victim was not telling the truth[]*")."

> - *Id.* at 1217 (emphasis added).

317.   The Superior Court in *Medina* went on to conclude that because the witness testified and inculpated the petitioner "consistently and unequivocally at trial," neither defense counsel nor the petitioner, without any supporting factual basis, should have expected to change the witness' testimony, either at trial or afterwards. *Id.* at 1217-18 (citing, *inter alia*, *Commonwealth v. McCracken,* 659 A.2d 541, 545 (Pa. 1995)). Under *Commonwealth v. Bennett,* 593 Pa. 382 (Pa. 2007), the content of (the new facts revealed through) a later recantation is an after-discovered fact providing an exception to the PCRA timeliness bar, independent of the petitioner's knowledge of the perjury at the time of trial. *Medina* holds that due diligence does *not* require a petitioner to investigate known, lying witnesses to discover such recantations if the Commonwealth represents that those witnesses are telling the truth.

318.   Secondly, Tillery argued that *Commonwealth v. Burton*, 121 A.3d 1063 (Pa. Super. 2015) stood for the proposition that due diligence for incarcerated petitioners without representation is fact-specific, and that a less strict diligence standard applies.

319.   The PCRA court in Tillery's appeal distinguished *Medina* and *Davis* by arguing that "[i]n both *Davis* and *Medina*, the Superior Court's due diligence

118

analysis centered on the fact that neither Davis nor Medina had reason to believe they could elicit exculpatory information from the respective witnesses." Court of Common Pleas Opinion Under Pa. R. App. P. 1925(a), p. 6 (Exhibit "Y"). This statement was correct, but it deliberately elides the point.

320.   The Superior Court in *Medina* did hold that the petitioner had no reason to believe he could obtain exculpatory information from the witnesses at his trial. However, this was so *even though Medina knew that the witnesses were lying, because he knew he was innocent*. Despite this, the petitioner was not required to investigate the lying witnesses. That is the whole point of the case.

321.   The Superior Court of Pennsylvania affirmed the PCRA court without comment on *Davis* or *Medina*. On the second, *Burton* issue, it held that "[t]he Pennsylvania Supreme Court previously evaluated the argument that prison conditions constitute a timeliness exception to the PCRA, and rejected it." *Commonwealth v. Tillery*, 193 A.3d 1063, p. 5 (Pa. Super. 2018) (citing *Commonwealth v. Albrecht,* 994 A.2d 1091, 1095 (Pa. 2010)) (unpublished memorandum) (Exhibit "Z").

322.   Franklin's PCRA petition was also denied on timeliness grounds. On appeal, he raised identical arguments to Tillery in the Superior Court, which reversed. The relevant portion of the Superior Court's opinion bears repeating here:

"In its Pa.R.A.P. 1925(a) opinion, the PCRA court found that Claitt's favorable treatment in pending cases was thoroughly explored at trial. Furthermore, it characterized the recantation claim as 'garden variety', and found that Appellant had not exercised due diligence as he failed to contact Claitt in three decades. [Citation omitted]. Moreover, the court maintained that the claims of misconduct were so 'outlandish' and 'unreliable' as to permit a credibility-based dismissal without an evidentiary hearing. [Footnote and citation omitted]. The court distinguished *Medina* and [*Davis*] as 'extremely fact specific, presenting unique circumstances.' [Citation omitted].

We find that Appellant properly pled exceptions to the time-bar . . . Our decisions in *Medina* and *Davis* are instructive in this regard. In *Medina* . . . this Court concluded that the petitioner had *no way of knowing that the two children had lied at trial because a detective had threatened them.* Furthermore, *we found that a reasonable investigation could not have revealed these circumstances* . . .

In *Davis* . . . due diligence **did not require the petitioner to assume that the witnesses were committing perjury sanctioned by the Commonwealth.**"

- *Commonwealth v. Franklin,* 201 A.3d 854, pp. 9-11 (Pa. Super. 2018) (unpublished memorandum) (emphasis added) (Exhibit "AA").

323.    On the *Burton* issue, the Superior Court sanctioned *Burton's* holding that "due diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." *Commonwealth v. Franklin,* 201 A.3d 854, p. 11 (Pa. Super. 2018) (citing *Burton,* 121 A.3d at 1071) (unpublished memorandum) (Exhibit "AA").

324.   The Superior Court's decision in Franklin's appeal was actually over a stronger lower court decision than Tillery's, since the PCRA court made credibility determinations in Franklin's appeal. Despite this, the Superior Court saw fit to reverse.

325.   The decisions denying Tillery an evidentiary hearing in the Pennsylvania courts were manifestly incorrect. Tillery respectfully submits that, on identical facts, citing exactly the same cases, and making the same arguments, Tillery's co-defendant has been granted the relief which Tillery is rightfully entitled to: a determination of the merits of the grave allegations of prosecutorial misconduct and the constitutional violations he raises here for the first time.

### 2.   Petitioner's *Pro Se* 2007 PCRA Petition

326.   The Superior Court of Pennsylvania, in denying Tillery a hearing on timeliness grounds, also approved the PCRA court's declaration that the claims in this petition were previously raised in Tillery's second, 2007 *pro se* PCRA petition. *Commonwealth v. Tillery*, 193 A.3d 1063, p. 5 (Pa. Super. 2018). For purposes of clarity, Tillery describes his 2007 PCRA petition below.

327.   The factual predicate of Tillery's *pro se* 2007 PCRA petition (Exhibit "U") was that Claitt was offered a sentence of "less than ten years" as a plea deal

on the 1978-1980 charges and that Mickens had obtained parole assistance, contradicting their trial testimony that they had no deals.

328.   Exhibit "M", Arnold Gordon's January 31, 1984, letter to the Parole Board and Exhibit "K", Assistant District Attorney Leonard Ross's letter to Judge Katz on January 5, 1981 were attached as exhibits to Tillery's 2007 PCRA petition. The other exhibits referenced in Tillery's 2016 PCRA petition (as well as this Petition) are new, and were not available in 2007.

329.   There was no documentation in the available records at that time to support the new facts, as now revealed in Claitt's and Mickens' declarations, that their testimony was manufactured and coached by the Commonwealth. Nor were the specific plea deals known, which included dismissals of open charges - including entire sets of charges which were never disclosed at trial - along with other inducements offered to Claitt and Mickens, such as arranging for sex with girlfriends in homicide interview rooms.

330.   The 1983 log records of the Police Administration Building (PAB) homicide interview rooms, which corroborate the assertions of sexual liaisons in exchange for false testimony, are not public records and could not have been

122

discovered by Tillery through a records search. They were provided to Tillery by a prisoner, Andre Harvey, who obtained them through a private investigator.

331.   Based on the trial testimony of Claitt and Mickens, who stated at trial that they were witnesses to or in some way involved in the shootings, Tillery had always assumed that Claitt and Mickens were uncharged accessories to the October 22, 1976 shooting. This did not change until he discovered, through Claitt's and Mickens' declarations, that neither had been at the poolhall on October 22, 1976 at all.

332.   Although the 2007 PCRA petition alleges Claitt's deal with prosecutors for the 1978-1980 charges, it did not include Claitt's admission that he had a deal with the Commonwealth, since that was not available at the time.

333.   More significantly, it did not include the claim that the Commonwealth completely concealed the existence of the May 16, 1980 robbery charges and its agreement to dismiss those charges - prosecutorial misconduct which alone should merit reversal.

334.   The 2007 PCRA petition also did not include the Commonwealth's agreement with Claitt to dismiss the April 13, 1983 charges (the 1983 robbery charges).

335.   Although it alleges the existence of an agreement between Mickens and the Commonwealth, the 2007 PCRA petition does not include an allegation that Mickens had a deal to receive zero prison time. Nor was the 2007 petition supported by an admission, from Mickens, that such a deal existed.

336.   The existence of the sex-for-testimony arrangement between Claitt, Mickens and the Commonwealth was also not alleged in the 2007 PCRA petition.

337.   Petitioner has consistently maintained his innocence from the date of his conviction. The claims in this Petition were not alleged in 2007 for the simple reason that there was no evidence at the time to support them.

338.   Tillery's 2016 PCRA petition contains substantively different claims from his 2007 PCRA. The 2016 PCRA also contains entirely different, and far more serious, factual allegations regarding the specific content of the perjured testimony - the entirety of Claitt and Mickens' testimony - supported by newly discovered evidence.

**B.      PETITIONER MEETS THE REQUIREMENTS OF 28 U.S.C. § 2244 (b)(2)**

339.    In order to file a successive petition for writ of habeas corpus, a petitioner must demonstrate that his petition satisfies the requirements of § 2244(b)(2), which states:

> (i)      The factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii)     The facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

- 28 U.S.C § 2244(b)(2)(B).

**1.      The Factual Predicate of These Claims Could Not Have Been Discovered Previously Through the Exercise of Due Diligence**

340.    An important, even primary, consideration in evaluating Tillery's exercise of due diligence is the extent and impact of the evidence which has been suppressed by the Commonwealth. This Petition does not allege that a potentially exculpatory piece of documentary evidence was suppressed, or that a single, secondary witness subsequently recanted their testimony. The primary eyewitness has now stated that his testimony was entirely perjured, and *every* eyewitness so states. Furthermore, the Commonwealth deliberately suppressed the existence of

robbery charges (the May 1980 robbery charges) and its deal with Claitt on those charges, in addition to deals on other charges (the 1983 robbery charges and the 1978-1980 charges), the revelation of which would undoubtedly have compelled a different verdict at trial.

341.   As discussed below, the factual predicate is not that Claitt and Mickens lied in inculpating Tillery: that is not a new fact. Tillery was well aware of this, and has always maintained that he is factually innocent.

342.   The following acts of misconduct by the Commonwealth were previously unknown to Tillery:

    (a)    The fact that prosecution witnesses Claitt and Mickens were not on the scene of the shootings at all, and that the entirety of their testimony concerning Tillery was false, was known to the Commonwealth, which used threats and promises of favorable treatment as an inducement for that false testimony;

    (b)    Threatening prosecution witnesses Claitt and Mickens with false murder charges unless they agreed to provide false testimony against Tillery;

(c)     Arranging private meetings for sexual liaisons involving Claitt and

        Mickens, while they were in custody, by named detectives, with

        named women;

(d)     Manufacturing Claitt's and Mickens' false statements and testimony

        inculpating Tillery;

(e)     Arranging a meeting of Claitt with Mickens, while they were in

        custody, for Claitt to convince Mickens to falsely testify against

        Tillery;

(f)     Granting multiple undisclosed plea deals to Claitt and Mickens,

        including dismissal of charges, minimal sentences, bail arrangements

        and release from jail despite detainers;

(g)     Concealing the existence of a set of charges (the May 16, 1980

        robbery charges) from the defense, on which the Commonwealth had

        an agreement to dismiss the charges entirely;

(h)     Prompting Claitt and Mickens to testify falsely denying those same

        plea deals and bail and parole agreements; and

(i)     Vouching at trial for the truthfulness and lack of ulterior motive for

        Claitt's and Mickens' false testimony, and failing to correct that

        perjured testimony.

343.    The Supreme Court has held that a stricter standard of materiality applies in cases where the prosecution intentionally solicits perjured testimony. *United States v. Agurs,* 427 U.S. 97, 103 (1976). In the *Brady* context, the Third Circuit has also definitively rejected the proposition that a due diligence requirement should be imposed on a petitioner. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3rd Cir. 2016). In doing so, the Third Circuit noted:

> "[*Brady's*] focus on disclosure by the prosecutor, not diligence by defense, is reiterated in the Supreme Court's approval of the shift in the traditional adversarial system *Brady* imposes . . . That the government may be burdened by the *Brady* rule does not undercut its need to comply with it. The imposition of an affirmative due diligence requirement on defense counsel would erode the prosecutor's obligation under, and the basis for, *Brady* itself."

> - *Dennis,* 834 F.3d at 290

344.    The exculpatory evidence considered in *Dennis* was a receipt in the possession of the Commonwealth which, the Commonwealth asserted, could have been obtained by the defense through public records searches, but was not discovered until many years later. The wrongdoing documented in this Petition is far more egregious: it undermines the entirety of the evidence actually presented at trial. Furthermore, it was not available through public records, and was actively suppressed by the Commonwealth.

128

345.   In fact, as noted previously, the allegations in this Petition closely track *Banks v. Dretke,* 540 U.S. 668 (2004), on which *Dennis* relied. In *Banks,* a witness' trial testimony had been "intensively coached by prosecutors and law enforcement officers", and a police informant "testified, untruthfully, that he never gave the police any statement and, indeed, had not talked to any police officer about the case until a few days before the trial." *Id.* at 675. In rejecting a due diligence requirement for a *Brady* claim alleging prosecutorial misconduct, the Supreme Court held in *Banks* that "[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696.

346.   Although a due diligence requirement for a *Brady* claim is analytically distinct from the gatekeeping inquiry here, the Third Circuit's opinion in *Dennis*, which involved facts far less egregious than those in Tillery's Petition, should weigh heavily in this Court's assessment of whether Tillery makes a showing of due diligence.

347.   The Third Circuit has explained that the "reasonable diligence" standard does not require extreme or exceptional diligence. *Wilson v. Beard*, 426 F.3d 653, 660 (citing *Schuleter v. Varner,* 384 F.3d 69, 74 (3d Cir. 2004) (". . . to satisfy § 2244(d)(1)(D)'s 'due diligence' standard, a prisoner must exercise

'reasonable diligence in the circumstances.'"); *Lacava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005) (reasonable diligence does not require 'the maximum feasible diligence.'). The standard does not require "perfection" in the conduct of the litigation. *Urcinoli v. Cathel,* 546 F.3d 269, 277 (3d Cir. 2008). The Third Circuit also recognizes that a long period of incarceration bears on the due diligence inquiry, and that "physical confinement can limit a litigant's ability to exercise due diligence." *Schuleter v. Varner,* 384 F.3d at 75 (citing *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004)).

348.   Petitioner has consistently maintained his innocence. He was aware at trial that the testimony against him was perjured. Following his conviction, despite the lack of legal representation, he steadily conducted research on Claitt and Mickens and investigated avenues through which he could prove his innocence. This included obtaining a large number of external documents and public records through the Pennsyvlania Right-to-Know Law, which were used to support his second PCRA petition in 2007.

349.   Petitioner's *pro se* 2007 PCRA petition, his second, was the result of these diligent and extensive efforts. The factual predicate of that petition was that Claitt was offered a sentence of "less than ten years" as a plea deal and Mickens

had obtained parole assistance, contradicting their trial testimony that they had no deals.

350.   In this regard it should also be noted that public access to Pennsylvania Criminal County criminal docket sheets only became available on September 18, 2006, shortly before Tillery filed his 2007 PCRA. Prior to that date, Tillery was unable to obtain comprehensive lists of Claitt and Mickens' docket sheets.

351.   The 2007 PCRA petition shows that Tillery has consistently and patiently sought, within the constraints imposed upon him by his more than 37-year incarceration (of which approximately 20 years were spent in solitary confinement) to uncover information on Claitt and Mickens and prove his innocence.

352.   There was no documentation in the available records at that time to support the new facts, as now revealed in Claitt's and Mickens' declarations, that their testimony was manufactured and coached by the Commonwealth. Nor were the specific plea deals known, which included dismissals of open charges - including entire sets of charges which were never disclosed at trial - along with other inducements offered to Claitt and Mickens, such as arranging for sex with girlfriends in homicide interview rooms.

353.    Based on the trial testimony of Claitt and Mickens, who stated at trial that they were witnesses to or in some way involved in the shootings, Tillery had always assumed that Claitt and Mickens were uncharged accessories to the October 22, 1976 shooting. This did not change until he discovered, through Claitt's and Mickens' declarations, that neither had been at the poolhall on October 22, 1976 at all.

354.    Petitioner did not previously attempt to contact Claitt or Mickens. He did not do so in the preparation for his 2007 PCRA, or afterwards, until Claitt and Mickens themselves came forward in 2016. It is not that doing so never occurred to him. The reason he did not previously seek to contact either witness is because the Commonwealth maintained, falsely, that Claitt and Mickens had been threatened by him.

355.    At trial, Claitt falsely maintained that Tillery had attempted to shoot him in 1982 in retaliation for his testimony. The Commonwealth also obtained a protective order at trial to conceal Mickens' identity from the defense, on the false grounds that Mickens feared retaliation. Because of the prosecutorial misconduct in this case, any attempt to contact Claitt or Mickens would have prompted immediate retaliation from prosecutors. Claitt states that, as recently as 2014, he

132

was still receiving favorable treatment from the Philadelphia District Attorney's office. Declaration of Emanuel Claitt, May 4, 2016 (Exhibit "A"). Both Claitt and Mickens state that they did not previously come forward due to fear of retaliation if they did so.

356.   To more clearly explain the consequences for him if he had attempted to contact either witness earlier, Tillery briefly summarizes the circumstances of his incarceration.

357.   Following his conviction, Tillery was identified in prison as a leader in the prison population and - falsely - as a former leader in the Philadelphia Black Mafia. After riots broke out at Camp Hill in October 1989, Tillery was shipped out of Pennsylvania and transferred into the federal system, into maximum security and solitary confinement at Leavenworth and then the super-max isolation prison at Marion, Ill. His prison jacket falsely stated that he was a participant in the Camp Hill riot and that he had "gang involvement". These allegations were plainly incorrect, since Tillery was *not even incarcerated at Camp Hill when the riots happened,* and could not have been a participant.[14]

------------------------

[14]   The errors in Tillery's record were not corrected until twenty years after his conviction, in 2007-2009, when Tillery participated in a class action lawsuit challenging the grounds for his solitary confinement in the New Jersey State

133

358.    Over three decades of incarceration, during which he spent more than twenty years in solitary confinement,[15] Tillery had zero misconducts based on gang affiliations or prisoner organizing, belying his alleged affiliation with the "Black Mafia". He was released from solitary confinement in 2014 after eleven years without a misconduct - only two years before Claitt and Mickens made their declarations.

359.    Furthermore, both Claitt and Mickens explicitly state that they feared, and continue to fear, retaliation for revealing the Commonwealth's solicitation of perjured testimony and exercise of coercion upon them.

360.    The conditions of Tillery's thirty year confinement are relevant to this Court's due diligence inquiry. *Schuleter v. Varner,* 384 F.3d at 75. Despite the conditions of his incarceration, Tillery utilized available public records to research

---

Management Control Unit (MCU). Although the action was dismissed on summary judgment, the twenty-year error in his record concerning his presence at Camp Hill during the riots was corrected during the lawsuit. *Tillery v. Hayman*, No. 3:07-cv-02662-MLC-LHG (D.N.J. Mar. 31, 2011).

134

and file his second PCRA petition in 2007. The records underpinning this Petition - the declarations of Claitt and Mickens, and the PAB log sheets provided by Andre Harvey - were not public records. Tillery could not have located Claitt and Mickens safely until they themselves came forth. Furthermore, the witnesses who have now come forward state explicitly that they feared, and continue to fear, retaliation for doing so.

361.   Petitioner has exercised reasonable diligence in pursuing avenues for relief. Reasonable diligence is fact-specific, and takes into account the conditions of a petitioner's confinement. Due diligence cannot include a requirement for a petitioner to affirmatively take steps to contact known, lying witnesses who represented that they feared retaliation from the petitioner, who actually testified that they were attacked by the petitioner at trial, and with respect to whom the petitioner would have faced retaliation for attempting to contact.

362.   "In *Banks [v. Dretke]*, the Supreme Court explicitly rejected the notion that 'the prosecution can lie and conceal and the prisoner still has the burden

---

[15]   Over the course of his thirty year incarceration, Tillery has been transferred to more than ten different prisons. In addition to solitary confinement at Leavenworth and Marion, Tillery spent five years in the New Jersey State Management Control Unit (MCU) in Trenton, four years in solitary at SCI Retreat,

to . . . discover the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) (quoting *Banks,* 540 U.S. at 696). The Supreme Court has made it clear that the Commonwealth's conduct, as described in this Petition, is the very sort of government interference with the truth-seeking process that cannot be tolerated. Under *Banks,* "a defendant is 'entitled to treat the prosecutor's submissions as truthful.' *Banks,* 540 U.S. at 698; *see also id.* at 696 (counsel is entitled to "'presume that [the Commonwealth has] properly discharges [its] official duties'") (citation omitted); *Berger v. United States,* 295 U.S. 78, 88 (1935).

363.    Although *Dennis'* rejection of a due diligence requirement for the substantive component of a *Brady* claim is analytically distinct from the due diligence inquiry of  28 U.S.C. § 2244(b)(2), Tillery respectfully submits to this Court that concerns regarding prosecutorial misconduct, as well as the corruption of the truth-seeking process by the intentional procurement of perjured testimony, should weigh heavily in its consideration of due diligence for a successive petition.

---

SCI Pittsburgh and SCI Forest, and four months in solitary at SCI Frackville, for a total of approximately 20 years in solitary confinement.

### 2. With the Facts Underlying This Petition, No Reasonable Factfinder Could Have Found Tillery Guilty of the Underlying Offense

364. The two witnesses on whose testimony Tillery's conviction depended state that their substantive testimony was entirely false. They recount circumstances in which their perjured testimony was extorted from them through threats of prison time. Inducements were provided, including promises of leniency and sexual inducements. Those promises of leniency were, actually, fulfilled. None of this was disclosed to Tillery.

365. The declarations of Emanuel Claitt and Robert Mickens undermine the entirety of the Commonwealth's case. Both state their testimony - *all* the evidence inculpating Tillery - was manufactured by the Commonwealth.

366. In addition to this, the Commonwealth suppressed evidence of deals to dismiss a set of robbery charges, to receive reduced time on charges which Claitt pled guilty to, and also completely concealed the existence of a separate set of robbery charges for which Claitt was arrested *four days* before his statement to police inculpating Tillery.

367. This Court has explained that if a key witness testifies, falsely, that they received no consideration for their testimony, this alone suffices to make out a *Napue* claim. *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 145-47 (3d Cir.

2017) (citations omitted). Taking these facts "in light of the evidence as a whole" - a review which should include in its purview the paucity of direct evidence against Tillery at trial - this Court should conclude, to a clear and convincing (or indeed, to any) standard, that no reasonable factfinder who was aware of this evidence could have found Tillery guilty.

### C.  PETITIONER SATISFIES AN EQUITABLE EXCEPTION TO 28 U.S.C. § 2244(d)

#### 1.  Legal Standard

368.   "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). As relevant here, the limitations period begins anew on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

369.   AEDPA's limitation period "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run'." *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough,* 547 U.S. 198, 208 (2006)). The Supreme Court has held that AEDPA's limitation period is not jursidictional. *Id.* (citing *Day,*

138

547 U.S. at 205); *see also Miller v. N.J. State Dep't of Corr.,* 145 F.3d 616, 617 (3d Cir. 1998). Instead, the limitation period is subject to both statutory and equitable tolling.[16] *Munchinski v. Wilson*, 694 F.3d 308, 327-29 (3d Cir. 2012).

370.   In addition to tolling, "to prevent a 'fundamental miscarriage of justice', an untimely petition is not barred when a petition makes a 'credible showing of actual innocence' . . . " *Reeves v. Fayette SCI,* 897 F.3d 154, 160 (3d Cir. 2018) (quoting *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013)).

### 2.    Petitioner's Innocence Provides a Gateway Through the Statute of Limitations

371.   Petitioner's showing of innocence allows him to overcome procedural default and to obtain a ruling on the merits of any procedurally defaulted claim. The Supreme Court recently reiterated the significance of such a showing of innocence to obtaining review of otherwise procedurally-defaulted claims:

> "Decisions of this Court support Perkins' view of the significance of a convincing actual-innocence claim . . . We have recognized . . . that a prisoner 'otherwise subject to defense of abusive or successive use of the writ [of habeas corpus] may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence.' *Id.,* at 404

---

[16]   Because the Pennsylvania courts rejected Tillery's PCRA petition as untimely, it was not "properly filed" within the meaning of 28 U.S.C. § 2244(d)(2), and he was not entitled to statutory tolling, per *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005).

139

(*citing Sawyer v. Whitley,* 505 U.S. 333 (1992)). *See also Murray v. Carrier,* 477 U.S. 478, 496 (1986) ('[w]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.'). In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief. 'This rule, or fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.' *Herrera,* 506 U.S. at 404.

We have applied the miscarriage of justice exception to overcome various procedural defaults. These include 'successive' petitions asserting previously rejected claims, see *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986) (plurality opinion), 'abusive' petitions asserting in a second petition claims that could have been raised in a first petition, see *McCleskey v. Zant*, 499 U.S. 467, 494-495 (1991), failure to develop facts in state court, see *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 11-12 (1992), and failure to observe state procedural rules, including filing deadlines, see *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Carrier,* 477 U.S. 495-496."

- *McQuiggin v. Perkins*, 569 U.S. 383, 392-393 (2013).

372.    Thus, when a petitioner presents a claim of innocence and a fundamental miscarriage of justice, concepts of cause and prejudice "must yield to the imperative of correcting a fundamentally unjust incarceration." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). The "miscarriage of justice" exception applies to cases of "probable innocence", *Schlup v. Delo,* 513 U.S. 298, 317, 324-25, 326-27 & n. 42 (1995).

140

373.   AEDPA's statute of limitations is a federal procedural default, to which a gateway claim of actual innocence provides an equitable exception. *McQuiggin*, 569 U.S. at 394.

374.   The claim in *Schlup* was not itself a constitutional claim, but a gateway through which the petitioner could pass in order to obtain review of otherwise barred claims. *Id.* at 315-16. Consequently, *Schlup* carried less of a burden of proof than *Herrera*. *Id.* at 316. A petitioner need not show that he is actually innocent of the crime he was convicted of, but only that in light of the new evidence "a court cannot have confidence in the outcome of the trial." *Id.* This standard is significantly easier to meet than the standard for a sufficiency of the evidence challenge under *Jackson v. Virginia*, 443 U.S. 307 (1979). *Schlup,* 513 U.S. at 327, 330.

375.   A court determining whether a gateway claim of actual innocence has been proven engages in a "probabilistic determination" regarding whether it is "more likely than not" that no reasonable juror, in light of the new evidence, would have found the petitioner guilty. *Id.* at 315-16. The Supreme Court has also described this standard as whether it is "more likely than not *any* reasonable juror would have reasonable doubt . . ." *House v. Bell,* 547 U.S. 518, 538 (2006) (emphasis added).

376.   A reviewing court does not exercise "independent judgment as to whether reasonable doubt exists." Instead, it makes an evaluation "about what reasonable, properly instructed jurors would do." This inquiry is "[focused] . . . on the likely behavior of the trier of fact." *Schlup,* 513 U.S. at 329-30; *Reeves v. Fayette SCI,* 897 F.3d 154, 160-61 (3d Cir. 2018). "Because a *Schlup* claim involves evidence the jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall newly supplemented record." *House,* 547 U.S. at 555. "The *Schlup* inquiry . . . requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable doubt standard." *Id.*

377.   Evidence that casts doubt upon the reliability of the proof of guilt, including impeachment evidence, but which does not affirmatively prove innocence, can be enough to pass through the *Schlup* gateway. *See Schlup*, 513 U.S. at 327 ("[U]nder the gateway standard . . . , the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial."); *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997).

378.   Here, Tillery has pled facts that establish a "miscarriage of justice". The evidence against Tillery at his trial was already questionable. There was no

physical evidence, and the case rested entirely on the testimony of Emanuel Claitt.

The new exculpatory evidence described above undermines the entirety of the

evidence against Tillery, and in light of this evidence - particularly Claitt's

statements that the Commonwealth manufactured his testimony - it is more likely

than not that no reasonable juror would vote to convict him. Other courts have

found a *Schlup* claim on similar proof. They have also found a *Schlup* claim to be

made out when less than all the eyewitnesses declared their testimony was false.[17]

In this case, *every* fact witness has declared that their testimony was not only false

or inaccurate, but manufactured by the Commonwealth.

---

[17] *See, e.g., Finch v. McKoy,* 914 F.3d 292 (4th Cir. 2019) (no physical evidence; recantation of secondary eyewitness who did not give perjured testimony, but who was pressured by police and prosecutors into testifying, cast doubt on primary eyewitness and met *Schlup* standard); *Teleguz v. Pearson,* 689 F.3d 322 (4th Cir. 2012) (recantations of two out of three eyewitnesses, who had been threatened by police and prosecutors, met *Schlup* standard); *Fairman v. Anderson,* 188 F.3d 635 (5th Cir. 1999) (recantation of sole witness, who testified under threatened charges by police; court held the recantation met *Schlup* standard, granted the writ and reversed conviction); *Arnold v. Dittman,* 901 F.3d 830 (7th Cir. 2018) (sexual assault of a child; recantation of key eyewitness, standing alone, required remand for an evidentiary hearing on *Schlup* claim); *Amrine v. Bowersox,* 128 F.3d 1222 (8th Cir. 1997) (no physical evidence; three direct eyewitnesses all recanted, stating they were pressured into testifying and had open charges dismissed; remand to consider *Schlup* claim); *Carriger v. Stewart,* 132 F.3d 463 (9th Cir. 1997) (chief prosecution witness recanted; court granted the writ).

143

379.   At a minimum, Tillery is entitled to show his actual innocence at an evidentiary hearing. "Actual innocence" is fact-dependent. As *Schlup* found, "[t]he fact-intensive nature of this inquiry, together with the District Court's ability to take testimony from the key witnesses if it deems that course advisable, convinces us that the most expeditious procedure is to . . . remand[] to the District Court for further proceedings consistent with this opinion." *Schlup*, 513 U.S. at 332.

380.   Accordingly, as to his allegations that his innocence acts as a gateway to review of defaulted claims, this Court should either: 1) find that Tillery has met the *Schlup* standard and review any claims found to be procedurally defaulted on their merits; or 2) grant him an evidentiary hearing to show his actual innocence as a gateway to review of any such defaulted substantive claims. Such a hearing would also be required to permit him to demonstrate his entitlement to relief based on his innocence as a free-standing claim for relief.

381.   The requirements of 28 U.S.C. § 2254(e)(2) do not apply to any evidentiary hearing on a *Schlup* claim. *Cristin v. Brennan*, 281 F.3d 404, 417 (3d Cir. 2002) (28 U.S.C. § 2254(e)(2) does not apply to "hearings on excuses for procedural defaults"); *Holloway v. Horn,* 355 F.3d 707, 716 (3d Cir. 2004) (same, for cause to excuse a procedural default).

144

### 2. Petitioner Qualifies for Equitable Tolling

382.    The AEDPA statute of limitations is also subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631 (2010). ". . . equitable tolling is appropriate when 'principles of equity would make the rigid application of a limitation period unfair." *Munchinski v. Wilson,* 694 F.3d 308, 328-329 (3d Cir. 2002) (quoting *Miller v. N.J. State Dep't of Corr.,* 145 F.3d 616, 618 (3d Cir. 1998)). For equitable tolling to apply, a petitioner must show that he has been diligently pursuing his rights and that an extraordinary circumstance prevented him from filing his petition on time. *Holland,* 560 U.S. at 649.

383.    As discussed previously, Tillery has shown reasonable diligence in pursuing his petition. He submits that his lack of access to legal resources during his incarceration, including the destruction of his legal files in 2011 at SCI Pittsburgh, constitutes extraordinary circumstances. *Miller v. N.J. State Dep't of Corr.,* 145 F.3d 616 (3d Cir. 1998).

## CONCLUSION AND REQUEST FOR RELIEF

Wherefore, Petitioner, Major G. Tillery, prays this Honorable Court, for all of the aforementioned reasons, including the attached affidavits and exhibits, and in the interests of justice, to:

1)    Grant him an evidentiary hearing and discovery;

2)    Reverse his conviction;

3)    Bar re-trial, and

4)    Issue a writ of habeas corpus and order his immediate release.

Dated: _____          Respectfully Submitted,


_____
MAJOR G. TILLERY
Petitioner *Pro Se*
SCI Chester
500 E. 4th Street
Chester, PA 19013


146

# INDEX TO EXHIBITS

| Exhibit No. | Title |
|---|---|
| Exhibit A | Verified Declaration of Emanuel Claitt, May 4, 2016 |
| Exhibit B | Verified Declaration of Emanuel Claitt, June 3, 2016 |
| Exhibit C | Transcript - Videotaped Statement of Emanuel Claitt, August 3, 2016 |
| Exhibit D | Verified Declaration of Robert Mickens, April 18, 2016 |
| Exhibit E | Statement of John Pickens, October 22, 1976 |
| Exhibit F | Declaration of Rachel Wolkenstein, September 6, 2016 |
| Exhibit G | Philadelphia Police Administration Log Book for December 14, 1983 (Excerpt) |
| Exhibit H | Right-to-Know Law Requests for Police Administration Building Log Books and Transportation Records of Emanuel Claitt and Robert Mickens |
| Exhibit I | Written Statement of Robert Mickens, September 26, 1984 |
| Exhibit J | Summary of Charges and Docket Sheets, Emanuel Claitt |
| Exhibit K | Letter From Assistant District Attorney Leonard Ross to Judge Leon Katz, January 5, 1981 |
| Exhibit L | Transcript of Emanuel Claitt's Sentencing Hearing Before Judge Leon Katz, September 17, 1981 (Excerpts) |
| Exhibit M | Letter From Homicide Unit Chief Arnold Gordon to Parole Board, January 31, 1984 |

| Exhibit No. | Title |
|---|---|
| Exhibit N | Letter From District Attorney Edward Rendell to Judge John L. Chiovero, February 18, 1984 |
| Exhibit O | Letter From Homicide Unit Assistant Chief Jeffrey A. Brodkin to Parole Board, October 25, 1984 |
| Exhibit P | *Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum) |
| Exhibit Q | Petitioner's 1996 PCRA Petition, September 20, 1996 |
| Exhibit R | *Commonwealth v. Tillery,* No. 523 Philadelphia 1998, 742 A.2d 1055 (Pa. Super. 1999) (unpublished memorandum) |
| Exhibit S | District Court's Order Denying Petitioner's First Petition for Habeas Corpus, July 30, 2003 |
| Exhibit T | Opinion of the Court of Appeals, *Tillery v. Horn,* 142 F.App'x 66 (3d Cir. 2005) (No. 03-3616) |
| Exhibit U | Petitioner's 2007 PCRA Petition, August 13, 2007 |
| Exhibit V | *Commonwealth v. Tillery,* 981 A.2d 937 (Pa. Super. 2009) (unpublished memorandum) |
| Exhibit W | Petitioner's 2016 PCRA Petition, June 16, 2016[1] |

---

[1]   The exhibits to the 2016 PCRA Petition are duplicative of other exhibits in this petition. To avoid multiple sets of exhibits, they have not been included.

| Exhibit No. | Title |
|---|---|
| Exhibit X | Petitioner's 2016 Supplemental PCRA Petition, September 7, 2016[2] |
| Exhibit Y | Court of Common Pleas Opinion Under Pa. R. App. P. 1925(a), *Commonwealth v. Tillery,* 3270 EDA 2016, 193 A.3d 1063 (Pa. Super. 2018) |
| Exhibit Z | *Commonwealth v. Tillery*, 3270 EDA 2016, 193 A.3d 1063 (Pa. Super. 2018) (unpublished memorandum) |
| Exhibit AA | *Commonwealth v. Franklin,* 201 A.3d 854 (Pa. Super. 2018) \| (unpublished memorandum) |

---

[2]  The exhibits to the 2016 Supplemental PCRA Petition are duplicative of other exhibits in this petition. To avoid multiple sets of exhibits, they have not been included.

Exhibit A

Verified Declaration of Emanuel Claitt, May 4, 2016

## DECLARATION OF EMANUEL CLAITT
### PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

Emanuel Claitt makes the following verified declaration:

I submit this declaration stating that I lied when I testified at the trial of Major Tillery in May 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.

I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.

I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.

I was in prison in 1980 on serious charges and I was approached by Philadelphia detectives Larry Gerrard and Ernest Gilbert. They threatened to charge me with the murder of Samuel Goodwin. I had eight or nine open cases, at least three of them were felonies with a lot of years of prison time.

I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder.

Detectives and prosecutors ADA Roger King and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I

Pa 272

E. C. 1

wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted to arrest him and Franklin. So Franklin was tried in December 1980 and I falsely testified against William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This

Pa 273

E. E.   2

*E.C.*
*Dana Goodwin*

argument supposedly took place in the home of ~~Samuel Good~~win. I testified

that Major Tillery was there and after an argument and pistol slapping of Clark

by Hollis, Major Tillery said that "Hollis would have to die for what he did."

This was not true. I was not at any such meeting and I didn't have any

personal knowledge of this supposed argument and threat made by Major

Tillery.

*E.C.* I also testified at Major Tillery's trial that after the argument in

*Goodman's*
~~Goodwin~~'s house a group that included me as well as Clark and Major Tillery

met at a mosque in North Philadelphia and drove a few blocks to a poolroom

owned by William Franklin to demand Sylvester White, the head of the West

Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this

actually happened.

I falsely testified that on October 22, 1976, I was standing by the door

inside the pool hall during the meeting to prevent anyone from entering or

leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard a gunshot/gunshots in the pool hall, saw

Pickens and Hollins shot and that Major Tillery and Franklin were in the pool

hall and that they were the shooters.

*E.C.*

3

Pa 274

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery. I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on the front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie , Roger King interviewed me, and worked over my testimony to make sure

4

Major Tillery and William Franklin were convicted of murder and attempted murder.

*false E.C.* [handwritten]

In exchange for my testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison, *for something I did or do + framed by the ADA E.C.* [handwritten]

In 2014 I was given help by the prosecution in getting all my bond *judgements did my stuff* money returned to me for cases going back over 23 years. *E.C.* [handwritten]

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this. I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

DATED: May 4, 2016

_____
EMANUEL CLAITT

## **VERIFICATION**

I verify that the statements made in the above Declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date: May 4 , 2016

EMANUEL CLAITT

Exhibit B

Verified Declaration of Emanuel Claitt, June 3, 2016

## SUPPLEMENTAL DECLARATION OF EMANUEL CLAITT
PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

Emanuel Claitt makes the following verified declaration:

I submit this supplemental declaration about my false, manufactured

testimony against Major Tillery and William Franklin in the November 1980

and May 1985 trials for the murder of Joseph Hollis and attempted murder of

John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any

personal knowledge that Major Tillery and William Franklin were involved or

part of those shootings. They manufactured the lies I gave against Tillery and

Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the

shootings at the poolroom on October 22, 1976, that I wasn't there then or at

the argument at Dana Goodman's house or meetings before the October 22,

1976 shootings. ~~They said things to me~~ like: For example In our meetings I
said you know I wasn't there — you have to fill
in the blanks. Detectives Gerrard, Gilbert, Det
Lubiejewski and ADA Lynn Ross would tell
me —"you've got to say it this way,"
I was told - "we've got to bring him down -
you've got to help us," That meant I should lie
Barbara Christie told me, "your the best, you should
have been a lawyer." That meant I knew how to lie.

*Emanuel Claitt*

The prosecutor against William Franklin in 1980 was Lynn Ross. I met
with him as well as ADAs who worked with Barbara Christie.
soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert ? Lubiejewski
E. C. I met with ADA Roger King als who had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She
was worried about my first statement that John Pickens had gone through a
glass door. She coached me to testify about a second door leading out of the
poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's
questions about whether I had plea deals or any agreements for leniency in
sentencing for all the charges I faced back in 1980 when I first gave a statement
about the shootings of Hollis and Pickens and since then. ADA Christie
coached me on this like ADA Lynn Ross did before I testified against William
Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that
the only plea agreement was that my sentences on three cases would run
concurrently. But I had been promised the DA's recommendation to receive no
more than 10 years. In fact I got one and a half-years. When I was questioned
about this at Major Tillery's case I repeated the lie that I had no plea deal about
length of sentencing. ADA Christie knew that wasn't true.

I was scheduled to go to trial on my robbery case soon after the Tillery
trial was over. ADA Christie coached me to stick to saying that the robbery
case was "open" and that there were no agreements about leniency and
sentencing. She coached me to just say I knew the judge would be told about
my cooperation in Major Tillery's case and other cases. That's what I stuck to.
But my testimony that there was no plea deal was a lie and ADA Christie knew
that. She told me ~~I would get very little time.~~ the robbery charges & other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery
and George Rose were involved in bombing/firebombing in 1979 and 1980 that
I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and
threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at these trials
and that my false testimony was manufactured by the ADAs and police until
now. It has taken me all these years to be willing and able to deal with my
conscience and put aside my fears of retaliation by the police and prosecution
for telling what really happened at those trials.

Pa 281

3

I am now ready and willing to testify in court for Major Tillery and

William Franklin and tell the truth that I lied against them at their trials,

coerced by police and prosecutors.

DATED: 6/3/16

EMANUEL CLAITT

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct
to the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: June 3, 2016

EMANUEL CLAITT

4



Exhibit C

Transcript - Videotaped Statement of Emanuel Claitt, August 3, 2016

# Transcript – Video Taped Statement of Emanuel Claitt, August 3, 2016

**Emanuel Claitt:**

I am Emanuel Claitt and I affirm the truthfulness of my verified declarations dated May 4, 2016 and June 3, 2016.

I lied when I testified at the trials of William Franklin in November 1980 and of Major Tillery in 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured. I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.

I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Larry Gerrard, Ernest Gilbert and Lt. Bill Shelton and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

They worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

I was in prison in 1980 on serious charges and I had a lot of open cases. At least three of them were felonies with a lot of years of prison time.

Detectives and prosecutors ADA Lynn Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

The detectives with the knowledge and direction of ADAs Lynn Ross, Barbara Christie and Roger King promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

None of my testimony was true. I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I saw Major Tillery and William Franklin shoot Pickens and Hollins.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Road, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing -firebombings in 1979 and 1980 that I testified to that in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. In fact I got one and a half-years.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

At Major Tillery's trial I testified that there was no plea deal. That was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I wasn't willing to tell the truth about the lies I testified to at these trials and that my false testimony was manufactured by the ADAs and police until now.

I gave my verified declarations because I want to free my conscience. I need to be able to live with myself.

It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth, the whole truth, that I lied against them at their trials, coerced by police and prosecutors. That is the end of the statement.

**Emanuel Claitt**: I get so much energy talking to you and knowing that you are the one that is going to fight the beat to get them out. They deserve to be out. They didn't do that crime and I didn't do the crime that they said I committed. The same thing I did to them the DA did to me—and got somebody to lie and I did 13½ years in prison and I lost a lot of time away from my family. Tillery and Franklin done did triple the time I did and I just think that they need to be free.

If right is right, right gonna prevail because the DA knows that they lied and got me to lie. I want to free my conscience. I can't live with myself knowing that I did that.

Transcript checked against Video Taped Statement
By Rachel Wolkenstein



Exhibit D

Verified Declaration of Robert Mickens, April 18, 2016

**DECLARATION OF ROBERT MICKENS**
PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

ROBERT MICKENS affirms the following under penalty of perjury:

In May 1985 I falsely testified as a witness for the Philadelphia County

District Attorney in the prosecution of Major George Tillery (CP-51-CR-

0305681-1984) on murder charges.

The testimony I gave at that trial was false, manufactured by the

prosecutor, Assistant District Attorney Barbara Christie.

I was coerced and promised favors if I falsely testified against Major

Tillery.

I was arrested on February 28, 1984 on charges of robbery and rape and

faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I "worked with [her] on the Major Tillery

case" she "guaranteed" I wouldn't be sent upstate on my robbery and rape case

and would be "protected."

ADA Christie and her homicide detectives, John Cimino and James

McNeshy, repeatedly brought me in for questioning on a number of robbery

and murder cases, asking me to become a prosecution witness against Major

Tillery. On one occasion ADA Christie showed me what looked like a paper

signed by Major Tillery saying that I was going to be an alibi witness for him. I

told her I was.

$Pa2906. M.$

1

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men. When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known "snitch." I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but never taken from the van. Claitt told me I was "pretty hemmed up" and that Major Tillery was a "slime," that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

Pa.29 S. M.

2

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the false grounds that I needed a protective order to protect me from Major Tillery.

That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the shooting of John Hollis and John Pickens. That was totally false. My entire testimony was scripted and rehearsed by ADA Barbara Christie.

I agreed to give this false testimony because I was I promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my own guilt for falsely testifying against Major Tillery and my fear of retaliation by the prosecution and police.

Page 292 $\beta$. $\mathcal{M}$

3

Much in my life has changed. I want to make amends for falsely

testifying against Major Tillery. I am willing and ready to be a witness in any

proceeding brought to challenge his conviction.

Dated: April /8, 2016

*Mr. Robert R. Mickens*

ROBERT MICKENS

## VERIFICATION

 I verify that the statements made in the above Declaration are true and correct
to the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: April /8, 2016

*Mr. Robert B. Mickens*

ROBERT MICKENS

4

Exhibit E

Statement of John Pickens, October 22, 1976

Exhibit E



Interviewed W 11-23-76 at 11:35 am

In the Respiratory ICU, Temple Hospital

B: [illegible] McGuire

I was with Holli's ... he went ...
... [illegible] ... we ... ... with
w-- Rikie. They looked [illegible]
AD wouldn't let us out. They ...
... [illegible]. He had AD at min,
he states.

Q. What is Rikie's full name + address?
A. I Don't Know. I just Know him by
his face.

Exhibit - E

— HOUSES WERE IN the Jail HALL?

A.— 4

Q. How many WEAPONS AND How Many DD the Shooting?

A All four HAD guns, Two DID Shooting.

Q. WHAT WERE the NAMES of the shot males?

A Apples AD DAVE, I DoLt know the other one.

Q. CAN you tell me the full NAMES of ADDR of the other males?

A. No — Just knew then By their faces.

2

3

Q. Why did they try to ... ...

A. They locked the door and wouldn't
let us out.

Q. Did they say anything ... ... ... ...
anything from you?

A. He took $300 from me.

Q. Did they take anything from
you?

A. No — I don't know what

Q. What did Richie look like and what
was he wearing?

A. He was as tall as me (6'2"), Dark S...
Blue hat, Blue Spots and Blue Suede Sh...
Blue Hanky, Blue Tie, so Jacket, a ...

3



His neck. He had a good chai
agound his neck. He had a black
Rain-coat. He had a light green
?? Cod poeket pcloss the Street
and in the Street.

Told Carkis showd photos: Alfred
?pict ?nd 437509, will on Franklin (P#4,73?
Mack Gallick (P#403490 Fed Bailey (P#444?2?
Toma? Day (P#9338 Bobb, Jam?? (P#4318?
M???L Styles (P#?5709 James Ravenhill (P#?.
Frank Junius (P#43906? James Taylor (P#43?
Rodey# Thomas (P#455838 ?-?- ?Jes (P#867
Dotes how Any of the above ID shooting.
Points to Knowing Pit?? Bailey, Julius Ju?
R. Face.

4.

5

Interviewed מה 11:35 By Det nGvus+

Q. Do you know who shot you?

A @ yes.

O. "נא did write the names of the persons who shot you in סof _____ CEPUK ?

r - 5.

)

5.





MARK. A

Exhibit F

Declaration of Rachel Wolkenstein, September 6, 2016

## DECLARATION OF RACHEL WOLKENSTEIN
### PURSUANT TO PA C.S. § 4904 AND 28 U.S.C. § 1746

RACHEL WOLKENSTEIN, declares the following under penalty of perjury:

I am an attorney at law, admitted to practice in the State of New York since 1974, residing in Brooklyn, NY.

This declaration is submitted in support of the Supplemental Petition filed by Petitioner.

Since approximately February 2015, I have assisted Major Tillery *pro bono,* in his efforts to overturn his conviction, to obtain and review his court records, and those of the witnesses against him, to conduct limited investigation and help him find *pro bono* legal representation in upcoming legal proceedings. In April 2016 I had phone call with Robert Mickens in which he said that he would provide an affidavit and was willing to testify on behalf of Major Tillery.

We met on April 18, 2016 and for the first time described why he had lied when he testified against Major Tillery at his trial. Robert Mickens recounted to me the combination of threats and favors he received from detectives and prosecutors to coerce and induce him to testify falsely. He described how the prosecutors coached him to answer questions about what he supposedly saw on the night of the shootings and to deny he received any plea deals.

I typed up the key points of what he told me. This was reviewed by Mr. Mickens and he signed his verified declaration that same day.

Mr. Mickens disclosed why his false testimony was sought by the
prosecution and police and how it was obtained. He disclosed the van ride with
Emanuel Claitt between the Roundhouse and the county prison on State Road
during which Mr. Claitt pushed him to testify against Major Tillery. Mr. Mickens
also disclosed that homicide detectives arranged for his girlfriend to join him in
the Roundhouse for a sexual encounter. Mr. Mickens was quite emotional in
describing this and expressed pain and regret about his role in Major Tillery's
conviction.

It was a surprise when shortly after this a lead resulted in learning that
Emanuel Claitt, whose testimony was the sole evidence against Major Tillery, was
willing to meet and indicated that he needed to finally tell the truth about his false
testimony against Major Tillery and William Franklin, who was the co-defendant
in the case and tried three years earlier than Petitioner.

I met with Emanuel Claitt on May 3, 2016 and he told me that his trial
testimony against Major Tillery and William Franklin was totally false, that he
[Claitt] wasn't even in or near the poolroom that night and he had no personal
knowledge of the who shot Joseph Hollis and John Pickens. Emanuel Claitt
described the process of the detectives and prosecutors obtaining his false
statement and preparing him to testify. I took notes in speaking with Mr. Claitt
and met him the next morning, May 4, 2016 with a typed up declaration. He made
some corrections and signed the declaration under penalty of perjury. I spoke with

him again on the phone and in person on June 3, 2016 and he signed a
supplemental declaration.

I met with Emanuel Claitt again on August 3, 2016. During this meeting he
gave me the names of three of the women who he had sex with while in police
custody. One woman, Barbara Claitt is deceased. He also told me that Helen Ellis,
who is the mother of three of his children, saw him in the Roundhouse a number
of times for the purposes of having sex. A third woman, Denise Certain ("De De")
was another woman who he saw at the Roundhouse.

On August 3, 2016, Emanuel Claitt agreed to be videotaped. I taped
Emanuel Claitt as he reaffirmed his sworn declarations and read a statement that is
a composite of his two verified declarations. This videotape is submitted as an
exhibit to the Supplemental Declaration. [Exhibit A]

I located Helen Ellis on August 4, 2016 outside her home and spoke with
her briefly. She acknowledged that she had sex with Emanuel Claitt in the
Roundhouse homicide interview rooms and that arrangements were made with
detectives who brought her up to him.

Based on the information received from Emanuel Claitt, I located Denise
Certain.

With the information received from Robert Mickens, that included being
put in a police van alone with Emanuel Claitt to give Claitt the opportunity to
persuade Mickens to falsely testify against Major Tillery, and that homicide
detectives had facilitated private sexual encounters for both men with their

respective girlfriends in the Roundhouse, I attempted to obtain documentary corroborative evidence.

This included research in public records and the filing of requests pursuant to the RTKL for: Roundhouse log-in records for periods from 1980 through 1985, covering Emanuel Claitt's and Robert Mickens' periods of incarceration; and prisoner transport records between the PAB building and the detention center on State Road; and regarding Robert Mickens, transport records between the Northhampton County prison and Philadelphia in late 1984-1985. These requests were denied, appealed and reviewed. Both the Philadelphia Police Department and Northhampton County state they have searched and cannot locate these records and were likely not retained. [Exhibit B]

I learned of other murder convictions from the same years (mid-80s) that involved the same detectives as those who worked with Emanuel Claitt, Det. Lawrence Gerrard and Ernest Gilbert and a similar modus operandi in obtaining convictions – providing sexual favors to prisoner informants.

On August 25, 2016 I visited Andre Harvey, a lifer imprisoned at SCI Graterford, and he gave me documents that he had acquired when he challenged his conviction in a 1995 PCRA, in part on grounds that the prosecution witnesses against him had been provided sexual favors to falsely testify against him. Detectives Gerrard and Gilbert were central to that.

Andre Harvey gave me copies of the 17 pages of "sign-in and out logs at the Roundhouse" secured by his then investigator Paul J. Paris. This was just 17

pages of 80 from the period of June 1-December 31, 1983. In looking over those

pages, I saw that on page 192, the log-in sheet for December 14, 1983, Emanuel

Claitt signed in under Det. Gilbert and his girlfriend Denise Certain signed in

under Det. Gerrard. [Exhibit C]

Andre Harvey said that doesn't have any other portion of the Roundhouse

log in sheets.

On behalf of Petitioner, Major Tillery, I am continuing in the search for

additional records that corroborate the Commonwealth misconduct that permeates

the conviction of Major Tillery for crimes he did not commit. on August 3, 2016

Dated: September 6, 2016

_s/_____

RACHEL WOLKENSTEIN

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct to
the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: September 6, 2016

_s/_____

RACHEL WOLKENSTEIN

Exhibit G

Philadelphia Police Administration Log Book for December 14, 1983 (Excerpt)

IN THE COMMON PLEAS COURT OF PHILADELPHIA

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0305 |
| ANDRE HARVEY | : | |

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0309 |
| HOWARD WHITE | : | |

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0314 |
| RUSSELL WILLIAMS | : | |

- - -

PHILADELPHIA, PENNSYLVANIA

- - -

FEBRUARY 18TH, 1997

- - -

BEFORE:      HONORABLE GENECE E. BRINKLEY, JUDGE

- - -

# PAUL J. PARIS

Detective Agency
P.O. BOX 296
CROYDON, PA 19021-0948

LICENSED & BONDED
IN PA & NJ

FAX
215-673-0326

May 15, 1995

Andre Harvey #AM9119
S.C.I. Mahanoy
301 Morea Rd.
Frackville, Pa. 17932

Dear Andre:

Enclosed, please find copies of 17 pages taken from the sign-in & out logs at the Roundhouse. Also enclosed, please find copies of the statements taken from Maxie Harris-Jiles and Sharon Artis. Plus, find my breakdown of the entries on the 17 pages. You will see my notes at the bottom of the breakdown page.

As of this date, Jeremy is waiting to receive the logs for May, 1983, from the Roundhouse. Also, he is waiting for the sign-in & out logs from the Detention Center and Holmesburg, covering May 1 to December 31, 1983. Give me a call after you have reviewed this stuff. I will be in Pittsburgh on Derrick's case next week, not this week.

Sincerely,

Paul J. Paris

PJP/lms
Encl.

REVIEW OF THE SIGN IN & OUT LOGS OBTAINED FROM THE P.A.B., COVERING
THE PERIOD FROM 6-1-83 to 12-31-83. THE FOLLOWING ENTRIES ARE LISTED
BY PAGE NUMBER, NAME OF VISITOR, DETECTIVE, AND DATE.

Page 110, McClain, Det. Gerrard #9189, 6-2-83.
Page 117, McClain, Gerrard, 6-16-83.
Page 120, McClain, Gerrard, 6-23-83.
Page 122, Maxie Harris & Douglas Atwell, Gerrard, 6-28-83
Page 123, McClain, Gerrard, 6-30-83.
Page 128, Maxie Harris, Gilbert #9148, 7-14-83.
Page 131, Maxie Harris, Gerrard, 7-20-83 & Thelma & Constance Martin,
Gilbert, also 7-20-83.
Page 135, Maxie Harris, Charles Atwell, & Jerry Fields, Gerrard, 8-3-
83.
Page 137, McClain, Gilbert, 8-9-83.
Page 140, Maxie Harris, Gilbert, & Jerry Fields, Gerrard, 8-17-
83.
Page 149, Maxie Harris, Gerrard, & Gertrude & Sarah Martin, Gilbert,
9-7-83.
Page 161, Maxie Harris, Gilbert, Thelma Fields, Gilbert, and
Constance Fields, (Girard), 10-7-83
Page 169, Rochelle Jackson (anyone?), Gilbert, 10-27-83.
Page 183, Maxie Harris, Gerrard, 11-23-83 & Lettie Randolph
(anyone?), Gerrard, 11-23-83.
Page 189, Theresa Burrell (anyone?), Gilbert, 12-7-83.
Page 192, Annie Edmonds, Nancy Claitt?, & Denise Certain (any of
these mean anything?), Gilbert & Gerrard, 12-13 & 12-14-83.
Page 199, Mary Whach & Floretta Caudle (mean anythng?), Gerrard, 12-
29-83.

The other pages had none of our people. It would appear that Atwell
was being brought down by a wagon, meaning he would come in a
different entrance and therefore, would not show on this log. We need
to put these dates & times together with the logs from the Detention
Center & Holmesburg.

— FIND NO SIGN-INS FOR: SHARON ARTIS, GLONDENNA REDDICK,
CHARMAINE PASCHALL, OR DARLENE PARKER.

| Date | Name | | | | | |
|---|---|---|---|---|---|---|
| | Daniel Thomas | I.D. | | | | |
| 12/13/83 | Wm. Hayward | I.D. | | | | |
| 12/13/83 | Tyrone Brown | H.M | 1:5P | J. | | |
| 12/13/83 | Barry Tomass | Poly | | 3. | | |
| 12/13/83 | Rosemary Cafaliere | NARC | 2:85 PM | | | |
| 12/13/83 | Christine J. Cineu | NARC | 8:05 | | | |
| 12/13/83 | D.S. Palmer Kirk | SCU. | 45PM | 17:55AM | Oakley Bryant / Annie Raglow |
| 12/13/83 | Frank Della | S.O.D | 4:30 | V 55 | O.Pug Hem |
| 12/13/83 | Linda Lizzone | Hom | 7:05 | on | |
| 12/13/83 | Steve Doysler | Hom | 7:05 PM | | Grace / Bender |
| 12-13-83 | Annie Edmunds (?) | Hom | 8:45 | | Ilene |
| | Carmelo Riana | Hm. | 9:00P | 10:10 | Bernard / Deyn |
| | Doris Bonns | '' | 9:05 P | 10:20 | Deyn / 9/6 |
| | Mike Bonns | '' | | | |
| | Milton | '' | | | |
| | Wilfredo De Cortez | Hom | 40:00 | | |
| 12-14-83 | Henry Clark | Hom | | | |
| 12-14-83 | John McConvile | Hom | p.S.U | | McClellan |
| 12-14-83 | Richard Makay | I.D. | 9:40 | D:45 | McClellan |
| 12-14-83 | Denise Cintran ? (?) | Narc | 9:45 | 1.A. | Pentoso / McClellan |
| 12-14-83 | Effrain Nunes | Hom | 11:45 PM | 12:30 PM | Bernard |
| '' | Luis Torres | Hom | 12 | 12:44 | Sgt Fry |
| 12/14/83 | George Hennyas | Hom | | 11 | |
| 12:34pm | Caesar Baez | Hom | 2:00 | 6:31P | Nachqust |
| | Calvin Butter | I.D. | 2 | 6:35P | Nachqust |
| 12-14-83 | Marilyn Kilson | Hom | 4:15 P | 2:50P | Joshua |
| 12-14-83 | Cristino Valle | Hom | 4:15 P | 7:05 | McCant |
| 12-14-83 | Angel Frisneda | Hom. | 5:00P | | Deyn |
| 12-14-83 | 3. Edmonds | Poly | 5:35 PM | 8:31 | Lt. McC |
| 12-14-83 | Alvin McClan | Hom. | 5:05P | | |
| 12-14-83 | George Felder | Aug | 6:00P | 7:35P | |
| '' '' | Eula Bay | Garbage | 6:50 | 9:15 PM | Kinsey |
| | | '' | '' | 9:15 Pm | '' '' |

192

Exhibit H

Right-to-Know Law Requests for Police Administration
Building Log Books and Transportation Records of Emanuel
Claitt and Robert Mickens



**CITY OF PHILADELPHIA**

**POLICE DEPARTMENT**
HEADQUARTERS, FRANKLIN SQUARE
PHILADELPHIA, PENNSYLVANIA 19106

RICHARD J. ROSS JR.
Commissioner

July 5, 2016

Ms. Rachel Wolkenstein
515 Avenue I Apt. 6C
Brooklyn, NY 11230

RE:    Pennsylvania Right-To-Know Act (RTKA) Request

Dear Ms. Wolkenstein:

Your Pennsylvania Right-To-Know Act request dated 06-27-16 was received by this
office on 06-27-16 for:

1. Police Administration Building ( Round House) Log-in Book entries for :
   January 1 – November 29, 1980
   June 1, 1981- November 30, 1982 &
   April 1, 1983- July 31, 1985

2. Transport Orders/Records for transport of prisoner Emanuel Claitt ( PP# 439759)
   between the Philadelphia Detention Center on State Road and the Police
   Administration Building on Race Street:
   January 1- November 19, 1980
   September 1, 1981- November 30, 1982
   April 1, 1983- July 31, 1985

3. Transport Orders/Records for transport of prisoner Robert Mickens (PP#0472454)
   between the Philadelphia Detention Center on State Road and the Police
   Administration building on Race Street.
   February 1, 1984- May 25, 1985

After processing your request, the Philadelphia Police Department responds as follows:

Your request *cannot be granted* for the reason that the record requested is beyond the
agency's **retention schedule**. Pursuant to Section 507 of the Act "*Nothing is this act shall be
construed to modify, rescind, or supersede any record retention policy or disposition schedule of
an agency established pursuant to law, regulation, policy, or other directive*".

Should you wish to contest any part of this decision, you may file an appeal with the
Office of Open records as provided for in 65 P.S. § 67.1101. You have 15 business days from the
mailing date of the City's response to challenge the response. Please direct any appeal to the

**RACHEL WOLKENSTEIN**                                                    07-05-16
**PENNSYLVANIA RIGHT-TO-KNOW ACT REQUEST:  06-27-16**                     Page 2

Office of Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor,
Harrisburg, PA 17120-0225 and copy the undersigned.

     Please be sure to copy Mr. Jeffrey Cohen, Assistant City Solicitor for the City of
Philadelphia Law Department on your appeal, located at One Parkway Building, 17th Floor, 1515
Arch Street, Philadelphia, PA 19102.

**FOR THE POLICE COMMISSIONER**

                                        Sincerely,

                                        Lt Edward Egenlauf #435

                                        Lieutenant Edward Egenlauf
                                        Open Records Officer
                                        Philadelphia Police Department
                                        750 Race Street, Room 203
                                        Philadelphia, PA 19106
                                        FAX: 215-686-1183
                                        Email: police.righttoknow@phila.gov

Pa 314



**pennsylvania**

OFFICE OF OPEN RECORDS

## FINAL DETERMINATION

| IN THE MATTER OF | : |
| --- | --- |
| | : |
| **RACHEL WOLKENSTEIN,** | : |
| **Requester** | : |
| | : |
| **v.** | : **Docket No.: AP 2016-1257** |
| | : |
| **PHILADELPHIA POLICE** | : |
| **DEPARTMENT,** | : |
| **Respondent** | : |

On June 27, 2016, Rachel Wolkenstein ("Requester") submitted a request ("Request") to the Philadelphia Police Department ("Department") pursuant to the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101 *et seq.*, seeking log-in book entries and transportation records for two named inmates. On July 5, 2016, the Department denied the Request, asserting that the Records requested are no longer possessed by the Department, pursuant to its record retention schedule.

On July 25, 2016, the Requester appealed to the Office of Open Records ("OOR"), challenging the denial. On August 4, 2016, the Department submitted a position statement, reiterating its position that the requested records are beyond the Department's record retention schedule. Accompanying the submission was the affidavit of the Department's Open Records Officer, who testifies, under penalty of perjury, that a search of the Department's records discovered no records responsive to the Request.

Under the RTKL, an affidavit may serve as sufficient evidentiary support for the nonexistence of records. *See Sherry v. Radnor Twp. Sch. Dist.*, 20 A.3d 515, 520-21 (Pa. Commw. Ct. 2011); *Moore v. Office of Open Records*, 992 A.2d 907, 909 (Pa. Commw. Ct. 2010). In the absence of any competent evidence that the Department acted in bad faith or that the record exists in the possession of the Department, "the averments in [the affidavit] should be accepted as true." *McGowan v. Pa. Dep't of Envtl. Prot.*, 103 A.3d 374, 382-83 (Pa. Commw. Ct. 2014) (citing *Office of the Governor v. Scolforo*, 65 A.3d 1095, 1103 (Pa. Commw. Ct. 2013)). Based on the evidence provided, the Department has met its burden of proving that the records requested do not exist in the Department's possession, custody or control. Accordingly, the appeal is **denied**.

For the foregoing reason, the Department is not required to take any further action. This Final Determination is binding on all parties. Within thirty days of the mailing date of this Final Determination, any party may appeal or petition for review to the Philadelphia County Court of Common Pleas. 65 P.S. § 67.1302(a). All parties must be served with notice of the appeal. The OOR also shall be served notice and have an opportunity to respond as per Section 1303 of the RTKL. However, as the quasi-judicial tribunal adjudicating this matter, the OOR is not a proper party to any appeal and should not be named as a party.[1] This Final Determination shall be placed on the website at: http://openrecords.pa.gov.

## FINAL DETERMINATION ISSUED AND MAILED: August 26, 2016

*/s/ Blake Eilers*
Blake Eilers, Esq.
Appeals Officer

Sent to:    Rachel Wolkenstein (via e-mail only);
             Jeffrey Cohen, Esq. (via e-mail only);
             Lieutenant Edward Egenlauf (via e-mail only)

---

[1] *Padgett v. Pa. State Police*, 73 A.3d 644, 648 n.5 (Pa. Commw. Ct. 2013).

-----Original Message-----
From: Daniel ODonnell <DODonnell@northamptoncounty.org>
To: rwolkenstein3 <rwolkenstein3@aol.com>
Cc: Edna Hewitt <EHewitt@northamptoncounty.org>; Sharon Lerch
<SLerch@northamptoncounty.org>
Sent: Fri, Jul 8, 2016 2:37 pm
Subject: Re: Right to Know

Ms. Wolkenstein:

I received a response from the Prison with regard to your request below. They searched
their records and archives. They have no such records going back that far. Accordingly,
the request must be **DENIED** pursuant to RTKL Section 705 because no such records
exist in the possession of the County.

You have a right to appeal this decision in writing to the Executive Director, Office of
Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor,
Harrisburg, PA 17120. If you choose to file an appeal, you must do so within fifteen (15)
business days of the mailing date of the agency's response as outlined in Section 1101 of
the RTKL. If you have further questions, feel free to contact the Solicitors Office.

**Daniel M. O'Donnell, Esq.**
*Assistant County Solicitor & Open Records Officer*
**Office of the Solicitor**
**Northampton County Courthouse**
**669 Washington Street**
**Easton, PA 18042**
Telephone: 610.829.6350
Fax: 610.559.3001

**From:** Daniel ODonnell
**Sent:** Tuesday, July 5, 2016 2:36 PM
**To:** rwolkenstein3@aol.com
**Cc:** Edna Hewitt; Sharon Lerch
**Subject:** Right to Know

Rachel Wolkenstein
VIA EMAIL ONLY

Ms. Wolkenstein:

The County received your request made pursuant to the Pennsylvania Right to Know Law (RTKL) on June 30, 2016 seeking transport orders "and or other records" for Robert Mickens, between 9/15/1984 and 10/10/1985.

Ordinarily, a response would be due within five (5) business days of receipt, or in this case July 8, 2016. However, in this case given the age of the documents at issue, the County is invoking its right to an extension of time to respond by up to thirty (30) days from the original due date. Accordingly, the response from the County in this matter will be due on or before **August 7, 2016**.

Also, please be aware that the Office of the District Attorney has its own Open Records Officer. So to the extent you may be seeking records from that office, you will need to contact them directly. Additionally, please be aware that any information in the Criminal Division file is a public record, but is not subject to disclosure by the County under the Right to Know Law as such records are non-financial Judicial Records, not County records, and such filings are generally already available for inspection and copying at the Office of the Criminal Division.

The extension herein is invoked pursuant to RTKL Section 902(a): (3) a timely response to the request for access cannot be accomplished due to bona fide and specified staffing limitations; (4) a legal review is necessary to determine whether the record is a record subject to access under the RTKL, and (7) the extent or nature of the request precludes a response within the required time period.

Thank you.

**Daniel M. O'Donnell, Esq.**
*Assistant County Solicitor & Open Records Officer*
**Office of the Solicitor**
**Northampton County Courthouse**
**669 Washington Street**
**Easton, PA 18042**
Telephone: 610.829.6350
Fax: 610.559.3001

CONFIDENTIALITY NOTICE This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



**pennsylvania**

OFFICE OF OPEN RECORDS

## FINAL DETERMINATION

| | |
|---|---|
| **IN THE MATTER OF** | : |
| | : |
| **RACHEL WOLKENSTEIN,** | : |
| **Requester** | : |
| | : |
| **v.** | : **Docket No: AP 2016-1262** |
| | : |
| **NORTHAMPTON COUNTY,** | : |
| **Respondent** | : |

On June 30, 2016, Rachel Wolkenstein ("Requester") submitted a request ("Request") to Northampton County ("County") pursuant to the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101 *et seq.,* seeking various records related to the transport of Robert Mickens between September 15, 1984 and October 10, 1985. On July 8, 2016, the County denied the Request, claiming that it does not possess any responsive records.

On July 26, 2016, the Requester filed a timely appeal with the Office of Open Records ("OOR"), challenging the denial and stating grounds for disclosure. The OOR invited both parties to supplement the record and directed the County to notify any third parties of their ability to participate in this appeal. *See* 65 P.S. § 67.1101(c). On August 5, 2016, the County submitted the affidavit of Daniel Keen, the Director of the Northampton County Prison, who attests that a search was conducted and that no responsive records exist in the County's possession, custody, or control.[1]

Under the RTKL, an affidavit may serve as sufficient evidentiary support. *See Sherry v. Radnor Twp. Sch. Dist.*, 20 A.3d 515, 520-21 (Pa. Commw. Ct. 2011); *Moore v. Office of Open Records*, 992 A.2d 907, 909 (Pa. Commw. Ct. 2010). In the absence of any evidence that the County has acted in bad faith or that the records do, in fact, exist, "the averments in [the affidavit] should be accepted as true." *McGowan v. Pa. Dep't of Envtl. Prot*, 103 A.3d 374, 382-83 (Pa. Commw. Ct. 2014) (citing *Office of the Governor v. Scolforo*, 65 A.3d 1095, 1103 (Pa. Commw. Ct. 2013)). Based on the evidence provided, the County has met its burden of proof that it does not possess the records sought in the Request. Accordingly, the appeal is **denied**.

For the foregoing reasons, the County is not required to take any further action. This Final Determination is binding on all parties. Within thirty days of the mailing date of this Final

---

[1]The County also submitted the verification of Daniel O'Donnell, the County Open Records Officer and Assistant Solicitor, explaining in detail the search and his own efforts in supervising employees looking for records.

Determination, any party may appeal or petition for review to the Northampton County Court of Common Pleas. 65 P.S. § 67.1302(a). All parties must be served with notice of the appeal. The OOR also shall be served notice and have an opportunity to respond according to court rules as per Section 1303 of the RTKL. However, as the quasi-judicial tribunal adjudicating this matter, the OOR is not a proper party to any appeal and should not be named as a party.[2] This Final Determination shall be placed on the website at: http://openrecords.pa.gov.

## FINAL DETERMINATION ISSUED AND MAILED: August 25, 2016

/s/ Jordan C. Davis

Jordan C. Davis
Appeals Officer

Sent to:    Rachel Wolkenstein (via e-mail only)
            Daniel O'Donnell, Esq. (via e-mail only)

---

[2] *Padgett v. Pa. State Police*, 73 A.3d 644, 648 n.5 (Pa. Commw. Ct. 2013).

Exhibit I

Written Statement of Robert Mickens, September 26, 1984

Case: 20-1942675 Document Page: 366 06/05/20 Filed: 05/07/2021

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT H    E DIVISION | CASE NO. H76-315 |
|---|---|---|---|
| | | | INTERVIEWER McNesby - Cimino |
| NAME Robert Mickens | | AGE 2 | RACE N/M | DOB 5-28-52 |
| ADDRESS 1507 W. Master St. | | ST. NO. 203 | PHONE NO. None |
| NAME OF EMPLOYMENT/SCHOOL | | | SOC. SEC. NO. |
| ADDRESS OF EMPLOYMENT/SCHOOL | | DEPARTMENT | PHONE NO. |
| DATES OF PLANNED VACATIONS | 1 | | |
| DATES OF PLANNED BUSINESS TRIPS | | | |

NAME OF CLOSE RELATIVE        Regina Belser  ( Common Law Wife)

| ADDRESS 1507 W. Master St. | | PHONE NO. None |
|---|---|---|
| PLACE OF INTERVIEW Inside Room 104 PAB | DATE 9-26-84 | TIME 1630  AM/PM |
| BROUGHT IN BY Police | DATE 9-26-84 | TIME  AM/PM |

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Joseph Hollis 20N/M, who was shot and killed inside the pool room 1008 W. Huntingdon St. 10-22-76 at

WARNINGS GIVEN BY _____ DATE _____ TIME 9:50 PM

ANSWERS

|  (1)  |  (2)  |  (3)  |  (4)  |  (5)  |  (6)  |  (7)  |
|---|---|---|---|---|---|---|

Q- What is your full and correct name?

A- Robert Mickens.

Q- Are you known by any other name or nickname?

A- Bobby.

Q- Can you read and write the English language?

A- Yes.

Q- Are you now under the influence of any drugs or alcohol?

A- No.

Q- How far did you go in school?

A- 11th Grade.

Q- Did you know the deceased in this case Joseph Hollis?

A- I didn't now him personally but used to see him a round.

Q- Go on in your own words and tell me what you know of his death.

A- I was at Germantown and Huntingdon Sts. by myself. It was dark out and t

RECORD  ☐ Yes  ☐ No    CHECKED BY

1- Continued...........

stores were closed. It had to be 9:30 PM or a little later and was walking
~~west~~ *east* on Huntingdon St. towards Warnock St. When I got t o the corner of War-
nock & Huntingdon St. I ran into Alfred Clark and I saw William Franklin and
Major Tillery on the steps of Goldies poolroom. Askir ~~(Alfred Clark)~~ *Major Tillery K.M* asked
me where I was gone at. I said what's up. He said we are supposed to be havi
a meeting here and a couple of guys are supposed to be coming from West Phil
~~Major~~ *Askir K.M* said, " You know how the police is if they see all these cars out here
they will start asking questions and knocking on doors". He was referring to
his ~~car~~ *Askir Car K.M* a white cadilac and ~~Major Tillery~~ *his K.M* 's car which was a Lincoln. The car
were parked up on the pavement of Warnock St. Askir asked me to look out to
see if the police came and if they did to tap on the glass. I said "How lon
do you want me to lay here" and he said to hold fast, the guys that were
supposed to come should be there in a few minutes. I sat by there on the
step and maybe 15 or 20 minutes went by and a couple more card pulled up
one of them parked on the 2600 block of Warnock St. Two guys got out and
went inside the poolroom. I did not catch who that was, then another car
pulls up, itpulled on the 1000 block of Huntingdon St. I stood up and went
back to the corner where the pool room is at, on the southwest corner. The
two guys walked past me and they went into the poolroom too. I was getting
ready to knock on thedoor of the poolroom to ask Askir if everything was ol
cause I was getting ready to go, but he had come out the door already and 1
told me everything was cool, for me to stay there and look out for the
police. I went back to the side step and sat down again. Maybe 20 minute
went by and I heard a couple ~~shots~~ *guns shots R.M*. I heard some glass break so I jumped

~~~ west on

Huntingdon. William Franklin was behind this dude, he was chasing him.
By this time I got into a little panic so I started going towards
Cumberland St., then I went west and came back up 11th and as I was
approaching Huntingdon, I seen William go back towards the poolroom,
he was walking fast. I got to the corner of 11th & Huntingdown and
I seen Alfred and the Major getting in different cars. Alfred got in
his Caddy and the Major got in the Lincoln. I turned back around and
I seen the police coming with their lights on. I went back in my house,
I was staying at 2547 N. 11th St then. I took my jacket off and layed
it down and came back to the door and I seen the police half way in the
middle of the block. People was saying somebody got shot and ran to
Miss Brown's house where he fell in the door.

Q. Do you know who was being chased by William Franklin?.

A. I don't know who he was, I just saw him by the side as he was running.

Q. Did William Franklin have anything in his hands as he was chasing this

A. He had a gun in his right hand. I don't know what kind though. It wa
a revolver.

Q. Was William Franklin saying anything when he was chasing the man?

A. No

Q. How many shots did you hear coming from the poolroom when you were
sitting on the steps?

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| Robert Mickens | PAGE 4 | CASE NO. |

Did you hear any other shots, other than the ones you heard come from the poolroom?

. No

Q. How far was William Franklin in back of the dude when he was chasing him?

A. Less than 10 feet.

Q. Did you ever talk with William Franklin, the Major or Alfred Clark about this killing?

A. I talked with the Major about 2 days later. I met him at Broad and Warnick R.M. Cumberland and he told me that if the police should pick me up to say that I was at the Mosque that night and that he, the Major, was on post in the Mosque too. He also told me to say that he brought me and my girlfriend hom that night, he said that way the police could not place him at thescene of the killing. Also about a month and a half ago I seen him in Holmesburg. He told me he was going to give my name to his lawyer so that I could say he was at the Mosque with me on the night of the killing. He also told me to make sure I said that he brought me a my girlfried home about 11:30PM or 12:00 midnight. Then he gave me hi prison number which he said was M9786. Then he gave me a name, Jonci Major, he said she was his lady, he gave me her phone number but I do have it now, I got it back at my room, I can get it for you. He told to keep in contact with Jonci and he told me she could tell me where be at.

Pa 325 Robert A Melvos

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| | PAGE | CASE NO. |
|---|---|---|
| Robert Mickens | 5 | |

Did you talk with William Franklin?

Within a few days after the killing he told me nobody was going to give him that body cause it was found in the pool room. He did tell me though that "I found out the mother fucker that I shot, the one that went in Miss Brown's house, was trying to get to his car". The man's car had been parked in front of my house, the Homicide Detectives got it the next day.

Q. Do you know who the guy that was found in Miss Brown's house was with in the poolroom?

A. He was with Joseph Hollis. They was the last two to go into the poolroom then Alfred Clark told me everything was okay, that they was going to start the meeting.

Q. Who is Major and where does he stay?

A. He used to be from 49th & Woodland, we called him Slime. We also calle him Major Tillery.

Q. Who is Alfred Clark and where does he stay?

A. His street name is Beesley, he is dead now, he was shot and killed.

Q. Who is William Franklin and where does he stay?

A. They call him Pork, he used to live on the 2600 block of Sartain St.

Q. How many cars were at the meeting?

There was 5, Beesleys car which was parked on the pavement, 2500 bl

Pa 326    Robert Mickens

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
| Robert Mickens | 6 | |

N. Warnock St., Major Tillery's was parked right behind Beesley's c

there was a car parked on the 2600 block of N. Warnock St., one

parked on the 1000 block Huntingdon St., then one on the 2500 block

N. 11th St. These last three cars must have been from the guys

from West Philly because all the people from these cars went into

the poolroom.

Q. Do you know what glass was broken when you said earlier in your

statement you heard breaking glass when the shooting started?

A. I didn't know at that time but I found out later that it was the

glass on the door of the poolroom.

Q. Do you know what this meeting was about inside the Pool Room?

A. It was about Alfred Clark getting smacked in the face. See some-

time before this meeting, there was another meeting out in West

Philly and Hollis smacked Clark in his face. Clark could not do

nothing out there so they let it cool for awhile and then they

set the meeting up in the Pool Room in North Philly in the pool

room. The Major set the meeting up.

Exhibit J

Summary of Charges and Docket Sheets, Emanuel Claitt



**Claitt, Emmanuel**                               DOB: 02/05/1955                          Sex: Male
Philadelphia, PA 19144                                                                      Eyes: Brown
Aliases:                                                                                    Hair: Unknown or Completely Bald
Barry Rivers                                                                                Race: Black
EMANUAL CLAITT
Emanuel Clait
Emanuel Claitt
Emanuel M. Claitt
Emanuel M. Cliatt
Emanuel M. Elaitt
Emanuel Michael Claitt
Emmanuel Claitt
Emmanuel Cliatt
Emmanuel M. Claitt

**Closed**

**Philadelphia**

**CP-51-CR-0904461-1972**        Proc Status: Completed                     DC No: 7117035511                    OTN:
Arrest Dt: 08/16/1972          Disp Date: 01/18/1973       Disp Judge: Dwyer, William A. Jr.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | | Grade | Description | | Disposition |
|--------|---------|--|-------|-------------|--|-------------|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 6106 | | | CARRYING FIREARMS WITHOUT LICENSE | | Guilty |
| | 01/18/1973 | Confinement | | | | |

**CP-51-CR-0108261-1973**        Proc Status: Completed                     DC No: 7235077158                    OTN:
Arrest Dt: 12/29/1972          Disp Date: 05/17/1973       Disp Judge: Salus, Herbert W.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 3502 | | BURGLARY | Not Guilty |
| 2 | Migration § Migration | | | Demurrer Sustained |

**CP-51-CR-1210971-1974**        Proc Status: Completed                     DC No: 7414066094                    OTN:Z4758633
Arrest Dt: 10/15/1974          Disp Date: 04/09/1975       Disp Judge: Jenkins, Norman
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 35 § 780-113 §§ A16 | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Not Guilty |
| 2 | 35 § 780-113 §§ A30 | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Not Guilty |

**CP-51-CR-0400383-1975**        Proc Status: Completed                     DC No: 7535016432                    OTN:Z4758644
Arrest Dt: 03/12/1975          Disp Date:                 Disp Judge:

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 3502 | | BURGLARY | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 329


**Claitt, Emmanuel (Continued)**
 **Closed (Continued)**
  **Philadelphia (Continued)**

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| 2 | 18 § 903 | | | CRIMINAL CONSPIRACY | |
| 3 | 18 § 3701 | | | ROBBERY | |
| 4 | 18 § 6106 | | | CARRYING FIREARMS WITHOUT LICENSE | |
| 5 | 18 § 6108 | | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | |
| 6 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | |
| 7 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | |

**CP-51-CR-1222231-1975**  Proc Status: Completed    DC No: 7514026970    OTN:Z4758655
Arrest Dt: 05/08/1975    Disp Date: 07/12/1976    Disp Judge: Kubacki, Stanley L.
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 18 § 6108 | | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty |
| | 07/12/1976 | Probation | | | |

**CP-51-CR-0408091-1979**  Proc Status: Completed    DC No: 7904013546    OTN:
Arrest Dt: 04/07/1979    Disp Date: 09/17/1981    Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3928 | | UNAUTH USE AUTO AND OTHER VEHICLES | Nolle Prossed |
| 2 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 3 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |

**CP-51-CR-0510241-1980**  Proc Status: Completed    DC No: 8006026046    OTN:Z4758736
Arrest Dt: 05/02/1980    Disp Date: 09/28/1981    Disp Judge: Cain, Herbert R. Jr.
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 2 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |
| 3 | 18 § 3928 | | UNAUTH USE AUTO AND OTHER VEHICLES | Nolle Prossed |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 330



**First Judicial District of Pennsylvania**

**Court Summary**

**Claitt, Emmanuel (Continued)**
 **Closed (Continued)**
  **Philadelphia (Continued)**

**CP-51-CR-0810671-1980**     Proc Status: Completed                DC No: 7935020793              OTN:
Arrest Dt: 03/31/1979        Disp Date: 09/17/1981    Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 35 § 780-113 §§ A16 | | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 2 Year(s) | |
| 2 | 35 § 780-113 §§ A30 | | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 2 Year(s) | |

**CP-51-CR-0813281-1980**     Proc Status: Completed                DC No: 8014000991              OTN:
Arrest Dt: 01/06/1980        Disp Date: 09/17/1981    Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | | Nolle Prossed |
| 2 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | | Nolle Prossed |
| 3 | 35 § 780-113 §§ A16 | | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | | Guilty Plea |
| | 09/17/1981 | Confinement | | | | |
| 4 | 35 § 780-113 §§ A30 | | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | | Nolle Prossed |
| 5 | 18 § 903 | | | CRIMINAL CONSPIRACY | | Nolle Prossed |

**CP-51-CR-0820931-1980**     Proc Status: Completed                DC No: 7935097848              OTN:Z4758795
Arrest Dt: 08/08/1980        Disp Date: 09/17/1981    Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 3301 | | | ATT ARSON ENDANGERING PERSONS | | Nolle Prossed |
| 2 | 18 § 3301 | | | ATT ARSON ENDANGERING PROPERTY | | Nolle Prossed |
| 3 | 18 § 3304 | | | CRIMINAL MISCHIEF | | Nolle Prossed |
| 4 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | | Nolle Prossed |
| 5 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | | Nolle Prossed |

---

CPCMS 3541                                                 3                                    Printed: 6/12/2016 12:28 PM

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Case: 20-1942675 Document 1-1 Page: 336 Date Filed 05/27/2016
Case: 20-1942675 Document 1-1 Page: 336 Date Filed 05/27/2016

**First Judicial District of Pennsylvania**

**Court Summary**



**Claitt, Emmanuel (Continued)**

**Closed (Continued)**

**Philadelphia (Continued)**

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 6 | 18 § 908.1 | | | PROHIBITED OFFENSIVE WEAPONS | | Nolle Prossed |
| 7 | 18 § 3302 | | | CAUSING/RISKING CATASTROPHE | | Nolle Prossed |
| 8 | 18 § 903 | | | CRIMINAL CONSPIRACY | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 1 Year(s) | |

| CP-51-CR-0916561-1980 | | Proc Status: Completed | | | DC No: 8035071776 | | OTN:Z4758806 |
|---|---|---|---|---|---|---|---|
| Arrest Dt: 09/10/1980 | | Disp Date: 12/05/1980 | | Disp Judge: Ivanoski, Leonard A. | | | |
| Def Atty: Deutsch, Myron H. - (PR) | | | | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 2702 | | AGGRAVATED ASSAULT | Not Guilty |
| 2 | 18 § 2701 | | SIMPLE ASSAULT | Not Guilty |
| 3 | 18 § 2705 | | RECKLESSLY ENDANGERING ANOTHER PERSON | Not Guilty |

| CP-51-CR-1107131-1980 | | Proc Status: Completed | | DC No: 8035025356 | | OTN: |
|---|---|---|---|---|---|---|
| Arrest Dt: 05/16/1980 | | Disp Date: 04/13/1982 | | Disp Judge: Anderson, Levy | | |
| Def Atty: Deutsch, Myron H. - (PR) | | | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 2705 | | RECKLESSLY ENDANGERING ANOTHER PERSON | Nolle Prossed |
| 2 | 18 § 2706 | | TERRORISTIC THREATS | Nolle Prossed |
| 3 | 18 § 903 | | CRIMINAL CONSPIRACY | Nolle Prossed |
| 4 | 18 § 2702 | | AGGRAVATED ASSAULT | Nolle Prossed |
| 5 | 18 § 2701 | | SIMPLE ASSAULT | Nolle Prossed |
| 6 | 18 § 6106 | | CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed |
| 7 | 18 § 6106 | | FIREARMS WITHOUT LICENSE-IN AUTO | Nolle Prossed |
| 8 | 18 § 6108 | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed |
| 9 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed |
| 10 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed |
| 11 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 12 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |
| 13 | 18 § 3701 | | ROBBERY | Nolle Prossed |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 332

**Claitt, Emmanuel (Continued)**
  **Closed (Continued)**
    **Philadelphia (Continued)**

| CP-51-CR-0537641-1983 | Proc Status: Completed | | DC No: 8339002000 | OTN:M1474292 |
|---|---|---|---|---|
| Arrest Dt: 04/21/1983 | Disp Date: 12/16/1987 | | Disp Judge: Manfredi, William J. | |
| Def Atty: Williams, Brian R. - (CA) | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 6106 | | CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed |
| 2 | 18 § 6108 | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed |
| 3 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed |
| 4 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed |
| 5 | 18 § 903 | | CRIMINAL CONSPIRACY | Nolle Prossed |
| 6 | 18 § 3701 | | ROBBERY | Nolle Prossed |
| 7 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 8 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |

| CP-51-CR-0513651-1989 | Proc Status: Completed | | DC No: 8914031724 | OTN:M3950391 |
|---|---|---|---|---|
| Arrest Dt: 05/01/1989 | Disp Date: 10/23/1991 | | Disp Judge: Guarino, Angelo A. | |
| Def Atty: Defender Association of Philadelphia - (PD) | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 18 § 2705 | | RECKLESSLY ENDANGERING ANOTHER PERSON | Nolle Prossed |
| 2 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed |
| 3 | 18 § 907 | M1 | POSSESSING INSTRUMENTS OF CRIME WEAPON | Guilty Plea |
| | 10/23/1991 | Confinement | | Min: 1 Year(s) Max: 2 Year(s) |
| 4 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 5 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |
| 6 | 18 § 3701 | F1 | ROBBERY | Guilty Plea |
| | 10/23/1991 | Confinement | | Min: 5 Year(s) Max: 10 Year(s) |
| 7 | 18 § 2701 | | SIMPLE ASSAULT | Nolle Prossed |
| 8 | 18 § 903 | F2 | CRIMINAL CONSPIRACY | Guilty Plea |
| | 10/23/1991 | Confinement | | Min: 1 Year(s) Max: 2 Year(s) |

---

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 333

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 1 of 3

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-1222231-1975

| | | | |
|---|---|---|---|
| Judge Assigned: Caesar, Berel | | Date Filed: 05/08/1975 | Initiation Date: 05/08/1975 |
| OTN: Z 475865-5 | LOTN: | Originating Docket No: | |
| Initial Issuing Authority: | | Final Issuing Authority: Berel Caesar | |
| Arresting Agency: Philadelphia Pd | | Arresting Officer: Affiant | |

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 7514026970 |
| District Control Number | 7514026970 |
| Legacy Docket Number | M7505053111 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 05/08/1975 |
|---|---|---|---|---|---|
| | | 12/01/1975 | Completed | | |
| | | 05/08/1975 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 05/08/1975 |

## DEFENDANT INFORMATION

| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |
|---|---|---|

Alias Name
Clait, Emanual
Claitt, Emanual
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | CLAITT, EMANUAL |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 6105 | POSSESSION ARMS-CONV CRIME OF VIOLENCE | 05/08/1975 | Z 475865-5 |
| 2 | 2 | | 18 § 6106 | CARRYING FIREARMS WITHOUT LICENSE | 05/08/1975 | Z 475865-5 |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 2 of 3

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | 18 § 6108 | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 05/08/1975 | Z 475865-5 |
| 4 | 4 | | 18 § 6110 | VUFA DEL TO MINOR-DRUG ADDICT ETC | 05/08/1975 | Z 475865-5 |
| 5 | 5 | | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 05/08/1975 | Z 475865-5 |
| 6 | 6 | | 18 § 908.1 | PROHIBITED OFFENSIVE WEAPONS | 05/08/1975 | Z 475865-5 |

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

| | | | |
|---|---|---|---|
| **Guilty** Defendant Was Not Present | | | |
| Migrated Dispositional Event | 12/01/1975 | Final Disposition | |
| 1 / POSSESSION ARMS-CONV CRIME OF VIOLENCE | Guilty | | 18 § 6105 |
| Caesar, Berel | 12/01/1975 | | |
| Probation | 5.00 Years | | |
| 2 / CARRYING FIREARMS WITHOUT LICENSE | Demurrer Sustained | | 18 § 6106 |
| Caesar, Berel | 12/01/1975 | | |
| 3 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty | | 18 § 6108 |
| Caesar, Berel | 12/01/1975 | | |
| Probation | 5.00 Years | | |
| 4 / VUFA DEL TO MINOR-DRUG ADDICT ETC | Dismissed | | 18 § 6110 |
| Caesar, Berel | 12/01/1975 | | |
| 5 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Dismissed | | 18 § 907 |
| Caesar, Berel | 12/01/1975 | | |
| 6 / PROHIBITED OFFENSIVE WEAPONS | Dismissed | | 18 § 908.1 |
| Caesar, Berel | 12/01/1975 | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 3 of 3

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| <u>Name:</u>  Philadelphia County District Attorney's Office<br>    Prosecutor | <u>Name:</u>  Myron H. Deutsch<br>    Private |
| <u>Supreme Court No:</u> | <u>Supreme Court No:</u>  012362 |
| <u>Phone Number(s):</u> | <u>Rep. Status:</u>  Active |
|   215-686-8000    (Phone) | <u>Phone Number(s):</u> |
| <u>Address:</u> |   215-567-2693    (Phone) |
|   3 South Penn Square<br>  Philadelphia, PA  19107 | <u>Address:</u> |
| |   Deutsch, Larrimore & Farnish<br>  2100 Arch Street 5th Floor<br>  Philadelphia, PA  19103 |
| | Representing: CLAITT, EMANUAL |

| ENTRIES | | | |
|---|---|---|---|
| Sequence Number | CP Filed Date | Document Date | Filed By |
| 1 | 05/08/1975 | | |
| PARS Transfer | | | |
| 1 | 12/01/1975 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 12/01/1975 | | |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any responsibility for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.



# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: CP-51-CR-1222231-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 1 of 3

### CASE INFORMATION

| | | |
|---|---|---|
| Judge Assigned: Kubacki, Stanley L. | Date Filed: 12/29/1975 | Initiation Date: 12/29/1975 |
| OTN: Z 475865-5          LOTN: | Originating Docket No: MC-51-CR-0505311-1975 | |
| Initial Issuing Authority: | Final Issuing Authority: | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant | |
| Complaint/Incident #: | | |

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| District Control Number | 7514026970 |
| PSI Microfilm Number | 761141 |
| Police Incident Number | 7514026970 |
| Legacy Microfilm Number | 76021081 |
| Legacy Docket Number | C7512222311 |

### STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 05/08/1975 |
|---|---|---|---|---|---|
| | | 07/12/1976 | Completed | | |
| | | 12/29/1975 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 12/29/1975 |

### DEFENDANT INFORMATION

| | | |
|---|---|---|
| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |

Alias Name
Clait, Emanual
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

### CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | CLAITT, EMANUAL |

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 6108 | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 05/08/1975 | Z 475865-5 |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1222231-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 2 of 3

## DISPOSITION SENTENCING/PENALTIES

| Disposition | | |
|---|---|---|
| Case Event | Disposition Date | Final Disposition |
| Sequence/Description | Offense Disposition | Grade Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

| | | |
|---|---|---|
| Migrated Dispositional Event | 07/12/1976 | Final Disposition |
| 1 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty | 18 § 6108 |
| Kubacki, Stanley L. | 07/12/1976 | |
| Probation | 5.00 Years | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Myron H. Deutsch |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000        (Phone) | Phone Number(s): |
| Address: | 215-567-2693        (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA  19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA  19103 |
| | Representing: CLAITT, EMANUAL |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 12/29/1975 | | Unknown Filer |
| Appeal | | | |
| 1 | 07/12/1976 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 07/12/1976 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 07/12/1976 | | Migrated, Filer |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1222231-1975**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania
v.
Emanual Claitt

Page 3 of 3

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 4

## CASE INFORMATION

Judge Assigned: Katz, Leon     Date Filed: 08/12/1980     Initiation Date: 08/12/1980

OTN:     LOTN:     Originating Docket No: MC-51-CR-0330461-1979

Initial Issuing Authority:     Final Issuing Authority:

Arresting Agency: Philadelphia Pd     Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Legacy Microfilm Number | 81026823 |
| PSI Microfilm Number | 801557 |
| PSI Microfilm Number | 811899 |
| Police Incident Number | 7935020793 |
| District Control Number | 7935020793 |
| Legacy Docket Number | C8008106711 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 03/31/1979 |
|---|---|---|---|---|---|
| | | 09/17/1981 | Completed | | |
| | | 08/12/1980 | Migrated Case (Active) | | |

Complaint Date:    08/12/1980

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth:     02/05/1955     City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

CPCMS 9082                                                 Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 4

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | **35 § 780-113 §§ A16** | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 11/30/1978 | |
| 2 | 2 | | **35 § 780-113 §§ A30** | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | 11/30/1978 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Grade       Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition |
|---|---|---|
| 1 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Guilty Plea | 35 § 780-113 §§ A16 |
| Katz, Leon | 09/17/1981 | |
| Confinement | Min of 1.50 Years | |
| 2 / MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Guilty Plea | 35 § 780-113 §§ A30 |
| Katz, Leon | 09/17/1981 | |
| Confinement | Min of 1.50 Years | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:** Philadelphia County District Attorney's Office | **Name:** Myron H. Deutsch |
| Prosecutor | Private |
| **Supreme Court No:** | **Supreme Court No:** 012362 |
| **Phone Number(s):** | **Rep. Status:** Active |
| 215-686-8000       (Phone) | **Phone Number(s):** |
| **Address:** | 215-567-2693       (Phone) |
| 3 South Penn Square | **Address:** |
| Philadelphia, PA  19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA  19103 |
| | Representing: Claitt, Emanuel M. |

## ENTRIES

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 4

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/12/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel M. |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 4 of 4

## CASE FINANCIAL INFORMATION

Last Payment Date:

Total of Last Payment:

| **Claitt, Emanuel M.**<br>Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $2,700.00 | $0.00 | ($2,700.00) | $0.00 | $0.00 |
| Grand Totals: | $2,700.00 | $0.00 | ($2,700.00) | $0.00 | $0.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 1 of 3

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-0813281-1980

| | |
|---|---|
| Judge Assigned: Colins, James | Date Filed: 01/06/1980    Initiation Date: 01/06/1980 |
| OTN:              LOTN: | Originating Docket No: |
| Initial Issuing Authority: | Final Issuing Authority: James Colins |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant |
| Complaint/Incident #: | |

Case Local Number Type(s)                  Case Local Number(s)

| | |
|---|---|
| Legacy Docket Number | M7912348811 |
| District Control Number | 8014000991 |
| Police Incident Number | 8014000991 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 01/06/1980 |
|---|---|---|---|---|---|
| | | 08/11/1980 | Completed | | |
| | | 01/06/1980 | Migrated Case (Active) | | |

Complaint Date:    01/06/1980

## DEFENDANT INFORMATION

| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |
|---|---|---|

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Claitt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 35 § 780-113 §§ A16 | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 01/05/1980 | |
| 2 | 2 | | 35 § 780-113 §§ A30 | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | 01/05/1980 | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 2 of 3

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | **18 § 903** | CRIMINAL CONSPIRACY | 01/05/1980 | |
| 4 | 4 | | **18 § 907** | POSSESSING INSTRUMENTS OF CRIME WEAPON | 01/05/1980 | |
| 5 | 5 | | **18 § 908.1** | PROHIBITED OFFENSIVE WEAPONS | 01/05/1980 | |
| 6 | 6 | | **18 § 6106** | CARRYING FIREARMS WITHOUT LICENSE | 01/05/1980 | |
| 7 | 7 | | **18 § 6108** | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 01/05/1980 | |

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

| **Held for Court** | Defendant Was Not Present | | |
|---|---|---|---|
| Migrated Dispositional Event | 08/11/1980 | Final Disposition | |
| 1 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Held for Court | | 35 § 780-113 §§ A16 |
| Colins, James | 08/11/1980 | | |
| 2 / MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Held for Court | | 35 § 780-113 §§ A30 |
| Colins, James | 08/11/1980 | | |
| 3 / CRIMINAL CONSPIRACY | Held for Court | | 18 § 903 |
| Colins, James | 08/11/1980 | | |
| 4 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Held for Court | | 18 § 907 |
| Colins, James | 08/11/1980 | | |
| 5 / PROHIBITED OFFENSIVE WEAPONS | Held for Court | | 18 § 908.1 |
| Colins, James | 08/11/1980 | | |
| 6 / CARRYING FIREARMS WITHOUT LICENSE | Held for Court | | 18 § 6106 |
| Colins, James | 08/11/1980 | | |
| 7 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Held for Court | | 18 § 6108 |
| Colins, James | 08/11/1980 | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 3 of 3

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| <u>Name:</u>  Philadelphia County District Attorney's Office<br>Prosecutor | <u>Name:</u>  Myron H. Deutsch<br>Private |
| <u>Supreme Court No:</u> | <u>Supreme Court No:</u>  012362 |
| <u>Phone Number(s):</u><br>215-686-8000      (Phone) | <u>Rep. Status:</u>  Active |
| <u>Address:</u><br>3 South Penn Square<br>Philadelphia, PA  19107 | <u>Phone Number(s):</u><br>215-567-2693      (Phone) |
|  | <u>Address:</u><br>Deutsch, Larrimore & Farnish<br>2100 Arch Street 5th Floor<br>Philadelphia, PA  19103 |
|  | Representing: Claitt, Emanuel |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 01/06/1980 | | |
| PARS Transfer | | | |
| 1 | 08/11/1980 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 08/11/1980 | | |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 1 of 3

## CASE INFORMATION

| | | |
|---|---|---|
| Judge Assigned: Katz, Leon | Date Filed: 08/14/1980 | Initiation Date: 08/14/1980 |
| OTN: | LOTN: | Originating Docket No: MC-51-CR-1234881-1979 |
| Initial Issuing Authority: | | Final Issuing Authority: |
| Arresting Agency: Philadelphia Pd | | Arresting Officer: Affiant |
| Complaint/Incident #: | | |

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Legacy Microfilm Number | 81026824 |
| Police Incident Number | 8014000991 |
| District Control Number | 8014000991 |
| Legacy Docket Number | C8008132811 |

## STATUS INFORMATION

| | | | | |
|---|---|---|---|---|
| Case Status: | Closed | Status Date | Processing Status | Arrest Date: 01/06/1980 |
| | | 09/17/1981 | Completed | |
| | | 08/14/1980 | Migrated Case (Active) | |
| | | | | Complaint Date: 08/14/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

| | | |
|---|---|---|
| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 2 of 3

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | **35 § 780-113 §§ A16** | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 01/05/1980 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|------------|------------------|-------------------|
| Sequence/Description | Offense Disposition | Grade    Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition |
|------------------------------|------------|-------------------|
| 3 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Guilty Plea | 35 § 780-113 §§ A16 |
| Katz, Leon | 09/17/1981 | |
| Confinement | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|--------------------------|----------------------|
| Name:    Philadelphia County District Attorney's Office | Name:    Myron H. Deutsch |
|    Prosecutor |    Private |
| Supreme Court No: | Supreme Court No:    012362 |
| Phone Number(s): | Rep. Status:    Active |
|    215-686-8000    (Phone) | Phone Number(s): |
| Address: |    215-567-2693    (Phone) |
|    3 South Penn Square | Address: |
|    Philadelphia, PA 19107 |    Deutsch, Larrimore & Farnish |
| |    2100 Arch Street 5th Floor |
| |    Philadelphia, PA 19103 |
| | |
| | Representing: Claitt, Emanuel |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|-----------------|---------------|---------------|----------|
| 1 | 08/14/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 3 of 3

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 3

## CASE INFORMATION

| | | |
|---|---|---|
| Judge Assigned: Katz, Leon | Date Filed: 08/26/1980 | Initiation Date: 08/26/1980 |
| OTN: Z 475879-5 | LOTN: | Originating Docket No: MC-51-CR-0805451-1980 |
| Initial Issuing Authority: | Final Issuing Authority: | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant | |
| Complaint/Incident #: | | |

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 7935097848 |
| Legacy Microfilm Number | 81027198 |
| District Control Number | 7935097848 |
| Legacy Docket Number | C8008209311 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 08/08/1980 |
|---|---|---|---|---|---|
| | | 09/17/1981 | Completed | | |
| | | 08/26/1980 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 08/26/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

| | | |
|---|---|---|
| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |

**Alias Name**
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 3

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 8 | 8 | | 18 § 903 | CRIMINAL CONSPIRACY | 11/11/1979 | Z 475879-5 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | | Disposition Date | Final Disposition | |
|---|---|---|---|---|
| Sequence/Description | | Offense Disposition | Grade | Section |
| Sentencing Judge | | Sentence Date | Credit For Time Served | |
| Sentence/Diversion Program Type | | Incarceration/Diversionary Period | Start Date | |
| Sentence Conditions | | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition | |
|---|---|---|---|
| 8 / CRIMINAL CONSPIRACY | Guilty Plea | | 18 § 903 |
| Katz, Leon | 09/17/1981 | | |
| Confinement | Min of 1.00 Years | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Myron H. Deutsch |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | 215-567-2693 (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA 19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA 19103 |
| | Representing: Claitt, Emanuel M. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/26/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 3

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel M. |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

## CASE FINANCIAL INFORMATION

Last Payment Date:                                                     Total of Last Payment:

| **Claitt, Emanuel M.**<br>Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $27,000.00 | $0.00 | ($27,000.00) | $0.00 | $0.00 |
| Grand Totals: | $27,000.00 | $0.00 | ($27,000.00) | $0.00 | $0.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 1 of 5

## CASE INFORMATION

Judge Assigned: Anderson, Levy | Date Filed: 11/07/1980 | Initiation Date: 11/07/1980

OTN: | LOTN: | Originating Docket No: MC-51-CR-0512961-1980

Initial Issuing Authority: | Final Issuing Authority:

Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
| --- | --- |
| Police Incident Number | 8035025356 |
| Legacy Microfilm Number | 82015467 |
| District Control Number | 8035025356 |
| Legacy Docket Number | C8011071311 |

## STATUS INFORMATION

Case Status: Closed | | | Arrest Date: 05/16/1980

| | Status Date | Processing Status | |
| --- | --- | --- | --- |
| | 04/13/1982 | Completed | |
| | 11/07/1980 | Migrated Case (Active) | |

Complaint Date: 11/07/1980

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
| --- | --- | --- | --- | --- | --- |
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth: 02/05/1955 | City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
| --- | --- |
| Defendant | Claitt, Emmanuel |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 2 of 5

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 1 | 1 | | **18 § 2705** | RECKLESSLY ENDANGERING ANOTHER PERSON | 04/05/1980 | |
| 2 | 2 | | **18 § 2706** | TERRORISTIC THREATS | 04/05/1980 | |
| 3 | 3 | | **18 § 903** | CRIMINAL CONSPIRACY | 04/05/1980 | |
| 4 | 4 | | **18 § 2702** | AGGRAVATED ASSAULT | 04/05/1980 | |
| 5 | 5 | | **18 § 2701** | SIMPLE ASSAULT | 04/05/1980 | |
| 6 | 6 | | **18 § 6106** | CARRYING FIREARMS WITHOUT LICENSE | 04/05/1980 | |
| 7 | 7 | | **18 § 6106** | FIREARMS WITHOUT LICENSE-IN AUTO | 04/05/1980 | |
| 8 | 8 | | **18 § 6108** | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 04/05/1980 | |
| 9 | 9 | | **18 § 907** | POSSESSING INSTRUMENTS OF CRIME | 04/05/1980 | |
| 10 | 10 | | **18 § 907** | POSSESSING INSTRUMENTS OF CRIME WEAPON | 04/05/1980 | |
| 11 | 11 | | **18 § 3921** | THEFT BY UNLAWFUL TAKING OR DISPOSITION | 04/05/1980 | |
| 12 | 12 | | **18 § 3925** | THEFT BY RECEIVING STOLEN PROPERTY | 04/05/1980 | |
| 13 | 13 | | **18 § 3701** | ROBBERY | 04/05/1980 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 04/13/1982 | Final Disposition | |
|------------------------------|------------|-------------------|---|
| 1 / RECKLESSLY ENDANGERING ANOTHER PERSON | Nolle Prossed | 18 § 2705 | |
| Anderson, Levy | 04/13/1982 | | |
| 2 / TERRORISTIC THREATS | Nolle Prossed | 18 § 2706 | |
| Anderson, Levy | 04/13/1982 | | |
| 3 / CRIMINAL CONSPIRACY | Nolle Prossed | 18 § 903 | |
| Anderson, Levy | 04/13/1982 | | |
| 4 / AGGRAVATED ASSAULT | Nolle Prossed | 18 § 2702 | |
| Anderson, Levy | 04/13/1982 | | |
| 5 / SIMPLE ASSAULT | Nolle Prossed | 18 § 2701 | |
| Anderson, Levy | 04/13/1982 | | |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 3 of 5

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |
| 6 / CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed | | 18 § 6106 |
| Anderson, Levy | 04/13/1982 | | |
| 7 / FIREARMS WITHOUT LICENSE-IN AUTO | Nolle Prossed | | 18 § 6106 |
| Anderson, Levy | 04/13/1982 | | |
| 8 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed | | 18 § 6108 |
| Anderson, Levy | 04/13/1982 | | |
| 9 / POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed | | 18 § 907 |
| Anderson, Levy | 04/13/1982 | | |
| 10 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed | | 18 § 907 |
| Anderson, Levy | 04/13/1982 | | |
| 11 / THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed | | 18 § 3921 |
| Anderson, Levy | 04/13/1982 | | |
| 12 / THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed | | 18 § 3925 |
| Anderson, Levy | 04/13/1982 | | |
| 13 / ROBBERY | Nolle Prossed | | 18 § 3701 |
| Anderson, Levy | 04/13/1982 | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Myron H. Deutsch, Esq. |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | 215-567-2693 (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA 19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA 19103 |
| | |
| | Representing: Claitt, Emmanuel |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 4 of 5

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/07/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 04/13/1982 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 04/13/1982 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 04/13/1982 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emmanuel |
| Motion to Vacate Bail Judgment Filed | | | |
| Motion to Vacate Bail Judgment Filed on behalf of Emmanuel Claitt. | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

On 07/24/2014, upon consideration of the Motion to Vacate or Reduce Bail Judgment filed on 06/06/2014, it is ordered that the bail forfeiture and bail judgment are vacated in full. The defendant attests under penalty of falsification to authorities that the defendant failed to appear on the above date because the defendant was incarcerated, and incarceration records are not available.

This Order will become final unless within 30 days of the date the Order was docketed and mailed the Petitioner files a request for a hearing by a Court Designated Bail Authority Reviewing Officer with the Clerk of Courts, Room 310, 1301 Filbert St, Phila. PA 19107.

Honorable Sheila A. Woods-Skipper, President Judge, Court of Common Pleas
For the Court: Glenn S. Bozzacco, Esq., Reviewing Officer

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 5 of 5

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| | | | |

## CASE FINANCIAL INFORMATION

Last Payment Date:      Total of Last Payment:

| **Claitt, Emmanuel**<br>Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $67,500.00 | $0.00 | -$67,500.00 | $0.00 | $0.00 |
| Grand Totals: | $67,500.00 | $0.00 | -$67,500.00 | $0.00 | $0.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Page 37

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0910651-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel M Claitt

Page 1 of 2

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-0916561-1980

| | | |
|---|---|---|
| Judge Assigned: Cadran, Francis P. | Date Filed: 09/10/1980 | Initiation Date: 09/10/1980 |
| OTN: Z 475880-6    LOTN: | Originating Docket No: | |
| Initial Issuing Authority: | Final Issuing Authority: Francis P. Cadran | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant | |
| Complaint/Incident #: | | |

Case Local Number Type(s)      Case Local Number(s)

| | |
|---|---|
| Police Incident Number | 8035071776 |
| District Control Number | 8035071776 |
| Legacy Docket Number | M8009106511 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 09/10/1980 |
|---|---|---|---|---|---|
| | | 09/18/1980 | Completed | | |
| | | 09/10/1980 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 09/10/1980 |

## DEFENDANT INFORMATION

Date Of Birth:    02/05/1955      City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emmanuel M. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 4 | 4 | | **18 § 907** | POSSESSING INSTRUMENTS OF CRIME WEAPON | 08/20/1980 | Z 475880-6 |
| 5 | 5 | | **18 § 908.1** | PROHIBITED OFFENSIVE WEAPONS | 08/20/1980 | Z 475880-6 |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0910651-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel M Claitt

Page 2 of 2

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | | |
|---|---|---|---|---|
| Sequence/Description | Offense Disposition | | Grade | Section |
| Sentencing Judge | Sentence Date | | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | | Start Date |
| Sentence Conditions | | | | |

**Held for Court**   Defendant Was Not Present

| Migrated Dispositional Event | 09/18/1980 | Final Disposition | | |
|---|---|---|---|---|
| 4 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Held for Court | | | 18 § 907 |
| Cadran, Francis P. | 09/18/1980 | | | |
| 5 / PROHIBITED OFFENSIVE WEAPONS | Held for Court | | | 18 § 908.1 |
| Cadran, Francis P. | 09/18/1980 | | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Myron H. Deutsch |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | 215-567-2693 (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA 19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA 19103 |
| | Representing: Claitt, Emmanuel M. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 09/10/1980 | | |
| PARS Transfer | | | |
| 1 | 09/18/1980 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/18/1980 | | |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 4

## CASE INFORMATION

| | |
|---|---|
| Judge Assigned: Guarino, Angelo A. | Date Filed: 05/10/1989    Initiation Date: 05/10/1989 |
| OTN: M 395039-1    LOTN: | Originating Docket No: MC-51-CR-0500271-1989 |
| Initial Issuing Authority: | Final Issuing Authority: |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant |
| Complaint/Incident #: | |

Case Local Number Type(s)            Case Local Number(s)

| | |
|---|---|
| Police Incident Number | 8914031724 |
| Legacy Microfilm Number | 91060193 |
| District Control Number | 8914031724 |
| Legacy Docket Number | C8905136511 |

## RELATED CASES

| Related Docket No | Related Case Caption | Related Court | Association Reason |
|---|---|---|---|
| **Joined Codefendant Cases** | | | |
| CP-51-CR-0822791-1989 | Comm. v. Morgan,jr., Thomas | CP-01-51-Crim | Joined Codefendant Cases |

## STATUS INFORMATION

| | | | |
|---|---|---|---|
| Case Status: Closed | Status Date | Processing Status | Arrest Date: 05/01/1989 |
| | 10/23/1991 | Completed | |
| | 05/10/1989 | Migrated Case (Active) | |
| | | | Complaint Date: 05/10/1989 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Payment Plan Conference | 04/08/2015 | 1:00 pm | 1104 | | Scheduled |

---

CPCMS 9082                                                                    Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 4

## DEFENDANT INFORMATION

Date Of Birth:     02/05/1955     City/State/Zip:   PHILA., PA   19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Claitt, Emanuel M.
Claitt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 3 | 3 | M1 | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 04/30/1989 | M 395039-1 |
| 6 | 6 | F1 | 18 § 3701 | ROBBERY | 04/30/1989 | M 395039-1 |
| 8 | 8 | F2 | 18 § 903 | CRIMINAL CONSPIRACY | 04/30/1989 | M 395039-1 |

## DISPOSITION SENTENCING/PENALTIES

| Disposition | | |
|---|---|---|
| Case Event | Disposition Date | Final Disposition |
|     Sequence/Description |     Offense Disposition |     Grade     Section |
|     Sentencing Judge |     Sentence Date |     Credit For Time Served |
|       Sentence/Diversion Program Type |     Incarceration/Diversionary Period |     Start Date |
|         Sentence Conditions | | |

**Migrated Disposition**

| Migrated Dispositional Event | 10/23/1991 | Final Disposition | |
|---|---|---|---|
| 3 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Guilty Plea | M1 | 18 § 907 |
|    Guarino, Angelo A. | 10/23/1991 | | |
|     Confinement | Min of 1.00 Years | | |
| | Max of 2.00 Years | | |
| 6 / ROBBERY | Guilty Plea | F1 | 18 § 3701 |
|    Guarino, Angelo A. | 10/23/1991 | | |
|     Confinement | Min of 5.00 Years | | |
| | Max of 10.00 Years | | |

CPCMS 9082

Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 4

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

| | | | |
|---|---|---|---|
| 8 / CRIMINAL CONSPIRACY | Guilty Plea | F2 | 18 § 903 |
| Guarino, Angelo A. | 10/23/1991 | |
| Confinement | Min of 1.00 Years | |
| | Max of 2.00 Years | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:** Philadelphia County District Attorney's Office | **Name:** Defender Association of Philadelphia |
| Prosecutor | Public Defender |
| **Supreme Court No:** | **Supreme Court No:** |
| **Phone Number(s):** | **Rep. Status:** Active |
| 215-686-8000 (Phone) | **Phone Number(s):** |
| **Address:** | **Address:** |
| 3 South Penn Square | |
| Philadelphia, PA 19107 | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 05/10/1989 | | Unknown Filer |
| Held for Court | | | |
| 1 | 10/23/1991 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 10/23/1991 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 10/23/1991 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 07/12/2009 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 925 Days Overdue | | | |
| 1 | 12/01/2011 | | Claitt, Emanuel M. |
| Refer to New Agency - Collections Continued | | | |

CPCMS 9082

Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 4 of 4

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 12/07/2012 | | Claitt, Emanuel M. |
| Return Case From Collection Agency - Court Request/Order | | | |

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 51-2006-P100348439 | Monthly | 12/30/2006 | Yes | $641.00 |
| | | | No | $10.00 |

| | Payment Plan History: | Receipt Date | Payor Name | Participant Role | Amount |
|---|---|---|---|---|---|
| | | 09/11/2007 | Payment | State Correctional Institution ( | Payor | $30.00 |
| | | 06/01/2009 | Payment | CVCF | Payor | $60.00 |

## CASE FINANCIAL INFORMATION

Last Payment Date: 09/11/2007                    Total of Last Payment: -$30.00

| Claitt, Emanuel M.<br>Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Crime Victims Compensation (Act 96 of 1984) | $15.00 | ($15.00) | $0.00 | $0.00 | $0.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Judicial Computer Project | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Crimes Commission Cost (Act 96 of 1984) | $15.00 | ($15.00) | $0.00 | $0.00 | $0.00 |
| Collection Fee (Philadelphia) | $2.52 | $0.00 | ($2.52) | $0.00 | $0.00 |
| Bail Assessment (Philadelphia) (UDS) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Attorney Collection Fee 9 (Philadelphia) | $2,253.75 | $0.00 | ($2,253.75) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $29,301.27 | ($30.00) | ($29,256.27) | $0.00 | $15.00 |
| Grand Totals: | $29,301.27 | ($30.00) | ($29,256.27) | $0.00 | $15.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Exhibit K

Letter From Assistant District Attorney Leonard Ross to Judge
Leon Katz, January 5, 1981

Case 2:20-cv-02675 Document 1 Page: 409 06/05/20 Filed 05/05/2020 7



**DISTRICT ATTORNEY'S OFFICE**
2300 CENTRE SQUARE WEST
PHILADELPHIA, PENNSYLVANIA 19102

EDWARD G. RENDELL
DISTRICT ATTORNEY

January 5, 1981

DIRECT DIAL (215) MU 6-

Honorable Leon Katz
Judge, Court of Common Pleas
Trial Division, Philadelphia County
111 One East Penn Square
Philadelphia, Pa.    19107

Re:   Emmanuel Claitt

Dear Judge Katz:

This letter is written pursuant to your request regarding Mr. Claitt's cooperation with the Commonwealth.

Mr. Claitt's cooperation began in January, 1980, with discussions regarding the homicide investigation of Tae Bong Cho, a Korean grocer killed allegedly by Robert "Sugar Bear" Lark. Later, in May of 1980, Mr. Claitt was interviewed, while incarcerated in the Detention Center, about his knowledge concerning the death of his business partner and close friend, Samuel "Omar" Goodwin.

During that interview, Mr. Claitt mentioned that he believed George Rose killed "Omar" and that Rose had also killed Alfred Clark in April of 1979. Mr. Claitt was subsequently brought to the Homicide Division of the Police Department to give a formal statement about the death of Alfred Clark. This statement led to the arrest of George Rose. Mr. Claitt gave additional statements regarding the activities of the drug traffickers in North Philadelphia. Part of this information led to the arrest of William Franklin for a murder which occured in 1976, and warrants being issued for George "Major" Tillery for the same offense. Warrants were also issued for Tillery for a series of bombings in late 1979 and early 1980. Rose was also implicated and was arrested for these bombings. Tillery is presently a fugitive.

Mr. Claitt gave police background information regarding other homicides under investigation as well as the drug traffic in Philadelphia. Information was supplied by Mr. Claitt in the investigation of the death of Philadelphia Police Officer Ernest Davis in July 1980.

Honorable Leon Katz
Page 2
January 5, 1981

Re:  Emmanuel Claitt


    Mr. Claitt testified at the preliminary hearings and trials
of George Rose and William Franklin in the homicide charges.  He
testified at the preliminary hearings of George Rose and a
co-defendant, James Brand, in the bombings.  These matters are
still pending.  He has agreed to testify against Tillery, once
he is captured.

    I hope this letter answers some of the questions that
the Court had.  I will be present at sentencing on February 3, 1981,
and of course, if the Court has any additional questions, I am
available at your convenience.

                              Sincerely,

                              Leonard N. Ross

                              LEONARD N. ROSS
                              Assistant District Attorney
                              Homicide Unit

LNR:cm

cc:  Myron H. Deutsch, Esquire

Exhibit L

Transcript of Emanuel Claitt's Sentencing Hearing Before Judge
Leon Katz, September 17, 1981 (Excerpts)

Stanley L. Goldstein
Official Court Reporter
Court of Common Pleas
Philadelphia, Pa. 19107

IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

| | |
|---|---|
| COMMONWEALTH | : APRIL TERM, 1979 |
| | : NO.809-UNAUTH USE AUTO |
| | 810-THEFT, RSP |
| | : - - - |
| | MAY TERM, 1980 |
| | : |
| | 1024-THEFT, RSP |
| | : 1025-UNAUTH USE AUTO |
| | : AUGUST TERM, 1980 |
| | : NO.2093-ATT ARSON PERS |
| | ATT ARSON PROP |
| | : 2094-ATT CRIM MISCH |
| | 2095-PIC GEN |
| | : PIC WEAPON |
| | PROHIB OFF WEAPON |
| EMANUEL M. CLIATT | : 2096-RISK CAT |
| | 2097-CONSPIRACY |

- - -

Room 615, City Hall

Philadelphia, Pennsylvania

- - -

September 17, 1981

- - -

BEFORE:

HONORABLE LEON KATZ, J.

Pa 368

PRESENT:

        LEONARD ROSS, ESQUIRE
        Assistant District Attorney
        For the Commonwealth

        MYRON DEUTSCH, ESQUIRE
        Court Appointed Counsel
        For the Defendant

- - -

as to one of those bills, and t
with regard to that case, will

The other two cases that remain,
that are open, are 7904-809 and 810, which
will be nol-prossed upon sentencing, and 8005,
1024 to 1025, which will be nol-prossed--

THE COURT: 80 what?

MR. ROSS: 8005, 1024 and 1025.
That will also be nol-prossed after Your
Honor sentences Mr. Cliatt.

Those two cases, Your Honor, both
involve the possession and use of stolen
automobiles. Those are the two cases that
the Commonwealth is going to nol-pros.

Mr. Cliatt will be pleading guilty
to the one bills that's remaining, number,
that's Bill 2097, Judge, August of 1980.

THE COURT: What's the charge?

MR. ROSS: Charing the defendant
with criminal conspiracy, where the object is
arson, risking catastrophe; overt act, did
possess an explosive device. Co-defendants
in the case are George Rose, George Tillary,
and Douglas Smith, and George Grant.

THE COURT: Are there any other cases other than the ones you mentioned that are open or pending against this defendant?

MR. ROSS: No. Is that right?

MR. DEUTSCH: No.

MR. ROSS: I believe.

MR. DEUTSCH: The only thing is--

MR. ROSS: Montgomery County.

THE COURT: I'm talking about Philadelphia.

MR. DEUTSCH: In Philadelphia, no, sir.

MR. ROSS: This is it, Judge.

MR. DEUTSCH: It involves an auto-mobile.

THE COURT: Are you saying to me that if and when he pleads guilty to 2097, and the others are nol-prossed at the time of sentencing, then all of the cases pending against him are completed in Philadelphia County?

MR. ROSS: Yes, that's my understand-ing, Judge.

MR. DEUTSCH: That's right.

THE COURT: Any you're prepared for sentencing on the other matters today?

MR. DEUTSCH: If I may, Your Honor--

(Conference by defense counsel with defendant off the record.)

THE COURT: I don't want to have a piecemeal sentence because this case has been kicking around a long time.

MR. ROSS: I agree with Your Honor. I think the sentence should all be imposed on one day. The Commonwealth has no objection to however it's done. If Mr. Cliatt wants to plead guilty today and be sentenced on all of them, that's fine. If he wants to be continued, that's fine. Whatever Mr. Cliatt wants.

THE COURT: How about the matter that we discussed earlier, matters that are pending, without going into detail?

MR. ROSS: Without going into detail, Mr. Cliatt has continued his cooperation, Your Honor.

THE COURT: You feel confident that that cooperation will continue even after

raise that on appeal and say you should not
have pled guilty because at the time you had
a defense available to you, whether it was
true or not, doesn't make any difference. So,
that you could not raise on appeal the fact
that you wanted to raise a defense. Do you
understand that?

THE DEFENDANT: Yes.

MR. ROSS: Do you have any questions
now, Mr. Cliatt, with regard to your guilty
plea?

THE DEFENDANT: No.

MR. ROSS: Does Your Honor have any
additional questions?

THE COURT: No.

MR. DEUTSCH: I have no questions.

THE COURT: Do you understand there
are no promises?

MR. ROSS: I'm sorry.

THE COURT: Here, as there aren't
in the other cases, as to what your sentence
would be. You've been told there's a poss-
ibility of a maximum of five to ten years
plus a fine. And although that's the maximum,

the name of Kenneth Washington. At that time
the device did not explode.

It was subsequently taken by the
Philadelphia bomb squad and subsequently
exploded at the Police Academy in an area
that they have designed specifically for
the exploding of explosives that have been
confiscated.

Some time in 1980 Mr. Cliatt came
forward, after a number of statements that
he gave to the police regarding other cases,
he gave the police a statement indicating his
involvement in the attempted bombing of the
home that was owned by Kenneth Washington.
In that he indicated that he made an agreement,
if not oral, certainly a tacit agreement with
George Tillary, who was a business associate,
George Rose, who was a business associate,
and Douglas Smith, who was a business associate
of Mr. Cliatt's, and all of them were part of
the same business conspiracy at the time to
get even with Mr. Washington for certain
wrongs that had been committed against Major
Tillary.

In the statement Mr. Cliatt in-
dicated to the police that he was instrumental
in picking up certain explosives from an in-
dividual named George Grant. He was also
present at the time the explosive device was
placed at Mr. Washington's home, was there
at the time, although he didn't participate
other than being there. That when the ex-
plosive device did not go off, several gun
shots were fired at it in an attempt to make
it explode, which it didn't. And eventually
they left the scene.

Mr. Cliatt has reiterated the state-
ment he gave to the police at two separate
preliminary hearings involving George Rose
and Douglas Smith, who have been apprehended
and their cases are pending before this Court
with regard to the bombings.

That in brief summary, Your Honor,
is the matter that Mr. Cliatt is pleading
guilty to.

Mr. Cliatt, do you understand the
facts as I've just basically summarized them
to the Judge?

I pronounce sentence, and of course, I assume
we all agree at this time that both defense
counsel, the D.A., has examined the pre-sentence
investigation, mental health evaluation, and
unless I hear to the contrary I will assume
that there are no corrections as far as the
factual and history contained therein.

      MR. DEUTSCH: I think there was just
one correction that Mr. Cliatt is the father
of three children. I noticed it said two
children.

      THE COURT: All right.

      MR. DEUTSCH: And that's the only
thing I saw.

      THE COURT: Also the drug evaluation
which I didn't mention.

      MR. DEUTSCH: Yes, we have read it.
That was provided before this hearing and we
have read it.

      THE COURT: I also want to put on
the record that I have received from Leonard
N. Ross, assistant district attorney of the
homicide unit, a letter dated January 5th;
1981, and without being specific, for reasons

that I think we all concur, Mr. Ross has

outlined a pattern of cooperation of a mean-

ingful nature on the part of the defendant.

And, that in response to my question, Mr.

Ross has indicated that he's confident that

that cooperation will continue. Is that correct,

sir?

MR. ROSS: Yes, Your Honor. And

if it doesn't there's, I'm confident--

THE COURT: For whatever reason

you're confident, you are confident it will

continue.

MR. ROSS: Yes, sir.

THE COURT: Am I to understand

from the defendant and/or counsel, that the

defendant has been incarcerated for a peric

of three months on this case, or on one of

these cases as a result of a bench warrant

that I issued?

MR. DEUTSCH: That's correct. That's

as a result of a bench warrant alone.

THE COURT: Whatever time I give

him, he has approximately three months credit.

MR. ROSS: Judge, actually, to be

honest, he's probably got close to a year
on these cases. What was basically happening,
Judge, is just to be very quick about it,
and it's hard to distinguish exactly what,
he had so many cases open and so many detainers
and bench warrants, that's something the prison
may have to figure out. He was released for
a period of time and then he wouldn't show
up when he was supposed to and he would be
arrested for a while--

        THE COURT: We're not going to get
involved in that mathematics. It's not
germaine to what the sentence is.

        MR. ROSS: Whatever the sentence
Your Honor gives, if you just add the words
"To be given credit for whatever time he's
served on these cases," and if that's a problem
we can certainly straighten it out at a later
date.

        MR. DEUTSCH: I understand--I
recognize the seriousness of the charges to
which the defendant has pled guilty. And,
I'm sure the district attorney shares that with
me as does his counsel. I also recognize the

importance of the cooperation that he's extended.

THE COURT: Must keep in mind that although one cooperates with the Commonwealth, we cannot wash out the fact that he's been convicted of at least nine crimes, possibly more, including the crimes to which he pled guilty today, because as of the time of the pre-sentence investigation, as stated on the face sheet, he was convicted of seven crimes and he's pled guilty today to another one, so it's at least eight.

He's had two commitments. He's had one probation violation, without any juvenile record.

The recommendation of the pre-sentence investigator is incarceration. And, if it were not, if it were not for the cooperation extended to the Commonwealth, I would think that full justification that this defendant should receive a maximum sentence of seven and a half to fifteen years on the drug charge, namely 1067, manufacture, sale, and delivery of drugs. Not that I'm minimizing the other

charges, such as the conspiracy to fire bomb
the house and the possession of the drugs.

However, I'm taking that into con-
sideration because I think, in the field of
law enforcement, that there are many times
when we cannot prosecute career criminals
or criminals who commit acts of violence
without the cooperation of either co-defendants
or others who have information. And that's,
I think, what is present in this case.

MR. ROSS: Judge, might I just
comment briefly on that one fact for the
record, so Your Honor will have some--

THE COURT: Please do.

MR. ROSS: In these particular
cases, Your Honor, none of those cases could
have been brought to trial without Mr. Cliatt's
statements. The two homicide matters, as
well as the bombings, although we basically
knew who was involved, Judge, we had no hard
evidence to present to a Court until Mr.
Cliatt made his statements. Everything that
you said in general terms is specifically
true in this particular case. Those five

cases or so that have been presented, and
people have been arrested for, could not have
happened without Mr. Cliatt's statements and
cooperation.

THE COURT: I think that the de-
fendant should be subject to the parole
authorities.

What happened in the probation cases?
Didn't he have three probations pending?

MR. DEUTSCH: As I understand it,
Your Honor, we tried a case a number of years
ago before Judge Kubacki and he's the one that
put him on the probation. Although, there's
been some arrests and detainers and back and
forth, it's always been with Judge Kubacki.
It was a five year probation and we got through
about three and a half, almost four without
too much trouble, and it was only in the last
year of the probation that it began to break
down from these other matters. The actual
date of expiration was July 10th, 1981. If
you take it into five annual years.

MR. ROSS: The other judge, Judge
Caesar, was the Municipal Court case of which

Mr. Cliatt appealed and then Judge Kubacki

had the exact same case. So, there really

is only one judge in terms of probation, and

the only one that's active is Judge Kubacki.

And I would say for the record, Judge Kubacki's

indication was that probably, regardless of

what Your Honor did, he would terminate his

probation since you would have him under some

kind of supervision, either your own personal

supervision or state parole supervision if

Your Honor were to sentence him.

THE COURT: Do you have anything

to say, Mr. Cliatt, yourself?

MR DEUTSCH: Could we start, Your

Honor, with my discussing that matter with

you at side bar, and then--

THE COURT: What matter, sentencing

matter?

MR. DEUTSCH: No, having to do

originally when we talked about some cooper-

ation, there was something I wanted to say

off the record.

THE COURT: All right. .

(Conference in chambers off the

record.)

(The following is in open court:)

THE COURT: All right, Mr. Cliatt,
for the reasons that I've stated, and upon
analysis of the pre-sentence report, mental
health evaluation, the drug evaluation, the
letter from Mr. Ross that I alluded to dated
January 5th, 1981, sentence of the Court is
as follows--

MR. ROSS: Judge, excuse me for
just one second, before you do that, the
question that you asked Mr. Cliatt, whether
he had anything to say remained unanswered.

THE COURT: Do you have anything
to say, sir, before I sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Please say it.

MR. DEUTSCH: He did want to address
the Court.

THE COURT: Go ahead.

THE DEFENDANT: What I wanted to
say was, that as far as my life, as far as
my life of being involved in crime, you know,
I think, not only think, I know that, you know,

I'm through with crime as far as I'm concerned because, you know, I'm not accepted amongst the hustlers and people in the street, doing the things that are wrong, because I have told and testified on these people. My type is not accepted amongst that type no more. I'm saying whatever you sentence me to today, Your Honor, like, you know, after this, you know, this is it.

THE COURT: What you're saying to me is you really don't have any choice because you're not going to be trusted, in a way. That's a hard way of walking the straight and narrow, but apparently that's, whatever reason it is, we should all be thankful that you're going to get out of the field of crime.

THE DEFENDANT: Yes, sir.

THE COURT: For your own sake, it would have been better if you never got in as deeply as you did. Nevertheless, is there anything else you want to say?

THE DEFENDANT: No, Your Honor.

THE COURT: On Bill 1067, which is the drug bill that I mentioned, wherein the

maximum is fifteen years, sentence of the
Court is to undergo a period of incarceration
of not less than eighteen months nor more
than seven years.

On Bill 1329, which is the possession,
where the maximum is one year, the sentence
of the Court is six to twelve months to run
concurrently with the bill imposed on 1067.

On Bill 2097, which is the conspiracy
and fire bombing case, where the maximum is
ten years, the sentence of the Court is to
undergo a period of incarceration of not less
than one nor more than five years. And that
sentence is to run concurrently with the sen-
tence imposed on 1067.

I will entertain a motion to nol-pros
all other bills.

MR. ROSS: Judge, I will move to
nol-pros all the remaining bills that are
before you.

THE COURT: Motion is granted.
All other bills are nol-prossed.

Mr. Ross, would you advise him as
to his rights to appeal any or all of the

sentences imposed today?

MR. ROSS: Mr. Cliatt, you have thirty days from today in which to appeal the sentences that have just been handed down on all these cases. Since you pled guilty, as I indicated, you're appellat rights are severely limited.

If you do not notify that you wish to appeal within thirty days, your right to appeal will be considered to be waived.

You have, however, ten days also for you to file a motion with this Court to modify the sentence that was imposed upon you, and you must do that prior to your perfecting your appeal or notice of appeal to the Superior Court.

If you cannot afford to have a lawyer to represent you, one will be appointed for you free of charge. Mr. Deutsch will notify the appellate court if you wish to appeal, if you want to do so, and then a lawyer will be appointed for you if you could not afford one and wanted one. Do you understand that?

Exhibit M

Letter From Homicide Unit Chief Arnold Gordon to Parole
Board, January 31, 1984



## DISTRICT ATTORNEY'S OFFICE
1300 CHESTNUT STREET
PHILADELPHIA PENNSYLVANIA 19107

EDWARD G RENDELL
DISTRICT ATTORNEY

January 31, 1984

Mr. Herman Tartler
Secretary, Pennsylvania Board
of Probation and Parole
P. O. Box 1661
Harrisburg, Pennsylvania 17120

Re: Emanuel Claitt, Police No. 430750
Birth Date 2-7-51

Dear Mr. Tartler:

The above-captioned individual is presently on
Pennsylvania State Parole as a result of a 1980 conviction
in Philadelphia Common Pleas Court (C.P. 80-08-1067). He
is awaiting trial here on charges of robbery and related
offenses (C.P. 83-05-3764-3768) and remains in custody
because of a state parole detainer.

Mr. Claitt is our only eyewitness in the very serious
homicide case of Commonwealth v. Major Tillery. This case
cannot be successfully prosecuted without his testimony.

Although Claitt has already testified, without any
promises whatsoever, against a co-defendant in the same case,
he now, through counsel, seeks his release on bail as a
condition of further cooperation. He does not seek any
promises or consideration with respect to his open charges.

In view of the fact that this witness subjects himself
to considerable risk in testifying against Tillery, we do not
believe his request is unreasonable. We ask, therefore, that
the parole board remove his detainer. With this done, we will

Case 2:20-cv-01641-DEU Document Page: 463 06/05/20 Filed 05/07/2020

_____ necessary steps to _____ he him released on bail and
_____ ensure that he is present for all further hearings
before the board.

The preliminary hearing in the <u>Tillery Case</u> is listed
for February 9, 1984. Mr. Claitt will not be available as
a Commonwealth witness on that date unless the above
arrangements have been completed. We therefore ask that
the matter be expedited.

Your cooperation is greatly appreciated.

Very truly yours,

ARNOLD GORDON
Chief, Homicide Unit

/ktm



Exhibit N

Letter From District Attorney Edward Rendell to Judge John L. Chiovero, February 18, 1984

Case 2:20-cv-04267... Document... Page 465 of... Page 280 of 267

February 18, 1984

Honorable John J. Chiovero
105 One East Penn Square Building
Juniper and Market Streets
Philadelphia, Pa. 19107

       Re:  Commonwealth v. Emanuel Claitt
          C.P. 8305-3764 to 3768

Dear Judge Chiovero:

      The defendant in the above matter, which has been
assigned to you for trial, is an essential Commonwealth witness
in the case involving one George Major Tillery. Mr. Claitt
is presently in custody in lieu of $2000.00 bail. Our office
requests that he be permitted to sign his own bail in that
amount, for the reasons that follow.

      George Major Tillery is charged with murder and
aggravated assault as to an incident of October 22, 1976. He
is also charged with three separate fire bombings of occupied
residences. In the opinion of our office, Tillery is a major
figure in organized crime in the City of Philadelphia. The
testimony of Emanuel Claitt is essential to the successful
prosecution of all of these cases against Tillery. Claitt has
not requested nor has this office promised him any consideration
with respect to the disposition of the open matter before you.
He has, however, through counsel, requested his release on bail
as a condition to his testifying against Tillery.

      Since Major Tillery presents an enormously greater
threat to the community than does Emanuel Claitt, we believe the
Court will further the interests of justice by granting our request.

                  Very truly yours,

                  EDWARD G. RENDELL
                  District Attorney

Exhibit O

Letter From Homicide Unit Assistant Chief Jeffrey A. Brodkin
to  Parole Board, October 25, 1984

October 25, 1984

Herman Tartler, Board Secretary
PA. Board of Probation and Parole
P.O. Box 1661
3101 North Front Street
Harrisburg, PA 17120

RE: EMANUEL CLAITT

Dear Mr. Tartler:

Emanuel Claitt is scheduled to have a hearing, I believe on
November 2, 1984, concerning his violation of parole.

Mr. Claitt has appeared for the Commonwealth as a witness in
approximately four homicide trials. He is scheduled to appear for
the Commonwealth in the case of Commonwealth v. Major Tillery.

Mr. Claitt is obviously in danger anywhere in the Pennsylvania
Prison System. In fact, to place him in jaul would most surely
place him in jeopardy.

Although we are aware that Mr. Claitt has violated his parole
on numerous occassions, it it our opinion that Mr. Claitt's viola-
tions are clearly outweighed by the potential danger to his person.
Therefore, we request that you continue Mr. Claitt's parole.

Sincerely yours,

JEFFREY A. BRODKIN
Assistant District Attorney
Assistant Chief, Homicide Unit

JAE:tde

cc: Fred.W. Jacobs, Chairman

*P.S. If there are any questions concerning this request please
feel free to contact me at any time at (215) 875-6466.

Pa 393

Exhibit P

*Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563A.2d
195 (Pa. Super. 1989) (unpublished memorandum)

Case: 20-1942 Document: 1 Page: 469 Date Filed: 05/28/2020

J. 17001/89

COMMONWEALTH OF PENNSYLVANIA,       :        IN THE SUPERIOR COURT OF
                                    :             PENNSYLVANIA
                Appellee            :
                                    :        No. 3297 Philadelphia 1986
        v.                          :
                                    :
MAJOR GEORGE TILLERY,               :
                                    :
                Appellant           :


              Appeal from the Judgment of Sentence of the
              Court of Common Pleas of Philadelphia County,
              Criminal Division at Nos. 8403-568, 570, 571,
              573, 574.


BEFORE:    POPOVICH, JOHNSON and WATKINS, JJ.


MEMORANDUM:        '                        FILED  MAY 3 0 1989


          This is an appeal from a December 9, 1986, judgment of

sentence of the Philadelphia County Court of Common Pleas.  On

May 29, 1985, a jury convicted appellant of murder in the first

degree, possessing instruments of a crime generally, criminal

conspiracy and aggravated assault.[1]  Post-trial motions were

---

[1]    For the crime of first degree murder, appellant was
sentenced to life imprisonment.  For the crime of possessing
instruments of a crime generally, appellant received a sentence of
not less than one year nor more than two years incarceration.  For
the crime of criminal conspiracy, appellant was sentenced to
prison for not less than five years nor more than ten years.  For
the crime of aggravated assault, appellant received a sentence of
not less than five years nor more than ten years incarceration.
For a second charge of criminal conspiracy, appellant was
sentenced to prison for not less than five years nor more than ten
years.  All sentences are to run concurrently with the sentence
for first degree murder, except the sentence for aggravated
assault, which is to run consecutively to the sentence for first
degree murder.

Pa 395

J. 17001/89

denied by the Honorable J. Geisz on December 8, 1986.  We
affirm.[2]

The facts of this have a rather long and tortuous past.
At approximately 10:00 p.m. on October 22, 1976, Philadelphia
police received a call to the address at Huntingdon and Warnock
Streets in North Philadelphia.  At that corner, they broke down
the locked door of a poolroom operated by William Franklin and
discovered the dead body of John Hollis.  A medical examination
later revealed that Hollis died of a gunshot wound to the trunk of
his body.  Inside the poolroom, the police found live and spent
.38 caliber ammunition and a set of car keys.  Around the corner
from the poolroom at 2527 North 11th Street, police officers found
John Pickens bleeding from a gunshot wound.  He was treated at a
hospital and survived his injuries.  Both Pickens and Hollis were
shot by different guns.

For more than three years, the shooting of Pickens and
Hollis remained unsolved.  However, in the spring of 1980, police
detectives, investigating the homicide of Samuel Goodwin, visited
a Philadelphia prison to determine if Emanual Claitt, an inmate
who had known Goodwin, could provide any information about
Goodwin's death.  The information Claitt provided went far beyond
the Goodwin case.  Claitt described in detail the operation of
what he labeled the "black mafia", a crime syndicate run by black

_____

[2]    A notice of appeal to the Superior Court was filed on
December 9, 1986.  In November, 1988, the record was certified to
this Court without the requisite Rule 1925 opinion.

Case 2:00-cr-00415-FL Document 1-1 Filed 05/18/2016 Page 286 of 467

J. 17001/89

Muslims in Philadelphia.  His information described a vivid
picture of the events culminating with the shootings of Pickens
and Hollis.

          Claitt testified that from 1976 until 1980, he engaged
in drug dealing and extortion as a member of the Philadelphia
"black mafia".  The organization divided the city into sections
for business purposes.  Alfred Clark was the leader of the North
Philadelphia branch.  He held the rank of first lieutenant and had
"the last word" for all business in the city.  Sylvester White
directed the West Philadelphia branch.  John Pickens also dealt
drugs in West Philadelphia.  During the 1970's, appellant held the
rank of first lieutenant and "had control of the entire city as
far as methamphetamines is concerned . . . ."  Claitt received his
heroin supply from Clark and his methamphetamine supply from
appellant.  Clark and appellant were partners in the heroin and
methamphetamine trade.  Claitt characterized appellant as Clark's
"right hand man".

          On the night of October 20, 1976, Claitt, Clark,
appellant, James Ravenell and Rainey met at the home of Dana
Goodman at 59th and Woodbine Streets to discuss a disagreement
between Goodwin and Pickens over drug selling in West
Philadelphia.  Pickens arrived with Hollis and argued with Clark
about a transaction in which Clark disposed of drugs claimed by
Pickens at the expense of Pickens.  During the argument, Hollis
called Clark a "gangster".  He then grabbed Clark by the collar,
took out a pistol, slapped Clark in the face with the gun and

J. 17001/89

pointed it at Clark as if he were about to shoot. Pickens stopped
Hollis from firing the weapon, but appellant said that Hollis
"would have to die for what he did". Although White was not
present, Clark said he would talk to him and arrange a meeting at
Franklin's poolroom to settle the dispute.

Thereafter, a group consisting of Clark, Claitt, Rainey,
Ravenell and appellant met White at a mosque at 13th Street and
Susquehanna Avenue in North Philadelphia. The group then drove to
Franklin's poolroom. When they arrived at the poolroom, appellant
accused White of setting up the earlier incident and demanded a
meeting on Friday, October 22, 1976, to which White was to bring
Pickens and Hollis. White agreed to the demand.

On the evening of Friday, October 22, 1976, Clark met
the group outside the mosque. Clark made everyone surrender their
weapons because a peaceful meeting was planned. The group then
drove to the poolroom at Huntingdon and Warnock Streets. When
they arrived, Clark instructed Claitt to remove two more guns from
the group and then guard the door. Additionally, appellant
arranged for one of his couriers, Robert Mickens, to watch outside
the poolhall for police.

Inside the poolhall, appellant and Franklin sat at
opposite ends of a table. Appellant told Hollis to apologize, but
Hollis refused. Following a nod to Franklin, appellant reached
under the table and pulled out a gun. Franklin also reached under
the table and pulled out a weapon. Appellant then shot Hollis in

- 4 -

the back. When Pickens protested, appellant shot Hollis again and Franklin then shot Pickens. Pickens proceeded to run through a locked door shattering the glass.

William Arnold arrived immediately after the shootings and discovered Pickens holding his stomach. Pickens had collapsed from the wound. Arnold helped him to a house at 2527 North 11th Street where the police found him.

Based on Claitt's information, the police obtained a warrant on May 23, 1980, for appellant's arrest. However, for three years the police were not able to serve the warrant because appellant could not be located. A detective in California finally arrested appellant in November, 1983. Appellant was returned to Philadelphia on December 8, 1983, to stand trial for the aforementioned charges.

At the outset of our discussion of the issues, we must note that appellant's brief mocks the rules of appellate procedure.[3] The two and one-half page summary of argument is in violation of Pa.R.A.P. 2118 which reads, "[t]he summary of argument should not be a mere repetition of the statement of questions presented." The order in question is not included in the brief as required by Pa.R.A.P. 2115(a). Moreover, counsel for appellant raises approximately forty (40) issues in his forty-one

---

[3]    See _Commonwealth v. Jones_, 329 Pa.Super. 20, 477 A.2d 882 (1984); _Commonwealth v. Drew_, 353 Pa.Super. 632, 510 A.2d 1244 (1986); Pa.R.A.P. 2101.

J. 17001/89

page argument.[4]  He proceeds to raise the issues and then cite
paragraph after paragraph of law.  However, more often than not,
counsel for appellant fails to set forth little, if any, argument
to support his position on the issues. As such, many issues have
been waived.  See <u>Commonwealth v. Manigualt</u>, 501 Pa. 506, 462 A.2d
239 (1983).  Regardless, we have carefully reviewed <u>all</u> the claims
raised by appellant and found them to be without merit.

In section A of appellant's argument,[5] he lists 18
allegations of prosecutorial misconduct during closing remarks to
the jury.  Rather than offer a solid argument following each
allegation, appellant baldly asserts the prosecutor's comment was
either an improper expression of opinion, prejudicial, unfair or
irrelevant.  As such, issues A through F and issues H through R of
section A are hereby deemed waived for the failure to set forth
any substantive argument in support of the issues.  See
<u>Commonwealth v. Balch</u>, 328 Pa.Super. 71, 476 A.2d 458 (1984);
<u>Commonwealth v. Petras</u>, 368 Pa.Super. 372, 534 A.2d 483 (1987).

However, appellant does manage to set forth an argument
in his brief, albeit weak, in support of issue G of section A.

---

[4]  We agree with the Commonwealth's reflection that counsel for
appellant appears to think that if he claims prosecutorial
misconduct as often as possible, he can create the appearance of
impropriety where none, in fact, exists.  Appellate advocacy is
measured by effectiveness, not loquaciousness.  See <u>U.S. v. Hart</u>,
693 F.2d 286, 287, n. 1 (3rd Cir.  1982); cited with approval in
<u>Commonwealth v. Sirbaugh</u>, 347 Pa.Super. 154, 500 A.2d 453 (1985);
<u>Commonwealth v. Klinger</u>, 323 Pa.Super. 181, 470 A.2d 540 (1983).

[5]  The argument in appellant's brief consists of sections A
through I.

- 6 -

J. 17001/89

That issue is premised on the following remarks by the
Commonwealth:

> (g) "And I ask you to recall Mister
> Sterling's testimony indicating he knew the
> defendant through the courtship of his
> daughter.  Defendant through the courtship of
> Mister Sterling's now dead daughter in the
> year 1983, not in the year 1981, when Claitt
> gets ambushed and speeds away with a bullet
> meant to end his ability to talk."  (5/28/85
> p. 89).

Appellant contends the comments regarding the death of
Mr. Sterling's daughter were an ill-concealed attempt to divert
the jury from an objective evaluation of the testimony.  He
contends the remarks infer appellant was responsible for the death
of Mr. Sterling's daughter.  We disagree.

> Our Supreme Court has stated:
>
> . . . [T]hat a prosecutor, just as a defense
> attorney, must have reasonable latitude in
> presenting a case to the jury and must be free
> to present his or her argument with "logical
> force and vigor."  (citations omitted).
> Counsel's remarks to the jury may contain fair
> deductions and legitimate inferences from the
> evidence presented during the testimony.
> (citations omitted).  . . .
>
> However, not every intemperate or uncalled for
> remark by the prosecutor requires a new trial.
> As we have stated many times:
>
> > [C]omments by a prosecutor do not
> > constitute reversible error unless
> > the "unavoidable effect of such
> > comments would be to prejudice the
> > jury, forming in their minds fixed
> > bias and hostility toward the
> > defendant so that they could not
> > weigh the evidence objectively and
> > render a true verdict."  (citations
> > omitted).

J. 17001/89

> Furthermore, the prejudicial effect
> of the prosecutor's remarks must be
> evaluated in the context in which
> they occurred. (citations
> omitted).

Commonwealth v. D'Amato, 514 Pa. 471, 526 A.2d 300 (1987).

We are not of the opinion that the testimony concerning the death of Mr. Sterling's daughter inferred that appellant had, in fact, killed her. A review of the record indicates the Commonwealth did not attempt to connect the death of Mr. Sterling's daughter to the hands of the appellant. In fact, the remark clarified for the jury why Mr. Sterling's daughter did not testify at the trial. The remark did not affect the objectivity of the jury. Therefore, this argument must fail.

In section B of his brief, appellant maintains he was denied a fair trial by three instances of prosecutorial misconduct committed during the trial. The first two issues of the three listed are deemed waived. Again, appellant asserts only the naked allegation that the prosecutor's comments were irrelevant and prejudicial without setting forth any substantive argument to buttress his position. See e.g., Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); Commonwealth v. Simon, 432 Pa. 386, 248 A.2d 289 (1968).

However, appellant does offer an argument, albeit abbreviated, regarding the third allegation of prosecutorial misconduct. He claims the Commonwealth failed to provide trial counsel with discovery concerning the testimony of Los Angeles

- 8 -

J. 17001/89

Police Detective Richards. Appellant argues trial counsel,
"should have objected to the presentation of this witness due to
the fact the defense was unaware of this witness . . . " Despite
this allegation, appellant does not claim any harm whatsoever from
the detective's testimony. Without an assertion of prejudice,
appellant has not presented any basis or reason for relief to be
granted. See e.g., Commonwealth v. Starks, 304 Pa.Super. 527, 450
A.2d 1363 (1982).

Appellant raises a myriad of ineffective assistance of
counsel claims in section C of his brief. However, the five
issues raised by appellant are waived for the failure to set foth
a substantive argument or to assert prejudice from counsel's
actions. See Petras, 534 A.2d at 485; Commonwealth v. Pettus, 492
Pa. 558, 424 A.2d 1332 (1981); Commonwealth v. Pierce, 515 Pa.
153, 527 A.2d 973 (1987).

In section D of his brief, appellant contends the trial
court erred in granting the Commonwealth's petition for a
protective order for witness Robert Mikens (who was present
outside the poolroom at the time of the shootings). Appellant
asserts that since he was not represented at the in camera hearing
when the order was entered, he was denied his right to a fair
trial. He proceeds to argue that if he was informed of Mickens'
testimony prior to trial, he might have investigated him and
possibly discovered any biases the witness held against appellant.
We disagree.

J. 17001/89

Appellant was informed of Mickens' testimony before the
Commonwealth presented the witness. He received copies of the
witness' criminal record and statements concerning threats on
Mickens' family which justified the protective order. Moreover,
appellant was afforded a recess to prepare for Mickens' testimony
and he then thoroughly cross-examined the witness.

Regardless, appellant does not argue the evidence and
representations made to the trial court were insufficient to
support granting the protective order. His only claim is that he
should have been informed of Mickens' identity at a stage in the
proceedings that would have provided time to investigate the
witness. However, appellant does not allege any concrete
prejudice resulting from the delayed discovery. Instead, he
speculates about a possible investigation and discovery of biases
Mickens may have held against appellant. Any type of speculation
concerning issues raised on appeal is not sufficient grounds to
order a new trial. See, Commonwealth v. Holmes, 315
Pa.Super. 256, 461 A.2d 1268 (1983).

The arguments in Sections E and F of appellant's brief
are also deemed waived for the failure to offer a substantive
argument to buttress his position. See Balch, 476 A.2d at 461.
See also, Cosner v. United Penn Bank, 358 Pa.Super. 484, 517 A.2d
1337 (1986); Trustees of First Presbyterian Church of Pittsburgh
v. Oliver Tyrone Corp., 248 Pa.Super. 470 n.1, 375 A.2d 193
(1977).

J. 17001/89

The argument set forth in section G of appellant's brief
is that the trial court erred in allowing the Commonwealth to
present testimony from Robert Mickens that he had been assaulted
in prison. Appellant claims this testimony caused the jury to
have undue sympathy towards Mickens and that such testimony was
irrelevant and prejudicial because there was no showing the
assault was made with appellant's knowledge or consent. We are
not persuaded by this argument.

At the time of the trial, Mickens was a Commonwealth
informant against may other persons charged with various crimes.
The evidence was relevant to explain the witness' motives for
appearing as a witness for the Commonwealth.

Additionally, at the time of the prison assault, Mickens
was prepared to testify in an unrelated homicide case against
another defendant. When appellant met Mickens in prison around
the time of the assault, appellant stated he did not think Mickens
was acting as a Commonwealth source. As such, there was no reason
for the jury to draw a conclusion that appellant assaulted
Mickens.

In section H of his brief, appellant contends the trial
court erred in allowing the Commonwealth to present testimony of a
flight from the authorities by appellant because a warrant was not
issued until 1980, four years following the shooting incident.
Appellant maintains there was no direct evidence or circumstantial

proof that appellant had notice he was sought by the police until after he moved to California.  We disagree.

A thorough perusal of the record shows there was sufficient circumstantial evidence to prove that appellant knew he was, or would be, accused of committing a crime.  Commonwealth v. Hailey, 332 Pa.Super. 167, 480 A.2d 1240 (1984).  See also, Commonwealth v. Osborne, 433 Pa. 297, 249 A.2d 330 (1969).  The record reveals the appellant disappeared from Philadelphia following the shootings.  Alphonsa Sterling testified he knew the appellant in Los Angeles from May to July, 1983, when appellant was friendly with Sterling's daughter.  During that time, appellant called himself Isaiah, said he was from New Orleans, kept his hair short and wore dark glasses.  Clearly, evidence of appellant's flight from the city, change in appearance, use of an alias and false statements about his background provide sufficient circumstantial evidence he knew he was accused of a crime.

In section I of his brief, appellant attempts to advance the same argument in a different way.  Not only must this argument fail for the reasons enunciated in the discussion of the foregoing issue, but it is also waived by appellant's failure to offer an argument in support of his position.  Commonwealth v. Gravely, 486 Pa. 194, 404 A.2d 1296 (1979).

The length and vagueness of appellant's brief makes appellate review very difficult.  Although many of appellant's issues are technically waived, we nevertheless have reviewed all

- 12 -

J. 17001/89

of appellant's claims and found then to be without merit.
However, we note that when issues are not properly raised and
developed in briefs and when the briefs are wholly inadequate to
present specific issues for review, we do not have to consider the
merits of the appeal. Commonwealth v. Drew, 353 Pa.Super. 632,
510 A.2d 1244 (1986). See also, Commonwealth v. Stoppie, 337
Pa.Super. 235, 486 A.2d 994 (1984); Bolus v. United Penn Bank, 363
Pa.Super. 247, 525 A.2d 1215 (1987).

Judgment of sentence affirmed.

Exhibit Q

Petitioner's 1996 PCRA Petition, September 20, 1996

RICHARD P. HUNTER, JR.     ATTORNEY FOR DEFENDANT
IDENTIFICATION NO. 15379
SUITE 1C-51 THE PHILADELPHIAN
2401 PENNSYLVANIA AVENUE
PHILADELPHIA, PA    19130
(215) 978-4300

---

COMMONWEALTH OF PENNSYLVANIA   :   COURT OF COMMON PLEAS
                             :   PHILADELPHIA COUNTY

       VS.              :   MARCH TERM, 1984

MAJOR GEORGE TILLERY         :   BILLS #568 thru #574

*RECEIVED SEP 20 1996 CRIMINAL MOTION COURT FIRST JUDICIAL DISTRICT OF PENNSYLVANIA*

### MOTION PURSUANT TO THE POST CONVICTION RELIEF ACT

Petitioner, Major George Tillery, by his attorney Richard P. Hunter, Jr., Esquire, moves this court for relief under the Post Conviction Relief Act 42, Pa.C.S.A. § 9541 et. seq. and in support thereof represents the following:

1.  Your Petitioner, Major George Tillery, is presently incarcerated at Smithfield Correctional Institution at Huntingdon, Pennsylvania.

2.  On May 29, 1985 Petitioner was found guilty by a Jury which was presided over by the Honorable John E. Geisz, of the Charges of Murder in the First Degree, Possession of Instruments of Crime - Generally, Criminal Conspiracy, Aggravated Assault, under bills of Information March Term, 1984, Numbers 568, 570, 571, 573 and 574.

3.  On December 9, 1986 your Petitioner was sentenced under Bill #570 on the charge of First Degree Murder of Joseph Hollis to a mandatory sentence of Life Imprisonment;

1

On Bill Number 568 on the charge of possession of an
instrument of crime, Petitioner received one to two years
incarceration to run concurrent with Bill Number 570;

On Bill Number 571 on the charge of Criminal Conspiracy,
Petitioner was sentenced to not less than 5, and not more than 10
years incarceration, to run concurrent with the sentence on Bill
Number 570;

On Bill Number 573 charging Petitioner with Aggravated Assault
on John Pickens, Petitioner was sentenced to not less than 5 and
not more than 10 years incarceration, to run concurrent with the
sentence on Bill Number 570;

On Bill Number 574 charging Petitioner with Criminal
Conspiracy, Petitioner was sentenced to not less than 5 and not
more than 10 years incarceration, to run concurrent with the
sentence on Bill Number 570.

4.    Subsequent to this verdict Petitioner filed Post Trial
Motions which were denied.  Petitioner then filed a timely appeal
with the Superior Court of Pennsylvania under Docket Number 3297
Philadelphia, 1986.  The decision of lower court was affirmed by
the Superior Court on May 30, 1989.

5.    Petitioner then filed a petition for allowance of appeal
with the Supreme Court of Pennsylvania which was denied.

6.    At the trial of this case your Petitioner was represented
by Joseph Santaguida, Esquire.  At Post Trial Motions and the
filing of appeals before the Superior and Supreme Courts of
Pennsylvania, your Petitioner was represented by James S. Bruno,

2

Esquire.

7. Petitioner respectfully requests that the charges against him be dismissed, or in the alternative be granted a New Trial because of the ineffectiveness of his trial counsel, Joseph Santaguida, Esquire, and the ineffectiveness of his appellate counsel Joseph Bruno, Esquire.

8. Petitioner has only recently learned that trial counsel Joseph S. Santaguida, Esquire, was ineffective in his representation of Petitioner in that he had a conflict of interest, when he represented Petitioner in his trial before the Honorable John Geisz. For Mr. Santaguida represented not only petitioner at his trial but also simultaneously represented one of the petitioner's alleged victims, to wit: John Pickens.

9. Petitioner only recently learned about Mr. Santaguida's representation of the victim John Pickens when he read the case of Commonwealth vs. William Franklin, 397 Pa. Superior Ct. 265, (1990). In particular, at 273 the Superior Court of Pennsylvania indicates that Mr. Santaguida in May of 1983 informed trial counsel (trial counsel for William Franklin, a co-defendant of your petitioner) that because of Mr. Pickens' involvement in the events underlying the criminal charges filed against Franklin, he (Santaguida) would have to advise his client Mr. Pickens not to testify on Franklin's behalf.

10. Trial Counsel Joseph Santaguida, Esquire, had a clear conflict of interest and could not have represented both Mr. Pickens, the victim, and your Petitioner effectively. See, In the

3

Pa 411

Interest of Lloyd Saladin, 518 A2d. 1258 (1986).

11. For trial counsel to have represented both the alleged victim and the alleged assailant was not proper and had no reasonable basis which was designed to effectuate Petitioner's interest.

12. In fact, Petitioner at his trial requested Mr. Santaguida to call Mr. Pickens as a defense witness. Petitioner had reason to believe that Mr. Pickens told the police that Petitioner was not one of the assailants of the decedent Mr. Hollis or Mr. Pickens.

13. Mr. Santaguida had a clear conflict in that he was attempting to simultaneously protect the alleged victim by advising him to take the Fifth Amendment at the trial of Petitioner's Co-Defendant, William Franklin, and at the same time had a clear duty to present to the Court any and all exculpatory evidence on behalf of his other client your Petitioner, Mr. Tillery. See Saladin, Supra.

14. As a further result of this conflict of interest of trial counsel, Petitioner was not only denied effective representation of counsel but he was also deprived of his Due Process rights because he was prevented from introducing into the record evidence that would be vital to his defense; i.e. the testimony of the victim Pickens that petitioner was not one of the assailants.

15. Trial counsel was further ineffective as a result of this conflict because he did not request the court for a missing witness charge when the Commonwealth failed to call John Pickens who was also his client. Clearly trial counsel had a conflict and could

4

not request a missing witness charge when in fact he represented the missing witness.

16. Petitioner avers and therefore believes that trial counsel had represented the victim, Mr. Pickens, in other criminal proceedings prior to and subsequent to representing petitioner in this matter before Judge Geisz.

17. It is respectfully submitted that Mr. Santaguida's stewardship of your petitioner's case was ineffective for there was no reasonable basis, for him to have represented both the victim (Mr. Pickens) and his alleged assailant (petitioner). This conflict of interest of counsel under the circumstances of his representation of your petitioner, seriously undermined the truth determining process to such an extent that a reliable adjudication of guilt or innocence could not have taken place.

18. Further, petitioner was denied his 6th Amendment right under the United States Constitution Right to competent assistance of counsel. See also Pennsylvania Constitution Article 1 § 9 and Comm. ex rel., Washington v. Marone, 235 A.2d. 349, 1967.

19. Petitioner further avers and therefore believes that appellate counsel James Bruno, Esquire, who represented the petitioner from Post Trial Motions through the filing of a Petition for Allowance of Appeal with the Supreme Court of Pennsylvania, was ineffective in that he did not discover, through due diligence, and therefore did not assert at Post Trial Motions or in his appellate briefs that trial counsel, Joseph Santaguida, Esquire, had a conflict of interest and could not have effectively represented

5

Pa 413

your petitioner at trial.

20. Petitioner avers that the issues raised in this petition have not been previously litigated and that these allegations of error have not been waived in that petitioner only recently discovered that Mr. Santaguida had a conflict of interest when he represented petitioner at his trial.

WHEREFORE, for all the aforementioned reasons petitioner prays that he be released from custody and discharge or in the alternative that he be granted a new trial.

Respectfully submitted,

RICHARD P. HUNTER, JR.
ATTORNEY FOR DEFENDANT

Dated: September 13, 1996

6

**VERIFICATION**

I, **Major George Tillery,** do hereby verify the facts set forth in the attached Motion are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements made therein are subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

*Major G. Tillery*
**MAJOR GEORGE TILLERY**

DATED: 6-27-96

Exhibit R

*Commonwealth v. Tillery,* No. 523 Philadelphia 1998, 742 A.2d
1055 (Pa. Super. 1999) (unpublished memorandum)

J. S25021/99

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
Appellee : PENNSYLVANIA
:
:
v. :
:
:
GEORGE M. TILLERY, :
Appellant : No. 523 Philadelphia 1998

Appeal from the Order in the Court of
Common Pleas of Philadelphia County,
Criminal Division, No. MARCH TERM, 1984,
BILLS #568 THRU #574

BEFORE: MUSMANNO, J., LALLY-GREEN, J. and TAMILIA, J.

MEMORANDUM: **FILED** APR 2 1 1999

George Tillery appeals from the January 13, 1998 Order dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9541-9546. Following a May 1985 jury trial, appellant was found guilty of first degree murder,[1] possession of an instrument of crime,[2] criminal conspiracy[3] and aggravated assault[4] and sentenced to life imprisonment. Appellant's judgment of sentence was affirmed by this Court on May 30, 1989. *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989) (unpublished Memorandum), and his petition for allowance of appeal was

---

[1] 18 Pa.C.S.A. § 2502.

[2] *Id.*, § 907.

[3] *Id.*, § 903.

[4] *Id.*, § 2702.

Pa 417

J. S25021/99

otherwise free of legal error. ***Commonwealth v. Neal***, 713 A.2d 657 (Pa. Super. 1998). "'The findings of the post-conviction court will not be disturbed unless they have no support in the record.'" ***Id.*** at 660, *quoting* ***Commonwealth v. Schultz***, 707 A.2d 513, 516 (Pa. Super. 1997).

Upon careful review of the record in conjunction with those issues raised by appellant, we find the PCRA court acted properly in dismissing the petition. Appellant argues trial counsel was ineffective for "simultaneously" representing him as well as one of the victims, however, there is no evidence in support of this argument.[6]

The PCRA court heard argument on January 13, 1998. At that time, counsel for appellant suggested that five years prior to appellant's trial, a victim/potential witness was represented by appellant's trial counsel and that trial counsel should have called this person as a defense witness for his testimony that appellant was not at the scene of the crimes.

> The failure to call a potential witness is not *per se* ineffectiveness absent some positive demonstration that the testimony would have been helpful to the defense. In order to establish a claim of ineffectiveness for failure to interview and/or present a witness, appellant must prove: (1) the existence and availability of the witness; (2) counsel's awareness of the witness or duty to know of the witness; (3) the witness' willingness and ability to appear on behalf of the defendant; and (4) the necessity of the proposed testimony in order to avoid prejudice.

---

[6] The record reveals no conflict between any prior representations and the representation of appellant at trial.

J. S25021/99

dismissed only after the court reviewed the parties' briefs and heard argument by both sides. As the January 13, 1998 argument constitutes a "further proceeding", the court was not required to provide a Rule 1507(a) notice of its intention to dismiss. ***Commonwealth v. Albrecht***, ____ Pa. ____, 720 A.2d 693 (1998).

Order affirmed.

Exhibit S

District Court's Order Denying Petitioner's First Petition for
Habeas Corpus, July 30, 2003

Case 2:99-cv-06516-JMV Document 31-5 Filed 06/05/2007 Page 15 of 50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAJOR TILLERY | : | CIVIL ACTION |
| | : | |
|     Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| MARTIN HORN, at al. | : | |
| | : | NO. 99-6516 |
| | : | |
|     Respondent | : | |
| | : | |

**O R D E R**

AND NOW, this    day of July, 2003, upon reconsideration of Petitioner's Habeas Petition it is hereby ORDERED that this Court's October 30, 2000, Order approving and adopting U.S. Magistrate Melinson's Report and Recommendation is reaffirmed.

Pursuant to the Circuit Court's August 23, 2003, Order, this Court held hearings on April 23, 2003 and May 28, 2003, at which time Petitioner, who was represented by counsel, was given ample opportunity to present evidence showing that this Court erred in its denial of his ineffective assistance of counsel claim. Petitioner failed to present any evidence whatsoever to satisfy the two prong requirement that the witness, Petitioner claims should have been called at trial, (1) was available to testify at the time of trial and (2) would have been beneficial to the defense. Therefore, pursuant to <u>Zettlemoyer v. Fulcomer</u>, 923 F.3d 284, 298 (3d. Cir. 1991) and <u>Lewis v. Mazurkiewicz</u>, 915

1

Case 2:09-cv-04065-JHS Document 14 Filed 05/27/10 Page 2 of 2

F.2d 106, 115 (3d Cir. 1990), Petitioner's claim must fail. The
Circuit Court is directed to page 58 of the May 28, 2003,
transcript. Here, Petitioner's counsel freely admits that
Petitioner was unable to show that the witness in question was
able to testify. In addition, despite calling Petitioner's trial
counsel to the stand, Petitioner was unable to show that the
witness' testimony would have strengthened his case.


      AND IT IS SO ORDERED.


_____

Clarence C. Newcomer, S.J.

Exhibit T

Opinion of the Court of Appeals, *Tillery v. Horn,* 142 F.App'x 66 (3d Cir. 2005) (No. 03-3616)

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-3616

_____

MAJOR TILLERY,

<u>Appellant</u>

v.

MARTIN HORN,
Dept. of Penna State Prisons

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 99-cv-06516)
District Judge: Hon. Clarence C. Newcomer

_____

Argued: April 4, 2005

BEFORE: BARRY, AMBRO and  COWEN, <u>Circuit Judges</u>

(Filed:  July 29, 2005)

Michael J. Confusione, Esq. (Argued)
Hegge & Confusione
9 Tanner Street - West Entry
Haddonfield, NJ 08033

Counsel for Appellant

David C. Glebe, Esq. (Argued)
Office of District Attorney
1421 Arch Street
Philadelphia, PA 19102

Counsel for Appellee

————————

OPINION

————————

COWEN, <u>Circuit Judge</u>.

Appellant Major Tillery appeals from an order of the District Court denying his

petition for a writ of habeas corpus under 28 U.S.C. § 2254.  He argues that the petition

should have been granted because his trial counsel labored under an actual conflict of

interest.  We conclude that the claim is procedurally defaulted, and that Tillery has not

established actual prejudice.

I.

As we write solely for the parties, we briefly review the procedural background.

On May 29, 1985, following a jury trial, Tillery was convicted of first-degree murder and

related crimes.  The case arose from an October 22, 1976 shooting incident which

resulted in the death of John Hollis and the wounding of John Pickens.  The Pennsylvania

Superior Court affirmed, and on March 5, 1990, the Pennsylvania Supreme Court denied

*allocatur*.

On September 20, 1996, Tillery petitioned for collateral relief under the

Pennsylvania Post-Conviction Relief Act, alleging that he was denied effective assistance

2

of counsel under the Sixth Amendment because his trial counsel, Joseph Santaguida, operated under an actual conflict of interest. Santaguida had represented Tillery at trial, but was replaced by James Bruno, Esquire, who filed post-verdict motions on Tillery's behalf and represented him on direct appeal. The PCRA court dismissed Tillery's application, finding his conflict claim procedurally defaulted, and the Superior Court affirmed. The Pennsylvania Supreme Court denied *allocatur*.

Tillery filed the instant petition in the Eastern District of Pennsylvania, asserting that his trial counsel labored under an actual conflict of interest and was thus constitutionally ineffective. The District Court dismissed the petition and declined to issue a certificate of appealability. Tillery next sought relief in this Court, and we remanded, directing the District Court to permit him to present evidence in support of his conflict claim. The District Court thereafter held two hearings, but reaffirmed its previous order denying relief. This appeal ensued.

## II.

The District Court had jurisdiction over Tillery's habeas petition under 28 U.S.C. § 2254, and we have jurisdiction under 28 U.S.C. § 1291. The District Court's legal conclusions, including its resolution of legal questions arising from application of the procedural default doctrine, are subject to plenary review. *Hull v. Kyler*, 190 F.3d 88, 97 (3d Cir. 1999).

## III.

3

The Pennsylvania Superior Court concluded that Tillery had waived his actual conflict claim, finding that he had not raised the claim on direct appeal. The court relied on 42 Pa. Cons. Stat. Ann. § 9544(b), which states that "an issue is waived if the petitioner could have raised it but failed to do so . . . on appeal," as well as that "'[i]neffectiveness of trial counsel must be raised at the first opportunity at which the counsel whose effectiveness is being challenged no longer represents the defendant,'" (App. at 253 (quoting *Commonwealth v. Miller*, 564 A.2d 975, 977 (Pa. Super. Ct. 1989))). The state court's finding of waiver requires us to examine and employ the federal rules of procedural default.

A. *Procedural Default*

Under the doctrine of procedural default, a federal habeas court is prohibited from considering constitutional claims where a state court has refused to entertain their merits on the basis of an adequate and independent state procedural rule, *see Harris v. Reed*, 489 U.S. 255, 262 (1989), unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). A state procedural rule is "adequate" if it is regularly or consistently applied by the state court, *see Johnson v. Mississippi*, 486 U.S. 578, 587 (1988), and is "independent" if it does not "depend[] on a federal constitutional ruling," *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).

To avoid waiver of any ineffective assistance of counsel claims, Pennsylvania law required Tillery to raise such claims "at the earliest stage in the proceedings at which the

4

counsel whose effectiveness is being challenged no longer represents the defendant."

*Commonwealth v. Hubbard*, 372 A.2d 687, 695 n.6 (Pa. 1977).[1] Because Tillery obtained

new counsel following trial, before the filing of post-verdict motions, the Superior Court

recognized that he was obligated to raise all of his ineffective assistance of counsel claims

pertaining to his trial counsel, including that Santaguida labored under an actual conflict,

in post-verdict motions and on direct appeal.

Tillery challenges the adequacy of the *Hubbard* rule as applied to his case, arguing

that "the state court never made an 'adequate' finding of procedural default because

Tillery did not discover the claim until 1996, when he raised it on post-conviction relief."

(Appellant's Br. at 11.) Tillery, however, is conflating concepts of the adequacy and

independence of a state procedural rule with the correctness of the state court's

application of its own law. Tillery has not furnished any argument or evidence germane

to the adequacy inquiry. *See Reynolds v. Ellingsworth*, 843 F.2d 712, 719 (3d Cir. 1988).

We have previously determined that the *Hubbard* rule was an adequate and independent

state procedural rule, *see Richardson v. Warden, S.C.I. Huntingdon*, 2005 WL 289992 (3d

---

[1]The Pennsylvania Supreme Court overruled *Hubbard* in 2002, holding that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002). Consequently, "any ineffectiveness claim will be waived only after a petitioner has had the opportunity to raise that claim on collateral review and has failed to avail himself of that opportunity." *Id.* Tillery, however, cannot receive the benefit of this ruling, as the court further held that the new rule would be applied retroactively to cases currently pending on direct review in which ineffective assistance claims had been raised and preserved, but not to cases pending on collateral review. *Id.* at 738-9 & n.16. Tillery's direct and collateral state proceedings had concluded prior to the issuance of *Grant*.

Cir. 2005), and there is no evidence to suggest that it was not an independent and adequate state procedural rule as applied to Tillery. Instead, Tillery is charging Pennsylvania with the erroneous application of its own procedural rule, which courts have repeatedly counseled is not a cognizable claim on habeas. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995). Accordingly, the Pennsylvania Superior Court's decision to find Tillery's Sixth Amendment ineffective assistance claim waived rested upon application of an independent and adequate state procedural rule. His conflict of interest claim is procedurally defaulted. We can consider only whether cause and prejudice exists to excuse the procedural default.

B. *Cause and Prejudice*

A federal habeas court may entertain a procedurally defaulted claim if the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Although we agree that cause exists to excuse the procedural default, Tillery has not met his burden in demonstrating actual prejudice.

Tillery contends that the facts underlying the alleged actual conflict of interest were not known to him or his appellate counsel at the time of his direct appeal, thus giving rise to "cause" excusing his default. *See Murray v. Carrier*, 477 U.S. 478, 488

6

(1986).  Our analysis begins with a brief summary of the facts underpinning Tillery's claim.

Tillery's conflict of interest claim is grounded in allegations that Santaguida also served as counsel to Pickens, one of the victims of the 1976 shootings, during the trial of Tillery's co-defendant, William Franklin.  The Commonwealth tried Franklin for the 1976 shootings in 1980, five years prior to trying Tillery.  Because Pickens had, according to a police officer's notes, identified the shooters as individuals other than Franklin and Tillery, Franklin attempted to call Pickens as an exculpatory witness.  Santaguida informed Franklin's attorney that he advised Pickens to invoke his Fifth Amendment right against self-incrimination and refrain from testifying.  The record reflects that, by the time Franklin actually stood trial in 1980, Pickens had fled the jurisdiction and was unable to be located, despite extensive efforts by Franklin's counsel.

Tillery, represented by Santaguida at his trial in 1985, did not discover that counsel had represented Pickens in Franklin's trial until 1996, when he came across the decision of *Commonwealth v. Franklin*, 580 A.2d 25 (Pa. Super. Ct. 1990).  This decision, which affirmed the denial of Franklin's petition for collateral relief, revealed that "Mr. Santaguida informed trial counsel that because of Mr. Pickens' involvement in the events underlying the criminal charges filed against [Franklin], he would have to advise his client not to testify for [Franklin]." *Id.* at 29.

7

At the evidentiary hearing conducted by the District Court, Tillery testified that Santaguida never disclosed that he formerly represented Pickens at co-defendant Franklin's trial. Santaguida could not remember whether he informed Tillery that he had previously represented Pickens. Thus, the earliest Tillery could have learned of that representation was in 1990, when the Superior Court issued *Commonwealth v. Franklin.* This occurred well after the conclusion of Tillery's direct appeal. That Tillery's claim may not, in fact, be sustainable is not relevant to the reality that its factual basis was not reasonably available at the time of his direct appeal. Tillery has thus met his burden of showing cause.

To demonstrate "actual prejudice," Tillery must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Tillery cannot sustain this burden.

The Sixth Amendment guarantees criminal defendants the right to representation free of conflicts of interest. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir. 1988). A petitioner must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). If this showing is made, prejudice will be presumed. *Id.* at 349-50. The question of whether counsel operated

8

under an actual conflict of interest that adversely affected performance is a mixed question of law and fact subject to *de novo* review. *Id.* at 341-42.

Actual conflict is more likely to occur in cases involving joint representation in a single proceeding rather than in cases of multiple representation in which the attorney represents different clients in different matters. *Duncan v. Morton*, 256 F.3d 189, 197 (3d Cir. 2001) (citations omitted). Moreover, the existence of an actual conflict and any adverse effects from it are more likely to be apparent in cases in which counsel takes positive steps on behalf of one client to the detriment of the other, as opposed to cases involving the inaction and passivity of counsel. *Id.* This case presents at *most* one involving multiple representation, and Tillery cites only a passive lapse of representation by Santaguida. As such, to prove a Sixth Amendment violation premised on actual conflict, Tillery must show: (1) a plausible, alternative defense strategy or tactic might have been pursued that is of sufficient substance to be viable; and (2) the alternative defense was inherently in conflict with or not undertaken because of the attorney's other loyalty or interest. *See Gambino*, 864 F.2d at 1070.

Tillery argues that Santaguida's representation of Pickens in 1980 conflicted with Tillery's interest during his 1985 trial, and that this conflict manifested itself in constitutionally defective representation. Specifically, Tillery accuses Santaguida of failing to put forth his best effort to locate Pickens at the time of Tillery's trial.

9

Santaguida further declined to request a missing witness charge, which Tillery also attributes to his alleged divided loyalties.

The record undermines Tillery's claim of a debilitating conflict of interest. First, Tillery has not succeeded in showing that the defense strategy of subpoenaing Pickens as an exculpatory witness in his trial was a viable one. At the time Franklin's trial commenced in late 1980, Pickens could not be located. As Tillery admits, Santaguida explained in 1985 that he was unaware of Pickens' whereabouts, and that neither he nor the Commonwealth could locate Pickens. Although he could not recall exactly what steps he took in his attempts to contact Pickens, Santaguida testified that he did conduct a search. He theorized that Pickens was making himself scarce to avoid testifying. Significantly, even at the time that he provided advice to Pickens in 1980, and at all times thereafter, Santaguida had no knowledge of his location. Tillery, contrarily, attested that his counsel did not make every effort to locate Pickens. He did not, however, provide any specific examples or support for this bald assertion.

Second, Tillery has not succeeded in showing that Santaguida owed a continuing duty of loyalty to Pickens, that in turn prevented counsel from using his best efforts to locate him. Santaguida's representation of Pickens occurred five years prior to Tillery's trial, and likewise terminated before Tillery's trial. At best, the record discloses that the representation of Pickens was fleeting and minimal. When asked at the evidentiary hearing if he ever represented Pickens, Santaguida responded that he did not believe that

10

he represented him in a courtroom. Rather, based on his refreshed recollection, either Pickens or someone acting on his behalf called him to obtain advice on testifying in the *Franklin* case. Furthermore, he could not recall providing any additional legal services to Pickens, and testified that no communication took place between them other than that one instance. In his view, there was no conflict "because Mr. Pickens, number one, couldn't be found." (App. at 181.) Contrary to Tillery's claim, Santaguida never stated that, had he found Pickens, he would have advised him not to testify in Tillery's trial. There is not a shred of evidence that Santaguida's representation of Pickens continued past its brief lifespan in 1980. In short, counsel did not *actively* represent competing interests.

Tillery has failed to convince us that an actual conflict of interest existed that adversely impacted Santaguida's performance. His claim that the record discloses that Santaguida possessed a duty of loyalty to Pickens at the time he represented Tillery, and that this duty of loyalty conflicted with his duty of loyalty to Pickens, is purely speculative. Rather, the record plainly reveals a *successive* representation of two clients with possible diverging interests. Not only was this scenario not addressed by the Pennsylvania Lawyer's Code of Professional Responsibility in effect at the time, *compare* Pa. Lawyer's Rules of Professional Conduct R. 1.9 cmt. (1988), but the Supreme Court has made clear that the mere possibility of conflict is insufficient to demonstrate the existence of an actual conflict, *Cuyler*, 446 U.S. at 350. There is no evidence that Santaguida's actions and inactions were influenced by loyalty to Pickens, or that he even

11

maintained a loyalty to Pickens in 1985. Reliance upon the relationships created between himself, Pickens, and Santaguida cannot, standing alone, suffice to demonstrate the existence of an actual conflict of interest and adverse impact.

We conclude that Tillery's trial counsel's performance was not adversely affected by Santaguida's brief representation of Pickens. Tillery has not established that he was prejudiced, and his claim is thus procedurally defaulted.

<div align="center">IV.</div>

For the foregoing reasons, the judgment of the District Court entered on July 30, 2003, will be affirmed.

_____

<div align="center">12</div>

Exhibit U

Petitioner's 2007 PCRA Petition, August 13, 2007

Case 2:20-cv-01675-DBB Document Page 481 06/05/20 Filed 05/07/2020 Case 2:20-cv-01675-DBB Document Page 481 06/05/20 Filed 05/07/2020
ORIGINAL COPY

PENNSYLVANIA COURT OF COMMON PLEAS - COUNTY OF PHILADELPHIA

```
===============================+
                               :
COMMONWEALTH OF PENNSYLVANIA,:        March Term, 1984 Bills
          Plaintiff,         :        No. 568 - 574
                               :
     VS.                       :             And
                               :
                               :        March Term 1984 Bills
MAJOR G. TILLERY,              :        No. 0155 - 0169
          Defendant.          :
                               :
===============================+
```

RECEIVED

AUG 1 3 2007

PCRA UNIT

MOTION PURSUANT TO THE POST CONVICTION RELIEF ACT

Petitioner Major Tillery, pro se, moves this court for relief
under the Post Conviction relief Act 42, Pa.C.S.A. S 9541 et.
and in support thereof represent the following.

1. Your petitioner Major Tillery prison number is 526689,
is presently incarcerated at New Jersey State Prison. And has
a mailing address of P.O. Box 861, Trenton, NJ 08625.

2. On May 29, 1985 petitioner was found guilty by jury
which was presided over the Hon. John E. Geisz, of the charge
of murder in the 1st°, poss. of instrument of crime - generally,
criminal conspiracy, agg. assault, under bills of information
March Term 1984 numbers 568, 570, 571, 573, and 574.

3. On 12-9-86 your petitioner was sentence under bill
number 570 on the charge of 1st° murder of Joseph Hollis to
a mandatory life sentence.

On bill number 568 charge of poss. of instrument of
crime, petitioner received one to two years to run concurrent

-1-

with bill 570.

On bill number 573 charging petitioner with agg. assault on John Pickins, petitioner was sentence to 5-10 years to run concurrent with bill 570.

On bill number 574 charging petitioner with criminal conspiracy he was sentence to 5-10 years to run concurrent with bill 570.

4.    Subsequent to this verdict petitioner filed Port Trial Motions which were denied.  Petitioner then filed timely appeals to the State Superior Court of Pennsylvania in 1986.  The decision of the lower court was affirmed on 5-30-89.

5.    Petitioner than filed a petition for allowance of appeal with the Supreme Court of Pennsylvania which was also denied.

6.    At trial petitioner was represented by attorney Joseph Santaguida.  At Post Trial motions and the filing of appeals before the Superior Court and Supreme Court of Pennsylvania, your petitioner was represented by James S. Bruno.

### CASE NUMBER TWO

#### March Term 1984 - Bill 0155-0169

1.    On 8-5-85, petitioner was found guilty by jury on all counts which was presided over by the Hon. D'Alessandro. Petitioner was charged with Criminal Conspiracy, Risking a Catastrophe, Prohibited Offensive Weapons, Attempted Arson and

-2-

Arson.

2.     1984 March Bills, 0155 Criminal Conspiracy, 0156 Risking Catastrophe, 0158 Prohibited Offensive Weapons, 0159 Arson Endangering Person and Property, 0160 Arson Endangering Person and Property, 0161 Risking Catastrophe, 0163 Prohibited Offensive Weapons, 0164 Criminal Conspiracy, 0165 and 0166 Attempted Arson Endangering Persons and Property, 0167 Risking Catastrophe, 0168 Prohibited Offensive Weapon, and 0169 Criminal Conspiracy.

3.     At trial petitioner was represented by attorney Joseph Santaguida. On 8-31-87, Post Verdict Motions was denied, petitioner was sentenced to 12-24 years. petitioner was Represented by James A. Lineberger on post verdict motions.

4.     Petitioner attorney James A. Lineberger than filed a timely appeal to the Pennsylvania Superior Court, and the Supreme Court of Pennsylvania which was denied.

5.     Petitioner respectfully request that all the charges in both cases March Term 1984 Bill No. 568-574 and March Term 1984 No. 0155-0169 be dismissed, or in the alternative be granted a new trial!

## ARGUMENTS IN SUPPORT OF POST CONVICTION RELIEF

The following arguments are in support of petitioners motion for Post Conviction Relief.

-3-

## POINT ONE

**THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE KNOWINGLY
WITHHELD EXCULPATORY IMPEACHMENT
EVIDENCE OF ONE OF ITS KEY WITNES-
SES AGENT/INFORMANT EMMANUAL CLAITT
IN ORDER TO OBTAIN THE MURDER
CONVICTION. THUS DENYING DEFENDANTS
FOURTEENTH AMENDMENT RIGHTS OF THE
U.S. CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.**

In the case sub judice, the Commonwealth used a well known prosecutor informant by the name of Emmanuel Claitt as its prime witness in order to obtain the conviction of Major G. Tillery. Mr. Claitt was the only eye-witness to the murder of Joseph Hollis and assault of Pickins connecting defendant to the crimes. No other witness connected defendant to the crimes not even the surviving victem Mr. Pickins. Therefore, this case basically boils down to one of the credibility of the Commonwealths only witness as identified above. See, U.S. v. Foster, 874 F.2d 491 (8th Cir. 1988); "Case boils down to a question of the credibility of the witnesses."

However, the below argument is regarding the trial testimony of Emmanuel Claitt and the undisclosed preferential treatment that he received in return for his testimony against the defendant. Emmanuel Claitt is a career criminal and has a long criminal history in the state of Pennsylvania. [See, Exhibits 1, 2, and 3] Mr. Claitt also has a long history of providing information to the Commonwealth and has testified as a witness in many cases prior to the defendants and thereafter, which

-4-

he then in turn received preferential treatment from the
Commonwealth. At defendants trial defense attorney Mr. Joseph
Santiguida attempted to discredit Emmanuel Claitt testimony
with his past criminal history as well as with his potential
favorable expectations from the Commonwealth.

Although the Commonwealth via, Barbera Christie, disclosed
that it will speak to Mr. Claitt sentencing judge the Honorable
Judge Katz, and indicate Mr. Claitt favorable testimony against
Mr. Tillery, the Commonwealth intentionally withheld that it
would be recommended that Mr. Claitt receive a sentence of "no
more then ten (10) years" on his pending charges. [See, Exhibit
10 Attached hereto] Mr. Claitt at the time of defendants trial
had several indictments pending against him in the state of
Pennsylvania. [See, Exhibits 1, 2, and 3, Attached hereto]

Most of the pending charges Mr. Claitt had pending was
not disclosed to the defense prior to trial nor were the
favorable recommendation of "no more then ten (10) years" he
received from the Commonwealth in regards to his indictments,
contrary to Supreme Court precedent set forth in the matter
of, Brady v. Maryland, 373 U.S. 83 (1963); which states in
pertinent part that: "A prosecutor has a duty to provide an
accused with all evidence in the state's possession materially
favorable to the accused defense." The prosecutor failed to
do such here. See also, Com. v. Romansky, 702 A.2d 1064 Pa.
Super. 1997). Based on the Commonwealth recommendation of "no
more then ten (10) years", Judge Katz sentenced Mr. Claitt to

-5-

a concurrent sentence of 7 years but he only served 23 1/2 months
and he was released from Camp Hill on November 22, 1982 after
completing his prison term. After Mr. Claitts release however,
he committed more crimes as indicated in the attached exhibits
one, two, and three.

The only way defendant discovered Exhibits one, two, three,
and seven, is through his own independent research after his
convictions of the Hollis/Pickins shootings trial and the
subsequent fire bombing trial. Exhibits one, two, three, and
seven, is therefore newly discovered evidence that was
intentionally withheld by the Commonwealth in order to obtain
it's unlawful convictions. See, Romanky, supra. id.

Moreover, the Commonwealth committed a farce on the court
when it withheld Exhibits one, two, three, and seven, and in
fact, indicated to the court that Mr. Claitt will be receiving
"no recommendations" from the Commonwealth as to a set sentence
regarding his pending indictments before Judge Katz, and that
it was only agreed that Mr. Claitt will enter into an "open
plea" and that the court can sentence Mr. Claitt to the fullest
extent of the law. In other words, the Commonwealth gave the
impression to the jury and the defense as well as the trial
judges, that Mr. Claitt had no expectations other then protection
in return for his trial testimony. Thus giving him know motive
to falsely accuse the defendant of the indicted offenses. [See,
Exhibit 7]

-6-

Exhibit seven, is a letter that the Commonwealth wrote to the State of Pennsylvania Parole Board on January 31, 1984, recommending that the parole board remove a detainer pending against Mr. Claitt so that he may be released on bail which would otherwise be impossible with a pending parole detainer. This recommendation was based on Mr. Claitts future testimony against defendant in the homicide trial.

As a result of the Commonwealths recommendation to the parole board on behalf of Mr. Claitt the detainer was lifted and Mr. Claitt was able to make bail and was released. [See, Exhibits 7 and 11 Attached hereto]

Also attached hereto as exhibit six, is an additional letter written by the Commonwealth D.A. Ross dated January 5, 1981, to the Hon. Judge Katz, who's court Mr. Claitt had pending indictments. The letter indicates Mr. Claitt continual relationship as a Commonwealth witness since January of 1980, not only in the defendants case, but in several other cases in the state of Pennsylvania. This demonstrates that Mr. Claitt was a agent for the state of Pennsylvania and a well compensated one at that, considering the lenient sentences and dismissals of indictments he received in exchange for his cooperation's with the Commonwealth. [See, Exhibit 6 Attached hereto]. Matteo v. Superintendent, SCI Albion, 171 F.3d 877 (1999).

Mr. Claitt was not only a witness against Mr. Tillery in the homicide and aggravated assault (shootings) case, but was also a Commonwealth witness against Mr. Tillery in the

-7-

subsequent fire bombing indictment. In both cases Mr. Claitt
admits his participation in the crimes, but suspiciously was
never charged in the homicide case as an accomplice or a
co-conspirator, and received a concurrent sentence in the
subsequent fire bombing cases as stated earlier. The
Commonwealth never explained why Mr. Claitt was never charged
and indicted in the homicide of Mr. Hollis and the aggravated
assault of Mr. Pickins. Mr. Claitt not being charged in the
Hollis/Pickins crimes are clear signs of "Use Immunity" in return
for his various trial testimony's. This type of exchange should
have been disclosed to the jury and the Commonwealths failure
to do so is a clear due process violation contrary to the
Fourteenth Amendment of the United States Constitution. See,
e.g., Moore v. Kemp, 809 F.2d 702 (11th Cir. 1987); holding
in pertinent part that: "A defendant has the right to question
whether a witness is testifying under a grant of immunity, or
absent such a grant, whether witness thought he had immunity."

Furthermore, Mr. Claitt testimony against Mr. Tillery in
the Hollis/Pickins crimes in regards to his reasons and
expectations contradicts his subsequent trial testimony against
Mr. Tillery in the fire bombings cases. [See, Exhibit 10 and
11]

In exhibit ten, which is the closing summation of
Commonwealth D.A. Minehart in the fire bombing trial, that it
was recommended to Judge Katz, that Mr. Claitt not receive "no
more then ten (10) years" on his pending indictments in exchange

-8-

for his testimonies against Mr. Tillery. This testimony is
in direct contradiction to exhibit eleven, which is the
Commonwealth D.A. Christie closing summation at the defendants
homicide/aggravated assault trial where it's position is that
there was "no set deal" and that the Commonwealt only enter
into an "open plea" agreement with Mr. Claitt. An "open plea"
agreement meaning by the D.A. Christie definition is that the
judge has full discretion as to the sentence Mr. Claitt will
receive and that therefore Mr. Claitt has no expectations as
to the sentence he will receive. The latter position allowed
the Commonwealth in defendants homicide trial to paint a false
impression to the jury that Mr. Claitt had no ulterior motive
to want to curry favor for the prosecution. See, Moore v. Kemp,
809 F.2d 702 (11th Cir. 1987).

Also as new evidence the defendant discovered after his
convictions are exhibits four, five, eight, and nine, all of
which defendant discovered by his own independent investigations
by utilizing The Right To Know Act (TRTKA).

Exhibit four, is the transcript from Mr. George Rose
homicide trial, another victim of Mr. Claitts false testimony.
Mr. Rose was Mr. Tillery codefendant in the subsequent fire
bombing trial and went on trial in 1980 for the unrelated
homicide of Mr. Alfred Clark based on the testimony of
Commonwealth witness Mr. Claitt. This trial commenced prior
to the defendants capture, and it was indicated that Mr. Claitt
agreed with the D.A. Ross that five (5) open charges he had

-9-

pending at the time will be dismissed as a result of his testimony. This demonstrates that Mr. Claitt had an agreement of favorable treatment with the Commonwealth prior to the capture and homicide trial of the defendant. The defendant was arrested on December 8, 1983, in L.A. California and began trial in the Hollis/Pickins shootings in May of 1985. This evidence surely was known to the Commonwealth prior to defendants capture and it should had been disclosed to the defendant prior to his trial.

Fortunately for Mr. Rose, the jury disbelieved Mr. Claitts testimony against him and found him not guilty of all charges.

Furthermore, despite of the fact that Mr. Claitt testified that he was present during Mr. Clark murder he was never charged as an accomplice to Mr. Rose. The latter in itself demonstrates just as in the case sub judice, that Mr. Claitt is never charged by the Commonwealth for his participation in homicides. Which further supports the inference of an agreement with the Commonwealth in the form of "Use Immunity".

Exhibit five, is the December 1983 transcript from Mr. Frazier homicide trial, which is unrelated to the case sub judice. Mr. Claitt was a witness against Mr. Frazier and testified that Mr. Frazier confessed to him from his jail cell, although Mr. Claitt was well known in the jail as a Commonwealth police informant.

In the Frazier case, Mr. Claitt is cross-examined extensively about his cooperation with the Commonwealth in the indictments against the defendant Mr. Tillery, as well as to

-10-

other individuals including Mr. Rose.  Again--- Mr. Claitt
acknowledges that he had expectations from the Commonwealth
in exchange for his testimony against the defendant who had
not been apprehended at the time of Mr. Fraziers trial, but
a warrant was out for his arrest.  This evidence should have
been disclosed prior to the defendants trial.

Exhibit eight, is the transcript from Mr. James Brand fire
bombing trial.  Mr. Brand was the defendants co-defendant in
the fire bombing indictment but was separately triad in 1980
prior to defendants capture.  Mr. Claitt was the Commonwealths
prime witness against Mr. Brand, as he was in all the cases
mentioned above.

At Mr. Brand[2] trial Mr. Claitt falsely stated that he was
receiving no favorable recommendations from the Commonwealth
in exchange for his trial testimony's, and maintained that his
reasoning for coming forward to the police regarding the
indictments against defendant Mr. Tillery and co-defendants,
was simply because he sought justice for a friend [viz, "Samual
Goodwin"] that he suspected was killed by Mr. Tillery and
associates.

Exhibit nine, is additional testimony of Mr. Claitt from

---

[2]Mr. Rose, Mr. Smith, Mr. Brand, and Mr. Tillery were all
co-defendants on the fire bombing indictments.  Although Mr.
Rose appeared at the preliminary hearing with Mr. Brand, they
weren't tried together.  Mr. Rose and Mr. Tillery were tried
together, subsekuent to Mr. Brand and Smith.

-11-

Case: 20-1942    Document: 1    Page: 492    Date Filed: 05/07/2026
Case 2:20-cv-01675-DBB    Document 1    Page: 492    06/05/20 Filed 05/07/2020 7

the fire bombing indictment against James Brand. At Mr. Brand
and Mr. Rose preliminary hearing on the fire bombing indictment
in July of 1980, Mr. Claitt further submitted that he was
expecting no recommendation from the Commonwealth, as far as,
promises, or reduced sentences regarding his pending matters.
Which directly contradicts his testimony in other trials
regarding the same subject.

Because of the multitude of trial testimonies that Mr.
Claitt provided to the Commonwealth on various separate
occasions, made it the more difficult for the defendant to locate
and obtain the documents to support his position that Mr. Claitt
had good reason to want to curry favor for the prosecution.

It was only through defendants independent strenuous
research that he discovered the above mentioned material.
Material that was intentionally withheld by the Commonwealth.
Thus committing nothing less then a miscarriage of justice and
a farce upon the trial court. See, Com. v. Romanky, supra.
Where the court held that: "evidence of an understanding or
agreement regarding future prosecution would be relevant to
the witness credibility and the jury should have been informed
of it."

The defendant in the instant matter was left handicapped
from cross-examining Mr. Claitt as to his expectations because
of the Commonwealths intentional withholding of the very evidence
that discredited its prime witness and demonstrates that Mr.
Claitt had all the reason to falsely accuse Mr. Tillery of the

-12-

indicted offenses. Mr. Claitt was never charged with the
Hollis/Pickins shootings although he admitted he was part of
a criminal organization and not only was present when the
shootings occurred, but in fact, admitted he lead the two
shooting victims into an ambush.

Being well aware of Mr. Claitt envolvement in the
shootings, the Commonwealth gave no reasons to the Court or
the defense for it's decision not to charge Mr. Claitt as an
accomplice to murder and assault. It is clear that Mr. Claitt
received favorable treatment in the form of "Use Immunity" in
exchange for his testimony against the defendant. The
Commonwealth had an obligation to disclose such immunity to
the defense prior to trial. See, Moore v. Kemp, supra.

Furthermore, Mr. Claitt received a sentence of no more
then ten (10) years in Judge Katz court based on the
recommendation of the Commonwealth. This evidence existed prior
to defendants trial but was intentionally withheld from the
defense. At trial the Commonwealth gave the impression that
Mr. Claitt would be fully prosecuted in his pending indictments.
When in fact, his pending matters were disposed of by the
Commonwealth, through either concurrent sentences, nolle pros,
or out right dismissals, and again the guarantee of no more
then ten (10) years. [Exhibits 1, 2, 3, and 7]

If defendant would have be made aware of this evidence,
defense counsel could have utilized it to completely destroy
Mr. Claitt credibility as to his expectations from the

-13-

Commonwealth in exchange for his testimony against Mr. Tillery. The Commonwealth had an obligation to disclose such evidence and its failure to do so is a miscarriage of justice and tainted defendants conviction entitling him to a new trial. See e.g., Blankenship v. Estelle, 545 F.2d 510 (5th Cir. 1977); Where it was discussed in pertinent part: "Although in the instant case the testimony that Brooks and Crawford were under indictment may have been technically true, it left an erroneous impression of an impending trial and the absence of leniency as an inducement to testify. This court has recently made clear that we will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses."

As in the case sub judice, although it was technically correct that Mr. Claitt had pending indictments against him, and that the Commonwealth did write letters for his protection, the Commonwealth withheld the part that it was recommended that Mr. Claitt receive no more then ten (10) years, and that five other cases be nolle pros or dismissed as discussed earlier in the motion. Nor was it disclosed that Mr. Claitt received immunity from the Hollis/Pickins indictment.

Even more critical is the fact that the Commonwealth stated to the jury during its closing that Mr. Claitt received an "open plea" and that his sentence is totally left to the discretion of the court. (Trial Tran. ¶May 14, 1985) [Exhibit 11]

In conclusion, this case is before the court on a subsequent

-14-

motion under the Post-Conviction-Relief-Act (PCRA). As such,
the defendant has demonstrated that a grave miscarriage of
justice has been committed against him by the Commonwealths
intentional withholding of the above stated information. See,
Com. v. Lawson, 519 Pa. 504 (1988); Holding that: "A second
or subsequent post conviction request for relief will not be
entertained unless a strong prima facie showing is offered to
demonstrate that a miscarriage of justice may have occurred."

Therefore defendant has met his burden. The new evidence
as exhibits one, two, three, four, five, eight, and nine,
attached hereto was discovered by defendant within the last
sixty (60) days pusuant the the Post-Conciction-Relief Act
(PCRA), and clearly shows that the Commonwealth denied defendant
due process rights when it knowingly withheld material
impeachment evidence that should have been disclosed to defense
prior to trial, so that with this evidence defendant could have
swayed the jury's verdict in his favor and been acquitted of
all charges. See, Com. v. Szuchon, 534 Pa. 483, (1993).

For the foregoing reasons mentioned above, the defendant
should be entitled to a new trial under the Post Conviction
Relief Act (PCRA).

-15-

## POINT TWO

THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE AND MINEHART
ALLOWED ITS KEY WITNESS EMMANUEL
CLAITT FALSE TESTIMONY TO GO
UNCORRECTED IN ORDER TO OBTAIN
THE HOMICIDE & ARSON (FIRE BOMBING)
CONVICTIONS. THUS DENYING DEFENDA-
NTS FOURTEENTH AMENDMENT RIGHTS OF
THE U.S.CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.

The Commonwealths cases on the homicide and assault conviction

of Hollis/Pickins, as well as the fire bombing conviction was based

primarily on the testimony of informant Emmanuel Claitt as argued

in point one of the below motion. On May 20, 1980, Mr. Claitt was

interviewed by detectives from the Commonwealth of Pennsylvania

regarding an unrelated homicide. At that interview Mr. Claitt

volunteered information regarding the homicide of Mr. Hollis and

aggravated assault (shooting) of Mr. Pickins, and indicated that

defendant Mr. Tillery was responsible for there crimes.

As a result of Mr. Claitt false testimony, Mr. Tillery was

convicted of the Hollis/Pickins crimes on May 29, 1985 and sentenced

accordingly*.

Subsequent to Mr. Tillery murder conviction, Mr. Claitt testified

as the key witness for the Commonwealth on the additional indictment

regarding the aggravated arson (fire bombing) case. As a result

of Mr. Claitt testimony, Mr. Tillery was convicted on August 5, 1985,

---

*Defendant homicide trial and bombing trial was before different
trial judges. The homicide trial was tried before the Hon. John
E. Geitz. And Hon. N. D'Alessandro, presided over defendants' fire
bombing trial.

-16-

of all crimes associated with the fire bombing indictment.

Mr. Tillery has adamantly maintained his innocence and continues to do so.

The Commonwealth only obtained Mr. Tillery unlawful convictions through the uncorrected false testimony of Mr. Claitt. Mr. Claitt trial testimony's regarding his favorable expectations from the Commonwealth, is in conflict with each other. In fact, the trial testimony that he provided at Mr. Tillery homicide trial regarding expectations, is in direct contradiction to his testimony at the subsequent fire bombing trial.

Furthermore, Mr. Claitt provided a multitude of testimony's on behalf of the Commonwealth in several different trials prior to Mr. Tillery and thereafter. At trials unrelated to the case sub judice, Mr. Claitt was cross-examined about his long standing history of providing information for the Commonwealth, and his motives for providing such information in the cases against Mr. Tillery. As such, Mr. Claitt gave conflicting answers as to his under-handed deals with the Commonwealth. Most of the latter testimony Mr. Tillery recently learned of through his independent efforts by utilizing the Right To Know Act (RTKA).

For example, at Mr. Rose unrelated homicide trial in 1980, Mr. Claitt was a witness for the Commonwealth D.A. Ross. Mr. Claitt testified at that time that there in fact was a deal linked between himself and the Commonwealth that certain indictments pending against him would be dismissed as a result of his favorable testimony. This testimony could have been used at the defendants trial to show that

-17-

Pa 453

Mr. Claitt did have a deal. However, due to the Commonwealths
intentional failures Mr. Claitt was allowed to testify that he
received no deals from the Commonwealth and that he was testifying
to seek justice for the death of friend he felt defendant was
responsible for. [Exhibit 4]

Mr. Claitt also provided testimony at Mr. Frazier unrelated
homicide trial on behalf of the Commonwealth D.A. Ross. At the
Frazier trial Mr. Claitt was cross-examined significantly about his
assistance in the Mr. Tillery case. Mr. Claitt testified that Dt.
Raymond Dougherty and Lt. Shelton, who were the investigators in
the Tillery investigations, questioned him about defendants
involvement in criminal activity. At that time Mr. Claitt provided
incriminating statements regarding Mr. Tillery, and testified at
Mr. Frazier trial that he was indeed expecting some favorable
consideration from the Commonwealth for his assistance in the arrest
and convictions of defendant. [Exhibit 5]

Further, Mr. Claitt provided trial testimony at Mr. Tillery
co-defendant in the fire bombing case, Mr. Brand. At Mr. Brand
preliminary hearing and trial, Mr. Claitt testified that there was
no deals made, and his only reason for testifying was to seek justice
for a friend. [Exhibit(s) 8 and 9]

However, at Mr. Tillery codefendant in the Hollis/Pickins case,
Mr. Franklin. Mr. Claitt testified that there was deals made. And
the Commonwealth D.A. Ross who prosecutored the case against Franklin,
held a back room conference with Mr. Claitt sentencing Judge Kubacki
in which it was stated by the D.A. that there were deals made between

-18-

Pa 454

Case 2:20-cv-01675-DBB Document 1-11 Page 449 06/05/20 Filed 05/07/2020

the Commonwealth and Mr. Claitt. [Exhibit 20]

Then Mr. Claitt immediately contradicted himself later in the Franklin Hollis/Pickins trial when he testified that although he was hoping for a concurrent sentence on his pending fire bombing charges, he received no promises, or recommendations from the Commonwealth. [Exhibit 21]

The above reference testimonies all occurred prior to Mr. Tillery trials, and could had been utilized if the Commonwealth would have disclosed and corrected the false testimonies when they occurred.

Although, the Commonwealth of Pennsylvania was well aware of the contradictory testimony's provided by it's prime witness, the prosecutor(s) involved allowed this testimony to go before the jury uncorrected at both trials. See, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980); "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears."

Most importantly, the Commonwealth at the Mr. Tillery homicide trial viz, Barbera Christie, not only failed to correct the false testimony of Mr. Claitt when it appeared. She suborned such false testimony.

The relevant testimony occurred during direct examination at the homicide trial and is stated below: [Exhibit 11 pg. 5]:

**COMMONWEALTH: BARBERA CHRISTIE:**

QUESTION --- OKAY. THE 3 CHARGES THAT YOU'VE JUST DISCUSSED, WHAT IF ANYTHING DID YOU DO WITH REGARD TO THOSE CHARGES THAT CAUSED YOU TO BE INCARCERATED? DID YOU GO TO TRIAL OF WHAT DID YOU DO?
-19-

Case: 20-1042675 Document: Page:500 06/05/20 Filed: 05/05/2020

ANSWER BY CLAITT --- I PLEAD GUILTY, OPEN PLEA IN FRONT OF JUDGE LEON KATZ.

QUESTION --- ALL RIGHT. CAN YOU TELL THE JURY WHAT YOU MEAN BY OPEN PLEA?

ANSWER --- OPEN PLEA IS, I PLEAD GUILTY TO THE CHARGES WITH --- WITH NO RECOMMENDATION FROM THE DISTRICT ATTORNEY'S OFFICE. IT WAS AN OPEN PLEA WHEREIN THE JUDGE WOULD DECIDE MY FATE AS TO SENTENCE.

QUESTION --- ALL RIGHT. AND WHAT SENTENCE DID YOU RECEIVE FROM JUDGE KATZ ON YOUR PLEA TO THOSE CHARGES?

ANSWER --- ONE AND A HALF TO 7 YEARS FOR SALES ON NARCOTICS. AND ONE TO 5 YEARS FOR ATTEMPT ARSON AND 6 TO 12 MONTHS FOR POSSESSION OF AN INSTRUMENT OF CRIME.

[Also exhibit 11 pg 6:]

QUESTION --- NOW, AT THE TIME OF YOUR SENTENCING BEFORE JUDGE KATZ, DID ANY MEMBER OF THE DISTRICT ATTORNEY'S OFFICE RECOMMEND OR REQUEST OF JUDGE KATZ ANY PARTICULAR SENTENCING RELATIVE TO THOSE CHARGES TO WHICH YOU PLEAD GUILTY?

ANSWER --- ASSISTANT DISTRICT ATTORNEY LYNN ROSS RECOMMENDED TO JUDGE LEON KATZ THAT AT -- HE MADE THE COURT AWARE OF ANY COOPERATION WITH THE DISTRICT ATTORNEY'S OFFICE IN VIEW OF THE NUMBER OF CASES THAT I HELPED THEM PROSECUTOR AND HIS ONLY STIPULATION WAS THAT HE ASKED THE COURT TO RUN THE SENTENCE TOGETHER, MEANING CONCURRENT. [**Failed to add that there was a recommendation that he receive no more then 10 years on his sentence.**]

QUESTION --- ALL RIGHT. NOW WITH REGARD TO THE TIME WHICH YOU WOULD RECEIVE AND DID RECEIVE FROM JUDGE KATZ, DID ANY MEMBER OF THE DISTRICT ATTORNEY'S OFFICE, MISTER ROSS OR ANYONE ELSE, REQUEST OR RECOMMEND OR REPRESENT TO JUDGE KATZ, AND PARTICULAR PERIOD OF TIME OTHER THAN WHATEVER TIME YOU RECEIVED, THAT THE REQUEST, THAT THE TIME RUN TOGETHER, RUN CONCURRENT?

ANSWER --- NO. THERE WAS NO OTHER RECOMMENDATION. [**This testimony was false and known to be so by the Commonwealth and should have been corrected.**]

[Also Exhibit 11 pg 7]

QUESTION --- SO AT THE TIME OF THE PLEA BEFORE JUDGE KATZ, DID YOU HAVE OPEN CASES WHICH YOU IN YOUR TERMINOLOGY HAD TO FIGHT ALONE?

ANSWER --- YES, I DID.

QUESTION --- AND AT THE CURRANT MOMENT, AT THIS TIME, DO
-20-

YOU HAVE AN OPEN CASE PENDING?

     **ANSWER** --- YES, I DO.

     **QUESTION** --- WHAT' THE CHARGE IN THAT CASE?

     **ANSWER** --- ROBBERY.

     **QUESTION** --- OKAY. THAT IF ANY UNDERSTANDING OR AGREEMENT DO YOU HAVE WITH REGARD TO YOUR PENDING ROBBERY CASE WITH THE DISTRICT ATTORNEY'S OFFICE?

     **ANSWER** --- I HAVE NO AGREEMENT AT ALL. [**This testimony was false and known to be so by the Commonwealth and should have been corrected.**]

* * * *

Although the Commonwealth was well aware of the fact that it was promised to Mr. Claitt that it would be recommended that he receive no more then 10 years on his sentence. At no time did the D.A. Christie attempt to clarify Mr. Claitt false testimony when it occurred. And in fact, gave the impression to the jurors that Mr. Claitt will be sentence with no recommendation from the D.A. Office as shown above, and that Mr. Claitt received no promises and only that he plead to a so called "open plea"[2]. Also see, [Exhibit 23]

This is coupled by the closing summation testimony provided by D.A. Minehart at Mr. Tillery subsequent fire bombing trial. The

---

[2]According to the Commonwealth and Mr. Claitt, an "open plea" is a plea of no set time recommendations, and that the court can sentence a defendant to the fullest extent of the law. This position by the Commonwealth gave the jurors in Mr. Tillery trial the impression that Mr. Claitt had no expectations of receiving a lighter sentence in exchange for his testimony. Although the Commonwealth clearly knew that it was recommended that Mr. Claitt be sentenced to no more then 10 years.

-24-

Pa 457

fact that it was a different D.A. prosecuting Mr. Tillery fire bombing
trial then at the prior homicide, doesn't change the Commonwealth
responsibility to correct false testimony.

At Mr. Tillery fire bombing trial, Mr. Claitt admitted that
he was receiving a recommendation of no more then a 10 year sentence
from the Commonwealth prior to his testimony given at Mr. Tillery
homicide trial.

The relevant testimony was brought out on direct examination
at the fire bombing trial and is stated below: [Exhibit 14 pg 69]

### COMMONWEALTH MR. MINEHART:

QUESTION --- NOW, AS TO THE AGREEMENT, AS TO HOW MUCH TIME
YOU WOULD SPEND IN PRISON ON THIS CASE, WHAT WAS THE AGREEMENT WITH
THE DISTRICT ATTORNEY'S OFFICE THAT YOU HAD?

ANSWER --- THAT WHEN I GOT SENTENCED, MY SENTENCE WOULDN'T
EXCEED 10 YEARS, MAXIMUM. **[This testimony differs significantly
from his trial testimony at the prior homicide trial.]**

\*    \*    \*    \*

Evenmore troubling is the fact that Commonwealth D.A. Minehart
clearly was aware of the false testimony provided by Mr. Claitt
because he was the prosecutor in several of the indictments pending
against Mr. Claitt in Judge Katz court room and appeared at a
preliminary hearing on Novemeber 28, 1980 on behalf of the
Commonwealth to discuss the pending indictments status. This hearing
occurred an entire three years prior to Mr. Tillery's arrest in
California. At the preliminary hearing Mr. Claitts deals were
discussed and it was stated on the record by D.A. Minehart that there
clearly are deals, and Mr. Claitt also stated on the record that

-22-

Case: 20-1942 Document: 1 Page: 508 Date Filed: 05/07/2020

he received "promises" from the Commonwealth. [Exhibit 1]

Therefore, there should be no question that D.A. Minehart was
aware that Mr. Claitt was testifying falsey when he said he received
no "promises" or the like from the Commonwealth at defendants trials.

In fact D.A. Minehart went on to somewhat contradict his position
as with regards to the deals Mr. Claitt received at defendants fire
bombing trial in October 1985. At defendants fire bombing trial
Mr. Minehart admitted that there were all kinds of deals with Mr.
Claitt but still maintained that there was no promises, refusing
to take a strong position as to one fact or the other. At no time
did Mr. Minehart show even an attempt to correct Mr. Claitts false
testimony. [Exhibit 12]

Additionally, Dt. Gerrard testified on behalf of the Commonwealth
and admitted that there were deals made with Mr. Claitt prior to
1980. And that Mr. Claitt detainers were lifted and he was allowed
to sign his own bail. Thus contradicting Mr. Minehart position as
well, and what makes Dt. Gerrard testimony regarding what Mr. Claitt
received is more believable given the fact that Mr. Claitt was
released from jail and various indictments of his own were dismissed
by the Commonwealth.

Furthermore, Mr. Claitt provided testimony at defendants
co-defendant Mr. Rose fire bombing trial in 1985 as well. At Mr.
Rose trial the Commonwealth D.A. Mr. Minehart again admitted that
there were deals but immediately contradicted himself by stating
there were no deals. [Exhibit 16; pg 82-83]

Moreover, because of the veracity of Mr. Claitt various

-23-

testimonies and of the D.A. Office contradictory positions regarding the deals made with Mr. Claitt it is difficult to know when Mr. Claitt is telling the truth or not.... or whether he received a deal or not. And know conviction should even in part, be allowed to stand on such veracity. The Commonwealth has a obligation to make it clear to the court, jury, and the defense , whether a witness is receiving something in exchange for his testimony.

It is clear that Mr. Claitt is a career criminal and a habitual liar, who's credibility is meager at best and has a history of not being charged in homicide cases despit his admitted participation in them.

Basically the states case, as in, U.S. v. Foster, 874 F.2d 491 (8th Cir. 1988); "Boiled down to a question of the credibility of the witnesses." U.S. v. Foster, 874 F.2d 491 (8th Cir. 1988).

See e.g., Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). "Held: The failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment." Napue supra, 360 U.S. Id. "First, it is established that a conviction obtained through use of false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment, quoting: Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Also in Napue the Court stated that "The jury's estimate of the truthfulness and reliability of

-24-

a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Id.

Furthermore, in Napue at 269, quoting People v. Savvides, 1 N.Y. 2d 554, 557; 136 N.E. 2d 853,854-855; 154 N.Y.S. 2d 885, 887:

> "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.... That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

See supra, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980).

This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumulative. See, e.g., McCleskey v. Kemp, 753 F.2d 877, 885 (11th Cir. 1985).

The disclosure of Mr. Claitt' expectations from the state in return for his testimony against defendant, however, would not have been merely repetitious, reinforcing a fact already knew; instead, "the truth would have introduced a new source of potential bias." Brown v. Wainright, 785, F.2d 1457, 1466

-25-

Case 20-1942 Document 1 Page: 506 06/05/20 252407/2020

(11th Cir. 1986). See also <u>United States v. Sanfilippo,</u> 564
F.2d 176, 178 (5th Cir. 1977) ("A jury may very well give great
weight to a **precise reason** to doubt credibility when the witness
has been shown to be the kind of person who might perjure
himself.").

One might argue that Mr. Claitt false testimony was not
perjured. Under those circumstances the defendant directs the
courts attention to <u>Dupart v. United States,</u> 541 F. 2d 1148,
1150 (5th Cir. 1976); Where it was held "where testimony, even
though not perjurious, would surely be highly misleading to
the jury...."

Finally, this case is before the court on a subsequent
motion under the Post-Conviction-Relief-Act (PCRA). As such,
the defendant has demonstrated that a grave miscarriage of
justice has been committed against him by the Commonwealths
intentional systematic failures to correct false testimony at
the homicide trial and the fire bombing trial. Therefore, as
supported by the evidence presented and the supporting case
citations the defendant is entitled to a new and fair trial
which is guaranteed to him under the Fourteenth Amendment of
the United States Constitution and the Post Conviction Releif
Act (PCRA) as stated in <u>POINT ONE.</u>

-26-

Pa 462

## POINT THREE

**THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE KNOWINGLY WI-
THHELD EXCULPATORY IMPEACHMENT
EVIDENCE OF ONE OF ITS KEY
WITNESSES AGENT/INFORMANT ROBERT
MICKINS IN ORDER TO OBTAIN THE
MURDER/ASSAULT CONVICTIONS. AND AL-
LOWED ITS WITNESS FALSE TESTIMONY
TO GO UNCORRECTED BEFORE THE JURY.
THUS DENYING HIS FOURTEENTH
AMENDMENT RIGHTS UNDER THE
U.S. CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.**

Mr. Robert Mickins was the only other witness besides Mr. Claitt to implicate the defendant in the Hollis/Pickins crimes.

On September 26, 1984, Mr. Mickins gave a sworn statement to investigators from the Commonwealth of Pennsylvania implicating Mr. Tillery in the homicide and assault charges mentioned in the indictment. The alleged crimes occurred on October 22, 1976, an entire 8 years prior to Mr. Mickins statement to police. And he only gave the statement after he was arrested on unrelated rape and robbery charges. See, [Exhibit 3C]

A statement that he claims he never had the opportunity to read before signing. Because of this, he provided the Commonwealth with an additional statement in April of 1985 further implicating the defendant in the crimes and this time adding that it was Mr. Tillery who ask him to be the look out instead of another individual he initially said ask him to be the look out. See, [Exhibit 2B]

Although Mr. Mickins admitted that he was the look out guy at the crime scene which allowed these shootings to occur, he never

-27-

## POINT THREE

THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA ... IST... ...WINGLY WI-
THHELD E ...ULPATO ... ...MENT
EVIDENCE OF ON. OF ITS KEY
WITNESSES AGENT/INFORMANT ROBERT
MICKIN... IN ORDER TO OBTAIN THE
MURD /ASS...
LOWE ITS
TO GO UN ...RECTED B... ... ... ...
THUS YING HIS FOURTEENTH
AMF... RICHTS UNDER THE
<u>U.S.</u> ... TITUTI...
A<u>R</u><u>T.</u> 3 12;
et.

Mr. Rob ...kins was the only oth... ...ess besides Mr. Claitt
to implicate th ...le' .../Pickin.

On Septem '3, 1984, ...kins gave a sworn s... ...ent to
... from th ...ealth of Penn ...plicating Mr.
Tiller ... ...ed in the
...stm... The a ...ged ... ... occu... ...n to... 22, 1976, an
entire 8 years ...ri r to Mr. Mich ...tatement f ...lice. And he
... the ...after he wa... ...nrel ted rape and
robbery charg See ... ...

A statement that he cla ...c had the ...to read
... use of th ...ne ...ovided the ...onwealth with
an additi. Apr. ... 485 further ...licatin the
defendant ...a the ...rimes a... ...this ...e addi g that it was ... Tillery
...no ask him to be th... ...ut instead of another ind... ... he
initially said ask n... ...e ... ...281

Althou ...Mickin... ...dmitt... the ...ook out guy at
the crime s ...ch allowed these shoo... occur, he never

was charged as an accomplice or co-conspiritor in the indictment.

The Commonwealth via, Barbera Christie never gave any explanation as to why Mr. Mickins was not charged as such. Mr. Mickins not being charged in the Hollis/Pickins crimes are clear signs of an undisclosed "Use Immunity" agreement in return for his trial testimony against        cy. This    be of exchange should have been disclosed to the jury    he Comm    alths failure to do so is a clear due process vio    a contra    to th Four    nth        t of the United States Const    tion. Se , e.g., __ __.__ __ 30        02 (11th C    ); holding in pertinent par  that: 'A def        as the right    que        the  a witness is testifying under a grant of    nity, or absent    rant, whether witness thought he had

More        has a lo g c    al back    ound, and    _V_ __  __        infor        ent  Se , e.g., Matteo v. Superinten        . SCI A

testified i    l        w        the C   nw  lth, and        ses he    tated people confessed crimes to him for no app        add fuel to  fire  D.A. rbera  stie has a    usin,        se        assist he in obtainin  nvic        the    aich. The wo put together is a c  dly    nation. See, [Exhibit 5E]

Although at def ants trial it was disclosed that    ickins would be receiving some assistance from the Commonwealth on his pending rape/robbery indictment in exchange for his testimony. There were certain promises that was withheld from the defense.

-28-

Such as, exhibit 1A, which is attached hereto in support of defendants action. Exhibit 1A is evidence of further favorable treatment Mr. Mickins was receiving from the Commonwealth in exchange for his testimony against defendant. This evidence was never disclosed prior to Mr. Tillery trial and was not brought to the attention of the only learned of independen investigation through till and myyut as know Act (RTKA). See, [Exhibit 1A]

See, Brady es in pert pros du accused with a nce in the state's possession materially favorable to the accused defense." The prose r failed to do such here. See also, Com kv :

"ev

prosecutio uld be relevant to the witness credibility and the jur hould have been informed of it."

nts conviction Mr. Mickins contin his estimony aga as a bargaining tool to get favorable treatment from t alth on his own criminal matters.

As seen, in or about November of 1985, after defendants conviction, Mr. Mickins wrote to his own sentencing [viz, Judge Eugene Clark] asking for help in getting him released from son on a Home Furlough. And by using his history as a Commonwealth ness in several murder trials including Mr. Tillery's, as a bargaining tool,

Case: 20-1942 Document 1 Page: 51 Date Filed: 06/05/2020
Case 2:20-cv-01675-DBB Document 1-1 Page 51 of 60 Filed 05/05/2020 Pg 356 of 467

he was successful in obtaining furloughs, with a favorable
recommendation of the D.A. Miss Barbera Christie, who again, has
a history of using false witnesses. Mr. Mickins also clearly admitted
in his letter that the court only sentenced him to 2-5 years in
Northampton county prison instead of up state where prison sentences
are often served.

See e.g., Blankenship v. Estelle, 545 F.2d 510 (5th Cir. 1977);
Where it was discussed in pertinent part: "This court has recently
made clear that we will not tolerate prosecutorial participation
in technically correct, yet seriously misleading, testimony which
serves to conceal the existence of a deal with material witnesses."

If defendant would have been made privy to this evidence, it
would have given the defense more damaging evidence to show that
Mr. Mickins had great reason to want to curry favor for the
Commonwealth. And that reason was not to receive the full sentence
eligible for the rape/robbery charges. Charges that shoes Mr. Mickins
character as being a weak individual to want to prey on defenseless
woman. Such evidence goes directly to the credibility of the
Commonwealth on additional witness to the crimes and Mr. Tillery's
alleged involvement. See, United States v. Sanfilippo, 564 F.2d
176, 178 (5th Cir. 1977) ("A jury may very well give great weight
to a **precise reason** to doubt credibility when the witness has been
shown to be the kind of person who might perjure himself.").

In fact Mr. Mickins was allowed to testify that he only plead
guilty to an "open plea", and that sentencing was up to his sentencing
judge [viz, Clark] with no recommendations from the Commonwealth.

See, [Exhibit 4D]

The latter in itself was false evidence that was allowed to go uncorrected before the jury. The commonwea            oligation
to disclosed and correct Mr. Mickins false tes         the
eviden   of the favorable recommendations he received from the
Comm            e Clark court room. The deals M   Y   ins had
was              ed at Judge Clarks             monwealth
nolle            his pending ind             it 4D
pg 24-

Se   apue   linois,   0 U.S. 264              3 L.
Ed. 2d   7 (195   "Held:   fail             o correct
the te imony of the wit   whi                    ad
petiti              law in violation of   urteenth
        a   so 0   t         e      d  91 (8th ir  1988).
Napue 300 I.S. Id.  "     t          at     tion
obtained through        se evide         the
    sent              fall u
amendment  q       oney v   I    294             S.Ct.
340, 342, 79   79  (1935.  "              in the
        gn not   citing fa   vident   ws it
    when   ac ea  ."   s r  ague   e Court s    Full
"The jury's est:   th   cr  luln            Type
    s m   l be   a  native of   i innocence,   it is
    ch   le factor  as the possible interest of the witness
in   if ing falsely   t a defendant's life or liberty may depend."
Id.

-31-
Pa 468

In the case sub judice, when Mr. Mickins testified that there was no agreement [Ex. 4D pg 25]; the Commonwealth clearly knew that there was an agreement and should have immediately corrected such false testimony. It's failure to do so gave the false impression to the jury that Mr. Mickins had no reason to want to curry favor for the Commonwealth by lying against defendant. Even though, Mr. Mickins had every reason in the world to want to curry favor for the Commonwealth, and that reason was to stay out of prison, whether by Home Furloughs, or "Use Immunity" on the homicide indictment. or the very lenient sentence he received for rape/robbery.

See supra, Napue at 269, quoting People v. Savvides, 1 N.Y. 2d 554, 557; 136 N.E. 2d 853,854-855; 154 N.Y.S. 2d 885, 887:

> "A lie is a lie, no matter what its subject,
> and, if it is any way relevant to the case,
> the district attorney has the responsibility
> and duty to correct what he knows to be
> false and elicit the truth.... That the
> district attorney's silence was not the
> result of guile or a desire to prejudice
> matters little, for its impact was the same,
> preventing, as it did, a trial that could
> in any real sense be termed fair."

Again as stated in the matter of, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980); "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears."

This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumul-

-32-

ative. See, e.g., <u>McCleskey v. Kemp</u>, 753 F.2d 877, 885 (11th Cir. 1985).

If the truth would had been discl    "it would have introduced a new source of p ential b    row   Wainright, 785, F.2d  1457, 1466                    Unit   ates v. San    po,                         A jury may
    give great w                        ubt credibility when the vit       a                 nd of person who might perjure      ali

One might    ue that in Mi in fail      no. was ot ortured. Unde    ose circumstances the defendant irects the c    ntic    Dupart v. Un    ates, 541 F. 2    8, 1150 (5t                          timony, even th                 u uld

jury

Therefore, ligh of the evidence a   he arguments f        before the Co    defendant    to a new and fail        inked by the   s fals testimoni   E Mr. Micki                                    at under the Four   nth amendment of the United States Constitution.

Case 20-10942675 Document 1 Page: 515 06/05/20 Filed 05/06/2020

## C O N C L U S I O N

All of the issues presented in the below motion should

also                              ments are also

supported b        exhi

con

Major G. Tillery

Dated: 8-2-0 1

-34-

## VER    ATION

I          , do hereby verify                    ts set forth in the
a          on are true  d cor                    e best  f my knowledge
i. cmation and  elie        en                   otions W   he
P  per   i!                                       .

The  unders                                      atemet made therein
e subject to th                                  ectio  4904 relating
o unsw   falsification to a..

                                    r Till  v    526689

                                    e

                                    ey 08625

DATE

MAJOR TILLERY        Exhibit D
No.526689,/oso 563535
New Jersey State Prison
po box 861     4BR-21
Trenton N.J. 80625

Se    20, 2006

To, Ms. Ly n Abraham
Distr'      ey Office
1<
Phila. P

om
8403-5      1,571,572

Comm V-Tillery
Term No.1984-Nos 0155-0169

Dear Ms, Abraham
       o the Freedom Of      rmation A     5 U.S.C. 552, and the
priv -, ac' 5 1974 5    c.   a. I he eby request access to
(or copy            he following document .

1. All files , records, memorand            l filed
                   by searching through
             ts which contain    name.
oun     -s n
or , r defendants tea , william Frankl n.

2. All reco    an. tha s n     y y            ice
department. th the Two Jail House Witness use ... ese ase
Emmanuel Cl ith. And Robert Mickens, both have b n known t
uses other names.

3, All records and dates recored my you and the homicide
division showing how many times they where removed from the
prison to your offices and what family members where allowed
to visit them at the police station on these special visits,
Pa 473

3. Any and all documents demonstrating any payments such as special visit, lenient treatment on all the criminal charges that Robert Mickens, and Emmanual Claitt Where charged with, both said that had no deal with your office, they said they only hope your office would speak for them. This was false.

5. All records of the times your office went to the sentencing and talk to the sentencing Judge for both these jailhouse witnesses, All records of their criminal history to show how they where release on behalf of your agency and the police.

6 Since ho  these jailhouse i   wants testified in atlease
10 r             e that did    even involve m self   request
                  t                                      other
          ou                                          r office
       sentencin                                      mation.

7.All Entry and Time Logs books   at the          brought to
       Fir    uell         olj      r
                          lose m   Th se men  ave false
infor   on at my tr  l and                l    ce

                                                          in
                          rad                           (1963)

If this request is denied eithe          e or in part, Please
inf  m me to your    ncy appe          If an          s
       connecti                                       f all
                          my appro                    t I
          t funds at this          fe            d be
wa  .

If you do not grant my request w  n   working day as
prescribed by law. I will deem this request denied

       Thank you for your prompt attention in this matter.

Pa 474
Mayon Tiller

Exhibit V

*Commonwealth v. Tillery,* 981 A.2d 937 (Pa. Super. 2009)
(unpublished memorandum)

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MAJOR G. TILLERY, | : | |
| | : | |
| Appellant | : | No. 2937 EDA 2008 |

Appeal from the PCRA Order of September 9, 2008,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No. CP-51-CR-0305681-1984

BEFORE: GANTMAN, KELLY and COLVILLE*, JJ.

MEMORANDUM: **FILED JULY 15 , 2009**

This case is an appeal from the order dismissing Appellant's petition under the Post Conviction Relief Act ("PCRA"). Finding Appellant's petition untimely, we affirm the dismissal.

### *Facts*

Appellant was convicted of murder and related offenses. On appeal, this Court affirmed his judgment of sentence. *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum). On March 5, 1990, the Pennsylvania Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Tillery*, 593 A.2d 841 (Pa. 1990).

---

*Retired Senior Judge assigned to the Superior Court.

Case 2:10-cv-03186-JD Document 1-1 Page 524 06/D5/aF iled 05/06/2020 7

In a separate case, Appellant was convicted of, *inter alia*, arson. This Court affirmed his judgment of sentence on March 15, 1989. **Commonwealth v. Tillery**, 560 A.2d 830 (Pa. Super. 1989) (unpublished memorandum). He did not file a petition for allowance of appeal.

In 2007, Appellant filed the instant PCRA petition, his second on each case.[1] In his petition, Appellant claimed the Commonwealth withheld exculpatory and/or impeachment information from him prior to trial. More specifically, Appellant contended that, in return for testifying against him, certain Commonwealth witnesses were to receive, or had already received by the time of his trial, favorable treatment from the Commonwealth. The favorable treatment included immunity from prosecution and/or reduced sentencing on the witnesses' own criminal charges. Appellant's position was that the favorable treatment constituted undisclosed exculpatory or impeachment material. Similarly, Appellant also contended the Commonwealth allowed one or more of the witnesses to testify falsely by denying or understating the extent of the favorable treatment.

---

[1] The petition addresses both of Appellant's cases. While Appellant should have filed separate petitions, one at each case number, the PCRA court accepted his petition as filed and dismissed the petition through a single order now on appeal before us. Given the PCRA court's acceptance of the petition as filed and the fairly evident untimeliness of Appellant's PCRA requests, we see no reason to remand this matter to have the two cases treated separately.

In his petition, Appellant cited to numerous documents such as transcripts from various proceedings and letters from the Commonwealth (*e.g.*, a letter to the judge who was to sentence one of the aforesaid witnesses). The documents supposedly demonstrated the favorable treatment, the Commonwealth's failure to disclose it and the witnesses' false testimony about the favorable treatment.

Proceeding under Pa.R.Crim.P. 907, the PCRA court issued a notice of intent to dismiss the petition as being untimely. Subsequently, the court dismissed the petition on that basis. Appellant then filed this appeal.

### *Legal Principles*

In order to be timely, a PCRA petition, including a second or subsequent one, must normally be filed within one year of when a defendant's judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the end of direct review, including discretionary review in the Pennsylvania or U.S. Supreme Court, or at the expiration of time for seeking such review. *Id.* at (b)(3).

The time period for seeking review in the Pennsylvania Supreme Court is thirty days from the entry of our order sought to be reviewed. Pa.R.A.P. 1113(a). Ninety days is the period for petitioning the U.S. Supreme Court for a writ of *certiorari* after the Pennsylvania Supreme Court enters an order disposing of a case. SUP.CT.R. 13.

Despite the normal one-year deadline, the PCRA provides three statutory exceptions to the time bar. *See* 42 Pa.C.S.A. § 9545(b)(1) (setting forth exceptions based on governmental interference, newly discovered facts and/or a newly announced retroactive constitutional right). The exception for newly discovered facts requires the petitioner to plead and prove that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Id.* at (b)(1)(ii). Where a petitioner invokes one or more of the aforesaid exceptions, the PCRA petition must be filed within sixty days of when the claim could have been brought. *Id.* at (b)(2). Ultimately, if a PCRA petition is untimely, the PCRA court lacks jurisdiction to entertain it. *Commonwealth v. Hawkins*, 953 A.2d 1248, 1252 (Pa. 2006).

When considering a PCRA court's denial of relief, our standard of review is limited to determining whether the court's ruling is supported by the record and is free of legal error. *Commonwealth v. Treadwell*, 911 A.2d 987, 989 (Pa. Super. 2006). An appellant has the burden to persuade us that the PCRA court erred and that relief is due. *Commonwealth v. Wrecks*, 931 A.2d 717, 722 (Pa. Super. 2007).

## Analysis

Appellant's judgment of sentence on his murder case became final in June 1990 when the time for seeking a writ of *certiorari* in the U.S. Supreme

Court expired. On his arson case, his judgment of sentence became final in April 1989, thirty days after the entry of our affirmance. The instant PCRA petition was not filed until 2007 and was, therefore, facially late.

To overcome this untimeliness, Appellant attempts, as he did in the PCRA court, to invoke the exception for newly discovered facts. In particular, he claims that, within sixty days before he filed his petition, he discovered the transcripts and Commonwealth letters on which he relies to substantiate his claims. However, those documents all appear to be from the 1980s. Even to the extent Appellant might not have known about the facts contained therein until recently, he fails to show us why he could not have discovered those facts by due diligence at some earlier date. As such, he fails to convince us he is entitled to a time-bar exception under 42 Pa.C.S.A. § 9545(b)(1)(ii).

Accordingly, Appellant has not persuaded us of any legal or factual error in the PCRA court's dismissal of his petition on the grounds that the petition was late and that the court therefore lacked jurisdiction. Consequently, we will not disturb the court's ruling and we affirm the dismissal.

Order affirmed.

J. S40031/09

Judgment Entered.

Prothonotary

JUL 1 5

Date:_____

Exhibit W

Petitioner's 2016 PCRA Petition, June 16, 2016

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

**Received**

JUN **1 5 2016**

Office of Judicial Records
Appeals/Post Trial

## COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| | : | Docket Number |
| Respondent, | : | CP-51-CR-0305681-1984 |
| | : | |
| v. | : | |
| | : | |
| MAJOR G. TILLERY, | : | |
| | : | |
| Petitioner | : | |

## PETITION FOR POST- CONVICTION RELIEF
## And PRELIMINARY MEMORANDUM OF LAW

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully petitions this Court

for relief pursuant to the Post-Conviction Collateral Relief Act (PCRA), 42 Pa.

C.S. & 9541 *et. seq*., and in support thereof avers the following:

### I. INTRODUCTION

1. This is a case of factual innocence and gross prosecutorial

misconduct violating Petitioner Major Tillery's right to due process and a fair trail.

The actions of the Commonwealth resulted in a fundamental miscarriage of justice that shocks the conscience and warrants reversal of his conviction and dismissal of charges against Petitioner Major Tillery.

2. Newly discovered evidence proves the Commonwealth knowingly and intentionally manufactured and presented false evidence to convict Petitioner. Jailhouse informants were coerced and promised favors to lie and testify that Petitioner Major Tillery was involved in the shooting homicide of Joseph Hollis and assault of John Pickens. This falsified testimony was the *only evidence* presented against Petitioner. Petitioner has spent over thirty years in prison for crimes he did not commit.

3. Petitioner Major Tillery was convicted of homicide, assault, weapons and conspiracy charges in May 1985 for poolroom shootings that left Joseph Hollis dead and John Pickens wounded on October 22, 1976, purportedly over disputes between drug dealers. Career informant Emanuel Claitt also identified Petitioner as an official in the Nation of Islam and that the Nation of Islam ran the Black Mafia.

4. Petitioner is serving a sentence of life imprisonment without the possibility of parole. William Franklin, the operator of the poolroom, charged as a co-conspirator in the shootings, was tried and convicted in December 1980.

5. Pickens, the survivor of the shootings, gave a statement to police detectives that identified the shooters as individuals other than Petitioner and Franklin. Pickens did not testify at either trial.

6. There was no evidence against Petitioner linking him to these 1976 shootings except for the testimony of two jailhouse informants: that of Emanuel Claitt obtained in spring of1980 and the other from Robert Mickens obtained in the fall of 1984.

7. Claitt and Mickens were incarcerated with open felony charges and faced decades of state prison time. During their trial testimony both Claitt and Mickens repeatedly swore that they had received no promises, agreements or deals in exchange for their testimony. The trial prosecutor Barbara Christie insisted to the Court and to the Jury that these witnesses were not given any plea agreements or sentencing promises. This was false.

8. The newly discovered evidence in this Petition are the sworn declarations of these witnesses, Emanuel Claitt [Exhibit A, B] and Robert Mickens [Exhibit C] that their testimony was entirely false, and that this false testimony was manufactured by the prosecution with the assistance of police detectives and secured by threats, coercion and favors including dismissal of felony charges, minimal or no state time on pleas and access to sexual encounter while in the police custody.

9. Petitioner is factually innocent of the homicide of Joseph Hollis and the assault on John Pickens, but he was prevented from providing that defense at trial because the Commonwealth concealed its actions presenting false evidence and withheld material exculpatory evidence in violation of *Brady v. Maryland* and *Napue v. Illinois*, and the due process principles for which they stand.

## II. ELIGIBILITY FOR RELIEF

10.     This PCRA petition presents claims of actual innocence and the

denial of due process and a fair trial by the Commonwealth's intentional

manufacture and presentment of false evidence against the Petitioner, and

suppression of the information that it has done so. This petition also presents other

claims pursuant to *Brady v. Maryland* and its progeny for the suppression of

exculpatory impeachment evidence.

11.     Petitioner states that he is entitled to relief pursuant to the following

provisions of the PCRA:

> a. Petitioner's conviction resulted from "a violation of the Constitution of
>    Pennsylvania or laws of this Commonwealth or the Constitution of the
>    United States, which, in the circumstances of the particular case, so
>    undermined the truth-determining process that no reliable adjudication
>    of guilt or innocence could have taken place." 42 Pa. C.S.
>    §9543(a)(2)(i).
>
> b. Petitioner's conviction resulted from "the unavailability at the time of
>    trial of exculpatory evidence that has subsequently become available
>    and would have changed the outcome of the trial" if it had been
>    introduced." 42 Pa. C.S. §9543(a)(2)(vi).

12.     Specifically, the claims set forth herein are based upon violations of

Petitioner's right to due process of law guaranteed to him by the Fourteenth

Amendment to the United States Constitution and Article I, § 9 of the

Pennsylvania Constitution.

13.     The constitutional errors and newly discovered exculpatory evidence

described herein have been neither previously litigated nor waived. See 42 Pa.

4

Pa 486

C.S. § 9543(a).

14.     Petitioner has been convicted of crimes under the laws of this

Commonwealth and is actively serving a sentence of life imprisonment without

the possibility of parole as a result of his convictions. Therefore, Petitioner is

entitled to relief pursuant to the provisions of the PCRA.

## III. THIS PCRA PETITION IS TIMELY

15.     A PCRA petition, including any subsequent petition must be filed

within one year of the date the judgment becomes final. 42 Pa.C.S. §9545(b)(1).

16.     Petitioner is fully aware that his instant petition, his third PCRA

petition, is outside that time limitation. However, this petition is timely pursuant to

the exceptions to the time constraints imposed. 42 Pa. C.S. §9545(b)(1)(i), (ii), as

relevant here provide:

> (i) The failure to raise the claim previously was the result of
> interference by government officials with the presentation of the claim
> in violation of the Constitution or laws of this Commonwealth or the
> Constitution or laws of the United States;
>
> (ii)The facts upon which the claim is predicated were unknown to the
> petitioner and could not have been ascertained by the exercise of due
> diligence;
>
> ***
>
> (2) Any petition invoking an exception provided in paragraph (1) shall be
> filed within 60 days of the date the claim could have been presented.

17.     Petitioner presents several claims in this petition that are based upon

newly discovered facts that the Commonwealth manufactured false evidence

against the Petitioner and knowingly and intentionally presented this false evidence to the Jury and the Court. The prosecution suppressed the fact of its fabrication of the evidence against Petitioner as well as suppressed exculpatory impeachment evidence of plea deals and agreements. The Commonwealth committed a fraud on the Court and the Jury and undermined the fundamentals of due process.

18.    This case falls squarely under the considerations of *Mooney v Holohan*, 294 U.S. 103 (1935). Due process is violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."

19.    This case is also governed by the holdings and considerations in *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 154 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995) and their legal progeny.

20.    The newly discovered evidence is contained in the sworn declarations from the two prosecution fact witnesses, Emanuel Claitt and Robert Mickens, who provided the entirety of trial evidence against Petitioner.

21.    Claitt and Mickens now establish that their testimony was manufactured by the prosecution and police who coerced and threatened them with false charges and provided favors including plea agreements, dismissal of charges as well as allowing sexual favors while incarcerated to these witnesses as

inducement and in exchange for their false testimony. These witnesses were coached to testify falsely.

22.    Claitt and Mickens understood that the Commonwealth would penalize them if that did not lie on the witness stand and that they would be rewarded if they did.

23.    Commonwealth representatives told the Court and the Jury that these witnesses had no reason to falsify their testimony and asserted there were no plea agreements, knowing this was false. The witnesses' false statements that there were no plea agreements were not corrected.

24.    On April 18, 2016 Robert Mickens provided a sworn declaration in which he stated for the first time that his testimony at trial was fabricated and coerced by then Assistant District Attorney Barbara Christie, Detectives John Cimino and James McNeshy.  Mickens swore that he was promised a very favorable plea agreement and treatment in his pending criminal cases. He was promised protection in prison against prisoners who viewed him as a "snitch." Mickens was granted sexual favors in exchange for his false testimony.

25.    On May 4, 2016 Emanuel Claitt provided a sworn declaration, supplemented by another sworn declaration on June 3, 2016 stating that his testimony against Petitioner was fabricated and coerced and coached by ADAs Leonard Ross, Barbara Christie, along with ADA Roger King with the assistance of Detectives Larry Gerrard, Ernest Gilbert, Lubiejewski and Lt. Bill Shelton. As part of the coercion to convince Claitt into falsely testifying he was threatened

with false murder charges as well as given promises and agreements of favorable plea deals and sentencing. He was also given sexual favors.

26.    The Verified Declarations of Robert Mickens and Emanuel Claitt contain newly discovered facts that each testified falsely based on evidence fabricated by the prosecution and police.

27.    The facts upon which Petitioner bases his claims raised here became known to Petitioner within the last 60 days. This Petition is filed within 60 days of the date these claims could have been presented, meeting the jurisdictional time period set forth under 42 Pa. C.S. §9545(b)(2).

## A. Government Interference 42 Pa. C.S. §9545(b)(1)(i)

28.    Here the new evidence is the fact that it was the government itself that knowingly and intentionally fabricated and presented false evidence against Petitioner. The Commonwealth concealed and suppressed the facts of its actions.

29.    As set forth below *infra*, the prosecution denied that its witnesses were not truthful and made affirmative statements to the Court upholding the veracity of its witnesses and attacking the efforts of Petitioner to uncover the fundamental falsity of these witnesses' testimony: That neither witness was present at the time of the crime, and in the case of Claitt, also not present at the meetings two days before the shooting.

30.    The prosecution additionally falsely stated on the record that the Commonwealth had no agreement, no deals with these witnesses regarding their respective pending cases.

31.     Underlying the entirety of the Commonwealth's prosecution was
interference with the right of the Petitioner to due process by falsifying evidence
and concealing that falsification. That misconduct interfered and prevented
Petitioner from earlier discovering this new evidence. See, *Banks v. Dretke,* 540
U.S. 668, 696 (2004).

## B. After Discovered Facts and Due Diligence:

32.     It is averred that the facts revealed in these declarations were
previously unknown to Petitioner and could not have been previously discovered
through the exercise of due diligence.

33.     It was not within the power or capacity of Petitioner to obtain the
truth that Robert Mickens' and Emanuel Claitt's false testimony was actually
manufactured by the Commonwealth. The Commonwealth concealed that fact.

34.     Petitioner maintained his innocence from the time he learned he was
being accused of shooting Joseph Hollis and John Pickens. Because Petitioner was
not involved in that shooting, he knew that what Emanuel Claitt and Robert
Mickens testified to was false.

35.     Nonetheless Petitioner did not and could not obtain, no matter how
much he tried, evidence of the fact the Commonwealth fabricated the evidence and
coerced Claitt and Mickens into falsely testifying.

36.     Similarly there was no way for the Petitioner to obtain the factual
evidence that Commonwealth representatives allowed and assisted these witnesses
to have sex with girlfriends in the Round House interview rooms, and in Claitt's

case to be provided with hotel rooms prior to the willingness of these witnesses to come forward.

37.    Petitioner had no control over, nor could he by his exercise of due diligence obtain this new evidence until such time as these witnesses were willing and ready to come forward to clear their consciences and overcome fear of retaliation by the prosecution and police. It rested with Robert Mickens and Emanuel Claitt to decide to come forward. Their respective declarations state that they are only now willing to provide this information.

38.    Due diligence does not require the Petitioner to act on the *assumption* that Commonwealth withholds *Brady* material, that Commonwealth witnesses are committing perjury and the Commonwealth improperly permits them to do so. See *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (2010), *Commonwealth v. Davis*, 86 A.3d 883 (P.A. Super. 2014).

39.    Moreover, throughout the over thirty years Petitioner has been imprisoned for crimes he did not commit, he has repeatedly challenged his conviction under extremely difficult circumstances. For twenty of those thirty-plus years, Petitioner was in solitary and disciplinary custody with severe restrictions on phone communication, personal visits and access to legal materials.

40.    Petitioner was transferred almost two dozen times to prisons in the Federal system, New Jersey as well as within the PA Department of Corrections. His own legal records were taken from him and delayed in being returned to him

during each of these transfers. In 2011 his legal files, including transcripts and prior legal pleadings were destroyed by water damage at SCI Pittsburgh.

41.    Petitioner has had several serious medical emergencies, liver and bowel problems that incapacitated him for periods of time. In addition Petitioner was and is hampered by lack of funds and adequate legal assistance. This made it extremely difficult to conduct the investigation needed to pursue the new evidence presented here.

42.    These explanations are provided to this Court to explain the objective circumstances that impeded Petitioner's attempts to uncover and present to the Court the Commonwealth's falsification of evidence against him, the suppressed evidence of his innocence and other materially favorable evidence pursuant to *Brady* et. al.

43.    There is authority for the proposition that second or subsequent petitions will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred. See *Commonwealth v. Szuchon*, 633 A.2d 1098, 1099 (1993) (citing *Commonwealth v. Lawson*, 549 A.2d 107 (1988).

44.    This standard is met if the petitioner can demonstrate either: (1) that the proceedings resulting in the petitioner's conviction were so unfair that a miscarriage of justice occurred which no civilized society can tolerate; or (2) that the petitioner is innocent of the crimes charged.

45.     This Petition surely meets these tests. Petitioner is factually innocent. The gross intentional prosecutorial misconduct in fabricating witness testimony, coercing and inducing witnesses to present false testimony and suppressing materially favorable evidence is clearly a miscarriage of justice that shocks the conscience.

46.     To the extent the Commonwealth contests Petitioner's diligence in the discovery of any of the facts related to these claims, Petitioner requests an evidentiary hearing at which he will prove that he has acted with the requisite diligence. (See below p.53, the Court Must Provide an Evidentiary Hearing.)

47.     Moreover, in light of the *Brady* violations enumerated in this Petition, Petitioner is entitled to review of previously raised *Brady* claims. That is because the *Brady* claims require an evaluation of the cumulative impact of the *Brady* violations. See e.g. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (materiality of Brady violation "turns on the cumulative effect of all such evidence suppressed by the government"). In short, the new evidence of due process violations must be assessed with the old evidence on the same points.

## IV. RELEVANT CASE HISTORY

48.     Petitioner *pro se* Major Tillery AM9786 is serving a sentence of life without parole in the Commonwealth of Pennsylvania. He is incarcerated at SCI Frackville, 1111 Altamont Blvd., Frackville, PA 17931.

49.     On May 29, 1985, following a jury trial in the Philadelphia Court of Common Pleas, Petitioner Tillery was convicted of first-degree murder, aggravated assault, criminal conspiracy and weapons offenses arising out of the October 22, 1976 shooting death of Joseph Hollis and the wounding of John Pickens. Post-trial motions were denied by the Hon. John E. Geisz and Petitioner was sentenced to life imprisonment without possibility of parole on December 9, 1986. At trial Petitioner was represented by attorney Joseph Santaguida. At post-trial motions and the filing of appeals before the Superior Court and PA Supreme Court, Petitioner was represented by attorney James S. Bruno.

50.     The Pennsylvania Superior Court affirmed Tillery's conviction on May 30, 1989, *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989), and the Pennsylvania Supreme Court denied allocatur (Petition for Allowance on Appeal) on March 5, 1990, *Commonwealth v. Tillery*, 593 A.2d 841 (Pa. 1990).

51.     On September 20, 1996, Tillery filed a petition under Pennsylvania's Post-Conviction Relief Act (PCRA) asserting ineffective assistance of trial counsel because of a conflict of interest after he discovered that his trial counsel, Joseph Santaguida, Esq., had also represented Tillery's alleged victim, John Pickens, with respect to the Commonwealth's charges against William Franklin, Tillery's alleged co-perpetrator in the 1976 shooting. Franklin was tried in November-December 1980. The Court of Common Pleas dismissed Tillery's petition as procedurally defaulted and without an evidentiary hearing on January 13, 1998, and the Superior Court affirmed the dismissal on April 21, 1999.

*Commonwealth v. Tillery*, 738 A.2d 1058 (Pa. Super. 1999). Petitioner was represented by attorney Richard P. Hunter.

52.    Tillery then filed a petition for a writ of *habeas corpus* with the United States District Court for the Eastern District of Pennsylvania on December 22, 1999, in which he again contended that his trial counsel operated under an actual conflict of interest. On October 30, 2000, the District Court dismissed Tillery's petition.

53.    The Third Circuit Court of Appeals by Order dated August 23, 2003, directed the district court to hold an evidentiary hearing, after which the District Court by Order dated July 29, 2003, reaffirmed the dismissal of Tillery's petition. On July 29, 2005 in *Tillery v Horn* 432 Fed Appx 66 (2005) the Third Circuit affirmed the District Court's judgment of dismissal. Petitioner was represented by attorney Michael Consusione.

54.    On August 13, 2007 Petitioner filed a Second PCRA petition *pro se*. The central claim of that PCRA petition was the prosecution's suppression of exculpatory impeachment evidence, specifically a favorable plea deal. The Commonwealth filed a Motion to Dismiss via a letter brief on May 8, 2008. The PCRA court received a letter brief in opposition to the Motion to Dismiss on June 13, 2008. The letter was submitted by Brian J. McMonagel, Esq. on Petitioner's behalf, but an Amended PCRA was never filed. No evidentiary hearing was held.

55.    The Petition was dismissed by the Hon. John J. Poserina, Jr. on September 9, 2008 as untimely filed. A *pro se* Notice of Appeal was filed on

October 1, 2008. A formal Opinion was filed by the Hon. J. Poserina on December 11, 2009 affirming the denial of the petition as untimely filed. On July 15, 2009 the Superior Court affirmed the dismissal of Petitioner's Second PCRA. On December 9, 2009, the Pennsylvania Supreme Court denied a Petition for Allowance of Appeal.

56.     During the entire period of the preparation and pendency of his *pro se* Second PCRA petition, Petitioner was incarcerated at New Jersey State Prison in the Special Management Unit.

57.     Petitioner's right to due process of law is guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution.

58.     The constitutional errors and newly discovered exculpatory evidence described herein have been neither previously litigated nor waived. See 42 Pa. C.S. § 9543(a).

59.     Petitioner has been convicted of crimes under the laws of this Commonwealth and is actively serving a sentence of life imprisonment without the possibility of parole as a result of his convictions. Therefore, Petitioner is entitled to relief pursuant to the provisions of the PCRA.

## IV. STATEMENT OF FACTS RELEVANT TO PETIONER'S CLAIMS

### A. Overview and Evidence Relevant to Guilt

60.     The facts of the case as presented in the Superior Court decision

denying Petitioner's appeal from his December 9, 1986 judgment of sentence of

the Philadelphia County Court of Common Pleas, *Commonwealth v. Tillery*, 563

A.2d 195 (Pa. Super. 1989), begin with the following:

"The facts of this case have a rather long and tortuous past. At
approximately 10:00 p.m. on October 22, 1976, Philadelphia police
received a call to the address at Huntingdon and Warnock Streets in North
Philadelphia. At that corner they broke down the locked door of a poolroom
operated by William Franklin and discovered the dead body of John
[Joseph] Hollis. A medical examination later revealed that Hollis died of a
gunshot wound to the trunk of this body. Inside the poolroom, the police
found live and spent .38 caliber ammunition and a set of car keys. Around
the corner from the poolroom at 2527 North 11$^{th}$ Street, police officers
found John Pickens bleeding from a gunshot wound. He was treated at a
hospital and survived his injuries. Both Pickens and Hollis were shot by
different guns.

"For more than three years, the shooting of Pickens and Hollis remained
unsolved. However, in the spring of 1980, police detectives investigating
the homicide of Samuel Goodwin, visited a Philadelphia prison to
determine if Emanuel Claitt, and inmate who had known Goodwin, could
provide any information about Goodwin's death. The information Claittt
provided went far beyond the Goodwin case. Claitt described in detail the
operation of what he labeled the "black mafia" a crime syndicate run by
black Muslims in Philadelphia. His information described a vivid picture of
the events culminating with the shootings of Pickens and Hollis.

"Claitt testified that from 1976 until 1980, he engaged in drug dealing and
extortion as a member of the Philadelphia "black mafia". The organization
divided the city into sections for business purposes. Alfred Clark was he
leader of the North Philadelphia branch. He held the rank of first lieutenant
and had "the last word' for all business in the city. Sylvester White directed
the West Philadelphia branch. Johns Pickens also dealt drugs in West
Philadelphia. During the 1970s's, appellant had the rank of first lieutenant
and had 'had control of the entire city as far as methamphetamines is

concerned ....' Claitt received his heroin supply from Clark and his methamphetamine supply form appellant. Clark and appellant were partners in the heroin and methamphetamine trade. Claitt characterized appellant as Clark's 'right hand man.'"

.....

"Based on Claitt's information, the police obtained an arrest warrant on May 23, 1980, for appellant's arrest. William Franklin was charged as well for the same offenses and went to trial in November 1980, was convicted and sentenced to life imprisonment.

"However, for three years the police were not able to serve the warrant because appellant could not be located. A detective in California finally arrested appellant in November, 1983. Appellant was returned to Philadelphia on December 8, 1983, to stand trial."

61. No physical evidence from the scene was presented as evidence against Petitioner. Fingerprints were not taken. NT 10:83.[1] Car keys found in the poolroom were identified as belonging to Fred Rainey, but he was not charged for anything having to do with the shootings. NT 13:12. A large plastic bag containing a controlled substance was found on the pool table. NT 13:8. Coats, a hat and glasses were found in the poolroom, but not linked to anyone. NT 13:33. Alfred Clark was detained after a car stop shortly after the shooting, but he was not charged. NT 13:43-44. Eighteen hundred dollars was confiscated but was later released to Clark. NT 13:31.

---

[1] Petitioner is indicating transcript pages by using NT followed by a number that is the date in May 1985 of that testimony followed by the page number.

62. Shortly after the shooting, while in the hospital, surviving victim John Pickens made a statement to a homicide detective[2] NT 13:56, but no charges were brought against Petitioner, or anyone else. NT 13:57. Pickens never testified, not at William Franklin's trial in Nov-December 1980 nor at Petitioner's trial in May 1985. The prosecution didn't try to subpoena Pickens as a witness.

63. The Commonwealth's evidence against Petitioner that he was inside the poolroom and one of the shooters of Hollis and Pickens came solely from career jail informant Emanuel Claitt in May 1980.[3]

64. According to Claitt, Petitioner threatened Hollis after Hollis pistol-whipped Clark during a dispute about drug selling in West Philadelphia on October 20, 1976. NT 14:30. Petitioner was involved in making arrangements for a meeting at the poolroom between Hollis and Clark with others. NT 14:32, 39.

65. Claitt said that it was arranged that everyone would meet at the mosque and go from there to the poolroom, but before the service was over Petitioner and Franklin got up and left. NT 14:42.

66. After the service, Claitt drove over to the poolroom with Clark and others, and was asked by Clark to guard the door inside the poolroom. NT 14.49. Claitt didn't see Petitioner and William Franklin at the poolroom until they came from behind a barrier and shot at Hollis and Pickens. NT 14:59.

---

[2] Pickens gave a verbal and written statement to homicide detective McGrath that "Dave" and "Rickie" committed the shooting. (Exhibit D)

[3] Between January 1980 and Petitioner's 1985 trial Claitt provided information to and/or testified for the prosecution against Robert Lark, William Franklin, James Brand, George Rose, Fred Rainey, Major Tillery and Larry Frazier

67. Claitt said after Pickens was shot "he ran through this door which had a glass centerpiece in it."[4] NT 14:73.

68. Claitt was not charged in anyway in connection with the shootings.

69. The other prosecution fact witness was Robert Mickens, also a jail house informant. Mickens did not testify at Franklin's trial in 1980 and became a prosecution witness against Petitioner in a statement given to detectives on September 26, 1984, eight years after the shootings.

70. Mickens testified that while walking down the street in front of the poolroom shortly before 10 pm on the night of the shooting, he was asked by Petitioner to be an outside "lookout" to watch for patrolling police cars. NT 21:36.

71. Mickens said Petitioner was on the poolroom steps with Franklin and Alfred Clark. NT 21:35,60.

72. Mickens did not witness and did not know what happened inside the poolroom, but heard shots.

73. Mickens also testified that he was asked to and agreed to be an alibi witness for Petitioner back in 1976, a few days after the shootings. NT 21:15.

74. Mickens was a surprise witness for the prosecution, kept secret from Petitioner until he was called to the witness stand. The Commonwealth had

---

[4] The issue of whether Pickens went through a glass door, and even whether a glass door was in the poolroom in 1976 and/or an exist door from the poolroom, was an issue of extensive questioning to numerous witnesses at Petitioner's trial. None of the police officers at the scene in 1976 saw a glass door, or took photographs of any such door. Nor was the there any medical evidence that John Pickens was injured going through a glass door. It was only when ADA Barbara Christie prepared for Petitioner's trial in 1985 were photos taken of a hallway that reportedly once had a glass pane.

obtained a protective order prior pursuant to Rule 305 $F^5$. The Commonwealth disclosed over Mickens' September 24, 1984 statement (C-41) just minutes before he testified. [Exhibit E]

## B. Witnesses' Arrests and Plea Agreements with the Commonwealth

75.     Both Claitt and Mickens were prosecution witnesses with a criminal history, pending cases and were incarcerated during Petitioner Tillery's trial. The testimony of Claitt and Mickens was repeatedly challenged on the grounds they had received possible favorable plea deals in exchange for their testimony against Petitioner.

### *Claitt Testimony That He Had "No Plea Deals"*

76.     In April 1980 homicide detectives questioned Emanuel Claitt who was incarcerated on a probation violation and had 8 or 9 open cases. NT 14:8.

77.     Claitt was questioned about the homicide of Samuel Goodwin NT 15:8 and provided information on that homicide, as well as others, including the homicides of Alfred Clark (April 1979) and Joseph Hollis (October 1976) and firebombings committed by him and others. NT 14:8.

78.     Claitt's open charges included auto theft, possession with intent to distribute drugs, weapons charges and conspiracy.

---

[5] Petitioner objected to the *in camera* proceeding that led to the protective order that concealed the fact that Robert Mickens was going to be a prosecution witness on the grounds that there was no basis for a finding that Mickens needed protection from Petitioner. The court overruled the objection and preserved the record of the exparte petition. NT 21:2-13.

79.     On May 20, 1980, Claitt gave a 6-page statement on the 1976 shootings of Hollis and Pickens, "Investigation-Interview Record," taken by Det Lawrence Gerrard (Com. Exh-31).[6] NT 15:8. This inculpated Petitioner and William Franklin.

80.     Following Claitt's statement an arrest warrant was issued for Petitioner.

81.     Per Claitt, at the time of that statement he had "no agreement" regarding plea deals on his pending 8 or 9 cases. NT 14:78. The only "understanding" Claitt had with the Commonwealth was that after his testimony at preliminary hearings he would get help to be released on bail and he would have to fight his cases on his own "with no helping [sic] from the District Attorney's office." NT 14:83.

82.     On June 4, 1980, Claitt testified at Franklin's preliminary hearing and at the separate preliminary hearing against George Rose.[7]

83.     On June 10, 1980, Claitt was released from jail after the Commonwealth went to Judge Kubacki to lift Claitt's detainer on violation of probation on firearms charges. NT 14:81.

84.     On July 9, 1980—a month later—while out on bail, Claitt was arrested on new charges for car theft. When back in prison, the Commonwealth

---

[6] Petitioner has not been able to obtain a copy of C-31 from the Clerk's office. ADA Barbara Christie read a portion of the statement back to Claitt in her re-direct examination. See NT 16:71-76.

[7] Rose was charged with the murder of Alfred Clark but acquitted after a jury trial. NT 14:81.

also placed firebombings charges against him as well as Petitioner, George Rose and James Brand. NT 14:82.

85.     Claitt made bail for firebombing charge, and was out on the streets when he testified against Franklin at trial Nov-early Dec 1980. NT 14:79, 82.

86.     On November 29, 1980, during the Franklin trial, Claitt pled guilty to 3 of the pending charges, the firebombing and the 2 drug charges before the Hon. Judge Leon Katz. NT 14:83.

87.     Claitt testified this was an "open plea...I pled guilty to the charges with no recommendation from the District Attorney's office...the Judge would decide my fate as to sentence." The only request to Judge Katz would be a recommendation that the sentences run concurrent. NT 14:5, 6.

88.     On January 5, 1981 the ADA Leonard Ross sent a letter to Judge Katz. NT 14:19. (Exhibit F) Claitt testified this letter was to inform Judge Katz that he had "cooperated with the District Attorney."

89.     Claitt also said that the "agreement" he had with the District Attorney was that in view of this cooperation they [the District Attorney] would nolle pross three of his cases, but "would not recommend a sentence, they would leave it up to the judge." NT 14:86.

90. On Sept 18 1981 Claitt was sentenced by Judge Katz. On the three charges he pled guilty to he received concurrent sentences of one and a half to seven years, one and a half to five years and a matter of months.[8] NT 14:83.

91. Claitt was acquitted of two cases and the District Attorney nolle prossed three cases. NT 14:20.

92. This sentence gave Claitt a total of one and half to seven years in prison and 5 and a half years under the supervision of the parole board. NT 14:80.

93. On November 22, 1982 Claitt was released on parole. NT 15:24.

94. Claitt served a year and a half in prison. NT 15:22.

95. On April 21, 1983 Claitt was arrested on new charges of robbery and aggravated assault. 14:94 This robbery charge put Claitt in violation of state parole and put him back in custody. NT 14:94.

96. On February 29, 1984 Claitt was released on the parole violation and able to sign his own bond on the robbery case immediately after testifying against Petitioner at his preliminary hearing.[9] NT 14:95.

97. Claitt was re-incarcerated for violation of parole for reporting to his parole officer with a knife in his sock. NT 14:99.

---

[8] Unmentioned by Claitt or ADA Barbara Christie are 13 charges from May 16, 1980 including robbery, assault, firearms before Judge Levy Anderson, which were nolle prossed April 13, 1982. See CP-51-CR-1107131-1980 [Exhibit G]
[9] Undisclosed by ADA Barbara Christie were the letters by Arnold Gordon, Chief, Homicide Unit to the Secretary of PA Parole Board, January 31, 1984 and District Attorney Edward Rendell's letter to Judge John J. Chiovero, February 18, 1984. [Exhibits H, I, J]

98.    On May 14 and 15, 1985 Claitt testified against Petitioner, while

incarcerated in violation of parole and with pending robbery and aggravated

assault charges. NT 14:25, 93.

99.    At the time of his trial testimony against Petitioner, Claitt had spent

8 ½ months in Philadelphia Detention Center, Isolation Unit, Protective custody.

NT 14:3.

100.   Claitt testified there was no sentencing agreement on the pending

open robbery case, which was scheduled for trial June 24, 1985 before the Hon.

Judge John J. Chiovero. NT 14:6, 94.

101.   When questioned by ADA Christie if there was an understanding or

agreement with the Commonwealth concerning the disposition of those open

charges. Claitt said:

> "As to Agreement, the District Attorney merely mentioned that they did all
> they were going to do for me at that point but they would make Judge
> Chivoero aware of my prior cooperation and that I would be testifying in
> other trials in the near future." NT 14:94.

102.   ADA Barbara Christie told the Hon. John A. Geisz as part of her

objections to Petitioner's attorney continued questions to Claitt about possible plea

agreements:

> "The witness has testified to his understanding of the Agreement. And now
> the witness has indicated that there is no agreement with regard to
> sentencing on the open robbery. There is no agreement. He goes to trial on
> that. He has a parole date of September 85 and that he is currently in
> custody for violating his parole. And his understanding of any agreement he
> has with the commonwealth is that the Commonwealth will make the
> parole board aware of his cooperation in this and the other cases. NT 14:98.

24
Pa 506

103.    On May 28, 1985 ADA Christie gave her Summation to the Jury

saying there was "no set deal" and that the Com would only enter into an "open

plea" agreement with Claitt. NT 28:60. She further stated:

> "Claitt talked to the police in May 1980, *with no deal but with a great
> desire*, great desire for protection for himself and his family, particularly
> after he went public in court and testified in June 1980 at a preliminary
> hearing  and December 1980 at the Franklin trial.

> "Yes, Claitt was in and out of custody. He pled guilty to 3 crimes. He stood
> trial on 2 and he awaits trial on a third."[10] NT 28:90.

### *Mickens Testimony That He Had "No Plea Deal"*

104.    In February 1984 Robert Mickens was arrested on rape, assault and

robbery charges and remained incarcerated through the May 1985 trial of

Petitioner. NT 21:23, 54.

105.    In September 1984 Mickens was taken to police headquarters at 8th

and Race for questioning about the homicide of Ronald Johnson and volunteered

information to the homicide detective about other homicide cases. NT 12:29.

106.    On September 26, 1984 Mickens gave police a statement regarding

what he knew of the homicide by shooting of Joseph Hollis, recorded in a 6-page

Investigation-Interview Record (Com Exh 41). NT 21:106-7. [Exhibit E]

107.    Mickens placed Petitioner outside the poolhall on the night of the

shootings, asking Mickens to be a police look-out. NT 21:107.

---

[10] This 1983 robbery case from 1983, pending during Tillery trial was nolle
processed by the Commonwealth December 16, 1987. {See Exhibit G]

108. Mickens testified in in preliminary hearings two separate murder cases against George Brown and Kenneth Purnell, on December 8, 1984 and January 3, 1985. NT 21:27.

109. Mickens was identified in the prison as a snitch and placed in areas of protective custody in a Philadelphia prison and then transferred to a prison outside the Philadelphia area. NT 21:101,105

110. On May 16, 1985 Mickens pled guilty to criminal conspiracy and rape before the Hon. Eugene Clarke Jr. and was scheduled to be sentenced on July 18, 1985. NT 21:24.

111. Mickens testified it was an "open plea" with no plea bargaining, 21:24 that his sentencet would be up to the judge. NT 21:25.

112. Mickens was advised that he could get 10-20 years on the rape case, 5 to 10 on the conspiracy and that the sentences could run concurrent or consecutive. NT 21:26.

113. His only "understanding" with the District Attorney's office was that it would let Judge Clark know about his cooperation and that the other charges would be nolle prossed. NT 21:26.

114. In her summation, ADA Christie told the jury that Mickens "awaits sentence on a guilty plea to a rape charge and conspiracy. That could net him 15 to 30 years at the decision and discretion of the sentencing judge." NT 28:91.

115. When sentenced before the Hon. Eugene Clark, Jr. on October 10, 1985, Mickens received probation.

**IV. Newly Discovered Evidence and Exculpatory Evidence the
Commonwealth Has Concealed For the Past Thirty-one Years That
Proves Major Tillery is Innocent and that the Commonwealth
Knowingly Presented False Evidence of his Guilt**

116.    Petitioner has within the last sixty days discovered new evidence

from the two Commonwealth fact witnesses, Emanuel Claitt and Robert Mickens.

These newly discovered facts are contained in sworn declarations of Emanuel

Claitt and Robert Mickens.  [Exhibits A, B and C]

117.    Claitt and Mickens each swear that their testimony inculpating

Petitioner was a lie, manufactured by the Commonwealth, resulting from coercion

and promises of plea deals and sexual favors.

118.    The significance of this new evidence is that it proves that the

entirety of the prosecution's case against Petitioner was based on false testimony,

manufactured and presented by the Commonwealth.

119.    This new evidence proves Major Tillery's innocence. Without the

testimony of Emanuel Claitt the District Attorney could not have prosecuted

Petitioner. Had the facts of the coercion and promises made to these witnesses to

compel them to falsely testify been known to the jury, Petitioner would have been

acquitted at trial.

120.    This newly discovered evidence was unavailable to Petitioner

despite his exercise of due diligence. Claitt and Mickens were previously

unwilling to come forward with the truth and provide this evidence to Petitioner

because they feared retaliation by the police and prosecution.

Below, Petitioner presents the contents of these verified declarations.

## Newly Discovered Evidence From Emanuel Claitt, May 4 and June 3, 2016

121.    Without the testimony of Emanuel Claitt there is no case, no

evidence of Major Tillery's involvement in the shootings of Joseph Hollis and

John Pickens.

122.    Prior to Claitt's statement to police detectives May 20, 1980 there

were no suspects in the October 22, 1976 shootings of Hollis and Pickens. It was

only after Claitt's statement that an arrest warrant was issued for Petitioner.

### 123.    *Verified Declaration of Emanuel Claitt, May 4, 2016*

> I submit this declaration stating that I lied when I testified at the trial of Major Tillery in May 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.
>
> I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.
>
> I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.
>
> I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.
>
> I was in prison in 1980 on serious charges and I was approached by Philadelphia detectives Larry Gerrard and Ernest Gilbert. They threatened to charge me with the murder of Samuel Goodwin. I had eight or nine open cases, at least three of them were felonies with a lot of years of prison time.
>
> I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder.
>
> Detectives and prosecutors ADA Lynn Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Lynn Ross, Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted

to arrest him and Franklin. So Franklin was tried in December 1980 and I falsely testified against William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This argument supposedly took place in the home of Dana Goodman. I testified that Major Tillery was there and after an argument and pistol slapping of Clark by Hollis, Major Tillery said that "Hollis would have to die for what he did."

This was not true. I was not at any such meeting and I didn't have any personal knowledge of this supposed argument and threat made by Major Tillery.

I also testified at Major Tillery's trial that after the argument in Goodman's house a group that included me as well as Clark and Major Tillery met at a mosque in North Philadelphia and drove a few blocks to a poolroom owned by William Franklin to demand Sylvester White, the head of the West Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this actually happened.

I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from

entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard gunshots in the pool hall, saw Pickens and Hollins shot and that Major Tillery and Franklin were in the pool hall and that they were the shooters.

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on t he front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie, Len Ross, Roger King interviewed me, and worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

### 124. *Verified Supplemental Declaration of Emanuel Claitt, June 3, 2016*

I submit this supplemental declaration about my false, manufactured testimony against Major Tillery and William Franklin in the November 1980 and May 1985 trials for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the shootings at the poolroom on October 22, 1976, that I wasn't there then or at the argument at Dana Goodman's house or meetings before the October 22, 1976 shootings.

For example: In our meetings I said you know I wasn't there – you have to fill in the blanks. Detectives Gerard, Gilbert, Lubiejewski, Lt. Shelton and ADA Ross would tell me, "you've got to say it this way." I was told "we've got to bring him down—you've got to help us." That meant I should lie." Barbara Christie told me: "You're the best. You should have been a lawyer." That meant I knew how to lie.

The prosecutor against William Franklin in 1980 was Leonard Ross. I met with him as well as ADAs who worked with Barbara Christie soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert and Lubiejewski. I met with ADA Roger King also who had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact I got one and a half-years.

When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true.

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was "open" and that there were no agreements about leniency and sentencing.

She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to.

But my testimony that there was no plea deal was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing -firebombings in 1979 and 1980 that I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at

these trials and that my false testimony was manufactured by the ADAs and police until now.

It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

125. These declarations of Emanuel Claitt establish that the testimony he gave at trial was false. As most succinctly stated from Claitt's declarations, "I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured…I lied." (May 4, 2016)

126. Emanuel Claitt provides new evidence that the Commonwealth knowingly presented false inculpatory testimonial evidence against Petitioner. "The police detectives and prosecutors knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials." (June 3, 2016)

127. Claitt describes meetings with police and prosecutors in which they worked over what he would say, "filling in the blanks." Police and prosecutors knew that Claitt didn't have any personal knowledge of the poolroom shootings and what led up to that.

128. Claitt tried to recant after Franklin's trial but was threatened by a police lieutenant with being framed on a murder.

129. Claitt describes being set up to meet with Robert Mickens in a police van making a phony trip back and forth from the Roundhouse to the State prison

in order talk to Mickens and pressure him to also testify against Petitioner, because he had "no choice."

130.    Claitt states that ADA Christie worked him over and coached him to remedy a "problem" in his testimony that John Pickens fled the poolroom after being shot, running through a glass door.

131.    It was made up for Claitt to testify that Petitioner pulled a gun on him and threatened to shoot him in 1983.

132.    Claitt further states he was forced to testify that the Nation of Islam ran the "black mafia" controlling drug dealing in Philadelphia and to testify to everyone's Muslim names.

133.    Claitt states that his false testimony was based in part on the threats from police detectives that he would be charged with murders he did not commit if he refused to become a witness against Petitioner.

134.    Emanuel Claitt provides new evidence that the Commonwealth made numerous plea deals with Claitt to induce his false testimony, and then coached Claitt to deny those plea deals were made.

135.    Claitt testified at trial with the knowledge that he would be able to get out on bail, signing his own bonds and have parole and probation detainers lifted. This is supported by the letters from the District Attorney's office to judges and the PA Parole Board.

136. Claitt was given repeated "get out of jail" passes despite his numerous parole violations and the commission of new felonies each time he was released.

137. Although Claitt testified that there were "no deals" and "open pleas," he was secure and confident that the District Attorney's office would protect him, nolle prosse numerous felony charges and arrange for him to get minimal sentences.

138. That these plea deals existed is corroborated by the facts that for the 8 or 9 pending felonies in 1980, for which he faced 25-50 years on the three cases he pled guilty to, Claitt spent just a year and a half in prison.

139. There is also the matter of the undisclosed 13 charges from May 16, 1980 including robbery, assault and firearms that were pending against Emanuel Claitt when he testified at Franklin's trial. These were nolle prossed by the prosecution before Judge Levy Anderson on April 13, 1982. See CP-51-CR-1107131-1980.[Exhibit G]

140. ADA Barbara Christie did not disclose this history to Petitioner Tillery at his trial, nor did Emanuel Claitt testify about this..

141. Additionally the "open" robbery charges from 1983 that Claitt was questioned about at Petitioner's trial were nolle prossed after Petitioner's post-trial motions were denied. This was the very same charges that ADA Christie assured the Court and the Jury were "open" and that the prosecution had made no plea deals with Claitt.

Case: 20-1942 Document: 1-1 Page: 562 Date Filed: 05/07/2024

142.   Claitt also reveals in his declarations that while incarcerated police arranged visits between Claitt and different girl friends in homicide interview rooms in police headquarters and at hotels for him to have sex.

143.   Claitt's understanding and agreement with the Commonwealth was the plea deals and sexual favors were given in exchange for his false testimony to get a murder conviction against Petitioner. These agreements and arrangements were made possible only by the conscious action of the Commonwealth.

144.   Emanuel Claitt provides new evidence that the Commonwealth failed to correct the false testimony he gave on Petitioner's guilt and that there were no plea deals, but suppressed plea arrangements and favors asked of Judges and the Parole Board but suborned Claitt's false testimony.

## Newly Discovered Evidence Provided by Robert Mickens

145.   Robert Mickens was a surprise witness at Petitioner's trial. His testimony was intended to corroborate Emanuel Claitt that Petitioner was in the poolroom when shots were fired. Mickens was not a witness to the shootings.

146.   *Verified Declaration of Robert Mickens, April 18, 2016:*

> In May 1985 I falsely testified as a witness for the Philadelphia County District Attorney in the prosecution of Major George Tillery (CP-51-CR-0305681-1984) on murder charges.
>
> The testimony I gave at that trial was false, manufactured by the prosecutor, Assistant District Attorney Barbara Christie.
>
> I was coerced and promised favors if I falsely testified against Major Tillery.
>
> I was arrested on February 28, 1984 on charges of robbery and rape and faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I "worked with [her] on the Major Tillery case" she "guaranteed" I wouldn't be sent upstate on my robbery and rape case and would be "protected."

ADA Christie and her homicide detectives, John Cimino and James McNeshy, repeatedly brought me in for questioning on a number of robbery and murder cases, asking me to become a prosecution witness against Major Tillery.

On one occasion ADA Christie showed me what looked like a paper signed by Major Tillery saying that I was going to be an alibi witness for him. I told her I was.

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men.

When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known "snitch." I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but never taken from the van.

Claitt told me I was "pretty hemmed up" and that Major Tillery was a "slime," that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the

false grounds that I needed a protective order to protect me from Major Tillery.

That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the shooting of John Hollis and John Pickens. That was totally false. My entire testimony was scripted and rehearsed by ADA Barbara Christie.

I agreed to give this false testimony because I was I promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my own guilt for falsely testifying against Major Tillery and my fear of retaliation by the prosecution and police.

Much in my life has changed. I want to make amends for falsely testifying against Major Tillery. I am willing and ready to be a witness in any proceeding brought to challenge his conviction.

147. Robert Mickens swears in his declaration that his trial testimony was

"totally false …scripted and rehearsed by ADA Barbara Christie." He explains the

police and prosecution coerced him to testify falsely against Petitioner, to say he

was asked by Major Tillery to be a look-out for police outside the poolroom, that

Petitioner was him to be an alibi witness for him and he feared for his life and that

of his family if he wasn't.

148.  Mickens now exposes that his testimony was lies. He was not a look-out outside the poolroom, no one asked him to be lookout and that Petitioner hadn't asked him to be an alibi witness and Petitioner hadn't threatened him.

149.  It was the Commonwealth that threatened to bring false murder charges against Mickens, while promising him no prison time on rape and robbery charges if he testified against Petitioner. They set Mickens up with Emanual Claitt, their career informant, to convince him he had no choice but to lie against Petitioner.

150.  The police and prosecution arranged and allowed him to have sexual tryst with his girlfriend in police headquarters while he was in custody to induce his false testimony.

151.  Mickens feared retaliation if he came forward earlier and told the truth about his lying testimony.

152.  The new evidence provided by Mickens in his declaration supports the fact that the Commonwealth manufactured the testimonial evidence against Petitioner, knowingly presented this falsified evidence, suppressed materially favorable evidence and failed to correct Mickens false testimony.


## V. CLAIMS FOR RELIEF

153.  The above quoted declarations provide previously unavailable and newly discovered evidence showing that Petitioner is an innocent man. They show that Petitioner is the victim of gross prosecutorial misconduct in the

Commonwealth's manufacture and presentation of known false testimony inculpating Petitioner.

154. The Commonwealth also suppressed exculpatory information, i.e., information that either challenged the credibility of Commonwealth witnesses or the Commonwealth's trial presentation, and that demonstrate that Petitioner was not involved at all in the shootings of Joseph Hollis and John Pickens. Petitioner now places these verified declarations in their proper legal framework showing that Petitioner is entitled to relief on the following grounds.

## CLAIM I.

### Newly Discovered Evidence Demonstrates
### Petitioner's Innocence

155. Petitioner has always asserted his innocence. There is no physical or forensic evidence of the perpetrators from the crime scene in October 1976. There is no physical evidence presented linking Petitioner in any way to this crime. No guns found linked to the bullets. No fingerprints event taken. The keys found in the poolroom were not Petitioner's, the $1800 was not Petitioner's, the drugs were not Petitioner's, the items of clothing found in the poolroom were not Petitioner's. His car was not on the scene.

156. The surviving victim John Pickens gave police a statement shortly after he was shot that names other men, not Petitioner or William Franklin, as the shooters. Pickens did not testify at either Franklin's 1980 trial or Petitioner's in

1985. [Exhibit D]

157.    Without the testimony of Emanuel Claitt, there was *no evidence* against Major Tillery. It was only the testimony of Emanuel Claitt who put Petitioner inside the pool hall, pulling out a gun and shooting Joseph Hollis. It was Claitt who put Petitioner at a meeting where Petitioner supposedly made threats against Hollis's life and helped arrange the poolroom meeting where Hollis was killed and Pickens wounded. There was no other evidence against Petitioner. That testimony was a lie.

158.    Robert Mickens was brought in for Petitioner's trial, to provide some corroboration to Claitt's testimony by testifying that Petitioner asked him to be a lookout for police outside the poolroom. This is the only evidence, other than Claitt's testimony, that puts Petitioner at the poolroom that night. As Mickens declares, his testimony was a lie. No one, not Petitioner, Clark or Franklin asked him to be look-out that night. He did not see Major Tillery near the poolroom.

159.    In further support of this claim, Petitioner incorporates supporting paragraphs of this petition regarding facts and law.

160.    The newly discovered facts support Petitioner's claim that he is factually innocent. These new facts require the vacation of Petitioner's conviction.

161.    The legal standard governing a post-conviction claim of newly discovered evidence is well-known. A petitioner must: establish that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3)

it is not being used solely to impeach credibility; and (4) it would likely compel a

different verdict. *Commonwealth v. Washington*, 927 A.2d 586, 595-96 (Pa. 2007).

Petitioner new evidence of innocence meets each of these prongs.

## CLAIM II.

### The Commonwealth Manufactured and/or Presented False Inculpatory Evidence and Suppressed Material, Exculpatory Evidence in Violation of Petitioner's Sixth and Fourteenth Amendment Right to the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution

162.    Petitioner's right to due process, right to a fair trial, and right to

present a defense were violated as the Commonwealth manufactured and/or

intentionally presented false testimony and evidence of Petitioner's guilt and

withheld from Petitioner and his counsel material, exculpatory evidence, including

impeachment evidence, in violation of Petitioner's Fifth and Fourteenth

Amendment rights to the United states Constitution and Article I, §9 of the

Pennsylvania Constitution.

163.    The newly discovered evidence in this case exposes a fundamental

miscarriage of justice, violating the right to due process by the Commonwealth

against Petitioner Major Tillery by suborning the truth, and committing fraud on

the Court and jury with the intentional presentation of false evidence

manufactured by the Commonwealth against Petitioner Major Tillery. The false

evidence so manufactured and presented at Petitioner's trial constituted the sole

evidence of his culpability – that he shot and killed Joseph Hollis and wounded John Pickens-- as well as materially favorable impeachment evidence, the existence of plea deals that induced and coerced these witnesses to lie.

164.    It is long established that a conviction obtained through use of false evidence, known to be false by government representatives, must fall under the Fourteenth Amendment. *Mooney v Holohan*, 294 U.S. 103 (1935) held in a historic decision that due process is violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." See also, *Pyle v. Kansas*, 317 U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3ʳᵈ Cir. 1958).

165.    This case is also governed by the holdings and considerations in *Napue v. Illinois*, *supra*, *Brady v. Maryland*, *supra*, *Giglio v. United States*, *supra*, *Kyles v Whitely*, *supra*, and their legal progeny.

166.    In *Napue v Illinois*, 360 U.S. 264, 269 (1959) the United States Supreme Court confirmed the principle that "a State may not knowingly use false evidence, including false testimony to obtain a tainted conviction."

167.    The Pennsylvania courts have ruled strongly and similarly following *Napue.* The Commonwealth's intentional presentation of false evidence is a miscarriage of justice that no civilized society can tolerate.

168.    "It is of course, an established principle that a conviction obtained through the knowing use of materially false testimony may not stand; a

prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2$^{nd}$ 806, 810 (1977) ((citing *Giglio v. United States*, 405 U.S. 150 (1972), quoted in *Commonwealth v Hollowell*, 477 Pa. 232, 236-37, 383 A.2$^{nd}$ 909, 911 and *Commonwealth v Romansky*, 702 A.2$^{nd}$ 1064, 1066 ( Pa. Super. 1997).

169.    *Napue* created a three-part test to determine whether a conviction of this kind of case violates due process: that the testimony was false, the prosecutor knew it was false, and the false testimony was material.

170.    With the requirement that false testimony be "material," the Supreme Court meant that there must be "a reasonable likelihood that the false testimony could have affected the judgment." *Napue*. "Where the prosecution obtains a conviction through the use of false or perjured testimony, a strict standard of materiality must applied." *Commonwealth v Romansky*, 702 A.2d 1064, 1068 (Pa.Super. 1997), appeal denied, 555 Pa. 699, 723 A.2d 670 (1998). "[T]he false testimony is considered material if it could in any reasonable likelihood have affected the verdict." Id. When making the materiality determination, "the state of mind of the prosecutor is not material, but rather, the important issue is whether the accused received a fair trial." Id.

171.    In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Id*. at 373 U.S. 87. "Impeachment evidence

… as well as exculpatory evidence, falls within the Brady rule.) *United States v. Bageley*, 473 U.S. 667, 676 (1985). The prosecution has an affirmative "duty to disclose such evidence … even though there has been no request (for the evidence) by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976). That responsibility "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id.* at 280-281 (quoting *Kyles v, Whitley*, 514 U.S. 419, 438 (1995). ). It is well established that the state violates a defendant's right to due process under *Brady* when it is withheld. *Smith v. Cain*, --- U.S. ----, 132 S. Ct. 627, 630

172. To establish a *Brady* violation, Petitioner must prove three elements: "[1] the evidence (at issue) was favorable to the accused, either because it is exculpatory or because if it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1130 (Pa. 2011). The evidence withheld by the Commonwealth, as detailed above, ensured "[t]hat no reliable adjudication of Petitioner's guilt or innocence could have taken place." *Commonwealth v. Strong*, 761 A.2d 1167, 1175 (Pa. 2000) (reversing conviction for Commonwealth's failure to comply with *Brady* obligations).

173. Additionally, the Commonwealth failed to correct testimony given by Emanuel Claitt it knew to be false, in violation of *Napue v. Illinois,* 360 U.S 264, 269 (1959) (Holding that the State commits a Fourteenth Amendment

violation when "although not soliciting false evidence, [it] allows it to go
uncorrected when it appears.").

174.     Knowledge of information in the possession of any law enforcement
actor that has a connection to a particular prosecution is chargeable to the
prosecutor. *Kyles v. Whtley*, 514 U.S. 419, 437, 482 (1995) ("prosecutor is
responsible for any favorable evidence known to the others acting on the
government's behalf in the case, including the police"; "prosecutor has a duty to
learn of any favorable evidence known to others acting on the government's
behalf"). Thus, knowledge by any of the police officers working on this case is
chargeable to the prosecutor, as is knowledge by any one of the prosecutors.

175.     Under *Brady* and its progeny, a "showing of materiality [prejudice]
does not require demonstration by even a preponderance that disclosure of the
suppressed evidence would have resulted ultimately in the defendant's acquittal."
*Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a 'reasonable
probability' of a different result." *Id.*; *Commonwealth v. Strong*, 761 A.2d 1167,
1171 (Pa. 2000) ("As *Brady* and its progeny dictate, when the failure of the
prosecution to produce material evidence raises a reasonable probability that the
result of the trial would have been different if the evidence had been produced,
due process has been violated and a new trial is warranted." *citing United States v.
Bagley*, 473 U.S. 667 (1985)). A reasonable probability of a different result existed
"when the prosecution's evidentiary suppression 'undermines confidence in the
outcome of the trial.'" *Kyles, Id.*; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir.

1999) (The "undermines confidence" standard is not a stringent one. It is less demanding than the preponderance standard.").

176.    In assessing materiality, the Court considers how effective counsel could have used the suppressed information at trial and through pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); *Id.* at 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by the defense, may have made a difference); *Id.* at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled"); *Wilson v. Beard*, 589 F.3d 651, 659, 664 (3d Cir. 2009) (same).

177.    In assessing materiality, the Court considers how effective counsel could have proceeded in the absence of the due process violations both at trial and in pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441; *United States v. Bagley* 473 U.S. 667, 676; *Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *Breakiron v. Horn*, 642 F.3d 126 (3rd Cir. 2011).

178. In this case, the "absence of due process violations" would have meant no prosecution of the Petitioner, because in the absence of due process violations, there was no "evidence" against the Petitioner.

## 1. The Commonwealth Manufactured and/or Presented the False Testimony of Emanuel Claitt that Petitioner was Involved in the Homicide of Joseph Hollis and Assault on John Pickens

179. Emanuel Claitt's declarations establish that his testimonial evidence was false and that the Commonwealth knew it was false. The presentation of false evidence by a prosecutor constitutes the most fundamental violation of due process.

180. This is not a case of falsification or prosecutorial suppression of a *particular* aspect of the prosecution's case. This false evidence was the *entirety* of the evidence against Petitioner. This false evidence is unquestionably material to the conviction of Petitioner.

181. Petitioner was convicted solely on the basis of witness testimony. It was Emanuel Claitt alone who provided testimonial evidence that Petitioner Tillery was in the poolroom and shot the victims.

182. Petitioner incorporates the factual allegation and legal argumentation included in the paragraphs above in support of this claim.

183. Claitt's declaration also provides proof of the Commonwealth's intentional manufacture and presentation of false testimony against Petitioner. It also provides evidence of the prosecution's efforts to suborn perjury by Robert Mickens, by disclosing the phony transport of Claitt and Mickens from the Round

House to the jail on State Road for Claitt to pressure Mickens into testifying against Petitioner.

184. Since the prosecution's case did not exist without that Claitt's testimony there is no question that this new evidence is material.

## 2. The Commonwealth Manufactured and/or Presented False Testimony of Robert Mickens that Tillery was at the Poolroom When Hollis and Pickens were Shot

185. Robert Mickens provided testimonial evidence that Petitioner Tillery had asked him to be a police lookout outside the poolroom and that Tillery went into the poolroom shortly before he heard shots. Mickens also provided testimony that Petitioner was attemped to establish a false alibi.

186. Mickens' trial testimony provided corroboration to Claitt's testimony that Petitioner was in the poolroom when Hollis and Pickens were shot.

187. Mickens trial testimony served to prop up Claitt's testimony, which was weakened or compromised by his extensive and continued arrest record and the accusations that his testimony was induced by plea deals.

188. Mickens' declaration establishes that trial testimony was false and that the Commonwealth knew it was false because it was the Commonwealth that manufactured it. Mickens' declaration disclosed the Commonwealth's conscious efforts to coerce him into falsely testifying against Petitioner.

189. The new evidence provided by Mickens that his trial testimony was a lie, coerced and induced by the prosecution eliminates that his trial testimony corroborating Claitt.

190.     Mickens declaration also corroborates the Commonwealth's intent to

convict Petitioner, whatever the cost to truth. It confirms the Commonwealth's

manufacture of false evidence by threats of false prosecution and providing plea

deals, protection, and sexual favors. The new evidence provide by Mickens is

material.

**3.     The Commonwealth Presented False Testimony that Emanuel Claitt and Robert Mickens Had No Plea Agreements with the Commonwealth and that False Testimony was Not Corrected by the Commonwealth**

191.     Petitioner repeats and incorporates paragraphs above for relevant

facts and legal argument.

192.     The new evidence provided by Claitt and Mickens proves that the

Commonwealth had made plea deals in exchange for their testimony inculpating

Petitioner. The new evidence proves that both Claitt and Mickens lied in testifying

that they had serious pending criminal charges with "open" sentences. This fact

was known to the Commonwealth, and not corrected. In fact this falsification was

supported by the prosecution in its statements to the Court and to the Jury.

193.     The existence of plea deals in exchange for testimony is material to

the veracity of these witnesses, witnesses who provided the only evidence linking

Petitioner to these crimes. It is material evidence, the falsification of which and

failure to correct requires reversal of the conviction.

**4. The Commonwealth Suppressed Evidence of the Commonwealth's Threat to Falsely Charge Claitt with Crimes If he Didn't Provide False Testimony Against Tillery**

194. Petitioner repeats and incorporates paragraphs above for relevant

facts and legal argument.

195. It is a violation of due process to coerce a witness into falsely

testifying by threatening to charge him with a crime he did not commit.

196. It is material evidence that Emanuel Claitt's testimony, which was

the sole evidence directly inculpating Petitioner was induced by the

Commonwealth's threat to falsely charge him with a murder he didn't commit if

he didn't testify falsely inculpating Petitioner.

**5. The Commonwealth Suppressed Evidence of that the Commonwealth Provided Sexual Favors to Claitt and Mickens to Induce False Testimony**

197. Petitioner repeats and incorporates paragraphs above for relevant

facts and legal argument.

198. Both Claitt and Mickens reveal in their sworn declarations that a

component of the favors ande inducements, provided to them by the

Commonwealth to be false witnesses against Petitioner, was allowing and

arranging for them to have sexual relations with girlfriends. This was arranged

while each of them was in state custody, and took place either in a homicide

interview room or in Claitt's case, sometimes in a hotel.

199. Testimony induced by providing sexual trysts is not unknown by the

Philadelphia police. In *Com. v. Arthur Lester*, 572 A2nd 694 (Pa. Super. 1990) the

court found it coercive and a violation of due process and reversed a conviction based on Lester's confession that was induced by he promise of sexual favors. The named homicide detectives involved in 1983 were Lawrence Gerrard and Ernest Gilbert, the same detectives who were central to the handling of both Emanuel Claitt and Robert Mickens.

200.    Claitt's and Mickens' revelations that their false testimonies were induced by the Commonwealth providing them with sexual favors constitutes separate and independent grounds for reversal of the Petitioner's conviction.

## 6.    Petitioner's Claims are Supported by the New Evidence and Mandate Reversal of Petitioner's Conviction, if Not Dismissal of the Charges on the Grounds that his Conviction Constituted a Fundamental Miscarriage of Justice That Shocks the Conscience

201.    In conclusion, Petitioner returns to historic and fundamental principles that are supposed to apply in a criminal trial. In *Mooney v Holohan*, supra, the U.S. Supreme Court found due process is violated by the government's "deliberate deception of court and jury by the presentation of testimony known to be perjured."

202.    In *Berger v. United States*, 295 U. S. 78, 88 (1935) the U.S. Supreme Court mandated disclosure of evidence to a defendant, stating:

"Such disclosure will serve to justify trust in the prosecutor as the representative . . .of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."

203.    In *Kyles v Whitley*, supra., at 339-40, the U.S. Supreme Court reaffirmed the import of *Brady*, and the prosecution's constitutional obligation to

disclose favorable evidence to a defendant:

> "And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. See Rose v. Clark, 478 U. S. 570, 577–578 (1986); Estes v. Texas, 381 U. S. 532, 540 (1965); United States v. Leon, 468 U. S. 897, 900–901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting Alderman v. United States, 394 U. S. 165, 175 (1969)).

204.   Moreover, the government has special obligations when it comes to their cooperating informants. *See, Commonwealth v. Strong, 761 A.2d 1167, 1175 (2000),* observing that a tentative commitment from a prosecutor might be more likely to encourage false testimony from a cooperating witness than a firm promise, since the witness will have a greater incentive to curry favor with the prosecutor if a specific agreement has not yet been reached.

205.   Courts have established that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truthseeking mission of our criminal justice system." *Commonwealth of the Northern Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001).

206.   This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability. The second is that the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial. See *Bowie*, 236 F.3d at 1089 (citing *Berger v. United States, supra,* at 88.)

207.     In the instant case, the Commonwealth abandoned all concern and its constitutional obligations to the defendant to due process and a fair trial. The quest for a conviction at all costs, regardless of the veracity of "evidence," has resulted in a gross miscarriage of justice such that it shocks the conscience. The appropriate remedy is to dismiss the indictments and release Petitioner, and failing that to grant him a new trial.

## VI. PREVIOUS LITIGATION OF ISSUES RAISED

208.     The issues raised herein have not been previously litigated.

## VII. COURT MUST PROVIDE AN EVIDENTIARY HEARING

209.     This Court must afford Petitioner an evidentiary hearing. It has long been the standard that post-conviction hearings are appropriate when a petitioner pleads facts entitling him to relief. *Townsend v. Sain*, 372 U.S. 293 (1963). Where, as here, the post-conviction pleadings "raise material issues of fact" and evidentiary hearing is required. Pa. R. Crim. P. 908(A) (2); *Commonwealth v. Williams*, 732 A.2d 1167, 1189-90 (Pa. 1999) ("Clearly, a material factual controversy exists ...; therefore, we hold that the PCRA court erred in dismissing [the] ground for relief without conducting a factual hearing.") (citing former Pa. R. Crim. P. 1509(b)).

210.   A hearing cannot be denied unless this Court "is certain of total lack of merit" of the petition. *Commonwealth v. Bennett*, 462 A.2D 772, 773 (Pa. Super. 1983) (quoting *Commonwealth v. Rhodes*, 416 A.2d 1031, 1035-36 (Pa. Super. 1979)); accord *Commonwealth v. Korb*, 617 .2d 715, 716 (Pa. Super. 1992) (remanding for evidentiary hearing where "[i]t appears that appellant has presented a claim of ineffective assistance of counsel which contains at least arguable merit") (citing *Commonwealth v. Copeland*, 554 A.2d 54, 60-61 (Pa. 1988)). Even in "borderline cases Petitioners are to be given every conceivable legitimate benefit in the disposition of their claims for an evidentiary hearing." *Commonwealth v. Pulling*, 470 A.2d 170, 173 (Pa. Super. 1983) (remanding for evidentiary hearing) (quoting *Commonwealth v. Strader*, 396 A.2d 697, 702 (Pa. Super. 1978) and *Commonwealth v. Nahodil*, 239 A.2d 840 (Pa. Super. 1968)).

211.   A post-conviction hearing is particularly appropriate where the merits of a petitioner's claims revolve around the credibility of witnesses for whom the petitioner has provided an affidavit. A court may not judge the credibility of a recantation witness, or similar witness, based solely on an affidavit. *Commonwealth v. D'Amato*, 856 A.2d 806, 825-826 (pa. 2004) ("This Court has also emphasized, however, that even as to recantations that might otherwise appear dubious, the PCRA court must, in the first instance, assess the credibility and significance of the in light of the evidence as a whole."); see also, *Commonwealth v. Johnson,* 966 A.2d 523, 539 (Pa. 2009) ("one of the primary

reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone. The PCRA court here obviously appreciated this fact in part, since it made a controlling credibility determinations respecting Cook's recantation testimony.") and id. at 541-42 (in *D'Amato,* the PCRA court failed to mention, let alone pass upon, the credibility of the recantation testimony in its opinion. This Court held that the PCRA court had defaulted on its duty to assess the credibility of the recantation and its significance in light of the trial record, and we remanded the matter to the PCRA court for the limited purpose of making such determination.").

212. At a minimum, Petitioner must be afforded an opportunity to prove the timeliness of his Petition. He has pled with specificity that he has met the exceptions to the PCRA time bar. Therefore, this Court must give him an opportunity to prove these facts. Indeed, the petitioner in *Commonwealth v. Bennett,* 930 A.2d 1264, 1272, 1274 (Pa. 2007) also invoked the time bar exceptions pled by Petitioner and the Pennsylvania Supreme Court noted the requirements for an evidentiary hearing. *See also Commonwealth v. Lasky,* 934 A.2d 120, 123 (Pa. Super. 2007) (remanding to lower court "for the conduct of an evidentiary hearing by the lower court in order to determine (1) when certain procedural facts became known to Appellant, (2) whether the exercise of due diligence on Appellant's part would have revealed these facts to Appellant sooner,

56
Pa 538

and ultimately (3) whether Appellant now has made a viable claim that one of the exceptions articulated at 42 Pa.C.S.A. § 9545, i.e. (b)(1)(ii), to the one year time limit for filing a PCRA petition").

213.   Based on the above, Petitioner is entitled to, and therefore requests that an evidentiary hearing be held.

## VIII.  PETITIONER IS ENTITLED TO DISCOVERY

214.   Discovery in post-conviction proceedings is governed by Pa.R.Crim.P. 902 (E) (1), which permits discovery upon leave of Court and upon a showing of exceptional circumstances. Petitioner proffers that he shows such exceptional circumstances.

215.   The circumstances of this case are indeed exceptional. Petitioner requests immediate discovery of all reports of police and prosecution interviews, meetings and any communication relating to witnesses Emanuel Claitt and Robert Mickens.

216.   Petitioner requests leave to file a more detailed and specific discovery request.

## IX. CONCLUSION AND REQUEST FOR RELIEF

For all of the above reasons and the attached affidavits and exhibits,

Petitioner requests the following relief:

A. That Petitioner be granted permission for leave to proceed in forma pauperis.

B. That the Commonwealth be required to respond to this petition.

C. That the Court permit Petitioner to file such amendments, supplements or briefs as required in the interest of justice.

D. That the Court permits oral arguments on any and all dispositive issues.

E. That the Court permit discovery as requested above.

F. That following discovery, the Court conduct evidentiary hearings on all material disputed issues of fact.

G. That the Court vacates Petitioner's conviction and sentence and award him a new trial.

H. In the interest of justice given the gross violations of due process in this case, that the Court vacates Petitioner's conviction and sentence and dismiss the charges.

## CONCLUSION

For all the above reasons and for those set forth in this *pro se* PCRA

Petition and based on the entire record of this case, Petitioner MAJOR G.

TILLERY seeks vacation of his conviction and the attendant relief requested.

Dated: June 15, 2016

MAJOR G. TILLERY
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17932

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. sec. 4904, relating to unsworn falsification to authorities.

Date: June 15, 2016

MAJOR G. TILLERY

Exhibit X

Petitioner's 2016 Supplemental PCRA Petition, September 7, 2016

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

**Received**

SEP 0 7 '2016

Office of the P. & of
Appeals/Post Trial

## COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,          :
                                        :
          Respondent,                   : Docket Number
                                        : CP-51-CR-0305681-1984
                                        :
          v.                            :
                                        :
MAJOR G. TILLERY,                       :
                                        :
          Petitioner                    :
                                        :

## PETITIONER'S SUPPLEMENTAL PCRA PETITION

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully submits this Supplemental
PCRA Petition:

On June 15, 2016 petitioner filed a PCRA petition pursuant to 42 Pa. C.S. §
9541 et. stating, "this is a case of factual innocence and gross prosecutorial
misconduct violating Petitioner Major Tillery's right to due process and a fair trial.
The actions of the Commonwealth resulted in a fundamental miscarriage of justice
that shocks the conscience and warrants reversal of his conviction and dismissal of
charges against Petitioner Major Tillery."

The Petition is pending before this Court and this Court filed a Notice of Intent to Dismiss pursuant to PA.R.Crim. P. 907 on August 19, 2016. Petitioner is simultaneously filing his Response in Objection to Notice of Intent to Dismiss.

Petitioner continued his investigation subsequent to the filing of his PCRA in June 15, 2016 and has obtained new evidence and facts that were not previously known to him that corroborate the fact of the Commonwealth's misconduct, further supporting Petitioner's claims of actual innocence and violations of his right to due process.

Petitioner submits to this court the videotape of Emanuel Claitt recorded on August 3, 2016. [Exhibit A]  In this videotape Emanuel Claitt reaffirms his sworn declarations of May 4 and June 3, 2016.  This videotape is submitted to preserve the evidence provided by Emanuel Claitt that his entire trial testimony was falsified, the product of coercion and inducements by the Commonwealth including concealed plea deals and being providing sexual favors.

This videotape was recorded by Rachel Wolkenstein who is assisting Petitioner. Her sworn declaration is attached and is incorporated into this Petition.

As set forth in the Wolkenstein declaration, Petitioner now has evidence corroborating Emanual Claitt's statement that he received sexual favors while in custody by being allowed to have private sexual encounters with girlfriends in the Roundhouse, assisted by homicide detectives Lawrence Gerrard and Ernest Gilbert:

(1)    Emanuel Claitt has provided the names and contact information for two of the woman that were brought to him by homicide detectives, H    and D

(2)    H    acknowledged that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him.

(3)    Roundhouse log-in page 192 for December 14, 1983, has Emanuel Claitt's signature along with Det. Gilbert and his girlfriend D    signed in under Det. Gerrard for an overlapping time period. [Exhibit C]

Petitioner intends to present H    , D    as witnesses at an evidentiary hearing. Witness certifications are attached.

## Timeliness of Supplement

Petitioner reasserts the facts and legal argument set forth in the Petition and his Response In Objection to the Notice of Intent to Dismiss regarding timeliness. He makes the following additional points.

The new facts presented in this Supplement are timely filed pursuant to 42 Pa. C.S. § 95459(1) (i), inasmuch as the Commonwealth's failure to discharge its constitutional obligation to provide the defense *Brady* material constituted

"governmental interference" with the presentation of this claim. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Petitioner has satisfied the requirements of 42 Pa. C.S. 9545(ii) in that he has exercised the requisite diligence to uncover the undisclosed Roundhouse record and the activity of the detectives involved in this; and to investigate and obtain additional and corroborative evidence from witnesses whose possible relevance and involvement in this case only became known to Petitioner with the information provided by Emanuel Claitt on August 3, 2016.

Petitioner requests this Court order discovery of all reports, notes and correspondence in the possession of agents of the Commonwealth pertaining to this case.

Petitioner also requests that if this Court grants leave to Petitioner to file an amended complaint that the additional facts presented here be incorporated into said amended complaint.

September 6, 2016

Respectfully submitted,

*Major Tillery*

MAJOR G. TILLERY, *pro se*
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

## **VERIFICATION**

I verify that the statements made in the above ~~response~~ are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date: September 6 , 2016

MAJOR TILLERY

Exhibit Y

Court of Common Pleas Opinion Under Pa. R. App. P. 1925(a),
*Commonwealth v. Tillery,* 3270 EDA 2016, 193 A.3d 1063 (Pa.
Super. 2018)

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CRIMINAL TRIAL DIVISION

**COMMONWEALTH OF PENNSYLVANIA**

  **v.**

**GEORGE M. TILLERY**
             **CP-51-CR-0305681-1984**
             **3270 EDA 2016**

## <u>OPINION</u>

**LEON W. TUCKER, J.**

   This appeal comes before the Superior Court following the dismissal of a Post Conviction Relief Act ("PCRA")[1] petition filed on October 6, 2014. On September 26, 2016, this court dismissed the PCRA petition for the reasons set forth below.

## I. PROCEDURAL HISTORY

   George M. Tillery (hereinafter referred to as "Petitioner") was arrested and subsequently charged with homicide and related offenses stemming from the shooting death of John Hollis and the non-fatal shooting of John Pickens in October 1976 in the city of Philadelphia.

   On May 29, 1985, following a jury trial presided over by the Honorable John Geisz, Petitioner was convicted of first-degree murder, aggravated assault, two counts of criminal conspiracy, and possessing an instrument of crime. After post-verdict motions were denied, the trial court imposed a sentence of life imprisonment on the murder conviction and lesser terms of incarceration on the remaining convictions. Following a direct appeal, Petitioner's judgment of

---

[1] 42 Pa. Cons. Stat. §§ 9541-9546.

sentence was affirmed by the Superior Court on May 30, 1989, and the Pennsylvania Supreme Court denied *allocatur* on March 5, 1990.[2]

On September 16, 1996, through private counsel, Richard P. Hunter, Esquire, Petitioner filed his first PCRA petition. The PCRA court denied the petition on January 13, 1998. The Superior Court affirmed the PCRA court's order denying relief on April 21, 1999.[3] The Pennsylvania Supreme Court denied *allocatur* on August 18, 1999.[4]

Petitioner filed his second PCRA petition on August 13, 2007. On September 9, 2008, the PCRA court dismissed his petition as untimely. The dismissal of Petitioner's PCRA petition was affirmed by the Superior Court on July 15, 2009.[5] The Pennsylvania Supreme Court denied *allocatur* on December 9, 2009.[6]

On October 6, 2014, Petitioner filed the instant, *pro se,* collateral petition, his third.[7] Petitioner filed supplemental petitions on December 9, 2014 and June 15, 2016. Pursuant to Pennsylvania Rule of Criminal Procedure 907, Petitioner was served notice of the PCRA court's intention to dismiss his petition on August 19, 2016. Petitioner submitted responses to the Rule 907 letter on September 7 and September 21, 2016. On September 26, 2016, the PCRA court

---

[2] *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum), *appeal denied*, 593 A.2d 841 (Pa. 1990).
[3] *Commonwealth v. Tillery*, 738 A.2d 1055 (Pa. Super. 1999) (unpublished memorandum).
[4] *Commonwealth v. Tillery*, 742 A.2d 674 (Pa. 1999).
[5] *Commonwealth v. Tillery*, 981 A.2d 937 (Pa. Super. 2009) (unpublished memorandum).
[6] *Commonwealth v. Tillery*, 985 A.2d 972 (Pa. 2009).
[7] The current version of the PCRA contains a provision permitting a defendant whose conviction became final prior to January 16, 1996, the date the current version of the PCRA took effect, to file a timely first PCRA petition within one year of that date. *See Commonwealth v. Alcorn*, 703 A.2d 1054, 1056-57 (Pa. Super. 1997) (holding that where a petitioner's judgment of sentence became final on or before the effective date of the amendment to the PCRA, the amended PCRA contained a provision whereby a first PCRA petition could be filed by January 16, 1997, even if the conviction in question became final more than a year prior to the date of the filing). Petitioner's most recently filed PCRA petition was neither his first nor was it filed within one year of the date the amendment took effect.

2

dismissed his PCRA petition as untimely.[8] On October 20, 2016, the instant notice of appeal was timely filed to the Superior Court.

## II.  DISCUSSION

### A. Petitioner's current PCRA petition was manifestly untimely.

Petitioner's petition challenging the constitutionality of his conviction and legality of his detention was facially untimely. As a prefatory matter, the timeliness of a PCRA petition is a jurisdictional requisite. *Commonwealth v. Robinson,* 12 A.3d 477 (Pa. Super. 2011). A PCRA petition, including a second or subsequent petition, shall be filed within one year of the date the underlying judgment becomes final. 42 Pa. Cons. Stat. § 9545(b)(1). A judgment is deemed final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* § 9545(b)(3).

Petitioner's judgment of sentence became final for PCRA purposes in June 1990 after the Pennsylvania Supreme Court denied *allocatur* and time period for filing a petition for writ of *certiorari* in the United States Supreme Court expired. *See id.*; U.S. Sup. Ct. R. 13 (effective January 1, 1990). Petitioner's *pro se* petition, filed on October 6, 2014, was therefore untimely by approximately twenty-three years. *See* 42 Pa. Cons. Stat. § 9545(b)(1).

### B. Petitioner was ineligible for the limited timeliness exceptions found in 42 Pa. Cons. Stat. § 9545 (b)(1)(i), (ii).

Despite the one-year deadline, the PCRA permits the late filing of a petition where a petitioner alleges and proves one of the three narrow exceptions to the mandatory time-bar under

---

[8] The Honorable Leon W. Tucker issued the order and opinion in this matter in his capacity as Supervising Judge of the Criminal Section of the Court of Common Pleas of Philadelphia – Trial Division as of March 7, 2016 as the trial judge is no longer sitting.

3

42 Pa. Cons. Stat. § 9545(b)(1)(i)-(iii). To invoke an exception, a petition must allege and the petitioner must prove:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* § 9545(b)(1)(i)-(iii).

In attempt to overcome the PCRA's statutory time-bar, Petitioner argued that his petition fell within the "governmental interference" exception, § 9545(b)(1)(i),[9] and the "newly-discovered evidence" exception, § 9545(b)(1)(ii).[10]

According to Petitioner, the new information triggering both exceptions was found in signed recantations from Emanuel Claitt and Robert Mickens, Commonwealth witnesses who provided extensive inculpatory testimony at Petitioner's trial. Both witnesses now assert that they were not present during the commission of the crime and fabricated the entirety of their detailed testimonies. *See* PCRA petition, 6/15/16 at exhibits A, B, C. According to Claitt and

---

[9] The "governmental interference" exception, § 9545(b)(1)(i) requires a petitioner to plead and prove: (1) the failure to previously raise the claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence. *Commonwealth v. Williams,* 105 A.3d 1234, 1240 (Pa. 2014) (citing *Commonwealth v. Abu–Jamal,* 941 A.2d 1263, 1268 (Pa. 2008)).

[10] The timeliness exception set forth in Section 9545(b)(1)(ii) requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence. *Commonwealth v. Bennett,* 930 A.2d 1264, 1271 (Pa. 2007). Due diligence demands that the petitioner take reasonable steps to protect his own interests. *Commonwealth v. Carr,* 768 A.2d 1164, 1168 (Pa. Super. 2001). A petitioner must explain why he could not have learned the new fact(s) earlier with the exercise of due diligence. *Commonwealth v. Breakiron,* 781 A.2d 94, 98 (Pa. 2001).

Mickens, a cabal of prosecutorial agents – assistant district attorneys and members of law enforcement – implemented a scheme of coercion and incentives to obtain fabricated testimony against Petitioner. *Id.*

Notwithstanding Petitioner has previously raised these claims in a prior PCRA,[11] his failure to demonstrate that the witnesses' statements could not have been obtained earlier by exercising due diligence was fatal to proving either statutory exception. Rather than detailing any specific efforts to contact Claitt or Mickens in the thirty-one years between his conviction and the filing of his instant petition, Petitioner instead argued that i) the circumstances of his confinement prevented communication and ii) irrespective of his inability to communicate, Claitt's and Mickens's decisions to recant could not have possibly been fostered at an earlier time. Neither argument is persuasive.

In support of his first assertion, Petitioner detailed a litany of general impediments to his ability to contact the witnesses. *See* PCRA petition, 6/15/16 at 10. Petitioner claimed, for example, that for twenty of the past thirty-plus years, his access to communication channels was "severely restricted." PCRA petition, 6/15/16. Even if Petitioner substantiated this claim with supporting evidence, and the court excluded those years from scrutiny, Petitioner failed to articulate any attempts to locate the witnesses during the remaining decade. Furthermore, although Petitioner cited instances of illness and frequent transfer between correctional facilities, he did not specify whether these incidents occurred during the non-restricted period of incarceration, and if so, for what duration. PCRA petition, 6/15/16 at 10-11. Petitioner's attempt to explain his inability to act for over thirty years was therefore patently insufficient to demonstrate due diligence.

---

[11] *See* PCRA petition, 8/13/07.

Alternatively, Petitioner relied upon the Superior Court's decision in *Commonwealth* v. *Davis,* 86 A.3d 883 (Pa. Super. 2014) and *en banc* decision in *Commonwealth* v. *Medina,* 92 A.3d 1210 (Pa. Super. 2014) in arguing that waiting for Claitt and Mickens to feel comfortable recanting was sufficient to meet his burden of due diligence. *See* 907 response, 9/7/16 at 7-11.

In *Davis,* the defendant was convicted of murder based, in part, on the testimony of Commonwealth witness Jerome Watson. *Davis,* 86 A.3d at 885–86. More than thirty years after the conclusion of Davis's trial, Watson recanted his trial testimony and revealed he made an undisclosed deal with the assistant district attorney. *Id.* at 888. The Superior Court held that since there was no indication at trial of any deal or expected leniency, it would have been unreasonable to require that Davis conduct a search prior to receiving Watson's affidavit detailing possible governmental interference. *Id.* at 890–891.

In *Medina,* the defendant was convicted of murder based, in part, on the testimony of two Commonwealth witnesses. *Medina,* 92 A.3d at 1213. More than a decade after the conviction, the witnesses recanted their trial testimonies. *Id.* at 1213–1214. The Superior Court upheld the PCRA court's finding that Medina satisfied the newly-discovered evidence exception to the statutory time-bar. *Id.* at 1218.

In both *Davis* and *Medina*, the Superior Court's due diligence analysis centered on the fact that neither Davis nor Medina had reason to believe they could elicit exculpatory information from the respective witnesses. *Davis,* 86 A.3d at 890; *Medina,* 92 A.3d at 1218–1219.

Here, Petitioner would have been aware that Claitt and Mickens falsely inculpated him at trial. Furthermore, in 2007, nine years before acquiring the affidavits supporting the instant petition, Petitioner claimed to have uncovered evidence that the witnesses perjured themselves

regarding undisclosed preferential treatment from the Commonwealth in exchange for their testimonies. *See* PCRA petition, 8/13/07. Based upon Petitioner's purported discovery of the Commonwealth's role in suborning Claitt and Mickens, Petitioner had reason to believe that the witnesses may be amenable to disclosing their fabricated testimony.

Not only were the instant facts distinguishable from those in *Davis* and *Medina*, the Superior Court in *Davis* also evaluated whether Davis exercised due diligence in discovering proof that the witness fabricated his murder confession, a fact that would have been immediately known to Davis. *Davis*, 86 A.3d at 890–91. In concluding that Davis did exercise due diligence, the Superior Court relied upon Davis's affidavits detailing attempts by family members and friends to contact the witness after trial to convince him to admit that he lied on the stand. *Id.* at 891. Again, *Davis* is of no benefit to Petitioner, who failed to demonstrate any efforts by either himself, or anyone on his behalf, to contact either witness prior to 2016.

Ultimately, Petitioner argued that because Claitt's and Mickens's statements indicated that they only recently desired to "clear their consciences," any effort on his part to urge their emotional cleansing would have been fruitless.[12] *See* PCRA petition 6/15/16 at 10 ("It rested with Robert Mickens and Emanuel Claitt to decide to come forward."). In other words, Petitioner suggested that known, untruthful witnesses may be reasonably afforded an indefinite time for reflection, free from pleas from aggrieved petitioners. The PCRA court does not agree. Petitioner's attempt to circumvent his duty to act diligently by speculating that any interaction prior to 2016 would have been futile was unavailing.

---

[12] The fact that both witnesses chose to "clear their consciences" immediately upon speaking with Petitioner's attorney, Rachel Wolkenstein, in 2016, weakens Petitioner's intimation that the witnesses were previously impervious to persuasion. *See* Supplemental petition, 9/7/16 at 12.

## IV. CONCLUSION

This court has once again evaluated an untimely collateral petition (his third) filed by Mr. Tillery. Petitioner failed, however, to plead and prove an exception to the timeliness provision found in either subsections 9545 (b)(1)(i) or (ii). Additionally, Petitioner was not entitled to habeas corpus relief.[13] Accordingly, for the reasons stated herein, the decision of the court dismissing the collateral petition should be affirmed.

BY THE COURT:

LEON W. TUCKER, J. /NV

---

[13] Petitioner erroneously contended that the Department of Corrections ("DOC") lacked legal authority for his continued detention due to the lack of a written sentencing order, in contravention of 42 Pa. Cons. Stat. § 9764(a)(8) and 37 Pa. Code § 91.3. *See Joseph v. Glunt,* 96 A.3d 365 (Pa. Super. 2014) (concluding that the PCRA did not subsume an illegal-sentence claim based on the inability of the DOC to produce a written sentencing order). Upon review, the Honorable John Geisz entered sentencing orders in this matter on December 9, 1986. Additionally, upon reviewing the criminal docket through the Common Pleas Case Management System, Petitioner's sentence was accurately docketed by the Clerk of Courts of this court. The Superior Court has held that even when the DOC lacks possession of a written sentencing order, it has continuing authority to detain a prisoner. *Id.* at 372.

8

Exhibit Z

*Commonwealth v. Tillery*, 3270 EDA 2016, 193 A.3d 1063 (Pa. Super. 2018) (unpublished memorandum)

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAJOR GEORGE TILLERY | : | |
| | : | |
| Appellant | : | No. 3270 EDA 2016 |

Appeal from the PCRA Order September 26, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0305681-1984

BEFORE: GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY PANELLA, J.                    FILED JUNE 11, 2018

Major George Tillery[1] appeals from the order entered in the Philadelphia County Court of Common Pleas, denying his untimely third petition filed **pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-**9546. We affirm.

Briefly, Appellant was convicted of first-degree murder, aggravated assault, possessing an instrument of crime, and two counts of criminal conspiracy following a jury trial in 1985. The court sentenced him to life imprisonment. This Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal.

---

[1] Appellant indicates his name is incorrectly listed on this appeal **as "George M. Tillery."** *See* **Appellant's Brief, at 1.** Previous court documents confirm Appellant has been referred to as "Major George Tillery" throughout associated proceedings. We have corrected the error.

Thereafter, Appellant filed his first PCRA petition, which was unsuccessful. In 2007, Appellant untimely filed his second PCRA petition. In it, he claimed a timeliness exception to the PCRA based on newly discovered evidence. Appellant alleged **two of the Commonwealth's witnesses at his trial**, Emanuel Claitt and Robert Mickens, received previously undisclosed favorable plea deals in exchange for their false testimony. Appellant contended these plea deals, previously unknown to him, gave the witnesses motive to lie about Appell**ant's involvement in the murder**. The PCRA court denied the petition as untimely, and this Court affirmed.

Appellant filed this petition, his third, on June 15, 2016. The PCRA court denied the petition without holding an evidentiary hearing. This appeal is now properly before us.

Appellant argues the PCRA court erred in dismissing his petition as untimely. We review an order dismissing a petition under the PCRA by exam**ining whether the court's determination is supported by the evidence of** record and is free of legal error. *See Commonwealth v. Halley*, 870 A.2d **795, 799 n.2 (Pa. 2005). We will not disturb the court's factual findings unless** there is no support for them in the certified record. *See Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001). Moreover, a court may decline **to hold a hearing on a petition if it determines the petitioner's claim is patently** frivolous and is without a trace of support either in the record or from other evidence. *See Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001).

The timeliness of a post-conviction petition is jurisdictional. *See Commonwealth v. Hernandez*, 79 A.3d 649, 651 (Pa. Super. 2013). Generally, a petition for relief under the PCRA, including a second or subsequent petition, must be filed within one year of the date the judgment is final unless the petition alleges, and the petitioner proves, an exception to the timeliness requirement. *See* 42 Pa.C.S.A. § 9545(b)(1)(i)-(iii). A PCRA petition invoking one of these statutory "exceptions must be filed within sixty days of the date the claims could have been presented." *Hernandez*, 79 A.3d at 652 (citing 42 Pa.C.S.A. § 9545(b)(2)). Finally, exceptions to the PCRA's time bar must be pled in the petition. *See Commonwealth v. Burton*, 936 A.2d 521, 525 (Pa. Super. 2007). *See also* Pa.R.A.P. 302(a).

Appellant's judgment of sentence became final on June 3, 1990, when his time for filing a writ of *certiorari* with the United States Supreme Court expired. *See* 42 Pa.C.S.A. § 9545(b)(3); U.S. Sup. Ct. R. 13. Appellant filed this petition on June 15, 2016—more than 26 years after his judgment of sentence became final. It is, as he concedes, patently untimely. *See* Appellant's PCRA Petition, filed 6/15/16, at 5. Thus, the PCRA court lacked jurisdiction to review Appellant's petition unless he was able to successfully plead and prove one of the statutory exceptions to the PCRA's time-bar.

Appellant attempts to plead both the governmental interference exception and the newly discovered facts exception. He proffers the same evidence for both claims: signed affidavits from two witnesses in his case, Emanuel Claitt and Robert Mickens. In their affidavits, the men aver they

received favorable plea deals and other favors from the Commonwealth in exchange for their testimony, and that they lied when asked about any **potential plea deals during Appellant's trial**. Claitt and Mickens also allege various police detectives and the Assistant District Attorney prosecuting **Appellant's** case repeatedly threatened them with criminal charges, which coerced them to provide testimony falsely incriminating Appellant.

To demonstrate the governmental interference exception, "the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could **not have been obtained earlier with the exercise of due diligence.**" *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008) (citation omitted). To claim the newly discovered facts exception, a petitioner must **plead and prove that "the facts upon which the claim is predicated were** unknown to the petitioner and could not have been ascertained by the exercise of due **diligence[.]**" 42 Pa.C.S.A. § 9545(b)(1)(ii). "[D]ue diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a cl**aim for collateral relief.**" *Commonwealth v. Brown*, 141 A.3d 491, 506 (Pa. Super. 2016) (citation omitted).

**Appellant devotes much of his brief to disputing the PCRA court's** dismissal of his petition, on the grounds that Appellant failed to prove he acted with due diligence. Appellant contends he had no way of knowing before he received these affidavits that the Commonwealth orchestrated a conspiracy to

keep him in jail, and requiring him to have investigated this matter in the 31 years between his trial and the filing of this PCRA petition placed an unreasonable burden on him. Appellant also argues the conditions of his incarceration prevented him from filing a PCRA petition sooner. Appellant chronicles his movements between various prisons, as well as stints in solitary confinement, as evidence that he was unable to file this petition at an earlier date.

The Pennsylvania Supreme Court previously evaluated the argument that prison conditions constitute a timeliness exception to the PCRA, and rejected it. *See Commonwealth v. Albrecht*, 994 A.2d 1091, 1095 (Pa. 2010) (holding inmate's failure to show restricted conditions of incarceration were illegal prevented him from obtaining timeliness relief under PCRA's governmental interference exception).

Also, Appellant's contention that he was unable to obtain this information sooner is belied by his second PCRA petition, filed in 2007. In it, Appellant accuses the Commonwealth of suborning perjury from Claitt and Mickens, and he provides various transcripts and letters as proof. While Appellant's 2007 petition lacks the signed affidavits from Claitt and Mickens attached to his current petition, he raises substantially the same arguments in each. The claims here merely expand on the arguments in the 2007 petition, and he offers only vague speculation that Claitt and Mickens would have been unwilling to provide such information before. We find such explanations unavailing.

- 5 -

Consequently, we find Appellant has failed to prove he acted with due diligence in discovering these allegedly new facts and governmental interference. Accordingly, we affirm the order dismissing his PCRA petition as untimely.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/11/18

Exhibit AA

*Commonwealth v. Franklin,* 201 A.3d 854 (Pa. Super. 2018)
(unpublished memorandum)

J-S46011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIAM FRANKLIN | : | |
| | : | |
| Appellant | : | No. 3263 EDA 2017 |

Appeal from the PCRA Order September 12, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0605611-1980

BEFORE:  BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 16, 2018**

William Franklin appeals from the September 12, 2017 order dismissing his *pro se* PCRA petition pursuant to Pa.R.Crim.P. 907 as untimely.  After thorough review, we vacate the order and remand for an evidentiary hearing.

Appellant was arrested and charged in the 1976 murder of Joseph Hollis and attempted murder of John Pickens, and tried before a jury in 1982.  This Court summarized the trial court's account of the facts as follows:

> The relevant crimes were committed during a meeting on October 22, 1976[,] which occurred between two rival syndicates engaged in illegal narcotics operations, the "North Philadelphia" and "West Philadelphia" groups.  The purpose of the meeting allegedly was to reconcile differences between the two syndicates[,] which had arisen two days earlier when Hollis insulted Alfred Clark, the leader of the North Philadelphia organization, by questioning his credentials as a "real gangster" and slapping him in the face with a gun.

Case: 20-1942 Document: 1-1 Page: 16 Date Filed: 05/07/2020

> The meeting on October 22, 1976 was attended by approximately ten people. During the meeting, [A]ppellant and Major Tillery, a member of the North Philadelphia syndicate, drew weapons from underneath a pool table and shot Hollis and Pickens; Hollis died as a result of the shooting. Emmanuel Claitt, also a member of the North Philadelphia group, testified that he had no prior knowledge of the shooting and that he was standing by the door during the meeting to prevent anyone from entering or leaving. Based on information supplied by Claitt, [A]ppellant was arrested four years later. Claitt's evidence was given in return for leniency from the Commonwealth relating to other open cases.

*Commonwealth v. Franklin*, 580 A.2d 25, 27 (Pa.Super. 1990).

At the conclusion of the jury trial, Appellant was convicted of first-degree murder, conspiracy, possessing an instrument of crime ("PIC"), and aggravated assault. He was sentenced on July 7, 1982, to a mandatory term of life imprisonment without parole for the murder, and concurrent terms of five to ten years imprisonment for aggravated assault and conspiracy, and a concurrent term of two and one-half to five years imprisonment on the PIC conviction.

Appellant's judgment of sentence was affirmed by this Court on direct appeal, and the Supreme Court denied allowance of appeal. *Commonwealth v. Franklin*, 488 A.2d 1163 (Pa.Super. 1984) (unpublished memorandum) (*app. denied* June 24, 1985). Appellant filed a timely first PCRA petition, counsel was appointed, and an amended petition was filed. After an evidentiary hearing, the petition was dismissed. This Court affirmed the dismissal, *Commonwealth v. Franklin*, 580 A.2d 25 (Pa.Super. 1990), and allowance of appeal was denied. *Commonwealth v. Franklin*, 593 A.2d 415 (Pa. 1991).

- 2 -

Appellant filed the instant PCRA petition, his second, more than thirty years after his judgment of sentence became final. He alleged that his petition was timely based upon the timeliness exceptions for governmental interference and newly-discovered facts. The pertinent newly-discovered fact was the recent declaration of Emanuel Claitt, the sole witness against Appellant, "that his testimony was entirely false," and that "it was manufactured by the prosecution with the assistance of police detectives and secured by threats, coercion and favors." PCRA Petition, 7/18/16, at ¶8. In support of the governmental interference exception, Appellant pled that he was prevented from demonstrating his innocence at trial "because the Commonwealth concealed its actions presenting false evidence and withheld exculpatory evidence in violation of *Brady v. Maryland*[, 373 U.S. 83 (1963),] and *Napue v. Illinois*[, 360 U.S. 264 (1959),] and due process principles[.]" *Id*. at ¶9.

Appellant averred further that Claitt made a sworn declaration on behalf of Appellant's co-defendant Major Tillery on May 4, 2016, and a supplemental sworn declaration on behalf of Appellant on June 3, 2016, recanting his trial testimony implicating Appellant in the murder. These facts became known to him within sixty days of the filing of the petition when Tillery's attorney forwarded the declaration to him. He pled further that Claitt's recantation was unknown to him and could not have been ascertained earlier with the exercise of reasonable diligence. Appellant attached to his petition the declaration by Claitt dated June 3, 2016. Appellant also filed a supplemental PCRA petition

- 3 -

in which he provided witness certifications for Helen Ellis and Denise Certain, as well as homicide unit logs and correspondence, that he alleged corroborated Claitt's claims that the Commonwealth gave him favorable treatment and sexual favors in return for his perjured testimony.[1]

Although Appellant invoked the newly-discovered fact exception to the timeliness bar, and offered declarations and witness certifications in support of the timeliness of his petition, the PCRA court issued Rule 907 notice of its intent to dismiss the petition as untimely.[2] The court stated therein that the PCRA petition filed July 18, 2016, based on Claitt's declaration recanting his testimony dated May 4, 2016, was filed more than sixty days after he could

---

[1] Appellant filed a witness certification that he intended to call Helen Ellis to testify at the evidentiary hearing. He provided her address and date of birth. He represented that Ms. Ellis would testify that "she had sex with Emanuel Claitt in the Roundhouse homicide interview room and that arrangements were made by detectives who brought her up to him." Certification of Helen Ellis as a Witness, 10/28/16, at 1.

The witness certification for Denise Certain also contained her identifying information, and the substance of her proffered testimony was virtually identical. In addition, however, Appellant represented that Ms. Certain would identify her signature on the Roundhouse login sheet for December 14, 1983. **See** Certification of Denise Certain as a Witness, at 1.

[2] Pennsylvania Rule of Criminal Procedure 907(1) provides in pertinent part:

> If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal . . . .

Pa.R.Crim.P. Rule 907(1).

- 4 -

have first presented the claim, and hence, untimely. Furthermore, Appellant's failure to contact Claitt during the intervening thirty-five years, despite having every reason to question and investigate that witness, did not meet the requisite showing of due diligence. The court also found that witness certifications from Claitt and two other witnesses were legally insufficient, and that affidavits were required to support the claim. Finally, the court stated that Appellant had failed to demonstrate how the government had suppressed evidence of the two witnesses, Ms. Ellis and Ms. Certain, and additionally, that he had not filed the petition within sixty days of accessing this information.

Appellant filed a response objecting to dismissal, in which he clarified that he filed the petition within sixty days of receiving Claitt's declaration. In support of that contention, he attached an affidavit from his co-defendant's attorney who had mailed the declarations to him. Appellant also challenged the court's affidavit requirement, citing authority that witness certifications were sufficient under the PCRA. Finally, Appellant cited *Commonwealth v. Medina*, 92 A.3d 1210 (Pa.Super. 2014) (*en banc*), *Commonwealth v. Loner*, 836 A.2d 125 (Pa.Super. 2003) (*en banc*), and *Commonwealth v. McCracken*, 659 A.2d 541 (Pa. 1995), wherein courts had rejected the notion that recantation could have been discovered earlier with due diligence, and which discussed the need for an evidentiary hearing. Nonetheless, on September 12, 2017, the court dismissed the petition as untimely without a hearing.

Appellant timely appealed, and he presents three issues for our review:

- 5 -

     I.     Whether the PCRA court erred where it dismiss[ed] Appellant's PCRA petition without a hearing, where Appellant invoked an exception under 42 Pa.C.S. § 9545(b)(1)(i); 42 Pa.C.S. § 9545(b)(1)(ii)[,] and 42 Pa.C.S. § 9545(b)(2)?

     II.    Whether the prosecution violated Appellant's state and federal constitutional rights to due process, a fair trial, and his right to present a viable defense?

     III.   Whether the prosecution violated the rule pronounced in ***Brady v. Maryland***, where the prosecution withheld material, exculpatory evidence from the Appellant?

Appellant's brief at 4.

On appeal from the denial of PCRA relief, our standard of review compels us to determine whether the ruling of the PCRA court is supported by the record and free of legal error. ***Commonwealth v. Lesko***, 15 A.3d 345, 358 (Pa. 2011). We will review an order dismissing a PCRA petition in the light most favorable to the prevailing party at the PCRA level. ***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa.Super. 2012).

Generally, a petition for post-conviction relief, including a second or subsequent petition, must be filed within one year of the date the judgment is final, unless the petitioner alleges and proves that one of the three exceptions to the time bar applies. "A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review. 42 Pa.C.S. § 9545(b)(3)." ***Commonwealth v. Hernandez***, 79 A.3d 649, 650 (Pa.Super. 2013). The

- 6 -

merits of a PCRA petition cannot be addressed unless the PCRA court has jurisdiction. **Commonwealth v. Albrecht**, 994 A.2d 1091, 1093 (Pa. 2010). Jurisdiction does not exist if the PCRA petition is untimely filed. **Id**.

Appellant conceded that his petition was facially untimely under 42 Pa.C.S. § 9545(b), but pled the applicability of the newly-discovered fact and governmental interference exceptions set forth in § 9545(b)(1)(i) and (ii):

> (i)     the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii)    the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence;

42 Pa.C.S. § 9545(b)(1)(i) and (ii).

It is the petitioner's burden to allege and prove that one of the timeliness exceptions applies. **See Commonwealth v. Smallwood**, 155 A.3d 1054, 1060 (Pa.Super. 2017). Regarding the newly-discovered facts exception, "a petitioner must demonstrate that he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence." **Commonwealth v. Brown**, 111 A.3d 171, 176 (Pa.Super. 2015) (citations and quotation marks omitted). In addition, a petitioner must plead and prove specific facts demonstrating that his claim was raised within the sixty-day time frame.

- 7 -

As to the governmental interference exception, the petitioner must plead and prove that government officials interfered with his ability to present a timely PCRA claim. Appellant alleges that he only recently learned that the Commonwealth offered Claitt preferential treatment in pending cases and sexual favors to testify against Appellant.

The law is well settled that, "[q]uestions regarding the scope of the statutory exceptions to the PCRA's jurisdictional time-bar raise questions of law; accordingly, our standard of review is *de novo*." ***Commonwealth v. Robinson***, 185 A.3d 1055, 1059 (Pa.Super. 2018) (*en banc*) (quoting ***Commonwealth v. Chester***, 895 A.2d 520, 522 n.1 (Pa. 2006)).

In its Pa.R.A.P. 1925(a) opinion, the PCRA court found that Claitt's favorable treatment in pending cases was thoroughly explored at trial. Furthermore, it characterized the recantation claim as "garden variety," and found that Appellant had not exercised due diligence as he failed to contact Claitt in three decades. PCRA Court Opinion, 12/27/17, at 5. Moreover, the court maintained that the claims of misconduct were so "outlandish" and "unreliable" as to permit a credibility-based dismissal without an evidentiary hearing.[3] ***Id***. at 9. The court distinguished ***Medina*** and ***Commonwealth v.***

---

[3] The exception for newly-discovered facts only requires that a petitioner "prove that the facts were unknown to him and that he exercised due diligence in discovering those facts." ***Commonwealth v. Bennett***, 930 A.2d 1264, 1270 (Pa. 2001). Although the PCRA court based its ruling in part on a lack of due diligence, it also prematurely assessed the merits of the underlying

- 8 -

*Davis*, 86 A.3d 883 (Pa.Super. 2014), as "extremely fact specific, presenting unique circumstances." PCRA Court Opinion, 12/27/17, at 7.

We find that Appellant properly pled exceptions to the time-bar and offered sufficient support to merit an evidentiary hearing on the timeliness of the petition. Our decisions in **Medina** and **Davis** are instructive in this regard. In **Medina**, the petitioner invoked the newly-discovered fact exception to the PCRA time bar based on recantation testimony from the primary Commonwealth witness, who was a child when he testified. Appellant filed the petition within sixty days as required. In that case, however, the PCRA court afforded the petitioner an evidentiary hearing on the timeliness issue, and thereafter concluded that he had presented credible evidence that his petition was timely filed. On appeal, the Commonwealth argued that the petitioner had not demonstrated due diligence. This Court concluded that the petitioner had no way of knowing that the two children had lied at trial because a detective had threatened them. Furthermore, we found that a reasonable investigation could not have revealed these circumstances since even the prosecutors claimed at the PCRA evidentiary hearing that they did not know of the detective's conduct. We reasoned that if the prosecutors did not know, petitioner and his counsel had no reason to look for such evidence, and

---

claim. **See Commonwealth v. Cox**, 146 A.3d 221 (Pa.Super. 2016) (rejecting notion that newly-discovered facts exception involves a merits analysis of the underlying claim).

- 9 -

concluded that the petitioner's efforts were reasonable under the circumstances. ***Id***. at 1217.

In ***Davis***, ***supra***, the testimony of two witnesses contributed heavily to petitioner's 1972 conviction of robbery and first-degree murder. In 2008, the petitioner filed a PCRA petition in which he pled that he discovered facts establishing that the witnesses had testified pursuant to an undisclosed agreement with the Commonwealth, and that one of them had committed perjury. ***Id***. at 886. The PCRA court found that the newly-discovered facts were publicly available in court transcripts with the exercise of due diligence, and that petitioner had failed to satisfy the timeliness exception of Section 9545(b)(1)(ii). We disagreed, holding that the petitioner's efforts were triggered when he received the affidavits signed by one of the witnesses. As to the undisclosed deal offered by the Commonwealth, which the witnesses had denied at trial, we held that the petitioner had no reason to seek out transcripts of the testimony of the witnesses in unrelated cases to look for such evidence. In other words, due diligence did not require the petitioner to assume that the witnesses were committing perjury sanctioned by the Commonwealth.

The primary issue herein with regard to the newly-discovered fact exception is whether Appellant exercised due diligence in learning that the

prosecution's principal witness against him recanted his testimony.[4]  As we recognized in **Commonwealth v. Burton**, 121 A.3d 1063, 1070 (Pa.Super. 2015), the due diligence inquiry is fact-sensitive and dependent upon the circumstances presented.   Furthermore, "due diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." **Burton**, **supra**, at 1071.

Herein, Appellant pled timeliness exceptions and supported their applicability with witness certifications and documentary evidence.  The PCRA court erred in rejecting the proffered witness certifications as insufficient. **See Commonwealth v. Pander**, 100 A.3d 626, 639 (Pa.Super. 2014) (citing **Commonwealth v. Brown**, 767 A.2d 576 (Pa.Super. 2001)) (holding affidavit requirement is "flatly contradicted by and is in clear derogation of both the PCRA statute and the rules of criminal procedure"); **see also Commonwealth v. Reid**, 99 A.3d 427, 438 (Pa. 2014) (holding that procedurally, "a signed certification as to each intended witness stating the witness's name, address, date of birth and substance of testimony" is sufficient to obtain an evidentiary hearing on an ineffectiveness claim for a failure to present witness testimony).

---

[4] Appellant's second and third issues go to the merits of his claims.  We cannot reach them unless Appellant succeeds in proving a timeliness exception.

- 11 -

We find that Appellant has raised genuine issues of material fact regarding the timeliness of the instant PCRA petition. An evidentiary hearing is warranted to permit him to establish governmental interference, or to prove that he was duly diligent in discovering the recantation, and that he filed this petition within sixty days of when the claims could first have been presented.

Accordingly, we vacate the order dismissing the petition and remand for an evidentiary hearing on the timeliness issue. We direct the PCRA court to consider Appellant's request that counsel be appointed, as well as his application for discovery.

Order vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/18

- 12 -