**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**MAJOR GEORGE TILLERY,**
    **Petitioner**                 :            **CIVIL ACTION**

         **v.**                      :

**KENNETH EASON, et al.,**
    **Respondents**            :            **NO.  20-2675**

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

Respondents respectfully request that the petition for a writ of habeas corpus be dismissed with prejudice and without a hearing, and in support thereof submit the following response.

## FACTS

The trial court set forth the facts of petitioner's crimes as follows:

. . . At approximately 10:00 p.m. on October 27, 1976, Philadelphia police received a call to the address at Huntingdon and Warnock Streets in North Philadelphia. At the corner, they broke down the locked door of a poolroom operated by William Franklin and discovered the dead body of John Hollis. A medical examination later revealed that Hollis died of a gunshot wound to the trunk of his body. Inside the poolroom, the police found live and spent .38 caliber ammunition and a set of car keys. Around the corner from the poolroom at 2527 North 11th Street, police officers found John Pickens bleeding from a gunshot wound. Both Pickens and Hollis were shot by different guns.

For more than three years, the shooting of Pickens and Hollis remained unsolved. However, in the spring of 1980, police detectives, investigating the homicide of Samuel Goodwin, visited a Philadelphia prison to determine

if Emanual Claitt, an inmate who had known about Goodwin, could provide any information about Goodwin's death. The information Claitt provided went far beyond the Goodwin case. Claitt described in detail the operation of what he labeled the "black mafia," a crime syndicate run by black Muslims in Philadelphia. His information described a vivid picture of events culminating with the shootings of Pickens and Hollis.

Claitt testified that from 1976 until 1980, he engaged in drug dealing and extortion as a member of the Philadelphia "black mafia." The organization divided the city into sections for business purposes. Alfred Clark was the leader of the North Philadelphia branch. He held the rank of first lieutenant and had "the last word" for all business in the city. Sylvester White directed the West Philadelphia branch. John Pickens also dealt drugs in West Philadelphia. During the 1970s, [petitioner] held the rank of first lieutenant and "had control of the entire city as far as methamphetamine is concerned. . . ." Claitt received his heroin supply from Clark and his methamphetamine supply from [petitioner]. Clark and [petitioner] were partners in the heroin and methamphetamine trade. Claitt characterized [petitioner] as Clark's "right hand man."

On the night of October 20, 1976, Claitt, Clark, [petitioner], James Ravenell and Rainey met at the home of Dana Goodman at 59th and Woodbine Streets to discuss a disagreement between Goodwin and Pickens over drug selling in West Philadelphia. Pickens arrived with Hollis and argued with Clark about a transaction with Clark which disposed of drugs claimed by Pickens at the expense of Pickens. During the argument, Hollis called Clark a "gangster." He then grabbed Clark by the collar, took out a pistol, slapped Clark in the face with the gun and pointed at Clark as if he were about to shoot. Pickens stopped Hollis from firing the weapon, but [petitioner] said that Hollis "would have to die for what he did." Although White was not present, Clark said he would talk to him and arrange a meeting at Franklin's poolroom to settle the dispute.

2

Thereafter, a group consisting of Clark, Claitt, Rainey, Ravenell and [petitioner] met White at a mosque at 13th Street and Susquehanna Avenue in North Philadelphia. The group then drove to Franklin's poolroom. When they arrived at the poolroom, [petitioner] accused White of setting up the earlier incident and demanded a meeting on Friday, October 22, 1976, to which White was to bring Pickens and Hollis. White agreed to the demand. On the evening of Friday, October 22, 1976, Clark met the group outside the mosque. Clark made everyone surrender their weapons because a peaceful meeting was planned. The group then drove to the poolroom at Huntingdon and Warnock Streets. When they arrived, Clark instructed Claitt to remove two more guns from the group and then guard the door. Additionally, [petitioner] arranged for one of his couriers, Robert Mickens, to watch outside the poolhall for police.

Inside the poolhall, [petitioner] and Franklin sat at opposite ends of a table. [Petitioner] told Hollis to apologize, but Hollis refused. Following a nod to Franklin, [petitioner] reached under the table and pulled out a gun. Franklin also reached under the table and pulled out a weapon. [Petitioner] then shot Hollis in the back. When Pickens protested, [petitioner] shot Hollis again and Franklin then shot Pickens. Pickens proceeded to run through a locked door shattering the glass.

William Arnold arrived immediately after the shooting and discovered Pickens holding his stomach. Pickens had collapsed from the wound. Arnold helped him to a house at 2527 North 11th Street where the police found him.

Based on Claitt's information, the police obtained a warrant on May 23, 1980, for [petitioner's] arrest. However, for three years police were not able to serve the warrant because [petitioner] could not be located. A detective in California finally arrested [petitioner] in November, 1983. [Petitioner] was returned to Philadelphia on December 8, 1983, to stand trial. . . .

Commonwealth v. Tillery, 391 Pa. Super. 641, 563 A.2d 1956 (Memorandum), slip op. at 2-5.

## **PROCEDURAL HISTORY**

On May 29, 1985, a jury sitting before the Honorable John A. Geisz of the Philadelphia Court of Common Pleas found petitioner guilty of murder in the first degree, aggravated assault, two counts of criminal conspiracy, and possession of an instrument of crime.  Petitioner was represented at trial by Joseph Santaguida, Esquire, who was replaced after the trial by James Bruno, Esquire, who filed post-verdict motions on petitioner's behalf.  On December 9, 1986, Judge Geisz sentenced petitioner to life imprisonment for the murder conviction, with various terms of confinement for his other convictions.

Petitioner appealed to the Pennsylvania Superior Court, advancing dozens of claims of prosecutorial misconduct, trial counsel ineffectiveness, and trial court error.  On May 30, 1989, the Superior Court affirmed Petitioner's judgment of sentence. Commonwealth v. Tillery, 563 A.2d 195 (Pa. Super. 1989) (table) (memorandum opinion attached as Exhibit A).  On March 5, 1990, the Pennsylvania Supreme Court denied allowance of appeal.  Commonwealth v. Tillery, 593 A.2d 841 (Pa. 1990) (table).

On or about September 20, 1996, petitioner filed a counseled petition for collateral relief, under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. Section 9541, *et seq.*  On January 13, 1998, the PCRA court dismissed the petition.  Petitioner appealed, contending that he was denied the effective assistance of trial counsel because Mr. Santaguida had not called as a witness one of the victims from the shooting incident, John Pickens, allegedly because of a conflict of interest on Mr. Santaguida's part.  The Superior Court affirmed the denial of PCRA relief on April 21, 1999.  Commonwealth v.

Tillery, 738 A.2d 1058 (Pa. Super. 1999) (table).  On August 18, 1999, the Pennsylvania Supreme Court denied allowance of appeal.  Commonwealth v. Tillery, 742 A.2d 674 (Pa. 1999) (table).

On December 22, 1999, petitioner filed a petition for a writ of habeas corpus in federal court, once again claiming trial counsel was ineffective and had a conflict of interest.  By order dated October 27, 2000, the Honorable Clarence C. Newcomer adopted and approved the report and recommendation of the Honorable Chief Magistrate Judge James R. Melinson, and dismissed the petition with no certificate of appealability issued.

Petitioner sought relief in the Court of Appeals for the Third Circuit, which remanded his case to the District Court on August 23, 2002 for further proceedings on his conflict of interest/ineffectiveness claim.  The District Court thereafter held hearings on April 23, 2003, and May 28, 2003.  On July 28, 2003, the District Court entered another order, reaffirming its previous order of October 30, 2000, concluding that petitioner had failed to make a sufficient showing to warrant habeas relief.  On July 23, 2004, the Court of Appeals granted another certificate of appealability.   On July 29, 2005, the Court of Appeals affirmed, concluding that petitioner failed to demonstrate an actual conflict of interest that adversely impacted his trial counsel's performance.  Tillery v. Horn, 142 Fed. Appx. 66, 70–71 (3d Cir. 2005) (unpublished).  On November 28, 2005, the United States Supreme Court denied petitioner's petition for writ of certiorari.  Tillery v. Beard, 546 U.S. 1043 (2005) (memorandum).

Petitioner filed his second PCRA petition on August 13, 2007, alleging that the two eyewitnesses to his crime, Emanuel Claitt and Robert Mickens, had provided false

testimony, and that the Commonwealth had knowingly withheld exculpatory impeachment information from him prior to trial. (Petition attached as Exhibit B). Specifically, petitioner argued that, in return for testifying against him, Claitt and Mickens received favorable treatment from the Commonwealth, including immunity from prosecution and/or reduced sentencing on their own criminal charges. The PCRA court dismissed petitioner's second petition as untimely, and the Superior Court affirmed on July 15, 2009. Commonwealth v. Tillery, 981 A.2d 937 (Pa. Super. 2009) (table) (memorandum opinion attached as Exhibit C). On December 9, 2009, the Pennsylvania Supreme Court denied allowance of appeal. Commonwealth v. Tillery, 985 A.2d 972 (Pa. 2009) (table).

On October 6, 2014, petitioner filed his third PCRA petition (attached as Exhibit D), wherein he proffered signed recantations from Claitt and Mickens, and repeated the allegations raised in his 2007 petition – that they had provided false testimony at his trial and that the Commonwealth provided them favorable treatment in return. The PCRA court dismissed the petition as untimely on September 26, 2016. (The PCRA court's opinion is attached as Exhibit E). On June 11, 2018, the Pennsylvania Superior Court affirmed. Commonwealth v. Tillery, 193 A.3d 1063 (Pa. Super. 2018) (table) (reargument denied (Aug. 9, 2018)) (memorandum attached as Exhibit F). On February 6, 2019, the Pennsylvania Supreme Court denied allowance of appeal. Commonwealth v. Tillery, 201 A.3d 729 (Pa. 2019) (table).

On June 22, 2020, the Court of Appeals granted petitioner leave to file a second or subsequent habeas petition. In re: Major G. Tillery, C.A. No. 20-1941; ECF Doc 1. This Court ordered respondents to file an answer to petitioner's serial habeas petition. Respondents answer that petitioner fails to meets the qualifications to file a second

habeas petition, the petition is barred by the statute of limitations, the claims are defaulted, and the claims are meritless. Accordingly, his petition should be dismissed with prejudice and without a hearing.

## APPLICABLE LEGAL STANDARDS

### A.   Independent and adequate state ground doctrine

"A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, 131 S.Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Id.

A state procedural rule is "independent" if it does not "depend[ ] on a federal constitutional ruling." Ake v. Oklahoma, 470 U.S. 68, 75 (1985). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" Walker, 131 S.Ct. at 1127 (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)). "[A] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review." Kindler, 558 U.S. at 60. "[A] discretionary rule can be 'firmly established' and 'regularly followed' – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Id. at 60-61.

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, . . . or demonstrate that failure to consider the

federal claim will result in a fundamental miscarriage of justice." <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989).

    **B.**    **Exhaustion requirement**

    "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999). <u>See also</u> 28 U.S.C.A. § 2254(b)(1). "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts." <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995) (per curiam). The fair presentation doctrine requires that "the substance of a federal habeas corpus claim must first be presented to the state courts." <u>Picard v. Connor</u>, 404 U.S. 270, 278 (1971). "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-163 (1996). "[M]ere similarity of claims is insufficient to exhaust." <u>Duncan</u>, 513 U.S. at 366.

    Fair presentation also requires a state prisoner to "invok[e] one complete round of the State's established appellate review process." <u>Carey v. Saffold</u>, 536 U.S. 214, 220 (2002). "In Pennsylvania, one complete round includes presenting the federal claim through the Superior Court on direct or collateral review." <u>Moore v. McCready</u>, 2012 WL 6853243 at *6 (E.D. Pa. 2012) (report and recommendation). "The burden of establishing that . . . claims were fairly presented falls upon the petitioner." <u>Lines v. Larkin</u>, 208 F.3d 153, 159 (3d Cir. 2000).

    "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982). "[I]t would be unseemly in our dual system of

government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." Id. (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)).

"[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. . . there is a procedural default for purposes of federal habeas." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

### C.   Cause and prejudice and miscarriage of justice

When a claim is procedurally defaulted, federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Id., 501 U.S. at 750.

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him."   Id. at 753 (emphasis omitted). Generally, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" Id. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

There is, however, a "narrow exception" to the general rule of Coleman: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez v. Ryan, 566 U.S. 1, 9 (2012). This "narrow exception" has four requirements:

"(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding[,]'" or "makes it virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim on direct review." Trevino v. Thaler, 569 U.S. 413, 423 (2013) (quotation marks and citation omitted).

The miscarriage of justice gateway to defaulted claims first "requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." Id. at 316. "Evidence is not new if it was available at trial, but a petitioner merely chose not to present it to the jury." Goldblum v. Klem, 510 F.3d 204, 226 n.14 (3d Cir. 2007) (quotation marks and citation omitted).  In addition, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327. "[T]he Schlup standard is demanding and permits review only in the extraordinary case." House v. Bell, 547 U.S. 518, 538 (2006) (quotation marks and citations omitted).

10

**D.     Deference to state court adjudications on merits**

When a federal claim has been adjudicated on the merits in the state court proceedings, the "restrictive" and "deferential" standard of review set forth in 28 U.S.C. § 2254(d) applies to the claim on federal habeas review. Johnson v. Williams, 568 U.S. 289, 293, 297 (2013).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d). "[T]he requirements of § 2254(d) are difficult to meet." Johnson, 568 U.S. at 292. This section "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner." Id. at 298.

"Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quotation marks and citation omitted). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. at 71-72.

"A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the United States

11

Supreme Court's] cases, or if it decides a case differently than [the Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. 362, 406 (2000).

"The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." Bell, 535 U.S. at 694. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. . . . The state court's application of clearly established law must be objectively unreasonable." Lockyer, 538 U.S. at 75. There must be "no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." Nevada v. Jackson, 569 U.S. 505, 508-509 (2013) (per curiam). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington v. Richter, 562 U.S. 86, 102 (2011). The decision reviewed under section 2254(d) is "the last state-court adjudication on the merits." Greene v. Fisher, 565 U.S. 34, 40 (2011).

### E.    Deferential ineffectiveness standard

The clearly established federal law regarding claims of ineffective assistance of counsel is found in Strickland v. Washington, 466 U.S. 668 (1984). Cullen v. Pinholster, 563 U.S. 170, 189 (2011). Under Strickland, judicial scrutiny of counsel's performance is "highly deferential" and counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

judgment." 466 U.S. at 689-690. "To establish ineffective assistance of counsel a defendant must show both deficient performance by counsel and prejudice." Premo v. Moore, 562 U.S. 115, 121 (2011) (quotation marks and citation omitted).

"To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Richter, 562 U.S. at 104 (quotation marks and citation omitted). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Id. (quotation marks and citation omitted).

"Of particular importance in a claim of appellate or PCRA counsel ineffectiveness is the 'well established principle that counsel decides which issues to pursue on appeal and there is no duty to raise every possible claim.'" Figueroa v. Mooney, 2016 WL 4975211 at *10 (E.D. Pa. 2016) (report and recommendation) (quoting Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996)). "This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quotation marks and citation omitted). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome." Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) (quoted with approval in Smith v. Robbins, 528 U.S. 259, 288 (2000).

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quotation marks and citation omitted). Prejudice "requires a substantial,

not just conceivable, likelihood of a different result." Pinholster, 536 U.S. at 189 (quotation marks and citation omitted).

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." Richter, 562 U.S. at 105 (quotation marks and citations omitted). "The Strickland standard is a general one, so the range of reasonable applications is substantial." Id.

## F.      Deference to state court factual determinations

Pursuant to the federal habeas statute, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). "This presumption of correctness applies to factual determinations of both state trial and appellate courts." Lewis v. Horn, 581 F.3d 92, 111 (3d Cir. 2009). "Implicit factual findings are entitled to § 2254(e)(1)'s presumption of correctness as well." Id. "Additionally, . . . [section] 2254 does not condition deference to state court factual findings on whether the state court held a hearing." Id.

14

## ARGUMENT

**THE HABEAS PETITION SHOULD BE DISMISSED AS IT DOES NOT MEET THE QUALIFICATIONS FOR A SECOND PETITION AND IS UNTIMELY, DEFAULTED, AND MERITLESS.**

In the instant second habeas petition, petitioner presents affidavits from the two eyewitnesses from his trial, Emmanuel Claitt and Robert Mickens, recanting their testimony. He claims that these affidavits provide newly-discovered evidence that these witnesses' entire testimony was fabricated for them by a cabal of detectives and prosecutors, and that they were instructed to lie about the extent of their plea agreements. These recantations are so unreliable as to not meet the requirements for a second petition. Additionally, petitioner is unable to demonstrate that he meets the habeas statute's timeliness requirements, where he filed his habeas petition four years after obtaining the affidavits and made no prior attempt to interview these witnesses, even when he allegedly had cause to do so decades earlier. Nor are the alleged "facts" from these dubious recantations reliable such as to grant him equitable tolling. Also, his claims are defaulted because the state court found them untimely raised under state law. Finally, even if considered on the merits, petitioner's claims fail. His free-standing claim of innocence is not a basis for habeas relief and his claim that the state court violated "due process" in how it applied its own state law on collateral review is not cognizable. For all of these reasons, habeas relief should be denied.

## I.   PETITIONER HAS NOT SATISFIED THE HABEAS STATUTE'S REQUIREMENTS FOR A SECOND PETITION.

The habeas statute creates a substantial burden for a petitioner to overcome before obtaining review of a second petition, such as the one filed in the instant matter. The statute reads as follows:

**(2)** A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--

**(A)** the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

**(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

**(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2244(b).[1]

Petitioner is not raising a new rule of constitutional law, so the first exception does not apply.  He is claiming that the recantations meet the second exception, based on the

---

[1]      Notably, these requirements are stricter than those to create a gateway to actual innocence in a first petition, under Schlup v. Delo, 513 U.S. 298 (1995) (discussed infra in Section II(E)), in that the statute requires petitioner to additionally demonstrate due diligence and prove his qualification with clear and convincing evidence.  Cooper v. Woodford, 358 F.3d 1117, 1119 (9th Cir. 2004).  Because this is a second petition, it is the statutory requirements, rather than those articulated in Schlup, that control.  See McQuiggin v. Perkins, 569 U.S. 383, 397 n.1 (2013) (we held inapplicable to first petitions the stricter standard AEDPA prescribed for second-or-successive petitions); House v. Bell, 547 U.S. 518, 539 (2006) (recognizing that AEDPA "clear and convincing" standard applies to second and subsequent petitioners, while Schlup standard applies to first petitions).

unsupported accusations of misconduct made against the police and prosecutors.  ECF Doc 2-1, at 135-148.[2]  Although the Third Circuit determined that petitioner had made a prima facie showing that his petition satisfied the second exception, it  is ultimately for this Court to serve as the gatekeeper to determine whether he in fact has met the exception. As explained below, petitioner did not meet either prong of this exception. He has proffered the least reliable form of evidence: recantations from fellow career criminals making outlandish, unsupported accusations against police and prosecutors.  Therefore, respondents respectfully request that this Court determine that petitioner has not met the stringent requirements for review of a second petition.

**A.     The Court of Appeals has not issued a final ruling on the issue; this Court makes the determination of whether the statute's requirement was met.**

Even where the Court of Appeals has preliminarily authorized the filing of a second petition for a writ of habeas corpus, this Court is required to conduct its own independent gatekeeping analysis of whether the statutory requirements for a second petition have been met. See 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section"); Goldblum v. Klem, 510 F.3d 204, 220 (3d Cir. 2007) ("if a court of appeals finds that a petitioner has made a prima facie showing, the district court is obligated to conduct an independent gatekeeping inquiry under section 2244(b)(4)").

---

[2]     The numbers of the pages are obscured in this document because multiple headers are printed on top of each other.  Thus, any page number references to ECF Doc 2-1 herein reference the page of the pdf file on the ECF system.

Here, as detailed below, petitioner is unable to meet the above-quoted statutory exception to have a second or subsequent petition reviewed.   The alleged factual predicates for petitioner's claims could have been discovered through due diligence many years ago, if they were in fact true. Moreover, the facts underlying petitioner's claims do not come close to establishing by clear and convincing evidence that no reasonable juror – not even one – would have voted to convict him. Petitioner has not satisfied the statutory requirements for merits review of a successive habeas petition, and thus, his petition should be dismissed.

**B.    Petitioner's offer of proof does not meet the standard of reliability.**[3]

The recantations proffered by career criminals now claiming they perjured themselves and making unsupported accusations against police and prosecutors do not come close to the quality of evidence that demonstrates by clear and convincing evidence that no juror would convict upon hearing it.  Even under the more lenient <u>Schlup</u> standard, recantations do not qualify as "reliable." "Affidavits of recantation do not fall into any type of reliable evidence – exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – identified in <u>Schlup</u>." <u>Ajamu-Osagboro v. Patrick</u>, 620 F.Supp.2d 701, 718 (E.D. Pa. 2009). Indeed, recantation evidence is inherently unreliable. <u>See</u> <u>United States v. Williams</u>, 70 Fed.Appx. 632, 634 (3d Cir. 2003) ("cases are legion that courts look upon recantations with great suspicion"); <u>Landano v. Rafferty</u>, 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation testimony with great suspicion"); <u>Ajamu-Osagboro</u>, 620 F.Supp.2d at 718 ("Recantation testimony

---

[3]    For ease of discussion, respondents will address the second prong first, and then discuss the diligence prong in the next section.

is inherently untrustworthy").  As it is "inherently suspect," recantation evidence does not meet the clear and convincing evidence standard that no reasonable factfinder, upon learning of the recantation, would have still found petitioner guilty.  Swainson v. Walsh, CIV.A. 12-165, 2014 WL 3508642, at *6 (E.D. Pa. July 16, 2014).  Thus, by their very nature, these affidavits do not meet the requirements to establish an exception to the prohibition against second and subsequent petitions.

Moreover, the reasons for finding these particular recantations unreliable are far more than just generic distrust of recantations.  They include the significant improbability of the specific story underlying the recantations, the incentive for the recanters to lie, and the objective evidence countering their assertions.

**1.      The police did not fabricate long detailed stories.**

The most obvious reason to find that these recantations do not meet the standard for reliability is that the probability of them being true is highly unlikely.  These witnesses both claim that the **entirety** of their accounts was made up for them by several police and prosecutors.  See Doc 2-1, at 173 (Claitt: "Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false. My testimony was made up while being questioned by homicide detectives Larry Gerrard, Ernest Gilbert and Lt. Bill Shelton and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin"); id. at 181 (Mickens: "At the trial I falsely testified that I was a look-out during the shooting of John Hollis and John Pickens.  That was totally false.  My entire testimony

was scripted and rehearsed by ADA Barbara Christie"). However, this would require several factors to be true, which individually would be unlikely enough, and combined go well beyond the realm of reasonable possibility.

First, for the recantations to be true, it would require several detectives and prosecutors to demonstrate such an extraordinary disregard for professionalism, justice, and morality as to provide entirely fabricated stories to two people who were not even present for the events they claim to have witnessed. Claitt claims that Lt. Shelton "said [he] would be framed in another murder" if he did not adopt the manufactured statement against petitioner. Doc 2-1, at 174. Forcing a total non-witness to become the sole eyewitness to the murders requires malicious intent that goes well beyond the misconduct, however unacceptable, normally attributed to over-zealous prosecutors and police. Moreover, despite petitioner's fondness for characterizing himself as the victim of a grand conspiracy, even **he** has never explained the motive for so many police and prosecutors to take such extreme measures in targeting him four years after the crime took place, such that they would manufacture their case from nothing.[4]

Second, even if all of these police and prosecutors had the requisite level of malice to fabricate their entire case against petitioner, they would also need the creative abilities of the very best novelists to fabricate the statements and testimony from nothing. To fully appreciate the depth of imagination it would take to fabricate these accounts, one would need to read the entirety of the witnesses' statements and extensive testimony. However,

---

[4]      As explained infra, if police simply wanted to "clear" the case, there was much easier target to choose.

even examination of selected details should more than suffice to show that police detectives did not compose these accounts from their own imaginations.

### a.     Claitt's story is far too detailed to have been made up by police.

Claitt claims that the police not only made up his witnessing the crime, but also fabricated an entire meeting that took place two days earlier.  ECF Doc. 2-1, 164.  But if police wanted to pin the crime on petitioner, they needed only coach Claitt to say that he witnessed petitioner pull the trigger.   And it strains credulity to believe that the police would have been able to invent the details described by Claitt.  As Claitt described the meeting in his trial testimony, he arrived at Dana Goodman's house along with Alfred Clark, James, Ravenell, Fred Rainey, and petitioner (N.T. 5/14/85, 27).   Dana and Lawrence Goodman were already there.  After about five to ten minutes of waiting in the kitchen, John Pickens, "Shank," and Joe Hollis arrived.  Id. at 27-28.  For the police to think not only of who was present at the meeting, but the order in which they arrived, and the room in which Claitt waited would require great attention to detail.  In detailing the argument that ensued, the police and prosecutors allegedly went into extraordinary detail as to who said what, every line of dialogue in that exchange, the exact place that people grabbed each other, how guns were held, and the point at which Claitt could no longer see people.   All of this detail occurs in this small fragment of Claitt's much larger testimony:[5]

> Well, John Pickens confronted Alfred Clark.  He asked Alfred, he said, said
> Alfred, he said, "how come you took the drugs from – from Mark Garrick?"
> Alfred – responded, he asked him why he wanted to know.   And John

---

[5]      It appears from the transcript that Claitt spoke with a stutter.  Hence, the awkward syntax.

Pickens told him the drugs that he took were his because he was partners with Mark Garrick in the heroin that he took.  And that – Alfred Clark said, "It's too late because the drugs are already out on the street."

…

Pickens said was that – "that mean I'm going to take a loss?"  And Alfred said, "Those were the breaks."  So, after he said that, Joe Holis asked Alfred, you know, like – like, "what do you think? . . .  You are not a real gangster" and Hollis grabbed Alfred by the collar and took a pistol and smacked him across the face with the pistol.  After he smacked him, he leveled the gun off, like leveled off and as though he was going to shoot him and John – John Pickens pushed his hand out and said that we don't have to do it that way.  We can talk this over.

After that happened, Dana Goodman said that they were going to have to leave his house with those guns because when Hollis drew his gun and smacked Alfred, Gregory and John Pickens drew guns. . .. After Dana made the statement that they had to leave the house with those guns like that . . . John Pickens, Gregory which his name is Shank and Joe Hollis . . . backed out of the kitchen, like, Fred said to John Pickens, he said, "I want to talk to you."  So Fred Rainey went out with them.  Where they went after that, after they left the kitchen, I didn't see but it looked as though they was going out the door.

N.T. 5/14/85, 28-29 (quotation marks added for ease of reading).

Second, the level of detail in Claitt's description of the shooting itself, just a portion of which is reprinted here, seems far more complex than what police would need, if they were just trying to frame petitioner.  It also seems very difficult for a non-eyewitness to fabricate this level of detail.  Claitt testified:

Well, Alfred had began to – to – to discuss the business that was at hand, which was to be about drug – area and discrepancies that they were having in West Philly and when he was – before he began to discuss that, he had

mentioned it to Joe Hollis that that incident out in West Philly was not forgotten, the incident talking about at Goodman's house.  He had let Hollis know that that wasn't forgotten.

And at that point, [petitioner] said, well, to Joe Hollis – he asked him did he remember that he smacked Alfred out in West Philly at Dana Goodman's house with a pistol and Joe Hollis asked him, well, so what?  What about it, right?  We came out here to talk about, you know, cooling things out, making the peace.

And so [petitioner] then said that … none of us had, like, never approached Alfred in that manner and he had wanted Joe Hollis to apologize.  He feel as though Joe Hollis owed Alfred apology to what he did – did to him at Dana Goodman's house.

And, like, Joe Hollis like said he remembered it but what about it. And [petitioner] went on to say, you know, like, none of us did this job, you know, caused these and what have you and he wanted him to apologize and Hollis said he wasn't going to do that.  And so [petitioner] then said, right, you know, like as a smart gesture, you know, okay.

And in saying that, like, he looked to the other end of the pool table which directly straight ahead was William Franklin.  Like, he gave William Franklin a gesture, and, like I was standing back, you know, looking at everything that was happening around the pool table.  I noticed him nod his head and in compliance with Franklin.

And at that time, [petitioner] and Franklin, like, they – they took their hands and went underneath the pool table.  Where [petitioner] was standing at, James Ravenell was positioned where, when he went down under the pool table, he didn't . . . bend down in a body gesture.  He took his hand and went just, like, underneath the pool table.

When they came from underneath the pool table with their hands, I noticed [petitioner] to have a gun in his hand.  And when he went underneath it and came from underneath the table, he had the gun and placed it around to – to his back.

23

And at the same time, he started to see around James Ravenell and . . . for whatever reason that he had, he just stepped around Ravenell and Hollis was standing with his attention toward Alfred talking and [petitioner] just shot Joe Hollis in the back.  . . .

It appeared to me that – that Joe Hollis had been hit at the time because of the way he jolted.  When I heard the sound of the gun go off, I didn't see where the bullet actually traveled but I seen Joe Hollis jolt and jolt.

In falling he went up against the pool table and, like, he went up against the pool table and, like, was about to make a turn in my direction.  And me seeing him got shot once and come in my way, I wanted to get out of the range of fire because [petitioner] still had the gun pointed at him.

And when he turned to, like, as though to get out of the way of where he was – you know, he was being shot, [petitioner] fired again.  But – but before [petitioner] fired, John Hollis – Jo – Jo – Jo – John Pickens objected to what was – what had happened about Joe getting shot.

N.T. 5/14/85, 60-62.

Claitt also claims that "it was also a total fabrication that [petitioner] pulled a gun on me and threatened to shoot me in Philadelphia in early 1983."  ECF Doc 2-1, at 175. Again, it takes significant effort for police and/or prosecutors to come up with an entire non-existent instance of witness intimidation.  Moreover, the level of detail, involving various people, clearly came from Claitt, not a third-party non-witness.

I ran into [petitioner] around 3 blocks from my family's business establishment up in West Oak Lane section.  . . . I had came to the intersection of – of Kimball and Nedro Avenue and Kimball and Nedro is an intersection where it's a point.  It comes to a triangle point and there's a bar called the Pigeon Coop and it's a telephone that sits right on the point of the triangle.

And I was going there to meet a gentleman by the name of Donald Lattimere who was an associate of mine in the drug world.

24

> Upon my arrival there, I had a female in a 1981 Fleetwood of mine and when I pulled up on the corner near the telephone booth, I left my car running and as I got out to meeting Donald on the corner, a friend of mine sig – signaled to me to go back . . . .
>
> In the direction that he waved his – this person waved their hand, I looked in that direction, to – see [petitioner] getting – getting out his car and he was running in a gesture where – where he had a gun in his hand but down, pointed down and he was, like, trying to creep up on me from across the street near Church Lane. . . .
>
> When I seen then, by that time, I had got in my car and I had left my car running and I proceeded to just get away from where [petitioner] was coming.  And as I was driving off, which I – I pushed down on the accelerator very hard because I realized that he had a gun in his hand and I realized that I – he had knowledge of my testimony against him on a murder charge at a preliminary hearing against his codefendant…

N.T. 5/14/85, 90-92.

Finally, it bears noting that the cross-examination took two days of trial. Claitt was able to recount in great detail events that he allegedly never experienced, answer questions about these events for three days, and then convince twelve people to unanimously agree that these events had taken place.  The recantation claiming that he was able to do this simply by recounting a story wholly fabricated by law enforcement is highly improbable.

**b.    Mickens' testimony was not scripted.**

Without belaboring the same point with Mickens, it still bears noting that the level of detail in his testimony belies the assertion that the prosecutor "scripted" it.  For instance, on cross-examination, defense counsel insinuated that it did not make sense for Mickens to look out for police on Warnock Street, when the intersecting street Huntingdon was

allegedly the more "main" street.  N.T. 5/21/85, 65-66.  Mickens explained this, without leading questions, on redirect: "Well, at that time stake-out unit is in the regular police. They knew that certain people were approaching certain areas certain ways.  So, knowing me, if they was trying to sneak up on me, they wouldn't buck traffic coming up Warnock, center the north side or the south side."  Id. at 117.  Mickens then elaborated, "I could conceal myself better on Warnock Street and plus if the cops did come, I could knock on the side glass without the cops nosing there."  Id.  Petitioner, and his new-found friend Mickens, would like this Court to believe that the prosecutor was so clever and creative that she "scripted" this unintuitive explanation for Mickens to give on redirect examination in case defense counsel happened to ask on cross-examination about his choice of street to stand upon.  This is highly implausible.  His recantation should be disregarded.

**2.      It does not make sense for the police to fabricate complex stories for the witnesses while making them far less helpful than they could have been.**

Paradoxically, for Claitt's and Mickens' story to be correct, the police would have been so clever as to write an incredibly detailed story of multiple events for the witnesses, yet so foolish as to miss opportunities to make this a much easier case to close.

Most obviously, the police and prosecutors inexplicably did not use Mickens to their full advantage.  According to Mickens, his "entire trial testimony was scripted and rehearsed" by the trial prosecutor and was "totally false."  ECF Doc 2-1, at 181.    If this were true, it is inexplicable why the allegedly clever and unscrupulous prosecutor scripted a story that was so minimally helpful.  Mickens testified at trial that shortly before the murder, petitioner asked him to stand outside the poolhall as a lookout.  N.T. 5/21/85, 32-36. He also testified that a few days after the shooting, petitioner asked him to be an alibi

26

witness for him.  Id. at 17.  While this established petitioner's presence at the scene and a certain consciousness of guilt, it still allowed room for petitioner to claim that one of the many other people in the poolhall was responsible for the shooting.  If the prosecutor was willing to "script" anything, it is unfathomable that she did not write the script to include Mickens as a witness to the shooting, who would identify petitioner as the shooter.

Likewise, Mickens testified that after he heard the shots, he saw William Franklin running with a gun in hand in hot pursuit of the person who had earlier entered with Mr. Hollis.  N.T. 5/21/85, 39-40.  Mickens testified that petitioner emerged sometime later, and made no mention of a gun or pursuit.  Id. at 43.  If the prosecutor was willing to script anything needed to convict petitioner, it does not make sense that she failed to include in her "script" that petitioner had a gun and was pursuing individuals.  The absurdity of Mickens' accusation about his testimony being "scripted" casts into doubt everything else that he claims.

Second, it would have been impractical to pin the crime on petitioner, when there were much easier targets.  For instance, responding police had seen Alfred Clark's vehicle at the scene when they first arrived, and then found it gone shortly thereafter.  N.T. 5/9/85, 86, 112-114.  Police managed to stop that vehicle and Alfred Clark fled from it.  Id. at 68.  Thus, if police were simply looking to score a "clearance," it would have been far easier to "script" their witnesses to accuse Alfred Clark.  In fact, Alfred Clark was dead by the time of trial (id. at 128), so accusing him would have ensured virtually no risk of the clearance being challenged.  Moreover, they would not have needed to wait four years to clear it.  Finally, if police and prosecutors were so unscrupulous, it is strange that they

would be so honest as to introduce evidence to the jury about Clark that would leave petitioner with an avenue for pointing to an alternate suspect.

In fact, having to pursue the case against petitioner was terribly inconvenient for the detectives whom Claitt accuses of corruption, because petitioner was so difficult to find. Detective Girard testified that he had to spend ten days in the back of a van on a stakeout for petitioner. N.T. 5/20/83, 57. Presumably, a corrupt detective who will do anything to clear a case would not unnecessarily inconvenience himself this way. Petitioner points to no evidence whatsoever that Detective Girard would have any reason to want to target him. And if Detective Girard really did have such a burning desire to arrest petitioner, no moral scruples, and a limitless imagination, then it is impossible to understand why it took him **four years** after the crime to force someone to give a statement against petitioner, or why this belatedly identified witness was someone who could be easily challenged in court with his own criminal past.

**3.    Claitt and Mickens have several motives to falsely recant.**

While petitioner fails to establish any reason why a cabal of prosecutors and detectives would conspire to convict him, it is not difficult to readily ascertain Claitt's reasons for his sudden recantation. Claitt himself states his disdain for law enforcement. He claims that "[a]fter Major Tillery's trial I was told I hadn't done good enough, that I 'straddled the fence.' In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA." Doc 2-1 at 176.

This statement is revealing for multiple reasons. First, it appears from the docket that Claitt pled guilty to multiple charges, making his allegation that he too is an innocent

man framed by law enforcement especially suspect.  See Exhibit G (Claitt's criminal history); online dockets for CP-51-CR-0513651-1989; CP-51-CR-0630691-1989; CP-51-CR-0726811-1989, located at www.pacourts.us/courts/courts-of-common-pleas/docket-sheets.  Second, it makes no sense that the prosecution would claim that he "straddled the fence," in this case.  Claitt made no denial or hedging that he was testifying to what he witnessed.  Third, it is clear he bears a grudge against the Commonwealth because he served over a decade in prison starting four years after his testimony.  Fourth, rather than taking responsibility for his crimes, Claitt (much like petitioner) blames law enforcement for his jail time.  Fifth, Claitt was literally a partner in crime with petitioner, as they worked for the same crime boss, Alfred Clark.  Sixth, even by the time of trial, other criminals made Claitt suffer for his cooperation with police.  N.T. 5/16/85, 45 ("missionaries" for petitioner in prison threatened Claitt and his family); 98 (after testifying against Franklin, Claitt was stabbed in the eye in prison).   Petitioner apparently did not become any less dangerous while in prison, as he continued to orchestrate assaults, threats, gambling, and gang activities.  See Conquest v. Hayman, CIV. A. 07-2125 MLC, 2011 WL 1322153, at *9 (D.N.J. Mar. 31, 2011) (discussed in greater detail infra at Section II(D)).  The dangers of "snitching" in Philadelphia have certainly not lessened over time.  Indeed, a witness in a homicide case today almost invariably recants **at trial**, usually by claiming police made up or forced the statement.  Therefore, Claitt's motivations to dishonestly recant are obvious and plentiful.

Likewise, Mickens has many of the same motives.  Mickens expresses his displeasure that after cooperating with law-enforcement in other cases, they allowed information to be leaked to the press, causing him to be in danger of being labeled a

"snitch."   ECF Doc 2-1, at 180.   As he put it, he "complained" about this to the trial prosecutor in the instant matter.   Id.   As detailed further below, Mickens faced a great deal of intimidation regarding his testimony. And it seems that following trial, he remained in the criminal world where cooperating with law enforcement is abhorred.   In 2001, Mickens was arrested again for retail theft, MC-51-CR-0108481-2001.   Someone in Mickens' position has far more to gain in the "no snitch" culture around him by recanting his statement than by keeping petitioner in prison for a murder that has no personal significance to Mickens.

### 4.   Claitt's and Mickens' claims about undisclosed deals are unsubstantiated and disproven.

Both Mickens and Claitt claim that with regard to their open cases that they disclosed to the jury, they also had secret deals that they hid from the jurors, allegedly pursuant to the prosecutor's instructions.   Respondents are placed at a terrible disadvantage in responding due to the extreme tardiness of these claims, where it is now impossible to assemble the normal evidence that would be used to rebut them. Nonetheless, it must be noted that of the objective evidence that is available, none of it supports petitioner's claim, and some of it in fact rebuts the claim. In fact, it shows that rather than "dropping" Claitt's open case pursuant to a deal, the prosecution was forced to *null pros* the case when the complaining witness failed to appear.   Thus, the claims of a "secret deal" do not have sufficient reliability to meet the statutory exception for second petitions.

### a.   Claitt did not get an undisclosed deal.

The jury was well-aware that Claitt received significantly reduced jail time for a number of cases because of his cooperation.   Nonetheless, Claitt now claims that he

received an additional benefit with a robbery case that he told the jury was open, and was coached to lie about this at trial.  ECF Doc 2-1, at 170.  It is hardly a coincidence that he makes such a claim for petitioner's benefit.  Petitioner claimed in his second PCRA litigation (2007-2009) that Claitt had lied about that robbery charge being an open case because it was dismissed three years after Claitt testified.  See Second PCRA Petition, filed 8/13/07 (Exhibit B), at 21 (quoting Claitt's trial testimony that he received no agreement for his pending robbery charge followed by petitioner's editorializing "this testimony was false and known to be so by the Commonwealth and should have been corrected").

However, there is objective evidence that the charges were not dismissed pursuant to a deal, but rather because the victim of the robbery failed to appear at trial.  Petitioner (who wishes to give the impression of an isolated prisoner without access to anything), apparently has more materials than are available to Respondents, as he has the notes of testimony from that case, which he attached to his second PCRA petition.  Commonwealth v. Claitt, CP-51-CR-0537641-1983, notes of testimony, 12/16/87 (attached here as Exhibit H).[6]  It turns out that the charges were *null prossed* because the victim left the courthouse without permission.  Exhibit H, at 3.  The victim proceeded to disregard a bench warrant.  Id.  Additionally, the prosecution requested a *null pros* (rather than a court dismissal) so it could investigate whether there was witness intimidation.  Id. at 6.  Thus, it was against the wishes of the prosecution that the robbery case against Claitt had to be dropped, and hardly depicts a scenario where the

---

[6]   Respondents find it curious that petitioner omitted certain pages, and if the issue is further litigated, will file a discovery motion to obtain the complete transcript from petitioner.

prosecution dropped the case due to some undisclosed "deal."  Therefore, Claitt told the truth when he testified three years earlier that the robbery case was still open without agreement.[7]  This is further evidence that Claitt's recent declaration, written for the benefit of petitioner, is false.

Moreover, the jury was well aware that Claitt was testifying pursuant to agreements with the Commonwealth that enabled him to receive little jail time in return for his cooperation.  Claitt testified that he had eight open cases at the time he gave his statement to police.  N.T. 5/15/85, 8.  He acknowledged that his lawyer recommended to him that he cooperate with police so as to curry favor with the District Attorney's Office and get a reduction in his punishment.  Id. at 14.  As soon as Claitt testified against petitioner's fellow-shooter William Franklin, the District Attorney's Office went to a judge and got Claitt's detainer lifted, allowing him to leave jail immediately.  Id.  Claitt testified that as a result of his cooperation, prosecutors dropped three of the cases against him. Id. at 19.  For three of the remaining cases, for which Claitt pled guilty, the District Attorney's Office wrote a letter to the judge explaining his cooperation.  Id. at 19.  The judge sentenced Claitt to a minimum of 18 months in prison.  Id. at 20.  Claitt ended up serving even less than that before being paroled.  Id. at 21. Although Claitt was acquitted in two of his eight cases (N.T. 5/15/85, 6, 16), the jury learned the bottom line was that, as a result of his cooperation, Claitt served eighteen months for six cases that included: car theft, possession of drugs, weapons possession (N.T. 5/14/85, 86), attempted arson

---

[7]     The following part of cross-examination gives insight into Claitt's state of mind that he intended to take the case to trial:
Q. [by defense counsel]: "And now you were faced with being in violation of your parole and another open case for robbery, is that correct?"
A. [by Claitt]: "Only if I'm found guilty of that robbery."  N.T. 5/15/85, 24-25.

(N.T. 5/15/85, 20), and selling drugs (id.).   Thus, any claim by petitioner that the prosecution and Claitt had concealed from the jury that he received significant benefits for his cooperation are belied by the record.

Moreover, there is additional corroborating evidence that Claitt was not given a deal beyond the positive recommendation of the prosecution.   The notes of testimony from Claitt's sentencing following his guilty plea to drug dealing and conspiracy in the arson case reflect as much.   After the prosecutor informed the sentencing court of Claitt's ongoing cooperation, the court asked what the recommended sentence was.   The prosecutor stated: "As part of the negotiation the Commonwealth agreed to make no recommendation, so that we are bound not to make a recommendation."   Commonwealth v. Claitt,   N.T. 9/17/81 (Exhibit I), 7.   This is also consistent with what the court advised Claitt at his guilty plea hearing.   Commonwealth v. Claitt, N.T. 11/28/80, at 42 (exhibit to second PCRA petition, at 16) (attached here as Exhibit J) (The District Attorney "is not going to recommend any sentence in this case and that will be purely within my discretion as to what the appropriate sentence should be").

Interestingly, Claitt was not even consistent with his recent claims of secret deals. In his first declaration, signed May 4, 2016, he claimed that detectives and prosecutors promised him that if he cooperated: "I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with."   ECF Doc 2-1, 161-162.[8]   In his "supplemental" declaration, signed on June

---

[8]      Claitt testified at trial that detectives initially suspected him of the Goodman murder, and he went to talk to them in part to deny his involvement. N.T. 5/14/85, 12-15. If Claitt's testimony was merely scripted by the police and prosecutors, it seems very odd that they would include this in their "script."

3, 2016, Claitt claims that he "had been promised the DA's recommendation to receive no more than 10 years." ECF Doc 2-1, at 169. Nor is this "supplement" -- really an amendment from "no state time" to "no more than 10 years" -- surprising, because in petitioner's second PCRA petition (from 2007) petitioner had claimed that the prosecution had recommended no more than 10 years. PCRA Petition, 8/13/07, at 5-6. Apparently, Claitt adjusts his story to petitioner's liking so as to match the claims petitioner made in the past. This is hardly reliable.

**b.    Petitioner presents no supporting evidence that Mickens received a secret deal negotiated before the end of petitioner's trial.**

Mickens claims that the Commonwealth promised him "no prison time" on his pending rape case. Doc 2-1, at 181. At trial, Mickens explained that he had pled open to rape, was awaiting sentencing, and that no promises as to his sentence had been made. N.T. 5/21/85, at 26. However, he also informed the jury that the prosecution was dropping other related charges in his case, including robbery. Id. at 25. At trial, Mickens told the jury that he expected the Commonwealth would tell the sentencing judge that Mickens had provided information on this and other murders and that he believed the judge would give him a "little tap on the wrist" for the rape and robbery. N.T. 5/21/85, 26, 55-56.

Petitioner presents no evidence that the sentence eventually imposed on Mickens was the result of any agreement made at any time, let alone prior to petitioner's trial.[9] He does not provide the transcripts of Mickens' sentencing hearing or any other court

---

[9]    It is difficult to ascertain from the computerized version of the court records what that sentence actually was. The record states there was a sentence of "confinement" for rape and a minimum of 5 years of probation for conspiracy. The length of confinement for the rape is not specified. (Record is attached as Exhibit L).

documents supporting his allegations.  Instead, he merely speculates that the sentence imposed must have been the result of a secret deal made prior to trial.  What is certain is that the mere representation of Mickens, in the context of a recantation of testimony made decades earlier, is the least reliable form of evidence of an allegedly undisclosed deal.  It is all too easy for Mickens to simply sign whatever petitioner would like to forward to the court.  As petitioner has not produced objective, reliable evidence of an undisclosed deal, he has failed to meet his burden to show that he has previously unobtainable evidence that would convince twelve jurors to vote for acquittal.

5.  **Mickens' claim that the Commonwealth falsely claimed he needed protection is not reliable.**

Mickens claims: "My identity as a prosecution witness was kept from [petitioner] and his lawyer before I was called as a witness at the trial on the false grounds that I needed a protective order to protect me from [petitioner]."  ECF Doc 2-1, at 181.  He further claims: "That was not true.  I had told [petitioner] that I would be a witness for him at the murder trial of John Hollis [i.e. the instant matter].  He had no reason to think I'd be a witness *against* him.  I had no contact with [petitioner] once I was sent to Northampton County Prison.  I did not fear him or ask for protection from [petitioner]."  Id. (italics in original). While this "revelation" serves to fulfill petitioner's wishlist of the alleged injustices rendered against him by his imagined conspiracy, it actually further illustrates the unreliability of Mickens' recantation as a whole.

Before trial, the Commonwealth filed a motion, pursuant to a state rule of criminal procedure, requesting a protective order for Mickens.  In accordance with that rule, the trial court held a hearing without defense counsel present.  At the hearing, the prosecutor explained that Mickens had expressed fear for his safety in testifying at this trial.

35

Petitioner had seen Mickens in prison and asked him if he had given information to police. When Mickens denied it, petitioner warned him that the safety of Mickens and Mickens' family depended on Mickens not giving information to police.   N.T. 4/23/85, 5.   The prosecutor explained that Mickens had been transferred out of Pennsylvania, but that the safety of his family, who remained in the particular section of Philadelphia under petitioner's influence, was still in jeopardy.  Id. at 5-6.

At this point, a different prosecutor named Mr. Long related the threats Mickens received as a result of his cooperation in Mr. Long's unrelated homicide prosecution.  Mr. Long explained that a newspaper article had been written about Mr. Mickens' testimony for the prosecution in his case, and that the article had been posted on a bulletin board in the prison.  As a result of this, Mickens had received "a lot of veiled threats."   Id. at 7. Mickens had informed the prosecutor in the instant matter that he was attacked in prison. Id. at 7-8.  Thus, Mickens was transferred to Northampton County Prison and placed in protective custody.  Id. at 8.  Based on this information, the court granted the protective order, allowing late disclosure of Mickens' statement and keeping Mickens out of the Philadelphia prison system.  Id. at 9.  The prosecutor then related to the court: "Mickens' only concern is that once he testifies here, however many days it takes him to testify, if it takes more than one day, that the sheriffs may forgot or not realize that he should be returned to Northampton, so that he's not left in any area where he could be in jeopardy by the population of the local prisons."  Id. at 13.

At trial, defense counsel objected to the protective order having been granted, claiming that the prosecution could make such a request for every witness in every case. The prosecutor explained that the request was truly exceptional based on the

circumstances of this particular witness.  The judge agreed, stating that this was the first such request he received "for many years."  N.T. 5/21/85, 13.  Defense counsel also argued that Mickens and petitioner were so friendly that petitioner "attempted to use him for an alibi and there was nothing in the statement that he ever refused [petitioner]."  Id. at 8.  The prosecutor cogently responded that the moment when it became clear that Mickens would not be an alibi witness, and in fact would be a witness for the prosecution, would be the moment where his life would become endangered.  Id. at 9.  Mickens corroborated in his testimony at trial that petitioner had asked him to be an alibi witness and that he agreed to do so.  N.T. 5/21/85, 15-19.

Mickens' recantation statement, while superficially what petitioner would like to hear, actually does more to corroborate than undermine the prosecutor's representations to the court.  Mickens states that he had requested the prosecutor to transfer him to Northampton prison because his cooperation in a different prosecution became known through a newspaper article.  ECF Doc 2-1, at 180.  This corroborates exactly what the prosecutor represented to the court at the hearing on the protective order.  N.T. 4/23/85, 7.  Mickens (uncoincidentally) repeats the faulty argument of petitioner's trial counsel that he did not need protection because he had told petitioner he would serve as an alibi witness.  That argument is as irrational as when trial counsel made it, because the danger Mickens and his family faced was from petitioner finding out that Mickens would no longer serve as an alibi witness and had instead become a witness for the prosecution.  Mickens claims that he faced no danger from petitioner because he was safely in Northampton prison.  Not only does this actually corroborate the need for his protection, it also ignores

the prosecutor's representations that Mickens had family in North Philadelphia, the area under the thumb of petitioner and his associates in organized crime.

Furthermore, it is unclear why the prosecution would go through such extraordinary measures to protect Mickens if he had not expressed concern regarding his safety. While petitioner would have this court believe that it was a dishonest tactic to surprise the defense, the effort required, the risk of the judge finding out, as well as the necessary cooperation of yet another prosecuting attorney (Mr. Long), would hardly be justified if it were not true. Trial counsel Joseph Santiguida was one of the very best defense attorneys at the time. The prosecutor would know that Mr. Santiguida finding out late about this witness would hardly prevent him from being able to conduct an extensive cross-examination. Indeed, even a cursory review of the sixty pages of transcript containing the cross and recross-examinations of Mickens reveal counsel was not prevented from exhaustively challenging his testimony. N.T. 5/21/85, 50-99, 121-130. As the Superior Court explained on direct appeal: petitioner's counsel "received copies of [Mickens'] criminal record and statements concerning threats on Mickens' family which justified the protective order.[10] Moreover, [petitioner] was afforded a recess to prepare for Mickens' testimony and he then thoroughly cross-examined the witness." Exhibit A, at 10. Finally, if Mickens had never conveyed any concern to the prosecutor and the motion was just a tactic to sandbag defense counsel, then it served no purpose for the prosecutor to claim Mickens wished to go back to Northampton County **after** his testimony. Once again, petitioner would have this Court believe that the detectives and

---

[10]     The record reflects that the defense also received the statement of Mickens to police regarding this case. N.T. 5/21/85, 6.

prosecutor had no limits to their moral boundaries and creative abilities but then they used them for little to no actual purpose.

In light of the above, it is clear that Mickens told the prosecutor that he was in fear for his safety and his claim to the contrary in his recantation is patently false.  This is yet another portion of the recantation that is so implausible as to cast doubt upon the whole.

**6.    Claitt's and Mickens' claims about being allowed sexual favors are not of such a nature as to require a reasonable person to acquit.**

Claitt claims in his statement that he "was allowed to have sex" with his four girlfriends in "homicide rooms and hotel rooms in exchange for [his] cooperation."  ECF Doc 2-1, at 162.  Mickens provides petitioner a throw-away line that he told detectives that he "missed" his girlfriend, so they obligingly allowed him to have sexual relations with her at the police station.  ECF Doc 2-1, at 180.  It is not a coincidence that Claitt and Mickens, on behalf of petitioner, would make this claim.  Petitioner's fellow gangster Andre Harvey unsuccessfully tried this accusation in 2000.[11]   A PCRA court held an evidentiary hearing in Harvey's case (CP-51-CR-0703051-1983), found the claim incredible, and made factual findings that are significant in understanding this claim (the PCRA court's opinion is attached hereto as Exhibit K).

The allegation in Harvey's case was that police allowed witness Charles Atwell to received sexual favors from his girlfriend Maxine Harris-Jiles.  At the evidentiary hearing,

---

[11]    Andre Harvey was convicted of killing Fred Rainey.  As established in petitioner's trial, Fred Rainey was part of Alfred Clark's faction (the same faction as petitioner), and in fact, arrived with petitioner and Claitt to the meeting at Goodman's house.  N.T. 5/14/85, 27.

Mr. Atwell testified that Ms. Harris-Jiles was permitted to visit him at the police station, along with their children, so he could visit with all of them.  The court found this testimony, which was corroborated by Detective Gerrard (the same detective from this case), credible.  Exhibit K, at 9.  The court also explicitly found incredible the testimony of Ms. Harris-Jiles that police had allowed her to provide sexual favors to Atwell, as she claimed extreme memory loss, including about the statement she gave to police regarding witness intimidation. Id. at 13.[12]

Here, Claitt does not even claim that these alleged sexual visits induced him in any way to give his statement or testimony against petitioner.  In fact, Claitt testified at trial that the District Attorney's Office went to a judge and got his detainer lifted, allowing him to leave jail.  N.T. 5/15/85, 14.  Notably, he was released on June 4, 1980, which was only two weeks after he gave his statement to police on May 20, 1980.  N.T. 5/16/85, 15, 64.  Presumably, Claitt could arrange any sexual rendezvous on his own at this point without police assistance.  It seems unlikely that he would make up an entire story that he would maintain during trial five years later, just to have sex two weeks early.  Moreover, when viewed in context with Claitt's false allegations that the police wrote his entire testimony for him and that he was given a deal for a robbery charge that was actually dropped due to the key witness failing to appear, this appears to just be another part of the laundry list of allegations petitioner would like Claitt to make.

---

[12]    Respondents acknowledge that a decade prior to Harvey's PCRA hearing, in Commonwealth v. Lester, 572 A.2d 694, 697 (Pa. Super. 1990), a similar allegation was made against Detective Gerrard and was not disputed by the Commonwealth, for reasons that are no longer ascertainable.

Finally, while Respondents would not countenance such irregular police procedure if it took place, it hardly seems relevant at this point.  Claitt and Mickens claim that their entire testimony was completely false and scripted later by police and prosecutors.  As explained above, the "bottom line" is that these recantations have so many obvious holes and implausibilities as to be facially incredible.  Neither Claitt nor Mickens claim that the substance of their police statements or trial testimony in any way turned on being able to visit their girlfriends at a particular point during their police interviews.  To the contrary, they are claiming secret deals (unsubstantiated and/or contradicted by the record) and that the police and prosecutors fabricated their entire eyewitness accounts.  Thus, these salacious stories of sex in the police station are not "evidence" of the nature that twelve jurors hearing it would be at all compelled to acquit.[13]

## C.     Petitioner does not meet the requirement that the factual predicate could not have been discovered with due diligence.

Petitioner has also failed to meet the other statutory prong for a second or subsequent petition; namely, that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."  28 U.S.C. §2244(b)(B)(i).

The factual predicate here is that the witnesses against petitioner at trial perjured their testimony inculpating petitioner, and that they did not disclose the full nature of their agreements with the prosecution.  As petitioner claims his actual innocence, he would

---

[13]     The same could be said for the allegation that Claitt and Mickens make that police put them together in the hopes that Claitt would persuade Mickens to cooperate.  As Mickens is claiming that he only testified to get a secret deal, even if such an encounter took place (and there is no reason to assume it did), it hardly seems relevant to the bottom line, i.e. there is hardly clear and convincing evidence that the mere allegation of this encounter would make any reasonable juror acquit, particularly as such an alleged encounter is not *per se* police misconduct.

already have been aware that these witnesses "perjured" their testimony.  In his second PCRA litigation in 2007-2009, petitioner already claimed, through use of court documents, that these witnesses had not disclosed the full nature of their plea agreements.  Moreover, petitioner relied on sentencing procedures from the 1980s as alleged support for his claims.  Thus, the factual predicate for a claim regarding those procedures could have been brought decades ago.   Because petitioner has "known" the vital facts underlying the recantations for many years, this evidence is not previously undiscoverable through the exercise of due diligence, as required under the statute.  See Swainson v. Walsh, CIV.A. 12-165, 2014 WL 3508642, at *6 (E.D. Pa. July 16, 2014) (petitioner failed to meet the due diligence requirement for second and subsequent petitions where he "offer[ed] no reasonable basis to explain" why he could not have in his prior state and federal proceedings sought the information contained in a recantation statement); Miller v. D.A. for County of Philadelphia, CV 12-0742, 2019 WL 2869641, at *10 (E.D. Pa. June 12, 2019), report and recommendation adopted, CV 12-0742, 2019 WL 2866506 (E.D. Pa. July 1, 2019) (petitioner failed to meet the due diligence requirement for second and subsequent petitions with his proffer of a recantation by witness "Arnold" because "[t]he vital fact underlying Arnold's recantations was that Arnold perjured himself at Petitioner's 1998 trial. This has been known to Petitioner since his 1998 trial").

Respondents are not raising petitioner's lack of diligence as a mere technicality or procedural trap.  Rather, Respondents are truly prejudiced by petitioner's inexplicable delay.  Petitioner was aware at the time of trial that Claitt had not yet been sentenced for a pending robbery charge, as Claitt testified to this. N.T. 5/14/85, at 7. Claitt's robbery charge was dismissed in 1987.  CP-51-CR-0537641-1983.  Thus, petitioner and his

lawyers could have followed up at any time since 1987 to investigate the reasons for the dismissal  by reviewing the notes of testimony, speaking with Claitt's attorney, and even speaking with Claitt himself, if necessary. Had petitioner and his attorneys challenged the dismissal of the charges closer in time, Respondents would have a plethora of evidence to rebut the challenge, including the court file, the prosecution's file, and the prosecution and defense attorneys as witnesses to the reasons for the dismissal.   Instead, Respondents must rely solely on the selected pages of notes of testimony from the dismissal of Claitt's robbery at a court proceeding in 1987, that petitioner attached to his prior pleadings, to demonstrate that the case was withdrawn because the complaining witness failed to appear despite a bench warrant, not because of a secret deal.

Likewise, the delay in bringing the claim that Mickens received a secret deal for what was apparently an open rape case at the time of petitioner's trial was completely unnecessary and prejudicial.  Petitioner knew at the time of trial that Mickens was going to be sentenced.  Petitioner identifies no reason why, as soon as the sentencing was completed, he and his lawyers could not have obtained the transcripts and court materials to determine if there were any improprieties or statements that could be used to support a claim that Mickens had received an undisclosed deal from the Commonwealth.

The extreme delay in petitioner making this claim severely prejudices Respondents' ability to rebut it.  The undersigned attempted to obtain the notes of testimony and trial file.  However, the court reporters do not maintain notes of testimony for non-homicide matters beyond seven years.  Likewise, it has not been possible to

obtain the District Attorney's file for such an old non-homicide case.  Thus, it is impossible to see what sentence the prosecutor asked for at Mickens' sentencing.[14]

Moreover, even if the prosecutor had asked for a low sentence because of Mickens' cooperation, that in no way proves that this was pursuant to an agreement made *before* Mickens testified against petitioner.  The Commonwealth at this point has no way to call the prosecutor of that case (the Commonwealth has not even been able to ascertain the prosecutor's identity) to ask what plea recommendation was given and why, let alone produce the file that would likely contain notes needed to refresh that prosecutor's recollection about a case from more than 30 years ago.

Likewise, if petitioner wished to investigate the allegation that Claitt and Mickens were allowed to have conjugal visits with their girlfriends at the police station, he had much earlier opportunities to do so.  This allegation first appeared with regard to two detectives in his case in Commonwealth v. Lester, 572 A.2d 694, 697 (Pa. Super. 1990). As discussed above, the allegation next appeared at the 1997 PCRA hearing in Commonwealth v. Harvey, CP-51-CR-0703051-1983, a case involving the murder of one of the gangsters mentioned in petitioner's trial.  The delay in bringing this claim substantially prejudices Respondents.  The recollection of the detectives, assuming they are even available at this point, will be substantially diminished.  The same is true for the unsupported claim that detectives asked Claitt to assist them in securing Mickens' cooperation.  Respondents now do not have a fair opportunity to ask detectives if the two were ever brought together, and if so, for what purpose.  Had petitioner made any attempt

---

[14] And as explained, supra note 9, it is not even possible to determine what sentence Mickens received.

to reach out to Claitt and Mickens sooner, perhaps they would have been willing to make these accusations sooner for his benefit.  His failure to even attempt it, precludes review of his second petition.

## II.   Petitioner fails to overcome the habeas statute of limitations.

The present petition is governed by the federal habeas corpus statute, 28 U.S.C. § 2241 et seq., also known as AEDPA (for the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), amending, inter alia, the federal habeas statute at 28 U.S.C. §§ 2241 et seq., effective April 24, 1996).  Holland v. Florida, 560 U.S. 631 (2010); Lindh v. Murphy, 521 U.S. 320, 336 (1997).  That statute includes a one-year time limitation on the filing of new petitions:

> (1)   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of --
>
> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Under any of these possible start dates, the petition is untimely.

**A.      Date judgment became final**

Petitioner was sentenced on December 9, 1986. On May 30, 1989, the Superior Court affirmed Petitioner's judgment of sentence.  Commonwealth v. Tillery, 563 A.2d 195 (Pa. Super. 1989) (table).   On March 5, 1990, the Pennsylvania Supreme Court denied allowance of appeal.  Commonwealth v. Tillery, 593 A.2d 841 (Pa. 1990) (table). Petitioner's convictions therefore became final on June 4, 1990.[15] See Sup. Ct. R. 13.1 (providing 90 days to file timely petition for writ of certiorari); Fahy v. Horn, 240 F.3d 239, 243 (3d Cir. 2001) (judgment of sentence becomes final at "the conclusion of direct review or the expiration of the time for seeking such review").   As petitioner's judgment of sentence became final before AEDPA and its statute of limitations was enacted, "the one-year limitations period runs from the AEDPA's effective date: April 24, 1996."  Wood v. Milyard, 566 U.S. 463, 468 (2012). Petitioner's petition is decades too late.


**B.         Date factual predicate could have been discovered with due diligence**

Petitioner does not qualify for a later start date on the grounds that he did not "discover" the recantations until 2016 when the witnesses signed their statements.  The true date that the alleged "facts" became known to petitioner was much earlier than the date the recantation statements were signed.   The vital "facts" underlying petitioner's claims are that the two eyewitnesses against him lied at trial, not that they later decided to recant.  See Santiago v. Barone, CIV.A. 10-649, 2012 WL 6151748, at *2 (E.D. Pa. Dec. 10, 2012) (the vital fact in a recantation claim is that the witnesses lied at trial, not that they later decided to recant, thus the operative date is the date of trial, not the date

---

[15]      While June 3, 1990 was exactly 90 days later, it was a Sunday.

the recantation was signed) (citing Sistrunk v. Rozum, 674 F.3d 181 (3d Cir. 2012) (likewise holding that petitioner had not shown he pursued his rights diligently where he knew of witness's perjury but did nothing about it for 12 years, the point where he received a letter from the witness recanting his testimony and claiming police coercion)). Nonetheless, petitioner made no apparent attempt to contact these witnesses until he sent an attorney to talk to them in 2016, whereupon they immediately provided statements.  See ECF Doc 2-1, 191-192 (statement of Rachel Wolkenstein, Esquire, relating virtually immediate cooperation of Claitt and Mickens in recanting).

In any event, petitioner did not file the instant habeas petition until four years after the recantation statements were signed. The earliest possible date that petitioner filed the present habeas petition was April 30, 2020, the date he signed it.  ECF Doc 2, at 19. Petitioner may not use as an excuse that he was waiting to see whether the state court would rule his petition untimely, as it did.  See Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005) (rejecting argument that exhaustion requirement forced petitioner to wait and see if PCRA petition was timely before filing habeas petition because petitioner could have filed timely "protective" habeas petition); Preski v. Shapiro, 3:19-CV-00288, 2020 WL 315758, at *6 (M.D. Pa. Jan. 21, 2020) (petitioner fails to exercise due diligence when he waits for state proceedings to end before filing claim of "new" evidence) (citing Pace, supra; Garrick v. Diguglielmo, 162 Fed.Appx. 122, 125 (3d Cir 2005) (noting that "nothing prevented [petitioner] from filing a timely [federal] petition and then seeking to amend or otherwise complete it as 28 U.S.C. § 2242 and Fed.R.Civ.P. 15(a) would allow," once all pending state proceedings resolved); Tyler v. Palakovich, 2006 WL 485306, at *6 (M.D. Pa. 2006) (rejecting petitioner's argument that he "needed to exhaust state court remedies

on his 'newly discovered evidence' claim before filing a federal habeas petition" because petitioner could have filed timely "protective" habeas petition)).

Likewise, petitioner's claim to have newly "discovered" that the witnesses received alleged undisclosed plea deals also fails.  First, it was disclosed *at trial* that these witnesses had open cases for which the Commonwealth would inform the sentencing courts of these witnesses' cooperation.   N.T. 5/15/85, 8 (Claitt); N.T. 5/21/85, 26 (Mickens).   Moreover, those sentencings took place in the 1980s, thus giving petitioner decades to investigate what took place at the sentencings and challenge them.  See supra, Section I(C) (detailing petitioner's lack of diligence).   Finally, petitioner already claimed in his second PCRA petition filed in 2007 to have evidence that Claitt and Mickens received deals for their testimony, using documents that were available from the 1980s. Commonwealth v. Tillery, 2937 EDA 2008 (Pa. Super. 2009) (memorandum opinion), at 5.  Yet he did not file a habeas petition until several years after the dismissal of that 2007 petition.  Thus, petitioner has no basis to claim that he has timely raised his claims.

## C. Statutory Tolling

Section 2244 of the federal habeas statute provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  As explained above, the time limit began on April 24, 1996.  Petitioner initiated his state post-conviction proceedings on September 20, 1996, 149 days later.  On August 18, 1999, the Pennsylvania Supreme Court denied allowance of appeal.  Commonwealth v. Tillery, 742 A.2d 674 (Pa. 1999)

(table).  This is the date on which the statute of limitations began to run again.  <u>Stokes v. D.A. of County of Philadelphia</u>, 247 F.3d 539, 542 (3d Cir. 2001) ("the time during which a state prisoner may file a petition for a writ of *certiorari* in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations").  Thus, after accounting for statutory tolling, the deadline for a timely petition was on March 23, 2000.  Again, the instant habeas petition was not filed until April 30, 2020.  ECF Doc 2, at 19.  Thus, this petition is manifestly untimely.

### D.    Equitable Tolling

The habeas statute of limitations is subject to equitable tolling in appropriate circumstances.  <u>Holland v. Florida</u>, <u>supra</u>; <u>accord</u> <u>Miller v. New Jersey State Dept' of Corrections</u>, 145 F.3d 616 (3d Cir. 1998).  No such circumstances are present here.  A party seeking equitable tolling must demonstrate that: (1) some extraordinary circumstance prevented him from filing his federal habeas petition until he actually filed it, despite (2) his exercise of diligence in attempting to file his federal habeas petition as early as possible throughout the entire period for which he seeks equitable tolling.  <u>Holland</u>, 560 U.S. at 649*;* <u>Pace</u>, 544 U.S at 418; <u>LaCava v. Kyler</u>, 398 F.3d 271, 276 (3d Cir. 2005).

There are no extraordinary circumstances that prevented petitioner from filing in federal court by the deadline.  Petitioner was able to file his first habeas petition on December 22, 1999, approximately twenty years before the instant petition.  As explained above in Section I(C), the basis of petitioner's claims of perjury and alleged sentencing deals with the witnesses would have been ascertainable since the 1980s, more than a

decade before that initial habeas petition was filed.

Petitioner's attempt to excuse his lack of diligence by blaming the prison for placing him in restrictive housing (ECF Doc 2-1, 143-146) should not be countenanced. He only has himself to blame for his discipline in prison. As explained by the United States District Court in New Jersey: petitioner received "a total of twenty-six disciplinary charges from the Pennsylvania Department of Corrections during his current incarceration." Conquest v. Hayman, CIV. A. 07-2125 MLC, 2011 WL 1322153, at *9 (D.N.J. Mar. 31, 2011). "Notably, five of the misconduct charges were assaults on other inmates, and four involved threats to staff members. He also has accumulated forty-nine inmate 'keep separates' due to his criminal associations both before and during his incarceration." Id. "His behavior while incarcerated in Pennsylvania included violent assaults, fighting, threatening correctional staff members with bodily harm and refusing to obey an order." Id. "Included in his disruptive behavior are numerous challenges to procedures, attempted orchestrated assaults against staff and inmates, and organized gambling, in addition to a long history of gang related criminal activities." Id.

Petitioner's behavior in New Jersey's prison system was not better. "A memo from NJDOC Director William F. Plaintier in April 2005 to Chief of Staff Charles Ellis described [petitioner's] potential for MCU placement at NJSP. His history of assaultive and threatening behavior against both inmates and staff was noted, along with his involvement in an elaborate escape attempt during a potential court appearance." Id. "Also noted was [petitioner's] alliance with the 'Black Mafia' that gives him a significant power base within the Pennsylvania Department of Corrections, as well as many

separation issues. Finally, it was noted that [petitioner] is non-compliant with programming recommendations." Id.

In light of petitioner's extensive misconduct in prison,  his complaint that he was in restrictive housing resembles that of the man who murders his parents and then pleads for sympathy on the grounds of being an orphan.  Moreover, petitioner's "restrictive" housing situation did not keep him from filing PCRA petitions in 1996 and 2007 and a first habeas petition in 1999.  Additionally, petitioner has had several lawyers in several legal proceedings over the years.  Petitioner lists no less than seven attorneys, who represented him at trial, direct appeal, three PCRA proceedings, and one prior habeas proceeding.  ECF Doc 2-1, 5-6.  There is no reason why these lawyers could not have obtained transcripts and court records to support the claims of alleged deals.  There is also no reason why these lawyers could not reach out to Mickens and Claitt to find support for their claims.  Petitioner is not entitled to equitable tolling.

### E.  Petitioner does not demonstrate the miscarriage of justice exception based on his assertion of actual innocence.

Petitioner asserts that the recantations of the witnesses against him meets the standard under Schlup v. Delo, 513 U.S. 298, 324, 327 (1995) to have a claim of actual innocence reviewed, despite the statute of limitations.  Doc 2-1, at 154.  He is incorrect.

"Proving actual innocence based on new evidence requires the petitioner to demonstrate (1) new evidence (2) that is reliable and (3) so probative of innocence that no reasonable juror would have convicted the petitioner."  Santiago v. Barone, CIV.A. 10-

649, 2012 WL 6151748, at *2–3 (E.D. Pa. Dec. 10, 2012) (quoting *Sistrunk v. Rozum,* 674 F.3d 181, 191 (3d Cir.2012) (citing *Schlup v. Delo,* 513 U.S. 298, 324, 327 (1995)).

Claitt's and Mickens' recantations are not new evidence for purposes of <u>Schlup</u>. The vital "facts" underlying this evidence are that they supposedly perjured their testimony inculpating petitioner and that they did not disclose the full nature of their agreements with the prosecution.  As petitioner claims his actual innocence, he would already have been aware that these witnesses "perjured" their testimony.  In his second state PCRA litigation in 2007-2009, petitioner already claimed, through use of court documents, that these witnesses had not disclosed the full nature of their plea agreements   Because petitioner has "known" the vital facts underlying the recantations for many years, this evidence is not new under <u>Schlup</u>. <u>See</u> <u>Sistrunk</u>, 674 F.3d at 189, 191 (finding that letter from witness Gregory Anderson admitting to perjury at preliminary hearing and affidavit stating that Damon Rodriguez admitted to being shooter were not new under <u>Schlup</u> because "Sistrunk not only could have known, but actually *did* know of the vital facts underlying both the Anderson letter and Rodriguez affidavit – i.e., Damon Rodriguez was the real shooter and Gregory Anderson perjured himself – long before the filing of his habeas petition") (emphasis in original).

Moreover, reliability is sorely lacking here. "Affidavits of recantation do not fall into any type of reliable evidence – exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – identified in <u>Schlup</u>." <u>Ajamu-Osagboro v. Patrick</u>, 620 F.Supp.2d 701, 718 (E.D. Pa. 2009). Recantation evidence is inherently unreliable. <u>See</u> <u>United States v. Williams</u>, 70 Fed.Appx. 632, 634 (3d Cir. 2003) ("cases are legion that courts look upon recantations with great suspicion"); <u>Landano v. Rafferty</u>, 856 F.2d

569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation testimony with great suspicion"); Ajamu-Osagboro, 620 F.Supp.2d at 718 ("Recantation testimony is inherently untrustworthy").  As the proffer is not only a recantation "admitting" a massive amount of perjury but is an extremely tardy one at that, it is particularly unreliable.  See Santiago, 2012 WL 6151748, at *3 (finding tardy letter of recantation does not support equitable tolling because it is not reliable); (citing Sistrunk, 674 F.3d at 191 (finding a recantation letter unreliable where the letter came "nearly a decade too tardy"); Teagle v. DiGuglielmo, 336 F. App'x 209, 213 (3d Cir.2009) (characterizing affidavit admitting the bulk of witness's trial testimony was perjury as "suspicious and untrustworthy evidence" that "does not, in the absence of additional corroborating evidence or circumstances, meet the standard of reliability contemplated by Schlup")).

Finally, not only is the proffered evidence "inherently suspect," by nature of being very tardy recantations, it is also suspect for the myriad of reasons detailed above in Section I(B). These witnesses claim that their **entire** police statements and testimony were made-up by a sizable conspiracy of police and prosecutors.  As discussed above, the level of detail and the fact these witnesses persuaded a jury of the truth of their testimony after extensive cross-examination (more than a day for Claitt), belies their outlandish assertions.  In Mickens' case, it is incredible that police and prosecutors would make up a story for him to tell that was not even an eyewitness account of the shooting. Moreover, the objective evidence available regarding their sentencings demonstrates that they told the truth at trial that they had not received negotiated sentences in exchange for their testimony, contrary to their new allegations of secret deals about the sentence.  And Claitt even admits his hostility towards law enforcement.   Any reasonable juror would

recognize that the recantations are beyond incredible and would hardly compel them to acquit.

### III.    Petitioner's claims are defaulted because the state court found them untimely under an independent and adequate rule of state law.

Petitioner's claims are also procedurally defaulted based on the state court's application of the PCRA's timeliness requirement.  The Superior Court concluded that petitioner's most recent PCRA petition (his third) was untimely under the PCRA statute's time limitations.  Commonwealth v. Tillery, 3270 EDA 2016 (Pa. Super. 2018) (memorandum opinion, Exhibit F, at 3).  "The PCRA's timeliness requirement is an independent and adequate state ground, rendering [a petitioner's] claim procedurally defaulted and unreviewable in federal court"  Chrupalyk v. Kauffman, 2:19-CV-00047-GJP, 2020 WL 4060569, at *7 (E.D. Pa. May 15, 2020), report and recommendation adopted, CV 19-0047, 2020 WL 4059885 (E.D. Pa. July 20, 2020) (citing Peterson v. Brennan, 196 F. App'x 135, 142 (3d Cir. 2006) (not precedential) (affirming the district court's "order that the PCRA statute of limitations is an adequate and independent state ground to deny habeas relief").  While petitioner pled exceptions to the timeliness requirement, he failed to meet the requirements for those exceptions by demonstrating an extreme lack of due diligence in bringing his claim.

**A.      As found by the state courts, petitioner failed to demonstrate due diligence.**

The state court's finding that Petitioner's third PCRA petition was untimely was a purely state law ruling that is binding and may not be reconsidered on federal habeas review.  See Merritt v. Blaine, 326 F.3d 157, 165 (3d Cir. 2003) ("A federal court is bound by a state court's finding that a petitioner's PCRA petition was untimely, even where the petitioner sought to pursue his PCRA petition under a statutory exception to the PCRA's time bar").  In any event, the state court clearly got state law right.

In considering petitioner's raising of the statutory exceptions for new facts and governmental interference, the Superior Court found that petitioner failed to exercise due diligence in bringing his claims.  Commonwealth v. Tillery, 3270 EDA 2016 (Pa. Super. 2018) (memorandum opinion, Exhibit F, at 5-6).   The Superior Court noted that petitioner brought the same claims that the prosecution had suborned perjury from the witnesses in his PCRA petition from 2007, without attaching statements from Claitt or Mickens.  Id. at 5.  Petitioner failed to adequately explain why he did not obtain such statements at the time he first brought those claims, offering nothing more than "vague speculation" that the witnesses would have been unwilling to provide such statements earlier than 2016.  Id. Thus, the Superior Court concluded that petitioner failed to exercise due diligence in obtaining his allegedly newly discovered evidence, as required by the PCRA statute.  Id. at 6.

The PCRA court, whose ruling the Superior Court affirmed, explained this reasoning in more detail, making two particularly significant points.  PCRA Court Opinion, filed 1/13/17, (Tucker, J.) (Exhibit E).  First, while petitioner made vague allegations of having been in restrictive housing, ill, and frequently transferred in prison, he failed to

provide supporting evidence of his general assertions.  Id. at 5.  Moreover, petitioner did not provide a meaningful recounting of the past thirty years to show that he specifically could not make any effort during that very long period of time to ascertain the willingness of witnesses, whom he supposedly knew perjured themselves, to recant.  Id. at 5.

Second, and of greater importance, the PCRA court noted that petitioner alleged in 2007 that the witnesses had received undisclosed deals based on his reading of court records from the 1980s.  Id. at 6-7.  Thus, it was untenable that he did not even attempt to obtain the witnesses' version of events at that time in light of his alleged "discovery."  See id. at 7 ("Based upon Petitioner's purported discovery of the Commonwealth's role in suborning Claitt and Mickens, Petitioner had reason to believe that the witnesses may be amenable to disclosing their fabricated testimony").

The conclusions of the state courts that petitioner did not exercise due diligence are well supported by the record.  Petitioner knew at the time of his trial that Claitt and Mickens had open cases, as they testified to this.  N.T. 5/15/85, 8 (Claitt); N.T. 5/21/85, 26 (Mickens).  Petitioner also heard them testify as to the scope of any promises made by the prosecution.  N.T. 5/15/85, at 14, 19-21 (Claitt); N.T. 5/21/85, at 25-26 (Mickens).  Petitioner and his many attorneys could have easily followed-up by examining the notes of testimony from the sentencing hearings and court records to ascertain what representations were made to the court.  If there were any discrepancies between the sentencing proceedings and the testimony of the witnesses at trial, petitioner could have raised them in a timely manner, and there would be a contemporaneous record and witnesses available to testify as to what happened.  In fact, he could have compelled Claitt and Mickens to testify at a PCRA hearing, if he had raised the claims in a timely

manner and had a sufficient offer of proof of a secret deal.  Indeed, in his 2007 PCRA

petition, petitioner raised claims that the witnesses had received secret plea deals, using

documents that were available from the 1980s.  Commonwealth v. Tillery, 2937 EDA 2008

(Pa. Super. 2009) (memorandum opinion), at 5.[16]  Thus, at the very least, petitioner could

have contacted Claitt and Mickens at that time to investigate his claim of alleged secret

deals.

Likewise, petitioner's post-conviction attorneys could have pursued the sex-for-

cooperation claim if they wished.  The Superior Court's decision announcing misconduct

by the same detectives in petitioner's case was from 1990.  Commonwealth v. Lester,

572 A.2d 694, 697 (Pa. Super. 1990).  Thus, if the attorneys wished to investigate whether

the detectives had committed similar misconduct in petitioner's case, they were free to

contact Mickens and Claitt and ask about it.[17]

---

[16]     Respondents would stress that these documents did not actually reveal secret plea
deals.  Claitt and Mickens testified that these were open cases.  There was nothing in the
records to suggest otherwise, besides petitioner's speculative belief that the outcomes
were too good to not have been negotiated.  However, that does not take into account
any negotiations that may have taken place **after** petitioner's trial with regard to the other
matters in which those witnesses cooperated, or the particularities of the sentencing
judges who had heard about their extensive cooperation in homicide matters.  Plea deals
made after trial are not Brady material. See Bracey v. Superintendent Rockview SCI, 17-
1064, 2021 WL 191847, at *17 n.1 (3d Cir. Jan. 20, 2021) (Phipps, Cir.J., concurring)
("The two witnesses entered plea agreements on the additional charges, but the
transcripts do not specify when they entered those agreements. Unless those plea
agreements were in place when those witnesses testified against Bracey, the prosecution
would not have been obligated to disclose them: post-trial favorable treatment of a
witness is not within the scope of Brady disclosures." (citing Bell v. Bell, 512 F.3d 223,
234 (6th Cir. 2008) (en banc)).

[17]     They were also free to subpoena the police log administration building log books
from the early 1980s that petitioner uses as an exhibit.

The complete absence of any effort whatsoever by Petitioner over a period of thirty years to even ascertain the state of mind of these witnesses defies any notion of due diligence.  Based on his statement, Claitt seems to believe that the prosecution framed him for a crime he did not commit, causing him to serve a 13.5 year sentence beginning in 1989.  ECF 2-1, 176.  It seems incredible that this "framed" man (who pled guilty to these crimes), who already received the benefits of his cooperation, would not be all too willing to tell petitioner anything he wanted more than a decade ago, as he did in 2016. It appears that these witnesses gave their statements in 2016, because that is when Rachel Wolkenstein, Esquire, decided to speak with them.

Indeed, the Pennsylvania courts' decision to find the claims time-barred on the basis of petitioner's lack of due diligence in bringing them was consistent with how the Third Circuit interprets effectively identical language in the federal analogue to 42 Pa.C.S. § 9545(b)(1)(ii) – 28 U.S.C. § 2244(d)(1)(D) – in exactly the same way. Section 2244(d)(1)(D) provides that the one year statute of limitations for federal habeas petitions may run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). The Third Circuit has held that "the 'factual predicate' of a petitioner's claims constitutes the 'vital facts' underlying those claims." McAleese v. Brennan, 483 F.3d 206, 214 (3d Cir. 2007). See also Champney v. Secretary, Dept. of Corrections, 469 Fed. Appx. 113, 116 (3d Cir. 2012) ("The requisite 'factual predicate' of a claim is the set of 'vital facts' underlying the claim"). The Pennsylvania Superior Court's interpretation of its own state postconviction relief procedures in accordance with how this Circuit interprets its corresponding federal postconviction procedures was not "inconsistent with

the traditions and conscience of our people or with any recognized principle of fundamental fairness." D.A.'s Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 70 (2009).

**B.     The Dennis decision does not excuse petitioner's lack of diligence.**

Petitioner claims that he should not be required to demonstrate due diligence because the underlying basis of his claims are that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963) by not disclosing to him that the prosecution "knew" the witnesses were perjuring themselves and that there were alleged undisclosed deals. Petitioner cites Dennis v. Sec., Pennsylvania Dept. of Corrections, 834 F.3d 263, 275 (3d Cir. 2016) (en banc) for the proposition that the due diligence requirement does not exist for Brady claims.  However, the state court here did not ever assert that Brady contained a due diligence requirement.  Rather, the state court found that the state PCRA statute contains a due diligence requirement for bringing forward new evidence.  Likewise, the Dennis decision did not examine the PCRA's due diligence requirement, let alone find that it violated the Constitution or clearly established Supreme Court law interpreting it. Thus, Dennis is of no moment in determining whether the state court unreasonably applied Supreme Court law in determining that the PCRA petition was untimely filed.  See Vogt v. Coleman, CV 08 - 530, 2017 WL 2480732, at *2 (W.D. Pa. June 8, 2017) ("The Pennsylvania Superior Court concluded that Petitioner's second PCRA petition was untimely filed and, no matter what effect Dennis may have on that decision, although it has none, this Court is "bound" by that finding").[18]

---

[18]     For similar reasons, the Dennis decision in inapplicable with regard to the federal habeas statute's time limitations.  See Smith v. Mahally, CV 17-5809, 2018 WL 4658714, at *5 (E.D. Pa. Apr. 19, 2018), report and recommendation adopted, CV 17-05809, 2018 WL 4635937 (E.D. Pa. Sept. 26, 2018), certificate of appealability denied sub nom. Smith v. Superintendent Dallas SCI, 18-3465, 2019 WL 2064447 (3d Cir. Apr. 1, 2019)

In any event, even putting aside that <u>Dennis</u> has no applicability to reviewing the constitutionality of a state court's enforcement of its own statute of limitations, it also bears noting that applying it to the inherently suspect "recantations" would stretch the holding in <u>Dennis</u> far beyond what could have reasonably been intended.   Petitioner puts the proverbial cart before the horse by presuming that he has a viable <u>Brady</u> claim without proffering reliable evidence in support of it.   The <u>Dennis</u> case did not do this, as there appears to have been no dispute that the <u>Brady</u> material itself existed, as they were items that existed in objective reality.[19]   Specifically, the items were a receipt, a police activity sheet, and six police documents regarding a tip pointing to a different suspect.   <u>Dennis</u>, 834 F.3d at 275.   Such physical evidence existing from the time before trial starkly contrasts with the "word" of self-admitting perjurers given thirty years after trial.

 Indeed, the <u>Dennis</u> court in no way contemplated that it would be overturning the law that recantations are "inherently unreliable," and that a petitioner can force the state to spend significant resources on an evidentiary hearing on a recantation claim as long as the recantations make unsupported allegations of misconduct on the part of police and prosecutors.[20]  Such a ruling not only goes against significant federal and state precedent

---

("The <u>Dennis</u> court did not address any timeliness challenge as none was raised. Although the calculation of the AEDPA limitations period may not begin until discovery of the alleged <u>Brady</u> material, such a claim is still subject to the habeas limitations period" (citing several decisions).

[19]     The <u>Dennis</u> court itself emphasized that these were objective pieces of evidence. <u>See</u> <u>Dennis</u>, 834 F.3d at 285 ("The Commonwealth did not disclose the DPW receipt that was in the police's possession, provided objective impeachment evidence of a key Commonwealth witness, and bolstered Dennis's alibi").

[20]     Recantation claims almost invariably include some allegation that the police and prosecution coerced the witness.  Indeed, it is rare in a homicide trial in Philadelphia held within recent decades that the witnesses do not recant, claiming that the police and/or

60

regarding the unreliability of recantations, it also allows perjurers, usually acting in collusion with the criminal defendant, to derail the entire criminal justice process any time they see fit.  Nothing in the <u>Dennis</u> decision supports such a result.

In the alternative, even if the state decision had been based on evaluating the merits of the <u>Brady</u> claim, instead of a state procedural bar, <u>Dennis</u> would still not excuse petitioner's lack of diligence.  As the Court of Appeals recently explained, "where the record demonstrates that the defendant or defense counsel was aware of the potential <u>Brady</u> material but failed to pursue investigation of that ultimate claim, nothing in <u>Dennis</u> or any other decision of this Circuit, including today's, stands in the way of any of the consequences that AEDPA attaches to a lack of due diligence."  <u>Bracey v. Superintendent Rockview SCI</u>, 17-1064, 2021 WL 191847, at *13 (3d Cir. Jan. 20, 2021) (quotation marks and citations omitted).   "[A]s far as <u>Brady</u> claims go, due diligence requirements remain substantial: If there is a reasonable basis for a petitioner to believe additional investigation will yield undisclosed <u>Brady</u> material, that petitioner must investigate or else risk the statutory consequences."  <u>Id.</u>  Here, petitioner had every reason to investigate his own claims that the witnesses obtained secret deals and perjured themselves, as he has been alleging this since at least trial and in his 2007 PCRA petition.  Therefore, his lack of diligence is not excusable.

In any event, even if petitioner could somehow ignore all of the procedural bars and resulting defaults, he still could not establish the materiality prong of a <u>Brady</u> claim

---

prosecutors made up their statements.  This is why the Pennsylvania courts were compelled to allow a witness's prior contemporaneously recorded and adopted statements to be used as substantive evidence.  <u>Commonwealth v. Brady</u>, 507 A.2d 66 (Pa. 1986) (as limited by <u>Commonwealth v Wilson</u>, 707 A.2d 1114 (Pa. 1998)) and <u>Commonwealth v. Lively</u>, 610 A.2d 7 (Pa. 1992)).

based on his proffer of two inherently unreliable recantations.  As explained in great detail above in section I(B), these recantations are particularly unreliable as they simultaneously claim that the police and prosecutors were so creative and unscrupulous as to make up the entirety of detailed eyewitness statements, yet chose stories that would not ensure conviction, making one "eyewitness" not even present for the killings.

Moreover, the witnesses somehow withstood extensive cross-examination about their recollections of events that they supposedly never witnessed.  Adding in an obvious motive for these witnesses to lie – one claims that the prosecution completely manufactured an unrelated case against him – and these recantations could never establish materiality, let alone be compared with the objective evidence presented in Dennis.

Petitioner's claim is defaulted and should be rejected on that basis as well for the foregoing reasons.   To the extent petitioner relies on Schlup's equitable exception to procedural bars based on a reliable claim of actual innocence, respondents dispute that he meets that exception for the reasons articulated supra in Claim II(E) (addressing the Schlup exception in regards to the federal habeas statute's time restrictions).

## IV.   Petitioner's claims fail on the merits.

Even if reviewed on the merits, despite the three significant procedural bars to review – statutory restrictions for a second petition, habeas statute of limitations, and procedural default – the two grounds for relief raised in the petition do not entitle him to the writ.  Petitioner raises a free-standing claim of actual innocence, which is not a cognizable claim for relief.  Petitioner's due process claims are also not grounded in the

law, as they merely complain of the state court's discretionary rulings during his third PCRA proceeding.  Relief should be denied.

**A.    Petitioner's free-standing claim of actual innocence does not entitle him to relief.**

Petitioner's first ground for relief in his petition is "factual innocence."  ECF Doc 2, at 8; ECF Doc 2-1, at 102.  This claim is unavailing.

"Generally, a stand-alone claim of actual innocence is not a cognizable claim in a federal habeas proceeding."  Sutherland v. Gilmore, CV 19-0732, 2019 WL 7906193, at *7 (E.D. Pa. Nov. 26, 2019), report and recommendation adopted, 2:19-CV-00732, 2020 WL 703679 (E.D. Pa. Feb. 12, 2020) (quoting  Albrecht v. Horn, 485 F.3d 103, 121-122 (3d Cir. 2007) (citing Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L. Ed.2d 203 (1993)).  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Id. (quoting Herrera, 506 U.S. at 400) (also citing Albrecht, 485 F.3d at 121-22; Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004)).  "Instead, actual innocence may be a 'gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  Id. (quoting Herrera, 506 U.S. at 404 (also citing Schlup, 513 U.S. 298; House v. Bell, 547 U.S. 518 (2006)).

Rather than base his claim on an underlying constitutional violation, petitioner erroneously asserts: "Innocence constitutes a substantive ground upon which to relieve [petitioner] of his unconstitutional incarceration."  ECF Doc 2-1, 106.  Thus, under Herrera,

petitioner's "stand-alone claim of actual innocence is non-cognizable and therefore, must be dismissed." Sutherland, at *7.

**B.    Petitioner's due process claim does not entitle him to relief.**

Petitioner's only other ground for relief is that the prosecution violated his due process rights by putting forward allegedly perjured testimony and not disclosing alleged plea deals. ECF Doc 2-1, at 108-124. However, as detailed above, he has not come close to demonstrating any purported misconduct.

Petitioner complains that he did not receive an evidentiary hearing. ECF Doc 2-1, at 124. This claim is not cognizable on habeas review. See Swainson v. Walsh, CIV.A. 12-165, 2014 WL 3508642, at *17 (E.D. Pa. July 16, 2014) (claim that PCRA court erred in not granting evidentiary hearing based on untimely PCRA petition raising a recantation claim is not cognizable on habeas review) (citing Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); id. ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir.2004) ("alleged errors in collateral proceedings ... are not a proper basis for habeas relief")).

Petitioner claims that the state court applied state law inconsistently with how it applied it in his co-defendant's case, by granting the co-defendant an evidentiary hearing. ECF Doc 2-1, at 115-131. Petitioner cites no clearly established Supreme Court law making a constitutional requirement that co-defendants (who received separate trials) to receive identical treatment at each stage of their respective appellate processes. Such a rule would not even make sense because any two trials and appellate procedures will

64

have some variation.  Essentially, this argument is a restatement of his previous claim that the state court misapplied its law regarding evidentiary hearings, and thus is not cognizable on habeas review.

Lastly, petitioner claims that the state court erroneously found that he was raising essentially the same claims as presented in his 2007 PCRA petition.  ECF Doc 2-1, at 131-134.  The state court, however, was correct.  In 2007, petitioner asserted that the witnesses in his case received favorable sentences allegedly based on undisclosed plea deals.  PCRA petition, filed 8/13/07 (Exhibit B) at 4 ("the below argument is regarding the trial testimony of Emanuel Claitt and the undisclosed preferential treatment that he received in return for his testimony against [petitioner]"); id. at 32 ("when Mr. Mickens testified that there was no agreement. . . the Commonwealth clearly knew there was an agreement and should have immediately corrected such false testimony").  In that 2007 PCRA petition, he at least used court records, albeit ones that he could have brought forward when they were generated in the 1980s.  Commonwealth v. Tillery, 2937 EDA 2008 (Pa. Super. 2009) (memorandum opinion), at 5.  In his 2016 PCRA petition, petitioner brought the same claim using **less** reliable "evidence," in the form of recantation statements.

Moreover, the similarity in claims was not the underlying basis of the Superior Court's ruling.  The state court's ruling was based on petitioner's failure to exercise due diligence in the 31 years after his conviction to bring forth his claims.  The similarity of his claims to those he presented a decade earlier was among the factors underscoring petitioner's lack of diligence.  See Exhibit F, at 5-6 (in the sentence immediately following the Superior Court's observation that the arguments in his third petitioner "expanded"

those in the 2007 petition, it wrote: "Consequently, we find [petitioner] failed to prove he acted with due diligence in discovering these allegedly new facts and governmental interference"). Therefore, petitioner's due process claims fail on the merits.

## **CONCLUSION**

Petitioner failed to meet the statutory requirements for a second habeas petition, his petition is barred by the federal statute of limitations, it is defaulted, and it is meritless. For the foregoing reasons, respondents respectfully request that the petition for a writ of habeas corpus be dismissed with prejudice, without a hearing, and without a certificate of appealability.

Respectfully submitted,

/s *Samuel H. Ritterman*
SAMUEL H. RITTERMAN
Assistant District Attorney

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**MAJOR GEORGE TILLERY,**
     **Petitioner**               :              **CIVIL ACTION**

            **v.**               :

**KENNETH EASON, et al.,**
     **Respondents**           :             **NO.  20-2675**


**CERTIFICATE REGARDING SERVICE**


     I, SAMUEL H. RITTERMAN, counsel for Respondents, hereby certify that on

February 5, 2021, a copy of the foregoing document served on petitioner via first-class

mail at the following address:

Smart Communications/PADOC
Major George Tillery / AM9786
SCI CHESTER
PO Box 33028
St Petersburg, FL 33733


                                     */s/ Samuel H. Ritterman*

                                   _____
                                   SAMUEL H. RITTERMAN
                                   Assistant District Attorney