# EXHIBIT D

Third PCRA petition filed June 15, 2016

&

Supplemental petition filed September 7, 2016

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

**Received**

JUN **1 5** 2016

Office of Judicial Records
Appeals/Post Trial

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

---

COMMONWEALTH OF PENNSYLVANIA, :

: 

Respondent, :    Docket Number
:    CP-51-CR-0305681-1984
:

v. :

:

MAJOR G. TILLERY, :

:

Petitioner :

---

## PETITION FOR POST- CONVICTION RELIEF
### And PRELIMINARY MEMORANDUM OF LAW

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully petitions this Court

for relief pursuant to the Post-Conviction Collateral Relief Act (PCRA), 42 Pa.

C.S. & 9541 *et. seq.*, and in support thereof avers the following:

## I. INTRODUCTION

1.    This is a case of factual innocence and gross prosecutorial

misconduct violating Petitioner Major Tillery's right to due process and a fair trail.

CP-51-CR-0305681-1984 Comm. v Tillery, George
Post-Conviction Relief Act Petition Filed



7460878261

The actions of the Commonwealth resulted in a fundamental miscarriage of justice that shocks the conscience and warrants reversal of his conviction and dismissal of charges against Petitioner Major Tillery.

      2.     Newly discovered evidence proves the Commonwealth knowingly and intentionally manufactured and presented false evidence to convict Petitioner. Jailhouse informants were coerced and promised favors to lie and testify that Petitioner Major Tillery was involved in the shooting homicide of Joseph Hollis and assault of John Pickens. This falsified testimony was the *only evidence* presented against Petitioner. Petitioner has spent over thirty years in prison for crimes he did not commit.

      3.     Petitioner Major Tillery was convicted of homicide, assault, weapons and conspiracy charges in May 1985 for poolroom shootings that left Joseph Hollis dead and John Pickens wounded on October 22, 1976, purportedly over disputes between drug dealers. Career informant Emanuel Claitt also identified Petitioner as an official in the Nation of Islam and that the Nation of Islam ran the Black Mafia.

      4.     Petitioner is serving a sentence of life imprisonment without the possibility of parole. William Franklin, the operator of the poolroom, charged as a co-conspirator in the shootings, was tried and convicted in December 1980.

      5.     Pickens, the survivor of the shootings, gave a statement to police detectives that identified the shooters as individuals other than Petitioner and Franklin. Pickens did not testify at either trial.

6.     There was no evidence against Petitioner linking him to these 1976 shootings except for the testimony of two jailhouse informants: that of Emanuel Claitt obtained in spring of 1980 and the other from Robert Mickens obtained in the fall of 1984.

7.     Claitt and Mickens were incarcerated with open felony charges and faced decades of state prison time. During their trial testimony both Claitt and Mickens repeatedly swore that they had received no promises, agreements or deals in exchange for their testimony. The trial prosecutor Barbara Christie insisted to the Court and to the Jury that these witnesses were not given any plea agreements or sentencing promises. This was false.

8.     The newly discovered evidence in this Petition are the sworn declarations of these witnesses, Emanuel Claitt [Exhibit A, B] and Robert Mickens [Exhibit C] that their testimony was entirely false, and that this false testimony was manufactured by the prosecution with the assistance of police detectives and secured by threats, coercion and favors including dismissal of felony charges, minimal or no state time on pleas and access to sexual encounter while in the police custody.

9.     Petitioner is factually innocent of the homicide of Joseph Hollis and the assault on John Pickens, but he was prevented from providing that defense at trial because the Commonwealth concealed its actions presenting false evidence and withheld material exculpatory evidence in violation of *Brady v. Maryland* and *Napue v. Illinois*, and the due process principles for which they stand.

3

## II. ELIGIBILITY FOR RELIEF

10.     This PCRA petition presents claims of actual innocence and the denial of due process and a fair trial by the Commonwealth's intentional manufacture and presentment of false evidence against the Petitioner, and suppression of the information that it has done so. This petition also presents other claims pursuant to *Brady v. Maryland* and its progeny for the suppression of exculpatory impeachment evidence.

11.     Petitioner states that he is entitled to relief pursuant to the following provisions of the PCRA:

a.  Petitioner's conviction resulted from "a violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States, which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. §9543(a)(2)(i).

b.  Petitioner's conviction resulted from "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial" if it had been introduced." 42 Pa. C.S. §9543(a)(2)(vi).

12.     Specifically, the claims set forth herein are based upon violations of Petitioner's right to due process of law guaranteed to him by the Fourteenth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution.

13.     The constitutional errors and newly discovered exculpatory evidence described herein have been neither previously litigated nor waived. See 42 Pa.

C.S. § 9543(a).

14.    Petitioner has been convicted of crimes under the laws of this Commonwealth and is actively serving a sentence of life imprisonment without the possibility of parole as a result of his convictions. Therefore, Petitioner is entitled to relief pursuant to the provisions of the PCRA.


### III. THIS PCRA PETITION IS TIMELY

15.    A PCRA petition, including any subsequent petition must be filed within one year of the date the judgment becomes final. 42 Pa.C.S. §9545(b)(1).

16.    Petitioner is fully aware that his instant petition, his third PCRA petition, is outside that time limitation. However, this petition is timely pursuant to the exceptions to the time constraints imposed. 42 Pa. C.S. §9545(b)(1)(i), (ii), as relevant here provide:

> (i) The failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii)The facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence;
>
>                      ***
>
> (2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

17.    Petitioner presents several claims in this petition that are based upon newly discovered facts that the Commonwealth manufactured false evidence

against the Petitioner and knowingly and intentionally presented this false evidence to the Jury and the Court. The prosecution suppressed the fact of its fabrication of the evidence against Petitioner as well as suppressed exculpatory impeachment evidence of plea deals and agreements.  The Commonwealth committed a fraud on the Court and the Jury and undermined the fundamentals of due process.

18.    This case falls squarely under the considerations of *Mooney v Holohan*, 294 U.S. 103 (1935).  Due process is violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."

19.    This case is also governed by the holdings and considerations in *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 154 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995) and their legal progeny.

20.    The newly discovered evidence is contained in the sworn declarations from the two prosecution fact witnesses, Emanuel Claitt and Robert Mickens, who provided the entirety of trial evidence against Petitioner.

21.    Claitt and Mickens now establish that their testimony was manufactured by the prosecution and police who coerced and threatened them with false charges and provided favors including plea agreements, dismissal of charges as well as allowing sexual favors while incarcerated to these witnesses as

inducement and in exchange for their false testimony. These witnesses were coached to testify falsely.

22.    Claitt and Mickens understood that the Commonwealth would penalize them if that did not lie on the witness stand and that they would be rewarded if they did.

23.    Commonwealth representatives told the Court and the Jury that these witnesses had no reason to falsify their testimony and asserted there were no plea agreements, knowing this was false. The witnesses' false statements that there were no plea agreements were not corrected.

24.    On April 18, 2016 Robert Mickens provided a sworn declaration in which he stated for the first time that his testimony at trial was fabricated and coerced by then Assistant District Attorney Barbara Christie, Detectives John Cimino and James McNeshy.  Mickens swore that he was promised a very favorable plea agreement and treatment in his pending criminal cases. He was promised protection in prison against prisoners who viewed him as a "snitch." Mickens was granted sexual favors in exchange for his false testimony.

25.    On May 4, 2016 Emanuel Claitt provided a sworn declaration, supplemented by another sworn declaration on June 3, 2016 stating that his testimony against Petitioner was fabricated and coerced and coached by ADAs Leonard Ross, Barbara Christie, along with ADA Roger King with the assistance of Detectives Larry Gerrard, Ernest Gilbert, Lubiejewski and Lt. Bill Shelton. As part of the coercion to convince Claitt into falsely testifying he was threatened

with false murder charges as well as given promises and agreements of favorable plea deals and sentencing. He was also given sexual favors.

26.     The Verified Declarations of Robert Mickens and Emanuel Claitt contain newly discovered facts that each testified falsely based on evidence fabricated by the prosecution and police.

27.     The facts upon which Petitioner bases his claims raised here became known to Petitioner within the last 60 days. This Petition is filed within 60 days of the date these claims could have been presented, meeting the jurisdictional time period set forth under 42 Pa. C.S. §9545(b)(2).

## A. Government Interference 42 Pa. C.S. §9545(b)(1)(i)

28.     Here the new evidence is the fact that it was the government itself that knowingly and intentionally fabricated and presented false evidence against Petitioner.  The Commonwealth concealed and suppressed the facts of its actions.

29.     As set forth below *infra*, the prosecution denied that its witnesses were not truthful and made affirmative statements to the Court upholding the veracity of its witnesses and attacking the efforts of Petitioner to uncover the fundamental falsity of these witnesses' testimony: That neither witness was present at the time of the crime, and in the case of Claitt, also not present at the meetings two days before the shooting.

30.     The prosecution additionally falsely stated on the record that the Commonwealth had no agreement, no deals with these witnesses regarding their respective pending cases.

31.     Underlying the entirety of the Commonwealth's prosecution was interference with the right of the Petitioner to due process by falsifying evidence and concealing that falsification. That misconduct interfered and prevented Petitioner from earlier discovering this new evidence. See, *Banks v. Dretke,* 540 U.S. 668, 696 (2004).

**B. After Discovered Facts and Due Diligence:**

32.     It is averred that the facts revealed in these declarations were previously unknown to Petitioner and could not have been previously discovered through the exercise of due diligence.

33.     It was not within the power or capacity of Petitioner to obtain the truth that Robert Mickens' and Emanuel Claitt's false testimony was actually manufactured by the Commonwealth. The Commonwealth concealed that fact.

34.     Petitioner maintained his innocence from the time he learned he was being accused of shooting Joseph Hollis and John Pickens. Because Petitioner was not involved in that shooting, he knew that what Emanuel Claitt and Robert Mickens testified to was false.

35.     Nonetheless Petitioner did not and could not obtain, no matter how much he tried, evidence of the fact the Commonwealth fabricated the evidence and coerced Claitt and Mickens into falsely testifying.

36.     Similarly there was no way for the Petitioner to obtain the factual evidence that Commonwealth representatives allowed and assisted these witnesses to have sex with girlfriends in the Round House interview rooms, and in Claitt's

case to be provided with hotel rooms prior to the willingness of these witnesses to come forward.

37.     Petitioner had no control over, nor could he by his exercise of due diligence obtain this new evidence until such time as these witnesses were willing and ready to come forward to clear their consciences and overcome fear of retaliation by the prosecution and police. It rested with Robert Mickens and Emanuel Claitt to decide to come forward. Their respective declarations state that they are only now willing to provide this information.

38.     Due diligence does not require the Petitioner to act on the *assumption* that Commonwealth withholds *Brady* material, that Commonwealth witnesses are committing perjury and the Commonwealth improperly permits them to do so. See *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (2010), *Commonwealth v. Davis*, 86 A.3d 883 (P.A. Super. 2014).

39.     Moreover, throughout the over thirty years Petitioner has been imprisoned for crimes he did not commit, he has repeatedly challenged his conviction under extremely difficult circumstances. For twenty of those thirty-plus years, Petitioner was in solitary and disciplinary custody with severe restrictions on phone communication, personal visits and access to legal materials.

40.     Petitioner was transferred almost two dozen times to prisons in the Federal system, New Jersey as well as within the PA Department of Corrections. His own legal records were taken from him and delayed in being returned to him

during each of these transfers. In 2011 his legal files, including transcripts and prior legal pleadings were destroyed by water damage at SCI Pittsburgh.

41.     Petitioner has had several serious medical emergencies, liver and bowel problems that incapacitated him for periods of time. In addition Petitioner was and is hampered by lack of funds and adequate legal assistance. This made it extremely difficult to conduct the investigation needed to pursue the new evidence presented here.

42.     These explanations are provided to this Court to explain the objective circumstances that impeded Petitioner's attempts to uncover and present to the Court the Commonwealth's falsification of evidence against him, the suppressed evidence of his innocence and other materially favorable evidence pursuant to *Brady* et. al.

43.     There is authority for the proposition that second or subsequent petitions will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred. See *Commonwealth v. Szuchon*, 633 A.2d 1098, 1099 (1993) (citing *Commonwealth v. Lawson*, 549 A.2d 107 (1988).

44.     This standard is met if the petitioner can demonstrate either: (1) that the proceedings resulting in the petitioner's conviction were so unfair that a miscarriage of justice occurred which no civilized society can tolerate; or (2) that the petitioner is innocent of the crimes charged.

45.     This Petition surely meets these tests. Petitioner is factually innocent. The gross intentional prosecutorial misconduct in fabricating witness testimony, coercing and inducing witnesses to present false testimony and suppressing materially favorable evidence is clearly a miscarriage of justice that shocks the conscience.

46.     To the extent the Commonwealth contests Petitioner's diligence in the discovery of any of the facts related to these claims, Petitioner requests an evidentiary hearing at which he will prove that he has acted with the requisite diligence. (See below p.53, the Court Must Provide an Evidentiary Hearing.)

47.     Moreover, in light of the *Brady* violations enumerated in this Petition, Petitioner is entitled to review of previously raised *Brady* claims. That is because the *Brady* claims require an evaluation of the cumulative impact of the *Brady* violations. See e.g. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (materiality of Brady violation "turns on the cumulative effect of all such evidence suppressed by the government"). In short, the new evidence of due process violations must be assessed with the old evidence on the same points.

## IV. RELEVANT CASE HISTORY

48.     Petitioner *pro se* Major Tillery AM9786 is serving a sentence of life without parole in the Commonwealth of Pennsylvania. He is incarcerated at SCI Frackville, 1111 Altamont Blvd., Frackville, PA 17931.

49.     On May 29, 1985, following a jury trial in the Philadelphia Court of Common Pleas, Petitioner Tillery was convicted of first-degree murder, aggravated assault, criminal conspiracy and weapons offenses arising out of the October 22, 1976 shooting death of Joseph Hollis and the wounding of John Pickens. Post-trial motions were denied by the Hon. John E. Geisz and Petitioner was sentenced to life imprisonment without possibility of parole on December 9, 1986. At trial Petitioner was represented by attorney Joseph Santaguida. At post-trial motions and the filing of appeals before the Superior Court and PA Supreme Court, Petitioner was represented by attorney James S. Bruno.

50.     The Pennsylvania Superior Court affirmed Tillery's conviction on May 30, 1989, *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989), and the Pennsylvania Supreme Court denied allocatur (Petition for Allowance on Appeal) on March 5, 1990, *Commonwealth v. Tillery*, 593 A.2d 841 (Pa. 1990).

51.     On September 20, 1996, Tillery filed a petition under Pennsylvania's Post-Conviction Relief Act (PCRA) asserting ineffective assistance of trial counsel because of a conflict of interest after he discovered that his trial counsel, Joseph Santaguida, Esq., had also represented Tillery's alleged victim, John Pickens, with respect to the Commonwealth's charges against William Franklin, Tillery's alleged co-perpetrator in the 1976 shooting. Franklin was tried in November-December 1980. The Court of Common Pleas dismissed Tillery's petition as procedurally defaulted and without an evidentiary hearing on January 13, 1998, and the Superior Court affirmed the dismissal on April 21, 1999.

*Commonwealth v. Tillery*, 738 A.2d 1058 (Pa. Super. 1999). Petitioner was represented by attorney Richard P. Hunter.

52.     Tillery then filed a petition for a writ of *habeas corpus* with the United States District Court for the Eastern District of Pennsylvania on December 22, 1999, in which he again contended that his trial counsel operated under an actual conflict of interest. On October 30, 2000, the District Court dismissed Tillery's petition.

53.     The Third Circuit Court of Appeals by Order dated August 23, 2003, directed the district court to hold an evidentiary hearing, after which the District Court by Order dated July 29, 2003, reaffirmed the dismissal of Tillery's petition. On July 29, 2005 in *Tillery v Horn* 432 Fed Appx 66 (2005) the Third Circuit affirmed the District Court's judgment of dismissal. Petitioner was represented by attorney Michael Consusione.

54.     On August 13, 2007 Petitioner filed a Second PCRA petition *pro se*. The central claim of that PCRA petition was the prosecution's suppression of exculpatory impeachment evidence, specifically a favorable plea deal. The Commonwealth filed a Motion to Dismiss via a letter brief on May 8, 2008. The PCRA court received a letter brief in opposition to the Motion to Dismiss on June 13, 2008. The letter was submitted by Brian J. McMonagel, Esq. on Petitioner's behalf, but an Amended PCRA was never filed. No evidentiary hearing was held.

55.     The Petition was dismissed by the Hon. John J. Poserina, Jr. on September 9, 2008 as untimely filed. A *pro se* Notice of Appeal was filed on

October 1, 2008. A formal Opinion was filed by the Hon. J. Poserina on December 11, 2009 affirming the denial of the petition as untimely filed. On July 15, 2009 the Superior Court affirmed the dismissal of Petitioner's Second PCRA. On December 9, 2009, the Pennsylvania Supreme Court denied a Petition for Allowance of Appeal.

56.     During the entire period of the preparation and pendency of his *pro se* Second PCRA petition, Petitioner was incarcerated at New Jersey State Prison in the Special Management Unit.

57.     Petitioner's right to due process of law is guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution.

58.     The constitutional errors and newly discovered exculpatory evidence described herein have been neither previously litigated nor waived. See 42 Pa. C.S. § 9543(a).

59.     Petitioner has been convicted of crimes under the laws of this Commonwealth and is actively serving a sentence of life imprisonment without the possibility of parole as a result of his convictions. Therefore, Petitioner is entitled to relief pursuant to the provisions of the PCRA.

## IV. STATEMENT OF FACTS RELEVANT TO PETIONER'S CLAIMS

### A. Overview and Evidence Relevant to Guilt

60.     The facts of the case as presented in the Superior Court decision

denying Petitioner's appeal from his December 9, 1986 judgment of sentence of

the Philadelphia County Court of Common Pleas, *Commonwealth v. Tillery*, 563

A.2d 195 (Pa. Super. 1989), begin with the following:

> "The facts of this case have a rather long and tortuous past. At
> approximately 10:00 p.m. on October 22, 1976, Philadelphia police
> received a call to the address at Huntingdon and Warnock Streets in North
> Philadelphia. At that corner they broke down the locked door of a poolroom
> operated by William Franklin and discovered the dead body of John
> [Joseph] Hollis. A medical examination later revealed that Hollis died of a
> gunshot wound to the trunk of this body. Inside the poolroom, the police
> found live and spent .38 caliber ammunition and a set of car keys. Around
> the corner from the poolroom at 2527 North 11[th] Street, police officers
> found John Pickens bleeding from a gunshot wound. He was treated at a
> hospital and survived his injuries. Both Pickens and Hollis were shot by
> different guns.

> "For more than three years, the shooting of Pickens and Hollis remained
> unsolved. However, in the spring of 1980, police detectives investigating
> the homicide of Samuel Goodwin, visited a Philadelphia prison to
> determine if Emanuel Claitt, and inmate who had known Goodwin, could
> provide any information about Goodwin's death. The information Claittt
> provided went far beyond the Goodwin case. Claitt described in detail the
> operation of what he labeled the "black mafia" a crime syndicate run by
> black Muslims in Philadelphia. His information described a vivid picture of
> the events culminating with the shootings of Pickens and Hollis.

> "Claitt testified that from 1976 until 1980, he engaged in drug dealing and
> extortion as a member of the Philadelphia "black mafia". The organization
> divided the city into sections for business purposes. Alfred Clark was he
> leader of the North Philadelphia branch. He held the rank of first lieutenant
> and had "the last word' for all business in the city. Sylvester White directed
> the West Philadelphia branch. Johns Pickens also dealt drugs in West
> Philadelphia. During the 1970s's, appellant had the rank of first lieutenant
> and had 'had control of the entire city as far as methamphetamines is

concerned ....' Claitt received his heroin supply from Clark and his methamphetamine supply form appellant. Clark and appellant were partners in the heroin and methamphetamine trade. Claitt characterized appellant as Clark's 'right hand man.'"
.....

"Based on Claitt's information, the police obtained an arrest warrant on May 23, 1980, for appellant's arrest. William Franklin was charged as well for the same offenses and went to trial in November 1980, was convicted and sentenced to life imprisonment.

"However, for three years the police were not able to serve the warrant because appellant could not be located. A detective in California finally arrested appellant in November, 1983. Appellant was returned to Philadelphia on December 8, 1983, to stand trial."

61.     No physical evidence from the scene was presented as evidence against Petitioner. Fingerprints were not taken. NT 10:83.[1] Car keys found in the poolroom were identified as belonging to Fred Rainey, but he was not charged for anything having to do with the shootings. NT 13:12. A large plastic bag containing a controlled substance was found on the pool table. NT 13:8. Coats, a hat and glasses were found in the poolroom, but not linked to anyone. NT 13:33. Alfred Clark was detained after a car stop shortly after the shooting, but he was not charged. NT 13:43-44. Eighteen hundred dollars was confiscated but was later released to Clark. NT 13:31.

62.     Shortly after the shooting, while in the hospital, surviving victim John Pickens made a statement to a homicide detective[2] NT 13:56, but no charges

_____

[1] Petitioner is indicating transcript pages by using NT followed by a number that is the
[2] Pickens gave a verbal and written statement to homicide detective McGrath that "Dave" and "Rickie" committed the shooting. (Exhibit D)

were brought against Petitioner, or anyone else. NT 13:57. Pickens never testified, not at William Franklin's trial in Nov-December 1980 nor at Petitioner's trial in May 1985. The prosecution didn't try to subpoena Pickens as a witness.

63.     The Commonwealth's evidence against Petitioner that he was inside the poolroom and one of the shooters of Hollis and Pickens came solely from career jail informant Emanuel Claitt in May 1980.[3]

64.     According to Claitt, Petitioner threatened Hollis after Hollis pistol-whipped Clark during a dispute about drug selling in West Philadelphia on October 20, 1976. NT 14:30. Petitioner was involved in making arrangements for a meeting at the poolroom between Hollis and Clark with others. NT 14:32, 39.

65.     Claitt said that it was arranged that everyone would meet at the mosque and go from there to the poolroom, but before the service was over Petitioner and Franklin got up and left. NT 14:42.

66.     After the service, Claitt drove over to the poolroom with Clark and others, and was asked by Clark to guard the door inside the poolroom. NT 14.49. Claitt didn't see Petitioner and William Franklin at the poolroom until they came from behind a barrier and shot at Hollis and Pickens. NT 14:59.

67.     Claitt said after Pickens was shot "he ran through this door which had a glass centerpiece in it."[4] NT 14:73.

_____

[3] Between January 1980 and Petitioner's 1985 trial Claitt provided information to and/or testified for the prosecution against Robert Lark, William Franklin, James Brand, George Rose, Fred Rainey, Major Tillery and Larry Frazier

68.     Claitt was not charged in anyway in connection with the shootings.

69.     The other prosecution fact witness was Robert Mickens, also a jail house informant. Mickens did not testify at Franklin's trial in 1980 and became a prosecution witness against Petitioner in a statement given to detectives on September 26, 1984, eight years after the shootings.

70.     Mickens testified that while walking down the street in front of the poolroom shortly before 10 pm on the night of the shooting, he was asked by Petitioner to be an outside "lookout" to watch for patrolling police cars. NT 21:36.

71.     Mickens said Petitioner was on the poolroom steps with Franklin and Alfred Clark. NT 21:35,60.

72.     Mickens did not witness and did not know what happened inside the poolroom, but heard shots.

73.     Mickens also testified that he was asked to and agreed to be an alibi witness for Petitioner back in 1976, a few days after the shootings. NT 21:15.

74.     Mickens was a surprise witness for the prosecution, kept secret from Petitioner until he was called to the witness stand. The Commonwealth had

---

[4] The issue of whether Pickens went through a glass door, and even whether a glass door was in the poolroom in 1976 and/or an exist door from the poolroom, was an issue of extensive questioning to numerous witnesses at Petitioner's trial. None of the police officers at the scene in 1976 saw a glass door, or took photographs of any such door. Nor was the there any medical evidence that John Pickens was injured going through a glass door. It was only when ADA Barbara Christie prepared for Petitioner's trial in 1985 were photos taken of a hallway that reportedly once had a glass pane.

obtained a protective order prior pursuant to Rule 305 F[5].  The Commonwealth disclosed over Mickens' September 24, 1984 statement (C-41) just minutes before he testified. [Exhibit E]

**B. Witnesses' Arrests and Plea Agreements with the Commonwealth**

75.     Both Claitt and Mickens were prosecution witnesses with a criminal history, pending cases and were incarcerated during Petitioner Tillery's trial. The testimony of Claitt and Mickens was repeatedly challenged on the grounds they had received possible favorable plea deals in exchange for their testimony against Petitioner.

*Claitt Testimony That He Had "No Plea Deals"*

76.     In April 1980 homicide detectives questioned Emanuel Claitt who was incarcerated on a probation violation and had 8 or 9 open cases. NT 14:8.

77.     Claitt was questioned about the homicide of Samuel Goodwin NT 15:8 and provided information on that homicide, as well as others, including the homicides of Alfred Clark (April 1979) and Joseph Hollis (October 1976) and firebombings committed by him and others. NT 14:8.

78.     Claitt's open charges included auto theft, possession with intent to distribute drugs, weapons charges and conspiracy.

---

[5] Petitioner objected to the *in camera* proceeding that led to the protective order that concealed the fact that Robert Mickens was going to be a prosecution witness on the grounds that there was no basis for a finding that Mickens needed protection from Petitioner.  The court overruled the objection and preserved the record of the exparte petition. NT 21:2-13.

79.     On May 20, 1980, Claitt gave a 6-page statement on the 1976 shootings of Hollis and Pickens,  "Investigation-Interview Record," taken by Det Lawrence Gerrard (Com. Exh-31).[6] NT 15:8. This inculpated Petitioner and William Franklin.

80.     Following Claitt's statement an arrest warrant was issued for Petitioner.

81.     Per Claitt, at the time of that statement he had "no agreement" regarding plea deals on his pending 8 or 9 cases. NT 14:78.  The only "understanding" Claitt had with the Commonwealth was that after his testimony at preliminary hearings he would get help to be released on bail and he would have to fight his cases on his own "with no helping [sic] from the District Attorney's office." NT 14:83.

82.     On June 4, 1980, Claitt testified at Franklin's preliminary hearing and at the separate preliminary hearing against George Rose.[7]

83.     On June 10, 1980, Claitt was released from jail after the Commonwealth went to Judge Kubacki to lift Claitt's detainer on violation of probation on firearms charges. NT 14:81.

84.     On July 9, 1980—a month later—while out on bail, Claitt was arrested on new charges for car theft. When back in prison, the Commonwealth

---

[6] Petitioner has not been able to obtain a copy of C-31 from the Clerk's office. ADA Barbara Christie read a portion of the statement back to Claitt in her re-direct examination. See NT 16:71-76.

[7] Rose was charged with the murder of Alfred Clark but acquitted after a jury trial. NT 14:81.

also placed firebombings charges against him as well as Petitioner, George Rose and James Brand. NT 14:82.

85.     Claitt made bail for firebombing charge, and was out on the streets when he testified against Franklin at trial Nov-early Dec 1980. NT 14:79, 82.

86.     On November 29, 1980, during the Franklin trial, Claitt pled guilty to 3 of the pending charges, the firebombing and the 2 drug charges before the Hon. Judge Leon Katz. NT 14:83.

87.     Claitt testified this was an "open plea…I pled guilty to the charges with no recommendation from the District Attorney's office…the Judge would decide my fate as to sentence." The only request to Judge Katz would be a recommendation that the sentences run concurrent. NT 14:5, 6.

88.     On January 5, 1981 the ADA Leonard Ross sent a letter to Judge Katz. NT 14:19. (Exhibit F) Claitt testified this letter was to inform Judge Katz that he had "cooperated with the District Attorney."

89.     Claitt also said that the "agreement" he had with the District Attorney was that in view of this cooperation they [the District Attorney] would nolle pross three of his cases, but "would not recommend a sentence, they would leave it up to the judge." NT 14:86.

90.     On Sept 18 1981 Claitt was sentenced by Judge Katz. On the three charges he pled guilty to he received concurrent sentences of one and a half to seven years, one and a half to five years and a matter of months.[8] NT 14:83.

91.     Claitt was acquitted of two cases and the District Attorney nolle prossed three cases. NT 14:20.

92.     This sentence gave Claitt a total of one and half to seven years in prison and 5 and a half years under the supervision of the parole board. NT 14:80.

93.     On November 22, 1982 Claitt was released on parole. NT 15:24.

94.     Claitt served a year and a half in prison. NT 15:22.

95.     On April 21, 1983 Claitt was arrested on new charges of robbery and aggravated assault. 14:94 This robbery charge put Claitt in violation of state parole and put him back in custody. NT 14:94.

96.     On February 29, 1984 Claitt was released on the parole violation and able to sign his own bond on the robbery case immediately after testifying against Petitioner at his preliminary hearing.[9] NT 14:95.

97.     Claitt was re-incarcerated for violation of parole for reporting to his parole officer with a knife in his sock. NT 14:99.

_____

[8] Unmentioned by Claitt or ADA Barbara Christie are 13 charges from May 16, 1980 including robbery, assault, firearms before Judge Levy Anderson, which were nolle prossed April 13, 1982. See CP-51-CR-1107131-1980 [Exhibit G]

[9] Undisclosed by ADA Barbara Christie were the letters by Arnold Gordon, Chief, Homicide Unit to the Secretary of PA Parole Board, January 31, 1984 and District Attorney Edward Rendell's letter to Judge John J. Chiovero, February 18, 1984. [Exhibits H, I, J]

98.    On May 14 and 15, 1985 Claitt testified against Petitioner, while incarcerated in violation of parole and with pending robbery and aggravated assault charges. NT 14:25, 93.

99.    At the time of his trial testimony against Petitioner, Claitt had spent 8 ½ months in Philadelphia Detention Center, Isolation Unit, Protective custody. NT 14:3.

100.    Claitt testified there was no sentencing agreement on the pending open robbery case, which was scheduled for trial June 24, 1985 before the Hon. Judge John J. Chiovero. NT 14:6, 94.

101.    When questioned by ADA Christie if there was an understanding or agreement with the Commonwealth concerning the disposition of those open charges. Claitt said:

"As to Agreement, the District Attorney merely mentioned that they did all they were going to do for me at that point but they would make Judge Chivoero aware of my prior cooperation and that I would be testifying in other trials in the near future." NT 14:94.

102.    ADA Barbara Christie told the Hon. John A. Geisz as part of her objections to Petitioner's attorney continued questions to Claitt about possible plea agreements:

"The witness has testified to his understanding of the Agreement. And now the witness has indicated that there is no agreement with regard to sentencing on the open robbery. There is no agreement. He goes to trial on that. He has a parole date of September 85 and that he is currently in custody for violating his parole. And his understanding of any agreement he has with the commonwealth is that the Commonwealth will make the parole board aware of his cooperation in this and the other cases. NT 14:98.

103.    On May 28, 1985 ADA Christie gave her Summation to the Jury

saying there was "no set deal" and that the Com would only enter into an "open

plea" agreement with Claitt. NT 28:60. She further stated:

> "Claitt talked to the police in May 1980, *with no deal but with a great
> desire*, great desire for protection for himself and his family, particularly
> after he went public in court and testified in June 1980 at a preliminary
> hearing  and December 1980 at the Franklin trial.

> "Yes, Claitt was in and out of custody. He pled guilty to 3 crimes. He stood
> trial on 2 and he awaits trial on a third."[10] NT 28:90.

### Mickens Testimony That He Had "No Plea Deal"

104.    In February 1984 Robert Mickens was arrested on rape, assault and

robbery charges and remained incarcerated through the May 1985 trial of

Petitioner. NT 21:23, 54.

105.    In September 1984 Mickens was taken to police headquarters at 8th

and Race for questioning about the homicide of Ronald Johnson and volunteered

information to the homicide detective about other homicide cases. NT 12:29.

106.    On September 26, 1984 Mickens gave police a statement regarding

what he knew of the homicide by shooting of Joseph Hollis, recorded in a 6-page

Investigation-Interview Record (Com Exh 41). NT 21:106-7. [Exhibit E]

107.    Mickens placed Petitioner outside the poolhall on the night of the

shootings, asking Mickens to be a police look-out. NT 21:107.

---

[10] This 1983 robbery case from 1983, pending during Tillery trial was nolle
processed by the Commonwealth December 16, 1987. {See Exhibit G]

108.    Mickens testified in in preliminary hearings two separate murder cases against George Brown and Kenneth Purnell, on December 8, 1984 and January 3, 1985. NT 21:27.

109.    Mickens was identified in the prison as a snitch and placed in areas of protective custody in a Philadelphia prison and then transferred to a prison outside the Philadelphia area. NT 21:101,105

110.    On May 16, 1985 Mickens pled guilty to criminal conspiracy and rape before the Hon. Eugene Clarke Jr. and was scheduled to be sentenced on July 18, 1985. NT 21:24.

111.    Mickens testified it was an "open plea" with no plea bargaining, 21:24  that his sentencet would be up to the judge. NT 21:25.

112.    Mickens was advised that he could get 10-20 years on the rape case, 5 to 10 on the conspiracy and that the sentences could run concurrent or consecutive. NT 21:26.

113.    His only "understanding" with the District Attorney's office was that it would let Judge Clark know about his cooperation and that the other charges would be nolle prossed. NT 21:26.

114.    In her summation, ADA Christie told the jury that Mickens "awaits sentence on a guilty plea to a rape charge and conspiracy. That could net him 15 to 30 years at the decision and discretion of the sentencing judge." NT 28:91.

115.    When sentenced before the Hon. Eugene Clark, Jr. on October 10, 1985, Mickens received probation.

**IV. Newly Discovered Evidence and Exculpatory Evidence the Commonwealth Has Concealed For the Past Thirty-one Years That Proves Major Tillery is Innocent and that the Commonwealth Knowingly Presented False Evidence of his Guilt**

116.  Petitioner has within the last sixty days discovered new evidence from the two Commonwealth fact witnesses, Emanuel Claitt and Robert Mickens. These newly discovered facts are contained in sworn declarations of Emanuel Claitt and Robert Mickens.  [Exhibits A, B and C]

117.  Claitt and Mickens each swear that their testimony inculpating Petitioner was a lie, manufactured by the Commonwealth, resulting from coercion and promises of plea deals and sexual favors.

118.  The significance of this new evidence is that it proves that the entirety of the prosecution's case against Petitioner was based on false testimony, manufactured and presented by the Commonwealth.

119.  This new evidence proves Major Tillery's innocence. Without the testimony of Emanuel Claitt the District Attorney could not have prosecuted Petitioner. Had the facts of the coercion and promises made to these witnesses to compel them to falsely testify been known to the jury, Petitioner would have been acquitted at trial.

120.  This newly discovered evidence was unavailable to Petitioner despite his exercise of due diligence. Claitt and Mickens were previously unwilling to come forward with the truth and provide this evidence to Petitioner because they feared retaliation by the police and prosecution.

Below, Petitioner presents the contents of these verified declarations.

**Newly Discovered Evidence From Emanuel Claitt, May 4 and June 3, 2016**

121.    Without the testimony of Emanuel Claitt there is no case, no

evidence of Major Tillery's involvement in the shootings of Joseph Hollis and

John Pickens.

122.    Prior to Claitt's statement to police detectives May 20, 1980 there

were no suspects in the October 22, 1976 shootings of Hollis and Pickens. It was

only after Claitt's statement that an arrest warrant was issued for Petitioner.

123.    ***Verified Declaration of Emanuel Claitt, May 4, 2016***

> I submit this declaration stating that I lied when I testified at the trial of Major Tillery in May 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.
>
> I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.
>
> I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.
>
> I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.
>
> I was in prison in 1980 on serious charges and I was approached by Philadelphia detectives Larry Gerrard and Ernest Gilbert. They threatened to charge me with the murder of Samuel Goodwin. I had eight or nine open cases, at least three of them were felonies with a lot of years of prison time.
>
> I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder.
>
> Detectives and prosecutors ADA Lynn Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Lynn Ross, Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted

to arrest him and Franklin. So Franklin was tried in December 1980 and I falsely testified against William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This argument supposedly took place in the home of Dana Goodman. I testified that Major Tillery was there and after an argument and pistol slapping of Clark by Hollis, Major Tillery said that "Hollis would have to die for what he did."

This was not true. I was not at any such meeting and I didn't have any personal knowledge of this supposed argument and threat made by Major Tillery.

I also testified at Major Tillery's trial that after the argument in Goodman's house a group that included me as well as Clark and Major Tillery met at a mosque in North Philadelphia and drove a few blocks to a poolroom owned by William Franklin to demand Sylvester White, the head of the West Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this actually happened.

I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from

entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard gunshots in the pool hall, saw Pickens and Hollins shot and that Major Tillery and Franklin were in the pool hall and that they were the shooters.

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on t he front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie, Len Ross, Roger King interviewed me, and worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

**124.  *Verified Supplemental Declaration of Emanuel Claitt, June 3, 2016***

I submit this supplemental declaration about my false, manufactured testimony against Major Tillery and William Franklin in the November 1980 and May 1985 trials for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the shootings at the poolroom on October 22, 1976, that I wasn't there then or at the argument at Dana Goodman's house or meetings before the October 22, 1976 shootings.

For example: In our meetings I said you know I wasn't there – you have to fill in the blanks. Detectives Gerard, Gilbert, Lubiejewski, Lt. Shelton and ADA Ross would tell me, "you've got to say it this way." I was told "we've got to bring him down—you've got to help us." That meant I should lie." Barbara Christie told me: "You're the best. You should have been a lawyer." That meant I knew how to lie.

The prosecutor against William Franklin in 1980 was Leonard Ross. I met with him as well as ADAs who worked with Barbara Christie soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert and Lubiejewski. I met with ADA Roger King also who had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact I got one and a half-years.

When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true.

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was "open" and that there were no agreements about leniency and sentencing.

She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to.

But my testimony that there was no plea deal was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing -firebombings in 1979 and 1980 that I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at

these trials and that my false testimony was manufactured by the ADAs and police until now.

> It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.
>
> I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

125.   These declarations of Emanuel Claitt establish that the testimony he gave at trial was false. As most succinctly stated from Claitt's declarations, "I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured…I lied." (May 4, 2016)

126.   Emanuel Claitt provides new evidence that the Commonwealth knowingly presented false inculpatory testimonial evidence against Petitioner. "The police detectives and prosecutors knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials." (June 3, 2016)

127.   Claitt describes meetings with police and prosecutors in which they worked over what he would say, "filling in the blanks." Police and prosecutors knew that Claitt didn't have any personal knowledge of the poolroom shootings and what led up to that.

128.   Claitt tried to recant after Franklin's trial but was threatened by a police lieutenant with being framed on a murder.

129.   Claitt describes being set up to meet with Robert Mickens in a police van making a phony trip back and forth from the Roundhouse to the State prison

in order talk to Mickens and pressure him to also testify against Petitioner, because he had "no choice."

130.    Claitt states that ADA Christie worked him over and coached him to remedy a "problem" in his testimony that John Pickens fled the poolroom after being shot, running through a glass door.

131.    It was made up for Claitt to testify that Petitioner pulled a gun on him and threatened to shoot him in 1983.

132.    Claitt further states he was forced to testify that the Nation of Islam ran the "black mafia" controlling drug dealing in Philadelphia and to testify to everyone's Muslim names.

133.    Claitt states that his false testimony was based in part on the threats from police detectives that he would be charged with murders he did not commit if he refused to become a witness against Petitioner.

134.    Emanuel Claitt provides new evidence that the Commonwealth made numerous plea deals with Claitt to induce his false testimony, and then coached Claitt to deny those plea deals were made.

135.    Claitt testified at trial with the knowledge that he would be able to get out on bail, signing his own bonds and have parole and probation detainers lifted. This is supported by the letters from the District Attorney's office to judges and the PA Parole Board.

136.   Claitt was given repeated "get out of jail" passes despite his numerous parole violations and the commission of new felonies each time he was released.

137.   Although Claitt testified that there were "no deals" and "open pleas," he was secure and confident that the District Attorney's office would protect him, nolle prosse numerous felony charges and arrange for him to get minimal sentences.

138.   That these plea deals existed is corroborated by the facts that for the 8 or 9 pending felonies in 1980, for which he faced 25-50 years on the three cases he pled guilty to, Claitt spent just a year and a half in prison.

139.   There is also the matter of the undisclosed 13 charges from May 16, 1980 including robbery, assault and firearms that were pending against Emanuel Claitt when he testified at Franklin's trial. These were nolle prossed by the prosecution before Judge Levy Anderson on April 13, 1982. See CP-51-CR-1107131-1980.[Exhibit G]

140.   ADA Barbara Christie did not disclose this history to Petitioner Tillery at his trial, nor did Emanuel Claitt testify about this..

141.   Additionally the "open" robbery charges from 1983 that Claitt was questioned about at Petitioner's trial were nolle prossed after Petitioner's post-trial motions were denied. This was the very same charges that ADA Christie assured the Court and the Jury were "open" and that the prosecution had made no plea deals with Claitt.

142.   Claitt also reveals in his declarations that while incarcerated police arranged visits between Claitt and different girl friends in homicide interview rooms in police headquarters and at hotels for him to have sex.

143.   Claitt's understanding and agreement with the Commonwealth was the plea deals and sexual favors were given in exchange for his false testimony to get a murder conviction against Petitioner. These agreements and arrangements were made possible only by the conscious action of the Commonwealth.

144.   Emanuel Claitt provides new evidence that the Commonwealth failed to correct the false testimony he gave on Petitioner's guilt and that there were no plea deals, but suppressed plea arrangements and favors asked of Judges and the Parole Board but suborned Claitt's false testimony.

**Newly Discovered Evidence Provided by Robert Mickens**

145.   Robert Mickens was a surprise witness at Petitioner's trial. His testimony was intended to corroborate Emanuel Claitt that Petitioner was in the poolroom when shots were fired. Mickens was not a witness to the shootings.

146.   *Verified Declaration of Robert Mickens, April 18, 2016:*

> In May 1985 I falsely testified as a witness for the Philadelphia County District Attorney in the prosecution of Major George Tillery (CP-51-CR-0305681-1984) on murder charges.
>
> The testimony I gave at that trial was false, manufactured by the prosecutor, Assistant District Attorney Barbara Christie.
>
> I was coerced and promised favors if I falsely testified against Major Tillery.
>
> I was arrested on February 28, 1984 on charges of robbery and rape and faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I "worked with [her] on the Major Tillery case" she "guaranteed" I wouldn't be sent upstate on my robbery and rape case and would be "protected."

ADA Christie and her homicide detectives, John Cimino and James McNeshy, repeatedly brought me in for questioning on a number of robbery and murder cases, asking me to become a prosecution witness against Major Tillery.

On one occasion ADA Christie showed me what looked like a paper signed by Major Tillery saying that I was going to be an alibi witness for him. I told her I was.

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men.

When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known "snitch." I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but never taken from the van.

Claitt told me I was "pretty hemmed up" and that Major Tillery was a "slime," that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the

false grounds that I needed a protective order to protect me from
Major Tillery.

That was not true. I had told Major Tillery that I would be a witness
for him at the murder trial of John Hollis. He had no reason to think
I would be a witness *against* him. I had no contact with Major
Tillery once I was sent to Northampton County Prison. I did not fear
him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the
shooting of John Hollis and John Pickens. That was totally false. My
entire testimony was scripted and rehearsed by ADA Barbara
Christie.

I agreed to give this false testimony because I was I promised no
prison time on the rape and robbery charges and that I would be
protected by the prosecution. I was given sexual favors in exchange
for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of
rape and criminal conspiracy, I didn't get prison time. I was
sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my
own guilt for falsely testifying against Major Tillery and my fear of
retaliation by the prosecution and police.

Much in my life has changed. I want to make amends for falsely
testifying against Major Tillery. I am willing and ready to be a
witness in any proceeding brought to challenge his conviction.

147.    Robert Mickens swears in his declaration that his trial testimony was

"totally false …scripted and rehearsed by ADA Barbara Christie." He explains the

police and prosecution coerced him to testify falsely against Petitioner, to say he

was asked by Major Tillery to be a look-out for police outside the poolroom, that

Petitioner was him to be an alibi witness for him and he feared for his life and that

of his family if he wasn't.

148.   Mickens now exposes that his testimony was lies. He was not a look-out outside the poolroom, no one asked him to be lookout and that Petitioner hadn't asked him to be an alibi witness and Petitioner hadn't threatened him.

149.   It was the Commonwealth that threatened to bring false murder charges against Mickens, while promising him no prison time on rape and robbery charges if he testified against Petitioner. They set Mickens up with Emanual Claitt, their career informant, to convince him he had no choice but to lie against Petitioner.

150.   The police and prosecution arranged and allowed him to have sexual tryst with his girlfriend in police headquarters while he was in custody to induce his false testimony.

151.   Mickens feared retaliation if he came forward earlier and told the truth about his lying testimony.

152.   The new evidence provided by Mickens in his declaration supports the fact that the Commonwealth manufactured the testimonial evidence against Petitioner, knowingly presented this falsified evidence, suppressed materially favorable evidence and failed to correct Mickens false testimony.


## V. CLAIMS FOR RELIEF

153.   The above quoted declarations provide previously unavailable and newly discovered evidence showing that Petitioner is an innocent man. They show that Petitioner is the victim of gross prosecutorial misconduct in the

Commonwealth's manufacture and presentation of known false testimony inculpating Petitioner.

154.    The Commonwealth also suppressed exculpatory information, i.e., information that either challenged the credibility of Commonwealth witnesses or the Commonwealth's trial presentation, and that demonstrate that Petitioner was not involved at all in the shootings of Joseph Hollis and John Pickens. Petitioner now places these verified declarations in their proper legal framework showing that Petitioner is entitled to relief on the following grounds.

### CLAIM I.

### Newly Discovered Evidence Demonstrates
### Petitioner's Innocence

155.    Petitioner has always asserted his innocence. There is no physical or forensic evidence of the perpetrators from the crime scene in October 1976. There is no physical evidence presented linking Petitioner in any way to this crime. No guns found linked to the bullets. No fingerprints event taken. The keys found in the poolroom were not Petitioner's, the $1800 was not Petitioner's, the drugs were not Petitioner's, the items of clothing found in the poolroom were not Petitioner's. His car was not on the scene.

156.    The surviving victim John Pickens gave police a statement shortly after he was shot that names other men, not Petitioner or William Franklin, as the shooters. Pickens did not testify at either Franklin's 1980 trial or Petitioner's in

1985. [Exhibit D]

157.    Without the testimony of Emanuel Claitt, there was *no evidence* against Major Tillery. It was only the testimony of Emanuel Claitt who put Petitioner inside the pool hall, pulling out a gun and shooting Joseph Hollis. It was Claitt who put Petitioner at a meeting where Petitioner supposedly made threats against Hollis's life and helped arrange the poolroom meeting where Hollis was killed and Pickens wounded. There was no other evidence against Petitioner. That testimony was a lie.

158.    Robert Mickens was brought in for Petitioner's trial, to provide some corroboration to Claitt's testimony by testifying that Petitioner asked him to be a lookout for police outside the poolroom. This is the only evidence, other than Claitt's testimony, that puts Petitioner at the poolroom that night. As Mickens declares, his testimony was a lie. No one, not Petitioner, Clark or Franklin asked him to be look-out that night. He did not see Major Tillery near the poolroom.

159.    In further support of this claim, Petitioner incorporates supporting paragraphs of this petition regarding facts and law.

160.    The newly discovered facts support Petitioner's claim that he is factually innocent. These new facts require the vacation of Petitioner's conviction.

161.    The legal standard governing a post-conviction claim of newly discovered evidence is well-known. A petitioner must: establish that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3)

it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Commonwealth v. Washington*, 927 A.2d 586, 595-96 (Pa. 2007). Petitioner new evidence of innocence meets each of these prongs.

## CLAIM II.

### The Commonwealth Manufactured and/or Presented False Inculpatory Evidence and Suppressed Material, Exculpatory Evidence in Violation of Petitioner's Sixth and Fourteenth Amendment Right to the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution

162.    Petitioner's right to due process, right to a fair trial, and right to present a defense were violated as the Commonwealth manufactured and/or intentionally presented false testimony and evidence of Petitioner's guilt and withheld from Petitioner and his counsel material, exculpatory evidence, including impeachment evidence, in violation of Petitioner's Fifth and Fourteenth Amendment rights to the United states Constitution and Article I, §9 of the Pennsylvania Constitution.

163.    The newly discovered evidence in this case exposes a fundamental miscarriage of justice, violating the right to due process by the Commonwealth against Petitioner Major Tillery by suborning the truth, and committing fraud on the Court and jury with the intentional presentation of false evidence manufactured by the Commonwealth against Petitioner Major Tillery.  The false evidence so manufactured and presented at Petitioner's trial constituted the sole

evidence of his culpability – that he shot and killed Joseph Hollis and wounded

John Pickens-- as well as materially favorable impeachment evidence, the

existence of plea deals that induced and coerced these witnesses to lie.

164.    It is long established that a conviction obtained through use of false

evidence, known to be false by government representatives, must fall under the

Fourteenth Amendment. *Mooney v Holohan*, 294 U.S. 103 (1935) held in a

historic decision that due process is violated "if a State has contrived a conviction

through the pretense of a trial which in truth is but used as a means of depriving a

defendant of liberty through a deliberate deception of court and jury by the

presentation of testimony known to be perjured." See also, *Pyle v. Kansas*, 317

U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3rd Cir. 1958).

165.    This case is also governed by the holdings and considerations in

*Napue v. Illinois*, *supra*, *Brady v. Maryland*, *supra*, *Giglio v. United States*, *supra*,

*Kyles v Whitely, supra*, and their legal progeny.

166.    In *Napue v Illinois*, 360 U.S. 264, 269 (1959) the United States

Supreme Court confirmed the principle that "a State may not knowingly use false

evidence, including false testimony to obtain a tainted conviction."

167.    The Pennsylvania courts have ruled strongly and similarly following

*Napue.* The Commonwealth's intentional presentation of false evidence is a

miscarriage of justice that no civilized society can tolerate.

168.    "It is of course, an established principle that a conviction obtained

through the knowing use of materially false testimony may not stand; a

prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2nd 806, 810 (1977) ((citing *Giglio v. United States*, 405 U.S. 150 (1972), quoted in *Commonwealth v Hollowell*, 477 Pa. 232, 236-37, 383 A.2nd 909, 911 and *Commonwealth v Romansky*, 702 A.2nd 1064, 1066 ( Pa. Super. 1997).

169.   *Napue* created a three-part test to determine whether a conviction of this kind of case violates due process: that the testimony was false, the prosecutor knew it was false, and the false testimony was material.

170.   With the requirement that false testimony be "material," the Supreme Court meant that there must be "a reasonable likelihood that the false testimony could have affected the judgment." *Napue*. "Where the prosecution obtains a conviction through the use of false or perjured testimony, a strict standard of materiality must applied." *Commonwealth v Romansky*, 702 A.2d 1064, 1068 (Pa.Super. 1997), appeal denied, 555 Pa. 699, 723 A.2d 670 (1998). "[T]he false testimony is considered material if it could in any reasonable likelihood have affected the verdict." Id. When making the materiality determination, "the state of mind of the prosecutor is not material, but rather, the important issue is whether the accused received a fair trial." Id.

171.   In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Id*. at 373 U.S. 87. "Impeachment evidence

… as well as exculpatory evidence, falls within the Brady rule.) *United States v. Bageley*, 473 U.S. 667, 676 (1985). The prosecution has an affirmative "duty to disclose such evidence … even though there has been no request (for the evidence) by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976). That responsibility "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id.* at 280-281 (quoting *Kyles v, Whitley*, 514 U.S. 419, 438 (1995). ). It is well established that the state violates a defendant's right to due process under *Brady* when it is withheld.  *Smith v. Cain*, --- U.S. ----, 132 S. Ct. 627, 630

172.    To establish a *Brady* violation, Petitioner must prove three elements: "[1] the evidence (at issue) was favorable to the accused, either because it is exculpatory or because if it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1130 (Pa. 2011). The evidence withheld by the Commonwealth, as detailed above, ensured "[t]hat no reliable adjudication of Petitioner's guilt or innocence could have taken place." *Commonwealth v. Strong*, 761 A.2d 1167, 1175 (Pa. 2000) (reversing conviction for Commonwealth's failure to comply with *Brady* obligations).

173.    Additionally, the Commonwealth failed to correct testimony given by Emanuel Claitt it knew to be false, in violation of *Napue v. Illinois,* 360 U.S 264, 269 (1959) (Holding that the State commits a Fourteenth Amendment

violation when "although not soliciting false evidence, [it] allows it to go uncorrected when it appears.").

174.    Knowledge of information in the possession of any law enforcement actor that has a connection to a particular prosecution is chargeable to the prosecutor. *Kyles v. Whtley*, 514 U.S. 419, 437, 482 (1995) ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case, including the police"; "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf"). Thus, knowledge by any of the police officers working on this case is chargeable to the prosecutor, as is knowledge by any one of the prosecutors.

175.    Under *Brady* and its progeny, a "showing of materiality [prejudice] does not require demonstration by even a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a 'reasonable probability' of a different result." *Id.*; *Commonwealth v. Strong*, 761 A.2d 1167, 1171 (Pa. 2000) ("As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted." *citing United States v. Bagley*, 473 U.S. 667 (1985)). A reasonable probability of a different result existed "when the prosecution's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles, Id.*; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir.

1999) (The "undermines confidence" standard is not a stringent one. It is less demanding than the preponderance standard.").

176.    In assessing materiality, the Court considers how effective counsel could have used the suppressed information at trial and through pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); *Id.* at 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by the defense, may have made a difference); *Id.* at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled"); *Wilson v. Beard*, 589 F.3d 651, 659, 664 (3d Cir. 2009) (same).

177.    In assessing materiality, the Court considers how effective counsel could have proceeded in the absence of the due process violations both at trial and in pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441; *United States v. Bagley* 473 U.S. 667, 676; *Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *Breakiron v. Horn*, 642 F.3d 126 (3rd Cir. 2011).

178.   In this case, the "absence of due process violations" would have meant no prosecution of the Petitioner, because in the absence of due process violations, there was no "evidence" against the Petitioner.

## 1.   The Commonwealth Manufactured and/or Presented the False Testimony of Emanuel Claitt that Petitioner was Involved in the Homicide of Joseph Hollis and Assault on John Pickens

179.   Emanuel Claitt's declarations establish that his testimonial evidence was false and that the Commonwealth knew it was false. The presentation of false evidence by a prosecutor constitutes the most fundamental violation of due process.

180.   This is not a case of falsification or prosecutorial suppression of a *particular* aspect of the prosecution's case. This false evidence was the *entirety* of the evidence against Petitioner.  This false evidence is unquestionably material to the conviction of Petitioner.

181.   Petitioner was convicted solely on the basis of witness testimony. It was Emanuel Claitt alone who provided testimonial evidence that Petitioner Tillery was in the poolroom and shot the victims.

182.   Petitioner incorporates the factual allegation and legal argumentation included in the paragraphs above in support of this claim.

183.   Claitt's declaration also provides proof of the Commonwealth's intentional manufacture and presentation of false testimony against Petitioner. It also provides evidence of the prosecution's efforts to suborn perjury by Robert Mickens, by disclosing the phony transport of Claitt and Mickens from the Round

House to the jail on State Road for Claitt to pressure Mickens into testifying against Petitioner.

184.    Since the prosecution's case did not exist without that Claitt's testimony there is no question that this new evidence is material.

## 2.    The Commonwealth Manufactured and/or Presented False Testimony of Robert Mickens that Tillery was at the Poolroom When Hollis and Pickens were Shot

185.    Robert Mickens provided testimonial evidence that Petitioner Tillery had asked him to be a police lookout outside the poolroom and that Tillery went into the poolroom shortly before he heard shots. Mickens also provided testimony that Petitioner was attemped to establish a false alibi.

186.    Mickens' trial testimony provided corroboration to Claitt's testimony that Petitioner was in the poolroom when Hollis and Pickens were shot.

187.    Mickens trial testimony served to prop up Claitt's testimony, which was weakened or compromised by his extensive and continued arrest record and the accusations that his testimony was induced by plea deals.

188.    Mickens' declaration establishes that trial testimony was false and that the Commonwealth knew it was false because it was the Commonwealth that manufactured it. Mickens' declaration disclosed the Commonwealth's conscious efforts to coerce him into falsely testifying against Petitioner.

189.    The new evidence provided by Mickens that his trial testimony was a lie, coerced and induced by the prosecution eliminates that his trial testimony corroborating Claitt.

190.    Mickens declaration also corroborates the Commonwealth's intent to convict Petitioner, whatever the cost to truth. It confirms the Commonwealth's manufacture of false evidence by threats of false prosecution and providing plea deals, protection, and sexual favors. The new evidence provide by Mickens is material.

3.    **The Commonwealth Presented False Testimony that Emanuel Claitt and Robert Mickens Had No Plea Agreements with the Commonwealth and that False Testimony was Not Corrected by the Commonwealth**

191.    Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

192.    The new evidence provided by Claitt and Mickens proves that the Commonwealth had made plea deals in exchange for their testimony inculpating Petitioner. The new evidence proves that both Claitt and Mickens lied in testifying that they had serious pending criminal charges with "open" sentences. This fact was known to the Commonwealth, and not corrected. In fact this falsification was supported by the prosecution in its statements to the Court and to the Jury.

193.    The existence of plea deals in exchange for testimony is material to the veracity of these witnesses, witnesses who provided the only evidence linking Petitioner to these crimes. It is material evidence, the falsification of which and failure to correct requires reversal of the conviction.

4. **The Commonwealth Suppressed Evidence of the Commonwealth's Threat to Falsely Charge Claitt with Crimes If he Didn't Provide False Testimony Against Tillery**

194.   Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

195.   It is a violation of due process to coerce a witness into falsely testifying by threatening to charge him with a crime he did not commit.

196.   It is material evidence that Emanuel Claitt's testimony, which was the sole evidence directly inculpating Petitioner was induced by the Commonwealth's threat to falsely charge him with a murder he didn't commit if he didn't testify falsely inculpating Petitioner.

5. **The Commonwealth Suppressed Evidence of that the Commonwealth Provided Sexual Favors to Claitt and Mickens to Induce False Testimony**

197.   Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

198.   Both Claitt and Mickens reveal in their sworn declarations that a component of the favors ande inducements, provided to them by the Commonwealth to be false witnesses against Petitioner, was allowing and arranging for them to have sexual relations with girlfriends. This was arranged while each of them was in state custody, and took place either in a homicide interview room or in Claitt's case, sometimes in a hotel.

199.   Testimony induced by providing sexual trysts is not unknown by the Philadelphia police. In *Com. v. Arthur Lester*, 572 A2nd 694 (Pa. Super. 1990) the

court found it coercive and a violation of due process and reversed a conviction based on Lester's confession that was induced by he promise of sexual favors. The named homicide detectives involved in 1983 were Lawrence Gerrard and Ernest Gilbert, the same detectives who were central to the handling of both Emanuel Claitt and Robert Mickens.

200.   Claitt's and Mickens' revelations that their false testimonies were induced by the Commonwealth providing them with sexual favors constitutes separate and independent grounds for reversal of the Petitioner's conviction.

**6.   Petitioner's Claims are Supported by the New Evidence and Mandate Reversal of Petitioner's Conviction, if Not Dismissal of the Charges on the Grounds that his Conviction Constituted a Fundamental Miscarriage of Justice That Shocks the Conscience**

201.   In conclusion, Petitioner returns to historic and fundamental principles that are supposed to apply in a criminal trial. In *Mooney v Holohan*, supra, the U.S. Supreme Court found due process is violated by the government's "deliberate deception of court and jury by the presentation of testimony known to be perjured."

202.   In *Berger v. United States*, 295 U. S. 78, 88 (1935) the U.S. Supreme Court mandated disclosure of evidence to a defendant, stating:

> "Such disclosure will serve to justify trust in the prosecutor as the representative . . .of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."

203.   In *Kyles v Whitley*, supra., at 339-40, the U.S. Supreme Court reaffirmed the import of *Brady*, and the prosecution's constitutional obligation to

disclose favorable evidence to a defendant:

> "And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. See Rose v. Clark, 478 U. S. 570, 577–578 (1986); Estes v. Texas, 381 U. S. 532, 540 (1965); United States v. Leon, 468 U. S. 897, 900–901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting Alderman v. United States, 394 U. S. 165, 175 (1969)).

204.   Moreover, the government has special obligations when it comes to their cooperating informants. *See, Commonwealth v. Strong, 761 A.2d 1167, 1175 (2000),* observing that a tentative commitment from a prosecutor might be more likely to encourage false testimony from a cooperating witness than a firm promise, since the witness will have a greater incentive to curry favor with the prosecutor if a specific agreement has not yet been reached.

205.   Courts have established that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truthseeking mission of our criminal justice system." *Commonwealth of the Northern Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001).

206.   This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability. The second is that the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial. See *Bowie*, 236 F.3d at 1089 (citing *Berger v. United States, supra,* at 88.)

207.   In the instant case, the Commonwealth abandoned all concern and its constitutional obligations to the defendant to due process and a fair trial. The quest for a conviction at all costs, regardless of the veracity of "evidence," has resulted in a gross miscarriage of justice such that it shocks the conscience.  The appropriate remedy is to dismiss the indictments and release Petitioner, and failing that to grant him a new trial.

.

## VI. PREVIOUS LITIGATION OF ISSUES RAISED

208.   The issues raised herein have not been previously litigated.

## VII. COURT MUST PROVIDE AN EVIDENTIARY HEARING

209.   This Court must afford Petitioner an evidentiary hearing. It has long been the standard that post-conviction hearings are appropriate when a petitioner pleads facts entitling him to relief. *Townsend v. Sain*, 372 U.S. 293 (1963). Where, as here, the post-conviction pleadings "raise material issues of fact" and evidentiary hearing is required. Pa. R. Crim. P. 908(A) (2); *Commonwealth v. Williams*, 732 A.2d 1167, 1189-90 (Pa. 1999) ("Clearly, a material factual controversy exists …; therefore, we hold that the PCRA court erred in dismissing [the] ground for relief without conducting a factual hearing.") (citing former Pa. R. Crim. P. 1509(b)).

210.   A hearing cannot be denied unless this Court "is certain of total lack of merit" of the petition. *Commonwealth v. Bennett*, 462 A.2D 772, 773 (Pa. Super. 1983) (quoting *Commonwealth v. Rhodes*, 416 A.2d 1031, 1035-36 (Pa. Super. 1979)); accord *Commonwealth v. Korb*, 617 .2d 715, 716 (Pa. Super. 1992) (remanding for evidentiary hearing where "[i]t appears that appellant has presented a claim of ineffective assistance of counsel which contains at least arguable merit") (citing *Commonwealth v. Copeland*, 554 A.2d 54, 60-61 (Pa. 1988)). Even in "borderline cases Petitioners are to be given every conceivable legitimate benefit in the disposition of their claims for an evidentiary hearing." *Commonwealth v. Pulling*, 470 A.2d 170, 173 (Pa. Super. 1983) (remanding for evidentiary hearing) (quoting *Commonwealth v. Strader*, 396 A.2d 697, 702 (Pa. Super. 1978) and *Commonwealth v. Nahodil*, 239 A.2d 840 (Pa. Super. 1968)).

211.   A post-conviction hearing is particularly appropriate where the merits of a petitioner's claims revolve around the credibility of witnesses for whom the petitioner has provided an affidavit. A court may not judge the credibility of a recantation witness, or similar witness, based solely on an affidavit. *Commonwealth v. D'Amato*, 856 A.2d 806, 825-826 (pa. 2004) ("This Court has also emphasized, however, that even as to recantations that might otherwise appear dubious, the PCRA court must, in the first instance, assess the credibility and significance of the in light of the evidence as a whole."); see also, *Commonwealth v. Johnson,* 966 A.2d 523, 539 (Pa. 2009) ("one of the primary

reasons PCRA hearings are held in the first place is so that credibility

determinations can be made; otherwise, issues of material fact could be decided on

pleadings and affidavits alone. The PCRA court here obviously appreciated this

fact in part, since it made a controlling credibility determinations respecting

Cook's recantation testimony.") and id. at 541-42 (in *D'Amato,* the PCRA court

failed to mention, let alone pass upon, the credibility of the recantation testimony

in its opinion. This Court held that the PCRA court had defaulted on its duty to

assess the credibility of the recantation and its significance in light of the trial

record, and we remanded the matter to the PCRA court for the limited purpose of

making such determination.").

212.   At a minimum, Petitioner must be afforded an opportunity to prove

the timeliness of his Petition. He has pled with specificity that he has met the

exceptions to the PCRA time bar. Therefore, this Court must give him an

opportunity to prove these facts. Indeed, the petitioner in *Commonwealth v.*

*Bennett,* 930 A.2d 1264, 1272, 1274  (Pa. 2007) also invoked the time bar

exceptions pled by Petitioner and the Pennsylvania Supreme Court noted the

requirements for an evidentiary hearing. *See also Commonwealth v. Lasky*, 934

A.2d 120, 123 (Pa. Super. 2007) (remanding to lower court "for the conduct of an

evidentiary hearing by the lower court in order to determine (1) when certain

procedural facts became known to Appellant, (2) whether the exercise of due

diligence on Appellant's part would have revealed these facts to Appellant sooner,

and ultimately (3) whether Appellant now has made a viable claim that one of the exceptions articulated at 42 Pa.C.S.A. § 9545, i.e. (b)(1)(ii), to the one year time limit for filing a PCRA petition").

213.   Based on the above, Petitioner is entitled to, and therefore requests that an evidentiary hearing be held.

## VIII.  PETITIONER IS ENTITLED TO DISCOVERY

214.   Discovery in post-conviction proceedings is governed by Pa.R.Crim.P. 902 (E) (1), which permits discovery upon leave of Court and upon a showing of exceptional circumstances. Petitioner proffers that he shows such exceptional circumstances.

215.   The circumstances of this case are indeed exceptional. Petitioner requests immediate discovery of all reports of police and prosecution interviews, meetings and any communication relating to witnesses Emanuel Claitt and Robert Mickens.

216.   Petitioner requests leave to file a more detailed and specific discovery request.

## IX. CONCLUSION AND REQUEST FOR RELIEF

For all of the above reasons and the attached affidavits and exhibits,

Petitioner requests the following relief:

A. That Petitioner be granted permission for leave to proceed in forma pauperis.

B. That the Commonwealth be required to respond to this petition.

C. That the Court permit Petitioner to file such amendments, supplements or briefs as required in the interest of justice.

D. That the Court permits oral arguments on any and all dispositive issues.

E. That the Court permit discovery as requested above.

F. That following discovery, the Court conduct evidentiary hearings on all material disputed issues of fact.

G. That the Court vacates Petitioner's conviction and sentence and award him a new trial.

H. In the interest of justice given the gross violations of due process in this case, that the Court vacates Petitioner's conviction and sentence and dismiss the charges.

178.   In this case, the "absence of due process violations" would have meant no prosecution of the Petitioner, because in the absence of due process violations, there was no "evidence" against the Petitioner.

**1.   The Commonwealth Manufactured and/or Presented the False Testimony of Emanuel Claitt that Petitioner was Involved in the Homicide of Joseph Hollis and Assault on John Pickens**

179.   Emanuel Claitt's declarations establish that his testimonial evidence was false and that the Commonwealth knew it was false. The presentation of false evidence by a prosecutor constitutes the most fundamental violation of due process.

180.   This is not a case of falsification or prosecutorial suppression of a *particular* aspect of the prosecution's case. This false evidence was the *entirety* of the evidence against Petitioner.  This false evidence is unquestionably material to the conviction of Petitioner.

181.   Petitioner was convicted solely on the basis of witness testimony. It was Emanuel Claitt alone who provided testimonial evidence that Petitioner Tillery was in the poolroom and shot the victims.

182.   Petitioner incorporates the factual allegation and legal argumentation included in the paragraphs above in support of this claim.

183.   Claitt's declaration also provides proof of the Commonwealth's intentional manufacture and presentation of false testimony against Petitioner. It also provides evidence of the prosecution's efforts to suborn perjury by Robert Mickens, by disclosing the phony transport of Claitt and Mickens from the Round

House to the jail on State Road for Claitt to pressure Mickens into testifying against Petitioner.

184.   Since the prosecution's case did not exist without that Claitt's testimony there is no question that this new evidence is material.

## 2.   The Commonwealth Manufactured and/or Presented False Testimony of Robert Mickens that Tillery was at the Poolroom When Hollis and Pickens were Shot

185.   Robert Mickens provided testimonial evidence that Petitioner Tillery had asked him to be a police lookout outside the poolroom and that Tillery went into the poolroom shortly before he heard shots. Mickens also provided testimony that Petitioner was attemped to establish a false alibi.

186.   Mickens' trial testimony provided corroboration to Claitt's testimony that Petitioner was in the poolroom when Hollis and Pickens were shot.

187.   Mickens trial testimony served to prop up Claitt's testimony, which was weakened or compromised by his extensive and continued arrest record and the accusations that his testimony was induced by plea deals.

188.   Mickens' declaration establishes that trial testimony was false and that the Commonwealth knew it was false because it was the Commonwealth that manufactured it. Mickens' declaration disclosed the Commonwealth's conscious efforts to coerce him into falsely testifying against Petitioner.

189.   The new evidence provided by Mickens that his trial testimony was a lie, coerced and induced by the prosecution eliminates that his trial testimony corroborating Claitt.

190.    Mickens declaration also corroborates the Commonwealth's intent to convict Petitioner, whatever the cost to truth. It confirms the Commonwealth's manufacture of false evidence by threats of false prosecution and providing plea deals, protection, and sexual favors. The new evidence provide by Mickens is material.

3.    **The Commonwealth Presented False Testimony that Emanuel Claitt and Robert Mickens Had No Plea Agreements with the Commonwealth and that False Testimony was Not Corrected by the Commonwealth**

191.    Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

192.    The new evidence provided by Claitt and Mickens proves that the Commonwealth had made plea deals in exchange for their testimony inculpating Petitioner. The new evidence proves that both Claitt and Mickens lied in testifying that they had serious pending criminal charges with "open" sentences. This fact was known to the Commonwealth, and not corrected. In fact this falsification was supported by the prosecution in its statements to the Court and to the Jury.

193.    The existence of plea deals in exchange for testimony is material to the veracity of these witnesses, witnesses who provided the only evidence linking Petitioner to these crimes. It is material evidence, the falsification of which and failure to correct requires reversal of the conviction.

4.    **The Commonwealth Suppressed Evidence of the Commonwealth's Threat to Falsely Charge Claitt with Crimes If he Didn't Provide False Testimony Against Tillery**

194.    Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

195.    It is a violation of due process to coerce a witness into falsely testifying by threatening to charge him with a crime he did not commit.

196.    It is material evidence that Emanuel Claitt's testimony, which was the sole evidence directly inculpating Petitioner was induced by the Commonwealth's threat to falsely charge him with a murder he didn't commit if he didn't testify falsely inculpating Petitioner.

5.    **The Commonwealth Suppressed Evidence of that the Commonwealth Provided Sexual Favors to Claitt and Mickens to Induce False Testimony**

197.    Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

198.    Both Claitt and Mickens reveal in their sworn declarations that a component of the favors ande inducements, provided to them by the Commonwealth to be false witnesses against Petitioner, was allowing and arranging for them to have sexual relations with girlfriends. This was arranged while each of them was in state custody, and took place either in a homicide interview room or in Claitt's case, sometimes in a hotel.

199.    Testimony induced by providing sexual trysts is not unknown by the Philadelphia police. In *Com. v. Arthur Lester*, 572 A2nd 694 (Pa. Super. 1990) the

court found it coercive and a violation of due process and reversed a conviction

based on Lester's confession that was induced by he promise of sexual favors. The

named homicide detectives involved in 1983 were Lawrence Gerrard and Ernest

Gilbert, the same detectives who were central to the handling of both Emanuel

Claitt and Robert Mickens.

200.    Claitt's and Mickens' revelations that their false testimonies were

induced by the Commonwealth providing them with sexual favors constitutes

separate and independent grounds for reversal of the Petitioner's conviction.

**6.      Petitioner's Claims are Supported by the New Evidence and Mandate
         Reversal of Petitioner's Conviction, if Not Dismissal of the Charges on
         the Grounds that his Conviction Constituted a Fundamental
         Miscarriage of Justice That Shocks the Conscience**

201.    In conclusion, Petitioner returns to historic and fundamental

principles that are supposed to apply in a criminal trial. In *Mooney v Holohan*,

supra, the U.S. Supreme Court found due process is violated by the government's

"deliberate deception of court and jury by the presentation of testimony known to

be perjured."

202.    In *Berger v. United States*, 295 U. S. 78, 88 (1935) the U.S. Supreme

Court mandated disclosure of evidence to a defendant, stating:

> "Such disclosure will serve to justify trust in the prosecutor as the
> representative . . .of a sovereignty . . . whose interest . . . in a criminal
> prosecution is not that it shall win a case, but that justice shall be done."

203.    In *Kyles v Whitley*, supra., at 339-40, the U.S. Supreme Court

reaffirmed the import of *Brady*, and the prosecution's constitutional obligation to

disclose favorable evidence to a defendant:

> "And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. See Rose v. Clark, 478 U. S. 570, 577–578 (1986); Estes v. Texas, 381 U. S. 532, 540 (1965); United States v. Leon, 468 U. S. 897, 900–901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting Alderman v. United States, 394 U. S. 165, 175 (1969)).

204.    Moreover, the government has special obligations when it comes to their cooperating informants. *See, Commonwealth v. Strong, 761 A.2d 1167, 1175 (2000),* observing that a tentative commitment from a prosecutor might be more likely to encourage false testimony from a cooperating witness than a firm promise, since the witness will have a greater incentive to curry favor with the prosecutor if a specific agreement has not yet been reached.

205.    Courts have established that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truthseeking mission of our criminal justice system." *Commonwealth of the Northern Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001).

206.    This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability. The second is that the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial. See *Bowie*, 236 F.3d at 1089 (citing *Berger v. United States, supra,* at 88.)

207.   In the instant case, the Commonwealth abandoned all concern and its constitutional obligations to the defendant to due process and a fair trial. The quest for a conviction at all costs, regardless of the veracity of "evidence," has resulted in a gross miscarriage of justice such that it shocks the conscience.  The appropriate remedy is to dismiss the indictments and release Petitioner, and failing that to grant him a new trial.

.

## VI. PREVIOUS LITIGATION OF ISSUES RAISED

208.   The issues raised herein have not been previously litigated.

## VII. COURT MUST PROVIDE AN EVIDENTIARY HEARING

209.   This Court must afford Petitioner an evidentiary hearing. It has long been the standard that post-conviction hearings are appropriate when a petitioner pleads facts entitling him to relief. *Townsend v. Sain*, 372 U.S. 293 (1963). Where, as here, the post-conviction pleadings "raise material issues of fact" and evidentiary hearing is required. Pa. R. Crim. P. 908(A) (2); *Commonwealth v. Williams*, 732 A.2d 1167, 1189-90 (Pa. 1999) ("Clearly, a material factual controversy exists …; therefore, we hold that the PCRA court erred in dismissing [the] ground for relief without conducting a factual hearing.") (citing former Pa. R. Crim. P. 1509(b)).

210. A hearing cannot be denied unless this Court "is certain of total lack

of merit" of the petition. *Commonwealth v. Bennett*, 462 A.2D 772, 773 (Pa.

Super. 1983) (quoting *Commonwealth v. Rhodes*, 416 A.2d 1031, 1035-36 (Pa.

Super. 1979)); accord *Commonwealth v. Korb*, 617 .2d 715, 716 (Pa. Super. 1992)

(remanding for evidentiary hearing where "[i]t appears that appellant has

presented a claim of ineffective assistance of counsel which contains at least

arguable merit") (citing *Commonwealth v. Copeland*, 554 A.2d 54, 60-61 (Pa.

1988)). Even in "borderline cases Petitioners are to be given every conceivable

legitimate benefit in the disposition of their claims for an evidentiary hearing."

*Commonwealth v. Pulling*, 470 A.2d 170, 173 (Pa. Super. 1983) (remanding for

evidentiary hearing) (quoting *Commonwealth v. Strader*, 396 A.2d 697, 702 (Pa.

Super. 1978) and *Commonwealth v. Nahodil*, 239 A.2d 840 (Pa. Super. 1968)).

211. A post-conviction hearing is particularly appropriate where the

merits of a petitioner's claims revolve around the credibility of witnesses for

whom the petitioner has provided an affidavit. A court may not judge the

credibility of a recantation witness, or similar witness, based solely on an affidavit.

*Commonwealth v. D'Amato*, 856 A.2d 806, 825-826 (pa. 2004) ("This Court has

also emphasized, however, that even as to recantations that might otherwise

appear dubious, the PCRA court must, in the first instance, assess the credibility

and significance of the in light of the evidence as a whole."); see also,

*Commonwealth v. Johnson,* 966 A.2d 523, 539 (Pa. 2009) ("one of the primary

reasons PCRA hearings are held in the first place is so that credibility

determinations can be made; otherwise, issues of material fact could be decided on

pleadings and affidavits alone. The PCRA court here obviously appreciated this

fact in part, since it made a controlling credibility determinations respecting

Cook's recantation testimony.") and id. at 541-42 (in *D'Amato,* the PCRA court

failed to mention, let alone pass upon, the credibility of the recantation testimony

in its opinion. This Court held that the PCRA court had defaulted on its duty to

assess the credibility of the recantation and its significance in light of the trial

record, and we remanded the matter to the PCRA court for the limited purpose of

making such determination.").

212.    At a minimum, Petitioner must be afforded an opportunity to prove

the timeliness of his Petition. He has pled with specificity that he has met the

exceptions to the PCRA time bar. Therefore, this Court must give him an

opportunity to prove these facts. Indeed, the petitioner in *Commonwealth v.*

*Bennett,* 930 A.2d 1264, 1272, 1274  (Pa. 2007) also invoked the time bar

exceptions pled by Petitioner and the Pennsylvania Supreme Court noted the

requirements for an evidentiary hearing. *See also Commonwealth v. Lasky*, 934

A.2d 120, 123 (Pa. Super. 2007) (remanding to lower court "for the conduct of an

evidentiary hearing by the lower court in order to determine (1) when certain

procedural facts became known to Appellant, (2) whether the exercise of due

diligence on Appellant's part would have revealed these facts to Appellant sooner,

and ultimately (3) whether Appellant now has made a viable claim that one of the exceptions articulated at 42 Pa.C.S.A. ∮ 9545, i.e. (b)(1)(ii), to the one year time limit for filing a PCRA petition").

213.   Based on the above, Petitioner is entitled to, and therefore requests that an evidentiary hearing be held.

## VIII.  PETITIONER IS ENTITLED TO DISCOVERY

214.   Discovery in post-conviction proceedings is governed by Pa.R.Crim.P. 902 (E) (1), which permits discovery upon leave of Court and upon a showing of exceptional circumstances. Petitioner proffers that he shows such exceptional circumstances.

215.   The circumstances of this case are indeed exceptional. Petitioner requests immediate discovery of all reports of police and prosecution interviews, meetings and any communication relating to witnesses Emanuel Claitt and Robert Mickens.

216.   Petitioner requests leave to file a more detailed and specific discovery request.

# IX. CONCLUSION AND REQUEST FOR RELIEF

For all of the above reasons and the attached affidavits and exhibits,

Petitioner requests the following relief:

A.  That Petitioner be granted permission for leave to proceed in forma pauperis.

B.  That the Commonwealth be required to respond to this petition.

C. That the Court permit Petitioner to file such amendments, supplements or briefs as required in the interest of justice.

D. That the Court permits oral arguments on any and all dispositive issues.

E. That the Court permit discovery as requested above.

F. That following discovery, the Court conduct evidentiary hearings on all material disputed issues of fact.

G. That the Court vacates Petitioner's conviction and sentence and award him a new trial.

H. In the interest of justice given the gross violations of due process in this case, that the Court vacates Petitioner's conviction and sentence and dismiss the charges.

## CONCLUSION

For all the above reasons and for those set forth in this *pro se* PCRA

Petition  and based on the entire record of this case, Petitioner MAJOR G.

TILLERY seeks vacation of his conviction and the attendant relief requested.

Dated:  June 15, 2016

MAJOR G. TILLERY
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17932

VERIFICATION

I verify that the statements made in the above Declaration are true and
correct to the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. sec. 4904, relating to
unsworn falsification to authorities.

Date:  June 15, 2016

MAJOR G. TILLERY

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

Received

SEP 0 7 2016

Office of Judicial Records-Motions

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

Received

SEP 0 7 2016

Office of Judicial Records
Appeals/Post Trial

COMMONWEALTH OF PENNSYLVANIA,          :
                                       :
                   Respondent,         :   Docket Number
                                       :   CP-51-CR-0305681-1984
        v.                             :
                                       :
MAJOR G. TILLERY,                      :
                                       :
                   Petitioner          :

PETITIONER'S SUPPLEMENTAL PCRA PETITION

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully submits this Supplemental PCRA Petition:

On June 15, 2016 petitioner filed a PCRA petition pursuant to 42 Pa. C.S. § 9541 et. stating, "this is a case of factual innocence and gross prosecutorial misconduct violating Petitioner Major Tillery's right to due process and a fair trial. The actions of the Commonwealth resulted in a fundamental miscarriage of justice that shocks the conscience and warrants reversal of his conviction and dismissal of charges against Petitioner Major Tillery."

The Petition is pending before this Court and this Court filed a Notice of Intent to Dismiss pursuant to PA.R.Crim. P. 907 on August 19, 2016. Petitioner is simultaneously filing his Response in Objection to Notice of Intent to Dismiss.

Petitioner continued his investigation subsequent to the filing of his PCRA in June 15, 2016 and has obtained new evidence and facts that were not previously known to him that corroborate the fact of the Commonwealth's misconduct, further supporting Petitioner's claims of actual innocence and violations of his right to due process.

Petitioner submits to this court the videotape of Emanuel Claitt recorded on August 3, 2016. [Exhibit A]  In this videotape Emanuel Claitt reaffirms his sworn declarations of May 4 and June 3, 2016.  This videotape is submitted to preserve the evidence provided by Emanuel Claitt that his entire trial testimony was falsified, the product of coercion and inducements by the Commonwealth including concealed plea deals and being providing sexual favors.

This videotape was recorded by Rachel Wolkenstein who is assisting Petitioner. Her sworn declaration is attached and is incorporated into this Petition.

As set forth in the Wolkenstein declaration, Petitioner now has evidence corroborating Emanual Claitt's statement that he received sexual favors while in custody by being allowed to have private sexual encounters with girlfriends in the Roundhouse, assisted by homicide detectives Lawrence Gerrard and Ernest Gilbert:

2

(1)    Emanuel Claitt has provided the names and contact information for two of the woman that were brought to him by homicide detectives, Helen Ellis and Denise Certain.

(2)    Helen Ellis acknowledged that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him.

(3)    Roundhouse log-in page 192 for December 14, 1983, has Emanuel Claitt's signature along with Det. Gilbert and his girlfriend Denise Certain signed in under Det. Gerrard for an overlapping time period. [Exhibit C]

Petitioner intends to present Helen Ellis, Denise Certain as witnesses at an evidentiary hearing. Witness certifications are attached.

## Timeliness of Supplement

Petitioner reasserts the facts and legal argument set forth in the Petition and his Response In Objection to the Notice of Intent to Dismiss regarding timeliness. He makes the following additional points.

The new facts presented in this Supplement are timely filed pursuant to 42 Pa. C.S. § 95459(1) (i), inasmuch as the Commonwealth's failure to discharge its constitutional obligation to provide the defense *Brady* material constituted

"governmental interference" with the presentation of this claim. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Petitioner has satisfied the requirements of 42 Pa. C.S. 9545(ii) in that he has exercised the requisite diligence to uncover the undisclosed Roundhouse record and the activity of the detectives involved in this; and to investigate and obtain additional and corroborative evidence from witnesses whose possible relevance and involvement in this case only became known to Petitioner with the information provided by Emanuel Claitt on August 3, 2016.

Petitioner requests this Court order discovery of all reports, notes and correspondence in the possession of agents of the Commonwealth pertaining to this case.

Petitioner also requests that if this Court grants leave to Petitioner to file an amended complaint that the additional facts presented here be incorporated into said amended complaint.

## VERIFICATION

 I verify that the statements made in the above response are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date:  September ᘓ , 2016

MAJOR TILLERY

September   2016

Respectfully submitted,

MAJOR G. TILLERY, *pro se*
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| | : | Docket Number |
| Respondent, | : | CP-51-CR-0305681-1984 |
| | : | |
| v. | : | |
| | : | |
| MAJOR G. TILLERY, | : | |
| | : | |
| Petitioner | : | |

**Certification of Helen Ellis as a Witness**

I, Major Tillery, the Petitioner in the above-captioned action certify the following:

It is my intention to call Helen Ellis as my witness in an evidentiary hearing held on the claims presented in my PCRA petition filed June 15, 2016.

Helen Ellis resides at 2452 32nd Street, Philadelphia, PA and her date of birth is December 28, 1955.

Helen Ellis will testify that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him.

September 6, 2016

Respectfully submitted,

MAJOR G. TILLERY, *pro se*
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, :
            : Docket Number
      Respondent, : CP-51-CR-0305681-1984
            :
     v.       :
            :
MAJOR G. TILLERY,     :
            :
     Petitioner   :

**Certification of Denise Certain as a Witness**

I, Major Tillery, the Petitioner in the above-captioned action certify the following:

  It is my intention to call Denise Certain as my witness in an evidentiary hearing held on the claims presented in my PCRA petition filed June 15, 2016.

  Denise Certain resides at 616 N. 32nd Street, Philadelphia, PA and her date of birth is July 29, 1958.

  Denise Certain will testify that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him. She will identify her signature on the Roundhouse login sheet for December 14, 1983.

| Date | Name | | Type | | | |
|---|---|---|---|---|---|---|
| 12.13.83 | Daniel Thomas | | I.D. | | | |
| 12.13.83 | Wm. Hayward | | I.D. | | | |
| 12/13/83 | Tyrone Brown | | HOM | 1:15 | 3:12 | |
| 12/13/83 | Barry Zumoff | | Poly | | | |
| 12/13/83 | Rosemary Calabrese | | NARC | 2:85 | | |
| 12/13/83 | Christina J. Cruz | | NARC | 8:00 | | |
| 12/13/83 | A.S. Palmer/UP | | SCU | 4PM | 7:55PM | Corey Bryant |
| 12/13/83 | Frank Della | | S.O.P | 4:30 | | Annie Barbosa |
| 12/13/83 | Linda Lizzmore | | Hom | 7:05 | | D.Del Herr |
| 12/13/83 | Steve Koysler | | Hom | 7:05 | | Grace/Benn |
| 12-13-83 | Annie Edmonds | | Hom | 8 | | Gerard |
| " | Carmelo Rivera | | HAM | 9:00p | 10:10 | Deyp |
| " | Doris Bonns | | " | 9:05 | 10:20 | " |
| " | Mike | | " | | | " |
| " | Milton | | " | | | |
| 12-14-83 | Mary Clark | | Hom | 10:00 | | |
| 12-14-83 | John McConkle | | Hom | PSU | | |
| 12-14-83 | Richard McKay | | I.D. | 9:10 | 9:45 | |
| 12-14-83 | Denise Certain | | NARC | 9:45 | | |
| 12-14-83 | Efrain Nunes | | Hom | 11:55 | 1:30 | Gerard |
| " | Luis Torres | | Hom | 12 | 1:45 | Sqt |
| 12/14/83 | George Hodges | | | | | |
| " | Cesar Baez | | Hon | 2:20 | 6:25P | Nachguis |
| 12:34pm | Calvin Butler | | Hom | 2 | 6:25P | Nachguis |
| 12-14-83 | Marlyn Kilson | | Hom | 4:15 | 7:05 | Coglis |
| 12-14-83 | Cristino Valle | | Hom | 5 | | McCant |
| 12-14-83 | Angel Fresneda | | Poly | 5:35 | | Deyp |
| 12-14-83 | S. Edmonds | | Hom | 5:50 | 8:34 | Lt. McG |
| 12-14-83 | Alvin Mullen | | Hom | 6:00P | 7:25 | |
| 12-14-83 | Geneva Poldak | | Gardant | 6 | 9 | |
| " " | Eula Bud | | " | " | | |

192

September 6, 2016

Respectfully submitted,

MAJOR G. TILLERY, *pro se*
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

## DECLARATION OF RACHEL WOLKENSTEIN
PURSUANT TO PA C.S. § 4904 AND 28 U.S.C. § 1746

RACHEL WOLKENSTEIN, declares the following under penalty of perjury:

I am an attorney at law, admitted to practice in the State of New York since 1974, residing in Brooklyn, NY.

This declaration is submitted in support of the Supplemental Petition filed by Petitioner.

Since approximately February 2015, I have assisted Major Tillery *pro bono,* in his efforts to overturn his conviction, to obtain and review his court records, and those of the witnesses against him, to conduct limited investigation and help him find *pro bono* legal representation in upcoming legal proceedings. In April 2016 I had phone call with Robert Mickens in which he said that he would provide an affidavit and was willing to testify on behalf of Major Tillery.

We met on April 18, 2016 and for the first time described why he had lied when he testified against Major Tillery at his trial. Robert Mickens recounted to me the combination of threats and favors he received from detectives and prosecutors to coerce and induce him to testify falsely. He described how the prosecutors coached him to answer questions about what he supposedly saw on the night of the shootings and to deny he received any plea deals.

I typed up the key points of what he told me. This was reviewed by Mr. Mickens and he signed his verified declaration that same day.

1

Mr. Mickens disclosed why his false testimony was sought by the prosecution and police and how it was obtained. He disclosed the van ride with Emanuel Claitt between the Roundhouse and the county prison on State Road during which Mr. Claitt pushed him to testify against Major Tillery. Mr. Mickens also disclosed that homicide detectives arranged for his girlfriend to join him in the Roundhouse for a sexual encounter. Mr. Mickens was quite emotional in describing this and expressed pain and regret about his role in Major Tillery's conviction.

It was a surprise when shortly after this a lead resulted in learning that Emanuel Claitt, whose testimony was the sole evidence against Major Tillery, was willing to meet and indicated that he needed to finally tell the truth about his false testimony against Major Tillery and William Franklin, who was the co-defendant in the case and tried three years earlier than Petitioner.

I met with Emanuel Claitt on May 3, 2016 and he told me that his trial testimony against Major Tillery and William Franklin was totally false, that he [Claitt] wasn't even in or near the poolroom that night and he had no personal knowledge of the who shot Joseph Hollis and John Pickens. Emanuel Claitt described the process of the detectives and prosecutors obtaining his false statement and preparing him to testify. I took notes in speaking with Mr. Claitt and met him the next morning, May 4, 2016 with a typed up declaration. He made some corrections and signed the declaration under penalty of perjury. I spoke with

him again on the phone and in person on June 3, 2016 and he signed a
supplemental declaration.

I met with Emanuel Claitt again on August 3, 2016. During this meeting he
gave me the names of three of the women who he had sex with while in police
custody. One woman, Barbara Claitt is deceased. He also told me that Helen Ellis,
who is the mother of three of his children, saw him in the Roundhouse a number
of times for the purposes of having sex. A third woman, Denise Certain ("De De")
was another woman who he saw at the Roundhouse.

On August 3, 2016, Emanuel Claitt agreed to be videotaped. I taped
Emanuel Claitt as he reaffirmed his sworn declarations and read a statement that is
a composite of his two verified declarations. This videotape is submitted as an
exhibit to the Supplemental Declaration.  [Exhibit A]

I located Helen Ellis on August 4, 2016 outside her home and spoke with
her briefly. She acknowledged that she had sex with Emanuel Claitt in the
Roundhouse homicide interview rooms and that arrangements were made with
detectives who brought her up to him.

Based on the information received from Emanuel Claitt, I located Denise
Certain.

With the information received from Robert Mickens, that included being
put in a police van alone with Emanuel Claitt to give Claitt the opportunity to
persuade Mickens to falsely testify against Major Tillery, and that homicide
detectives had facilitated private sexual encounters for both men with their

3

respective girlfriends in the Roundhouse, I attempted to obtain documentary corroborative evidence.

This included research in public records and the filing of requests pursuant to the RTKL for: Roundhouse log-in records for periods from 1980 through 1985, covering Emanuel Claitt's and Robert Mickens' periods of incarceration; and prisoner transport records between the PAB building and the detention center on State Road; and regarding Robert Mickens, transport records between the Northhampton County prison and Philadelphia in late 1984-1985. These requests were denied, appealed and reviewed. Both the Philadelphia Police Department and Northhampton County state they have searched and cannot locate these records and were likely not retained. [Exhibit B]

I learned of other murder convictions from the same years (mid-80s) that involved the same detectives as those who worked with Emanuel Claitt, Det. Lawrence Gerrard and Ernest Gilbert and a similar modus operandi in obtaining convictions – providing sexual favors to prisoner informants.

On August 25, 2016 I visited Andre Harvey, a lifer imprisoned at SCI Graterford, and he gave me documents that he had acquired when he challenged his conviction in a 1995 PCRA, in part on grounds that the prosecution witnesses against him had been provided sexual favors to falsely testify against him. Detectives Gerrard and Gilbert were central to that.

Andre Harvey gave me copies of the 17 pages of "sign-in and out logs at the Roundhouse" secured by his then investigator Paul J. Paris. This was just 17

4

pages of 80 from the period of June 1-December 31, 1983. In looking over those pages, I saw that on page 192, the log-in sheet for December 14, 1983, Emanuel Claitt signed in under Det. Gilbert and his girlfriend Denise Certain signed in under Det. Gerrard.  [Exhibit C]

Andre Harvey said that doesn't have any other portion of the Roundhouse log in sheets.

On behalf of Petitioner, Major Tillery, I am continuing in the search for additional records that corroborate the Commonwealth misconduct that permeates the conviction of Major Tillery for crimes he did not commit. on August 3, 2016

Dated:  September /6 , 2016

_____
RACHEL WOLKENSTEIN

**VERIFICATION**

 I verify that the statements made in the above Declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date: September 6 , 2016

_____
RACHEL WOLKENSTEIN

5

EXHIBIT  B



**CITY OF PHILADELPHIA**

**POLICE DEPARTMENT**
HEADQUARTERS, FRANKLIN SQUARE
PHILADELPHIA, PENNSYLVANIA 19106

RICHARD J. ROSS JR.
Commissioner

July 5, 2016

Ms. Rachel Wolkenstein
515 Avenue I Apt. 6C
Brooklyn, NY 11230

RE:   Pennsylvania Right-To-Know Act (RTKA) Request

Dear Ms. Wolkenstein:

Your Pennsylvania Right-To-Know Act request dated 06-27-16 was received by this office on 06-27-16 for:

1. Police Administration Building ( Round House) Log-in Book entries for :
   January 1 – November 29, 1980
   June 1, 1981- November 30, 1982 &
   April 1, 1983- July 31, 1985
2. Transport Orders/Records for transport of prisoner Emanuel Claitt ( PP# 439759) between the Philadelphia Detention Center on State Road and the Police Administration Building on Race Street:
   January 1- November 19, 1980
   September 1, 1981- November 30, 1982
   April 1, 1983- July 31, 1985
3. Transport Orders/Records for transport of prisoner Robert Mickens (PP#0472454) between the Philadelphia Detention Center on State Road and the Police Administration building on Race Street.
   February 1, 1984- May 25, 1985

After processing your request, the Philadelphia Police Department responds as follows:

Your request **cannot be granted** for the reason that the record requested is beyond the agency's **retention schedule**. Pursuant to Section 507 of the Act *"Nothing is this act shall be construed to modify, rescind, or supersede any record retention policy or disposition schedule of an agency established pursuant to law, regulation, policy, or other directive"*.

Should you wish to contest any part of this decision, you may file an appeal with the Office of Open records as provided for in 65 P.S. § 67.1101. You have 15 business days from the mailing date of the City's response to challenge the response. Please direct any appeal to the

RACHEL WOLKENSTEIN                                                    07-05-16
PENNSYLVANIA RIGHT-TO-KNOW ACT REQUEST:  06-27-16                      Page 2

Office of Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor,
Harrisburg, PA 17120-0225 and copy the undersigned.

    Please be sure to copy Mr. Jeffrey Cohen, Assistant City Solicitor for the City of
Philadelphia Law Department on your appeal, located at One Parkway Building, 17th Floor, 1515
Arch Street, Philadelphia, PA 19102.

FOR THE POLICE COMMISSIONER

                                    Sincerely,

                                    Lt Edward Egenlauf #430

                                    Lieutenant Edward Egenlauf
                                    Open Records Officer
                                    Philadelphia Police Department
                                    750 Race Street, Room 203
                                    Philadelphia, PA 19106
                                    FAX: 215-686-1183
                                    Email: police.righttoknow@phila.gov



# pennsylvania

## OFFICE OF OPEN RECORDS

### FINAL DETERMINATION

IN THE MATTER OF        :
       :
**RACHEL WOLKENSTEIN,**    :
**Requester**        :
       :
**v.**        :    **Docket No.: AP 2016-1257**
       :
**PHILADELPHIA POLICE**    :
**DEPARTMENT,**      :
**Respondent**       :

On June 27, 2016, Rachel Wolkenstein ("Requester") submitted a request ("Request") to the Philadelphia Police Department ("Department") pursuant to the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101 *et seq.*, seeking log-in book entries and transportation records for two named inmates. On July 5, 2016, the Department denied the Request, asserting that the Records requested are no longer possessed by the Department, pursuant to its record retention schedule.

On July 25, 2016, the Requester appealed to the Office of Open Records ("OOR"), challenging the denial. On August 4, 2016, the Department submitted a position statement, reiterating its position that the requested records are beyond the Department's record retention schedule. Accompanying the submission was the affidavit of the Department's Open Records Officer, who testifies, under penalty of perjury, that a search of the Department's records discovered no records responsive to the Request.

Under the RTKL, an affidavit may serve as sufficient evidentiary support for the nonexistence of records. *See Sherry v. Radnor Twp. Sch. Dist.*, 20 A.3d 515, 520-21 (Pa. Commw. Ct. 2011); *Moore v. Office of Open Records*, 992 A.2d 907, 909 (Pa. Commw. Ct. 2010). In the absence of any competent evidence that the Department acted in bad faith or that the record exists in the possession of the Department, "the averments in [the affidavit] should be accepted as true." *McGowan v. Pa. Dep't of Envtl. Prot.*, 103 A.3d 374, 382-83 (Pa. Commw. Ct. 2014) (citing *Office of the Governor v. Scolforo*, 65 A.3d 1095, 1103 (Pa. Commw. Ct. 2013)). Based on the evidence provided, the Department has met its burden of proving that the records requested do not exist in the Department's possession, custody or control. Accordingly, the appeal is **denied**.

For the foregoing reason, the Department is not required to take any further action. This Final Determination is binding on all parties. Within thirty days of the mailing date of this Final Determination, any party may appeal or petition for review to the Philadelphia County Court of Common Pleas. 65 P.S. § 67.1302(a). All parties must be served with notice of the appeal. The OOR also shall be served notice and have an opportunity to respond as per Section 1303 of the RTKL. However, as the quasi-judicial tribunal adjudicating this matter, the OOR is not a proper party to any appeal and should not be named as a party.[1] This Final Determination shall be placed on the website at: http://openrecords.pa.gov.

**FINAL DETERMINATION ISSUED AND MAILED: August 26, 2016**

*/s/ Blake Eilers*
Blake Eilers, Esq.
Appeals Officer

Sent to:   Rachel Wolkenstein (via e-mail only);
           Jeffrey Cohen, Esq. (via e-mail only);
           Lieutenant Edward Egenlauf (via e-mail only)

---

[1] *Padgett v. Pa. State Police*, 73 A.3d 644, 648 n.5 (Pa. Commw. Ct. 2013).

2

-----Original Message-----
From: Daniel ODonnell <DODonnell@northamptoncounty.org>
To: rwolkenstein3 <rwolkenstein3@aol.com>
Cc: Edna Hewitt <EHewitt@northamptoncounty.org>; Sharon Lerch
<SLerch@northamptoncounty.org>
Sent: Fri, Jul 8, 2016 2:37 pm
Subject: Re: Right to Know

Ms. Wolkenstein:

I received a response from the Prison with regard to your request below. They searched
their records and archives. They have no such records going back that far. Accordingly,
the request must be **DENIED** pursuant to RTKL Section 705 because no such records
exist in the possession of the County.

You have a right to appeal this decision in writing to the Executive Director, Office of
Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor,
Harrisburg, PA 17120. If you choose to file an appeal, you must do so within fifteen (15)
business days of the mailing date of the agency's response as outlined in Section 1101 of
the RTKL. If you have further questions, feel free to contact the Solicitors Office.

**Daniel M. O'Donnell, Esq.**
*Assistant County Solicitor & Open Records Officer*
**Office of the Solicitor**
**Northampton County Courthouse**
**669 Washington Street**
**Easton, PA 18042**
Telephone: 610.829.6350
Fax: 610.559.3001

**From:** Daniel ODonnell
**Sent:** Tuesday, July 5, 2016 2:36 PM
**To:** rwolkenstein3@aol.com
**Cc:** Edna Hewitt; Sharon Lerch
**Subject:** Right to Know

Rachel Wolkenstein
VIA EMAIL ONLY

Ms. Wolkenstein:

The County received your request made pursuant to the Pennsylvania Right to Know Law (RTKL) on June 30, 2016 seeking transport orders "and or other records" for Robert Mickens, between 9/15/1984 and 10/10/1985.

Ordinarily, a response would be due within five (5) business days of receipt, or in this case July 8, 2016.  However, in this case given the age of the documents at issue, the County is invoking its right to an extension of time to respond by up to thirty (30) days from the original due date.  Accordingly, the response from the County in this matter will be due on or before **August 7, 2016**.

Also, please be aware that the Office of the District Attorney has its own Open Records Officer.  So to the extent you may be seeking records from that office, you will need to contact them directly.  Additionally, please be aware that any information in the Criminal Division file is a public record, but is not subject to disclosure by the County under the Right to Know Law as such records are non-financial Judicial Records, not County records, and such filings are generally already available for inspection and copying at the Office of the Criminal Division.

The extension herein is invoked pursuant to RTKL Section 902(a): (3) a timely response to the request for access cannot be accomplished due to bona fide and specified staffing limitations; (4) a legal review is necessary to determine whether the record is a record subject to access under the RTKL, and (7) the extent or nature of the request precludes a response within the required time period.

Thank you.

**Daniel M. O'Donnell, Esq.**
*Assistant County Solicitor & Open Records Officer*
**Office of the Solicitor**
**Northampton County Courthouse**
**669 Washington Street**
**Easton, PA 18042**
Telephone:  610.829.6350
Fax: 610.559.3001

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



# pennsylvania

OFFICE OF OPEN RECORDS

## FINAL DETERMINATION

| | |
|---|---|
| IN THE MATTER OF | : |
| | : |
| **RACHEL WOLKENSTEIN,** | : |
| **Requester** | : |
| | : |
| v. | : **Docket No: AP 2016-1262** |
| | : |
| **NORTHAMPTON COUNTY,** | : |
| **Respondent** | : |

On June 30, 2016, Rachel Wolkenstein ("Requester") submitted a request ("Request") to Northampton County ("County") pursuant to the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101 *et seq.,* seeking various records related to the transport of Robert Mickens between September 15, 1984 and October 10, 1985. On July 8, 2016, the County denied the Request, claiming that it does not possess any responsive records.

On July 26, 2016, the Requester filed a timely appeal with the Office of Open Records ("OOR"), challenging the denial and stating grounds for disclosure. The OOR invited both parties to supplement the record and directed the County to notify any third parties of their ability to participate in this appeal. *See* 65 P.S. § 67.1101(c). On August 5, 2016, the County submitted the affidavit of Daniel Keen, the Director of the Northampton County Prison, who attests that a search was conducted and that no responsive records exist in the County's possession, custody, or control.[1]

Under the RTKL, an affidavit may serve as sufficient evidentiary support. *See Sherry v. Radnor Twp. Sch. Dist.*, 20 A.3d 515, 520-21 (Pa. Commw. Ct. 2011); *Moore v. Office of Open Records*, 992 A.2d 907, 909 (Pa. Commw. Ct. 2010). In the absence of any evidence that the County has acted in bad faith or that the records do, in fact, exist, "the averments in [the affidavit] should be accepted as true." *McGowan v. Pa. Dep't of Envtl. Prot*, 103 A.3d 374, 382-83 (Pa. Commw. Ct. 2014) (citing *Office of the Governor v. Scolforo*, 65 A.3d 1095, 1103 (Pa. Commw. Ct. 2013)). Based on the evidence provided, the County has met its burden of proof that it does not possess the records sought in the Request. Accordingly, the appeal is **denied**.

For the foregoing reasons, the County is not required to take any further action. This Final Determination is binding on all parties. Within thirty days of the mailing date of this Final

---

[1] The County also submitted the verification of Daniel O'Donnell, the County Open Records Officer and Assistant Solicitor, explaining in detail the search and his own efforts in supervising employees looking for records.

Determination, any party may appeal or petition for review to the Northampton County Court of Common Pleas.  65 P.S. § 67.1302(a).  All parties must be served with notice of the appeal.  The OOR also shall be served notice and have an opportunity to respond according to court rules as per Section 1303 of the RTKL.  However, as the quasi-judicial tribunal adjudicating this matter, the OOR is not a proper party to any appeal and should not be named as a party.[2]  This Final Determination shall be placed on the website at: http://openrecords.pa.gov.

**FINAL DETERMINATION ISSUED AND MAILED:  August 25, 2016**

/s/ Jordan C. Davis

———————————————

Jordan C. Davis
Appeals Officer

Sent to:      Rachel Wolkenstein (via e-mail only)
                  Daniel O'Donnell, Esq. (via e-mail only)

---

[2] *Padgett v. Pa. State Police*, 73 A.3d 644, 648 n.5 (Pa. Commw. Ct. 2013).

EXHIBIT C

PA OFFICE
(215) 673-6048

NJ OFFICE
(609) 340-8899

# PAUL J. PARIS

Detective Agency
P.O. BOX 296
CROYDON, PA 19021-0948

LICENSED & BONDED
IN PA & NJ

FAX:
215-673-0328

May 15, 1995

Andre Harvey #AM9119
S.C.I. Mahanoy
301 Morea Rd.
Frackville, Pa. 17932

Dear Andre:

Enclosed, please find copies of 17 pages taken from the sign-in & out logs at the Roundhouse. Also enclosed, please find copies of the statements taken from Maxie Harris-Jiles and Sharon Artis. Plus, find my breakdown of the entries on the 17 pages. You will see my notes at the bottom of the breakdown page.

As of this date, Jeremy is waiting to receive the logs for May, 1983, from the Roundhouse. Also, he is waiting for the sign-in & out logs from the Detention Center and Holmesburg, covering May 1 to December 31, 1983. Give me a call after you have reviewed this stuff. I will be in Pittsburgh on Derrick's case next week, not this week.

Sincerely,

Paul J. Paris

PJP/lms
Encl.

REVIEW OF THE SIGN IN & OUT LOGS OBTAINED FROM THE P.A.B., COVERING
THE PERIOD FROM 6-1-83 to 12-31-83. THE FOLLOWING ENTRIES ARE LISTED
BY PAGE NUMBER, NAME OF VISITOR, DETECTIVE, AND DATE.

Page 110, McClain, Det. Gerrard #9189, 6-2-83.
Page 117, McClain, Gerrard, 6-16-83.
Page 120, McClain, Gerrard, 6-23-83.
Page 122, Maxie Harris & Douglas Atwell, Gerrard, 6-28-83
Page 123, McClain, Gerrard, 6-30-83.
Page 128, Maxie Harris, Gilbert #9148, 7-14-83.
Page 131, Maxie Harris, Gerrard, 7-20-83 & Thelma & Constance Martin,
Gilbert, also 7-20-83.
Page 135, Maxie Harris, Charles Atwell, & Jerry Fields, Gerrard, 8-3-
83.
Page 137, McClain, Gilbert, 8-9-83.
Page 140, Maxie Harris, Gilbert, & Jerry Fields, Gerrard, 8-17-
83.
Page 149, Maxie Harris, Gerrard, & Gertrude & Sarah Martin, Gilbert,
9-7-83.
Page 161, Maxie Harris, Gilbert, Thelma Fields, Gilbert, and
Constance Fields, (Girard), 10-7-83
Page 169, Rochelle Jackson (anyone?), Gilbert, 10-27-83.
Page 183, Maxie Harris, Gerrard, 11-23-83 & Lettie Randolph
(anyone?), Gerrard, 11-23-83.
Page 189, Theresa Burrell (anyone?), Gilbert, 12-7-83.
Page 192, Annie Edmonds, Nancy Claitt? & Denise Certain (any of
these mean anything?), Gilbert & Gerrard, 12-13 & 12-14-83.
Page 199, Mary Whach & Floretta Caudle (mean anythng?), Gerrard, 12-
29-83.

The other pages had none of our people. It would appear that Atwell
was being brought down by a wagon, meaning he would come in a
different entrance and therefore, would not show on this log. We need
to put these dates & times together with the logs from the Detention
Center & Holmesburg.

— FIND NO SIGN-INS FOR: SHARON ARTIS, GLONDENNA REDDICK,
CHARMAINE PASCHALL, OR DARLENE PARKER.

| Date | Name | | | | | |
|---|---|---|---|---|---|---|
| 12.13.83 | Daniel Thomas | I.D. | | | | |
| 12.13.83 | Wm. Hayward | I.D. | | | | |
| 12/13/83 | Tyrone Brown | Hom | | | | |
| 12/13/83 | Barry Tomett | Poly | | | | |
| 12/13/83 | Rosemary Calabrese | Narc | | | | |
| 12/13/83 | Christine J. Cirelli | Narc | | | | |
| 12/13/83 | D.B. Palmer | SCU | | | | |
| 12/13/83 | Frank Delia | S.O.D | | | | |
| 12/13/83 | Linda Lazzone | Hom | | | | |
| 12/13/83 | Steve Poysler | Hom | | | | |
| 12-13-83 | Annie Edwards | Hom | | | | |
| 12-13-83 | Carmelo Rivera | Hom | | | | |
| " | Donis Bonns | " | | | | |
| " | Mike | " | | | | |
| " | Milton | " | | | | |
| 12-14-83 | | Hom | | | | |
| 12-14-83 | Mary Clark | Hom | | | | |
| 12-14-83 | John McConkle | | | | | |
| 12-14-83 | Richard McKay | I.D. | | | | |
| 12-14-83 | Klevie Certain | Narc | | | | |
| 12-14-83 | Efrain Nunes | Hom | | | | |
| " | Luis Torres | Hom | | | | |
| 12/14/83 | George Hengus | Hom | | | | |
| " | Casper Baez | Hom | | | | |
| 12:34pm | Calvin Butter | I.D. | | | | |
| 12-14-83 | Marlon Kilson | Hom | | | | |
| 12-14-83 | Cristino Valle | Hom | | | | |
| 12-14-83 | Angel Frisneda | Poly | | | | |
| 12-14-83 | S. Edmonds | Hom | | | | |
| 12-14-83 | Alvin Mullan | Ave | | | | |
| 12-14-83 | George Feldar | | | | | |
| " | Enola Bud | | | | | |

192