**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF PENNSYLVANIA**

| | |
|---|---|
| MAJOR GEORGE TILLERY | CIVIL ACTION |
| Petitioner | |
| v. | No. 20-cv-02675 |
| KENNETH EASON, *Acting Superintendent, State Correctional Institution at Chester* | Patrese B. Tucker, S.J. |
| Respondent. | |

**PETITIONER'S COUNSELED AND AMENDED
PETITION FOR WRIT OF HABEAS CORPUS**

JOSEPH M. MARRONE, JR.
MICHAEL D. POMERANTZ
Marrone Law Firm, LLC
The Bellevue
200 South Broad Street
Suite 400
Philadelphia, PA 19102
(215) 732-6700
jmarrone@marronelaw.com
mpomerantz@marronelaw.com

Counsel for Petitioner Major George Tillery

Dated: June 2, 2022

PAE AO 241
(Rev. 05/2018)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

| United States District Court | District:  Eastern District of Pennsylvania |
|---|---|
| **Name (under which you were convicted):** Major George Tillery | **Docket or Case No.:** 20-cv-02675 |
| **Place of Confinement:** SCI Chester | **Prisoner No.:** AM9786 |

| | |
|---|---|
| **Petitioner** (Include the name under which you were convicted): Major George Tillery | **Respondent** (Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner): Kenneth Eason, Superintendent SCI Chester |
| **V.** | **and** |
| | **The District Attorney of the County of:** Philadelphia |
| | **and** |
| | **The Attorney General of the State of:** Pennsylvania |

### PETITION

1.  (a)  Name and location of court that entered the judgment of conviction you are challenging:
    Pennsylvania Court of Common Pleas for Philadelphia County
    _____
    _____

    (b)  Criminal docket or case number (if you know): CP-51-CR-0305681-1984

2.  (a)  Date of judgment of conviction (if you know): May 29, 1985

    (b)  Date of sentencing: December 9, 1986

3.  Length of sentence: Life imprisonment

4.  In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case: _____
    First degree murder, criminal conspiracy, possessing instruments of crime generally,
    aggravated assault.
    _____

PAE AO 241
(Rev. 05/2018)

6.  (a)  What was your plea?  (Check one)

☑ (1)    Not Guilty              ☐ (3)    Nolo contendere (no contest)

☐ (2)    Guilty                  ☐ (4)    Insanity plea

(b)  If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?  Not applicable.

_____
_____
_____
_____

(c)  If you went to trial, what kind of trial did you have? (Check one)

☑ Jury              ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes              ☑ No

8.  Did you appeal from the judgment of conviction?

☑ Yes              ☐ No

9.  If you did appeal, answer the following:

(a)  Name of court:  Superior Court

(b)  Docket or case number (if you know):  3297 PHL 1986

(c)  Result:  Affirmed

(d)  Date of result (if you know):  May 30, 1989

(e)  Citation to the case (if you know):  563 A.2d 195 (Pa. Super. 1989)

(f)  Grounds raised:  Ineffective assistance of counsel

_____
_____
_____
_____
_____
_____

(g)  Did you seek further review by a higher state court?

☑ Yes              ☐ No

PAE AO 241
(Rev. 05/2018

Page 6

If yes, answer the following:

(1)  Name of court: Supreme Court of Pennsylvania

(2)  Docket or case number (if you know): _____

(3)  Result: Allocatur denied

(4)  Date of result (if you know): March 5, 1990

(5)  Citation to the case (if you know): 593 A.2d 841 (Pa. 1990)

(6)  Grounds raised: _____

_____

_____

_____

(h)  Did you file a petition for certiorari in the United States Supreme Court?

☐ Yes      ☑No

If yes, answer the following:

(1)  Docket or case number (if you know): _____

(2)  Result: _____

(3)  Date of result (if you know): _____

(4)  Citation to the case (if you know): _____

(i)  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

☑Yes      ☐ No

10.  If your answer to Question 10 was "Yes," give the following information:

(a)  (1)  Name of court: Pennsylvania Court of Common Pleas for Philadelphia County

(2)  Docket or case number (if you know): _____

(3)  Date of filing (if you know): September 20, 1996

(4)  Nature of the proceeding: PCRA

(5)  Grounds raised: Ineffective assistance of counsel

_____

_____

_____

_____

_____

_____

_____

PAE AO 241
(Rev. 05/2018)

(6)  Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes        ☐ No

(7)  Result: Relief denied

(8)  Date of result (if you know): January 13, 1998


(b)  If you filed any second petition, application, or motion, give the same information:

(1)  Name of court: Pennsylvania Court of Common Pleas for Philadelphia County

(2)  Docket or case number (if you know):

(3)  Date of filing (if you know): August 13, 2007

(4)  Nature of the proceeding: PCRA

(5)  Grounds raised: Brady claim


(6)  Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes        ☑ No

(7)  Result: Relief denied

(8)  Date of result (if you know): September 9, 2008


(c)  If you filed any third petition, application, or motion, give the same information:

(1)  Name of court: Pennsylvania Court of Common Pleas for Philadelphia County

(2)  Docket or case number (if you know):

(3)  Date of filing (if you know): June 15, 2016

(4)  Nature of the proceeding: PCRA

(5)  Grounds raised: Brady and Napue claims

PAE AO 241
(Rev. 05/2018)

Page 8

(6)  Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes      ☑ No

(7)  Result:  Relief denied

(8)  Date of result (if you know):  September 26, 2016

(d)  Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion:

(1)  First petition:      ☑ Yes      ☐ No

(2)  Second petition:   ☑ Yes      ☐ No

(3)  Third petition:    ☑ Yes      ☐ No

(e)  If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

11.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION:** To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:**

_____

Proecutor knowingly introduced false evidence in violation of Napue

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

SEE ATTACHED

_____

_____

_____

_____

_____

PAE AO 241
(Rev. 05/2018)

(b)   If you did not exhaust your state remedies on Ground One, explain why: _____

SEE ATTACHED

_____

_____

**(c)   Direct Appeal of Ground One:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes      ☑ No

(2)   If you did not raise this issue in your direct appeal, explain why? _____

Facts of the claim could not reasonably been known by the Petitioner

_____

**(d)   Post-Conviction Proceedings:**

(1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes      ☐ No

(2)   If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: PCRA

Name and location of the court where the motion or petition was filed: _____

Pennsylvania Court of Common Pleas for Philadelphia County

Docket or case number (if you know): _____

Date of the court's decision: September 26, 2016

Result (attach a copy of the court's opinion or order, if available): _____

SEE ATTACHED

(3)   Did you receive a hearing on your motion or petition?        ☐  Yes      ☑  No

(4)   Did you appeal from the denial of your motion or petition?   ☑  Yes      ☐  No

(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes      ☐ No

(6)   If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Superior Court of Pennsylvania

Docket or case number (if you know): _____

Date of the court's decision: June 11, 2018

Result (attach a copy of the court's opinion or order, if available): _____

SEE ATTACHED

_____

(7)   If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: Not applicable.   _____

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

SEE ATTACHED

**GROUND TWO:** _____

Brady claim

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

SEE ATTACHED

_____

_____

_____

_____

_____

(b)   If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

SEE ATTACHED

_____

(c)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes     ☑ No

PAE AO 241
(Rev. 07/10)

(2) If you did not raise this issue in your direct appeal, explain why? _____

Facts of the claim could not reasonably been known by the Petitioner

_____

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐          No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: PCRA

Name and location of the court where the motion or petition was filed: _____

Pennsylvania Court of Common Pleas for Philadelphia County

Docket or case number (if you know): _____

Date of the court's decision: September 26, 2016

Result (attach a copy of the court's opinion or order, if available): _____

SEE ATTACHED

(3) Did you receive a hearing on your motion or petition?          ☐   Yes     ☑   No
(4) Did you appeal from the denial of your motion or petition?     ☑   Yes     ☐   No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Superior Court of Pennsylvania

Docket or case number (if you know): _____

Date of the court's decision: June 11, 2018

Result (attach a copy of the court's opinion or order, if available): _____

SEE ATTACHED

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

Not applicable.

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

  SEE ATTACHED _____

_____

_____

**GROUND THREE:** _____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)  **Direct Appeal of Ground Three:**

  (1)  If you appealed from the judgment of conviction, did you raise this issue?

     ☐ Yes          ☐ No

  (2)  If you did not raise this issue in your direct appeal, explain why? _____

     _____

     _____

(d)  **Post-Conviction Proceedings:**

  (1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

     ☐ Yes          ☐ No

  (2)  If your answer to Question (d)(1) is "Yes," state:

     Type of motion or petition: _____

PAE AO 241
(Rev. 07/10)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

---

(3) Did you receive a hearing on your motion or petition?          ☐   Yes          ☐   No

(4) Did you appeal from the denial of your motion or petition?     ☐   Yes          ☐   No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐ Yes          ☐ No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

(b)   If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

**(c)   Direct Appeal of Ground Four:**

    (1)   If you appealed from the judgment of conviction, did you raise this issue?

        ☐ Yes        ☐ No

    (2)   If you did not raise this issue in your direct appeal, explain why? _____

        _____

        _____

**(d)   Post-Conviction Proceedings:**

    (1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☐ Yes        ☐ No

    (2)   If your answer to Question (d)(1) is "Yes," state:

        Type of motion or petition: _____

        Name and location of the court where the motion or petition was filed: _____

        _____

        Docket or case number (if you know): _____

        Date of the court's decision: _____

        Result (attach a copy of the court's opinion or order, if available): _____

        _____

    (3)   Did you receive a hearing on your motion or petition?        ☐ Yes        ☐ No

    (4)   Did you appeal from the denial of your motion or petition?        ☐ Yes        ☐ No

PAE AO 241
(Rev. 07/10)

    (5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

          ☐ Yes      ☐ No

    (6)  If your answer to Question (d)(4) is "Yes," state:

          Name and location of the court where the appeal was filed: _____

          _____

          Docket or case number (if you know): _____

          Date of the court's decision: _____

          Result (attach a copy of the court's opinion or order, if available): _____

          _____

          _____

    (7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

        issue: _____

        _____

        _____

        _____

        _____

    (e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

        _____

        _____

        _____

        _____

        _____

12.     Please answer these additional questions about the petition you are filing:

    (a)  Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

          ☑ Yes      ☐ No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

        presenting them: _____

        _____

        _____

        _____

(b)  Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

No.
_____
_____
_____

13.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?

☑ Yes          ☐  No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____
_____
_____ SEE ATTACHED _____
_____
_____
_____
_____

14.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?

☐  Yes          ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised: _____
_____
_____
_____

15.     Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a)  At preliminary hearing: _____
SEE ATTACHED
_____

(b)  At arraignment and plea: _____

SEE ATTACHED
_____

PAE AO 241
(Rev. 07/10)

Page 17

(c)  At trial: _____

SEE ATTACHED
_____

(d)  At sentencing: _____

SEE ATTACHED
_____

(e)  On appeal: _____

SEE ATTACHED
_____

(f)  In any post-conviction proceeding: _____

SEE ATTACHED
_____

(g)  On appeal from any ruling against you in a post-conviction proceeding: _____

SEE ATTACHED
_____

_____
_____

16.    Do you have any future sentence to serve after you complete the sentence for the judgment that you
       are challenging?

            ☐ Yes              ☑ No

(a)  If so, give the name and location of the court that imposed the other sentence you will serve in the
     future: _____

(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the other sentence: _____

(d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be
     served in the future?

            ☐ Yes          ☐ No

17.    **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you
       must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar
       your petition*

_____
SEE ATTACHED
_____

_____
_____
_____
_____

PAE AO 241                                                                                                                                Page 18
(Rev. 07/10)

      * The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of -

     (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

     (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

     (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

     (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

     Therefore, petitioner asks that the Court grant the following relief: _____

Grant the Petition for Habeas Corpus Relief
_____

_____

or any other relief to which petitioner may be entitled.


                          *Michael Pomerantz*
                       _____
                             *Signature of Attorney (if any)*

PAE AO 241
(Rev. 07/10)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system  on ___June 2, 2022_____.
*(month, date, year)*

Executed (signed) on __June 2, 2022_____(date).

*Michael Pomerantz*
*Signature of Petitioner*

If the person signing is not the petitioner, state the relationship to petitioner and explain why petitioner is not signing this petition. _____

Above Declaration is signed by Petitioner's counsel.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………………………...1

INTRODUCTION…………………………………………………………………….…3

THE PARTIES…………………………………………………………………………..5

PROCEDURAL HISTORY……………………………………………………………...6

FACTUAL BACKGROUND…………………………………………………………10

   **I.**    **The Night of the Shooting and the Initial Investigation**……………………10

   **II.**   **Continued Investigation in 1980 and Involvement of Emanuel Claitt**……………28

   **III.**  **Jailhouse Informants**………………………………………………………32

         A.    REVELATIONS OF POLICE AND PROSECUTOR MISCONDUCT, MANUFACTURED AND FALSE STATEMENTS…………………………..33

         B.    EMANUEL CLAITT: CRIMINAL CHARGES, PLEA DEALS AND COOPERATION……………………………………………………………41

         C.    CLAITT'S STATEMENT AGAINST MAJOR TILLERY……………………60

         D.    ROBERT MICKENS: ARREST RECORD AND PLEA DEALS……………67

   **IV.**  **Assistant District Attorney Barbara Christie**………………………………………72

   **V.**   **Sex for Lie**………………………………………………………………78

LEGAL ARGUMENT…………………………………………………….………....81
.
   I.     STANDARD OF REVIEW…………………………………………….……..81

   II.    RESPONDENTS HAVE WITHDRAWN THEIR OPPOSITION TO THE PRO SE SUCCESSIVE HABEAS PETITION (DOC. #2) AND THE PETITIONER HAS MET THE PROCEDURAL REQUIREMENTS TO MAKE AN ACTUAL INNOCENCE CLAIM UNDER *SCHLUP* AND *MCGUIGGAN*…………………………………………………………82

         a.   The Recantations of Claitt and Mickens Can Be Considered As Evidence of Petitioner's Actual Innocence Under *Howell v. Superintendent Albion SCI*…...83

        b.   Petitioner meets the Miscarriage of Justice Exception Because
            His New Evidence shows that he is actually innocent…………………………83

        c.   Under *Dennis* and *Bracey* Petitioner Cannot Be Defaulted For Lack of Due
            Diligence……………………………………………………………………84

        d.   The Evidence Offered In Support of the Second Petition is "New"
            Under *Schlup* Because it Was Not Available at Trial…………………………85

III.    THE PROSECUTION'S REPEATED AND KNOWING USE OF FALSE
       TESTIMONY TO OBTAIN A CONVICTION VIOLATED PETITIONER'S
       CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE 5TH AND 14TH
       AMENDMENTS, AND <u>NAPUE V. PEOPLE OF STATE OF ILL</u>……………..85

IV.    THE PROSECUTOR REPEATEDLY ENGAGED IN PREJUDICIAL
       MISCONDUCT IN VIOLATION OF THE PETITIONER'S CONSTITUTIONAL
       RIGHT TO DUE PROCESS UNDER THE 5TH AND 14TH AMENDMENTS, AND
       <u>BRADY V. MARYLAND</u>, BY WITHHOLDING EXCULPATORY EVIDENCE
       THAT HAD A REASONABLE PROBABILITY OF CHANGING THE
       OUTCOME OF THE TRIAL IF THE EVIDENCE HAD BEEN DISCLOSED……91

        a.   Information About the Extent of Allegations and Jail Time Being Faced by
            Emanuel Claitt at the time he made his May 20, 1980, statement to the police was
            withheld from Petitioner at trial, materially prejudicing his ability to cross
            examine Claitt and show bias to the jury………………………………………..92

        b.   Multiple letters from the District Attorney's office relating to special treatment for
            Claitt, including letters to Judges and the Parole Board were withheld from the
            Petitioner at trial, materially prejudicing his ability to cross-examine Claitt and
            show bias to the jury………………………………………………………….…93

        c.   The fact that Claitt and Mickens were placed in a police transport van for the
            purpose of convincing Mickens to give false evidence against the Petitioner at
            trial was withheld from the Petitioner, causing material prejudice
            to the Petitioner……………………………………………………….…….94

        e.   The fact that Claitt and Mickens were permitted to engage in sexual liaisons while
            incarcerated in return for their testimony in Peitioner's case and other cases was
            withheld from Petitioner at the time of trial and resulted in material
            prejudice to the Petitioner……………………………………………..……96

V.    UNDER <u>KYLES V. WHITLEY</u> THE COURT MAY CONSIDER THE
      COLLECTIVE MATERIALITY OF ALL CLAIMED <u>BRADY</u> VIOLATIONS..…98

CONCLUSION……………………………………………………………………..……99

## **PRELIMINARY STATEMENT**

Major G. Tillery has been imprisoned for the past thirty-eight years after being unconstitutionally convicted of a homicide he did not commit. The record now shows how false and fabricated evidence was *knowingly* introduced by the Commonwealth, in direct violation of *Napue v. People of State of Illinois*, 360 U.S. 264 (1959). These lies were presented through jailhouse informants Emanuel Claitt and Robert Mickens, whose incentives for providing coerced testimony were grossly misrepresented or outright lied about, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Both "witnesses" have now recanted and also provided stunning detail about how they were used in a "web of lies" manufactured by homicide detectives and by Assistant District Attorneys.

Emanuel Claitt, who provided the only evidence that Tillery committed the crime, signed a statement on May 20, 1980, that is completely at odds with the documented evidence at the crime scene. Claitt's full recantation decades later provides an explanation for the inaccuracies and impossibilities found in that May 20, 1980, statement. Even before trial began on April 28, 1985, Assistant District Attorney Barbara Christie knew that Claitt's statement was completely false. She went back to the crime scene on the eve of trial hoping to "fix" Claitt's statement by conjuring a non-existent broken glass door that Claitt repeatedly emphasized in the statement. Despite that emphasis, there was no broken glass door at the crime scene.

The glass door is just one of the "problems" in Claitt's fabricated statement that ADA Christie knew about before putting Claitt on the stand. The homicide file and district attorney files that were produced in voluntary discovery unequivocally show that ADA Christie knew she was putting on false evidence and did so anyway. That fact alone is more than sufficient for this Court to grant the requested relief under *Napue*.

1

The "incentives" that were used to have Claitt and Mickens sign their false statements and give their false testimony amounted to coercion on the part of Philadelphia homicide detectives and the District Attorney's office. Both Claitt and Mickens were threatened with homicide charges that carried life sentences. They were also offered, and received, private time for sexual liaisons in the police administration building (and other locations) during their incarceration and confinement. Especially in Claitt's case, there is also voluminous documentation that he would receive unheard of lenience in connection with a slew of open felony charges, nearly all of which were *nolle prossed* after Claitt signed the statement against Tillery.

At Tillery's trial, the jury learned almost nothing about the open charges that were pending against Claitt when he signed his statement. The jury never learned that Claitt had been arrested and charged with thirteen crimes just **four days before** he signed that statement. Both Claitt and ADA Christie falsely advised the jury that there was "no deal."

Robert Mickens gave testimony that falsely put Tillery at the scene of the homicide. Mickens did not claim to have seen Tillery committing any crime. His and Claitt's recantations both establish that Mickens was added to the scheme later, presumably when homicide detectives and District Attorneys realized all of the "problems" inherent in Claitt's bizarre and inaccurate statement. Of particular note is that, in their recantations, both Claitt and Mickens independently and without prompting describe a ride where the two of them, while incarcerated, were transported together in a police van that drove around the city while Claitt pressured Mickens to sign his own false statement and testify against Tillery. The fact that *both men tell the same story* about this van ride reinforces the credibility of their recantations and further undermines the coerced and manufactured testimony they were forced to give.

2

Assistant District Attorney Barbara Christie knowingly presented false and fabricated evidence to the jury. Tillery was denied the opportunity to fully cross-examine Claitt and Mickens because the charges against them, and the coercive manner in which their testimony had been obtained were concealed by the Commonwealth. The result was an unconstitutional conviction which this court should now overturn.

## **INTRODUCTION**

1.      Major Tillery has spent thirty-eight years in prison, including *twenty* in solitary confinement, based solely on the testimony of two jailhouse informants. Tillery has always asserted his factual innocence. Thirty years later those two jailhouse informants disclosed that their statements were concocted by Philadelphia police and prosecutors and had no basis in fact. Neither of the informants were in or near the pool hall at the time of the shootings. They were coached to lie under oath about the shooting, as well as about the threats, deals, bail, and parole favors they received in exchange for their false testimony. They also failed to disclose, until their recantations, that they were offered (and received) private time for sex inside the police administration building while they were still incarcerated in what has become known as the sex for lies scandal.

2.      After initially opposing Mr. Tillery's *Pro Se* Petition, the Commonwealth took the extraordinary step of withdrawing that opposition. In doing so, the Commonwealth acknowledged that Mr. Tillery had met the legal criteria for timeliness and for new evidence allowing him to proceed on the substance of his *Brady* claims. The filing which withdrew the Commonwealth's opposition stated that "[T]he prosecutor's "interest" in a criminal prosecution

3

is not that he shall win a case, but that justice shall be done. *Dennis v. Secretary, Pa. Dept. of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016) …"

3.      The Commonwealth further stated that its "previous response [to Mr. Tillery's *Pro Se* Petition] advanced arguments that are foreclosed by controlling precedent…. Acknowledging these four errors is necessary, both to meet the Commonwealth's ethical duty of candor to tribunal, Pa. Rule of Professional Conduct 3.3(a)(1), and to demonstrate why a stay, rather than dismissal, is appropriate at this stage." ECF No. 23, p.2-3.

4.      The Commonwealth has acknowledged the precedent applicable to Mr. Tillery's petition: (a) Recantation evidence cannot be categorically rejected as actual innocence evidence, *Howell v. Superintendent Albion SCI*, 978 F.3d 54 (2020). (b) Recantation evidence can be considered as reliable, credible actual innocence evidence. *Reeves v. Fayette SCI*, 897 F.3d 154 (2018), *citing House v. Bell*, 547 U.S. 518 (2006). (c) A timeliness, due diligence concept is "foreclosed" in a *Brady* analysis (*Dennis, supra.*), and that applies to the habeas statute of limitations due-diligence requirement of Section 2244(d)(1)(D). *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 291 (3d. Cir. 2021). (d) The key-witness recantations qualify as "new evidence" to prove Tillery's innocence under *Schlup v. Delo*, 513 U.S. 298, 327, 328 (1995); *Reeves*, 897 F.3d at 161.

5.      The Commonwealth concluded it is "foreclosed from arguing that Tillery failed to exercise due diligence in discovering the alleged *Brady* violations for purposes of 28 U.S. sec 2244(b)(3)(B)" and meets the requirements of a successive petition. *Bracy, supra.* at 286-88. And because recantations cannot be viewed as inherently unreliable, "Tillery raises a potentially meritorious argument that the state courts unreasonably denied his *Brady* claim and that his claim has merit." Consequently, the Commonwealth stated, Mr. Tillery's claims warrant "further

review" while stating "the Commonwealth takes no position on the ultimate question of whether Tillery is entitled to habeas relief or not."

6.      The Commonwealth has acknowledged that the factual predicate of Petitioner's *Pro Se* Petition (ECF No. 2) is properly before the Court as a matter of law for consideration of the substance of Mr. Tillery's Brady claims. There is no dispute that the instant Petition is founded on evidence that is both "new" and "timely."

7.      A substantive review of the evidence included with the *Pro Se* Petition, and additional items found in the recent discovery reviewing prosecution and homicide files and attached to this Amended Counseled Petition, conclusively establishes that Major Tillery was denied Due Process, that his prosecution and conviction are a fundamental miscarriage of justice and that there can be no confidence in his conviction.

8.      As a result, Petitioner Major Tillery respectfully requests that this Honorable Court grant the Petition by overturning his conviction, precluding a re-trial, and ordering his release from prison.

## **THE PARTIES**

9.      Petitioner Major G. Tillery is incarcerated by the Pennsylvania Department of Corrections and is currently confined in the State Correctional Institution at Chester, under a life sentence with no parole.

10.     Respondent Kenneth Eason is the superintendent of the State Correctional Institution at Chester.

11.     The District Attorney of Philadelphia is the prosecutor's office for the City of Philadelphia and represents the Commonwealth in all criminal prosecution brought within the City of Philadelphia, including the prosecution of Major G. Tillery.

12.     The Pennsylvania Attorney General is the chief law enforcement office in the Commonwealth of Pennsylvania and has responsibility for all criminal prosecutions in the Commonwealth.

## PROCEDURAL HISTORY

13.     Petitioner, Major G. Tillery was arrested and charged with murder in the first degree for the shooting death of Joseph Hollis, criminal conspiracy, possessing instruments of crime generally and aggravated assault under Philadelphia County, Pennsylvania docket number CP-51-CR-0305681-1984.

14.     His trial took place from May 2 - May 29, 1985. On May 29, 1985, Tillery was convicted on all counts. On December 9, 1986, Tillery was sentenced to life imprisonment without the possibility of parole on the first-degree murder conviction, to run concurrently with a 1-2 year sentence on possession of instruments of crime generally and concurrently with a 5-10 year sentence on criminal conspiracy. A 5–10-year sentence on aggravated assault was to run consecutively to the life sentence. Tillery was represented at trial by attorney Joseph Santaguida.

15.     On direct appeal, the Superior Court of Pennsylvania affirmed Tillery's conviction on May 30, 1999. *Commonwealth v. Tillery,* No. 3297 Philadelphia 1986, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum), *allocatur denied, Commonwealth v. Tillery,* 593 A.2d 841 (Pa. Mar. 5, 1990).

16.     Petitioner filed his first PCRA petition in the Court of Common Pleas (CCP) of Philadelphia County on September 20, 1996. The petition claimed ineffective assistance of trial counsel, Joseph Santaguida, on the basis that Santaguida had an actual conflict of interest because he had previously represented John Pickens, one of the alleged victims in Tillery's case, during the Commonwealth's case against Tillery's alleged co-conspirator, William Franklin.

17.     The CCP denied the petition on timeliness grounds on January 13, 1998. The Superior Court of Pennsylvania affirmed on appeal on April 21, 1999. *Commonwealth v. Tillery,* No. 523 Philadelphia 1998, 738 A.2d 1055 (Pa. Super. 1999) (unpublished memorandum), *allocatur denied, Commonwealth v. Tillery*, 742 A.2d 674 (Pa. Aug. 18, 1999). Exhibit "A". Petitioner was represented on his first PCRA petition by Richard P. Hunter.

18.     Petitioner filed a *pro se* petition for habeas corpus relief in this Court on December 22, 1999. *Tillery v. Horn*, 2:99-cv-065160-BWK (E.D. Pa.). This petition also alleged ineffective assistance of his trial counsel, Joseph Santaguida, as the first PCRA petition had.

19.     Initially, the District Court affirmed the magistrate judge's report and denied a hearing on October 30, 2000. The Court of Appeals granted a certificate of appealability on February 28, 2002 and clarified that its remand was for the purposes of a hearing on August 21, 2002. Tillery v. Horn, No. 00-3818 (3d Cir. 2002). Evidentiary hearings were held on April 23, 2003 and May 28, 2003, during which Tillery and Santaguida both testified. The District Court then denied relief on July 29, 2003. Exhibit "B".

20.     Petitioner was represented in the District Court by Edward H. Wiley, who was appointed following remand from the Court of Appeals (No. 00-3818) on August 21, 2002.

21.     Following the denial of relief on July 29, 2003, the Court of Appeals affirmed the District Court on July 29, 2005. *Tillery v. Horn*, 142 F. App'x. 66 (3rd Cir. 2005) (No. 03-3616). Exhibit "C". Tillery was represented in the Court of Appeals by Michael J. Confusione.

22.     On August 13, 2007, Tillery filed a second PCRA petition *pro se* in the Court of Common Pleas of Philadelphia County, with a *Brady* claim based on court records, including trial testimony in other cases, which provided information that Claitt was promised a sentence of "less than 10 years" and that Mickens had obtained parole assistance. Exhibit "D". The petition was dismissed by the Court of Common Pleas on September 9, 2008, on timeliness grounds.

23.     The Superior Court of Pennsylvania affirmed on appeal on July 15, 2009. *Commonwealth v. Tillery*, 981 A.2d 937 (Pa. Super. 2009) (unpublished memorandum*), allocatur denied*, *Commonwealth v. Tillery*, 985 A.2d 972 (Pa. Dec. 9, 2009). Exhibit "E".

24.     On June 15, 2016, Tillery filed a third PCRA petition pro se in the Court of Common Pleas of Philadelphia County. Exhibits "F", "G". This PCRA petition was dismissed by the Court of Common Pleas on September 26, 2016, on timeliness grounds.

25.     The Superior Court of Pennsylvania affirmed on appeal on June 11, 2018. *Commonwealth v. Tillery*, 193 A.3d 1063 (Pa. Super. 2018) (unpublished memorandum), *allocatur denied*, *Commonwealth v. Tillery*, 201 A.3d 729 (Pa. Feb. 6, 2019). Exhibits "H", "I". Tillery's Application for Reconsideration of the Denial of Allowance of Appeal was denied on May 1, 2019. Tillery was represented by Stephen P. Patrizio on the appeal.

26.     On May 7, 2020, Petitioner filed his pro se application for leave to file a successive petition pursuant to 28 U.S.C. § 2244(b) with the Third Circuit Court of Appeals. That application was granted on June 5, 2020, and on that same day the Pro Se Successive Habeas Corpus Petition was filed with this Court.

27.     On February 5, 2021, the Respondents filed their opposition to the *Pro Se* Petition, arguing that the new evidence discovered in 2016 was time-barred. On June 6, 2021, Petitioner filed a Reply Brief to show, *inter alia*, the Third Circuit decisions in *Dennis v. Secretary of Pennsylvania Department of Corrections*, 834 F.3d 263 (3d. Cir. 2016), *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274 (3d. Cir. 2021), and *Howell v. Superintendent Albion SCI*, 978 F.3d 54 (2020) showing that the Commonwealth's arguments in opposition to the Petition lacked merit.

28.     On December 7, 2021, undersigned counsel entered their appearances on behalf of Petitioner.

29.     On December 15, 2021, the Commonwealth filed a Motion for Stay that also explicitly withdrew their opposition to the *Pro Se* Successive Petition, agreeing that their arguments made in their Response in Opposition (ECF No. 13) were not supported by the precedents which Tillery cited in his Reply Brief (ECF No. 16). The Commonwealth explicitly stated that it takes no position on the question of granting the Habeas Petition and opted to engage in voluntary discovery (ECF No. 23). Petitioner did not oppose the Motion for Stay which the Court granted on January 10, 2022 (ECF No. 26).

30.     On March 1 and March 3, 2022, the Petitioner was given an opportunity to review portions of the homicide file and the District Attorney's file regarding this case. Petitioner designated portions of those files to be duplicated. Respondent provided the designated portion of the file to the Petitioner pursuant to a Confidentiality Agreement on March 28, 2022.

## FACTUAL BACKGROUND

**(NOTE: The following narrative includes newly disclosed information that was discovered as a result of reviewing the homicide file and the District Attorney's file. References to documents produced from that review are initially indicated with the legend "MGT DAO Files", followed by the Bates number and then the Exhibit letter.**

**There are also references to the Tillery trial transcript which are indicated by the date of the transcript within the month of May. For example, testimony on page 23 from May 18 would be indicated as "N.T. 18:23"**

**Counsel for Petitioner also represents co-defendant William Franklin and has access to his files and transcript. When referencing items from the Franklin files the legend WF DAO Files is followed by the Bates number for that series.**

**References to William Franklin's trial transcript are indicated with the legend "WF N.T. followed by the date and page. Thus, testimony from the third day of the month on page 115 is indicated as "WF N.T. 3:115")**

## I.   The Night of the Shooting and the Initial Investigation

31.   This case arises from shootings that occurred in North Philadelphia on October 22, 1976, at 9:54 pm. The body of Joseph Hollis was found in a pool hall at the corner of Huntingdon and Warnock Streets. The cause of death was determined to be a gunshot wound to the torso. John Pickens was also shot that night but survived.

32.   On October 22, 1976, police officer George Minner was assigned to Philadelphia Police Anti-Crime Team #2, a plainclothes special unit that worked in North Philadelphia to combat robberies and high crime. The territory that ACT II covered included the intersection between Huntingdon and Warnock Street. N.T. 9:102.

33.   Minner was part of the first team of officers who arrived at the pool hall within minutes in response to a report of a "Shooting and Hospital Case." They were approached by an unidentified male (later identified as William "Billy" Arnold) who told them there was a male inside the pool hall who had been shot.  Via the police radio they heard another male (John

Pickens) had been shot and was being picked up at 11th and Huntingdon Sts. Statement of P/O

Minner, MGT DAO Files at pp. 362-366, attached as Exhibit "J."

34.    When Minner reached the pool room, he hopped on a window ledge, looked into

the pool room. He observed the body of a man lying on the floor. "His head was pointed to the

east, feet west, and he was lying on his right side. He was not moving." Exhibit "J."

35.    Officers Norton and McAllister, part of that same first team, tried to open the pool

room door, but it was locked. The door was forced open, using a "sledgehammer to knock out

the lock". MT 9:103.

36.    William Arnold had driven to 11th and Huntingdon to meet up with John Pickens

and Joseph Hollis with plans to attend a concert. N.T. 10:48-49. He found Pickens wounded in

the street and carried him into the home of an unknown individual. Pickens told Arnold that

Hollis was shot in the pool room N.T. 10:49-52. Arnold saw police activity at the pool hall

around the corner, went there and told police that Hollis was inside. After the locked pool hall

door was broken into, Arnold entered the pool hall with police. Arnold states that Hollis' body

was face down, and that he turned Hollis over. Statement of William Arnold, MGT DAO File at

pp. 446-449, attached as Exhibit "K." Arnold then went to Temple Hospital and tried to see

Pickens but was not allowed. He was transported to the Police Administration Building and was

interviewed. N.T. 10:54-55 Arnold was able to see Pickens another day, but Pickens wouldn't

tell him anything about the shooting. N.T. 10:57.

37.    According to Minner's statement to homicide detectives at 11:30 pm and his trial

testimony, an initial search of the premises was conducted by Minner and his team prior to it

being secured by Sgt. Brown. The crime scene itself was filled with evidence, including a set of

car keys on the pool table, bullets on a counter, spent bullets and a fragment of a spent bullet, a

coat, glasses, sunglasses, hat, white powdered substance in the basement believed to be used for illegal narcotics, and a set of General Motors car keys.  Minner retrieved the keys off the pool table. MT 9:107 *See*, Mobile Crime Detection Report, MGT DAO Files at p. 404, attached as Exhibit "L.".

38.     Outside the pool room Minner saw a 1976 yellow Cadillac parked across the street that he said was "owned and operated by Alfred Clark." Minner had seen Alfred Clark driving that same vehicle on prior occasions over the past few months. N.T. 9:112

39.     Minner reported:

> I know Alfred Clark to be involved in narcotics and have arrested him before in regards to a shooting. I also know that he was involved in three drug related homicides and robberies. I also know that he is associated with William Franklin, who owns the pool hall [sic.[1]], Eughenhia Jones, Fred Rainey, Rudolph Thomas, Frank Junius, Mark Garrick and Andre Wright.

Exhibit "J."

40.     Minner's statement from immediately following the shooting *does not* name Major Tillery as a known associate of Alfred Clark or any of the other individuals named. N.T. 9:111-112 and Exhibit "J."

41.     Minner proceeded to the corner of 11th and Huntingdon, near where Pickens had been picked up, and observed "two of the above," Fred Rainey and Eughenia Jones, inside a store/restaurant beginning to eat.

42.     On his way to the store Minner was approached by Rudolph Thomas, who said he was being "nosey" and followed a police car. All three men were detained. N.T. 9:111-112 and Exhibit "J."

---

[1]      According to the statement of William Bullock (Exhibit "M"), Bullock himself owned the building since 1966, and the pool room on the first floor was leased to and operated by Charles Harris, also known as "Goldie."

43.     When Minner returned to Warnock and Huntingdon streets he saw that the yellow

Cadillac he identified as belonging to Alfred Clark was missing and notified police radio. Minner

was informed a short time later that the auto was stopped at Chadwick and Huntingdon Streets.

Exhibit "J."

44.     An interview report from P/O Norton at approximately 11:45pm says that he was

working plainclothes that night driving an unmarked 1976 pick-up truck. He said:

> At about 7:30, 7:45 pm we observed a 1976 yellow body, black convertible top
> Cadillac parked in the driveway off of Cumberland St., between Warnock and
> 11th.  Seated inside the car was Alfred Clark, on the passenger side and behind the
> wheel was Frank Junius. I did not speak to or question the men at this time……At
> about 9:54 pm we received a radio call "Shooting and Hospital Case at Warnock
> and Huntingdon."

Exhibit "N."

45.     P/O McGarvey then reported to the scene and spoke with Sgt. Brown and other

officers at the scene. P/O McGarvey continued:

> "Parked across the street from the pool room, at approximately 1009 Huntingdon,
> [was] the same yellow Cadillac that we had seen earlier at Cumberland St. The
> auto was unoccupied. We got back in our vehicle and began to patrol our area for
> possible suspects…
>
> A short time later, we heard over the police radio that the yellow Cadillac had left
> the scene and for all vehicles to be on the lookout for it. About 1 minute later we
> heard officer [Pressley] on 228 inform radio that he was behind the auto at 16th
> and Huntingdon."

Exhibit "O."

46.     P/O McGarvey proceeded to the location of the stop and saw Frank Junius get out

of the auto on driver's side and begin to run. He got about 15 feet before he was stopped by P/O

Pressley. McGarvey and his partner stopped Alfred Clark as he was moving quickly from the

passenger side of the auto. Clark did not have any weapons, but Clark said he had $1800 on him.

A police wagon was called for and Clark and Junius were detained for questioning. Exhibit "O."

13

47.    Minner testified that after learning Clark and Junius had been stopped and detained, he went to the home of brothers Frank Junius and James Ravenell at 925 York Street which was about two and a half blocks from the pool hall. Parked outside was the green Cadillac Minner knew belonged to Fred Rainey and the brown Oldsmobile Toronado he knew belonged to William Franklin. Minner requested that the residence be put under surveillance. N.T. 9:114-116 and Exhibit "J."

48.    Det. Chitwood met P/O Minner at 925 York Street. Using the car keys found inside the pool hall with Hollis' dead body, Det. Chitwood was able to open the door and start the ignition of the green Cadillac, confirmed as owned by Fred Rainey. N.T. 9:119.

49.    A search warrant was issued for Rainey's car. No drugs or weapons were found. Ownership of Rainey's car was confirmed. Surveillance at Junius' residence continued for an unknown period Search Warrant for Rainey's car, MGT DAO Files at pp. 484-486, attached as Exhibit "Q."

50.    Frank Junius' told homicide detectives on October 23, 1976, that Rainey's auto was parked in front of his house and that he had given the keys to Rainey's car back to him at the mosque at about 7pm, the night of the shooting. Statement of Frank Junius, MGT DAO Files at pp. 340-345, attached as Exhibit "P.".

51.    Minner and the other ACT II plainclothes officers demonstrate through their statements that they knew well which cars were being driven by which individuals in the neighborhood, including known associates of Alfred Clark.

52.    Numerous undercover police officers assigned to that area arrived at the scene and drove around the neighborhood looking for suspects. The only car recognized and stopped by the

police was Alfred Clarks's car. Later, Fred Rainey's green Cadillac and William Franklin's Toronado were identified a few blocks away from the pool room.

53.     Neither P/O Minner, nor any other Philadelphia police officer, identified Tillery or his car as being anywhere in the area on the night of the shooting. At trial, ADA Barbara Christie called P/O Minner to testify on re-cross that he had seen Tillery in the neighborhood days later.  Minner indicated that he had Tillery had spoken briefly. N.T. 9:128-129.

54.     In the hours immediately following the shootings, men who were known to have been associates of Alfred Clark and to have frequented the neighborhood, were detained and interviewed: Alfred Clark, Frank Junius, Fred Rainey, Eughinia Jones, William Arnold, Rudolph Thomas. Homicide Investigation Report, MGT DAO Files at pp. 164-170, attached as Exhibit "R." These were men identified in Minner's report as known associates of Clark. William Franklin was not questioned or detained.

55.     The Homicide Case Summary H-76-315, dated 1-16-77, was signed by assigned Detective Floyd Gallo.  He arrived at the scene at 11:20 pm.  Lt. John Malone and Det. Michael Chitwood, both of the Homicide Division, arrived at 11:45 pm. Chitwood first viewed Hollis' body at Temple Hospital, then searched the poolroom and the basement, and met with Det. Gallo. Exhibit "R."

56.     The Mobile Crime Detection Unit, Technician Jeffrey Parker and P/O Edward Little were on the scene at 10:35 pm.

57.     The following diagram of the pool room as marked as C-9 in William Franklin's trial and is attached as Exhibit "T":



58.      The pool hall is on the first floor of 1008 W. Huntingdon Street, which is the

southeast corner of Warnock and Huntingdon Streets. The entrance to the poolroom is door at an

angle and allows entry directly into the pool room from Huntingdon Street. The door also shows

damage in the area of the doorknob. Exhibit "L," and crime scene photographs attached as

Exhibits "U," "V," and "W."



Door to upstairs

Door to pool hall

*Exhibit "U"*

59.     Immediately next to that angled door, and slightly to the east, is a door that opens

into a hallway and the staircase to the apartment on the second floor. This hallway is on the other

side of the pool room's east wall.

60.     On the east wall of the pool room, about 10' south of the entrance door, there is a

door that opens to the hallway described in the previous paragraph. This door is locked from the

17

stairwell side of the door. MTG Copy p.165.  In the crime scene photographs, this door is shown *closed* with a grey over coat hanging off a hook on the door. Exhibit "V."



East wall door

*Exhibit "V"*

61.     Homicide Detective Gallo examined the scene on the night of the shooting. Gallo described that when he tried to open the door on the east wall of the pool room it was stuck. "It was still stuck a little bit, but I gave it one good little pull and it opened." N.T. 13:34.

62.     Gallo described what he saw after he was able to open the door:

Looked like to me as if they were trying to remodel or something. There was a lot of debris, not big debris but the place in there looked as if somebody was doing some work or something.

N.T. 13:34.



*Exhibit "W"*

63.     After Gallo opened the door, he looked into the hallway: "there was all kinds of plaster and stuff in there." N.T. 13:50. Gallo was also asked if he saw blood in the hallway and he testified that he "didn't see anything." N.T. 13:51.

64.     Other than the above image, no pictures were ever taken in this hallway behind the door on the east wall because Gallo "Didn't feel it was part of the crime scene. I felt the whole crime – everything was committed in the poolroom and we just restricted it to the crime scene area." N.T. 13:34.

65.     Three spent projectiles were recovered from the scene by police. The Mobile

Crime Scene Report, 11-3-76 describes the location of the spent bullets (# 2-4) as on the east side

of the pool room. Exhibit "L."

>    #1. 2 live western .38 cal. cartridges on counter top, 5'3" south of north
>         wall and 3'2" east of west wall;
>    #2. 1 spent projectile, on floor 2'2" west of east wall and 12' south of
>         north wall;
>    #3. 1 spent projectile, found on floor of hallway to 2nd floor at west wall
>         and 11'5" south of hallway entrance door;
>    #4. 1 spent projectile dug out of east wall, 4' 7" south of north wall. (door
>         on the east wall).

Exhibit "L."

66.     The Ballistics Report, dated October 27, 1976, includes those "spent projectiles"

as well as a bullet specimen taken from the body of the deceased (Joseph Hollis). Ballistics

report, MGT DAO p. 385, 388 attached as Exhibit "S."

67.     Homicide Detective Michael Chitwood was present at the scene during the initial

investigation. At Tillery's trial, Chitwood testified that there was no glass door for Pickens to

have run through:

>    Q.     You went to the crime scene, did you not?
>    A.     Yes, sir.
>    Q.     And didn't you tell us that you looked around to see what you could see, is
>            that correct.
>    A.     Yes, sir.
>    Q.     Did you seen any door that had all glass broken where somebody could
>            have ran through?
>    A.     No, sir.

N.T. 13:11.

68.     No fingerprints were taken from the crime scene. N.T. 10:83.

69.     A large plastic bag containing drugs, coats, a hat and glasses were also found in

the poolroom. None of this evidence was linked to Tillery. N.T. 13:8; 13:33.

70.     Within hours of the shooting, police had detained and attempted to interview Clark, Rainey, Thomas, Junius. All were questioned by police but refused to provide any substantive information.

71.     As stated above, Clark's car was identified as being across the street from the poolroom, and then disappeared from that location while Minner returned from seeing Rainey, Eugihania Jones, and Thomas. Minner put out a call on police radio for the car to be stopped, which happened within fifteen minutes following Minner's call. Exhibit "J."

72.     When Clark's yellow Cadillac was identified and stopped, Clark was in the passenger seat and Junius was driving. They both attempted to run. Clark was found with over $1800 cash in his car. Exhibit "R."

73.     The keys to Rainey's car were found on the pool table, right by Hollis' dead body. Frank Junius gave a statement to detectives that he had given the car keys back to Rainey at 7pm, when they were at the Mosque. Exhibit "P."

74.     No record of any follow-up regarding these detainees or their non-substantive statements was located in the files provided by the Commonwealth in voluntary discovery.

75.     The next morning, in the hospital, Pickens gave a statement to homicide detective McGrath. Pickens described being in the poolroom with Hollis when they were shot.



The above excerpt says the following:

> I was with Hollis. We went into the pool hall. We was shooting pool with Rickie.
> They locked the door and wouldn't let us out. They all pull guns. Rickie had a 38
> magnum. He shot us.

Statement of Pickens taken by Det. McGrath, MGT DAO Files at pp. 97-105, attached as Exhibit

"X."

76.     Pickens' statement also says there were four other men in the poolhall with them;

they all pulled guns.



INTERVIEWED at 11:35 BY DET McGRATH

Q. Do you know who shot you?

A. Yes.

Q. Can you write the names of the persons who shot you on a piece of paper?

A. Yes.



Dave

Rickie

77.     Pickens named "Rickie" and "Dave" as the shooters, provided a detailed physical description of Rickie, including his clothes and jewelry, and stated that his [Rickie's] light green Cadillac was parked near the pool hall. Exhibit "X."  Presumably this is the same green Cadillac that was identified by P/O Minner and Det. Chitwood as belonging to Fred Rainey. Although a search warrant was issued for the Rainey Cadillac, there was never any follow-up with Rainey himself.

78.     Pickens was shown photos (mug shots) of twelve people known to the detectives. William Franklin's photo was included. Pickens said that none of those men was the shooter. A photo of Major Tillery was not included among the of mug shots. Pickens wrote down the names Rickie and Dave when asked to write the names of the shooters. Exhibit "X."

79.     John Pickens did not testify at trial.[2]

80.     Homicide detectives interviewed William Bullock who owned the building where the pool room was located and lived in the third-floor apartment. Bullock was at home when he heard a shot outside and looked out the window.

81.     Bullock's statement confirms that the first-floor pool hall was rented and operated by Charles Harris, who was also known as "Goldie." The voluminous records that Tillery's representative was permitted to review in voluntary discovery revealed no interview with "Goldie" and no indication that there was any effort to interview "Goldie" about the shooting.

---

[2]        Pickens' failure to appear at trial was the subject of a previous post-conviction claim made by Major Tillery. Tillery's trial counsel was Joseph Santaguida who, unbeknownst to Tillery, represented Pickens while William Franklin was being tried. Santaguida even attended Franklin's preliminary hearing with Pickens. It is likely that Santaguida was still representing Pickens during the trial of Major Tillery, but Santaguida denied that when questioned during the first Federal Habeas proceeding.

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
| CONTINUATION SHEET | | POLICE DEPARTMENT | |
| NAME *William Henry Bullock* | | PAGE **4** | CASE NO. |

Q. what did you see?

A. I just saw several men or boy's running toward 11ᵗʰ St.

Q. How many people did you see?

A. A bunch of people, eighteen or twenty, something in that area.

Exhibit "M." Bullock describes seeing "a bunch of people, eighteen or twenty, something in that area" running toward 11th Street.

82.     Philadelphia homicide detectives obtained additional information about the identity of "Dave" on October 23, 1976, when Reggie Hollis, brother of decedent Joseph Hollis came to police with the following information:

The above excerpt says:

> Info received from
> Reggie Hollis bro of Dec.
> Dave is Dana, lives with
> Francine in Winfield [sic.]
> Francine maybe girlfriend of
> John Pickens. Dave beath Francine
> with a bat approx. 1 wk ago.

Upon information and belief, these notes were written by homicide detective Floyd Gallo who ran the investigation. Statement from Reggie Hollis, MGT DAO Files at p. 321, attached as Exhibit "Y."

83.     Years later, as discussed in more detail in Section III below, jailhouse informant Emanuel Claitt would sign a statement falsely saying there was a meeting at Dana Goodman's house that began a sequence of events that led to the murder of Hollis. At trial, however, Claitt mentioned the dispute over a woman:

> Well, with him [Dana Goodman] being from West Philadelphia, he was aligned with Sylvester, but him and John Pickens had did a disagreement. Was really behind a woman that both of them were involved with.

26

N.T. 14:26

84.    The homicide file also contained a statement from "24-year-old negro male"

Marvin Dyson, dated January 17, 1977:



The excerpt shown above reads as follows:

> Q – What do you know about the murder of Joe Hollis which occurred at 1008 W. Huntingdon on 10/22/76?

> A – Just what everybody on the street talks about Larry & Pie shot [illegible] Joe Hollis and killed him and paralyzed Johnny Cakes [John Pickens].

> Q – Who is Larry & Pie?

> A – Larry Goodman, they called him Dana Goodman there [sic.] brothers 2119 N. 58th St.

> Q – Why people they suppose to shoot Joe

> A – Behind some drugs, and Dana wife

Dyson Statement, MGT DAO Files at pp. 087-090, attached as Exhibit "Z."

85.     When Dyson was asked who told him Larry & Pie shot Hollis he responded: "Ernest Prior" and gave an address.

86.     During voluntary discovery, Tillery's representatives were unable to locate any reports of any investigation into the information given by Pickens, Reggie Hollis and Marvin Dyson.

87.     The last note located in the homicide file that refers to the initial phase of the investigation is the above-quoted interview with Dyson on January 17, 1977. Between the date of the shooting and the date of the Dyson statement, no charges were brought in connection with the shooting.

88.     Although the case was turned over to the Special Investigations Unit of the Philadelphia Police Department, Tillery's representatives did not locate any record of any activity or work on the case between the Dyson statement on January 17, 1977, and the beginning of Emanuel Claitt's involvement in 1980.

## II.     Continued Investigation in 1980 and Involvement of Emanuel Claitt

89.     On May 20, 1980, homicide detectives had Claitt sign a statement that was the only direct evidence in the Commonwealth's case against Major Tillery. In addition to that statement, there is also a document entitled "Continued Investigation" which describes police work on the case between May 15, 1980, and August 6, 1980. Continued Investigation Report, MGT DAO Files at p. 679-680, attached as Exhibit "AA."[3] The report is dated August 22, 1980,

---

[3]     The "Continued Investigation" portion of the homicide file indicates that it is a four-page document, although there are only two pages in the file. Discovery in the currently pending post-conviction litigation of Tillery's co-defendant William Franklin included all four pages of this "Continued Investigation" document. The bates numbers for the four-page version are WF DAO 348-351. For Completeness, both the two-page version from

and is signed by Det. Floyd Gallo, who was the assigned detective on October 22, 1976. It states

the following:

> --On 5/15/80 Emanuel Claitt was arrested for robbery.[4] Det. Gerrard of homicide
> interviews Mr. Claitt for information on open homicides. Claitt indicates he has
> information about the murder of Joseph Hollis on 10/22/76.
>
> --On 5/20/80, at approximately 6pm Emanuel Claitt is brought down from detention and
> interviewed by Det. Kuhar and Det. Grace [sic]. The statement, which is also audiotaped,
> is summarized in the report, including that there was "an argument between Joseph Hollis
> and Alfred Clarke over dope," and that Major Tillery made threats against Hollis. "In his
> statement Emanuel Claitt who was present in the poolroom at the time that Major Tillery
> shot and killed Joseph Hollis identified everyone who was present and what part they
> played in this crime." Mr. Claitt was polygraphed by police.
>
> --On 5/21/80 Det. Kane and Det. Gerrard "check outsources [sic.] and find out that Porky
> who was present during the killing of Joseph Hollis is William Franklin."
>
> --On 5/22/80 Lt. Shelton and Det. Gerrard "go to the 35th dis. to talk to witnesses on this
> case. Probable cause affidavits are prepared to obtain murder warrants for William
> Franklin and Major Tillery by Det. Kuhar."
>
> --On 5/29/80 William Franklin surrendered to Det. Lubiejewski, charged with murder of
> Joseph Hollis, held without bail. He is also charged with "another shooting" and held in
> $10,00 bail for that.
>
> --On 5/29/80 "Emanuel Claitt is brought down from the detention center and
> reinterviewed about other jobs and Major Tillery."

90.     Included in the homicide files that Tillery's representative reviewed earlier this

year is the 5/22/80 interview of Emanuel Claitt by Det. Gerrard where he asked Claitt to identify

William Franklin as the man he identified as "Porky" in the May 20, 1980, statement. See

Supplemental Claitt Statement, MGT DAO Files at p. 770, attached as Exhibit "BB." This

interview is not listed on the "Continued Investigation" report.

---

the Tillery file and the more illegible four-page version from the Franklin file are collectively attached as Exhibit
"AA."

[4]     Claitt was already in custody at the time of this arrest because of a probation violation.

91.     Although the "Continued Investigation" report states that on May 22, 1980, Lt. Shelton and Det Gerrard went to the 35th District to talk to witnesses, exhaustive review of the homicide file and District Attorney's files did not reveal any transcriptions or notes of interviews or any notes about attempted interviews.

92.     The "Continued Investigation" report also establishes that nothing was done to confirm Claitt's story (other than to allegedly administer an inadmissible polygraph test), and that Detective Gerrard was seeking a warrant for Tillery's arrest less than 48 hours after the Claitt statement was signed.

93.     Although the specific content of the May 20, 1980, statement is addressed in more detail below, it should be noted that the typed statement which homicide detectives prepared and had Claitt initial and sign states unequivocally that there are *eleven* people in the pool room at the time of the shooting:

1.  Emanuel Claitt*
2.  Major Tillery*
3.  William Franklin*
4.  Joseph Hollis
5.  John Pickens*
6.  Alfred Clark
7.  Sylvester White
8.  James Ravenell*
9.  Fred Rainey*
10. Andre Wright*
11. Frank Junius*

94.     On May 20, 1980, seven of those people (indicated above with a " * ") were still alive, including victim John Pickens. The "Continued Investigation" report does not show any attempt to interview any of these individuals in connection with the investigation. It should also be noted that the District Attorney's file contains no indication that any of the surviving individuals were sent subpoenas by prosecutors to attend and testify at the trial of Major Tillery.

30

95.    Claitt also named "Lonzo" as being outside the poolroom and Luvuan Enrico

Rivera as the person who brought the guns used in the shooting into the pool room and removed

them afterwards. "Lonzo" was and is still alive. Luvuan Rivera died in 2013.

96.    Most of the people named in the Claitt statement are individuals named by P/O

Minner during the initial phase of the investigation. Major Tillery's name was not included on

Minner's list.

97.    Information disclosed in voluntary discovery shows numerous contacts between

Claitt and homicide detectives where *there is no record of what was said*. These references to

unrecorded conversations and interactions include the following:

--May 8, 1980, bring down order from the homicide division to have Claitt transported
from the Detention Center to the Police Administration Building (MGT DAO Files at p.
646, attached as Exhibit "CC.'). There is no record of what transpired between Claitt and
homicide detectives on that date;

--May 15, 1980, Cliatt gives (audio only) statement to Detective Kuhar regarding murder
of Samuel Goodwin. That recording refers to a prior statement given to Detective
Gerrard. There is no record of what Claitt and Det. Gerrard talked about before Claitt
read a typed statement into a tape recorder;

--May 20, 1980, Claitt gives statement to Det. Kuhar implicating Tillery. Claitt again
confirms that he gave an earlier statement to Det. Gerrard, during which time he reviewed
"hundreds of photos." There is no record of what was discussed with Det. Gerrard before
reading the typed statement;

--May 22, 1980, 12:15pm, Det. Gerrard conducts a one-page interview where Claitt
identifies a photo (presumably not show in the initial batch of "hundreds" two days
earlier) of William Franklin as "Porky." Exhibit "BB";

--May 22, 1980, 1:00pm, Det Gerrard takes a ten-page statement from Claitt regarding
two open firebombing cases and again implicates Major Tillery. MGT DAO Files at p.
532-541, attached as Exhibit "DD."

--May 29, 1980, the "Continued Investigation" report states that Claitt was
"reinterviewed." Exhibit "AA." There are no notes or transcript of what occurred in that
interview.

98.     Emanuel Claitt's contacts with homicide detectives as an informant started in

January 1980, over four months before his statement about the Hollis murder. This was disclosed

in a January 5, 1981, letter by ADA Leonard Ross, attached as Exhibit "EE," who prosecuted

William Franklin, to the Hon. Leon Katz of the Philadelphia Court of Common Pleas. Emanuel

Claitt began cooperating with homicide detectives in January 1980, implicating Robert Lark in

the murder of a Korean grocer. Det. Gerrard was an assigned detective on that case.

99.     That same month, Emanuel Claitt's attorney Myron Deutsch, Esq., filed a motion

for bail reduction, stating that Claitt was fully cooperating with police department on several

open cases and that the district attorney's office did not oppose the request for reduced bail. The

Motion is attached as Exhibit "VV."


## II.     Jailhouse Informants

100.    The testimony of Emanuel Claitt is the only piece of evidence the Commonwealth

had to convict Major Tillery. Although both Claitt and Mickens acted as conduits for the

Commonwealth's manufactured story and both were victims of the same coercion, only Claitt

connects Tillery to the crime. Mickens merely confirms that Tillery was at the scene.

101.    None of the physical evidence from the scene linked Tillery to the crime. None of

the witnesses who were known to be at or near the scene linked Tillery to the crime.

102.    When Claitt and Mickens began their "cooperation" with Philadelphia homicide

detectives and ADAs, they were both incarcerated and both had significant charges pending

against them.

103.    As described in greater detail elsewhere in this Petition, detectives and ADAs

coerced Claitt and Mickens into signing statements and giving testimony that were utterly false.

This coercion took the form of threats of multiple homicide convictions, promises of private time for sexual liaisons during incarceration, and unprecedented leniency with regard to open charges.

104.    Despite the similar coercion tactics, Claitt's "cooperation" predates that of Mickens by approximately 3-1/2 years.[5]

105.    The voluminous documentation that Tillery's representatives were permitted to review in voluntary discovery shows no connection of any kind between Claitt and Mickens. There is also no indication that either one was a known associate of Alfred Clark or Fred Rainey, whose cars were identified at or near the shooting.

A.    REVELATIONS OF POLICE AND PROSECUTOR MISCONDUCT, MANUFACTURED AND FALSE STATEMENTS

106.    Before examining the statements that Claitt and Mickens signed to implicate Tillery, it is first necessary to address their more recent recantations. In 2016, both Claitt and Mickens provided Verified Declarations[6] which clearly spell out the coercion and incentives that were used to secure their perjured testimony.

107.    The substance of the recantations is being addressed *before* the inculpatory statements (i.e., out of chronological order) because those recantations highlight the inconsistency, inaccuracy and impossibility of Claitt's and Mickens' statements from 1980 and 1984, respectively.

---

[5]    Philadelphia police got a warrant for Tillery's arrest on May 22, 1980, just two days after Claitt signed his statement. Police were unable to apprehend Tillery until he was brought back to Philadelphia in December of 1983. His trial began on April 29, 1985.

[6]    During investigation in 2016, Claitt gave written statements on May 4 and June 3. On August 3 Claitt gave a video statement that incorporated all of the information and facts he provided in the previous two written statements. Although the two written statements and a transcript of the video are all attached, the only references in this subjection to Claitt's recantation is to the August 3, 2016, video transcript. The entire video can be viewed at https://www.justiceformajortillery.org/claitt.html.

108.   The recantations provide a factual basis for Tillery's claims for relief in the

instant Petition. The only evidence against Tillery was the testimony of Claitt and Mickens and

both now say their statements and trial testimony were not true, but rather a product

manufactured by ADA Christie and Philadelphia homicide detectives.

109.   Both Claitt and Mickens declared unequivocally that their statements to police

and their trial testimony were false and that they were coerced into making those statements by

homicide detectives and the District Attorney's office.

110.   Here is what Claitt said in his video statement:[7]



*Emanuel Claitt, August 3, 2016*

---

[7]     With the exception of a few spontaneous comments at the end of the video, the entire substance of Emanuel
Claitt's vide statement of August 3, 2016, is contained within his Verified Declarations of May 4 (Exhibit "FF") and
June 3, 2016 (Exhibit "GG"). Both of those Verified Declarations were explicitly made subject to the criminal
penalties of 18 Pa.C.S. § 4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

> I lied when I testified at the trials of William Franklin in November 1980 and of Major Tillery in 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.
>
> I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.  I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.
>
> I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.
>
> Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.
>
> My testimony was made up while being questioned by homicide detectives Larry Gerrard, Ernest Gilbert and Lt. Bill Shelton and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.
>
> They worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

Transcript of August 3, 2016, video declaration of Emanuel Claitt, attached as Exhibit "HH."

111.    Claitt goes on to give additional details about his involvement in the prosecution and trial of Major Tillery:

> The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.
>
> I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.
>
> ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.
>
> ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Transcript of August 3, 2016, video declaration of Emanuel Claitt, attached as Exhibit "HH."

      112.    Here is how Mickens began his Verified Declaration:

> **DECLARATION OF ROBERT MICKENS**
> PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746
>
> ROBERT MICKENS affirms the following under penalty of perjury:
>
> In May 1985 I falsely testified as a witness for the Philadelphia County District Attorney in the prosecution of Major George Tillery (CP-51-CR-0305681-1984) on murder charges.
>
> The testimony I gave at that trial was false, manufactured by the prosecutor, Assistant District Attorney Barbara Christie.
>
> I was coerced and promised favors if I falsely testified against Major Tillery.

Verified Declaration of Robert Mickens, dated April 18, 2016, attached as Exhibit "II."

113.     Mickens also gave a video interview to *The Philadelphia Inquirer* as part of a July 20, 2021, investigative article which highlighted much of the independent investigation already performed by Tillery's representative. In that interview, Mickens gave the following details about how he was used by detectives and district attorneys:



*Still from video interview with Bobby Mickens*

They were having us come down there. We would make a statement, we would, I don't know how they did it. I don't know if they retyped it or whatever, but the main thing they were concerned about was me putting my initial at the end of each page that I did. And when I turned that around I seen different statements that were perpetrated that I didn't make, you know? But I followed up with what Manny had said to me in the police van and that's how I got caught up in this web of lies with the police.

It was drafting through stuff that Manny told me and stuff that the detectives would feed me off other people's statements. Now I don't know who what statements they was giving me the information from because they had a folder with different statements in there, but they was drafting, I mean, give me, "Oh do you remember this part?" And their agreement was I just say "Yeah." You know, going in there you just agree to certain things that's said to you when we bring it up, you agree to it, that type of thing.

Entire video available at: https://www.youtube.com/watch?v=1nYAsf2swkI

114.    Claitt's video statement also provides additional details about how his

"cooperation" with Philadelphia law enforcement was obtained:

> Detectives and prosecutors ADA Lynn Ross and Barbara Christie
> promised if I said that Major Tillery and William Franklin were the shooters
> in the 1976 murder of Joseph Hollis and the attempted murder of John
> Pickens I wouldn't get state time in my many pending criminal charges and I
> wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to
> do with.
>
> I was threatened that I would get maximum prison time if I didn't
> cooperate to get Tillery and Franklin.
>
> The detectives with the knowledge and direction of ADAs Lynn Ross,
> Barbara Christie and Roger King promised me leniency, threatened me and
> allowed me private time for sex with girlfriends in the homicide interview
> rooms and hotel rooms.
>
> After Franklin's trial I tried to recant but Lt. Shelton threatened me
> and said I would be framed on another murder.

Transcript of August 3, 2016, video declaration of Emanuel Claitt, attached as Exhibit "HH."

115.    Claitt also talked about how he was coached to lie about his plea deals:

> ADA Christie coached me how to answer the defense attorney's
> questions about whether I had plea deals or any agreements for leniency in
> sentencing for all the charges I faced back in 1980 when I first gave a
> statement about the shootings of Hollis and Pickens and since then.
>
> ADA Christie coached me on this like ADA Lynn Ross did before I
> testified against William Franklin.
>
> Back in 1980 when I testified at Franklin's trial I lied when I said that
> the only plea agreement was that my sentences on three cases would run
> concurrently. In fact I got one and a half-years.
>
> In exchange for my false testimony many of my cases were not
> prosecuted. I got probation. I was sentenced to just 18 months for fire
> bombing and was protected when I was arrested between the time of
> Franklin's and Tillery's trials.

> At Major Tillery's trial I testified that there was no plea deal. That was a lie and ADA Christie knew that.  She told me the robbery charge and other charges would be nolle prossed. And they were.

Transcript of August 3, 2016, video declaration of Emanuel Claitt, attached as Exhibit "HH."

116.    The coercion and favors that Mickens referred to at the beginning of his recantation statement are fleshed out as follows:

> I agreed to give this false testimony because I was I promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.
>
> When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

Verified Declaration of Robert Mickens, dated April 18, 2016, attached as Exhibit "II.".

117.    In the video interview from *The Philadelphia Inquirer*, Mickens talks about meeting with ADA Barbara Christie at the Police Administration Building.

> It was only two detectives they called as my handler. It was John Cimino and James McNesby. They brought me down, like, two or three times when they wanted to correct certain things. One time they wanted me to be there when Barbara Christie was there, and she would go across a statement and say "well what this part here and blasey blasey," and they would correct certain things.

Entire video available at: https://www.youtube.com/watch?v=1nYAsf2swkI

118.    There is a particular detail that both Claitt and Mickens independently shared with Tillery's investigator in their separate statements. Both men, without any prompting, refer to a police van ride they shared while both were in custody sometime before Mickens' cooperation in the case had been confirmed.

39

119.     Here is what Emanuel Claitt said about the van ride when he was interviewed by

Tillery's investigator on August 3, 2016:

> Before Major Tillery's trial, detectives instructed me to persuade
> Robert Mickens to become a witness against Major Tillery.
>
> I was put in a police van to ride alone with Mickens back and forth
> from homicide up to the county holding prison on State Road, to make it
> clear to Mickens that he really had no choice, except to testify against Major
> Tillery.

Transcript of August 3, 2016, video declaration of Emanuel Claitt, attached as Exhibit "HH."

120.     Compare the above to Mickens' declaration obtained some time earlier:

> I was brought down from Easton, supposedly to meet with the homicide
> detectives in Philadelphia. Instead I was put in a police van with Emanuel
> Claitt, who already testified against Major Tillery's co-defendant. I rode back
> and forth from police headquarters to the county prison on State Street with
> Claitt, but never taken from the van. Claitt told me I was "pretty hemmed up"
> and that Major Tillery was a "slime," that Major Tillery had been spreading the
> word that I was a snitch and that I should testify against Major Tillery.

Verified Declaration of Robert Mickens, dated April 18, 2016, attached as Exhibit "II."

121.     Mickens, who is still alive and willing to testify, also gave a video interview to

*The Philadelphia Inquirer* as part of a July 20, 2021, investigative article which highlighted

much of the independent investigation already performed by Tillery's representative. In that

video, Mickens says the following about the van ride:

> I believe I was at Holmesburg prison and they told me I had to go down to
> the police administration building. So, when they picked me up, Manny
> [Emanuel Claitt] was in the van already and we got to talking and that's
> when he explained to me about Major Tillery. He was saying how, "you
> know why you here" and all this type of stuff and I said, "No, I don't
> know why I'm going down to the police station." And he said, "Well
> Major put your name in some stuff" like that and he left it right there. He
> said Major was trying to involve me in the murder, that type of stuff and I
> had no reason not to believe him. Manny knew a lot of stuff. So, I went on
> the street for a lot of things that he told me. And as years went by, I didn't
> realize that the corruption that was going on between the district attorneys
> and the homicide detectives over in the police administration building.

Entire video available at: https://www.youtube.com/watch?v=1nYAsf2swkI

122.    When Claitt and Mickens began providing information to the police about the

Hollis homicide, they were each in jail with pending criminal charges. Prosecutors repeatedly

arranged for bail and/or removal of detainers for Claitt. His possible terms of imprisonment were

reduced and many charges were nolle prossed after Claitt gave inculpatory statements and

testimony against William Franklin and Major Tillery.

B.    EMANUEL CLAITT: CRIMINAL CHARGES, PLEA DEALS AND
        COOPERATION

123.    On May 20, 1980, when Claitt signed his statement inculpating Major Tillery and

William Franklin, charges for arrests that occurred on 4/7/1979, 1/6/1980, 5/2/1980 and

5/16/1980 were open, for a total of twenty-eight open charges. Additionally, Claitt was in jail

held on a detainer for violation of his July 12,1976 five years probationary sentence for illegal

firearms.

41

124.    Prosecutors at the trials of William Franklin (November 26-December 5,1980) and Major Tillery (May1985) questioned Emanuel Claitt about the number of cases open when he provided and signed his May 20, 1980, statement. He responded on direct that it was 7 or 8 cases and that he had an open probation violation.  In all of Claitt's testimony, at Franklin's preliminary hearing and trial, and at Tillery's preliminary hearing and trial, Claitt repeatedly answered that he had "7 or 8 open cases" when he gave his May 20, 1980, statement. WF 3.89; MT14:78;  MT15:8.

125.    Court records establish that the Commonwealth completely suppressed the existence of 13 open charges for conspiracy, aggravated assault, robbery and firearms offenses (among other charges) for which Claitt was arrested on May 16, 1980. This was **four days** before Claitt provided his written statement to police inculpating Tillery and Franklin on May 20, 1980. Bail was set at $25,000, and Claitt was in prison on a detainer from that violation probation.

126.    In his *pro se* petition Major Tillery documented Emanuel Claitt's criminal record using the docket sheets available through the computerized Unified Judicial System of the Commonwealth of Pennsylvania. The May 16, 1980, arrest and 13 charges were identified, and argument was made that the existence of these charges was suppressed by the prosecutors trying the cases against William Franklin and Major Tillery. ECF No. 2.

127.    A copy of a typed document "Extract of Criminal Record" relating to Emanuel Claitt was located in the prosecution and H-files disclosed in voluntary discovery and is attached as MTG DAO Files at pp. 721-724, attached as Exhibit "JJ." This covers arrests from 12/2/72-4/30/7. This document also includes the May 16, 1980, arrest and the subsequent disposition of those charges.

42

128.     Upon information and belief and following review of portions of the District Attorney files and Homicide file that were made available during voluntary discovery and based on Mr. Tillery's own review of materials in his existent case files, the only information provided to Mr. Tillery at trial to cross-examine Emanuel Claitt was an undated, one-page, typed sheet, entitled "Criminal Record of Emanuel Claitt." This document included only a few of his criminal cases and their dispositions between 1971 and 1981. The last five cases listed are those that were before the Hon. Leon Katz and disposed of on September 17, 1981 (Exhibit "LL").

129.     Not included in that one-page sheet is the arrest of Emanuel Claitt on May 16, 1980: 13 charges for conspiracy, aggravated assault, robbery and firearms offenses (among other charges) **four days** before Claitt provided his written statement to police inculpating Tillery and Franklin.

130.     Claitt accumulated nineteen *additional* charges between May 1980 and Tillery's trial in May 1985, for a total of forty-seven charges. Exhibit "JJ." These are discussed in greater detail below.


**May 8, 1975: Firearms Offenses (Judge Kubacki)**

131.     Claitt was arrested on May 8, 1975, and charged with possession of firearms by a felon, carrying firearms without a license, carrying firearms in a public street or place, providing a firearm to a minor, possessing instruments of crime and possessing a prohibited offensive weapon. Exhibit "KK."

132.     Claitt pled guilty to possession of firearms by a felon and carrying firearms in a public street or place on July 12, 1976. The Hon. Stanley L. Kubacki sentenced Claitt to 5 years'

probation. Docket No. CP-51-CR-1222231-1975 (Exhibit "KK"). Claitt's probation extended to July 11, 1981.

**Claitt Violated Probation When He Was Subsequently Arrested: November 30, 1978 Drug Charges; April 7, 1979 Auto Theft; January 5, 1980 Drug Charges; May 2, 1980 Auto Theft;  May 16, 1980 Robbery**

133.    Claitt was arrested on November 30, 1978, for two charges, for drug possession and manufacture, including a sale of heroin to a DEA agent. Charges were filed on March 31, 1979. Docket No. CP-51-CR-0810671-1980 (Exhibit "KK").   On December 13, 1975, bail was set at $1500; on March 16, 1979, bail was forfeited for non-appearance. The Hon. Leon Katz was the judge assigned to this case.

134.    On April 7, 1979, Claitt was arrested and charged with theft, receiving stolen property and unauthorized use of an automobile (3 charges). Docket No. CP-51-CR-0408091-1979 (Exhibit "KK").  The Hon. Leon Katz was the judge assigned to this case.

135.    On January 6, 1980, Claitt was arrested and charged with drug possession, drug possession with intent to manufacture, criminal conspiracy, possessing instruments of crime, prohibited offensive weapons, carrying firearms without a license, and carrying firearms in a public place (7 charges).9 Docket No. CP-51-CR-0813281-1980 (Exhibit "KK"). The Hon. Leon Katz was the judge assigned to this case.

136.    At this time Claitt began his cooperation with homicide detectives in the investigation of the murder of a grocer, Tae Bong Cho, which contributed to homicide charges being brought against Robert Lark. Det. Lawrence Gerrard was a detective assigned to that case. ADA Ross Letter to Hon. Leon Katz, January 5, 1981, Exhibit "EE."

137.    At Mr. Tillery's trial, Claitt stated that he "was incarcerated for a probation violation," presumably on this 5-year probation, and "was visited by a homicide detective" in April 1980. NT 14:8.

138.    On May 2, 1980, Claitt was arrested and charged with three charges of auto theft. Docket No. CP-51-CR-0510241-1980 (Exhibit "KK").  This case was assigned to the Hon. Herbert R. Cain, Jr.  These offenses occurred on April 5, 1980 – immediately prior to the period that Claitt states he was incarcerated on probation violation, April 1980, for violating probation on the firearms conviction before Judge Kubacki. NT 14:8, 79.

**May 16, 1980: Robbery, Assault, Firearms Offenses**

139.    On May 16, 1980, while in jail on the probation violation, Claitt was again arrested, this time on 13 charges which included robbery, aggravated assault, reckless endangerment, terroristic threats, criminal conspiracy, carrying firearms without a license, carrying firearms in a public place, and possessing instruments of crime. Docket No. CP-51-CR-1107131-1980, Exhibit "KK".

140.    This arrest is recorded in the "Continued Homicide Investigation" report as having occurred on May 15, 1980, and that Det. Gerrard interviewed Claitt on open homicides. Claitt was arraigned on those charges on May 16, 1980. Bail was set in the amount of $25,000 for the robbery and other charges.

141.    On May 20, 1980, Dets. Kuhar and Brace obtained Claitt's signature on a six-page typed statement inculpating Major Tillery and William Franklin in the homicide of Joseph Hollis and shooting of John Pickens.

142.    On May 22, 1980, Claitt gave Detective Gerrard a statement inculpating Major

Tillery and others, including himself, on 8 unrelated charges including attempted arson, criminal

mischief, firearms offenses, risking catastrophe and criminal conspiracy. Claitt was formally

charged for these felonies on August 8, 1980, but Claitt knew he would be charged when he gave

his statements. Docket No. CP-51-CR-0820931-1980 (Exhibit "KK").

143.    Claitt testified at William Franklin's preliminary hearing on June 4, 1980. NT

14:79. He was still incarcerated for a probation violation on the 1976 firearms conviction, the

May 2, 1980 auto theft, and the robbery arrest on May 16, for which he was held on $25,000

bail.

144.    Immediately following Franklin's hearing, the Commonwealth appeared before

Judge Kubacki, following which Claitt's detainer was lifted. NT 14:81, 15:15.


**July 9, 1980:  Additional Weapons and Auto Theft Charges**

145.    On July 9, 1980, a month after the Commonwealth obtained Claitt's release on

bail following his June 4, 1980, testimony at William Franklin's preliminary hearing, Claitt was

arrested on firearms violations and the unlawful taking of an automobile in Montgomery County.

These were a new set of charges. N.T. 14:81.

146.    While Emanuel Claitt was incarcerated in Montgomery County on the auto theft

charges, the Philadelphia DA's office put a detainer on him in July because he had absconded

from Philadelphia in the face of the firebombing and arson charges. Additionally Judge Kubacki

had lodged another probation detainer against Claitt. WF N.T. 3:113-115.

147.    On August 8, 1980, Claitt was formally charged on 8 crimes, including

firebombing, "risking catastrophe," conspiracy. CP-51-CR-0820931-1980.  The detainer that was

lodged in July against Claitt by the Philadelphia District Attorney's office was removed.  Claitt was released on his own recognizance with reinstated $11,000 bail. WFT 3.111, MT14:17-18

148.    Claitt was not charged with a probation violation for the Montgomery County robbery charge; $5000 bail was set on those charges. WF N.T. 3:122.


**Claitt Out on Bail; Testimony At Franklin's Trial**

149.    In early November 1980, shortly before William Franklin's trial, Claitt was released from jail. With ADA Ross' intervention with Judge Katz and the Hon. Levy Anderson, Claitt was allowed to sign for his own bail for $1000 on the 1979 drug charges. CP-51-CR-0810671-1980.  Claitt was allowed to sign himself out for the $25,000 bond in the May 16, 1980, robbery case. CP-51-CR-1107131-1980 WF N.T. 113-115, N.T. 14:8, 79.

150.    Claitt remained out on bail during Franklin's trial.

151.    On November 28, 1980, after Franklin's trial had begun, Claitt pled guilty before the Hon. Leon Katz to the two drug charges (Docket No. CP-51-CR- 0810671-1980) and one charge of drug possession (Docket No. CP-51-CR- 0813281-1980) and conspiracy on the firebombing case (CP-51-CR-0820931-1980) NT 14:83. Other charges, including car thefts and firearms violations were agreed to be *nolle prossed* at sentencing.

152.    These guilty pleas involved cases before Judge Katz and Judge Cain. There was no acknowledgment of the 13 charges pending from the May 16, 1980, arrest.

153.    On December 3, 1980, Claitt testified in Franklin's trial as the sole fact witness.

**September 17, 1981: Sentencing Before Judge Katz**

154.    While on bail following the above referenced guilty pleas in front of Judge Katz,

Claitt repeatedly failed to appear in court and forfeited $33,000 bail.

> 01/20/1981 -- $25,000 bail sued out for failure to appeal in Anderson robbery case
>      CP-51-CR-1107131-1980
>
> 02/03/1981-- $3000 bail forfeited for failure to appear in CP-51-CR-0408091-1979
>
> 02/03/1981--$5000 bail forfeited for failure to appear in CP-51-CR-0813281-1980
>
> 06/19/1981 – Claitt incarcerated on a bench warrant from Katz issued 02/03/81
>      (Katz Sentencing Hearing Transcript, 9/17/81 pp. 28-29 Exhibit "LL")

155.    At the request of Judge Katz, Assistant District Attorney Leonard Ross sent a

letter on January 5, 1981, to Judge Katz, for pre-sentence consideration on charges remaining

after the November 29, 1980, plea. In this letter, ADA Ross described Claitt's role as an

informant in six separate homicides, going back to January 1980, along with his providing

"background information" concerning the "drug traffic in Philadelphia." Exhibit "EE."

156.    The sentencing hearing before Judge Katz took place on September 17, 1981.

Prior to issuing sentences, Judge Katz addressed the fact that Claitt had been incarcerated for a

period of time after the guilty pleas as a result of a bench warrant he had issued. ADA Ross

responded to the issue of how much jail time would be credited to Claitt:

> "Judge, actually, to be honest, he's [Claitt] probably go close to a year on these
> cases. What was basically happening, judge, to be very quick about it, and it's
> hard to distinguish exactly what, he had so many cases open and so many
> detainers and bench warrants, that's something the prison may have to figure out.
> He was released for a period of time and then wouldn't show up when he was
> supposed to and would be arrested for a while."

Sentencing Hearing Transcript, 10/17/81 pp. 28-29 Exhibit "LL."

157.    Judge Katz asked whether this sentencing would cover **all** the charges pending

against Claitt in Pennsylvania County. ADA Ross explicitly stated it would. Sentencing Hearing

Transcript, Sept. 17, 1981, p. 5 (Exhibit "LL"). **This was false**. *See* Docket No. CP-51-CR-1107131-1980. The May 16, 1980, robbery charges were still open before Judge Anderson.

158.    ADA Ross represented at the hearing that "Mr. Claitt has continued his cooperation." Sentencing Hearing Transcript, Sept. 17, 1981, p. 6 (Exhibit "LL"). Judge Katz stated:

> "The recommendation of the pre-sentence investigator is incarceration. And, if it were not, if it were not for the cooperation extended to the Commonwealth, I would think that full justification that this defendant should receive a maximum sentence of seven and a half to fifteen years on the drug charge, namely 1067, manufacture sale, and delivery of drugs. Not that I'm minimizing the other changes, such as the conspiracy to fire bomb the house and the possession of the drugs.
>
> However, I'm taking that into consideration because I think, in the field of law enforcement, that there are many times when we cannot prosecute career criminals or criminals who commit acts of violence without the cooperation of either co-defendants or others who have information. And that's, I think, what is present in this case."

Sentencing Hearing Transcript, Sept. 17, 1981, pp. 30-31 (emphasis added) (Exhibit "LL").

159.    ADA Ross added during the sentencing hearing:

"In these particular cases, Your Honor, none of these cases could have been brought to trial without Mr. Claitt's Statements. The two homicide matters, as well as the bombings, although we basically knew who was involved, Judge, *we had no hard evidence to present to a Court until Mr. Claitt made his statements.*" I*d.,* p. 31 (emphasis added)

160.    In response to Judge Katz's questions on other detainers for probation violation, ADA Ross stated "for the record, Judge Kubacki's indication was that probably, regardless of what Your Honor did, he would terminate his [Claitt's] probation."

161.    Judge Katz took the Commonwealth's representations of Claitt's cooperation "into consideration" in making his sentence. Later, Claitt testified at Tillery's trial that this was an "open plea". NT 14:5, 86. He testified that Leonard Ross's only request was for the court to impose concurrent sentences. N.T. 14:6.

49

162.     That sentencing disposed of most of Claitt's pending cases.  Prison sentences were given on the November 30, 1978 drug charges (2 charges -  1 ½ - 7 years), Docket No. CP-51-CR-0810671-1980; January 6, 1980 drug charge (1 of 7 charges – 6-12 months),–Docket No. CP-51-CR-0813281-1980, and the August 8, 1980 conspiracy arson charge (1 of 8 charges – 1- 5 years), Docket No. CP-51-CR-0820931- 1980).  Sentencing Hearing Transcript, 10/17/81 p.36, Exhibit "LL."

163.     Other cases were totally *nolle prossed*: April 7, 1979 auto theft charges (3 charges - Docket No. CP- 51-CR-0408091-1979); the May 2, 1980 auto theft charges (3 charges - Docket No. CP-51-CR-0510241-1980). Sentencing Hearing Transcript, 10/17/81 p. 36 Exhibit "LL."

164.     Claitt could have served a sentence of a 1 1/2 - 7 years since the sentences were ran concurrently. Sentencing Hearing Transcript, Sept. 17, 1981, p. 36 Exhibit "LL."

165.     Claitt received a one-and-a-half-year minimum sentence for charges on which he faced 25-50 years.

166.     The 13 charges from the May 16, 1980, arrests were *nolle prossed* by the Commonwealth on April 13, 1982. The record reflects that the complaining witness did not appear for the trial.

167.     Even though his sentence was supposed to be a minimum of 1 1/2 years, Claitt was released on parole on November 22, 1982, a little more than a year after sentencing. NT 14:89.

**April 13, 1983: Robbery (Judge Chiovero)**

168.     On April 13, 1983, Claitt was arrested and then formally charged on April 21, 1983, with 8 charges including robbery, criminal conspiracy and firearms offenses before the Hon. John J. Chiovero.12 Docket No. CP-51-CR-0537641-1983 (Exhibit "KK").

169.     The robbery arrest put Claitt in violation of his probation from the sentencing before Judge Katz on September 17, 1981, and Claitt was incarcerated again. N.T. 14:93

**Claitt As a Witness at Major Tillery's Preliminary Hearing and Trial.**

170.     On December 8, 1983, Major Tillery, who had been arrested in California, was brought back to Philadelphia on the arrest warrant for the homicide of Joseph Hollis. Tillery's preliminary hearing was set for February 1984.  Without the testimony of Emanuel Claitt, the case against Major Tillery could not proceed.

171.     The records disclosed in voluntary discovery show repeated efforts of the Commonwealth to obtain Emanuel Claitt's release from prison to testify at the preliminary hearing, and subsequently to have him remain out of prison through Major Tillery's trial.  As stated in these communications from the Office of the District Attorney of Philadelphia, these requests were driven by the statements of Claitt or his counsel that Claitt would not testify against Major Tillery unless he was out of jail released on his own recognizance pending disposition of his open charges.

172.     An unsigned "Agreement" between Emanuel Claitt and Homicide Division Unit Chief Arnold Gordon, dated January 31, 1984, was found in the prosecution files made available during voluntary discovery.

> It is an agreement for Claitt to testify "truthfully in all criminal proceedings against George Major Tillery (sic) ….and that the Commonwealth will "take all

51

steps necessary to cause Emanuel Claitt to be released upon his own recognizance pending dispositon of his open charges, to include taking steps necessary to lift a state parole detainer. It is understood that this is to be accomplished by the time Emanuel Claitt testifies at the preliminary hearing in the Tilley case (listed February 9, 1984), thus allowing Mr. Claitt's release prior to that date. It is expressly understood and agreed that the District Attorney's Office makes no promises of any kind regarding either the disposition or sentence in any of Emanuel Claitt's open cases."

Exhibit "MM."

173.    Also dated January 31, 1984, is a letter from Arnold Gordon, the Chief of the Philadelphia District Attorney Homicide Unit, to the Parole Board requesting that the Board lift Claitt's detainer. Gordon stated: "*Mr. Claitt will not be available as a witness"* in Tillery's preliminary hearing unless he was released on bail, and stated "[h]e does not seek any promises or consideration with respect to his open charges." (Emphasis in original) (Exhibit "NN").

174.    On February 18, 1984, Edward Rendell, the District Attorney of Philadelphia, wrote a letter to Judge Chiovero requesting, on behalf of the District Attorney's office, that Claitt be permitted to sign his own bond in the amount of $2,000 bail in his robbery case, for which he had been arrested on April 13, 1982. DA Rendell states, "The testimony of Emanuel Claitt is essential to the successful prosecution of all these cases against Tillery. Claitt has not requested nor has this office promised him any consideration with respect to the disposition of the open matter before you. *He has, however, through counsel, requested his release on bail as a condition to his testifying against Tillery."* Exhibit "OO."

175.    On February 29, 1984 - immediately after Tillery's preliminary hearing - Claitt was released despite his parole violation. He signed his own bond.

176.    On September 19, 1984, Claitt was re-incarcerated for a parole violation. ADA Barbara Christie stated in chambers that Claitt reported to his parole officer with a knife in his sock. NT 14:97.

177.     On October 25, 1984, Jeffrey Brodkin, Assistant Chief of the Philadelphia District Attorney Homicide Unit, wrote to the Parole Board requesting that Claitt's parole be continued. Exhibit "PP." Claitt was scheduled for a hearing on his parole violation on November 3, 1984.

178.     Claitt was incarcerated through Major Tillery's trial from May 9 – May 29, 1985.

179.     On June 7, 1985, following Major Tillery's conviction of first-degree murder on May 29, 1985, ADA Barbara Christie and Jeffrey Brodkin, Assistant Chief, Homicide Unit sent a letter to the Fred W. Jacobs, Chairman of the PA Board of Probation and Paroled to request Emanuel Claitt's early parole. Claitt was eligible for parole on 9/10/ 85 but the DA's office requested early release even though Claitt was awaiting trial on robbery charges. This meant that Claitt would not be incarcerated when he was scheduled to testify against Major Tillery on other charges on July 15, 1985.

180.     The below chart summarizes Claitt's arrests, charges, dispositions, and disposition dates, which are shown in chronological order along with the dates he testified against Franklin and Tillery.

| Arrest Date | Charges | # of Charges | Disposition | Judge / Disp Date |
|---|---|---|---|---|
| May 8, 1975 | • Pa Uniform Firearms Act 6105<br>• Pa Uniform Firearms Act 6106<br>• Pa Uniform Firearms Act 6108<br>• Pa Uniform Firearms Act 6110<br>• Possession of instrument of crime<br>• Prohibited offensive weapon | 6 | CONVICTED – Guilty plea<br><br>Probation 5-6 years | Kubacki 10-20-75 |
| March 30, 1979 | • Possession with intent to deliver controlled substance | 2 | N/G Plea waived – Min less 2yrs Max 7 yrs | Katz 9-17-81 |

| | | | | |
|---|---|---|---|---|
| | • Knowing/intentional possession of controlled substance | | | |
| April 6, 1979 | • Theft<br>• Receiving stolen property<br>• Unauthorized use of auto | 3 | N/G plea waived – nolle pross | Katz 9-17-81 |
| January 5, 1980 | • Possession with intent to deliver controlled substance<br>• Knowing/intentional possession of controlled substance<br>• Pa Uniform Firearms Act 6106<br>• Pa Uniform Firearms Act 6108<br>• Possession of instrument of crime<br>• Prohibited offensive weapon | 6 | N/G plea waived – Min less 6mos Max 1 yr. | Katz 9-17-81 |
| May 1, 1980 | • Theft<br>• Receiving stolen property<br>• Unauthorized use of auto | 3 | N/G plea waived- Nolle Pross | Cain 9-28-81 |
| May 15, 1980 | • Robbery<br>• Theft<br>• Receiving stolen property<br>• Aggravated assault<br>• Simple assault<br>• Reckless endangerment<br>• Terroristic threats<br>• Possession of instrument of crime<br>• Pa Uniform Firearms Act 6103, 6105, 6108<br>• Conspiracy | 13 | Nolle Pross witness unav. | Anderson 4-13-1982 |
| **MAY 20, 1980** | **STATEMENT AGAINST MAJOR TILLERY** | | | |

| | | | | |
|---|---|---|---|---|
| **JUNE 4, 1980** | **WILLIAM FRANKLIN PRELIMINARY HEARING** | | | |
| July 9, 1980 | • Possession of instrument of crime<br>• [Illegible]<br>• Pa Uniform Firearms Act 6106<br>• Pa Uniform Firearms Act 6108 | 4 | PIC W/D   LEW | Rose 10-15-1980 |
| July 10, 1980 | • Auto theft (Montgomery County) | 1 | | |
| August 8, 1980 | • Crim Att Arson<br>• Risk Catastrophe<br>• Crim Mischief<br>• Crim Conspiracy<br>• Possession of instrument of crime<br>• Possession of weapon | 6 | PTC-Min less 2 yrs on crim consp.<br>All other Nolle Pross | Katz 9-17-1981 |
| August 10, 1980 | • Knowing/intentional possession of controlled substance | 1 | Poss W/D   WOP | Silberstein 10-21-1980 |
| Sept. 10, 1980 | • Aggravated Assault<br>• Simple Asslt<br>• Reckless Endangerment<br>• Possession of instrument of crime<br>• Possession of weapon | 5 | N/G plea waived Waiver Verd Not/Glty | Ivanoski 12-5-1980 |
| **NOV. 1980** | **WILLIAM FRANKLIN'S TRIAL** | | | |
| April 12, 1983 | • Retail theft | 1 | | |
| April 20, 1983 | • Robbery<br>• Theft<br>• Receiving Stolen Property<br>• Possession of instrument of crime | 7 | | |

| | | | | |
|---|---|---|---|---|
| | • Pa Uniform Firearms Act 6106<br>• Pa Uniform Firearms Act 6108<br>• Conspiracy | | | |
| **Feb. 29, 1984** | **MAJOR TILLERY PRELIMINARY HEARING** | | | |

### Claitt's Deals

181.    Testifying at the trials of William Franklin and Major Tillery, Claitt said he talked

with his lawyer Myron Deutsch before talking with the detectives. Claitt testified he "was

looking for something [a deal]. Sure." WF N.T. 3.151.

182.    At Major Tillery's trial, Claitt testified he wanted advice about whether he was

doing the right thing and could get some help. His lawyer advised Claitt to do what he thought

was best and he "would see if he could make some type of agreement with the District

Attorney's office…that if [Claitt] co-operated with the District Attorney's Office, he's sure that

my punishment would be tempered with some type of mercy." N.T. 15:13-14

183.    Claitt testified that "nothing had been arranged *yet*" as to *specific* agreements

made with regard to his cases when he gave his May 20 statement. WF N.T. 3:75-6 (emphasis

added).

184.    Claitt testified that following his statements, his attorney "made a plea agreement"

with the Commonwealth. WF N.T. 3:69.

185.    Claitt continued that he "wasn't promised no set term, length of time" in

sentencing, but promised that "I would plead guilty to three of the cases and out of the sentence

as far as jail term is concerned, everything would run concurrent…. And that some of the charges

56

would be dropped…car theft, possession of guns, possession and intent to deliver narcotics." WF N.T. 3:70-71

186.    Claitt testified he was arrested for another "two or three offenses" between the preliminary hearing on June 4,1980 and the trial testimony December 3, 1980 against William Franklin. WF N.T. 3:106. A few days before Claitt's December 3, 1980 testimony, he pled guilty before the Hon. Leon Katz to four charges and "there was an agreement to drop" "the rest of the five or six charges." WF N.T. 3:108

187.    After consideration of ADA Leonard Ross's letter providing the history of Claitt's information and testimony on homicide and drug-related cases, on September 17, 1981, Judge Katz sentenced Claitt to a minimum of 1 ½ years to a maximum seven years on the charges to run concurrently. Claitt was released on parole on November 22, 1982, a little more than a year after sentencing. N.T. 14:89

188.    Claitt now states:

"ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens . . . Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact, I got one and a half-years. When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true."

Declaration of Emanuel Claitt, June 3, 2016) (Exhibit "GG").

189.    Claitt's testimony did not include any mention of the pending 13 charges including charges, for which he was arrested just *four days* before he gave his statement to homicide detectives.

190.    At Major Tillery's trial, Claitt testified that the understanding "that I had [with the Commonwealth] was *that I was being released*, *you know, only on - on bail* but I would have to go and, you know, fight the cases on my own with me and my attorney, with no - no helping from the District Attorney's office." N.T. 14:82-83 (Emphasis added).

191.    Claitt now states "[i]n exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials . . . I was promised no state time for crimes I did commit if I lied." Exhibit "FF."

192.    The record shows that Claitt was seeking plea deals with the Commonwealth to get charges dismisses and limit prison time. The record also shows that, despite the insistence of prosecutors that Claitt had "No Deals**," he was promised and received many deals**.

193.    The record shows that Claitt  demanded being released on bail and kept out of jail as *a pre-condition of Claitt's cooperation with the Commonwealth.* These demands were met by the Commonwealth, including by the District Attorney, Edward Rendell.

194.    There were repeated interventions in person and via letters from the DAO to judges and the parole board to secure Claitt's release on bail, as well as lifting violation of probation detainers and continuing Claitt on parole. See Exhibits "MM," "NN," "OO," and "PP."

195.    As detailed above, Claitt accumulated additional charges in April 1983, including robbery and firearms offenses. The arrest was also a parole violation that caused Claitt to be incarcerated again.

196.    At Tillery's trial Clatt was questioned on whether he had a deal from the Commonwealth on those charges, which were before Judge Chiovero. He testified, "I have no

agreement at all… [t]he case is still pending[,]" and that he "[expected] to be tried by a jury."

N.T. 14:7.

197.    Claitt then proceeded to contradict his previous testimony, stating:

"Well, as to agreement, they - the District Attorney merely mentioned that they had did all the - all they were going to do for me at that point but they would do is make Judge Chiovero aware - in the event I got convicted of the charge, they would make him aware of my cooperation with the District Attorney's office in reference to the trials I have testified and the trials that have yet still to testify in the very near future."

Direct Examination of Emanuel Claitt, N.T. 14:94.

198.    In a side-bar conference, Tillery's attorney objected to the Commonwealth's persistence that there were no agreements. Claitt "keeps on saying none and then they say what the agreement is…It's contradictory. There is an agreement." Assistent District Attorney Barbara Christie affirmed to Judge Chivero that "there is no agreement, hasn't been any agreement with regard to sentencing on the open robbery. **There is no agreement. He goes to trial on that**." N.T. 14:94 (emphasis added). She then stated that "[Claitt's] understanding of any agreement he has with the Commonwealth is that the Commonwealth will make the Parole Board aware of his cooperation in this and the other cases." N.T. 14:96.

199.    Claitt never went to trial on this robbery case at all.

200.    "[ADA Christie] told me *the robbery charges and other charges would be nolle prossed*. And they were." Declaration of Emanuel Claitt, June 3, 2016 (emphasis added) (Exhibit "GG").

201.    The Commonwealth affirmatively represented that all of Claitt's charges had been accounted for in its closing statement. Assistant District Attorney Barbara Christie intentionally, affirmatively and repeatedly represented that Claitt **"had no deal"**. *Id*.

C.      CLAITT'S STATEMENT AGAINST MAJOR TILLERY

202.    Claitt's statement on May 20, 1980, was "taken by Detective Kuhar, who begins

by noting the following:

> Emanuel you had told Det. Gerrard that you had some information on the murder
> of Joseph Hollis, will you go on in your own words & tell me what you know
> about his death?

> *See,* May 20, 1985, Statement of Emanuel Claitt, attached as Exhibit "QQ."

203.    As described above, exhaustive review of the homicide file and the District

Attorney's files made available revealed no documentation of what was discussed between

Gerrard and Claitt before the May 20, 1980, statement.

204.    Claitt also gave a statement to Gerrard two days later about open fire-bombing

cases. The letter from Ross indicates there was another interview with Claitt and police in

January of 1980. Neither Tillery nor any of his representatives have ever seen a transcript or

report of what was discussed with Claitt in January 1980.

205.    There is also the May 15, 1980, audio recording of Claitt's statement about the

murder of Samuel Goodwin. Like the statement from May 20, 1980, this statement from five

days earlier begins with detective Kuhar saying that Claitt had "previously given" a statement to

Detective Gerrard and was now going to read that statement into the tape recorder. Even after

voluntary discovery, Petitioner still has nothing to reflect the communications that occurred with

Detective Gerrard prior to the May 15, 1980, statement.

206.    The statement that Claitt signed on May 20, 1980, is the only version of what

happened in the pool hall when Hollis was shot. There is no other eyewitness account.

207.    The May 20, 1980, statement begins with Claitt telling police that he was present

for a meeting about a package of illegal narcotics that had supposedly been intended for Mark

Garrick, who sold drugs in West Philadelphia. Instead, this package was taken and sold by Alfred Clark, who sold drugs in North Philadelphia. The meeting occurred on October 20, 1976, at the home of Dana Goodman in North Philadelphia. According to the statement, the following individuals were present at the meeting: Claitt, Major Tillery, Alfred Clark, Fred Rainey and James Ravenel. *See*, May 20, 1985, Statement of Emanuel Claitt, attached as Exhibit "QQ."

208.    The statement goes on to indicate that Johnny Cakes (John Pickens), Joseph Hollis, and Gregory Hill arrived at Goodman's house to demand satisfaction for the very drug shipment Claitt and everyone were discussing. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

209.    According to Claitt's 1980 statement, Pickens had a financial interest in that particular drug shipment along with Mark Garrick. Allegedly, Alfred Clark told Pickens that there was nothing that he could do because the drugs were already on the street. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

210.    The Statement goes on to say that Pickens, Hollis and Hill pulled out their guns and threatened Clark. Hollis is described as telling Clark "You not a real gangster," and then grabbing him by the lapels and smacking him in the face with his pistol. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

211.    According to the statement, Hollis was then about to shoot Clark when Pickens intervened and stopped him. Goodman told them to leave, and Pickens, Hollis, and Hill slowly backed out of the house with their guns drawn. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

212.    After Pickens, Hollis, and Hill all left, the May 20, 1980, statement alleges that Major Tillery said "He has to die" in response to Hollis striking Clark. The Statement then

details how the remaining men next went to the mosque at 13th and Susquehanna where Tilery is alleged to have gone in and come back out a short time later with Frank Ravenell (brother of James), Andrew Wright and Sylvester White. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

213.    Claitt's 1980 version goes on to state that White, who was no longer alive at the time of the statement, was an important figure in the distribution of drugs in West Philadelphia and someone to whom Mark Garrick and Joseph Hollis had to answer. The statement tells how Clark wanted a meeting with White at a poolroom located at 11th and Cumberland.[8] *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ.".

214.    According to the 1980 statement, everyone got in their cars and drove from the mosque to the poolroom. At the poolroom it is alleged that Tillery confronted White and asked why he allowed Hollis, Pickens and Hall to come and threaten and assault him and Clark. White is alleged to have claimed no knowledge of the incident and that it was done without his consent. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ.".

215.    The 1980 statement goes on to describe how Tillery did not believe White and drew his gun. Clark is then alleged to have stopped Tillery from shooting White, telling White, "We are going to spare your life[,] but we want you to bring Johnny Cakes & Joe Hollis hear [sic.] for a meeting." *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

216.    According to Claitt's 1980 statement, nothing happened the following day, but on Friday, October 22, 1976, everyone went to religious services at the mosque. Afterwards, the following individuals met outside: Andre Wright, Frank & James Ravenell, Fred Rainey, Alfred

---

[8]    The pool hall where Hollis was shot two days later was actually located at Huntingdon and Warnock Streets, approximately two blocks away. This is just one of numerous details in Claitt's 1980 statement that are demonstrably and unequivocally false.

Clark, Sylvester White, Joe Hollis and John Pickens. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as as Exhibit "QQ."

217.    Everyone went to their cars and to give up their guns following instructions from White and Clark. White collected guns from Hollis and Pickens, who were the only two from West Philadelphia. Clark was supposed to have taken everyone else's guns, but the statement claims that Rainey and Ravenell kept theirs. *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

218.    The statement goes on to detail how everyone got in their cars and drove to the pool hall. Tillery's vehicle was already there.  *See*, May 20, 1980, Statement of Emanuel Claitt, attached as Exhibit "QQ."

219.     Below is a transcript of what is in the 1980 Claitt statement about what happened once everyone was on the pool room:

> Everybody got out of their cars, Joseph Hollis said that he didn't trust going into the pool room, Sylvester said don't worry about it, we are all brothers. Johnny Cakes said to Sylvester, "This better not be no cross." Sylvester said "I wouldn't do that man!" We all went into the poolroom and everybody surrounded the pool table, Major and Porky came from out of nowhere, Alfred told me to **padlock** the doors which I did. A discussion started Alfred brought up to Joseph about what he did the other nite, Hollis said what about it, Alfred said that you know I ain't forgotten, Johny Cakes said to hold up, I thought we came down here to talk a peace treaty. Major and Porky bent down, the went underneath the pool table, when Major was under there he said that is what we thought when you had us all out in Wynfield." Major stood back but he had the gun behind his back, Major said Alfred is the boss, he said none of us ever smacked him with a gun, Hollis then said "So what," but at that time Hollis didn't realize Major had the gun behind his back. Major was standing at one end of the pool table, Porky was at the other long end of the table. I was standing with my back against the door that I had **padlocked** just observing. Porky and Major nodded to each other, Major shot Joe Hollis in the back, Johnny cakes yelled out "You crossed us Sylvester" and Porky told him to shut up motherfucker and the Porky shot him. Joseph fell to the floor, **Johnny Cakes ran right thru the glass door. I couldn't believe it, he ran right thru the glass**. Joseph was slumped over the table, then Major shot him a couple more times. Then everybody started running, I opened the **padlock** again and we all split. Me, Andre and some guy named Lonzo who standing outside all

got into my car. We went to my house in Mt. Airy & stayed there. That was it as
far as the shooting was concerned.

*See*, May 20, 1980, Statement of Emanuel Claitt, attached as as Exhibit "QQ."

220.    There are numerous problems throughout the Claitt statement of 1980. The

inconsistencies, contradictions, and impossibilities are easily understood in the context of Mr.

Claitt's 2016 recantation.  The information attributed to him in 1980, and at trial, was

manufactured and false.

221.    The statement emphasizes Claitt's shock at Pickens crashing "right thru the glass

door. I couldn't believe it, he ran right thru the glass." All the information from the initial

investigation shows that there was no broken glass found at the scene and none of the doors

(front door onto Huntingdon Street and east wall door to hallway) were made of glass. Exhibit

"U" and "V."

222.    Claitt also emphasizes the presence of a padlock, remarking three times how he

locked the door with a padlock.

223.    As discussed in Section **I.** above, the initial police investigation only referred to

two doors: (1) the door from Huntingdon Street that led directly into the pool room and (2) a

door on the east wall of the pool room that lead to a hallway. Claitt's statement refers to only one

door.

224.    During William Franklin's trial however, Claitt testified about a *third* door, this

one on the Warnock Street side, opposite the door on the east wall:

Claitt:         I was positioned at the door, I had my back to the door.

ADA Ross:    Was it the door that you came in on the Huntingdon Street side?

Claitt:         No, the door on Warnock Street, double doors.

WF N.T. 3:61.

225.    Apparently, the above testimony caused enough confusion for Assistant District Attorney Len Ross to ask Claitt to place everyone on a diagram.

226.    Claitt marked the location of himself and others:



*Exhibit "XX"*

227.    The original diagram, drawn on a police department form, has no compass points for orientation, but Claitt testified that Major was standing closest to the Huntingdon Street door, which was at the northeast corner of the building. N.T. 14:59. With that in mind, it appears that Claitt has now placed himself at the east wall door, instead of the double doors on the Warnock side that he had testified about moments earlier.

65

228.    The ballistics report, attached as Exhibit "S," establishes that, using the above diagram, gunfire was coming from the right, or west side of the room, with rounds and casings being found on the east side of the room and embedded in the east wall. The diagram above shows Pickens and Hollis on the west side of the room. According to ballistics, gunfire would have been travelling away from where Claitt has shown the two victims, making it impossible for the events these events to have occurred as described.

229.    Andre Wright is one of the individuals that Claitt's statement says was in the room at the time of the shooting. There is, however, no indication on the above diagram that Wright was in the room.

230.    Evidence at the scene reveals that neither the front door nor the door on the east wall were locked with a padlock or even could be locked with a padlock. In fact, the door was locked with a two-sided key lock when P/O/ Minner and other officers arrived at the scene. That key lock needed to be bashed in with a sledgehammer for officers to gain entry. Exhibit "J."

231.    The fabricated nature of the statement is evident from the myriad of inaccuracies, including Claitt's emphasis on the broken glass door, his emphasis on the padlock, and the incorrect location of the pool room.

232.    As described above, Detective Minner and his team were familiar with many of the individuals they believed be involved in illegal narcotics in West Philadelphia at the time of the shooting. These officers knew what car each individual drove and who were all the known associates.

233.    Claitt's statement has extraordinary detail, but is also notable for the sheer number of events that Claitt is alleged to have personally witnessed:

a.   A meeting at Dana Goodman's house on October 20, 1976;

66

    b.   A meeting at the Mosque at 13th and Susquehanna immediately after the alleged incident where Hollis smacked Alfred Clark in the face;

    c.   A third meeting on that same night, now at the pool hall where Sylvester White's "life was spared";

    d.   A meeting at the Mosque for Friday Service on October 22, 1976;

    e.   The meeting at the pool room after the Mosque.

234.    The record contains no explanation for Claitt's uncanny ability to be present for all of these key events when he is never listed as a known associate of Alfred Clark (or of anyone else known to be at or near the pool room at the time of the shooting).

235.    On the basis of nothing more than Claitt's inaccurate and impossible statement, an arrest warrant was issued for Major Tillery.

D.    <u>ROBERT MICKENS: ARREST RECORD, PLEA DEALS, AND STATEMENT</u>

236.    Robert Mickens was arrested on February 28, 1984, on charges of robbery and rape. He was advised that he could get 10-20 years on the rape charge, 5-10 years for conspiracy and that his sentences could run concurrently or consecutively. N.T. 21:26.

237.    Robert Mickens lived in the neighborhood of the poolroom where the shootings happened. Neither the homicide investigation following the October 22, 1976 homicide of Joseph Hollis nor the May 1980 statement of Emanuel Claitt and "continued investigation" led to questioning Mickens about the poolroom shootings.

238.    In September 1984 Mickens was incarcerated and was providing information to detectives about a homicide that was unrelated to the Hollis homicide. He testified that rumors were going around the jail that he "was talking to the police about different murder cases." When

Mickens was brought down to the homicide division, he spoke to them about additional cases because he wanted police protection and to be transferred to a different prison. N.T. 25:101

239.    The homicide detectives interviewing Mickens were John Cimino and James McNesby, who with ADA Barbara Christie repeatedly brought him in for questioning on a number of robbery and murder cases, threatening him and promising a plea deal and favors, including private visits from his girlfriend for a sexual interlude, a to become a prosecution witness against Major Tillery. Declaration of Robert Mickens, April 18, 2016, Exhibit "II."

240.    Mickens describes other efforts by the police and prosecution to coerce him into being a witness against Tillery. Before he testified at the preliminary hearing against two men (unrelated to the Hollis homicide) for a different murder, which would make Mickens' cooperation with the prosecution and an informant was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that he going to be a witness.

241.    Mickens said, "This put me at risk as a known 'snitch'" and he "complained to ADA Christie and she promised to take care of me." Declaration of Robert Mickens, April 18, 2016, Exhibit "II."

242.    Mickens also describes in his Declaration being brought down from prison in Easton, "supposedly to meet with the homicide detectives in Philadelphia. Instead, I was put in a police van with Emanuel Claitt, who [had] already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street [sic] with Claitt, but [was] never taken from the van… Claitt told me I was 'pretty hemmed up'… that I should testify against Major Tillery." *Id.* See also, transcript of Mickens interview, in section III.A above.

68

243.    Handwritten notes of ADA Barbara Christie found in prosecution files available for voluntary discovery contain significant amount of attention to Mickens, much of it illegible. It does include reference to a news article and instruction Det. Floyd Gallo to read the paper and get it mailed to Mickens at the Northampton Prison in Easton. This is confirmation of Mickens concern that the had been "outed" as a police informant, as he states in his Declaration.

244.    On September 26, 1984, eight years after the October 1976 shootings Mickens gave detectives a written statement that on the night of the shootings he was asked by Alfred Clark and Major Tillery to be a look-out for police in the area of Goldie's poolroom. Mickens statement did not place him inside the poolroom.

245.    He stated that he ran into Alfred Clark, Major Tillery and William Franklin on the steps of the poolroom. Clark (Askir) told him "we are supposed to be having a meeting here and a couple of guys are supposed to be coming from West Philly."  then he said, "You know how the police is, if they see all these cars out here - they will start asking questions and knocking on doors." Clark then "asked me to look out to see if the police came and if they did to tap on the glass." MGT DAO Files at pp. 47-52, attached as Exhibit "RR."

246.    That statement, located in the prosecution files found during voluntary discovery, is not the same Mickens statement introduced into evidence as at Tillery's trial. Exhibit "SS."

247.    In April 1985, a month before Tillery's trial in May 1985, Assistant District Attorney Barbara Christie met with Mickens. N.T. 21:109. Mickens testified that ADA Christie asked him to look over the statement, and he "corrected all errors that [he] made," and then signed his initials. *Id*.

248.    Mickens changed his statement to substitute "Major Tillery" for Askir (Clark) as the person who told him about the meeting and who asked Mickens to be a look-out.  Mickens

69

also made changes identifying Tillery's and Clark's cars; amount of time of events, directions Mickens walked while being a look-out. N.T. 21: 113-115. It was this "corrected" statement that was introduced into evidence and the basis of Mickens' testimony.

249.     Contrary to Mickens trial testimony that these were his own corrections N.T. 21:115; they were made at ADA Christie's behest. Declaration of Robert Mickens, April 18, 2016, attached as Exhibit "II."

250.     Mickens was a surprise witness for the Commonwealth, kept secret from Tillery via a protective order pursuant to then-Pennsylvania Rule of Criminal Procedure 305(F), until he was called to the witness stand. The basis given for the protective order was that Mickens feared retaliation from Tillery if his identity as a prosecution witness was disclosed. The Commonwealth disclosed Mickens' September 24, 1984, statement just minutes before he testified.

251.     Tillery objected to the *in camera* proceeding which led to the protective order, on the grounds that there was no basis for a finding that Mickens needed protection from Tillery. The court overruled the objection and preserved the record of the *ex parte* petition. N.T. 21:2-13.

252.     Mickens testified at Tillery's trial that he made the corrections of his own accord, and that nobody had coached him to make them. N.T. 21:115.

253.     On May 16, 1985, days before testifying against Major Tillery, Mickens pled guilty to criminal conspiracy and rape before the Hon. Eugene Clarke, Jr. He was scheduled to be sentenced on July 18, 1985. N.T. 21:24.

254.     Mickens testified that it was an "open plea" with no plea bargaining. N.T. 21:24. He testified that his sentence would be up to the judge. N.T. 21:25.

70

255.    Mickens testified that his only "understanding" with the Commonwealth was that the Commonwealth would let Judge Clark know about his cooperation, and that his other charges would be *nolle prossed*. N.T. 21:26.

256.    At Tillery's trial, Mickens testified that it was Tillery who asked him to be the look-out. Tillery was at the bottom of the poolroom stairs, also with Pork and Askir. N.T. 21:35-36. He also testified that he saw Tillery's Lincoln and Clark's white Cadillac parked by the poolroom; *that Clark had come out of the poolroom to check with him*; and that soon after he heard gun shots, he heard glass break; saw Major and Clark getting into different cars, as he saw the police arriving, and saw William Franklin running with a gun pointed at another man. N.T. 21:67-68, 97.

257.    In her closing statement, ADA Christie told the jury that Mickens "awaits sentence on a guilty plea to a rape charge and conspiracy. That could net him 15 to 30 years at the decision and discretion of the sentencing judge." N.T. 28:91.

258.    Mickens now states that "ADA Christie told me that if I 'worked with [her] on the Major Tillery case' she 'guaranteed' I wouldn't be sent upstate on my robbery and rape case and would be 'protected.'" He states that "I agree to give . . . false testimony because I was . . . promised no prison time on the rape and robbery charges and that I would be protected by the prosecution." Declaration of Robert Mickens, April 18, 2016, Exhibit "II.".

259.    Mickens pled guilty and was sentenced before Judge Clark on October 10, 1985, after Tillery's trial. He received probation.

260.    The deal between Mickens and the Commonwealth was not disclosed to Tillery.

**IV.** <u>**Assistant District Attorney Barbara Christie**</u>

261.    Tillery's recent review of the District Attorney's file revealed notes written by ADA Barbara Christie, who tried the case for the Commonwealth.

262.    These notes show how Christie was aware that Claitt's repeated statements about broken glass were not and could not be true yet she proceeded to put him on the stand to testify in a manner that was consistent with his May 20, 1980, statement.

263.    On April 1, 1985, there is a note from ADA Christie that is somewhat illegible but appears to have a number of concerns listed for trial preparation. The note contains at least two references to "broken glass" which was not found at the crime scene:



The above excerpt refers to P/O Parker who was part of the team that processed the scene on the night of the shooting. It says "(2) Parker -> MCU [mobile crime unit] pics & sketch – [illegible] broken glass."



*See*, MGT DAO Files at p. 934, attached as Exhibit "TT."

264.    The second excerpt says "4) what door glass broken?" As discussed above, the

door to the poolroom was not made of glass, and the door on the east wall was not made of glass.

265.    A note from ADA Christie's file dated April 2, 1985, also shows unequivocally

that she knew Claitt's statement about the glass door was not true.



Notes of Barbara Christie, MGT DAO Files at p. 271, attached as Exhibit "UU."

266.     The circled portion says: "Poolroom front door glass till c. 7/76." This means that one month before Tillery's trial began, Christie knew that information in Claitt's May 20, 1980, statement was false.

267.     At Tillery's trial, homicide detective Gallo, who investigated the scene on the night of the shooting, had been "grabbed" by ADA Christie more recently to return to the crime scene, almost ten years after the shooting:

> She asked me some questions with the door. I described it just like I described to you, not knowing why she was asking me questions. I never really knew. And then we went out there and then she told me about somebody running through the door.

> N.T. 13:52.

268.     The fact that Christie returned to the crime scene with Gallo ten years after the shooting confirms what is seen in her notes leading up to the trial. The statement given by Claitt could not be true based on the absence of any broken glass door at the scene. Despite her knowledge that the content of Claitt's May 20, 1980, statement was demonstrably false, ADA Christie presented Claitt to the jury anyway.

269.     During live testimony, Claitt neglected to mention anything about a padlock. Instead he described the door as having a key lock:

> A:     "So the door on the Huntingdon Street entrance that everyone came in, I locked it with a key.

> Q:     Okay.

> A:     And left the key in the door.

(N.T. 14:50). After reviewing a number of photographs, Claitt continued:

> Q:     Now continuing with regard to, upon your return to the poolroom, you've indicated who was in the poolroom at the time you came in and were told

to lock the door. By the way, did you lock the door after being instructed to do so?

A:     Yes, I locked it with a key that was already in the door.

(N.T. 14:57-58).

270.    The same pattern played out with regard to the non-existent glass door. Once the prosecution realized that the 1980 statement could not be true (based on physical evidence), then Claitt had to "fix" his trial testimony. In his 1980 statement he was unequivocal about seeing Pickens smash through a glass door.  He said it twice and emphasized his reaction – "I couldn't believe it."

LONG END OF THE TABLE.  I WAS STANDING WITH MY BACK AGAINST THE DOOR THAT
I HAD PADLOCKED JUST OBSERVING.  PORKY AND MAJOR NODDED TO EACH OTHER,
MAJOR THEN SHOT JOE HOLLIS IN THE BACK, JOHNNY CAKES YELLED OUT "YOU
CROSSED US SYLVESTER" AND PORKY TOLD HIM TO SHUT UP MOTHERFUCKER AND
THEN PORKY SHOT HIM.  JOSEPH FELL TO THE FLOOR, JOHNNY CAKES RAN RIGHT
THRU THE GLASS DOOR.  I COULDN'T BELIEVE IT, HE RAN RIGHT THRU THE GLASS

*Exhibit "QQ"*

271.    When it came time for Claitt to give testimony in front of a jury, even on direct examination, his response departed from what he had allegedly told police before:

> So I doubled back around and ran after John Pickens because the door I was standing at, John Pickens was going out that door and he – he ran through this glass window. He ran through this door which had a glass centerpiece in it.
>         And I ran behind him and when I ran behind him he had ran past me and the door I was standing at I ran in back of him and I had to open the door, which it appeared that he had ran through and I opened that door and there was another door opened and I went and I left.

(N.T.14-64). According to the above, Claitt is saying that he followed Pickens, who was supposedly being pursued by William Franklin, through a broken door.

272.     This version of events is vaguely suggestive of a plan described by ADA Christie at sidebar during Detective Gallo's testimony. After grabbing Gallo and taking him back to 1008 W. Huntingdon, it appears that ADA Christie's attempt to fix the broken glass story was to present evidence that Pickens had actually gone through the door on the east wall, which Gallo testified was stuck and led to a hallway filled with debris. N.T. 13:37-38. *See* Photographs attached as Exhibit "V" and "W."

273.     Throughout Tillery's trial, ADA Christie contended that Pickens had gone through a glass door, just as described in the 1980 Claitt statement. A review of Pickens' medical records from Temple University Hospital for the night he was shot shows that he *did not have* any lacerations of other injuries that would be consistent with smashing through a glass door. All of Pickens' injuries were related to a gunshot wound to the abdomen and another to the neck. N.T. 20:29.

274.     In much the same way that Christie tried to "fix" the problem of the nonexistent glass door, she also tried to fix aspects of Mickens' statement.

275.     As discussed above, Mickens was not being depended upon to describe events that occurred in the pool hall. He was just the lookout. Between the time his statement was "given" on September 26, 1984, and the date of his testimony in May of 1985, he met with ADA Christie to review and correct his statement.

```
  .    INVESTIGATION  INTERVIEW  RECORD          CITY OF PHILADELPHIA
            CONTINUATION  SHEET               POLICE  DEPARTMENT
 THE                                    PAGE      CASE NO.
        Robert Mickens                    2       H76-315
```

1- Continued...........

stores were closed. It had to be 9:30 PM or a little later and was walking
~~east~~ west on Huntingdon St. towards Warnock St. When I got t o the corner of War-
nock & Huntingdon St. I ran into Alfred Clark and I saw William Franklin and
Major Tillery on the steps of Goldies poolroom. Askir ~~(Alfred Clark)~~ *Major Tillery* asked
me where I was gone at. I said what's up. He said we are supposed to be havi
a meeting here and a couple of guys are supposed to be coming from West Phil
~~Askir~~ *Major* said, " You know how the police is if they see all these cars out here
they will start asking questions and knocking on doors". He was referring to
his ~~car~~ *Asku Clus* a white cadilac and ~~Major Tillery's~~ *his* car which ~~was~~ a Lincoln. The car
were parked up on the pavement of Warnock St. Askir asked me to look out to
see if the police came and if they did to tap on the glass. I said "How lor
do you want me to lay here" and he said to hold fast, the guys that were

*Exhibit "SS"*

276.    As show in the image above, Mickens changed his direction of travel from east to
west, changed Alfred Clark's name to Major Tillery's twice and made other changes regarding
cars and pronouns. Other information was not corrected, such as the color of Alfred Clark's car,
and the location of the pool room at the intersection.

277.    The changes to Mickens' statement, and the attempt to conjure a broken glass
door, both made in anticipation of trial, show the level of manipulation and control Christie
exerted over this conviction. She was no longer presenting evidence, but now actively fabricating
evidence.

278.    Other aspects of the case that have been mentioned above are repeated here
because of their connection to ADA Barbara Christie. These include the following:

       a.    Suppression of 13 open charges that were pending against Claitt at the time he
             signed the May 20, 1980, statement; and

77

    b.   Providing false statements to the Court and having Claitt make false

statements about the deal he had and could expect as a result of his

cooperation in the prosecution of Franklin and Tillery.


**V.**    **<u>Sex for Lies</u>**

279.    Both Claitt and Mickens revealed, independently of one another, that one of the

special treatments they received in return for their agreement to provide false statements and

perjured testimony against Major Tillery, was private visits with girlfriends for sexual liasons

while they were incarcerated. As they both relate, Detectives Lawrence Gerrard and Ernest

Gilbert, among others, permitted Claitt and Mickens to have private sexual visits with girlfriends

in the Police Administration Building (PAB) homicide interview rooms. Exhibits "FF," "GG,"

"HH," and "II."

280.    With regard to what has now been dubbed the "sex for lies" scandal by the

Philadelphia Inquirer, Claitt had this to say about his own involvement:

> I was also allowed to have sex with my girlfriends (four of them) in the
> homicide interview rooms and in hotel rooms, in exchange for my
> cooperation.
>
> Detective Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the
> knowledge and direction of ADAs Roger King, Len Ross, and Barbara
> Christie, promised me leniency, threatened me and allowed me private
> time for sex with girlfriends in the homicide interview room and hotel
> rooms.

Exhibit "FF."

281.    Claitt's 2016 statements regarding "private time for sex" are corroborated by logs

that show him and one of his girlfriends being brought into the Police Administration Building at

around the same time. Exhibit "YY" is a copy of logs showing who went in and out of the Police

Administration Building on December 14, 193. The document shows that one of Claitt's girlfriends, Denise ("Dee Dee") Certain was brought in by Det. Larry Gerrard while Claitt had been brought in earlier on that same day by Det. Gilbert.

282.    Petitioner was provided with pages from the Roundhouse log books from June 1-December 31, 1983 by Andre Harvey, an inmate imprisoned at SCI Graterford who had raised the same claims concerning wrongful sexual visitation provided to witnesses.

283.    Another woman with whom Claitt was enabled to have private time for sex is Helen Ellis, who is the mother of three of his children. On March 3, 2020, Petitioner's investigator provided a Verified Declaration stating that she had spoken with Ms. Ellis who acknowledged her relationship with Claitt and confirmed that the two had sex in the Police Administration Building homicide interview rooms and that police personnel had facilitated these rendezvous'(Exhibit "ZZ).

284.    In 2016, Mickens reported that he was given similar consideration as an inducement to get his cooperation against Major Tillery:

> I told detectives Cimino and McNesby that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

Exhibit "II."

285.    In his *Philadelphia Inquirer* interview, Mickens gave additional information:

> That was a normal thing at that time. The detective let your girlfriend come down. Some guys would just visit them, some guys would be intimate with them, that type of thing was going on real heavy at the time. I asked could my girlfriend come down and they let her come down there.

[CITE https://www.youtube.com/watch?v=1nYAsf2swkI]

286.     Both Claitt and Mickens confirmed that their "cooperation" with Philadelphia

homicide detectives was not limited to Tillery's case. Also, Detective Larry Gerrard's use of

improper inducements was not limited to Claitt and Mickens. This inducement to prisoners was a

pattern and practice in the Philadelphia police homicide division. This has now been dubbed

"Sex for Lies" scandal by the *Philadelphia Inquirer* in the July 21, 2021 edition

(https://www.inquirer.com/news/a/philadelphia-homicide-detectives-bribes-exonerations-

murder-20210720.html)

287.     In U.S. District Court earlier this year, Willie Stokes' conviction and life sentence

were reversed in a case where Dets. Gerrard and Gilbert used "Sex for Lies" to coerce a prisoner

to falsely inculpate Stokes for a homicide. The Philadelphia DA office issued a statement

denouncing those practices. *See* Press release of the Philadelphia District Attorney's Office,

dated January 3, 2022 (https://phillyda.org/news/with-dao-support-federal-court-vacates-1984-

murder-conviction-of-willie-stokes/).

# LEGAL ARGUMENT

## I.    STANDARD OF REVIEW

288.    To obtain habeas corpus relief, the Petitioner may allege that his confinement is the result of a violation of the United States Constitution. The Constitutional error must have had a substantial and injurious influence on the determination of guilt made by the jury. *Brecht v. Abraham*, 113. S.Ct. 1710 (1993); *Kotteakos v. U.S.,* 328 U.S. 750, 756 (1946). Under the AEDPA, habeas relief will not be granted for any claim adjudicated on the merits in State court unless the decision was contrary to or involved an unreasonable application of "federal law clearly established by the Supreme Court", or "based upon an unreasonable determination of the facts." 28 U.S.C. §2254(d)(2). A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in the U.S. Supreme Court cases, or if it decides a case differently than the Court has on a set of materially indistinguishable facts. Relief may be granted under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

289.    Generally, state courts' factual findings are presumed correct unless the Petitioner can show by clear and convincing evidence that the findings were erroneous. 28 U.S.C. § 2254(d)(2) provides however, that relief may be granted where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The general presumption of correctness related to the State courts' factual findings do not apply to questions of law or mixed questions of law and fact. *Cunningham v.*

*Diesslin*, 92 F.3d 1054 (10th Cir. 1996); *Wellman v. Maine,* 962 F.2d 70 (1st Cir. 1992);

*Levasseur v. Pepe,* 70 F.3d 187, 193 (1ˢᵗ Cir. 1995).


II.     RESPONDENTS HAVE WITHDRAWN THEIR OPPOSITION TO THE PRO SE
        SUCCESSIVE HABEAS PETITION (ECF No. 2); THE PETITIONER HAS MET THE
        PROCEDURAL REQUIREMENTS TO MAKE AN ACTUAL INNOCENCE CLAIM
        UNDER *SCHLUP* AND *MCGUIGGAN.*

        290.    On February 5, 2021, the Philadelphia District Attorney's office, acting on behalf

of Respondents, filed their opposition to the Pro Se Successive Petition. That opposition

described the Petition as untimely, procedurally defaulted, and without merit (ECF No. 13).

        291.    On June 6, 2021, Tillery filed a *Pro Se* Reply Brief (ECF No. 16). That Reply

demonstrated, *inter alia*, that, as a matter of law, there were no procedural defects or valid

timeliness objections that would prevent the Court from substantive consideration of the

Peitioner's new evidence.

        292.    On December 15, 2021, Respondents filed a Motion for Stay (ECF No. 23) which

withdrew the opposition to Petitioner's Successive Habeas Petition. The Motion for Stay clearly

sets forth respondent's reaction to the *Pro Se* Reply Brief:

                The Commonwealth previously filed a response arguing that Tillery's
                petition should be dismissed. After careful review, the Commonwealth
                moves to stay Tillery's case to allow the parties to proceed with voluntary
                discovery. To explain why a stay to allow discovery is appropriate at this
                stage, after it already filed a response, the Commonwealth acknowledges
                that its prior response contained errors, as explained below. The
                Commonwealth does not at this time take a position on whether Tillery is
                entitled to habeas relief.
                                            * * *
                …[T]he prosecutor's "interest" in a criminal prosecution is not that he
                shall win a case, but that justice shall be done." *Dennis v. Secretary, Pa.
                Dept. of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016)…

a.  **The Recantations of Claitt and Mickens Can Be Considered as Evidence of Petitioner's Actual Innocence Under *Howell v. Superintendent Albion SCI.***

293.    In *Howell v. Superintendent Albion SCI,* 978 F.3d 54 (3d Cir. 2020) the Court rejected the notion that, in an attempt to show actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995), recantation evidence was inherently unreliable. Instead, the Court relied on *Schlup*'s holding that there are no categorical limits on the types of evidence that can be offered to overcome procedural rules when there has been a showing of actual innocence.

b.  **Petitioner meets the Miscarriage of Justice Exception Because His New Evidence shows that he is actually innocent.**

294.    In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court noted that concern about the imposition of punishment on innocent people is "at the core of the criminal justice system." *Id.*, at 325. By adopting the standard from *Murray v. Carrier*, 477 U.S. 478 (1986), the *Schlup* Court determined that an "actual innocence standard would balance the need for finality with the need to avoid a fundamental miscarriage of justice.

295.    In *House v. Bell*, 547 U.S. 518, 537 (2006) the Supreme Court provided further refinement, in particular with regard to the types of evidence that a district court could consider here a Petitioner is seeking to establish actual innocence. *Schlup* suggested three types of evidence that could give rise to an actual innocence finding that included exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *Schlup*, at 324. *House* clarified that the types of evidence that can be introduced in support of an actual innocence claim is not limited to the three types mentioned in *Schlup*.

83

296.     In *McGuiggan v. Perkins*, 569 U.S. 383, 401 (2013), the Supreme Court clarified that the actual innocence gateway should open when the evidence of actual innocence is so strong that the Court cannot have confidence in the conviction. This means that no procedural bar should impede a court from reviewing new evidence when that new evidence establishes actual innocence.

297.     The new evidence at issue in this case is the recantations of Claitt and Mickens. Their statements from 2016 provide proof of Tillery's actual innocence because they admit to providing perjured testimony that was manufactured by police and district attorneys.

c.     **Under *Dennis* and *Bracey* Petitioner Cannot Be Defaulted for Lack of Due Diligence.**

298.     Initially, the Respondent argued that Pro Se Second Petition was untimely because the factual basis could have been known sooner with the exercise of due diligence (Doc. #13).

299.     Tillery's Reply Brief (Doc. #16) notes that, in determining due diligence, the Third Circuit held that the standard from *Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) was applicable, according to *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274 (3d Cir. 2021).

300.     The Respondent's Motion for Stay conceded this point and restated the same argument: "The core holding of the Third Circuit's 2016 en banc ruling in *Dennis* was that the concept of 'due diligence' plays no role in a *Brady* analysis." (Doc. #23).

301.     *Dennis* removes the due diligence requirement altogether, stating that when a *Brady* claim is brought to the Court, the petitioner's due diligence is not to be considered.

84

    **d.**    **The Evidence Offered in Support of the Second Petition is "New" Under** ***Schlup*** **Because It Was Not Available at Trial.**

302.    Another argument that Respondents withdrew was the initial claim that Claitt's and Mickens' statements do not qualify as new because Tillery would have been aware that they were lying at the time of trial (Doc. #13).

303.    This argument undermines the entire concept of newness in the context of an actual innocence claim. Since a petitioner would have always known he was innocent, any previously unknown evidence that supported that pre-existing belief in innocence would be excluded.

304.    In the Motion top Stay (Doc. #23), the Respondents withdraw this argument and argue that *Schlup* and *Reeves* define evidence as "new" when it was either unavailable at trial or available but not presented as a result of ineffective counsel who failed to discover that evidence.

305.    Respondents also concede that Claitt and Mickens recantations were unavailable at the time of trial.

**III.**    THE PROSECUTION'S KNOWING USE OF FALSE TESTIMONY TO OBTAIN A CONVICTION VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE 5TH AND 14TH AMENDMENTS, AND *NAPUE V. PEOPLE OF STATE OF ILLINOIS.*

306.    The trial of Major Tillery presents an extraordinary example of prosecutorial misconduct. The knowing presentation of falsified evidence in the form of Claitt and Mickens' testimony is not only a matter of irrefutable fact, but it is also grounds for the relief requested in this Petition.

307.    The suppression of material exculpatory or impeachment evidence violates due process. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Brady v. Maryland,* 373 U.S.

83 (1963)). The suppression of favorable, material evidence, by itself and regardless of good

faith or bad faith of the prosecution, is a *Brady* violation. *Id.* at 153. However, the rule of *Brady*

encompasses two separate scenarios, with different standards of materiality. The first involves

cases where the government merely fails to disclose exculpatory or impeachment evidence. The

second, involving a greater degree of wrongdoing, involves cases "where previously undisclosed

evidence reveal[s] that the prosecution introduced trial testimony that it knew or should have

known was perjured . . ." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v.*

*Agurs*, 427 U.S. 97 (1976)).

308.    A "stricter standard of materiality" applies to *Brady* claims involving the knowing

use of perjured testimony, also known as a *Napue* claim. *United States v. Agurs*, 427 U.S. 97,

103 (1976) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).

309.    The Supreme Court has long held that a conviction obtained through use of false

evidence, known to be false by government representatives, violates the Fourteenth Amendment.

*Mooney v. Holohan*, 294 U.S. 103 (1935). Such claims fall within the ambit of *Brady*. *United*

*States v. Agurs*, 427 U.S. 97, 103 (1976). However, because a conviction obtained by the

knowing use of perjured testimony is fundamentally unfair, and because such claims involve

prosecutorial misconduct, a "strict standard of materiality" applies, and the conviction "must be

set aside if there is ***any*** reasonable likelihood that the false testimony could have affected the

judgment of the jury." Id. (citing *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*,

360 U.S. 264, 271 (1959)) (emphasis added).

310.    This materiality standard differs from the standard when exculpatory evidence is

merely suppressed. "[T]he materiality standard for false testimony is lower, more favorable to

the defendant, and hostile to the prosecution as compared to the standard for a general *Brady*

withholding violation." *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 152 (3d Cir. 2017)

(quoting *United States v. Clay*, 720 F.3d 1021, 1026 (8th Cir. 2013)).

311.    In the Third Circuit, to make out a constitutional violation based on the knowing

use of perjured testimony, the petitioner must show that 1) the testimony was perjured; 2) the

government knew or should have known of the perjury; 3) the testimony stood uncorrected; and

4) there is any reasonable likelihood that the false testimony could have affected the verdict.

*Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004); *Haskell v. Superintendent Greene SCI*,

866 F.3d 139, 146 (3d Cir. 2017) (citing *Lambert*) (". . . any reasonable likelihood that the false

testimony could have affected the judgment of the jury.") (Emphasis added).

312.    The clearest violation of *Napue* is evident from Barbara Christie's decision to put

Claitt on the stand. It is now known unequivocally that she knew his statement was littered with

falsehoods. Rather than proceeding with the prosecution of Major Tillery, Christie and the

Philadelphia District Attorney's office should have prevented the case from going forward.

313.    Instead, Christie "grabbed" Detective Gallo and returned to the crime scene, years

later, with the hope of finding Emanuel Claitt's imaginary glass door.

314.    The missing glass door is the most obvious example of Christie knowingly

presenting false evidence, but it is by no means the only example. As the factual recitation set

forth above shows, there are countless indications that the whole story that was concocted for the

May 20, 1980, statement Claitt signed was known to be false.

315.    This testimony about the key in the lock is completely at odds with the repeated

mentioning of a padlock in Claitt's 1980 statement. When ADA Christie decided to have Claitt

change his evidence to conform with the crime scene investigation, she suborned perjury because

*none of what Claitt told the jury was true*. The first story was haphazardly and carelessly

concocted by Detective Gerard, and the second story was invented to make the testimony fit the physical evidence.

316.    The events that are alleged to have happened at Dana Goodman's house two days before the shooting may be related to information from the initial investigation. Reggie Hollis (brother of victim) and Marvin Dyson both suggested that there was a dispute between Dana Goodman and John "Johnny Cakes" Pickens over a woman.

317.    During Tillery's trial, Claitt even brought up this suggestion when he unexpectedly blurted out that the dispute in West Philadelphia (where Goodman lived) was "actually behind a woman."

318.    This information suggests that someone *other than* Tillery is responsible for the shooting. By necessary implication, it also establishes that Claitt's statement and testimony, were solely manufactured for the purpose of implicating Tillery.

319.    Claitt's has a total lack of familiarity with the pool room. The non-existent glass door and absent padlock are obvious examples, but Claitt also puts the pool room at the wrong location. He has eleven people in the room, all surrounding the pool table, ignoring the fact that there are clearly stools on the west side of the room, leaving almost no room to have so many people standing around the table (Exhibit "T"). Also, Claitt left Andre Wright out of his diagram, even though the statement says that Wright was in the room.

320.    It is beyond suspicious that Claitt was at *every key event* in the story when there was no mention of him whatsoever in the initial investigation. P/O Minner and his plainclothes team knew people allegedly dealing narcotics in this part of North Philadelphia and Claitt was never on their radar. This fact is completely out of sync with Claitt being present at the meeting

in West Philadelphia, then going to the Mosque and the pool room *twice each* as the whole manufactured drama played out over two days.

321.     The May 20, 1980, Claitt statement says he was shown "hundreds of pictures." After being shown all of those pictures he identifies individuals whom he would later show standing around a pool table on a trial exhibit. Inexplicably, Claitt needed to be shown *one additional picture*, according to a statement that was taken by Det. Gerrard on May 22, 1980, in order to "confirm" that "porky" was William Franklin.

322.     At this time, Claitt was making frequent trips to the Police Administration Building, spending hours with homicide detectives. Until Claitt's recantation, the only "record" of what went on during those hours was Claitt's bizarre and impossible statement.

323.     All of these obvious problems were known to Barbara Christie. Her notes from before trial show how she tried to fix these issues, hoping to manipulate and manufacture facts.

324.     Christie knew that the story from Claitt's May 20, 1980, statement was not true because it was so compromised by the physical evidence at the scene. Her solution was to *replace one made up story with another one.*

325.     Since the front door of the pool room was not glass, Christie needed to find another door leading out of the building that was made of glass. She settled on an imaginary door in the vestibule leading from the hallway on the east side of the building to Huntingdon Street. That hallway could be accessed by a wooden door on the east wall of the pool room.

326.     At sidebar and in her closing, Christie repeated this theory that a wounded John Pickens had gone out the door on the east wall and *then* smashed through a non-existent glass door on his way to Huntingdon Street. This is just as preposterous as the phony story from the Claitt statement.

327.    When P/O Minner and other officers arrived on the scene soon after the shooting, the door on the east wall was not only closed, but it was also stuck. Once officers were able to open the door, they saw a hallway littered with debris. The one picture of the hallway shows a large radiator obstructing the path of escape that Pickens would had to have taken. Officers who looked into the hallway did not see any broken glass.

328.    Although it is inconceivable that Pickens could have exited the pool room through the east wall door, that is exactly the testimony that Christie attempted to introduce through Claitt.

329.    ADA Christie's use of Robert Mickens' testimony is similarly egregious, as the information in Mickens' pre-trial statement is so unreliable that Christie had to review and "correct" the statement with Mickens during one of his visits to the Police Administration Building while incarcerated.

330.    Mickens' statement has factual errors, including the location of the pool room and the color of Alfred Clark's car. Christie's "corrections" don't even address the patent inaccuracies, but they do show explicitly the way she would manipulate evidence.

331.    Mickens' statement also shows evidence of falsity in regard to the detail of Mickens standing watch while Clark and Tillery go in and out of the pool room to give Mickens updates. This is contradicted by Claitt's statement that he locked the door once everyone was inside and didn't unlock the door until after the shooting started.

332.    The perjured testimony that was used to convict Major Tillery was coerced through the use of threats of homicide prosecution and conviction, extreme leniency on open criminal charges, and private time for sex while Claitt and Mickens were incarcerated. These techniques render the evidence gained thereby unreliable, but more importantly, were employed

by the homicide division and the Assistant District Attorney for the exact purpose of having false

testimony given at trial.

333.    Perjured testimony was also used to undermine the cross examination of Claitt

during trial. Claitt, at both Franklin's trial in 1980, and Tillery trial in 1985, lied about the extent

of his open charges and the deals and promises he received in exchange for his statement and

testimony.

334.    At Tillery's trial, Christie not only placed this false evidence to the jury, but she

repeated the inaccurate claim that Claitt only had eight or nine open cases.


IV.    THE PROSECUTOR ENGAGED IN PREJUDICIAL MISCONDUCT IN VIOLATION
       OF THE PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER
       THE 5TH AND 14TH AMENDMENTS, AND <u>BRADY V. MARYLAND</u>, BY
       WITHHOLDING EXCULPATORY EVIDENCE THAT HAD A REASONABLE
       PROBABILITY OF CHANGING THE OUTCOME OF THE TRIAL IF THE
       EVIDENCE HAD BEEN DISCLOSED.

335.    A defendant's right to have all exculpatory evidence within the prosecution's

possession turned over is absolute and sacrosanct. The suppression of exculpatory or

impeachment evidence by the prosecution, by itself, with or without a request from the defense,

constitutes a violation of due process. *United States v. Agurs*, 427 U.S. 97, 104-108 (1976)

(citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

336.    There are three elements to the establishment of a *Brady* claim involving

prosecutorial misconduct: 1) The evidence must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; 2) The evidence must have been suppressed by the

state, either willfully or inadvertently; and 3) Prejudice must have resulted. *Banks*, 540 U.S. at

691. For purposes of this analysis, "prejudice" requires a finding of *Brady* materiality. *Id*. at 698.

Thus, under *Banks*, the analysis of a *Brady* claim which does not involve the knowing use of

91

perjured testimony by the prosecution involves an analysis of *Brady* materiality, as opposed to the "strict standard of materiality" of *Napue*.

337.    In short, there are two key differences between a *Brady* claim and a *Napue* claim. A *Napue* claim requires that the prosecution be aware of putting false evidence before the jury. With a *Brady* claim, there the "knowing" requirement is absent. The second difference is that for a *Napue* claim, there is no need to show materiality. A *Napue* claim is akin to a strict liability standard. In a *Brady* claim the Petitioner must show that the withheld evidence, even if withheld innocently and inadvertently, would have changed the outcome of the trial.

       a.    **Information About the Extent of Allegations and Jail Time Being Faced by Emanuel Claitt at the time he made his May 20, 1980, statement to the police was withheld from Petitioner at trial, materially prejudicing his ability to cross examine Claitt and show bias to the jury.**

338.    Under *Brady*, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *Strickler v. Greene,* 527 U.S. 236, 280 (1999); *Johnson v. Folino*, 705 F.3d 117, 128 (3rd Cir. 2013).

339.    Due process requires that any potential understanding between the prosecution and a witness be revealed to the jury. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Haskell v. Superintendent Greene SCI,* 866 F.3d 139, 141 (3rd Cir. 2017).

340.    Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence, and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness. *Giglio, supra.,* 153; *U.S. v. Friedman,* 658 F.3d 342, 357 (3rd Cir. 2011); *U.S. v. Milan,* 304 F.3d 273, 287 (3rd Cir. 2002).

341.	Formal documentation of a promise of leniency to a witness in exchange for the witness's testimony is not required in order for an agreement or understanding to qualify as Brady material. *United States v. Risha*, 445 F.3d 298, 303 n. 5. (3rd Cir. 2006)

342.	In order for the jury to have a fundamental understanding of the relationship between the prosecution and its principal witness, it would have been necessary for complete disclosure of Claitt's open claims, of which there were twenty-eight.

343.	Under *Brady*, Petitioner need not establish that the withholding of Claitt's open charges was knowing or even intentional. The only question is materiality.

344.	Evidence is "material" under *Brady* if there is reasonable probability that, had evidence been disclosed to the defense, the result of the proceeding would have been different. *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).

345.	Only a small fraction of Claitt's criminal history was disclosed to Tillery prior to trial. Through dogged investigation and voluntary discovery, it has come to light that Claitt had dozens of charges against and had received incomparable deals for reduced bail and leniency in sentencing. If this information had been before the jury it would have changed the outcome of the case.

**b.	Multiple letters from the District Attorney's office relating to special treatment for Claitt, including letters to Judges and the Parole Board were withheld from the Petitioner at trial, materially prejudicing his ability to cross-examine Claitt and show bias to the jury.**

346.	Along the same lines as the approximately plethora of pending charges that were not disclosed to the jury or the defense, there were also numerous letters found in the homicide file and through independent investigation that establish a very high degree of leniency afforded to Emanuel Claitt in return for his testifying in multiple homicide cases.

347.    These letters were sent by the District Attorney's office to judges who were hearing Claitt's many felony claims. There are also letters from the homicide division to the Parole Board. These letters constitute exculpatory evidence because it would have given rise to crucial cross examination.

348.    These letters show that Claitt was receiving an unprecedented amount of favorable treatment in exchange for his testimony. Since Tillery never had the opportunity to cross examine based on these letters, the prosecution violates *Brady* and must be overturned.

> **c.**    **The fact that Claitt and Mickens were placed in a police transport van for the purpose of convincing Mickens to give false evidence against the Petitioner at trial was withheld from the Petitioner, causing material prejudice to the Petitioner.**

349.    One of the most extraordinary new facts that came out of the 2016 investigation concerned a van ride during which Claitt and Mickens rode around town in a police transport.

350.    In 1984, Assistant District Attorney Barbara Christie knew that Claitt was vulnerable to withering cross-examination that would potentially cause her to lose the case. The main reason for Claitt's vulnerability was that his statement was manufactured with many demonstrative falsehoods throughout.

351.    In 2016, Emanuel Claitt described how, to continue to get favorable treatment from the District Attorney's office whereby he could stay out of jail despite mounting felony charges, he was compelled to recruit Mickens to fabricate additional evidence against Tillery:

> Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery. I was put in a police van to ride along with Mickens back and forth from homicide up to county holding prison on State Street, to make it clear to Mickens that he really had no choice except to testify against Major Tillery.

Exhibit "FF."

94

352.    Extraordinarily, Robert Mickens had related the same set of facts to Mr. Tillery's

investigator three weeks earlier:

> I was brought down from Easton, supposedly to meet with homicide
> detectives in Philadelphia. Instead, I was put in a police van with Emanuel
> Claitt, who already testified against Major Tillery's co-defendant. I rode
> back and forth from headquarters to the county prison on State Street with
> Claitt, but never taken from the van.

Exhibit "II."

353.    Mickens expanded on this episode when he gave an interview to the Philadelphia

Inquirer that was published in July of 2021:

> I believe I was in Holmesburg prison, and they told me I had to go down
> to the Police Administration building. So, when they picked me up,
> Manny [Claitt] was in the van already, and we got to talking and that's
> when he explained to me about Major Tillery. He was saying how, "You
> know why you're here," and all this type of stuff and I said, "No, I don't
> know why I'm going down to the police station." And he [Claitt] said,
> "Well Major put your name on some stuff," like that and he left it right
> there. He said Major was trying to involve me in the murder and that type
> of stuff. I had no reason not to believe him. Manny knew a lot of stuff. So,
> I went on the street for a lot of stuff he told me, and as the years went by, I
> didn't realize that the corruption that was going on between the district
> attorneys and the homicide detectives at the police administration
> building.

[CITE https://www.youtube.com/watch?v=1nYAsf2swkI].

354.    Neither Claitt nor Mickens were prompted with any information about this van

ride when they gave their statement in 2016. Until the Mickens statement made to Tillery's

investigator on April 18, 2016, the whole event remained undisclosed to Tillery. He certainly

never had an opportunity to cross examine Mickens and Claitt about the van ride because it was

actively concealed by police and prosecutors.

355.    More importantly, the fact that both men told the same story, unprompted,

reinforces the credibility of the 2016 evidence that was the basis for Tillery's Second Petition.

95

356.    Although this van ride implicates the knowing prosecutorial misconduct that is violative of *Napue*, (as discussed in Section III above), the failure to disclose this information to the Tillery prior to trial is also a *Brady* violation.

357.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose material evidence which is favorable to the accused, ***irrespective of whether such disclosure has been requested - and the failure to do so warrants relief***, regardless of the good or bad faith of the prosecutor. *Brady,* 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995).

358.    Furthermore, the materials which must be disclosed under *Brady* include all such materials available or known to any member of the police or prosecution. This requirement includes and extends beyond, directly exculpatory evidence, to evidence which can be used ***for impeachment of prosecution witnesses or prosecution theories***. *United States v. Bagley,* 473 U.S. 667,676 (1985) (emphasis added).

359.    The fact that Calitt and Mickens were placed in a police transport van that drove around the city while Claitt convinced Mickens to help convict Tillery is a fact that would clearly have had a material affect on the jury's deliberation. Therefore, the withholding of this fact is a violation of *Brady* that compels granting the relief requested herein.

      **d.**      **The fact that Claitt and Mickens were permitted to engage in sexual liaisons while incarcerated as inducement for their perjured testimony in Petitioner's case and other cases was withheld from Petitioner at the time of trial and resulted in material prejudice to the Petitioner.**

360.    The "sex for lies" scandal that was described in the above-linked Philadelphia Inquirer story had a direct impact on this case, form part of the coercion that was used to have Claitt and Mickens testify against Tillery.

96

361.    These inducements should never have been used. The failure to disclose their use, however, means that there was additional (not to mention explosive) impeachment evidence that was suppressed. In this instance, it is clear that the concealment of the sex for lies arrangements was intentional, but such intentionality is not even required for this Court to find a *Brady* violation.

362.    The Pennsylvania Superior Court addressed this same issue in the direct appeal of *Comm. v. Lester*, 392 Pa. Super. 66 (1990). The Court in that matter found that Gerrard's use of sexual favors, allowing Mr. Lester to have intimate contact with multiple women after he implicated himself in a crime. In overturning Lester's conviction, the Court found that "the police's offer of sex constituted a provocation powerful enough to coerce Lester to cooperate." *Id*. at 70.

363.    As with other *Brady* violations in this case, the withholding of "sex for lies" evidence from Tillery at trial more significantly implicates his *Napue* claim. It is not just that Tillery didn't have an opportunity to cross-examine Claitt and Mickens about these activities. The whole sex for lies scandal is about the fabrication of knowingly false evidence that was then presented to the jury in clear violation of *Napue*.

364.    Even so, this conduct also violates Petitioner's rights under *Brady*. There is no question that the information was withheld. As to materiality, the *Lester* decision cited above has already offered a considered evaluation about the practical effect of promising people in custody private time for sex while they are incarcerated. In *Lester*, the witness implicated himself, which shows the extreme nature of Detective Gerrard's conduct. If, in *Lester*, the promise of sexual liaisons was strong enough to create enough pressure for someone to implicate himself, then it was certainly strong enough in this case for Claitt and Mickens to implicate someone else. That

amount of pressure, which the Pennsylvania Superior Court referred to as "coercion" in the *Lester* decision is more than adequate to meet the materiality requirement under *Brady*.


V.      UNDER <u>KYLES V. WHITLEY</u> THE COURT MAY CONSIDER THE COLLECTIVE MATERIALITY OF ALL CLAIMED <u>BRADY</u> VIOLATIONS.

365.    The claims presented herein arise under *Brady*. Even the strict-liability standard of *Napue* is still a creature of *Brady* jurisprudence. The difference is that the knowing presentation of false and perjured evidence does not have to satisfy the materiality standard of *Brady*.

366.    For the discreet *Brady* violations raised herein, it is the Petitioner's argument that each one satisfies the need for materiality. However, under *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court may consider the collective materiality of all the claimed violations:

> [T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see *Brady,* 373 U.S., at 87, 83 S.Ct., at 1196–1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995).

367.    Under *Kyles,* this Court should consider the net effect of all undisclosed evidence, and not just the materiality of each item reviewed in a vacuum.

368.    Given the number and extent of *Brady* violations identified in this Petition the net effect is sufficiently material such that Tillery did not receive a fair trial and his conviction should be overturned.

## <u>CONCLUSION</u>

For the reasons set forth above, Petitioner Major George Tillery, by and through his counsel, respectfully requests that this Court grant the Petition and issue a Writ of Habeas Corpus.

Date:   June 2, 2022                                  Respectfully submitted,

                                                     MARRONE LAW FIRM

                            By:_____*Michael Pomerantz*_____

                                                     Joseph M. Marrone, Esquire
                                                     Pa. Attorney No. 64920
                                                     Michael D. Pomerantz, Esquire
                                                     Pa Attorney No. 83415
                                                     200 South Broad, Ste. 400
                                                     Philadelphia, PA. 19102
                                                     (215) 732-6700 – Phone
                                                     (215) 732-7660 – Fax
                                                     mpomerantz@marronelaw.com