## <u>INDEX OF EXHIBITS</u>

Exhibit "A"          Commonwealth v. Tillery, No. 523 Philadelphia 1998, 742 A.2d
                     1055 (Pa. Super. 1999) (unpublished
                     memorandum)

Exhibit "B"          District Court's Order Denying Petitioner's
                     First Petition for Habeas Corpus, July 30, 2003

Exhibit "C"          Opinion of the Court of Appeals, Tillery v. Horn, 142 F.App'x 66 (3d
                     Cir. 2005) (No. 03-3616)

Exhibit "D"          Petitioner's 2007 PCRA Petition, August 13, 2007

Exhibit "E"          Commonwealth v. Tillery, 981 A.2d 937 (Pa. Super. 2009)
                     (unpublished memorandum)

Exhibit "F"          Petitioner's 2016 PCRA Petition, June 16, 2016

Exhibit "G"          Petitioner's 2016 Supplemental PCRA Petition, September 7, 2016

Exhibit "H"          Court of Common Pleas Opinion Under Pa. R. App. P. 1925(a),
                     Commonwealth v. Tillery, 3270 EDA 2016, 193 A.3d 1063 (Pa. Super.
                     2018)

Exhibit "I"          Commonwealth v. Tillery, 3270 EDA 2016, 193 A.3d 1063 (Pa. Super.
                     2018) (unpublished memorandum)

Exhibit "J"          10/22/1976 Statement of P/O Minner

Exhibit "K"          10/22/1976 Statement of William Arnold

Exhibit "L"          11/3/1976 Mobile Crime Unit Report

Exhibit "M"          11/23/1976 Statement of William Bullock

Exhibit "N"          11/23/1976 Statement of P/O William Norton

Exhibit "O"          10/22/1976 Interview of P/O McGarvey

Exhibit "P"          10/23/1976 Statement of Frank Junius

Exhibit "Q"          Search Warrant for Fred Rainey's Green Cadillac

Exhibit "R"          1/31/1977 Homicide Investigation Report

Exhibit "S"            10/27/1976 Ballistics Report

Exhibit "T"            Pool Hall Diagram

Exhibit "U"            Photo of Front Door of Goldie's Billiards

Exhibit "V"            Photo of Interior Door on East Wall

Exhibit "W"            Photo of East Wall Door Ajar

Exhibit "X"            10/23/1976 Statement of John Pickens

Exhibit "Y"            10/23/1976 Notes re: Information From Reggie Hollis

Exhibit "Z"            1/17/1977 Statement of Marvin Dyson

Exhibit "AA"           8/22/1980 Continued Investigation Report

Exhibit "BB"           5/22/1980 Statement signed by Emanuel Claitt re "Porky"

Exhibit "CC"           5/8/1980 Bring Down Order for Emanuel Claitt

Exhibit "DD"           5/22/1980 Statement of Emanuel Claitt re Firebombing

Exhibit "EE"           1/5/1981 Letter from ADA Ross to Judge Katz re Claitt

Exhibit "FF"           5/4/2016 Verified Declaration of Emanuel Claitt

Exhibit "GG"           6/3/2016 Verified Declaration of Emanuel Claitt

Exhibit "HH"           Transcript of 8/3/2016 Video Statement of Emanuel Claitt

Exhibit "II"           4/18/2016 Verified Declaration of Robert Mickens

Exhibit "JJ"           Emanuel Claitt Arrest Record

Exhibit "KK"           Emanuel Claitt Docket Entries

Exhibit "LL"           Transcript of Emanuel Claitt's Sentencing Hearing Before
                       Judge Leon Katz, September 17, 1981 (Excerpts)

Exhibit "MM"           1/31/1984 Unsigned Cooperation Agreement Between Emanuel
                       Claitt and Philadelphia DA

| Exhibit "NN" | 1/31/1984 Letter from Homicide Chief Gordon to Parole Board re Emanuel Claitt |
| Exhibit "OO" | 2/18/1984 Letter from DA Rendell to Judge Chiovero |
| Exhibit "PP" | 10/25/1984 Letter from Asst. Homicide Chief Brodkin to Parole Board re Emanuel Claitt |
| Exhibit "QQ" | 5/20/1980 Statement signed by Emanuel Claitt re Pool Room Shooting |
| Exhibit "RR" | 9/26/1984 Statement of Robert Mickens re Pool Room Shooting |
| Exhibit "SS" | "Corrected" 9/26/1984 Statement of Robert Mickens re Pool Room Shooting |
| Exhibit "TT" | 4/1/1985 Notes of ADA Christie |
| Exhibit "UU" | 4/2/1985 Notes of ADA Christie |
| Exhibit "VV" | January 1980 Motion for Bail Reduction for Claitt |
| Exhibit "WW" | There is no Exhibit "WW" |
| Exhibit "XX" | Emanuel Claitt Diagram of Pool Room |
| Exhibit "YY" | Police Administration Building Visitor Logs |
| Exhibit "ZZ" | 9/16/2016 Verified Declaration of Rachel Wolkenstein |

# EXHIBIT "A"

**Commonwealth v. Tillery, No. 523 Philadelphia
1998, 742 A.2d
1055 (Pa. Super. 1999) (unpublished
memorandum)**

Case 2:20-cv-04267-ER Document 1-2 Filed 06/05/20 Page 5 of 387 Case ID: 160500267

J. S25021/99

COMMONWEALTH OF PENNSYLVANIA, :    IN THE SUPERIOR COURT OF
                     Appellee         :            PENNSYLVANIA
                                     :

          v.                        :

GEORGE M. TILLERY,            :
                     Appellant        :     No. 523 Philadelphia 1998

Appeal from the Order in the Court of
Common Pleas of Philadelphia County,
Criminal Division, No. MARCH TERM, 1984,
BILLS #568 THRU #574

BEFORE: MUSMANNO, J., LALLY-GREEN, J. and TAMILIA, J.

MEMORANDUM:                         **FILED**    APR 2 1 1999

George Tillery appeals from the January 13, 1998 Order dismissing his
petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. C.S.A.
§§ 9541-9546. Following a May 1985 jury trial, appellant was found guilty
of first degree murder,[1] possession of an instrument of crime,[2] criminal
conspiracy[3] and aggravated assault[4] and sentenced to life imprisonment.
Appellant's judgment of sentence was affirmed by this Court on May 30,
1989. **Commonwealth v. Tillery**, 563 A.2d 195 (Pa. Super. 1989)
(unpublished Memorandum), and his petition for allowance of appeal was

---

[1] 18 Pa.C.S.A. § 2502.

[2] **Id.**, § 907.

[3] **Id.**, § 903.

[4] **Id.**, § 2702.

Pa 417

Case 2:20-cv-01267-DSC Document 126-1 Filed 06/03/21 Page 6 of 387 Case 2:20-cv-01267 Document 126-1 Filed 05/07/2021

otherwise free of legal error. **Commonwealth v. Neal**, 713 A.2d 657 (Pa. Super. 1998). "'The findings of the post-conviction court will not be disturbed unless they have no support in the record.'" **Id.** at 660, *quoting* **Commonwealth v. Schultz**, 707 A.2d 513, 516 (Pa. Super. 1997).

Upon careful review of the record in conjunction with those issues raised by appellant, we find the PCRA court acted properly in dismissing the petition. Appellant argues trial counsel was ineffective for "simultaneously" representing him as well as one of the victims, however, there is no evidence in support of this argument.[6]

The PCRA court heard argument on January 13, 1998. At that time, counsel for appellant suggested that five years prior to appellant's trial, a victim/potential witness was represented by appellant's trial counsel and that trial counsel should have called this person as a defense witness for his testimony that appellant was not at the scene of the crimes.

> The failure to call a potential witness is not *per se* ineffectiveness absent some positive demonstration that the testimony would have been helpful to the defense. In order to establish a claim of ineffectiveness for failure to interview and/or present a witness, appellant must prove: (1) the existence and availability of the witness; (2) counsel's awareness of the witness or duty to know of the witness; (3) the witness' willingness and ability to appear on behalf of the defendant; and (4) the necessity of the proposed testimony in order to avoid prejudice.

---

[6] The record reveals no conflict between any prior representations and the representation of appellant at trial.

Case 2:20-cv-01275-JFC   Document 28-1   Filed 10/05/21   Page 7 of 387

J. S25021/99

dismissed only after the court reviewed the parties' briefs and heard argument by both sides. As the January 13, 1998 argument constitutes a "further proceeding", the court was not required to provide a Rule 1507(a) notice of its intention to dismiss. ***Commonwealth v. Albrecht***, ____ Pa. ____, 720 A.2d 693 (1998).

Order affirmed.

Pa 419

# EXHIBIT "B"

**District Court's Order Denying Petitioner's
First Petition for
Habeas Corpus, July 30, 2003**

Case 2:99-cv-06516-JBD Document 123-4 Filed 06/05/2015 Page 9 of 267

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAJOR TILLERY     :   CIVIL ACTION
          :
  Petitioner    :
          :
  v.        :
          :
MARTIN HORN, at al.    :
          :   NO.  99-6516
          :
  Respondent    :
          :

## O R D E R

    AND NOW, this   day of July, 2003, upon
reconsideration of Petitioner's Habeas Petition it is hereby
ORDERED that this Court's October 30, 2000, Order approving and
adopting U.S. Magistrate Melinson's Report and Recommendation is
reaffirmed.

     Pursuant to the Circuit Court's August 23, 2003, Order,
this Court held hearings on April 23, 2003 and May 28, 2003, at
which time Petitioner, who was represented by counsel, was given
ample opportunity to present evidence showing that this Court
erred in its denial of his ineffective assistance of counsel
claim.  Petitioner failed to present any evidence whatsoever to
satisfy the two prong requirement that the witness, Petitioner
claims should have been called at trial, (1) was available to
testify at the time of trial and (2) would have been beneficial
to the defense.  Therefore, pursuant to <u>Zettlemoyer v. Fulcomer</u>,
923 F.3d 284, 298 (3d. Cir. 1991) and <u>Lewis v. Mazurkiewicz</u>, 915

1

Case 2:09-cv-04065-CMR Document 31 Filed 05/17/2017 Page 10 of 387

F.2d 106, 115 (3d Cir. 1990), Petitioner's claim must fail.  The
Circuit Court is directed to page 58 of the May 28, 2003,
transcript.  Here, Petitioner's counsel freely admits that
Petitioner was unable to show that the witness in question was
able to testify.  In addition, despite calling Petitioner's trial
counsel to the stand, Petitioner was unable to show that the
witness' testimony would have strengthened his case.




      AND IT IS SO ORDERED.


 

_____
     Clarence C. Newcomer, S.J.

2

# EXHIBIT "C"

**Opinion of the Court of Appeals, Tillery v. Horn,
142 F.App'x 66 (3d Cir. 2005) (No. 03-3616)**

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-3616

_____

MAJOR TILLERY,

<u>Appellant</u>

v.

MARTIN HORN,
Dept. of Penna State Prisons

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 99-cv-06516)
District Judge: Hon. Clarence C. Newcomer

_____

Argued: April 4, 2005

BEFORE: BARRY, AMBRO and  COWEN, <u>Circuit Judges</u>

(Filed:  July 29, 2005)

Michael J. Confusione, Esq. (Argued)
Hegge & Confusione
9 Tanner Street - West Entry
Haddonfield, NJ 08033

Counsel for Appellant

David C. Glebe, Esq. (Argued)
Office of District Attorney
1421 Arch Street
Philadelphia, PA 19102

Counsel for Appellee

———————

OPINION

———————

COWEN, Circuit Judge.

Appellant Major Tillery appeals from an order of the District Court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. He argues that the petition should have been granted because his trial counsel labored under an actual conflict of interest. We conclude that the claim is procedurally defaulted, and that Tillery has not established actual prejudice.

I.

As we write solely for the parties, we briefly review the procedural background. On May 29, 1985, following a jury trial, Tillery was convicted of first-degree murder and related crimes. The case arose from an October 22, 1976 shooting incident which resulted in the death of John Hollis and the wounding of John Pickens. The Pennsylvania Superior Court affirmed, and on March 5, 1990, the Pennsylvania Supreme Court denied *allocatur*.

On September 20, 1996, Tillery petitioned for collateral relief under the Pennsylvania Post-Conviction Relief Act, alleging that he was denied effective assistance

2

of counsel under the Sixth Amendment because his trial counsel, Joseph Santaguida, operated under an actual conflict of interest. Santaguida had represented Tillery at trial, but was replaced by James Bruno, Esquire, who filed post-verdict motions on Tillery's behalf and represented him on direct appeal. The PCRA court dismissed Tillery's application, finding his conflict claim procedurally defaulted, and the Superior Court affirmed. The Pennsylvania Supreme Court denied *allocatur*.

Tillery filed the instant petition in the Eastern District of Pennsylvania, asserting that his trial counsel labored under an actual conflict of interest and was thus constitutionally ineffective. The District Court dismissed the petition and declined to issue a certificate of appealability. Tillery next sought relief in this Court, and we remanded, directing the District Court to permit him to present evidence in support of his conflict claim. The District Court thereafter held two hearings, but reaffirmed its previous order denying relief. This appeal ensued.

## II.

The District Court had jurisdiction over Tillery's habeas petition under 28 U.S.C. § 2254, and we have jurisdiction under 28 U.S.C. § 1291. The District Court's legal conclusions, including its resolution of legal questions arising from application of the procedural default doctrine, are subject to plenary review. *Hull v. Kyler*, 190 F.3d 88, 97 (3d Cir. 1999).

## III.

3

The Pennsylvania Superior Court concluded that Tillery had waived his actual conflict claim, finding that he had not raised the claim on direct appeal. The court relied on 42 Pa. Cons. Stat. Ann. § 9544(b), which states that "an issue is waived if the petitioner could have raised it but failed to do so . . . on appeal," as well as that "'[i]neffectiveness of trial counsel must be raised at the first opportunity at which the counsel whose effectiveness is being challenged no longer represents the defendant,'" (App. at 253 (quoting *Commonwealth v. Miller*, 564 A.2d 975, 977 (Pa. Super. Ct. 1989))). The state court's finding of waiver requires us to examine and employ the federal rules of procedural default.

A. *Procedural Default*

Under the doctrine of procedural default, a federal habeas court is prohibited from considering constitutional claims where a state court has refused to entertain their merits on the basis of an adequate and independent state procedural rule, *see Harris v. Reed*, 489 U.S. 255, 262 (1989), unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). A state procedural rule is "adequate" if it is regularly or consistently applied by the state court, *see Johnson v. Mississippi*, 486 U.S. 578, 587 (1988), and is "independent" if it does not "depend[] on a federal constitutional ruling," *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).

To avoid waiver of any ineffective assistance of counsel claims, Pennsylvania law required Tillery to raise such claims "at the earliest stage in the proceedings at which the

4

counsel whose effectiveness is being challenged no longer represents the defendant." *Commonwealth v. Hubbard*, 372 A.2d 687, 695 n.6 (Pa. 1977).[1] Because Tillery obtained new counsel following trial, before the filing of post-verdict motions, the Superior Court recognized that he was obligated to raise all of his ineffective assistance of counsel claims pertaining to his trial counsel, including that Santaguida labored under an actual conflict, in post-verdict motions and on direct appeal.

Tillery challenges the adequacy of the *Hubbard* rule as applied to his case, arguing that "the state court never made an 'adequate' finding of procedural default because Tillery did not discover the claim until 1996, when he raised it on post-conviction relief." (Appellant's Br. at 11.) Tillery, however, is conflating concepts of the adequacy and independence of a state procedural rule with the correctness of the state court's application of its own law. Tillery has not furnished any argument or evidence germane to the adequacy inquiry. *See Reynolds v. Ellingsworth*, 843 F.2d 712, 719 (3d Cir. 1988). We have previously determined that the *Hubbard* rule was an adequate and independent state procedural rule, *see Richardson v. Warden, S.C.I. Huntingdon*, 2005 WL 289992 (3d

---

[1]The Pennsylvania Supreme Court overruled *Hubbard* in 2002, holding that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002). Consequently, "any ineffectiveness claim will be waived only after a petitioner has had the opportunity to raise that claim on collateral review and has failed to avail himself of that opportunity." *Id.* Tillery, however, cannot receive the benefit of this ruling, as the court further held that the new rule would be applied retroactively to cases currently pending on direct review in which ineffective assistance claims had been raised and preserved, but not to cases pending on collateral review. *Id.* at 738-9 & n.16. Tillery's direct and collateral state proceedings had concluded prior to the issuance of *Grant*.

5

Cir. 2005), and there is no evidence to suggest that it was not an independent and

adequate state procedural rule as applied to Tillery.  Instead, Tillery is charging

Pennsylvania with the erroneous application of its own procedural rule, which courts have

repeatedly counseled is not a cognizable claim on habeas.  *See Lewis v. Jeffers*, 497 U.S.

764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.");

*Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995).  Accordingly, the

Pennsylvania Superior Court's decision to find Tillery's Sixth Amendment ineffective

assistance claim waived rested upon application of an independent and adequate state

procedural rule.  His conflict of interest claim is procedurally defaulted.  We can consider

only whether cause and prejudice exists to excuse the procedural default.

B.  *Cause and Prejudice*

A federal habeas court may entertain a procedurally defaulted claim if the

petitioner can show "cause for the default and actual prejudice as a result of the alleged

violation of federal law."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Although

we agree that cause exists to excuse the procedural default, Tillery has not met his burden

in demonstrating actual prejudice.

Tillery contends that the facts underlying the alleged actual conflict of interest

were not known to him or his appellate counsel at the time of his direct appeal, thus

giving rise to "cause" excusing his default.  *See Murray v. Carrier*, 477 U.S. 478, 488

6

(1986). Our analysis begins with a brief summary of the facts underpinning Tillery's claim.

Tillery's conflict of interest claim is grounded in allegations that Santaguida also served as counsel to Pickens, one of the victims of the 1976 shootings, during the trial of Tillery's co-defendant, William Franklin. The Commonwealth tried Franklin for the 1976 shootings in 1980, five years prior to trying Tillery. Because Pickens had, according to a police officer's notes, identified the shooters as individuals other than Franklin and Tillery, Franklin attempted to call Pickens as an exculpatory witness. Santaguida informed Franklin's attorney that he advised Pickens to invoke his Fifth Amendment right against self-incrimination and refrain from testifying. The record reflects that, by the time Franklin actually stood trial in 1980, Pickens had fled the jurisdiction and was unable to be located, despite extensive efforts by Franklin's counsel.

Tillery, represented by Santaguida at his trial in 1985, did not discover that counsel had represented Pickens in Franklin's trial until 1996, when he came across the decision of *Commonwealth v. Franklin*, 580 A.2d 25 (Pa. Super. Ct. 1990). This decision, which affirmed the denial of Franklin's petition for collateral relief, revealed that "Mr. Santaguida informed trial counsel that because of Mr. Pickens' involvement in the events underlying the criminal charges filed against [Franklin], he would have to advise his client not to testify for [Franklin]." *Id.* at 29.

At the evidentiary hearing conducted by the District Court, Tillery testified that Santaguida never disclosed that he formerly represented Pickens at co-defendant Franklin's trial. Santaguida could not remember whether he informed Tillery that he had previously represented Pickens. Thus, the earliest Tillery could have learned of that representation was in 1990, when the Superior Court issued *Commonwealth v. Franklin*. This occurred well after the conclusion of Tillery's direct appeal. That Tillery's claim may not, in fact, be sustainable is not relevant to the reality that its factual basis was not reasonably available at the time of his direct appeal. Tillery has thus met his burden of showing cause.

To demonstrate "actual prejudice," Tillery must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Tillery cannot sustain this burden.

The Sixth Amendment guarantees criminal defendants the right to representation free of conflicts of interest. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir. 1988). A petitioner must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). If this showing is made, prejudice will be presumed. *Id.* at 349-50. The question of whether counsel operated

8

under an actual conflict of interest that adversely affected performance is a mixed question of law and fact subject to *de novo* review. *Id.* at 341-42.

Actual conflict is more likely to occur in cases involving joint representation in a single proceeding rather than in cases of multiple representation in which the attorney represents different clients in different matters. *Duncan v. Morton*, 256 F.3d 189, 197 (3d Cir. 2001) (citations omitted). Moreover, the existence of an actual conflict and any adverse effects from it are more likely to be apparent in cases in which counsel takes positive steps on behalf of one client to the detriment of the other, as opposed to cases involving the inaction and passivity of counsel. *Id.* This case presents at *most* one involving multiple representation, and Tillery cites only a passive lapse of representation by Santaguida. As such, to prove a Sixth Amendment violation premised on actual conflict, Tillery must show: (1) a plausible, alternative defense strategy or tactic might have been pursued that is of sufficient substance to be viable; and (2) the alternative defense was inherently in conflict with or not undertaken because of the attorney's other loyalty or interest. *See Gambino*, 864 F.2d at 1070.

Tillery argues that Santaguida's representation of Pickens in 1980 conflicted with Tillery's interest during his 1985 trial, and that this conflict manifested itself in constitutionally defective representation. Specifically, Tillery accuses Santaguida of failing to put forth his best effort to locate Pickens at the time of Tillery's trial.

9

Santaguida further declined to request a missing witness charge, which Tillery also attributes to his alleged divided loyalties.

The record undermines Tillery's claim of a debilitating conflict of interest. First, Tillery has not succeeded in showing that the defense strategy of subpoenaing Pickens as an exculpatory witness in his trial was a viable one. At the time Franklin's trial commenced in late 1980, Pickens could not be located. As Tillery admits, Santaguida explained in 1985 that he was unaware of Pickens' whereabouts, and that neither he nor the Commonwealth could locate Pickens. Although he could not recall exactly what steps he took in his attempts to contact Pickens, Santaguida testified that he did conduct a search. He theorized that Pickens was making himself scarce to avoid testifying. Significantly, even at the time that he provided advice to Pickens in 1980, and at all times thereafter, Santaguida had no knowledge of his location. Tillery, contrarily, attested that his counsel did not make every effort to locate Pickens. He did not, however, provide any specific examples or support for this bald assertion.

Second, Tillery has not succeeded in showing that Santaguida owed a continuing duty of loyalty to Pickens, that in turn prevented counsel from using his best efforts to locate him. Santaguida's representation of Pickens occurred five years prior to Tillery's trial, and likewise terminated before Tillery's trial. At best, the record discloses that the representation of Pickens was fleeting and minimal. When asked at the evidentiary hearing if he ever represented Pickens, Santaguida responded that he did not believe that

10

he represented him in a courtroom.  Rather, based on his refreshed recollection, either Pickens or someone acting on his behalf called him to obtain advice on testifying in the *Franklin* case.  Furthermore, he could not recall providing any additional legal services to Pickens, and testified that no communication took place between them other than that one instance.  In his view, there was no conflict "because Mr. Pickens, number one, couldn't be found."  (App. at 181.)  Contrary to Tillery's claim, Santaguida never stated that, had he found Pickens, he would have advised him not to testify in Tillery's trial.  There is not a shred of evidence that Santaguida's representation of Pickens continued past its brief lifespan in 1980.  In short, counsel did not *actively* represent competing interests.

Tillery has failed to convince us that an actual conflict of interest existed that adversely impacted Santaguida's performance.  His claim that the record discloses that Santaguida possessed a duty of loyalty to Pickens at the time he represented Tillery, and that this duty of loyalty conflicted with his duty of loyalty to Pickens, is purely speculative.  Rather, the record plainly reveals a *successive* representation of two clients with possible diverging interests.  Not only was this scenario not addressed by the Pennsylvania Lawyer's Code of Professional Responsibility in effect at the time, *compare* Pa. Lawyer's Rules of Professional Conduct R. 1.9 cmt. (1988), but the Supreme Court has made clear that the mere possibility of conflict is insufficient to demonstrate the existence of an actual conflict, *Cuyler*, 446 U.S. at 350.  There is no evidence that Santaguida's actions and inactions were influenced by loyalty to Pickens, or that he even

11

maintained a loyalty to Pickens in 1985.  Reliance upon the relationships created between himself, Pickens, and Santaguida cannot, standing alone, suffice to demonstrate the existence of an actual conflict of interest and adverse impact.

We conclude that Tillery's trial counsel's performance was not adversely affected by Santaguida's brief representation of Pickens.  Tillery has not established that he was prejudiced, and his claim is thus procedurally defaulted.

IV.

For the foregoing reasons, the judgment of the District Court entered on July 30, 2003, will be affirmed.

———————

12

# EXHIBIT "D"

**Petitioner's 2007 PCRA Petition, August 13, 2007**

Case 2:20-cv-01675-DBB Document 28 Filed 06/06/23 Page 25 of 387 PageID: 2037

PENNSYLVANIA COURT OF COMMON PLEAS - COUNTY OF PHILADELPHIA

```
==============================+
                              :
COMMONWEALTH OF PENNSYLVANIA,:        March Term, 1984 Bills
            Plaintiff,        :        No. 568 - 574
                              :
    VS.                       :                And
                              :
                              :        March Term 1984 Bills
MAJOR G. TILLERY,             :        No. 0155 - 0169
            Defendant.        :
                              :
==============================+
```

**RECEIVED**

AUG 1 3 2007

PCRA UNIT

MOTION PURSUANT TO THE POST CONVICTION RELIEF ACT

Petitioner Major Tillery, pro se, moves this court for relief under the Post Conviction relief Act 42, Pa.C.S.A. S 9541 et. and in support thereof represent the following.

1. Your petitioner Major Tillery prison number is 526689, is presently incarcerated at New Jersey State Prison. And has a mailing address of P.O. Box 861, Trenton, NJ 08625.

2. On May 29, 1985 petitioner was found guilty by jury which was presided over the Hon. John E. Geisz, of the charge of murder in the 1st°, poss. of instrument of crime - generally, criminal conspiracy, agg. assault, under bills of information March Term 1984 numbers 568, 570, 571, 573, and 574.

3. On 12-9-86 your petitioner was sentence under bill number 570 on the charge of 1st° murder of Joseph Hollis to a mandatory life sentence.

   On bill number 568 charge of poss. of instrument of crime, petitioner received one to two years to run concurrent

-1-

with bill 570.

On bill number 573 charging petitioner with agg. assault on John Pickins, petitioner was sentence to 5-10 years to run concurrent with bill 570.

On bill number 574 charging petitioner with criminal conspiracy he was sentence to 5-10 years to run concurrent with bill 570.

4.   Subsequent to this verdict petitioner filed Port Trial Motions which were denied.  Petitioner then filed timely appeals to the State Superior Court of Pennsylvania in 1986.  The decision of the lower court was affirmed on 5-30-89.

5.   Petitioner than filed a petition for allowance of appeal with the Supreme Court of Pennsylvania which was also denied.

6.   At trial petitioner was represented by attorney Joseph Santaguida.  At Post Trial motions and the filing of appeals before the Superior Court and Supreme Court of Pennsylvania, your petitioner was represented by James S. Bruno.

## CASE NUMBER TWO

### March Term 1984 - Bill 0155-0169

1.   On 8-5-85, petitioner was found guilty by jury on all counts which was presided over by the Hon. D'Alessandro. Petitioner was charged with Criminal Conspiracy, Risking a Catastrophe, Prohibited Offensive Weapons, Attempted Arson and

-2-

Pa 438

Arson.

2.    1984 March Bills, 0155 Criminal Conspiracy, 0156 Risking Catastrophe, 0158 Prohibited Offensive Weapons, 0159 Arson Endangering Person and Property, 0160 Arson Endangering Person and Property, 0161 Risking Catastrophe, 0163 Prohibited Offensive Weapons, 0164 Criminal Conspiracy, 0165 and 0166 Attempted Arson Endangering Persons and Property, 0167 Risking Catastrophe, 0168 Prohibited Offensive Weapon, and 0169 Criminal Conspiracy.

3.    At trial petitioner was represented by attorney Joseph Santaguida. On 8-31-87, Post Verdict Motions was denied, petitioner was sentenced to 12-24 years. petitioner was Represented by James A. Lineberger on post verdict motions.

4.    Petitioner attorney James A. Lineberger than filed a timely appeal to the Pennsylvania Superior Court, and the Supreme Court of Pennsylvania which was denied.

5.    Petitioner respectfully request that all the charges in both cases March Term 1984 Bill No. 568-574 and March Term 1984 No. 0155-0169 be dismissed, or in the alternative be granted a new trial!

## ARGUMENTS IN SUPPORT OF POST CONVICTION RELIEF

The following arguments are in support of petitioners motion for Post Conviction Relief.

-3-

## POINT ONE

THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE KNOWINGLY
WITHHELD EXCULPATORY IMPEACHMENT
EVIDENCE OF ONE OF ITS KEY WITNES-
SES AGENT/INFORMANT EMMANUAL CLAITT
IN ORDER TO OBTAIN THE MURDER
CONVICTION. THUS DENYING DEFENDANTS
FOURTEENTH AMENDMENT RIGHTS OF THE
U.S. CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.

In the case sub judice, the Commonwealth used a well known
prosecutor informant by the name of Emmanuel Claitt as its prime
witness in order to obtain the conviction of Major G. Tillery.
Mr. Claitt was the only eye-witness to the murder of Joseph
Hollis and assault of Pickins connecting defendant to the crimes.
No other witness connected defendant to the crimes not even
the surviving victem Mr. Pickins. Therefore, this case basically
boils down to one of the credibility of the Commonwealths only
witness as identified above. See, U.S. v. Foster, 874 F.2d
491 (8th Cir. 1988); "Case boils down to a question of the
credibility of the witnesses."

However, the below argument is regarding the trial testimony
of Emmanuel Claitt and the undisclosed preferential treatment
that he received in return for his testimony against the
defendant. Emmanuel Claitt is a career criminal and has a long
criminal history in the state of Pennsylvania. [See, Exhibits
1, 2, and 3] Mr. Claitt also has a long history of providing
information to the Commonwealth and has testified as a witness
in many cases prior to the defendants and thereafter, which

-4-

he then in turn received preferential treatment from the
Commonwealth. At defendants trial defense attorney Mr. Joseph
Santiguida attempted to discredit Emmanuel Claitt testimony
with his past criminal history as well as with his potential
favorable expectations from the Commonwealth.

Although the Commonwealth via, Barbera Christie, disclosed
that it will speak to Mr. Claitt sentencing judge the Honorable
Judge Katz, and indicate Mr. Claitt favorable testimony against
Mr. Tillery, the Commonwealth intentionally withheld that it
would be recommended that Mr. Claitt receive a sentence of "no
more then ten (10) years" on his pending charges. [See, Exhibit
10 Attached hereto] Mr. Claitt at the time of defendants trial
had several indictments pending against him in the state of
Pennsylvania. [See, Exhibits 1, 2, and 3, Attached hereto]

Most of the pending charges Mr. Claitt had pending was
not disclosed to the defense prior to trial nor were the
favorable recommendation of "no more then ten (10) years" he
received from the Commonwealth in regards to his indictments,
contrary to Supreme Court precedent set forth in the matter
of, Brady v. Maryland, 373 U.S. 83 (1963); which states in
pertinent part that: "A prosecutor has a duty to provide an
accused with all evidence in the state's possession materially
favorable to the accused defense." The prosecutor failed to
do such here. See also, Com. v. Romansky, 702 A.2d 1064 Pa.
Super. 1997). Based on the Commonwealth recommendation of "no
more then ten (10) years", Judge Katz sentenced Mr. Claitt to

-5-

a concurrent sentence of 7 years but he only served 23 1/2 months
and he was released from Camp Hill on November 22, 1982 after
completing his prison term. After Mr. Claitts release however,
he committed more crimes as indicated in the attached exhibits
one, two, and three.

The only way defendant discovered Exhibits one, two, three,
and seven, is through his own independent research after his
convictions of the Hollis/Pickins shootings trial and the
subsequent fire bombing trial. Exhibits one, two, three, and
seven, is therefore newly discovered evidence that was
intentionally withheld by the Commonwealth in order to obtain
it's unlawful convictions. See, Romanky, supra. id.

Moreover, the Commonwealth committed a farce on the court
when it withheld Exhibits one, two, three, and seven, and in
fact, indicated to the court that Mr. Claitt will be receiving
"no recommendations" from the Commonwealth as to a set sentence
regarding his pending indictments before Judge Katz, and that
it was only agreed that Mr. Claitt will enter into an "open
plea" and that the court can sentence Mr. Claitt to the fullest
extent of the law. In other words, the Commonwealth gave the
impression to the jury and the defense as well as the trial
judges, that Mr. Claitt had no expectations other then protection
in return for his trial testimony. Thus giving him know motive
to falsely accuse the defendant of the indicted offenses. [See,
Exhibit 7]

-6-

Pa 442

Exhibit seven, is a letter that the Commonwealth wrote
to the State of Pennsylvania Parole Board on January 31, 1984,
recommending that the parole board remove a detainer pending
against Mr. Claitt so that he may be released on bail which
would otherwise be impossible with a pending parole detainer.
This recommendation was based on Mr. Claitts future testimony
against defendant in the homicide trial.

As a result of the Commonwealths recommendation to the
parole board on behalf of Mr. Claitt the detainer was lifted
and Mr. Claitt was able to make bail and was released. [See,
Exhibits 7 and 11 Attached hereto]

Also attached hereto as exhibit six, is an additional letter
written by the Commonwealth D.A. Ross dated January 5, 1981,
to the Hon. Judge Katz, who's court Mr. Claitt had pending
indictments. The letter indicates Mr. Claitt continual
relationship as a Commonwealth witness since January of 1980,
not only in the defendants case, but in several other cases
in the state of Pennsylvania. This demonstrates that Mr. Claitt
was a agent for the state of Pennsylvania and a well compensated
one at that, considering the lenient sentences and dismissals
of indictments he received in exchange for his cooperation's
with the Commonwealth. [See, Exhibit 6 Attached hereto]. Matteo
v. Superintendent, SCI Albion, 171 F.3d 877 (1999).

Mr. Claitt was not only a witness against Mr. Tillery in
the homicide and aggravated assault (shootings) case, but was
also a Commonwealth witness against Mr. Tillery in the

-7-

subsequent fire bombing indictment. In both cases Mr. Claitt
admits his participation in the crimes, but suspiciously was
never charged in the homicide case as an accomplice or a
co-conspirator, and received a concurrent sentence in the
subsequent fire bombing cases as stated earlier. The
Commonwealth never explained why Mr. Claitt was never charged
and indicted in the homicide of Mr. Hollis and the aggravated
assault of Mr. Pickins. Mr. Claitt not being charged in the
Hollis/Pickins crimes are clear signs of "Use Immunity" in return
for his various trial testimony's. This type of exchange should
have been disclosed to the jury and the Commonwealths failure
to do so is a clear due process violation contrary to the
Fourteenth Amendment of the United States Constitution. See,
e.g., Moore v. Kemp, 809 F.2d 702 (11th Cir. 1987); holding
in pertinent part that: "A defendant has the right to question
whether a witness is testifying under a grant of immunity, or
absent such a grant, whether witness thought he had immunity."

Furthermore, Mr. Claitt testimony against Mr. Tillery in
the Hollis/Pickins crimes in regards to his reasons and
expectations contradicts his subsequent trial testimony against
Mr. Tillery in the fire bombings cases. [See, Exhibit 10 and
11]

In exhibit ten, which is the closing summation of
Commonwealth D.A. Minehart in the fire bombing trial, that it
was recommended to Judge Katz, that Mr. Claitt not receive "no
more then ten (10) years" on his pending indictments in exchange

-8-

Case 2:20-cv-02675-DBB Document Page: 488 06/06/07 Page 54 7 20 287

for his testimonies against Mr. Tillery. This testimony is
in direct contradiction to exhibit eleven, which is the
Commonwealth D.A. Christie closing summation at the defendants
homicide/aggravated assault trial where it's position is that
there was "no set deal" and that the Commonwealt only enter
into an "open plea" agreement with Mr. Claitt. An "open plea"
agreement meaning by the D.A. Christie definition is that the
judge has full discretion as to the sentence Mr. Claitt will
receive and that therefore Mr. Claitt has no expectations as
to the sentence he will receive. The latter position allowed
the Commonwealth in defendants homicide trial to paint a false
impression to the jury that Mr. Claitt had no ulterior motive
to want to curry favor for the prosecution. See, Moore v. Kemp,
809 F.2d 702 (11th Cir. 1987).

Also as new evidence the defendant discovered after his
convictions are exhibits four, five, eight, and nine, all of
which defendant discovered by his own independent investigations
by utilizing The Right To Know Act (TRTKA).

Exhibit four, is the transcript from Mr. George Rose
homicide trial, another victim of Mr. Claitts false testimony.
Mr. Rose was Mr. Tillery codefendant in the subsequent fire
bombing trial and went on trial in 1980 for the unrelated
homicide of Mr. Alfred Clark based on the testimony of
Commonwealth witness Mr. Claitt. This trial commenced prior
to the defendants capture, and it was indicated that Mr. Claitt
agreed with the D.A. Ross that five (5) open charges he had

-9-

pending at the time will be dismissed as a result of his testimony. This demonstrates that Mr. Claitt had an agreement of favorable treatment with the Commonwealth prior to the capture and homicide trial of the defendant. The defendant was arrested on December 8, 1983, in L.A. California and began trial in the Hollis/Pickins shootings in May of 1985. This evidence surely was known to the Commonwealth prior to defendants capture and it should had been disclosed to the defendant prior to his trial.

Fortunately for Mr. Rose, the jury disbelieved Mr. Claitts testimony against him and found him not guilty of all charges.

Furthermore, despite of the fact that Mr. Claitt testified that he was present during Mr. Clark murder he was never charged as an accomplice to Mr. Rose. The latter in itself demonstrates just as in the case sub judice, that Mr. Claitt is never charged by the Commonwealth for his participation in homicides. Which further supports the inference of an agreement with the Commonwealth in the form of "Use Immunity".

Exhibit five, is the December 1983 transcript from Mr. Frazier homicide trial, which is unrelated to the case sub judice. Mr. Claitt was a witness against Mr. Frazier and testified that Mr. Frazier confessed to him from his jail cell, although Mr. Claitt was well known in the jail as a Commonwealth police informant.

In the Frazier case, Mr. Claitt is cross-examined extensively about his cooperation with the Commonwealth in the indictments against the defendant Mr. Tillery, as well as to

-10-

other individuals including Mr. Rose. Again--- Mr. Claitt acknowledges that he had expectations from the Commonwealth in exchange for his testimony against the defendant who had not been apprehended at the time of Mr. Fraziers trial, but a warrant was out for his arrest. This evidence should have been disclosed prior to the defendants trial.

Exhibit eight, is the transcript from Mr. James Brand fire bombing trial. Mr. Brand was the defendants co-defendant in the fire bombing indictment but was separately triad in 1980 prior to defendants capture. Mr. Claitt was the Commonwealths prime witness against Mr. Brand, as he was in all the cases mentioned above.

At Mr. Brand[2] trial Mr. Claitt falsely stated that he was receiving no favorable recommendations from the Commonwealth in exchange for his trial testimony's, and maintained that his reasoning for coming forward to the police regarding the indictments against defendant Mr. Tillery and co-defendants, was simply because he sought justice for a friend [viz, "Samual Goodwin"] that he suspected was killed by Mr. Tillery and associates.

Exhibit nine, is additional testimony of Mr. Claitt from

---

[2]Mr. Rose, Mr. Smith, Mr. Brand, and Mr. Tillery were all co-defendants on the fire bombing indictments. Although Mr. Rose appeared at the preliminary hearing with Mr. Brand, they weren't tried together. Mr. Rose and Mr. Tillery were tried together, subsekuent to Mr. Brand and Smith.

-11-

the fire bombing indictment against James Brand. At Mr. Brand
and Mr. Rose preliminary hearing on the fire bombing indictment
in July of 1980, Mr. Claitt further submitted that he was
expecting no recommendation from the Commonwealth, as far as,
promises, or reduced sentences regarding his pending matters.
Which directly contradicts his testimony in other trials
regarding the same subject.

Because of the multitude of trial testimonies that Mr.
Claitt provided to the Commonwealth on various separate
occasions, made it the more difficult for the defendant to locate
and obtain the documents to support his position that Mr. Claitt
had good reason to want to curry favor for the prosecution.

It was only through defendants independent strenuous
research that he discovered the above mentioned material.
Material that was intentionally withheld by the Commonwealth.
Thus committing nothing less then a miscarriage of justice and
a farce upon the trial court. See, Com. v. Romanky, supra.
Where the court held that: "evidence of an understanding or
agreement regarding future prosecution would be relevant to
the witness credibility and the jury should have been informed
of it."

The defendant in the instant matter was left handicapped
from cross-examining Mr. Claitt as to his expectations because
of the Commonwealths intentional withholding of the very evidence
that discredited its prime witness and demonstrates that Mr.
Claitt had all the reason to falsely accuse Mr. Tillery of the

-12-

indicted offenses. Mr. Claitt was never charged with the Hollis/Pickins shootings although he admitted he was part of a criminal organization and not only was present when the shootings occurred, but in fact, admitted he lead the two shooting victims into an ambush.

Being well aware of Mr. Claitt envolvement in the shootings, the Commonwealth gave no reasons to the Court or the defense for it's decision not to charge Mr. Claitt as an accomplice to murder and assault. It is clear that Mr. Claitt received favorable treatment in the form of "Use Immunity" in exchange for his testimony against the defendant. The Commonwealth had an obligation to disclose such immunity to the defense prior to trial. See, Moore v. Kemp, supra.

Furthermore, Mr. Claitt received a sentence of no more then ten (10) years in Judge Katz court based on the recommendation of the Commonwealth. This evidence existed prior to defendants trial but was intentionally withheld from the defense. At trial the Commonwealth gave the impression that Mr. Claitt would be fully prosecuted in his pending indictments. When in fact, his pending matters were disposed of by the Commonwealth, through either concurrent sentences, nolle pros, or out right dismissals, and again the guarantee of no more then ten (10) years. [Exhibits 1, 2, 3, and 7]

If defendant would have be made aware of this evidence, defense counsel could have utilized it to completely destroy Mr. Claitt credibility as to his expectations from the

-13-

Commonwealth in exchange for his testimony against Mr. Tillery. The Commonwealth had an obligation to disclose such evidence and its failure to do so is a miscarriage of justice and tainted defendants conviction entitling him to a new trial. See e.g., Blankenship v. Estelle, 545 F.2d 510 (5th Cir. 1977); Where it was discussed in pertinent part: "Although in the instant case the testimony that Brooks and Crawford were under indictment may have been technically true, it left an erroneous impression of an impending trial and the absence of leniency as an inducement to testify. This court has recently made clear that we will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses."

As in the case sub judice, although it was technically correct that Mr. Claitt had pending indictments against him, and that the Commonwealth did write letters for his protection, the Commonwealth withheld the part that it was recommended that Mr. Claitt receive no more then ten (10) years, and that five other cases be nolle pros or dismissed as discussed earlier in the motion. Nor was it disclosed that Mr. Claitt received immunity from the Hollis/Pickins indictment.

Even more critical is the fact that the Commonwealth stated to the jury during its closing that Mr. Claitt received an "open plea" and that his sentence is totally left to the discretion of the court. (Trial Tran. ¶May 14, 1985) [Exhibit 11]

In conclusion, this case is before the court on a subsequent

-14-

Case 2:20-cv-04267-DBB Document Page: 486 of 060962 filed 05/07/2020 7

motion under the Post-Conviction-Relief-Act (PCRA). As such, the defendant has demonstrated that a grave miscarriage of justice has been committed against him by the Commonwealths intentional withholding of the above stated information. See, Com. v. Lawson, 519 Pa. 504 (1988); Holding that: "A second or subsequent post conviction request for relief will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred."

Therefore defendant has met his burden. The new evidence as exhibits one, two, three, four, five, eight, and nine, attached hereto was discovered by defendant within the last sixty (60) days pusuant the the Post-Conciction-Relief Act (PCRA), and clearly shows that the Commonwealth denied defendant due process rights when it knowingly withheld material impeachment evidence that should have been disclosed to defense prior to trial, so that with this evidence defendant could have swayed the jury's verdict in his favor and been acquitted of all charges. See, Com. v. Szuchon, 534 Pa. 483, (1993).

For the foregoing reasons mentioned above, the defendant should be entitled to a new trial under the Post Conviction Relief Act (PCRA).

## POINT TWO

THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE AND MINEHART
ALLOWED ITS KEY WITNESS EMMANUEL
CLAITT FALSE TESTIMONY TO GO
UNCORRECTED IN ORDER TO OBTAIN
THE HOMICIDE & ARSON (FIRE BOMBING)
CONVICTIONS. THUS DENYING DEFENDA-
NTS FOURTEENTH AMENDMENT RIGHTS OF
THE U.S.CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.

The Commonwealths cases on the homicide and assault conviction
of Hollis/Pickins, as well as the fire bombing conviction was based
primarily on the testimony of informant Emmanuel Claitt as argued
in point one of the below motion. On May 20, 1980, Mr. Claitt was
interviewed by detectives from the Commonwealth of Pennsylvania
regarding an unrelated homicide. At that interview Mr. Claitt
volunteered information regarding the homicide of Mr. Hollis and
aggravated assault (shooting) of Mr. Pickins, and indicated that
defendant Mr. Tillery was responsible for there crimes.

As a result of Mr. Claitt false testimony, Mr. Tillery was
convicted of the Hollis/Pickins crimes on May 29, 1985 and sentenced
accordingly*.

Subsequent to Mr. Tillery murder conviction, Mr. Claitt testified
as the key witness for the Commonwealth on the additional indictment
regarding the aggravated arson (fire bombing) case. As a result
of Mr. Claitt testimony, Mr. Tillery was convicted on August 5, 1985,

---

*Defendant homicide trial and bombing trial was before different
trial judges. The homicide trial was tried before the Hon. John
E. Geitz. And Hon. N. D'Alessandro, presided over defendants' fire
bombing trial.

-16-

of all crimes associated with the fire bombing indictment.

Mr. Tillery has adamantly maintained his innocence and continues to do so.

The Commonwealth only obtained Mr. Tillery unlawful convictions through the uncorrected false testimony of Mr. Claitt. Mr. Claitt trial testimony's regarding his favorable expectations from the Commonwealth, is in conflict with each other. In fact, the trial testimony that he provided at Mr. Tillery homicide trial regarding expectations, is in direct contradiction to his testimony at the subsequent fire bombing trial.

Furthermore, Mr. Claitt provided a multitude of testimony's on behalf of the Commonwealth in several different trials prior to Mr. Tillery and thereafter. At trials unrelated to the case sub judice, Mr. Claitt was cross-examined about his long standing history of providing information for the Commonwealth, and his motives for providing such information in the cases against Mr. Tillery. As such, Mr. Claitt gave conflicting answers as to his under-handed deals with the Commonwealth. Most of the latter testimony Mr. Tillery recently learned of through his independent efforts by utilizing the Right To Know Act (RTKA).

For example, at Mr. Rose unrelated homicide trial in 1980, Mr. Claitt was a witness for the Commonwealth D.A. Ross. Mr. Claitt testified at that time that there in fact was a deal linked between himself and the Commonwealth that certain indictments pending against him would be dismissed as a result of his favorable testimony. This testimony could have been used at the defendants trial to show that

-17-

Mr. Claitt did have a deal. However, due to the Commonwealths intentional failures Mr. Claitt was allowed to testify that he received no deals from the Commonwealth and that he was testifying to seek justice for the death of friend he felt defendant was responsible for. [Exhibit 4]

Mr. Claitt also provided testimony at Mr. Frazier unrelated homicide trial on behalf of the Commonwealth D.A. Ross. At the Frazier trial Mr. Claitt was cross-examined significantly about his assistance in the Mr. Tillery case. Mr. Claitt testified that Dt. Raymond Dougherty and Lt. Shelton, who were the investigators in the Tillery investigations, questioned him about defendants involvement in criminal activity. At that time Mr. Claitt provided incriminating statements regarding Mr. Tillery, and testified at Mr. Frazier trial that he was indeed expecting some favorable consideration from the Commonwealth for his assistance in the arrest and convictions of defendant. [Exhibit 5]

Further, Mr. Claitt provided trial testimony at Mr. Tillery co-defendant in the fire bombing case, Mr. Brand. At Mr. Brand preliminary hearing and trial, Mr. Claitt testified that there was no deals made, and his only reason for testifying was to seek justice for a friend. [Exhibit(s) 8 and 9]

However, at Mr. Tillery codefendant in the Hollis/Pickins case, Mr. Franklin. Mr. Claitt testified that there was deals made. And the Commonwealth D.A. Ross who prosecutored the case against Franklin, held a back room conference with Mr. Claitt sentencing Judge Kubacki in which it was stated by the D.A. that there were deals made between

-18-

the Commonwealth and Mr. Claitt. [Exhibit 20]

Then Mr. Claitt immediately contradicted himself later in the Franklin Hollis/Pickins trial when he testified that although he was hoping for a concurrent sentence on his pending fire bombing charges, he received no promises, or recommendations from the Commonwealth. [Exhibit 21]

The above reference testimonies all occurred prior to Mr. Tillery trials, and could had been utilized if the Commonwealth would have disclosed and corrected the false testimonies when they occurred.

Although, the Commonwealth of Pennsylvania was well aware of the contradictory testimony's provided by it's prime witness, the prosecutor(s) involved allowed this testimony to go before the jury uncorrected at both trials. See, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980); "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears."

Most importantly, the Commonwealth at the Mr. Tillery homicide trial viz, Barbera Christie, not only failed to correct the false testimony of Mr. Claitt when it appeared. She suborned such false testimony.

The relevant testimony occurred during direct examination at the homicide trial and is stated below: [Exhibit 11 pg. 5]:

**COMMONWEALTH: BARBERA CHRISTIE:**

QUESTION --- OKAY. THE 3 CHARGES THAT YOU'VE JUST DISCUSSED, WHAT IF ANYTHING DID YOU DO WITH REGARD TO THOSE CHARGES THAT CAUSED YOU TO BE INCARCERATED? DID YOU GO TO TRIAL OF WHAT DID YOU DO?

ANSWER BY CLAITT --- I PLEAD GUILTY, OPEN PLEA IN FRONT OF JUDGE LEON KATZ.

QUESTION --- ALL RIGHT. CAN YOU TELL THE JURY WHAT YOU MEAN BY OPEN PLEA?

ANSWER --- OPEN PLEA IS, I PLEAD GUILTY TO THE CHARGES WITH --- WITH NO RECOMMENDATION FROM THE DISTRICT ATTORNEY'S OFFICE. IT WAS AN OPEN PLEA WHEREIN THE JUDGE WOULD DECIDE MY FATE AS TO SENTENCE.

QUESTION --- ALL RIGHT. AND WHAT SENTENCE DID YOU RECEIVE FROM JUDGE KATZ ON YOUR PLEA TO THOSE CHARGES?

ANSWER --- ONE AND A HALF TO 7 YEARS FOR SALES ON NARCOTICS. AND ONE TO 5 YEARS FOR ATTEMPT ARSON AND 6 TO 12 MONTHS FOR POSSESSION OF AN INSTRUMENT OF CRIME.

[Also exhibit 11 pg 6:]

QUESTION --- NOW, AT THE TIME OF YOUR SENTENCING BEFORE JUDGE KATZ, DID ANY MEMBER OF THE DISTRICT ATTORNEY'S OFFICE RECOMMEND OR REQUEST OF JUDGE KATZ ANY PARTICULAR SENTENCING RELATIVE TO THOSE CHARGES TO WHICH YOU PLEAD GUILTY?

ANSWER --- ASSISTANT DISTRICT ATTORNEY LYNN ROSS RECOMMENDED TO JUDGE LEON KATZ THAT AT -- HE MADE THE COURT AWARE OF ANY COOPERATION WITH THE DISTRICT ATTORNEY'S OFFICE IN VIEW OF THE NUMBER OF CASES THAT I HELPED THEM PROSECUTOR AND HIS ONLY STIPULATION WAS THAT HE ASKED THE COURT TO RUN THE SENTENCE TOGETHER, MEANING CONCURRENT. [**Failed to add that there was a recommendation that he receive no more then 10 years on his sentence.**]

QUESTION --- ALL RIGHT. NOW WITH REGARD TO THE TIME WHICH YOU WOULD RECEIVE AND DID RECEIVE FROM JUDGE KATZ, DID ANY MEMBER OF THE DISTRICT ATTORNEY'S OFFICE, MISTER ROSS OR ANYONE ELSE, REQUEST OR RECOMMEND OR REPRESENT TO JUDGE KATZ, AND PARTICULAR PERIOD OF TIME OTHER THAN WHATEVER TIME YOU RECEIVED, THAT THE REQUEST, THAT THE TIME RUN TOGETHER, RUN CONCURRENT?

ANSWER --- NO. THERE WAS NO OTHER RECOMMENDATION. [**This testimony was false and known to be so by the Commonwealth and should have been corrected.**]

[Also Exhibit 11 pg 7]

QUESTION --- SO AT THE TIME OF THE PLEA BEFORE JUDGE KATZ, DID YOU HAVE OPEN CASES WHICH YOU IN YOUR TERMINOLOGY HAD TO FIGHT ALONE?

ANSWER --- YES, I DID.

QUESTION --- AND AT THE CURRANT MOMENT, AT THIS TIME, DO

-20-

YOU HAVE AN OPEN CASE PENDING?

        **ANSWER** --- YES, I DO.

        **QUESTION** --- WHAT' THE CHARGE IN THAT CASE?

        **ANSWER** --- ROBBERY.

        **QUESTION** --- OKAY. THAT IF ANY UNDERSTANDING OR AGREEMENT DO YOU HAVE WITH REGARD TO YOUR PENDING ROBBERY CASE WITH THE DISTRICT ATTORNEY'S OFFICE?

        **ANSWER** --- I HAVE NO AGREEMENT AT ALL. **[This testimony was false and known to be so by the Commonwealth and should have been corrected.]**

\*   \*   \*   \*

Although the Commonwealth was well aware of the fact that it was promised to Mr. Claitt that it would be recommended that he receive no more then 10 years on his sentence. At no time did the D.A. Christie attempt to clarify Mr. Claitt false testimony when it occurred. And in fact, gave the impression to the jurors that Mr. Claitt will be sentence with no recommendation from the D.A. Office as shown above, and that Mr. Claitt received no promises and only that he plead to a so called "open plea"[2]. Also see, [Exhibit 23]

This is coupled by the closing summation testimony provided by D.A. Minehart at Mr. Tillery subsequent fire bombing trial. The

---

[2]According to the Commonwealth and Mr. Claitt, an "open plea" is a plea of no set time recommendations, and that the court can sentence a defendant to the fullest extent of the law. This position by the Commonwealth gave the jurors in Mr. Tillery trial the impression that Mr. Claitt had no expectations of receiving a lighter sentence in exchange for his testimony. Although the Commonwealth clearly knew that it was recommended that Mr. Claitt be sentenced to no more then 10 years.

-24-

fact that it was a different D.A. prosecuting Mr. Tillery fire bombing trial then at the prior homicide, doesn't change the Commonwealth responsibility to correct false testimony.

At Mr. Tillery fire bombing trial, Mr. Claitt admitted that he was receiving a recommendation of no more then a 10 year sentence from the Commonwealth prior to his testimony given at Mr. Tillery homicide trial.

The relevant testimony was brought out on direct examination at the fire bombing trial and is stated below: [Exhibit 14 pg 69]

### COMMONWEALTH MR. MINEHART:

QUESTION --- NOW, AS TO THE AGREEMENT, AS TO HOW MUCH TIME YOU WOULD SPEND IN PRISON ON THIS CASE, WHAT WAS THE AGREEMENT WITH THE DISTRICT ATTORNEY'S OFFICE THAT YOU HAD?

ANSWER --- THAT WHEN I GOT SENTENCED, MY SENTENCE WOULDN'T EXCEED 10 YEARS, MAXIMUM. [This testimony differs significantly from his trial testimony at the prior homicide trial.]

\* \* \* \*

Evenmore troubling is the fact that Commonwealth D.A. Minehart clearly was aware of the false testimony provided by Mr. Claitt because he was the prosecutor in several of the indictments pending against Mr. Claitt in Judge Katz court room and appeared at a preliminary hearing on Novemeber 28, 1980 on behalf of the Commonwealth to discuss the pending indictments status. This hearing occurred an entire three years prior to Mr. Tillery's arrest in California. At the preliminary hearing Mr. Claitts deals were discussed and it was stated on the record by D.A. Minehart that there clearly are deals, and Mr. Claitt also stated on the record that

-22-

Case 2:20-cv-01947 Document 1 Page 536 of 968 Page 52447/2087

he received "promises" from the Commonwealth. [Exhibit 1]

Therefore, there should be no question that D.A. Minehart was aware that Mr. Claitt was testifying falsey when he said he received no "promises" or the like from the Commonwealth at defendants trials.

In fact D.A. Minehart went on to somewhat contradict his position as with regards to the deals Mr. Claitt received at defendants fire bombing trial in October 1985. At defendants fire bombing trial Mr. Minehart admitted that there were all kinds of deals with Mr. Claitt but still maintained that there was no promises, refusing to take a strong position as to one fact or the other. At no time did Mr. Minehart show even an attempt to correct Mr. Claitts false testimony. [Exhibit 12]

Additionally, Dt. Gerrard testified on behalf of the Commonwealth and admitted that there were deals made with Mr. Claitt prior to 1980. And that Mr. Claitt detainers were lifted and he was allowed to sign his own bail. Thus contradicting Mr. Minehart position as well, and what makes Dt. Gerrard testimony regarding what Mr. Claitt received is more believable given the fact that Mr. Claitt was released from jail and various indictments of his own were dismissed by the Commonwealth.

Furthermore, Mr. Claitt provided testimony at defendants co-defendant Mr. Rose fire bombing trial in 1985 as well. At Mr. Rose trial the Commonwealth D.A. Mr. Minehart again admitted that there were deals but immediately contradicted himself by stating there were no deals. [Exhibit 16; pg 82-83]

Moreover, because of the veracity of Mr. Claitt various

-23-

Case 2:20-cv-01675-DEF Document Page Filed 06/06/21 Page 05/07/2021

testimonies and of the D.A. Office contradictory positions regarding the deals made with Mr. Claitt it is difficult to know when Mr. Claitt is telling the truth or not.... or whether he received a deal or not. And know conviction should even in part, be allowed to stand on such veracity. The Commonwealth has a obligation to make it clear to the court, jury, and the defense , whether a witness is receiving something in exchange for his testimony.

It is clear that Mr. Claitt is a career criminal and a habitual liar, who's credibility is meager at best and has a history of not being charged in homicide cases despit his admitted participation in them.

Basically the states case, as in, U.S. v. Foster, 874 F.2d 491 (8th Cir. 1988); "Boiled down to a question of the credibility of the witnesses." U.S. v. Foster, 874 F.2d 491 (8th Cir. 1988).

See e.g., Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). "Held: The failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment." Napue supra, 360 U.S. Id. "First, it is established that a conviction obtained through use of false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment, quoting: Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Also in Napue the Court stated that "The jury's estimate of the truthfulness and reliability of

-24-

Case 2:20-cv-01675-JDB Document Page Filed 06/06/20 Page 49 of 387

a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Id.

Furthermore, in Napue at 269, quoting People v. Savvides, 1 N.Y. 2d 554, 557; 136 N.E. 2d 853,854-855; 154 N.Y.S. 2d 885, 887:

> "It is of no consequence that the falsehood
> bore upon the witness' credibility rather
> than directly upon defendant's guilt.  A
> lie is a lie, no matter what its subject,
> and, if it is any way relevant to the case,
> the district attorney has the responsibility
> and duty to correct what he knows to be
> false and elicit the truth.... That the
> district attorney's silence was not the
> result of guile or a desire to prejudice
> matters little, for its impact was the same,
> preventing, as it did, a trial that could
> in any real sense be termed fair."

See supra, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980).

This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumulative. See, e.g., McCleskey v. Kemp, 753 F.2d 877, 885 (11th Cir. 1985).

The disclosure of Mr. Claitt' expectations from the state in return for his testimony against defendant, however, would not have been merely repetitious, reinforcing a fact already knew; instead, "the truth would have introduced a new source of potential bias." Brown v. Wainright, 785, F.2d 1457, 1466

-25-

Case 2:20-cv-04267-DDB Document 12-1 Filed 06/08/21 Page 50 of 387

(11th Cir. 1986). See also <u>United States v. Sanfilippo,</u> 564 F.2d 176, 178 (5th Cir. 1977) ("A jury may very well give great weight to a **precise reason** to doubt credibility when the witness has been shown to be the kind of person who might perjure himself.").

One might argue that Mr. Claitt false testimony was not perjured. Under those circumstances the defendant directs the courts attention to <u>Dupart v. United States,</u> 541 F. 2d 1148, 1150 (5th Cir. 1976); Where it was held "where testimony, even though not perjurious, would surely be highly misleading to the jury...."

Finally, this case is before the court on a subsequent motion under the Post-Conviction-Relief-Act (PCRA). As such, the defendant has demonstrated that a grave miscarriage of justice has been committed against him by the Commonwealths intentional systematic failures to correct false testimony at the homicide trial and the fire bombing trial. Therefore, as supported by the evidence presented and the supporting case citations the defendant is entitled to a new and fair trial which is guaranteed to him under the Fourteenth Amendment of the United States Constitution and the Post Conviction Releif Act (PCRA) as stated in <u>POINT ONE</u>.

-26-

## POINT THREE

**THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBARA CHRISTIE KNOWINGLY WI-
THHELD EXCULPATORY IMPEACHMENT
EVIDENCE OF ONE OF ITS KEY
WITNESSES AGENT/INFORMANT ROBERT
MICKINS IN ORDER TO OBTAIN THE
MURDER/ASSAULT CONVICTIONS. AND AL-
LOWED ITS WITNESS FALSE TESTIMONY
TO GO UNCORRECTED BEFORE THE JURY.
THUS DENYING HIS FOURTEENTH
AMENDMENT RIGHTS UNDER THE
U.S. CONSTITUTION AND PA. CONST.
ART. 3, § 12; 42 PA. CSA § 9541
et.**

Mr. Robert Mickins was the only other witness besides Mr. Claitt to implicate the defendant in the Hollis/Pickins crimes.

On September 26, 1984, Mr. Mickins gave a sworn statement to investigators from the Commonwealth of Pennsylvania implicating Mr. Tillery in the homicide and assault charges mentioned in the indictment. The alleged crimes occurred on October 22, 1976, an entire 8 years prior to Mr. Mickins statement to police. And he only gave the statement after he was arrested on unrelated rape and robbery charges. See, [Exhibit 3C]

A statement that he claims he never had the opportunity to read before signing. Because of this, he provided the Commonwealth with an additional statement in April of 1985 further implicating the defendant in the crimes and this time adding that it was Mr. Tillery who ask him to be the look out instead of another individual he initially said ask him to be the look out. See, [Exhibit 2B]

Although Mr. Mickins admitted that he was the look out guy at the crime scene which allowed these shootings to occur, he never

-27-

Pa 463

## POINT THREE

THE COMMONWEALTH OF PENNSYLVANIA
D.A. BARBAR      IST           WINGLY WI-
THHELD    E   OLPAT            L.  MENT
EVIDENCE   OF   ON    OF   ITS   KEY
WITNESSES   AGENT/INFORMANT   ROBERT
MICKI     IN  ORDER  TO  OBTAIN  THE
MURE   /ASS
LOWE  ITS
TO  GO  UN      RECTED BEFORE THE    I.
THUS       YING   HIS   FOURTEENTH
AMF          RICHTS   UNDER   THE
U.S.    TITUTIC
ART.  3    12;
et.

Mr. Rob    ki  s was the only oth      ness besides Mr. Claitt
to implicate th   le'              s/Pickin

On Septer'  b, 1984,      kins gave a sworn s    ent to
      from th       ealth of Penn          plicating Mr.
Tiller                                 and ued in the
    stme   The a  ged     occu     in  to   22, 1976, an
entire 8 years  r  r to Mr. Mich  statement   lice. And he
    the         after he was          inrel ted rape and
robbery charg   See     ...

A statement that he cla       had the      to read
         use of th   le  ovided the   onwealth with
an additi            Apr    85 further  plicating the
defendant  a the crimes a  this time addi g that it was  Tillery
  o ask him to be the   out instead of another ind   he
initially said ask n    e            281

Althou   Mickin admitt  the        took out guy at
the crime s    ch allowed these shoo    occur, he never

-27-
Pa 464

was charged as an accomplice or co-conspiritor in the indictment.

The Commonwealth via, Barbera Christie never gave any explanation as to why Mr. Mickins was not charged as such.   Mr. Mickins not being charged in the Hollis/Pickins crimes are clear signs of an undisclo ed "Us  mmunity" agreement in return for his trial testimony against          cy.  This    e of exchange should have been disclosed to the jury    he Comm   ilths failure to do so is a clear due process vio   a contra   to th  Four  th        t of the United States Const  tion. Se , e.u.,                30          02 (11th C   ); olding in pertinent par  that: 'A def         as the right  que      ther a witness is testifying unde  a grant of     nity, or absent      rant, whether witness thought he had

More                  as a l   c   al pack  ound, and
          V . . .             infor   ent  Se , e.g.,
Matteo v. Superinten      SCI A

test fied i      l              the C  unw lth, and           ses he    ated people confessed crimes to him for no app               add fuel to    fire  D.A.  rbera stie has a      usin               se              assist he  in obtainin  nvi      the      alth.  The wo p t together is a  dly  o ination  See, [Exhibit 5E]

Although at det ants trial it was disclosed that    ickins would be receiving some assistance from the Commonwealth  n his pending rape/robbery indictment in exchange for his testimony.  There were certain promises that was withheld from the defense.

Such as, exhibit 1A, which is attached hereto in support of defendants motion. Exhibit 1A is evidence of further favorable treatment Mr. Mickins was receiving from the Commonwealth in exchange for his testimony against defendant. This evidence was never disclosed prior to Mr. Tiller trial and was not brought to the attention of the                            t only learned of                                                                vn independent investigation through still being brought to know Act (RTKA). See, [Exhibit 1A]

See, Brady                                                        es in pert                     pros  d                          accused with a        nce in the state's possession materially favorable to the accused defense." The prosecutor failed to do such here. See also, Com          kv                                                 :

"ev

prosecution  uld be relevant to the witness credibility and the jury should have been informed of it."

nts conviction Mr. Mickins continu    i      his estimony aga            as a bargaining tool to get favorable treatment from t              alth on his own criminal matters.

As seen, in or about November of 1985, after defendants conviction, Mr. Mickins wrote to his own sentencing [viz, Judge Eugene Clark] asking for help in getting him released from  son on a Home Furlough. And by using his history as a Commonwealth  cness in several murder trials including Mr. Tillery's, as a bargaining tool,

Case 2:20-cv-02675-DBB Document 1 Page: 55 Filed 06/06/20 Page 55 of 387

he was successful in obtaining furloughs, with a favorable
recommendation of the D.A. Miss Barbera Christie, who again, has
a history of using false witnesses. Mr. Mickins also clearly admitted
in his letter that the court only sentenced him to 2-5 years in
Northampton county prison instead of up state where prison sentences
are often served.

See e.g., Blankenship v. Estelle, 545 F.2d 510 (5th Cir. 1977);
Where it was discussed in pertinent part: "This court has recently
made clear that we will not tolerate prosecutorial participation
in technically correct, yet seriously misleading, testimony which
serves to conceal the existence of a deal with material witnesses."

If defendant would have been made privy to this evidence, it
would have given the defense more damaging evidence to show that
Mr. Mickins had great reason to want to curry favor for the
Commonwealth. And that reason was not to receive the full sentence
eligible for the rape/robbery charges. Charges that shoes Mr. Mickins
character as being a weak individual to want to prey on defenseless
woman. Such evidence goes directly to the credibility of the
Commonwealth on additional witness to the crimes and Mr. Tillery's
alleged involvement. See, United States v. Sanfilippo, 564 F.2d
176, 178 (5th Cir. 1977) ("A jury may very well give great weight
to a **precise reason** to doubt credibility when the witness has been
shown to be the kind of person who might perjure himself.").

In fact Mr. Mickins was allowed to testify that he only plead
guilty to an "open plea", and that sentencing was up to his sentencing
judge [viz, Clark] with no recommendations from the Commonwealth.

See, [Exhibit 4D]

The latter in itself was false evidence that was allowed to
go uncorrected before the jury. The commonwea            bligation
to disclosed and correct Mr. Mickins false te        the
eviden   of the favorable recommendations he received from the
Comm           e Clark court room. The deals M    ins had
was          ed at Judge Clarks         monwealth
nolle           his pending ind        it 4D
pg 24-2

Se   Napue    linois,   0 U.S. 264       3 L.
Ed. 2d   17 (195   "Held:   fail          o correct
the te timony of the wit    whic          ad
petiti           law in violation of     urteenth
             so U       c        d  91 (8th ir  1988).
Napue 300 I.S. Id.  "F     t          at a    tion
obtained through       se evide             the
    sent               fall u
Amendment  q      Coney v         294          S.Ct.
340, 342, 79    79  (1935  "          n the
             gn not   citing fa   idenc     ws it
        when   au ea  ."    on Napue e Court s      that
"The jury's est:      th   truculn                Where
    s m   ll be   an native of     r innocence,    it is
    ch   le facto  as the possible interest of the witness
in   if ing falsely   t a defendant's life or liberty may depend."
Id.

In the case sub judice, when Mr. Mickins testified that there was no agreement [Ex. 4D pg 25]; the Commonwealth clearly knew that there was an agreement and should have immediately corrected such false testimony. It's failure to do so gave the false impression to the jury that Mr. Mickins had no reason to want to curry favor for the Commonwealth by lying against defendant. Even though, Mr. Mickins had every reason in the world to want to curry favor for the Commonwealth, and that reason was to stay out of prison, whether by Home Furloughs, or "Use Immunity" on the homicide indictment. or the very lenient sentence he received for rape/robbery.

See supra, Napue at 269, quoting People v. Savvides, 1 N.Y. 2d 554, 557; 136 N.E. 2d 853,854-855; 154 N.Y.S. 2d 885, 887:

> "A lie is a lie, no matter what its subject, and, if it is any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.... That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

Again as stated in the matter of, United States v. Bigeleisen, 625 F.2d 203 (8th Cir. 1980); "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears."

This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumul-

-32-

ative.  See, e.g., <u>McCleskey v. Kemp,</u> 753 F.2d 877, 885 (11th
Cir. 1985).

    If the truth would had been discl   "it would have
introduced a new source of p ential b   row  Wainright,
785, F.2d 1457, 1466     Jni  ates
v. San  po,  'A jury may
wr  give great w  ubt
credibility when the it  a  nd of
person who might perjure  al

    One might  ue that in Mi in fai  mo was ot
riured.  Unde  ose circumstances the defendant irects the
c  ntic  <u>Du art v. Un  ates,</u> 541 F. 2  '8,
1150 (5t  timony, even
th  uld
jur

    Therefore,  lig  of the evidence a  he arguments
E  before the Co  defendant  to a new
and fail  inted by the   s fal  testimoni  E
Mr. Micki  at
under the Four  nth amendment of the United States Constitution.

Case: 20-1901675 Document: Page: 59 06/06/2021 Pages 59/387

# C O N C L U S I O N

All of the issues presented in the below motion should

also                                        n                    ruments are also

supported b        exhi

con

Major G. Tillery

Dated: 8-2-01

-34-

## VER   ATION

I                  , do hereby verify          ts set forth in the
a               on are true   d cor           e best   r my knowledge
i: cmation and  elis          ene            otions W   n The
Pr per   il                   o             r.

The undersi                                atement made therein
e subject to th                            ection 4904 relating
o unsw   falsification to a.

                                           r Till  _v   526689
                                              e

                                           ey 08625

DATE  8 1

Case 2:20-cv-01967-DBT Document Page: Filed 06/06/07 Page 61 of 387

$Exhibit\ D$

MAJOR TILLERY
No.526689/oso 563535
New Jersey State Prison
po box 861    4BR-21
Trenton N.J. 80625

Se    20,  2006

To, Ms. Ly n Abraham
Distr'        ney Office
1<
Phila.  P

om
8403-5        1,571,572

Comm V-Tillery
Term No.1984-Nos 0155-0169

Dear Ms, Abaham
       o the Freedom Of     mation A    5 U.S.C. 552, and the
priv -, ac'  : 1994 5   : c. J  3. I he eby request access to
(or copy                         he following document .

1. All files , records, memorand                              l filed
                                         ., by searching through
      oui     .- u-                      .s which contain   name.
or  . ' defendanas tua , william Frankl n.

2. all reco   at.  tha = n    / yc                            ice
department. i th the Tuc Jail House Witness use ..  ese  ase
Emmanuel Clith. And  Robert Mickens, both have b  n known t
uses other names.

3, All records and dates recored my you and the homicide
division showing how many times they where removed from the
prison to your offices and what family members where allowed
to visit them at the police station on these special visits,
Pa 473

3. Any and all documents demonstrating any payments such as special visit, lenient treatment on all the criminal charges that Robert Mickens, and Emmanual Claitt Where charged with, both said that had no deal with your office, they said they only hope your office would speak for them. This was false.

5. All records of the times your office went to the sentencing and talk to the sentencing Judge for both these jailhouse witnesses, All records of their criminal history to show how they where release on behalf of your agency and the police.

6 Since both these jailhouse i    wants testified in atlease
10 ␣            e that did    even involve m self    request
␣            ␣            ␣            1 other
        ou            ␣            r office
    sentencin            ␣            mation.

7. All Entry and Time Logs books t at the        ␣ brought to
    Fir   uell   ␣   olj   r
                        lese m    Th se men ave false
infor    on at my arr l and            q    ce

␣                    ␣            in
                    rad            (1963)

If this request is denied eithe        e or in part, Please
infr m me to your    ncy appe        If an    s
        connecti                        f all
                    my appro            t I
        t tunds at this  e            fe    d be
wa  .

If you do not grant my request w    a  working day as
prescribed by law. I will deem this request denied

        Thank you for your prompt attention in this matter.

# EXHIBIT "E"

**Commonwealth v. Tillery, 981 A.2d 937 (Pa. Super. 2009)
(unpublished memorandum)**

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MAJOR G. TILLERY, | : | |
| | : | |
| Appellant | : | No. 2937 EDA 2008 |

Appeal from the PCRA Order of September 9, 2008,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No. CP-51-CR-0305681-1984

BEFORE: GANTMAN, KELLY and COLVILLE*, JJ.

MEMORANDUM: **FILED JULY 15 , 2009**

This case is an appeal from the order dismissing Appellant's petition
under the Post Conviction Relief Act ("PCRA"). Finding Appellant's petition
untimely, we affirm the dismissal.

### *Facts*

Appellant was convicted of murder and related offenses. On appeal,
this Court affirmed his judgment of sentence. ***Commonwealth v. Tillery***,
563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum). On March 5,
1990, the Pennsylvania Supreme Court denied his petition for allowance of
appeal. ***Commonwealth v. Tillery***, 593 A.2d 841 (Pa. 1990).

---

*Retired Senior Judge assigned to the Superior Court.

In a separate case, Appellant was convicted of, *inter alia*, arson. This Court affirmed his judgment of sentence on March 15, 1989. **Commonwealth v. Tillery**, 560 A.2d 830 (Pa. Super. 1989) (unpublished memorandum). He did not file a petition for allowance of appeal.

In 2007, Appellant filed the instant PCRA petition, his second on each case.[1] In his petition, Appellant claimed the Commonwealth withheld exculpatory and/or impeachment information from him prior to trial. More specifically, Appellant contended that, in return for testifying against him, certain Commonwealth witnesses were to receive, or had already received by the time of his trial, favorable treatment from the Commonwealth. The favorable treatment included immunity from prosecution and/or reduced sentencing on the witnesses' own criminal charges. Appellant's position was that the favorable treatment constituted undisclosed exculpatory or impeachment material. Similarly, Appellant also contended the Commonwealth allowed one or more of the witnesses to testify falsely by denying or understating the extent of the favorable treatment.

---

[1] The petition addresses both of Appellant's cases. While Appellant should have filed separate petitions, one at each case number, the PCRA court accepted his petition as filed and dismissed the petition through a single order now on appeal before us. Given the PCRA court's acceptance of the petition as filed and the fairly evident untimeliness of Appellant's PCRA requests, we see no reason to remand this matter to have the two cases treated separately.

In his petition, Appellant cited to numerous documents such as transcripts from various proceedings and letters from the Commonwealth (e.g., a letter to the judge who was to sentence one of the aforesaid witnesses). The documents supposedly demonstrated the favorable treatment, the Commonwealth's failure to disclose it and the witnesses' false testimony about the favorable treatment.

Proceeding under Pa.R.Crim.P. 907, the PCRA court issued a notice of intent to dismiss the petition as being untimely. Subsequently, the court dismissed the petition on that basis. Appellant then filed this appeal.

## *Legal Principles*

In order to be timely, a PCRA petition, including a second or subsequent one, must normally be filed within one year of when a defendant's judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the end of direct review, including discretionary review in the Pennsylvania or U.S. Supreme Court, or at the expiration of time for seeking such review. *Id.* at (b)(3).

The time period for seeking review in the Pennsylvania Supreme Court is thirty days from the entry of our order sought to be reviewed. Pa.R.A.P. 1113(a). Ninety days is the period for petitioning the U.S. Supreme Court for a writ of *certiorari* after the Pennsylvania Supreme Court enters an order disposing of a case. SUP.CT.R. 13.

Despite the normal one-year deadline, the PCRA provides three statutory exceptions to the time bar. **See** 42 Pa.C.S.A. § 9545(b)(1) (setting forth exceptions based on governmental interference, newly discovered facts and/or a newly announced retroactive constitutional right). The exception for newly discovered facts requires the petitioner to plead and prove that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Id.* at (b)(1)(ii). Where a petitioner invokes one or more of the aforesaid exceptions, the PCRA petition must be filed within sixty days of when the claim could have been brought. *Id.* at (b)(2). Ultimately, if a PCRA petition is untimely, the PCRA court lacks jurisdiction to entertain it. *Commonwealth v. Hawkins*, 953 A.2d 1248, 1252 (Pa. 2006).

When considering a PCRA court's denial of relief, our standard of review is limited to determining whether the court's ruling is supported by the record and is free of legal error. *Commonwealth v. Treadwell*, 911 A.2d 987, 989 (Pa. Super. 2006). An appellant has the burden to persuade us that the PCRA court erred and that relief is due. *Commonwealth v. Wrecks*, 931 A.2d 717, 722 (Pa. Super. 2007).

## *Analysis*

Appellant's judgment of sentence on his murder case became final in June 1990 when the time for seeking a writ of *certiorari* in the U.S. Supreme

Pa 479

Court expired. On his arson case, his judgment of sentence became final in April 1989, thirty days after the entry of our affirmance. The instant PCRA petition was not filed until 2007 and was, therefore, facially late.

To overcome this untimeliness, Appellant attempts, as he did in the PCRA court, to invoke the exception for newly discovered facts. In particular, he claims that, within sixty days before he filed his petition, he discovered the transcripts and Commonwealth letters on which he relies to substantiate his claims. However, those documents all appear to be from the 1980s. Even to the extent Appellant might not have known about the facts contained therein until recently, he fails to show us why he could not have discovered those facts by due diligence at some earlier date. As such, he fails to convince us he is entitled to a time-bar exception under 42 Pa.C.S.A. § 9545(b)(1)(ii).

Accordingly, Appellant has not persuaded us of any legal or factual error in the PCRA court's dismissal of his petition on the grounds that the petition was late and that the court therefore lacked jurisdiction. Consequently, we will not disturb the court's ruling and we affirm the dismissal.

Order affirmed.

J. S40031/09

---

Judgment Entered.

Karen Gamblett

Prothonotary

JUL 1 5

Date: _____

# EXHIBIIT "F"

**Petitioner's 2016 PCRA Petition, June 16, 2016**

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

**Received**

JUN **1 5** 2016

Office of Judicial Records
Appeals/Post Trial

## COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, : | |
| : | Docket Number |
| Respondent, : | CP-51-CR-0305681-1984 |
| : | |
| v. : | |
| : | |
| MAJOR G. TILLERY, : | |
| : | |
| Petitioner : | |

## PETITION FOR POST- CONVICTION RELIEF
## And PRELIMINARY MEMORANDUM OF LAW

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully petitions this Court

for relief pursuant to the Post-Conviction Collateral Relief Act (PCRA), 42 Pa.

C.S. & 9541 *et. seq.*, and in support thereof avers the following:

### I. INTRODUCTION

1.  This is a case of factual innocence and gross prosecutorial

misconduct violating Petitioner Major Tillery's right to due process and a fair trail.

The actions of the Commonwealth resulted in a fundamental miscarriage of justice that shocks the conscience and warrants reversal of his conviction and dismissal of charges against Petitioner Major Tillery.

2.      Newly discovered evidence proves the Commonwealth knowingly and intentionally manufactured and presented false evidence to convict Petitioner. Jailhouse informants were coerced and promised favors to lie and testify that Petitioner Major Tillery was involved in the shooting homicide of Joseph Hollis and assault of John Pickens. This falsified testimony was the *only evidence* presented against Petitioner. Petitioner has spent over thirty years in prison for crimes he did not commit.

3.      Petitioner Major Tillery was convicted of homicide, assault, weapons and conspiracy charges in May 1985 for poolroom shootings that left Joseph Hollis dead and John Pickens wounded on October 22, 1976, purportedly over disputes between drug dealers. Career informant Emanuel Claitt also identified Petitioner as an official in the Nation of Islam and that the Nation of Islam ran the Black Mafia.

4.      Petitioner is serving a sentence of life imprisonment without the possibility of parole. William Franklin, the operator of the poolroom, charged as a co-conspirator in the shootings, was tried and convicted in December 1980.

5.      Pickens, the survivor of the shootings, gave a statement to police detectives that identified the shooters as individuals other than Petitioner and Franklin. Pickens did not testify at either trial.

6. There was no evidence against Petitioner linking him to these 1976 shootings except for the testimony of two jailhouse informants: that of Emanuel Claitt obtained in spring of1980 and the other from Robert Mickens obtained in the fall of 1984.

7. Claitt and Mickens were incarcerated with open felony charges and faced decades of state prison time. During their trial testimony both Claitt and Mickens repeatedly swore that they had received no promises, agreements or deals in exchange for their testimony. The trial prosecutor Barbara Christie insisted to the Court and to the Jury that these witnesses were not given any plea agreements or sentencing promises. This was false.

8. The newly discovered evidence in this Petition are the sworn declarations of these witnesses, Emanuel Claitt [Exhibit A, B] and Robert Mickens [Exhibit C] that their testimony was entirely false, and that this false testimony was manufactured by the prosecution with the assistance of police detectives and secured by threats, coercion and favors including dismissal of felony charges, minimal or no state time on pleas and access to sexual encounter while in the police custody.

9. Petitioner is factually innocent of the homicide of Joseph Hollis and the assault on John Pickens, but he was prevented from providing that defense at trial because the Commonwealth concealed its actions presenting false evidence and withheld material exculpatory evidence in violation of *Brady v. Maryland* and *Napue v. Illinois*, and the due process principles for which they stand.

## II. ELIGIBILITY FOR RELIEF

10. This PCRA petition presents claims of actual innocence and the denial of due process and a fair trial by the Commonwealth's intentional manufacture and presentment of false evidence against the Petitioner, and suppression of the information that it has done so. This petition also presents other claims pursuant to *Brady v. Maryland* and its progeny for the suppression of exculpatory impeachment evidence.

11. Petitioner states that he is entitled to relief pursuant to the following provisions of the PCRA:

a. Petitioner's conviction resulted from "a violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States, which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. §9543(a)(2)(i).

b. Petitioner's conviction resulted from "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial" if it had been introduced." 42 Pa. C.S. §9543(a)(2)(vi).

12. Specifically, the claims set forth herein are based upon violations of Petitioner's right to due process of law guaranteed to him by the Fourteenth Amendment to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution.

13. The constitutional errors and newly discovered exculpatory evidence described herein have been neither previously litigated nor waived. See 42 Pa.

C.S. § 9543(a).

14.    Petitioner has been convicted of crimes under the laws of this

Commonwealth and is actively serving a sentence of life imprisonment without

the possibility of parole as a result of his convictions. Therefore, Petitioner is

entitled to relief pursuant to the provisions of the PCRA.

## III. THIS PCRA PETITION IS TIMELY

15.    A PCRA petition, including any subsequent petition must be filed

within one year of the date the judgment becomes final. 42 Pa.C.S. §9545(b)(1).

16.    Petitioner is fully aware that his instant petition, his third PCRA

petition, is outside that time limitation. However, this petition is timely pursuant to

the exceptions to the time constraints imposed. 42 Pa. C.S. §9545(b)(1)(i), (ii), as

relevant here provide:

> (i) The failure to raise the claim previously was the result of
> interference by government officials with the presentation of the claim
> in violation of the Constitution or laws of this Commonwealth or the
> Constitution or laws of the United States;
>
> (ii)The facts upon which the claim is predicated were unknown to the
> petitioner and could not have been ascertained by the exercise of due
> diligence;
>
> ***
>
> (2) Any petition invoking an exception provided in paragraph (1) shall be
> filed within 60 days of the date the claim could have been presented.

17.    Petitioner presents several claims in this petition that are based upon

newly discovered facts that the Commonwealth manufactured false evidence

against the Petitioner and knowingly and intentionally presented this false evidence to the Jury and the Court. The prosecution suppressed the fact of its fabrication of the evidence against Petitioner as well as suppressed exculpatory impeachment evidence of plea deals and agreements. The Commonwealth committed a fraud on the Court and the Jury and undermined the fundamentals of due process.

18.     This case falls squarely under the considerations of *Mooney v Holohan*, 294 U.S. 103 (1935). Due process is violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."

19.     This case is also governed by the holdings and considerations in *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 154 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995) and their legal progeny.

20.     The newly discovered evidence is contained in the sworn declarations from the two prosecution fact witnesses, Emanuel Claitt and Robert Mickens, who provided the entirety of trial evidence against Petitioner.

21.     Claitt and Mickens now establish that their testimony was manufactured by the prosecution and police who coerced and threatened them with false charges and provided favors including plea agreements, dismissal of charges as well as allowing sexual favors while incarcerated to these witnesses as

inducement and in exchange for their false testimony. These witnesses were coached to testify falsely.

22.    Claitt and Mickens understood that the Commonwealth would penalize them if that did not lie on the witness stand and that they would be rewarded if they did.

23.    Commonwealth representatives told the Court and the Jury that these witnesses had no reason to falsify their testimony and asserted there were no plea agreements, knowing this was false. The witnesses' false statements that there were no plea agreements were not corrected.

24.    On April 18, 2016 Robert Mickens provided a sworn declaration in which he stated for the first time that his testimony at trial was fabricated and coerced by then Assistant District Attorney Barbara Christie, Detectives John Cimino and James McNeshy.  Mickens swore that he was promised a very favorable plea agreement and treatment in his pending criminal cases. He was promised protection in prison against prisoners who viewed him as a "snitch." Mickens was granted sexual favors in exchange for his false testimony.

25.    On May 4, 2016 Emanuel Claitt provided a sworn declaration, supplemented by another sworn declaration on June 3, 2016 stating that his testimony against Petitioner was fabricated and coerced and coached by ADAs Leonard Ross, Barbara Christie, along with ADA Roger King with the assistance of Detectives Larry Gerrard, Ernest Gilbert, Lubiejewski and Lt. Bill Shelton. As part of the coercion to convince Claitt into falsely testifying he was threatened

with false murder charges as well as given promises and agreements of favorable plea deals and sentencing. He was also given sexual favors.

26. The Verified Declarations of Robert Mickens and Emanuel Claitt contain newly discovered facts that each testified falsely based on evidence fabricated by the prosecution and police.

27. The facts upon which Petitioner bases his claims raised here became known to Petitioner within the last 60 days. This Petition is filed within 60 days of the date these claims could have been presented, meeting the jurisdictional time period set forth under 42 Pa. C.S. §9545(b)(2).

**A. Government Interference 42 Pa. C.S. §9545(b)(1)(i)**

28. Here the new evidence is the fact that it was the government itself that knowingly and intentionally fabricated and presented false evidence against Petitioner. The Commonwealth concealed and suppressed the facts of its actions.

29. As set forth below *infra*, the prosecution denied that its witnesses were not truthful and made affirmative statements to the Court upholding the veracity of its witnesses and attacking the efforts of Petitioner to uncover the fundamental falsity of these witnesses' testimony: That neither witness was present at the time of the crime, and in the case of Claitt, also not present at the meetings two days before the shooting.

30. The prosecution additionally falsely stated on the record that the Commonwealth had no agreement, no deals with these witnesses regarding their respective pending cases.

31.    Underlying the entirety of the Commonwealth's prosecution was interference with the right of the Petitioner to due process by falsifying evidence and concealing that falsification. That misconduct interfered and prevented Petitioner from earlier discovering this new evidence. See, *Banks v. Dretke,* 540 U.S. 668, 696 (2004).

## B. After Discovered Facts and Due Diligence:

32.    It is averred that the facts revealed in these declarations were previously unknown to Petitioner and could not have been previously discovered through the exercise of due diligence.

33.    It was not within the power or capacity of Petitioner to obtain the truth that Robert Mickens' and Emanuel Claitt's false testimony was actually manufactured by the Commonwealth. The Commonwealth concealed that fact.

34.    Petitioner maintained his innocence from the time he learned he was being accused of shooting Joseph Hollis and John Pickens. Because Petitioner was not involved in that shooting, he knew that what Emanuel Claitt and Robert Mickens testified to was false.

35.    Nonetheless Petitioner did not and could not obtain, no matter how much he tried, evidence of the fact the Commonwealth fabricated the evidence and coerced Claitt and Mickens into falsely testifying.

36.    Similarly there was no way for the Petitioner to obtain the factual evidence that Commonwealth representatives allowed and assisted these witnesses to have sex with girlfriends in the Round House interview rooms, and in Claitt's

case to be provided with hotel rooms prior to the willingness of these witnesses to come forward.

37.     Petitioner had no control over, nor could he by his exercise of due diligence obtain this new evidence until such time as these witnesses were willing and ready to come forward to clear their consciences and overcome fear of retaliation by the prosecution and police. It rested with Robert Mickens and Emanuel Claitt to decide to come forward. Their respective declarations state that they are only now willing to provide this information.

38.     Due diligence does not require the Petitioner to act on the *assumption* that Commonwealth withholds *Brady* material, that Commonwealth witnesses are committing perjury and the Commonwealth improperly permits them to do so. See *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (2010), *Commonwealth v. Davis*, 86 A.3d 883 (P.A. Super. 2014).

39.     Moreover, throughout the over thirty years Petitioner has been imprisoned for crimes he did not commit, he has repeatedly challenged his conviction under extremely difficult circumstances. For twenty of those thirty-plus years, Petitioner was in solitary and disciplinary custody with severe restrictions on phone communication, personal visits and access to legal materials.

40.     Petitioner was transferred almost two dozen times to prisons in the Federal system, New Jersey as well as within the PA Department of Corrections. His own legal records were taken from him and delayed in being returned to him

during each of these transfers. In 2011 his legal files, including transcripts and prior legal pleadings were destroyed by water damage at SCI Pittsburgh.

41.     Petitioner has had several serious medical emergencies, liver and bowel problems that incapacitated him for periods of time. In addition Petitioner was and is hampered by lack of funds and adequate legal assistance. This made it extremely difficult to conduct the investigation needed to pursue the new evidence presented here.

42.     These explanations are provided to this Court to explain the objective circumstances that impeded Petitioner's attempts to uncover and present to the Court the Commonwealth's falsification of evidence against him, the suppressed evidence of his innocence and other materially favorable evidence pursuant to *Brady* et. al.

43.     There is authority for the proposition that second or subsequent petitions will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred. See *Commonwealth v. Szuchon*, 633 A.2d 1098, 1099 (1993) (citing *Commonwealth v. Lawson*, 549 A.2d 107 (1988).

44.     This standard is met if the petitioner can demonstrate either: (1) that the proceedings resulting in the petitioner's conviction were so unfair that a miscarriage of justice occurred which no civilized society can tolerate; or (2) that the petitioner is innocent of the crimes charged.

45.     This Petition surely meets these tests. Petitioner is factually

innocent. The gross intentional prosecutorial misconduct in fabricating witness

testimony, coercing and inducing witnesses to present false testimony and

suppressing materially favorable evidence is clearly a miscarriage of justice that

shocks the conscience.

46.     To the extent the Commonwealth contests Petitioner's diligence in

the discovery of any of the facts related to these claims, Petitioner requests an

evidentiary hearing at which he will prove that he has acted with the requisite

diligence. (See below p.53, the Court Must Provide an Evidentiary Hearing.)

47.     Moreover, in light of the *Brady* violations enumerated in this

Petition, Petitioner is entitled to review of previously raised *Brady* claims. That is

because the *Brady* claims require an evaluation of the cumulative impact of the

*Brady* violations. See e.g. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (materiality

of Brady violation "turns on the cumulative effect of all such evidence suppressed

by the government"). In short, the new evidence of due process violations must be

assessed with the old evidence on the same points.


## IV. RELEVANT CASE HISTORY

48.     Petitioner *pro se* Major Tillery AM9786 is serving a sentence of life

without parole in the Commonwealth of Pennsylvania. He is incarcerated at SCI

Frackville, 1111 Altamont Blvd., Frackville, PA 17931.

49.     On May 29, 1985, following a jury trial in the Philadelphia Court of Common Pleas, Petitioner Tillery was convicted of first-degree murder, aggravated assault, criminal conspiracy and weapons offenses arising out of the October 22, 1976 shooting death of Joseph Hollis and the wounding of John Pickens. Post-trial motions were denied by the Hon. John E. Geisz and Petitioner was sentenced to life imprisonment without possibility of parole on December 9, 1986. At trial Petitioner was represented by attorney Joseph Santaguida. At post-trial motions and the filing of appeals before the Superior Court and PA Supreme Court, Petitioner was represented by attorney James S. Bruno.

50.     The Pennsylvania Superior Court affirmed Tillery's conviction on May 30, 1989, *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989), and the Pennsylvania Supreme Court denied allocatur (Petition for Allowance on Appeal) on March 5, 1990, *Commonwealth v. Tillery*, 593 A.2d 841 (Pa. 1990).

51.     On September 20, 1996, Tillery filed a petition under Pennsylvania's Post-Conviction Relief Act (PCRA) asserting ineffective assistance of trial counsel because of a conflict of interest after he discovered that his trial counsel, Joseph Santaguida, Esq., had also represented Tillery's alleged victim, John Pickens, with respect to the Commonwealth's charges against William Franklin, Tillery's alleged co-perpetrator in the 1976 shooting. Franklin was tried in November-December 1980. The Court of Common Pleas dismissed Tillery's petition as procedurally defaulted and without an evidentiary hearing on January 13, 1998, and the Superior Court affirmed the dismissal on April 21, 1999.

*Commonwealth v. Tillery*, 738 A.2d 1058 (Pa. Super. 1999). Petitioner was represented by attorney Richard P. Hunter.

52.     Tillery then filed a petition for a writ of *habeas corpus* with the United States District Court for the Eastern District of Pennsylvania on December 22, 1999, in which he again contended that his trial counsel operated under an actual conflict of interest. On October 30, 2000, the District Court dismissed Tillery's petition.

53.     The Third Circuit Court of Appeals by Order dated August 23, 2003, directed the district court to hold an evidentiary hearing, after which the District Court by Order dated July 29, 2003, reaffirmed the dismissal of Tillery's petition. On July 29, 2005 in *Tillery v Horn* 432 Fed Appx 66 (2005) the Third Circuit affirmed the District Court's judgment of dismissal. Petitioner was represented by attorney Michael Consusione.

54.     On August 13, 2007 Petitioner filed a Second PCRA petition *pro se*. The central claim of that PCRA petition was the prosecution's suppression of exculpatory impeachment evidence, specifically a favorable plea deal. The Commonwealth filed a Motion to Dismiss via a letter brief on May 8, 2008. The PCRA court received a letter brief in opposition to the Motion to Dismiss on June 13, 2008. The letter was submitted by Brian J. McMonagel, Esq. on Petitioner's behalf, but an Amended PCRA was never filed. No evidentiary hearing was held.

55.     The Petition was dismissed by the Hon. John J. Poserina, Jr. on September 9, 2008 as untimely filed. A *pro se* Notice of Appeal was filed on

October 1, 2008. A formal Opinion was filed by the Hon. J. Poserina on December 11, 2009 affirming the denial of the petition as untimely filed. On July 15, 2009 the Superior Court affirmed the dismissal of Petitioner's Second PCRA. On December 9, 2009, the Pennsylvania Supreme Court denied a Petition for Allowance of Appeal.

56. During the entire period of the preparation and pendency of his *pro se* Second PCRA petition, Petitioner was incarcerated at New Jersey State Prison in the Special Management Unit.

57. Petitioner's right to due process of law is guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Pennsylvania Constitution.

58. The constitutional errors and newly discovered exculpatory evidence described herein have been neither previously litigated nor waived. See 42 Pa. C.S. § 9543(a).

59. Petitioner has been convicted of crimes under the laws of this Commonwealth and is actively serving a sentence of life imprisonment without the possibility of parole as a result of his convictions. Therefore, Petitioner is entitled to relief pursuant to the provisions of the PCRA.

## IV. STATEMENT OF FACTS RELEVANT TO PETIONER'S CLAIMS

### A. Overview and Evidence Relevant to Guilt

60.    The facts of the case as presented in the Superior Court decision

denying Petitioner's appeal from his December 9, 1986 judgment of sentence of

the Philadelphia County Court of Common Pleas, *Commonwealth v. Tillery*, 563

A.2d 195 (Pa. Super. 1989), begin with the following:

"The facts of this case have a rather long and tortuous past. At approximately 10:00 p.m. on October 22, 1976, Philadelphia police received a call to the address at Huntingdon and Warnock Streets in North Philadelphia. At that corner they broke down the locked door of a poolroom operated by William Franklin and discovered the dead body of John [Joseph] Hollis. A medical examination later revealed that Hollis died of a gunshot wound to the trunk of his body. Inside the poolroom, the police found live and spent .38 caliber ammunition and a set of car keys. Around the corner from the poolroom at 2527 North 11th Street, police officers found John Pickens bleeding from a gunshot wound. He was treated at a hospital and survived his injuries. Both Pickens and Hollis were shot by different guns.

"For more than three years, the shooting of Pickens and Hollis remained unsolved. However, in the spring of 1980, police detectives investigating the homicide of Samuel Goodwin, visited a Philadelphia prison to determine if Emanuel Claitt, and inmate who had known Goodwin, could provide any information about Goodwin's death. The information Claittt provided went far beyond the Goodwin case. Claitt described in detail the operation of what he labeled the "black mafia" a crime syndicate run by black Muslims in Philadelphia. His information described a vivid picture of the events culminating with the shootings of Pickens and Hollis.

"Claitt testified that from 1976 until 1980, he engaged in drug dealing and extortion as a member of the Philadelphia "black mafia". The organization divided the city into sections for business purposes. Alfred Clark was he leader of the North Philadelphia branch. He held the rank of first lieutenant and had "the last word' for all business in the city. Sylvester White directed the West Philadelphia branch. Johns Pickens also dealt drugs in West Philadelphia. During the 1970s's, appellant had the rank of first lieutenant and had 'had control of the entire city as far as methamphetamines is

concerned ....' Claitt received his heroin supply from Clark and his methamphetamine supply form appellant. Clark and appellant were partners in the heroin and methamphetamine trade. Claitt characterized appellant as Clark's 'right hand man.'"

.....

"Based on Claitt's information, the police obtained an arrest warrant on May 23, 1980, for appellant's arrest. William Franklin was charged as well for the same offenses and went to trial in November 1980, was convicted and sentenced to life imprisonment.

"However, for three years the police were not able to serve the warrant because appellant could not be located. A detective in California finally arrested appellant in November, 1983. Appellant was returned to Philadelphia on December 8, 1983, to stand trial."

61.    No physical evidence from the scene was presented as evidence against Petitioner. Fingerprints were not taken. NT 10:83.[1] Car keys found in the poolroom were identified as belonging to Fred Rainey, but he was not charged for anything having to do with the shootings. NT 13:12. A large plastic bag containing a controlled substance was found on the pool table. NT 13:8. Coats, a hat and glasses were found in the poolroom, but not linked to anyone. NT 13:33. Alfred Clark was detained after a car stop shortly after the shooting, but he was not charged. NT 13:43-44. Eighteen hundred dollars was confiscated but was later released to Clark. NT 13:31.

---

[1] Petitioner is indicating transcript pages by using NT followed by a number that is the date in May 1985 of that testimony followed by the page number.

62.     Shortly after the shooting, while in the hospital, surviving victim John Pickens made a statement to a homicide detective[2] NT 13:56, but no charges were brought against Petitioner, or anyone else. NT 13:57. Pickens never testified, not at William Franklin's trial in Nov-December 1980 nor at Petitioner's trial in May 1985. The prosecution didn't try to subpoena Pickens as a witness.

63.     The Commonwealth's evidence against Petitioner that he was inside the poolroom and one of the shooters of Hollis and Pickens came solely from career jail informant Emanuel Claitt in May 1980.[3]

64.     According to Claitt, Petitioner threatened Hollis after Hollis pistol-whipped Clark during a dispute about drug selling in West Philadelphia on October 20, 1976. NT 14:30. Petitioner was involved in making arrangements for a meeting at the poolroom between Hollis and Clark with others. NT 14:32, 39.

65.     Claitt said that it was arranged that everyone would meet at the mosque and go from there to the poolroom, but before the service was over Petitioner and Franklin got up and left. NT 14:42.

66.     After the service, Claitt drove over to the poolroom with Clark and others, and was asked by Clark to guard the door inside the poolroom. NT 14.49. Claitt didn't see Petitioner and William Franklin at the poolroom until they came from behind a barrier and shot at Hollis and Pickens. NT 14:59.

_____

[2] Pickens gave a verbal and written statement to homicide detective McGrath that "Dave" and "Rickie" committed the shooting. (Exhibit D)

[3] Between January 1980 and Petitioner's 1985 trial Claitt provided information to and/or testified for the prosecution against Robert Lark, William Franklin, James Brand, George Rose, Fred Rainey, Major Tillery and Larry Frazier

67.     Claitt said after Pickens was shot "he ran through this door which had a glass centerpiece in it."[4] NT 14:73.

68.     Claitt was not charged in anyway in connection with the shootings.

69.     The other prosecution fact witness was Robert Mickens, also a jail house informant. Mickens did not testify at Franklin's trial in 1980 and became a prosecution witness against Petitioner in a statement given to detectives on September 26, 1984, eight years after the shootings.

70.     Mickens testified that while walking down the street in front of the poolroom shortly before 10 pm on the night of the shooting, he was asked by Petitioner to be an outside "lookout" to watch for patrolling police cars. NT 21:36.

71.     Mickens said Petitioner was on the poolroom steps with Franklin and Alfred Clark. NT 21:35,60.

72.     Mickens did not witness and did not know what happened inside the poolroom, but heard shots.

73.     Mickens also testified that he was asked to and agreed to be an alibi witness for Petitioner back in 1976, a few days after the shootings. NT 21:15.

74.     Mickens was a surprise witness for the prosecution, kept secret from Petitioner until he was called to the witness stand. The Commonwealth had

---

[4] The issue of whether Pickens went through a glass door, and even whether a glass door was in the poolroom in 1976 and/or an exist door from the poolroom, was an issue of extensive questioning to numerous witnesses at Petitioner's trial. None of the police officers at the scene in 1976 saw a glass door, or took photographs of any such door. Nor was the there any medical evidence that John Pickens was injured going through a glass door. It was only when ADA Barbara Christie prepared for Petitioner's trial in 1985 were photos taken of a hallway that reportedly once had a glass pane.

obtained a protective order prior pursuant to Rule 305 F[5]. The Commonwealth disclosed over Mickens' September 24, 1984 statement (C-41) just minutes before he testified. [Exhibit E]

## B. Witnesses' Arrests and Plea Agreements with the Commonwealth

75.    Both Claitt and Mickens were prosecution witnesses with a criminal history, pending cases and were incarcerated during Petitioner Tillery's trial. The testimony of Claitt and Mickens was repeatedly challenged on the grounds they had received possible favorable plea deals in exchange for their testimony against Petitioner.

### *Claitt Testimony That He Had "No Plea Deals"*

76.    In April 1980 homicide detectives questioned Emanuel Claitt who was incarcerated on a probation violation and had 8 or 9 open cases. NT 14:8.

77.    Claitt was questioned about the homicide of Samuel Goodwin NT 15:8 and provided information on that homicide, as well as others, including the homicides of Alfred Clark (April 1979) and Joseph Hollis (October 1976) and firebombings committed by him and others. NT 14:8.

78.    Claitt's open charges included auto theft, possession with intent to distribute drugs, weapons charges and conspiracy.

---

[5] Petitioner objected to the *in camera* proceeding that led to the protective order that concealed the fact that Robert Mickens was going to be a prosecution witness on the grounds that there was no basis for a finding that Mickens needed protection from Petitioner. The court overruled the objection and preserved the record of the exparte petition. NT 21:2-13.

79.    On May 20, 1980, Claitt gave a 6-page statement on the 1976

shootings of Hollis and Pickens, "Investigation-Interview Record," taken by Det

Lawrence Gerrard (Com. Exh-31).[6] NT 15:8. This inculpated Petitioner and

William Franklin.

80.    Following Claitt's statement an arrest warrant was issued for

Petitioner.

81.    Per Claitt, at the time of that statement he had "no agreement"

regarding plea deals on his pending 8 or 9 cases. NT 14:78. The only

"understanding" Claitt had with the Commonwealth was that after his testimony at

preliminary hearings he would get help to be released on bail and he would have

to fight his cases on his own "with no helping [sic] from the District Attorney's

office." NT 14:83.

82.    On June 4, 1980, Claitt testified at Franklin's preliminary hearing

and at the separate preliminary hearing against George Rose.[7]

83.    On June 10, 1980, Claitt was released from jail after the

Commonwealth went to Judge Kubacki to lift Claitt's detainer on violation of

probation on firearms charges. NT 14:81.

84.    On July 9, 1980—a month later—while out on bail, Claitt was

arrested on new charges for car theft. When back in prison, the Commonwealth

---

[6] Petitioner has not been able to obtain a copy of C-31 from the Clerk's office.
ADA Barbara Christie read a portion of the statement back to Claitt in her re-
direct examination. See NT 16:71-76.

[7] Rose was charged with the murder of Alfred Clark but acquitted after a jury trial.
NT 14:81.

also placed firebombings charges against him as well as Petitioner, George Rose and James Brand. NT 14:82.

85.    Claitt made bail for firebombing charge, and was out on the streets when he testified against Franklin at trial Nov-early Dec 1980. NT 14:79, 82.

86.    On November 29, 1980, during the Franklin trial, Claitt pled guilty to 3 of the pending charges, the firebombing and the 2 drug charges before the Hon. Judge Leon Katz. NT 14:83.

87.    Claitt testified this was an "open plea…I pled guilty to the charges with no recommendation from the District Attorney's office…the Judge would decide my fate as to sentence." The only request to Judge Katz would be a recommendation that the sentences run concurrent. NT 14:5, 6.

88.    On January 5, 1981 the ADA Leonard Ross sent a letter to Judge Katz. NT 14:19. (Exhibit F) Claitt testified this letter was to inform Judge Katz that he had "cooperated with the District Attorney."

89.    Claitt also said that the "agreement" he had with the District Attorney was that in view of this cooperation they [the District Attorney] would nolle pross three of his cases, but "would not recommend a sentence, they would leave it up to the judge." NT 14:86.

90. On Sept 18 1981 Claitt was sentenced by Judge Katz. On the three charges he pled guilty to he received concurrent sentences of one and a half to seven years, one and a half to five years and a matter of months.[8] NT 14:83.

91. Claitt was acquitted of two cases and the District Attorney nolle prossed three cases. NT 14:20.

92. This sentence gave Claitt a total of one and half to seven years in prison and 5 and a half years under the supervision of the parole board. NT 14:80.

93. On November 22, 1982 Claitt was released on parole. NT 15:24.

94. Claitt served a year and a half in prison. NT 15:22.

95. On April 21, 1983 Claitt was arrested on new charges of robbery and aggravated assault. 14:94 This robbery charge put Claitt in violation of state parole and put him back in custody. NT 14:94.

96. On February 29, 1984 Claitt was released on the parole violation and able to sign his own bond on the robbery case immediately after testifying against Petitioner at his preliminary hearing.[9] NT 14:95.

97. Claitt was re-incarcerated for violation of parole for reporting to his parole officer with a knife in his sock. NT 14:99.

---

[8] Unmentioned by Claitt or ADA Barbara Christie are 13 charges from May 16, 1980 including robbery, assault, firearms before Judge Levy Anderson, which were nolle prossed April 13, 1982. See CP-51-CR-1107131-1980 [Exhibit G]
[9] Undisclosed by ADA Barbara Christie were the letters by Arnold Gordon, Chief, Homicide Unit to the Secretary of PA Parole Board, January 31, 1984 and District Attorney Edward Rendell's letter to Judge John J. Chiovero, February 18, 1984. [Exhibits H, I, J]

98.    On May 14 and 15, 1985 Claitt testified against Petitioner, while

incarcerated in violation of parole and with pending robbery and aggravated

assault charges. NT 14:25, 93.

99.    At the time of his trial testimony against Petitioner, Claitt had spent

8 ½ months in Philadelphia Detention Center, Isolation Unit, Protective custody.

NT 14:3.

100.    Claitt testified there was no sentencing agreement on the pending

open robbery case, which was scheduled for trial June 24, 1985 before the Hon.

Judge John J. Chiovero. NT 14:6, 94.

101.    When questioned by ADA Christie if there was an understanding or

agreement with the Commonwealth concerning the disposition of those open

charges. Claitt said:

>  "As to Agreement, the District Attorney merely mentioned that they did all
> they were going to do for me at that point but they would make Judge
> Chivoero aware of my prior cooperation and that I would be testifying in
> other trials in the near future." NT 14:94.

102.    ADA Barbara Christie told the Hon. John A. Geisz as part of her

objections to Petitioner's attorney continued questions to Claitt about possible plea

agreements:

>  "The witness has testified to his understanding of the Agreement. And now
> the witness has indicated that there is no agreement with regard to
> sentencing on the open robbery. There is no agreement. He goes to trial on
> that. He has a parole date of September 85 and that he is currently in
> custody for violating his parole. And his understanding of any agreement he
> has with the commonwealth is that the Commonwealth will make the
> parole board aware of his cooperation in this and the other cases. NT 14:98.

103.    On May 28, 1985 ADA Christie gave her Summation to the Jury

saying there was "no set deal" and that the Com would only enter into an "open

plea" agreement with Claitt. NT 28:60. She further stated:

> "Claitt talked to the police in May 1980, *with no deal but with a great desire*, great desire for protection for himself and his family, particularly after he went public in court and testified in June 1980 at a preliminary hearing and December 1980 at the Franklin trial.

> "Yes, Claitt was in and out of custody. He pled guilty to 3 crimes. He stood trial on 2 and he awaits trial on a third."[10] NT 28:90.

### Mickens Testimony That He Had "No Plea Deal"

104.    In February 1984 Robert Mickens was arrested on rape, assault and

robbery charges and remained incarcerated through the May 1985 trial of

Petitioner. NT 21:23, 54.

105.    In September 1984 Mickens was taken to police headquarters at 8th

and Race for questioning about the homicide of Ronald Johnson and volunteered

information to the homicide detective about other homicide cases. NT 12:29.

106.    On September 26, 1984 Mickens gave police a statement regarding

what he knew of the homicide by shooting of Joseph Hollis, recorded in a 6-page

Investigation-Interview Record (Com Exh 41). NT 21:106-7. [Exhibit E]

107.    Mickens placed Petitioner outside the poolhall on the night of the

shootings, asking Mickens to be a police look-out. NT 21:107.

---

[10] This 1983 robbery case from 1983, pending during Tillery trial was nolle processed by the Commonwealth December 16, 1987. {See Exhibit G]

108. Mickens testified in in preliminary hearings two separate murder cases against George Brown and Kenneth Purnell, on December 8, 1984 and January 3, 1985. NT 21:27.

109. Mickens was identified in the prison as a snitch and placed in areas of protective custody in a Philadelphia prison and then transferred to a prison outside the Philadelphia area. NT 21:101,105

110. On May 16, 1985 Mickens pled guilty to criminal conspiracy and rape before the Hon. Eugene Clarke Jr. and was scheduled to be sentenced on July 18, 1985. NT 21:24.

111. Mickens testified it was an "open plea" with no plea bargaining, 21:24 that his sentencet would be up to the judge. NT 21:25.

112. Mickens was advised that he could get 10-20 years on the rape case, 5 to 10 on the conspiracy and that the sentences could run concurrent or consecutive. NT 21:26.

113. His only "understanding" with the District Attorney's office was that it would let Judge Clark know about his cooperation and that the other charges would be nolle prossed. NT 21:26.

114. In her summation, ADA Christie told the jury that Mickens "awaits sentence on a guilty plea to a rape charge and conspiracy. That could net him 15 to 30 years at the decision and discretion of the sentencing judge." NT 28:91.

115. When sentenced before the Hon. Eugene Clark, Jr. on October 10, 1985, Mickens received probation.

**IV. Newly Discovered Evidence and Exculpatory Evidence the Commonwealth Has Concealed For the Past Thirty-one Years That Proves Major Tillery is Innocent and that the Commonwealth Knowingly Presented False Evidence of his Guilt**

116.    Petitioner has within the last sixty days discovered new evidence

from the two Commonwealth fact witnesses, Emanuel Claitt and Robert Mickens.

These newly discovered facts are contained in sworn declarations of Emanuel

Claitt and Robert Mickens.  [Exhibits A, B and C]

117.    Claitt and Mickens each swear that their testimony inculpating

Petitioner was a lie, manufactured by the Commonwealth, resulting from coercion

and promises of plea deals and sexual favors.

118.    The significance of this new evidence is that it proves that the

entirety of the prosecution's case against Petitioner was based on false testimony,

manufactured and presented by the Commonwealth.

119.    This new evidence proves Major Tillery's innocence. Without the

testimony of Emanuel Claitt the District Attorney could not have prosecuted

Petitioner. Had the facts of the coercion and promises made to these witnesses to

compel them to falsely testify been known to the jury, Petitioner would have been

acquitted at trial.

120.    This newly discovered evidence was unavailable to Petitioner

despite his exercise of due diligence. Claitt and Mickens were previously

unwilling to come forward with the truth and provide this evidence to Petitioner

because they feared retaliation by the police and prosecution.

Below, Petitioner presents the contents of these verified declarations.

**Newly Discovered Evidence From Emanuel Claitt, May 4 and June 3, 2016**

121.  Without the testimony of Emanuel Claitt there is no case, no

evidence of Major Tillery's involvement in the shootings of Joseph Hollis and

John Pickens.

122.  Prior to Claitt's statement to police detectives May 20, 1980 there

were no suspects in the October 22, 1976 shootings of Hollis and Pickens. It was

only after Claitt's statement that an arrest warrant was issued for Petitioner.

### 123.  *Verified Declaration of Emanuel Claitt, May 4, 2016*

I submit this declaration stating that I lied when I testified at the trial
of Major Tillery in May 1985 for the murder of Joseph Hollis and
attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and
John Pickens shot and injured.

I wasn't anywhere near Joseph Hollis and John Pickens when they
were shot.

I lied when I testified that Major Tillery and William Franklin were
in the pool hall and shot Hollis and Pickens.

I was in prison in 1980 on serious charges and I was approached by
Philadelphia detectives Larry Gerrard and Ernest Gilbert. They
threatened to charge me with the murder of Samuel Goodwin. I had
eight or nine open cases, at least three of them were felonies with a
lot of years of prison time.

I was threatened about the murder of Samuel Goodwin. The
detectives really wanted information to get Major Tillery for murder.

Detectives and prosecutors ADA Lynn Ross and Barbara Christie
promised if I said that Major Tillery and William Franklin were the
shooters in the 1976 murder of Joseph Hollis and the attempted
murder of John Pickens I wouldn't get state time in my many
pending criminal charges and I wouldn't be charged in the murder of
Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Lynn Ross, Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted

to arrest him and Franklin. So Franklin was tried in December 1980 and I falsely testified against William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This argument supposedly took place in the home of Dana Goodman. I testified that Major Tillery was there and after an argument and pistol slapping of Clark by Hollis, Major Tillery said that "Hollis would have to die for what he did."

This was not true. I was not at any such meeting and I didn't have any personal knowledge of this supposed argument and threat made by Major Tillery.

I also testified at Major Tillery's trial that after the argument in Goodman's house a group that included me as well as Clark and Major Tillery met at a mosque in North Philadelphia and drove a few blocks to a poolroom owned by William Franklin to demand Sylvester White, the head of the West Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this actually happened.

I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from

entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard gunshots in the pool hall, saw Pickens and Hollins shot and that Major Tillery and Franklin were in the pool hall and that they were the shooters.

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on t he front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Gerrard and Gilbert and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie, Len Ross, Roger King interviewed me, and worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

## 124. *Verified Supplemental Declaration of Emanuel Claitt, June 3, 2016*

I submit this supplemental declaration about my false, manufactured testimony against Major Tillery and William Franklin in the November 1980 and May 1985 trials for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the shootings at the poolroom on October 22, 1976, that I wasn't there then or at the argument at Dana Goodman's house or meetings before the October 22, 1976 shootings.

For example: In our meetings I said you know I wasn't there – you have to fill in the blanks. Detectives Gerard, Gilbert, Lubiejewski, Lt. Shelton and ADA Ross would tell me, "you've got to say it this way." I was told "we've got to bring him down—you've got to help us." That meant I should lie." Barbara Christie told me: "You're the best. You should have been a lawyer." That meant I knew how to lie.

The prosecutor against William Franklin in 1980 was Leonard Ross. I met with him as well as ADAs who worked with Barbara Christie soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert and Lubiejewski. I met with ADA Roger King also who had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact I got one and a half-years.

When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true.

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was "open" and that there were no agreements about leniency and sentencing.

She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to.

But my testimony that there was no plea deal was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing -firebombings in 1979 and 1980 that I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at

these trials and that my false testimony was manufactured by the ADAs and police until now.

32
Pa 514

It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

125. These declarations of Emanuel Claitt establish that the testimony he gave at trial was false. As most succinctly stated from Claitt's declarations, "I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured...I lied." (May 4, 2016)

126. Emanuel Claitt provides new evidence that the Commonwealth knowingly presented false inculpatory testimonial evidence against Petitioner. "The police detectives and prosecutors knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials." (June 3, 2016)

127. Claitt describes meetings with police and prosecutors in which they worked over what he would say, "filling in the blanks." Police and prosecutors knew that Claitt didn't have any personal knowledge of the poolroom shootings and what led up to that.

128. Claitt tried to recant after Franklin's trial but was threatened by a police lieutenant with being framed on a murder.

129. Claitt describes being set up to meet with Robert Mickens in a police van making a phony trip back and forth from the Roundhouse to the State prison

in order talk to Mickens and pressure him to also testify against Petitioner, because he had "no choice."

130. Claitt states that ADA Christie worked him over and coached him to remedy a "problem" in his testimony that John Pickens fled the poolroom after being shot, running through a glass door.

131. It was made up for Claitt to testify that Petitioner pulled a gun on him and threatened to shoot him in 1983.

132. Claitt further states he was forced to testify that the Nation of Islam ran the "black mafia" controlling drug dealing in Philadelphia and to testify to everyone's Muslim names.

133. Claitt states that his false testimony was based in part on the threats from police detectives that he would be charged with murders he did not commit if he refused to become a witness against Petitioner.

134. Emanuel Claitt provides new evidence that the Commonwealth made numerous plea deals with Claitt to induce his false testimony, and then coached Claitt to deny those plea deals were made.

135. Claitt testified at trial with the knowledge that he would be able to get out on bail, signing his own bonds and have parole and probation detainers lifted. This is supported by the letters from the District Attorney's office to judges and the PA Parole Board.

136.    Claitt was given repeated "get out of jail" passes despite his numerous parole violations and the commission of new felonies each time he was released.

137.    Although Claitt testified that there were "no deals" and "open pleas," he was secure and confident that the District Attorney's office would protect him, nolle prosse numerous felony charges and arrange for him to get minimal sentences.

138.    That these plea deals existed is corroborated by the facts that for the 8 or 9 pending felonies in 1980, for which he faced 25-50 years on the three cases he pled guilty to, Claitt spent just a year and a half in prison.

139.    There is also the matter of the undisclosed 13 charges from May 16, 1980 including robbery, assault and firearms that were pending against Emanuel Claitt when he testified at Franklin's trial. These were nolle prossed by the prosecution before Judge Levy Anderson on April 13, 1982. See CP-51-CR-1107131-1980.[Exhibit G]

140.    ADA Barbara Christie did not disclose this history to Petitioner Tillery at his trial, nor did Emanuel Claitt testify about this..

141.    Additionally the "open" robbery charges from 1983 that Claitt was questioned about at Petitioner's trial were nolle prossed after Petitioner's post-trial motions were denied. This was the very same charges that ADA Christie assured the Court and the Jury were "open" and that the prosecution had made no plea deals with Claitt.

142. Claitt also reveals in his declarations that while incarcerated police arranged visits between Claitt and different girl friends in homicide interview rooms in police headquarters and at hotels for him to have sex.

143. Claitt's understanding and agreement with the Commonwealth was the plea deals and sexual favors were given in exchange for his false testimony to get a murder conviction against Petitioner. These agreements and arrangements were made possible only by the conscious action of the Commonwealth.

144. Emanuel Claitt provides new evidence that the Commonwealth failed to correct the false testimony he gave on Petitioner's guilt and that there were no plea deals, but suppressed plea arrangements and favors asked of Judges and the Parole Board but suborned Claitt's false testimony.

**Newly Discovered Evidence Provided by Robert Mickens**

145. Robert Mickens was a surprise witness at Petitioner's trial. His testimony was intended to corroborate Emanuel Claitt that Petitioner was in the poolroom when shots were fired. Mickens was not a witness to the shootings.

146. *Verified Declaration of Robert Mickens, April 18, 2016:*

> In May 1985 I falsely testified as a witness for the Philadelphia County District Attorney in the prosecution of Major George Tillery (CP-51-CR-0305681-1984) on murder charges.
>
> The testimony I gave at that trial was false, manufactured by the prosecutor, Assistant District Attorney Barbara Christie.
>
> I was coerced and promised favors if I falsely testified against Major Tillery.
>
> I was arrested on February 28, 1984 on charges of robbery and rape and faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I "worked with [her] on the Major Tillery case" she "guaranteed" I wouldn't be sent upstate on my robbery and rape case and would be "protected."

ADA Christie and her homicide detectives, John Cimino and James McNeshy, repeatedly brought me in for questioning on a number of robbery and murder cases, asking me to become a prosecution witness against Major Tillery.

On one occasion ADA Christie showed me what looked like a paper signed by Major Tillery saying that I was going to be an alibi witness for him. I told her I was.

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men.

When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known "snitch." I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but never taken from the van.

Claitt told me I was "pretty hemmed up" and that Major Tillery was a "slime," that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the

false grounds that I needed a protective order to protect me from Major Tillery.

That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the shooting of John Hollis and John Pickens. That was totally false. My entire testimony was scripted and rehearsed by ADA Barbara Christie.

I agreed to give this false testimony because I was I promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my own guilt for falsely testifying against Major Tillery and my fear of retaliation by the prosecution and police.

Much in my life has changed. I want to make amends for falsely testifying against Major Tillery. I am willing and ready to be a witness in any proceeding brought to challenge his conviction.

147.    Robert Mickens swears in his declaration that his trial testimony was

"totally false …scripted and rehearsed by ADA Barbara Christie." He explains the

police and prosecution coerced him to testify falsely against Petitioner, to say he

was asked by Major Tillery to be a look-out for police outside the poolroom, that

Petitioner was him to be an alibi witness for him and he feared for his life and that

of his family if he wasn't.

148.     Mickens now exposes that his testimony was lies. He was not a look-out outside the poolroom, no one asked him to be lookout and that Petitioner hadn't asked him to be an alibi witness and Petitioner hadn't threatened him.

149.     It was the Commonwealth that threatened to bring false murder charges against Mickens, while promising him no prison time on rape and robbery charges if he testified against Petitioner. They set Mickens up with Emanual Claitt, their career informant, to convince him he had no choice but to lie against Petitioner.

150.     The police and prosecution arranged and allowed him to have sexual tryst with his girlfriend in police headquarters while he was in custody to induce his false testimony.

151.     Mickens feared retaliation if he came forward earlier and told the truth about his lying testimony.

152.     The new evidence provided by Mickens in his declaration supports the fact that the Commonwealth manufactured the testimonial evidence against Petitioner, knowingly presented this falsified evidence, suppressed materially favorable evidence and failed to correct Mickens false testimony.

### V. CLAIMS FOR RELIEF

153.     The above quoted declarations provide previously unavailable and newly discovered evidence showing that Petitioner is an innocent man. They show that Petitioner is the victim of gross prosecutorial misconduct in the

Commonwealth's manufacture and presentation of known false testimony inculpating Petitioner.

154. The Commonwealth also suppressed exculpatory information, i.e., information that either challenged the credibility of Commonwealth witnesses or the Commonwealth's trial presentation, and that demonstrate that Petitioner was not involved at all in the shootings of Joseph Hollis and John Pickens. Petitioner now places these verified declarations in their proper legal framework showing that Petitioner is entitled to relief on the following grounds.

## CLAIM I.

### Newly Discovered Evidence Demonstrates
### Petitioner's Innocence

155. Petitioner has always asserted his innocence. There is no physical or forensic evidence of the perpetrators from the crime scene in October 1976. There is no physical evidence presented linking Petitioner in any way to this crime. No guns found linked to the bullets. No fingerprints event taken. The keys found in the poolroom were not Petitioner's, the $1800 was not Petitioner's, the drugs were not Petitioner's, the items of clothing found in the poolroom were not Petitioner's. His car was not on the scene.

156. The surviving victim John Pickens gave police a statement shortly after he was shot that names other men, not Petitioner or William Franklin, as the shooters. Pickens did not testify at either Franklin's 1980 trial or Petitioner's in

1985. [Exhibit D]

157.    Without the testimony of Emanuel Claitt, there was *no evidence* against Major Tillery. It was only the testimony of Emanuel Claitt who put Petitioner inside the pool hall, pulling out a gun and shooting Joseph Hollis. It was Claitt who put Petitioner at a meeting where Petitioner supposedly made threats against Hollis's life and helped arrange the poolroom meeting where Hollis was killed and Pickens wounded. There was no other evidence against Petitioner. That testimony was a lie.

158.    Robert Mickens was brought in for Petitioner's trial, to provide some corroboration to Claitt's testimony by testifying that Petitioner asked him to be a lookout for police outside the poolroom. This is the only evidence, other than Claitt's testimony, that puts Petitioner at the poolroom that night. As Mickens declares, his testimony was a lie. No one, not Petitioner, Clark or Franklin asked him to be look-out that night. He did not see Major Tillery near the poolroom.

159.    In further support of this claim, Petitioner incorporates supporting paragraphs of this petition regarding facts and law.

160.    The newly discovered facts support Petitioner's claim that he is factually innocent. These new facts require the vacation of Petitioner's conviction.

161.    The legal standard governing a post-conviction claim of newly discovered evidence is well-known. A petitioner must: establish that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3)

it is not being used solely to impeach credibility; and (4) it would likely compel a

different verdict. *Commonwealth v. Washington*, 927 A.2d 586, 595-96 (Pa. 2007).

Petitioner new evidence of innocence meets each of these prongs.

## CLAIM II.

### The Commonwealth Manufactured and/or Presented False Inculpatory Evidence and Suppressed Material, Exculpatory Evidence in Violation of Petitioner's Sixth and Fourteenth Amendment Right to the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution

162.    Petitioner's right to due process, right to a fair trial, and right to

present a defense were violated as the Commonwealth manufactured and/or

intentionally presented false testimony and evidence of Petitioner's guilt and

withheld from Petitioner and his counsel material, exculpatory evidence, including

impeachment evidence, in violation of Petitioner's Fifth and Fourteenth

Amendment rights to the United states Constitution and Article I, §9 of the

Pennsylvania Constitution.

163.    The newly discovered evidence in this case exposes a fundamental

miscarriage of justice, violating the right to due process by the Commonwealth

against Petitioner Major Tillery by suborning the truth, and committing fraud on

the Court and jury with the intentional presentation of false evidence

manufactured by the Commonwealth against Petitioner Major Tillery. The false

evidence so manufactured and presented at Petitioner's trial constituted the sole

evidence of his culpability – that he shot and killed Joseph Hollis and wounded John Pickens-- as well as materially favorable impeachment evidence, the existence of plea deals that induced and coerced these witnesses to lie.

164.    It is long established that a conviction obtained through use of false evidence, known to be false by government representatives, must fall under the Fourteenth Amendment. *Mooney v Holohan*, 294 U.S. 103 (1935) held in a historic decision that due process is violated "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." See also, *Pyle v. Kansas*, 317 U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3rd Cir. 1958).

165.    This case is also governed by the holdings and considerations in *Napue v. Illinois*, *supra*, *Brady v. Maryland*, *supra*, *Giglio v. United States*, *supra*, *Kyles v Whitely*, *supra*, and their legal progeny.

166.    In *Napue v Illinois*, 360 U.S. 264, 269 (1959) the United States Supreme Court confirmed the principle that "a State may not knowingly use false evidence, including false testimony to obtain a tainted conviction."

167.    The Pennsylvania courts have ruled strongly and similarly following *Napue*. The Commonwealth's intentional presentation of false evidence is a miscarriage of justice that no civilized society can tolerate.

168.    "It is of course, an established principle that a conviction obtained through the knowing use of materially false testimony may not stand; a

prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2nd 806, 810 (1977) ((citing *Giglio v. United States*, 405 U.S. 150 (1972), quoted in *Commonwealth v Hollowell*, 477 Pa. 232, 236-37, 383 A.2nd 909, 911 and *Commonwealth v Romansky*, 702 A.2nd 1064, 1066 ( Pa. Super. 1997).

169.   *Napue* created a three-part test to determine whether a conviction of this kind of case violates due process: that the testimony was false, the prosecutor knew it was false, and the false testimony was material.

170.   With the requirement that false testimony be "material," the Supreme Court meant that there must be "a reasonable likelihood that the false testimony could have affected the judgment." *Napue*. "Where the prosecution obtains a conviction through the use of false or perjured testimony, a strict standard of materiality must applied." *Commonwealth v Romansky*, 702 A.2d 1064, 1068 (Pa.Super. 1997), appeal denied, 555 Pa. 699, 723 A.2d 670 (1998). "[T]he false testimony is considered material if it could in any reasonable likelihood have affected the verdict." Id. When making the materiality determination, "the state of mind of the prosecutor is not material, but rather, the important issue is whether the accused received a fair trial." Id.

171.   In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Id*. at 373 U.S. 87. "Impeachment evidence

… as well as exculpatory evidence, falls within the Brady rule.) *United States v. Bageley*, 473 U.S. 667, 676 (1985). The prosecution has an affirmative "duty to disclose such evidence … even though there has been no request (for the evidence) by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976). That responsibility "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id.* at 280-281 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). ). It is well established that the state violates a defendant's right to due process under *Brady* when it is withheld. *Smith v. Cain*, --- U.S. ----, 132 S. Ct. 627, 630

172.   To establish a *Brady* violation, Petitioner must prove three elements: "[1] the evidence (at issue) was favorable to the accused, either because it is exculpatory or because if it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1130 (Pa. 2011). The evidence withheld by the Commonwealth, as detailed above, ensured "[t]hat no reliable adjudication of Petitioner's guilt or innocence could have taken place." *Commonwealth v. Strong*, 761 A.2d 1167, 1175 (Pa. 2000) (reversing conviction for Commonwealth's failure to comply with *Brady* obligations).

173.   Additionally, the Commonwealth failed to correct testimony given by Emanuel Claitt it knew to be false, in violation of *Napue v. Illinois,* 360 U.S 264, 269 (1959) (Holding that the State commits a Fourteenth Amendment

violation when "although not soliciting false evidence, [it] allows it to go uncorrected when it appears.").

174.    Knowledge of information in the possession of any law enforcement actor that has a connection to a particular prosecution is chargeable to the prosecutor. *Kyles v. Whtley*, 514 U.S. 419, 437, 482 (1995) ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case, including the police"; "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf"). Thus, knowledge by any of the police officers working on this case is chargeable to the prosecutor, as is knowledge by any one of the prosecutors.

175.    Under *Brady* and its progeny, a "showing of materiality [prejudice] does not require demonstration by even a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a 'reasonable probability' of a different result." *Id.*; *Commonwealth v. Strong*, 761 A.2d 1167, 1171 (Pa. 2000) ("As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted." *citing United States v. Bagley*, 473 U.S. 667 (1985)). A reasonable probability of a different result existed "when the prosecution's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles, Id.*; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir.

1999) (The "undermines confidence" standard is not a stringent one. It is less demanding than the preponderance standard.").

176.    In assessing materiality, the Court considers how effective counsel could have used the suppressed information at trial and through pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); *Id.* at 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by the defense, may have made a difference); *Id.* at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial would have taken had the defense not been misled"); *Wilson v. Beard*, 589 F.3d 651, 659, 664 (3d Cir. 2009) (same).

177.    In assessing materiality, the Court considers how effective counsel could have proceeded in the absence of the due process violations both at trial and in pre-trial investigation and development of other evidence. *Kyles*, 514 U.S. at 441; *United States v. Bagley* 473 U.S. 667, 676; *Wilson v. Beard*, 589 F.3d 651, 664 (3d Cir. 2009); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *Breakiron v. Horn*, 642 F.3d 126 (3rd Cir. 2011).

178. In this case, the "absence of due process violations" would have meant no prosecution of the Petitioner, because in the absence of due process violations, there was no "evidence" against the Petitioner.

## 1. The Commonwealth Manufactured and/or Presented the False Testimony of Emanuel Claitt that Petitioner was Involved in the Homicide of Joseph Hollis and Assault on John Pickens

179. Emanuel Claitt's declarations establish that his testimonial evidence was false and that the Commonwealth knew it was false. The presentation of false evidence by a prosecutor constitutes the most fundamental violation of due process.

180. This is not a case of falsification or prosecutorial suppression of a *particular* aspect of the prosecution's case. This false evidence was the *entirety* of the evidence against Petitioner. This false evidence is unquestionably material to the conviction of Petitioner.

181. Petitioner was convicted solely on the basis of witness testimony. It was Emanuel Claitt alone who provided testimonial evidence that Petitioner Tillery was in the poolroom and shot the victims.

182. Petitioner incorporates the factual allegation and legal argumentation included in the paragraphs above in support of this claim.

183. Claitt's declaration also provides proof of the Commonwealth's intentional manufacture and presentation of false testimony against Petitioner. It also provides evidence of the prosecution's efforts to suborn perjury by Robert Mickens, by disclosing the phony transport of Claitt and Mickens from the Round

House to the jail on State Road for Claitt to pressure Mickens into testifying against Petitioner.

184.   Since the prosecution's case did not exist without that Claitt's testimony there is no question that this new evidence is material.

## 2.   The Commonwealth Manufactured and/or Presented False Testimony of Robert Mickens that Tillery was at the Poolroom When Hollis and Pickens were Shot

185.   Robert Mickens provided testimonial evidence that Petitioner Tillery had asked him to be a police lookout outside the poolroom and that Tillery went into the poolroom shortly before he heard shots. Mickens also provided testimony that Petitioner was attemped to establish a false alibi.

186.   Mickens' trial testimony provided corroboration to Claitt's testimony that Petitioner was in the poolroom when Hollis and Pickens were shot.

187.   Mickens trial testimony served to prop up Claitt's testimony, which was weakened or compromised by his extensive and continued arrest record and the accusations that his testimony was induced by plea deals.

188.   Mickens' declaration establishes that trial testimony was false and that the Commonwealth knew it was false because it was the Commonwealth that manufactured it. Mickens' declaration disclosed the Commonwealth's conscious efforts to coerce him into falsely testifying against Petitioner.

189.   The new evidence provided by Mickens that his trial testimony was a lie, coerced and induced by the prosecution eliminates that his trial testimony corroborating Claitt.

190.    Mickens declaration also corroborates the Commonwealth's intent to convict Petitioner, whatever the cost to truth. It confirms the Commonwealth's manufacture of false evidence by threats of false prosecution and providing plea deals, protection, and sexual favors. The new evidence provide by Mickens is material.

**3.    The Commonwealth Presented False Testimony that Emanuel Claitt and Robert Mickens Had No Plea Agreements with the Commonwealth and that False Testimony was Not Corrected by the Commonwealth**

191.    Petitioner repeats and incorporates paragraphs above for relevant facts and legal argument.

192.    The new evidence provided by Claitt and Mickens proves that the Commonwealth had made plea deals in exchange for their testimony inculpating Petitioner. The new evidence proves that both Claitt and Mickens lied in testifying that they had serious pending criminal charges with "open" sentences. This fact was known to the Commonwealth, and not corrected. In fact this falsification was supported by the prosecution in its statements to the Court and to the Jury.

193.    The existence of plea deals in exchange for testimony is material to the veracity of these witnesses, witnesses who provided the only evidence linking Petitioner to these crimes. It is material evidence, the falsification of which and failure to correct requires reversal of the conviction.

**4.    The Commonwealth Suppressed Evidence of the Commonwealth's Threat to Falsely Charge Claitt with Crimes If he Didn't Provide False Testimony Against Tillery**

194.    Petitioner repeats and incorporates paragraphs above for relevant

facts and legal argument.

195.    It is a violation of due process to coerce a witness into falsely

testifying by threatening to charge him with a crime he did not commit.

196.    It is material evidence that Emanuel Claitt's testimony, which was

the sole evidence directly inculpating Petitioner was induced by the

Commonwealth's threat to falsely charge him with a murder he didn't commit if

he didn't testify falsely inculpating Petitioner.

**5.    The Commonwealth Suppressed Evidence of that the Commonwealth Provided Sexual Favors to Claitt and Mickens to Induce False Testimony**

197.    Petitioner repeats and incorporates paragraphs above for relevant

facts and legal argument.

198.    Both Claitt and Mickens reveal in their sworn declarations that a

component of the favors ande inducements, provided to them by the

Commonwealth to be false witnesses against Petitioner, was allowing and

arranging for them to have sexual relations with girlfriends. This was arranged

while each of them was in state custody, and took place either in a homicide

interview room or in Claitt's case, sometimes in a hotel.

199.    Testimony induced by providing sexual trysts is not unknown by the

Philadelphia police. In *Com. v. Arthur Lester*, 572 A2nd 694 (Pa. Super. 1990) the

court found it coercive and a violation of due process and reversed a conviction based on Lester's confession that was induced by he promise of sexual favors. The named homicide detectives involved in 1983 were Lawrence Gerrard and Ernest Gilbert, the same detectives who were central to the handling of both Emanuel Claitt and Robert Mickens.

200.    Claitt's and Mickens' revelations that their false testimonies were induced by the Commonwealth providing them with sexual favors constitutes separate and independent grounds for reversal of the Petitioner's conviction.

## 6.    Petitioner's Claims are Supported by the New Evidence and Mandate Reversal of Petitioner's Conviction, if Not Dismissal of the Charges on the Grounds that his Conviction Constituted a Fundamental Miscarriage of Justice That Shocks the Conscience

201.    In conclusion, Petitioner returns to historic and fundamental principles that are supposed to apply in a criminal trial. In *Mooney v Holohan*, supra, the U.S. Supreme Court found due process is violated by the government's "deliberate deception of court and jury by the presentation of testimony known to be perjured."

202.    In *Berger v. United States*, 295 U. S. 78, 88 (1935) the U.S. Supreme Court mandated disclosure of evidence to a defendant, stating:

"Such disclosure will serve to justify trust in the prosecutor as the representative . . .of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."

203.    In *Kyles v Whitley*, supra., at 339-40, the U.S. Supreme Court reaffirmed the import of *Brady*, and the prosecution's constitutional obligation to

disclose favorable evidence to a defendant:

> "And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. See Rose v. Clark, 478 U. S. 570, 577–578 (1986); Estes v. Texas, 381 U. S. 532, 540 (1965); United States v. Leon, 468 U. S. 897, 900–901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting Alderman v. United States, 394 U. S. 165, 175 (1969)).

204. Moreover, the government has special obligations when it comes to their cooperating informants. *See, Commonwealth v. Strong, 761 A.2d 1167, 1175 (2000),* observing that a tentative commitment from a prosecutor might be more likely to encourage false testimony from a cooperating witness than a firm promise, since the witness will have a greater incentive to curry favor with the prosecutor if a specific agreement has not yet been reached.

205. Courts have established that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truthseeking mission of our criminal justice system." *Commonwealth of the Northern Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001).

206. This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability. The second is that the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial. See *Bowie*, 236 F.3d at 1089 (citing *Berger v. United States, supra,* at 88.)

207.    In the instant case, the Commonwealth abandoned all concern and its constitutional obligations to the defendant to due process and a fair trial. The quest for a conviction at all costs, regardless of the veracity of "evidence," has resulted in a gross miscarriage of justice such that it shocks the conscience. The appropriate remedy is to dismiss the indictments and release Petitioner, and failing that to grant him a new trial.

## VI. PREVIOUS LITIGATION OF ISSUES RAISED

208.    The issues raised herein have not been previously litigated.

## VII. COURT MUST PROVIDE AN EVIDENTIARY HEARING

209.    This Court must afford Petitioner an evidentiary hearing. It has long been the standard that post-conviction hearings are appropriate when a petitioner pleads facts entitling him to relief. *Townsend v. Sain*, 372 U.S. 293 (1963). Where, as here, the post-conviction pleadings "raise material issues of fact" and evidentiary hearing is required. Pa. R. Crim. P. 908(A) (2); *Commonwealth v. Williams*, 732 A.2d 1167, 1189-90 (Pa. 1999) ("Clearly, a material factual controversy exists …; therefore, we hold that the PCRA court erred in dismissing [the] ground for relief without conducting a factual hearing.") (citing former Pa. R. Crim. P. 1509(b)).

210. A hearing cannot be denied unless this Court "is certain of total lack of merit" of the petition. *Commonwealth v. Bennett*, 462 A.2D 772, 773 (Pa. Super. 1983) (quoting *Commonwealth v. Rhodes*, 416 A.2d 1031, 1035-36 (Pa. Super. 1979)); accord *Commonwealth v. Korb*, 617 .2d 715, 716 (Pa. Super. 1992) (remanding for evidentiary hearing where "[i]t appears that appellant has presented a claim of ineffective assistance of counsel which contains at least arguable merit") (citing *Commonwealth v. Copeland*, 554 A.2d 54, 60-61 (Pa. 1988)). Even in "borderline cases Petitioners are to be given every conceivable legitimate benefit in the disposition of their claims for an evidentiary hearing." *Commonwealth v. Pulling*, 470 A.2d 170, 173 (Pa. Super. 1983) (remanding for evidentiary hearing) (quoting *Commonwealth v. Strader*, 396 A.2d 697, 702 (Pa. Super. 1978) and *Commonwealth v. Nahodil*, 239 A.2d 840 (Pa. Super. 1968)).

211. A post-conviction hearing is particularly appropriate where the merits of a petitioner's claims revolve around the credibility of witnesses for whom the petitioner has provided an affidavit. A court may not judge the credibility of a recantation witness, or similar witness, based solely on an affidavit. *Commonwealth v. D'Amato*, 856 A.2d 806, 825-826 (pa. 2004) ("This Court has also emphasized, however, that even as to recantations that might otherwise appear dubious, the PCRA court must, in the first instance, assess the credibility and significance of the in light of the evidence as a whole."); see also, *Commonwealth v. Johnson,* 966 A.2d 523, 539 (Pa. 2009) ("one of the primary

reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone. The PCRA court here obviously appreciated this fact in part, since it made a controlling credibility determinations respecting Cook's recantation testimony.") and id. at 541-42 (in *D'Amato,* the PCRA court failed to mention, let alone pass upon, the credibility of the recantation testimony in its opinion. This Court held that the PCRA court had defaulted on its duty to assess the credibility of the recantation and its significance in light of the trial record, and we remanded the matter to the PCRA court for the limited purpose of making such determination.").

212. At a minimum, Petitioner must be afforded an opportunity to prove the timeliness of his Petition. He has pled with specificity that he has met the exceptions to the PCRA time bar. Therefore, this Court must give him an opportunity to prove these facts. Indeed, the petitioner in *Commonwealth v. Bennett,* 930 A.2d 1264, 1272, 1274 (Pa. 2007) also invoked the time bar exceptions pled by Petitioner and the Pennsylvania Supreme Court noted the requirements for an evidentiary hearing. *See also Commonwealth v. Lasky,* 934 A.2d 120, 123 (Pa. Super. 2007) (remanding to lower court "for the conduct of an evidentiary hearing by the lower court in order to determine (1) when certain procedural facts became known to Appellant, (2) whether the exercise of due diligence on Appellant's part would have revealed these facts to Appellant sooner,

and ultimately (3) whether Appellant now has made a viable claim that one of the exceptions articulated at 42 Pa.C.S.A. § 9545, i.e. (b)(1)(ii), to the one year time limit for filing a PCRA petition").

213. Based on the above, Petitioner is entitled to, and therefore requests that an evidentiary hearing be held.

## VIII. PETITIONER IS ENTITLED TO DISCOVERY

214. Discovery in post-conviction proceedings is governed by Pa.R.Crim.P. 902 (E) (1), which permits discovery upon leave of Court and upon a showing of exceptional circumstances. Petitioner proffers that he shows such exceptional circumstances.

215. The circumstances of this case are indeed exceptional. Petitioner requests immediate discovery of all reports of police and prosecution interviews, meetings and any communication relating to witnesses Emanuel Claitt and Robert Mickens.

216. Petitioner requests leave to file a more detailed and specific discovery request.

## IX. CONCLUSION AND REQUEST FOR RELIEF

For all of the above reasons and the attached affidavits and exhibits,

Petitioner requests the following relief:

A. That Petitioner be granted permission for leave to proceed in forma pauperis.

B. That the Commonwealth be required to respond to this petition.

C. That the Court permit Petitioner to file such amendments, supplements or briefs as required in the interest of justice.

D. That the Court permits oral arguments on any and all dispositive issues.

E. That the Court permit discovery as requested above.

F. That following discovery, the Court conduct evidentiary hearings on all material disputed issues of fact.

G. That the Court vacates Petitioner's conviction and sentence and award him a new trial.

H. In the interest of justice given the gross violations of due process in this case, that the Court vacates Petitioner's conviction and sentence and dismiss the charges.

## CONCLUSION

For all the above reasons and for those set forth in this *pro se* PCRA

Petition  and based on the entire record of this case, Petitioner MAJOR G.

TILLERY seeks vacation of his conviction and the attendant relief requested.

Dated:  June *15*, 2016

MAJOR G. TILLERY
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17932

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. sec. 4904, relating to unsworn falsification to authorities.

Date: June /5, 2016

MAJOR G. TILLERY

# EXHIBIT "G"

**Petitioner's 2016 Supplemental PCRA Petition,
September 7, 2016**

MAJOR G. TILLERY
AM 9786
Petitioner *PRO SE*
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

**Received**

SEP 07 '016

Office of the Prothonotary
Appeals/Post Trial

## COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : |
| | : Docket Number |
| Respondent, | : CP-51-CR-0305681-1984 |
| | : |
| v. | : |
| | : |
| MAJOR G. TILLERY, | : |
| | : |
| Petitioner | : |

## PETITIONER'S SUPPLEMENTAL PCRA PETITION

Petitioner, MAJOR G. TILLERY, *pro se*, respectfully submits this Supplemental
PCRA Petition:

On June 15, 2016 petitioner filed a PCRA petition pursuant to 42 Pa. C.S. §
9541 et. stating, "this is a case of factual innocence and gross prosecutorial
misconduct violating Petitioner Major Tillery's right to due process and a fair trial.
The actions of the Commonwealth resulted in a fundamental miscarriage of justice
that shocks the conscience and warrants reversal of his conviction and dismissal of
charges against Petitioner Major Tillery."

The Petition is pending before this Court and this Court filed a Notice of
Intent to Dismiss pursuant to PA.R.Crim. P. 907 on August 19, 2016. Petitioner is
simultaneously filing his Response in Objection to Notice of Intent to Dismiss.

Petitioner continued his investigation subsequent to the filing of his PCRA
in June 15, 2016 and has obtained new evidence and facts that were not previously
known to him that corroborate the fact of the Commonwealth's misconduct,
further supporting Petitioner's claims of actual innocence and violations of his
right to due process.

Petitioner submits to this court the videotape of Emanuel Claitt recorded on
August 3, 2016. [Exhibit A]  In this videotape Emanuel Claitt reaffirms his sworn
declarations of May 4 and June 3, 2016.  This videotape is submitted to preserve
the evidence provided by Emanuel Claitt that his entire trial testimony was
falsified, the product of coercion and inducements by the Commonwealth
including concealed plea deals and being providing sexual favors.

This videotape was recorded by Rachel Wolkenstein who is assisting
Petitioner. Her sworn declaration is attached and is incorporated into this Petition.

As set forth in the Wolkenstein declaration, Petitioner now has evidence
corroborating Emanual Claitt's statement that he received sexual favors while in
custody by being allowed to have private sexual encounters with girlfriends in the
Roundhouse, assisted by homicide detectives Lawrence Gerrard and Ernest
Gilbert:

(1)  Emanuel Claitt has provided the names and contact information

for two of the woman that were brought to him by homicide

detectives, H           and D.

(2)  H.          acknowledged that she had sex with Emanuel Claitt

in the Roundhouse homicide interview rooms and that

arrangements were made with detectives who brought her up to

him.

(3)  Roundhouse log-in page 192 for December 14, 1983, has

Emanuel Claitt's signature along with Det. Gilbert and his

girlfriend D.          signed in under Det. Gerrard for an

overlapping time period. [Exhibit C]

Petitioner intends to present H.          , D.          as witnesses at an

evidentiary hearing. Witness certifications are attached.

## Timeliness of Supplement

Petitioner reasserts the facts and legal argument set forth in the Petition and

his Response In Objection to the Notice of Intent to Dismiss regarding timeliness.

He makes the following additional points.

The new facts presented in this Supplement are timely filed pursuant to 42

Pa. C.S. § 95459(1) (i), inasmuch as the Commonwealth's failure to discharge its

constitutional obligation to provide the defense *Brady* material constituted

"governmental interference" with the presentation of this claim. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Petitioner has satisfied the requirements of 42 Pa. C.S. 9545(ii) in that he has exercised the requisite diligence to uncover the undisclosed Roundhouse record and the activity of the detectives involved in this; and to investigate and obtain additional and corroborative evidence from witnesses whose possible relevance and involvement in this case only became known to Petitioner with the information provided by Emanuel Claitt on August 3, 2016.

Petitioner requests this Court order discovery of all reports, notes and correspondence in the possession of agents of the Commonwealth pertaining to this case.

Petitioner also requests that if this Court grants leave to Petitioner to file an amended complaint that the additional facts presented here be incorporated into said amended complaint.

September 6, 2016

Respectfully submitted,

Major Tilly

MAJOR G. TILLERY, *pro se*
AM 9786
SCI Frackville
1111 Altamont Blvd.
Frackville, PA 17931

# EXHIBIT "H"

**Court of Common Pleas Opinion Under Pa. R. App. P.
1925(a),
Commonwealth v. Tillery, 3270 EDA 2016, 193 A.3d 1063
(Pa. Super. 2018)**

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

v.

GEORGE M. TILLERY

CP-51-CR-0305681-1984
3270 EDA 2016

OPINION

LEON W. TUCKER, J.

This appeal comes before the Superior Court following the dismissal of a Post Conviction Relief Act ("PCRA")[1] petition filed on October 6, 2014. On September 26, 2016, this court dismissed the PCRA petition for the reasons set forth below.

## I. PROCEDURAL HISTORY

George M. Tillery (hereinafter referred to as "Petitioner") was arrested and subsequently charged with homicide and related offenses stemming from the shooting death of John Hollis and the non-fatal shooting of John Pickens in October 1976 in the city of Philadelphia.

On May 29, 1985, following a jury trial presided over by the Honorable John Geisz, Petitioner was convicted of first-degree murder, aggravated assault, two counts of criminal conspiracy, and possessing an instrument of crime. After post-verdict motions were denied, the trial court imposed a sentence of life imprisonment on the murder conviction and lesser terms of incarceration on the remaining convictions. Following a direct appeal, Petitioner's judgment of

---

[1] 42 Pa. Cons. Stat. §§ 9541-9546.

1

sentence was affirmed by the Superior Court on May 30, 1989, and the Pennsylvania Supreme Court denied *allocatur* on March 5, 1990.[2]

On September 16, 1996, through private counsel, Richard P. Hunter, Esquire, Petitioner filed his first PCRA petition. The PCRA court denied the petition on January 13, 1998. The Superior Court affirmed the PCRA court's order denying relief on April 21, 1999.[3] The Pennsylvania Supreme Court denied *allocatur* on August 18, 1999.[4]

Petitioner filed his second PCRA petition on August 13, 2007. On September 9, 2008, the PCRA court dismissed his petition as untimely. The dismissal of Petitioner's PCRA petition was affirmed by the Superior Court on July 15, 2009.[5] The Pennsylvania Supreme Court denied *allocatur* on December 9, 2009.[6]

On October 6, 2014, Petitioner filed the instant, *pro se,* collateral petition, his third.[7] Petitioner filed supplemental petitions on December 9, 2014 and June 15, 2016. Pursuant to Pennsylvania Rule of Criminal Procedure 907, Petitioner was served notice of the PCRA court's intention to dismiss his petition on August 19, 2016. Petitioner submitted responses to the Rule 907 letter on September 7 and September 21, 2016. On September 26, 2016, the PCRA court

---

[2] *Commonwealth v. Tillery*, 563 A.2d 195 (Pa. Super. 1989) (unpublished memorandum), *appeal denied*, 593 A.2d 841 (Pa. 1990).

[3] *Commonwealth v. Tillery*, 738 A.2d 1055 (Pa. Super. 1999) (unpublished memorandum).

[4] *Commonwealth v. Tillery*, 742 A.2d 674 (Pa. 1999).

[5] *Commonwealth v. Tillery*, 981 A.2d 937 (Pa. Super. 2009) (unpublished memorandum).

[6] *Commonwealth v. Tillery*, 985 A.2d 972 (Pa. 2009).

[7] The current version of the PCRA contains a provision permitting a defendant whose conviction became final prior to January 16, 1996, the date the current version of the PCRA took effect, to file a timely first PCRA petition within one year of that date. *See Commonwealth v. Alcorn*, 703 A.2d 1054, 1056-57 (Pa. Super. 1997) (holding that where a petitioner's judgment of sentence became final on or before the effective date of the amendment to the PCRA, the amended PCRA contained a provision whereby a first PCRA petition could be filed by January 16, 1997, even if the conviction in question became final more than a year prior to the date of the filing). Petitioner's most recently filed PCRA petition was neither his first nor was it filed within one year of the date the amendment took effect.

2

dismissed his PCRA petition as untimely.[8] On October 20, 2016, the instant notice of appeal was timely filed to the Superior Court.

## II. DISCUSSION

### A. Petitioner's current PCRA petition was manifestly untimely.

Petitioner's petition challenging the constitutionality of his conviction and legality of his detention was facially untimely. As a prefatory matter, the timeliness of a PCRA petition is a jurisdictional requisite. *Commonwealth v. Robinson,* 12 A.3d 477 (Pa. Super. 2011). A PCRA petition, including a second or subsequent petition, shall be filed within one year of the date the underlying judgment becomes final. 42 Pa. Cons. Stat. § 9545(b)(1). A judgment is deemed final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* § 9545(b)(3).

Petitioner's judgment of sentence became final for PCRA purposes in June 1990 after the Pennsylvania Supreme Court denied *allocatur* and time period for filing a petition for writ of *certiorari* in the United States Supreme Court expired. *See id.*; U.S. Sup. Ct. R. 13 (effective January 1, 1990). Petitioner's *pro se* petition, filed on October 6, 2014, was therefore untimely by approximately twenty-three years. *See* 42 Pa. Cons. Stat. § 9545(b)(1).

### B. Petitioner was ineligible for the limited timeliness exceptions found in 42 Pa. Cons. Stat. § 9545 (b)(1)(i), (ii).

Despite the one-year deadline, the PCRA permits the late filing of a petition where a petitioner alleges and proves one of the three narrow exceptions to the mandatory time-bar under

---

[8] The Honorable Leon W. Tucker issued the order and opinion in this matter in his capacity as Supervising Judge of the Criminal Section of the Court of Common Pleas of Philadelphia – Trial Division as of March 7, 2016 as the trial judge is no longer sitting.

42 Pa. Cons. Stat. § 9545(b)(1)(i)-(iii). To invoke an exception, a petition must allege and the petitioner must prove:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* § 9545(b)(1)(i)-(iii).

In attempt to overcome the PCRA's statutory time-bar, Petitioner argued that his petition fell within the "governmental interference" exception, § 9545(b)(1)(i),[9] and the "newly-discovered evidence" exception, § 9545(b)(1)(ii).[10]

According to Petitioner, the new information triggering both exceptions was found in signed recantations from Emanuel Claitt and Robert Mickens, Commonwealth witnesses who provided extensive inculpatory testimony at Petitioner's trial. Both witnesses now assert that they were not present during the commission of the crime and fabricated the entirety of their detailed testimonies. *See* PCRA petition, 6/15/16 at exhibits A, B, C. According to Claitt and

---

[9] The "governmental interference" exception, § 9545(b)(1)(i) requires a petitioner to plead and prove: (1) the failure to previously raise the claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence. *Commonwealth v. Williams*, 105 A.3d 1234, 1240 (Pa. 2014) (citing *Commonwealth v. Abu–Jamal*, 941 A.2d 1263, 1268 (Pa. 2008)).

[10] The timeliness exception set forth in Section 9545(b)(1)(ii) requires a petitioner to demonstrate he did not know the facts upon which he based his petition and could not have learned those facts earlier by the exercise of due diligence. *Commonwealth v. Bennett*, 930 A.2d 1264, 1271 (Pa. 2007). Due diligence demands that the petitioner take reasonable steps to protect his own interests. *Commonwealth v. Carr*, 768 A.2d 1164, 1168 (Pa. Super. 2001). A petitioner must explain why he could not have learned the new fact(s) earlier with the exercise of due diligence. *Commonwealth v. Breakiron*, 781 A.2d 94, 98 (Pa. 2001).

Mickens, a cabal of prosecutorial agents – assistant district attorneys and members of law enforcement – implemented a scheme of coercion and incentives to obtain fabricated testimony against Petitioner. *Id.*

Notwithstanding Petitioner has previously raised these claims in a prior PCRA,[11] his failure to demonstrate that the witnesses' statements could not have been obtained earlier by exercising due diligence was fatal to proving either statutory exception. Rather than detailing any specific efforts to contact Claitt or Mickens in the thirty-one years between his conviction and the filing of his instant petition, Petitioner instead argued that i) the circumstances of his confinement prevented communication and ii) irrespective of his inability to communicate, Claitt's and Mickens's decisions to recant could not have possibly been fostered at an earlier time. Neither argument is persuasive.

In support of his first assertion, Petitioner detailed a litany of general impediments to his ability to contact the witnesses. *See* PCRA petition, 6/15/16 at 10. Petitioner claimed, for example, that for twenty of the past thirty-plus years, his access to communication channels was "severely restricted." PCRA petition, 6/15/16. Even if Petitioner substantiated this claim with supporting evidence, and the court excluded those years from scrutiny, Petitioner failed to articulate any attempts to locate the witnesses during the remaining decade. Furthermore, although Petitioner cited instances of illness and frequent transfer between correctional facilities, he did not specify whether these incidents occurred during the non-restricted period of incarceration, and if so, for what duration. PCRA petition, 6/15/16 at 10-11. Petitioner's attempt to explain his inability to act for over thirty years was therefore patently insufficient to demonstrate due diligence.

---

[11] *See* PCRA petition, 8/13/07.

Alternatively, Petitioner relied upon the Superior Court's decision in *Commonwealth v. Davis*, 86 A.3d 883 (Pa. Super. 2014) and *en banc* decision in *Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) in arguing that waiting for Claitt and Mickens to feel comfortable recanting was sufficient to meet his burden of due diligence. *See* 907 response, 9/7/16 at 7-11.

In *Davis,* the defendant was convicted of murder based, in part, on the testimony of Commonwealth witness Jerome Watson. *Davis,* 86 A.3d at 885–86. More than thirty years after the conclusion of Davis's trial, Watson recanted his trial testimony and revealed he made an undisclosed deal with the assistant district attorney. *Id.* at 888. The Superior Court held that since there was no indication at trial of any deal or expected leniency, it would have been unreasonable to require that Davis conduct a search prior to receiving Watson's affidavit detailing possible governmental interference. *Id.* at 890–891.

In *Medina,* the defendant was convicted of murder based, in part, on the testimony of two Commonwealth witnesses. *Medina,* 92 A.3d at 1213. More than a decade after the conviction, the witnesses recanted their trial testimonies. *Id.* at 1213–1214. The Superior Court upheld the PCRA court's finding that Medina satisfied the newly-discovered evidence exception to the statutory time-bar. *Id.* at 1218.

In both *Davis* and *Medina*, the Superior Court's due diligence analysis centered on the fact that neither Davis nor Medina had reason to believe they could elicit exculpatory information from the respective witnesses. *Davis,* 86 A.3d at 890; *Medina,* 92 A.3d at 1218–1219.

Here, Petitioner would have been aware that Claitt and Mickens falsely inculpated him at trial. Furthermore, in 2007, nine years before acquiring the affidavits supporting the instant petition, Petitioner claimed to have uncovered evidence that the witnesses perjured themselves

regarding undisclosed preferential treatment from the Commonwealth in exchange for their testimonies. *See* PCRA petition, 8/13/07. Based upon Petitioner's purported discovery of the Commonwealth's role in suborning Claitt and Mickens, Petitioner had reason to believe that the witnesses may be amenable to disclosing their fabricated testimony.

Not only were the instant facts distinguishable from those in *Davis* and *Medina*, the Superior Court in *Davis* also evaluated whether Davis exercised due diligence in discovering proof that the witness fabricated his murder confession, a fact that would have been immediately known to Davis. *Davis*, 86 A.3d at 890–91. In concluding that Davis did exercise due diligence, the Superior Court relied upon Davis's affidavits detailing attempts by family members and friends to contact the witness after trial to convince him to admit that he lied on the stand. *Id.* at 891. Again, *Davis* is of no benefit to Petitioner, who failed to demonstrate any efforts by either himself, or anyone on his behalf, to contact either witness prior to 2016.

Ultimately, Petitioner argued that because Claitt's and Mickens's statements indicated that they only recently desired to "clear their consciences," any effort on his part to urge their emotional cleansing would have been fruitless.[12] *See* PCRA petition 6/15/16 at 10 ("It rested with Robert Mickens and Emanuel Claitt to decide to come forward."). In other words, Petitioner suggested that known, untruthful witnesses may be reasonably afforded an indefinite time for reflection, free from pleas from aggrieved petitioners. The PCRA court does not agree. Petitioner's attempt to circumvent his duty to act diligently by speculating that any interaction prior to 2016 would have been futile was unavailing.

---

[12] The fact that both witnesses chose to "clear their consciences" immediately upon speaking with Petitioner's attorney, Rachel Wolkenstein, in 2016, weakens Petitioner's intimation that the witnesses were previously impervious to persuasion. *See* Supplemental petition, 9/7/16 at 12.

7

## IV. CONCLUSION

This court has once again evaluated an untimely collateral petition (his third) filed by Mr. Tillery. Petitioner failed, however, to plead and prove an exception to the timeliness provision found in either subsections 9545 (b)(1)(i) or (ii). Additionally, Petitioner was not entitled to habeas corpus relief.[13] Accordingly, for the reasons stated herein, the decision of the court dismissing the collateral petition should be affirmed.

BY THE COURT:

LEON W. TUCKER, J. /NV

---

[13] Petitioner erroneously contended that the Department of Corrections ("DOC") lacked legal authority for his continued detention due to the lack of a written sentencing order, in contravention of 42 Pa. Cons. Stat. § 9764(a)(8) and 37 Pa. Code § 91.3. *See Joseph v. Glunt,* 96 A.3d 365 (Pa. Super. 2014) (concluding that the PCRA did not subsume an illegal-sentence claim based on the inability of the DOC to produce a written sentencing order). Upon review, the Honorable John Geisz entered sentencing orders in this matter on December 9, 1986. Additionally, upon reviewing the criminal docket through the Common Pleas Case Management System, Petitioner's sentence was accurately docketed by the Clerk of Courts of this court. The Superior Court has held that even when the DOC lacks possession of a written sentencing order, it has continuing authority to detain a prisoner. *Id.* at 372.

## VERIFICATION

I verify that the statements made in the above ~~response~~ are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date: September 6, 2016

MAJOR TILLERY

# EXHIBIT "I"

**Commonwealth v. Tillery, 3270 EDA 2016,
193 A.3d 1063 (Pa. Super. 2018)
(unpublished memorandum)**

J-A28027-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAJOR GEORGE TILLERY | : | |
| | : | |
| Appellant | : | No. 3270 EDA 2016 |

Appeal from the PCRA Order September 26, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0305681-1984

BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY PANELLA, J.                    FILED JUNE 11, 2018

Major George Tillery[1] appeals from the order entered in the Philadelphia County Court of Common Pleas, denying his untimely third petition filed **pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-** 9546. We affirm.

Briefly, Appellant was convicted of first-degree murder, aggravated assault, possessing an instrument of crime, and two counts of criminal conspiracy following a jury trial in 1985. The court sentenced him to life imprisonment. This Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal.

---

[1] Appellant indicates his name is incorrectly listed on this appeal **as "George M. Tillery."** *See* **Appellant's Brief, at 1.** Previous court documents confirm Appellant has been referred to as "Major George Tillery" throughout associated proceedings. We have corrected the error.

Thereafter, Appellant filed his first PCRA petition, which was unsuccessful. In 2007, Appellant untimely filed his second PCRA petition. In it, he claimed a timeliness exception to the PCRA based on newly discovered evidence. Appellant alleged **two of the Commonwealth's witnesses at his trial**, Emanuel Claitt and Robert Mickens, received previously undisclosed favorable plea deals in exchange for their false testimony. Appellant contended these plea deals, previously unknown to him, gave the witnesses motive to lie about Appell**ant's involvement in the murder**. The PCRA court denied the petition as untimely, and this Court affirmed.

Appellant filed this petition, his third, on June 15, 2016. The PCRA court denied the petition without holding an evidentiary hearing. This appeal is now properly before us.

Appellant argues the PCRA court erred in dismissing his petition as untimely. We review an order dismissing a petition under the PCRA by exam**ining whether the court's determination is supported by the evidence of** record and is free of legal error. *See Commonwealth v. Halley*, 870 A.2d **795, 799 n.2 (Pa. 2005). We will not disturb the court's factual findings unless** there is no support for them in the certified record. *See Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001). Moreover, a court may decline **to hold a hearing on a petition if it determines the petitioner's claim is patently** frivolous and is without a trace of support either in the record or from other evidence. *See Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001).

Pa 561

The timeliness of a post-conviction petition is jurisdictional. *See Commonwealth v. Hernandez*, 79 A.3d 649, 651 (Pa. Super. 2013). Generally, a petition for relief under the PCRA, including a second or subsequent petition, must be filed within one year of the date the judgment is final unless the petition alleges, and the petitioner proves, an exception to the timeliness requirement. *See* 42 Pa.C.S.A. § 9545(b)(1)(i)-(iii). A PCRA **petition invoking one of these statutory "exceptions must be filed within sixty days of the date the claims could have been presented."** *Hernandez*, 79 A.3d at 652 (citing 42 Pa.C.S.A. § 9545(b)(2)). **Finally, exceptions to the PCRA's** time bar must be pled in the petition. *See Commonwealth v. Burton*, 936 A.2d 521, 525 (Pa. Super. 2007). *See also* Pa.R.A.P. 302(a).

**Appellant's judgment of sentence became final on** June 3, 1990, when his time for filing a writ of *certiorari* with the United States Supreme Court expired. *See* 42 Pa.C.S.A. § 9545(b)(3); U.S. Sup. Ct. R. 13. Appellant filed this petition on June 15, 2016—more than 26 years after his judgment of sentence became final. It is, as he concedes, patently untimely. *See* **Appellant's PCRA Petition, filed 6/15/16, at 5.** Thus, the PCRA court lacked jurisdiction to review Appellant**'s petition unless he was able to successfully plead and prove one of the statutory exceptions to the PCRA's time**-bar.

Appellant attempts to plead both the governmental interference exception and the newly discovered facts exception. He proffers the same evidence for both claims: signed affidavits from two witnesses in his case, Emanuel Claitt and Robert Mickens. In their affidavits, the men aver they

- 3 -

received favorable plea deals and other favors from the Commonwealth in exchange for their testimony, and that they lied when asked about any **potential plea deals during Appellant's trial**. Claitt and Mickens also allege various police detectives and the Assistant District Attorney prosecuting **Appellant's** case repeatedly threatened them with criminal charges, which coerced them to provide testimony falsely incriminating Appellant.

To demonstrate the governmental interference exception, "the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could **not have been obtained earlier with the exercise of due diligence."** *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008) (citation omitted). To claim the newly discovered facts exception, a petitioner must **plead and prove that "the facts upon which the claim is predicated were** unknown to the petitioner and could not have been ascertained by the exercise of due **diligence[.]"** 42 Pa.C.S.A. § 9545(b)(1)(ii). "[D]ue diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a cl**aim for collateral relief."** *Commonwealth v. Brown*, 141 A.3d 491, 506 (Pa. Super. 2016) (citation omitted).

**Appellant devotes much of his brief to disputing the PCRA court's** dismissal of his petition, on the grounds that Appellant failed to prove he acted with due diligence. Appellant contends he had no way of knowing before he received these affidavits that the Commonwealth orchestrated a conspiracy to

Pa 563

keep him in jail, and requiring him to have investigated this matter in the 31 years between his trial and the filing of this PCRA petition placed an unreasonable burden on him. Appellant also argues the conditions of his incarceration prevented him from filing a PCRA petition sooner. Appellant chronicles his movements between various prisons, as well as stints in solitary confinement, as evidence that he was unable to file this petition at an earlier date.

The Pennsylvania Supreme Court previously evaluated the argument that prison conditions constitute a timeliness exception to the PCRA, and rejected it. *See Commonwealth v. Albrecht*, 994 A.2d 1091, 1095 (Pa. **2010) (holding inmate's failure to show restricted conditions of incarceration were illegal prevented him from obtaining timeliness relief under PCRA's** governmental interference exception).

Also, Appe**llant's** contention that he was unable to obtain this information sooner is belied by his second PCRA petition, filed in 2007. In it, Appellant accuses the Commonwealth of suborning perjury from Claitt and Mickens, and he provides various transcripts and letters as proof. While **Appellant's 2007 petition lacks the signed affidavits** from Claitt and Mickens attached to his current petition, he raises substantially the same arguments in each. The claims here merely expand on the arguments in the 2007 petition, and he offers only vague speculation that Claitt and Mickens would have been unwilling to provide such information before. We find such explanations unavailing.

Consequently, we find Appellant has failed to prove he acted with due diligence in discovering these allegedly new facts and governmental interference. Accordingly, we affirm the order dismissing his PCRA petition as untimely.

Order affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/11/18

# EXHIBIT "J"
## 10/22/1976 Statement of P/O Minner

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. | |
|---|---|---|---|
| | | INTERVIEWER PETERSON #9085 | |

| NAME Policeman George MINNER #2816 | AGE | RACE | DOB |
|---|---|---|---|
| ADDRESS c/o ACT II | APARTMENT NO. | | PHONE |
| NAME OF EMPLOYMENT/SCHOOL City of Phila. | | | SOC. SEC. NO. |
| ADDRESS OF EMPLOYMENT/SCHOOL | | | PHONE |

| PLACE OF INTERVIEW 104 PAB | DATE AND TIME 10-22-76 11:30PM |
|---|---|
| BROUGHT IN BY | DATE AND TIME |

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Joseph HOLLIS 20 N/M, res: 5812 Christian St. that occured on Friday 10-22-76 inside 1008 N 11th St

| WARNINGS GIVEN BY | | | | | DATE AND TIME | |
|---|---|---|---|---|---|---|
| ANSWERS (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q. Officer, what tour of duty are you working, and what is your assignment?

A. I am working the 6PM to 2AM tour of duty and I am assigned to an unmarked patrol car (N-120) with my partners, Policeman William NORTON #6498 and Policeman William McALLISTER #9891.


Q. Will you tell me what you know concerning this incident?

A. At about 9:50PM we responded to a radio call "Report of a shooting and a hospital case at the pool hall - 11th and Huntingdon". We proceeded to the pool hall located at Warnock and Huntingdon St on the southeast cornor. We were the first officers to arrive at this scene. At this time we were approached by an unidentified negro male who stated that there was a male inside the pool hall who had been shot. We had also heard via Police Radio that another male who had been shot was being picked up at 11th and Huntingdon Sts.  I then hopped up on the window ledge and looked into the pool room. I observed the body of a negro male lying on the floor. His head was pointed to the east, feet west, and he was lying on his right side. He was not moving. Officers Norton and McAllister tried the door, however, it was locked. At this time the door was forced

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|
| REVIEWED BY | |

TilleryDAOFiles362

75-483 (Rev. 8/75)

| INVESTIGATION INTERVIEW RECORD **CONTINUATION SHEET** | | CITY OF PHILADELPHIA **POLICE DEPARTMENT** | |
|---|---|---|---|
| NAME Policeman George MINNER #2816 | | PAGE #2 | CASE NO. |

A. continued from page #1;- open and entrance was gained. The lights were

on, however, no one was inside except the body. There were hats and

coats strewn about the building. A Wagon crew arrived and removed the

victim to the hospital. He was later identified Joseph HOLLIS 20 N/M,

res: 5812 Christian St. The building was search with negative results

as to suspects. I observed a spent bullet lying on the floor in the area

of where the victim's waist had been. There were live rounds lying on

a bar in the cornor of the room. The scene was secured by Sgt BROWN.

I then went outside a 1976 Cadilac Bk over yellow, who I know to be owned

and operated to Alfred CLARK, was parked across the street. I know

Alfred CLARK be to involved in narcotics and have arrested him before

in reguards to a shooting. I also know that he was involved in three

drug related homicides, and robbies. I also know that he associated

with William Franklin, who owns the pool hall, Eugihania JONES, Fred

RAINEY, Rudolph THOMAS, Frank JUNIS, Mark GARRICK and Andre WRIGHT.

I then went to a store who is owned by William FRANKLIN which is located

at the southeast cornor of 11th and Huntingdon Sts, where the second

victim was picked up. When I arrived at this location I observed two

of the above - Fred RAINEY and Eugihania JONES - inside the store.

They were beginning to eat. While enroute to this location. I was

approached by Rudolph THOMAS who said that he had followed a police car

from 16th and Dauphin to the pool hall. He was detained for possibaa

identification. Fred RAINEY and Eugihania JONES were also detained

for possibal identification.     We then returned to Warnock and

Huntingdon Sts where I noticed that the auto that belonged to Alfred

CLARK was now missing. At this time I notified Police Radio

75-483A                                          TimelyDAOFiles364

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Policeman George MINNER #2816 | PAGE #3 | CASE NO. |
|---|---|---|

A. continued from page #2;- with information concerning the auto. A short
time later I was informed that the auto had been stopped at Chadwick
and Huntingdon Sts. It was being operated by Frank JUNIS and the passinger
was Alfred CLARK.  I then went to Frank JUNIS'S residence located at
925 W York St where I observed a green Cadilac PA LIC #666-D27 which I
had seen earlier in the evening being operated by Frank JUNIS. This auto
was owned by Fred RAINEY. I also observed an Oldsmobile 1972, PA LIC
#7X0160 who is owned by William FRANKLIN, parked infront of this residence.
At this time a surviellance of both vehicles was set up. I then proceeded
to homicide headquarters.

MGT COPY

75-483 A

# EXHIBIT "K"

**10/22/1976 Statement of William Arnold**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER R. Harmon |

| NAME William Arnold | AGE 23 | RACE N. | DOB 9-16-53 |
|---|---|---|---|

| ADDRESS 5854 Rodman St | APARTMENT NO. | PHONE SH8-3719 |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL Unemployed | SOC. SEC. NO. |
|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | PHONE |
|---|---|

| PLACE OF INTERVIEW Room #104 P.A.B. | DATE AND TIME 10-22-76  11:30 PM |
|---|---|

| BROUGHT IN BY Police. | DATE AND TIME 10-22-76  11:15 PM |
|---|---|

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Joseph Hollis & the shooting of John Pickens on 10-22-76 At ~~11th & Cumberland Sts~~ Warnock & Huntingdon

| WARNINGS GIVEN BY | DATE AND TIME |
|---|---|

ANSWERS

(1)     (2)     (3)     (4)     (5)     (6)     (7)

Q- Are you known by any other name or nickname?

A- Billy, that's all.

Q- Do you know Joseph Hollis and John Pickens?

A- I've known Joe Hollis about four or five years from 60th Street and I've known John Pickens about ten years. I usually hang around with John, and I just started hanging around with Joe in the last six or seven months.

Q- Will you tell me what you know concerning their getting shot?

A- I don't why they got shot. If I knew there was going to be any kind of trouble I wouldn't have met them down there.

Q- Why were they down there at 11th & Cumberland?

A- I don't know they just told me to meet them there then we would go to the show, Melba Moore & Bill Withers at Broad & Locust.

Q- When was the last time you saw Joe Hollis and

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

75-483 (Rev. 8/75)

TilleryDAOFiles446

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME **William Arnold**    PAGE 2    CASE NO.

John Pickens?

A. About ten minutes to eight tonight at Mosque at 41st & Haverford. I had borrowed Joes car, a Charger that he rented. I borrowed it while I was at his house earlier today. Then we went to the Mosque at about 7ᵒᵒ PM. Joe went in John Pickens car and I met them there. About 10 minutes to eight Joe told me to meet him at the pool room at 11th & Cumberland near Warnock, before the show started. I got there sometime between ten and ten thirty and when I came down 11th street between Cumberland and Huntingdon I saw John leaning up against a rail near a house in the middle of the block. I asked John what happened and he told me he got shot. He was bent over then he fell out. Then me and some young boys who were out there carried John into some womans house that lived on the block & she called for a ambulance. One of the young boys told me that John ran from around the pool room. The police came and then I went around the corner to the pool room. The police were there with flashlights. I told them somebody was with John and the shooting happened inside the pool room so somebody must be in there. So the police knocked the door down and we went in there. I saw Joe lying on the floor near the door. He was lying on his face. I went over to him and turned him over

75-483 A

TilleryDAOFiles447

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME: William Arnold       PAGE: 3       CASE NO.

I called him and he didn't answer me. I saw bullet holes in his coat. His eyes was open. I walked back around to John but the police had already taken him to the hospital. I went back to the Charger but the keys were gone. A couple of brothers took me to the hospital. I don't know who they was.

Q - Why did Joe Hollis and John Pickens go to the pool room?

A - ~~No.~~ I don't know.

Q - Did they deal in drugs?

A - No, they didn't mess with drugs.

Q - Did John Pickens tell you who shot them?

A - No, he fell out after he told me he got shot.

Q - Do you know who shot John Pickens & Joe Hollis?

A - No.

Q - Was anybody out to get either of them?

A - No.

Q - Did anybody tell you who shot them?

A - No.

Q - Have you ever been to the pool room before - or that area?

A - No.

Q - When did Joe rent the car?

A - Today.

75-483 A

TilleryDAOFiles449

# EXHIBIT "L"

### 11/3/1976 Mobile Crime Unit Report

| MOBILE CRIME DETECTION SERVICE REPORT | CITY OF PHILADELPHIA POLICE DEPARTMENT LABORATORY DIVISION | MOBILE LAB. NO. ML-76-1527 |
|---|---|---|

| OFFENSE OR INCIDENT Homicide | | CODE | C.C. NO. 22-63238 | DATE OF REPORT 11-3-76 |
|---|---|---|---|---|

| COMPLAINANT Joseph Hollis | AGE 20 | RACE N | SEX M | ADDRESS 5812 Christian St. |
|---|---|---|---|---|

| PLACE OF OCCURRENCE 1008 Huntingdon St. | ☑INSIDE  ☐OUTSIDE | DATE AND TIME OF OCCURRENCE 10-22-76 |
|---|---|---|

| NOTIFIED BY Pol.Radio | UNIT | DATE AND TIME NOTIFIED 10-22-76 10:30PM | TIME ARRIVAL SCENE 10-35PM | TIME DEPARTURE SCENE 12:30AM |
|---|---|---|---|---|

| INVESTIGATOR ASSIGNED AT SCENE ☑Yes ☐No  Det.Gallo#9065 | UNIT Hom. | TECHNICIAN ASSIGNED Plcm.E.Little #5834 | TECHNICIAN ASSISTED Tech.J.Parker |
|---|---|---|---|

| LOCATION OF SERVICES 1008 Huntingdon St. | ☑INSIDE ☐OUTSIDE | WEATHER CONDITIONS Clear Cold Night |
|---|---|---|

| PHOTOGRAPHS ☐1 Yes ☑2 No | TOTAL TAKEN 15 | NUMBER TO BE PRINTED 4 X 5 2-sets  8 X 10 2-sets | TOTAL PRINTED 30  4 X 5  8 X 10  30 |
|---|---|---|---|

### DISTRIBUTION OF PHOTOGRAPHS

| SIZE | DATE DELD. | UNIT | RECD. BY | UNIT | RECD. BY | UNIT | RECD. BY |
|---|---|---|---|---|---|---|---|
| 4" X 5" | | | | | | | |
| 8" X 10" | | | | | | | |

| SKETCH MADE ☑Yes ☐No | DATE COMPLETED |
|---|---|

| LATENT PRINTS ☐1 Examination ☑2 No Examination | RESULTS ☐1 Pos. ☐2 Neg. | IDENTIFIABLE ☐1 Yes ☐2 No | TYPE ☐1 Finger ☐2 Palm ☐3 Other |
|---|---|---|---|

SUMMARY OF SERVICES AND EVIDENCE *(Para. A — Summary, Para. B — Evidence, include Property Receipt Numbers)*

A. **DIRECTION OF SERVICE:**  On Friday 10-22-76 the assigned Plcm.E.Little #5834 and Tech.J.Parker met Det.Gallo #9065,of Homicide Unit,at the above location,where the following services were performed.

B. **PHOTOGRAPHS:**  Taken by Plcm.E.Little.
#1.View looking south showing broken front door to 1008 Huntingdon st.
#2.View from inside showing broken front door.
#3.View inside,looking north to south.
#4.View inside,looking south to north.
#5.View inside,showing spent projectile on floor of poolhall.
#6.View inside,showing sunglasses on floor.
#7.View of east wall of poolhall showing bullet hole.
#8.View of door in east wall,showing bullet hole in door.
#9.View of door in east wall,showing gray coat on door.
#10.View inside door on east wall showing spent projectile on floor.
#11.View of counter top in north end of room with two live bullets on it.
#12.View of east wall after removing paneling showing spent projectile.
#13.View of white powder on table in basement.
#14.View of front of residence 2527 N.Nx 11th st.
#15.View inside above residence showing livingroom floor.

C. **PHYSICAL EVIDENCE:**  The below listed physical evidence was collected by Plcm.E.Little #5834 at the above location,Items #1 to #4 on PR#636494 were submitted to the Ballistics Lab.,Items #1 to #5 on PR#636495 were submitted to the Chemical Lab.
#1.Two (2) live western .38 caliber cartridges on counter top,5'3" south of north wall and 3'2" east of west wall at 11PM.

**(continued)**

| DISTRIBUTION REPORTS HOMICIDE | | C/I Herron | | DATE FORWARDED |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | |

| TECHNICIAN ASSIGNED | UNIT SUPERVISOR | UNIT COMMANDER |
|---|---|---|
| | | HileryDAOFiles404 |

75-305 (Rev. 5/65)

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (8–9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|
| 76 | 22 | 22 | 63238 | ☒ | ☐ Status Change | 22 | |
| | | | | SUPPLEMENTAL (52) | ☒ Additional Info. | DIST./UNIT PREPARING | |
| PREVIOUS CLASSIFICATION | | CODE | | Continuation (51) | ☐ Court Disposition | MCDU | REPORT DATE |
| | | | | Sheet 2 of | | | 11-3-76 |

| CLASSIFICATION | CODE (14–17) | PLACE OF OCCURRENCE (18–34) | J.A.D. INVESTIGATIONS (33) | Juvenile Offenders |
|---|---|---|---|---|
| Homicide | | 1008 Huntingdon st. | 1. ☐ Male   2. ☐ Female | ☐ Adult   3. ☐ Offenders |

| COMPLAINANT (Use firm name) (36–52) | AGE (80–81) | RACE (82) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| Joseph Hollis | 20 | 1.☐ W  2.☒ N  4.☐ PR  3.☐ C  5.☐ O | 1.☒ M  2.☐ F | 5812 Christian st. | |

| TYPE OF PREMISES (53–55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|---|
| | 10-22-76 | | |

| DATE OF OCCURRENCE (56–61) | DAY CODE (62) | TIME (63–65) | FOUNDED (66) | STATUS (67) | UNIT |
|---|---|---|---|---|---|
| | | | ☐ Yes  ☐ No | 1. ☐ Active   3. ☐ Arrest – cleared<br>2. ☐ Inactive – not cleared   4. ☐ Exceptionally cleared | |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc.<br>2. ☐ T.V., Radio, Stereo<br>3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals<br>5. ☐ Household Items (Furniture, Washers)<br>6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs<br>8. ☐ Clothing B. ☐ Misc.<br>9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69–73) $ | RECOVERED VALUE (74–78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |

C. <u>PHYSICAL EVIDENCE:</u>   (continued)
#2. One (1) spent projectile,found on floor 2'2" west of east wall and 12'
   south of north wall at 11:05PM.
#3. One (1) spent projectile,found on floor of hallway to second floor at
   west wall and 11'6" south of hallway entrance door at 11:10PM.
#4. One (1) spent projectile, dug out of east wall 4'7" south of north wall.
<u>PR#636495</u>
#1. One (1) pair of eyeglasses,found on floor,6'2" south of north wall
   and 5'8" west of east wall at 11:15PM.
#2. One (1) gray hat,with red stains,found on floor,4" west of east wall
   and 12' south of north wall at 11:20PM.
#3. One (1) pool cue,on floor against west wall and 15' south of north wall
   at 11:45PM.
#4. One (1) black vinyl pool cue case,found on counter top,3' south of
   north wall and 4' east of west wall at 11:50PM.
#5. One (1) tan on dirty gray long coat,found on door to second floor at
   11:55PM.

D. <u>SKETCH:</u>  While at the above location a sketch was made by the assigned,a
finsihed sketch will be made at a later date.

E. <u>REMARKS:</u>  No other service requested at this time.

        Det.Gallo #9065,Homicide unit assigned.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Ptl. E.Little #5834 | | |

75-49 (Rev. 12/74)

DISTRICT ATTORNEY

MGT COPY
TilleryDAOFiles405

# EXHIBIT "M"
**11/23/1976 Statement of William Bullock**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER Finnerty |

**NAME** William Henry Bullock  **AGE** 42 yrs.  **RACE** Negro  **DOB** March, 10. 1932

**ADDRESS** 1008 W. Huntingdon St.  **APARTMENT NO.** 3rd Fl.  **PHONE** BA.1. 5216

**NAME OF EMPLOYMENT/SCHOOL** Board of Education (Custodian)  **SOC. SEC. NO.** 229.34.5514

**ADDRESS OF EMPLOYMENT/SCHOOL** 27th Huntingdon St. (Walton School)  **PHONE** 225.0975

**PLACE OF INTERVIEW** Homicide, P.A.B.  **DATE AND TIME** 10.23.76  12:50A

**BROUGHT IN BY** Det. Finnerty 9176  **DATE AND TIME** 10.23.76  12:35A

**WE ARE QUESTIONING YOU CONCERNING** the Shooting which occurred inside 1008 W.

**WARNINGS GIVEN BY** Huntingdon St.  F.W. 10.27.76  **DATE AND TIME**

**ANSWERS**

(1)     (2)     (3)     (4)     (5)     (6)     (7)

Bill go on in your own words & tell me what you know about this shooting.

A. Well I got home at about 5 minutes after 4pm & took a bath & a shave. & then I went down to the bar at Warnock & Cumberland St. (Rum Soap Inn) I come back in about a half-hour, I got to my house at 6pm. I went up to my third floor apartment and watched the news on the television & I watched the fight and then I watched the debate with the president. And then the door bell rang with you all. that's it.

**RECORD** ☐ Yes  ☐ No  **CHECKED BY**

**REVIEWED BY**

75-483 (Rev. 8/75)

TilleryDAOFiles457

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME William Henry Bullock | PAGE 2 | CASE NO. |

Q. Do you own the property at 1008 W. Huntingdon St.?

A. Right.

Q. How long have you owned this property?

A. Since 1966

Q. Does anyone else live at this property?

A. No.

Q. Do you rent the first floor?

A. It's on lease to Charles Harris, negro male

Q. Does this Charles Harris known by any other name.

A. Goldy is all I know.

75-483 A

TilleryDAOFiles458

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME William Henry Bullock | PAGE 3 | CASE NO. |

Q. Did you see this Charles Harris tonight in the pool room?

A. No.

Q. When was the last time you saw Charles Harris?

A. Its been at least three months.

Q. Did you hear any shooting tonight inside the pool room?

A. No, I only heard a shot from the outside on the street?

Q. What did you do when you heard the shot?

A. I looked out the window?

75-483 A

TilleryDAOFiles460

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME William Henry Bullock | PAGE 4 | CASE NO. |
|---|---|---|

Q. What did you see?

A. I just saw several men or boy's running toward 11th St.

Q. How many people did you see?

A. A bunch of people, eighteen or twenty, something in that area.

Q. Did you know any of these people?

A. I know the people who were across the street and the people next door but the people with the pool sticks I didn't know them.

Q. Do you shoot pool at Caldy's?

A. occasionally, sometimes.

75-483 A

TilleryDAOFiles462

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME: William Henry Bullock   PAGE 5   CASE NO.

Q. this photo I show you, William Franklin, is he the one that run's the pool room? PP# 467285.

A. Yes.

Q. was William Franklin in the pool room Tonight?

A. I don't know.

Q. When was the last time you went in the pool room?

A. It was on a holiday, Columbus day.

Q. Did you hear any arguing down in the pool room tonight?

A. no, its pretty loud in the pool room until you get use to the noise.

75-483 A

MGT COPY

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME William Henry Bullock | PAGE 6 | CASE NO. |
|---|---|---|

Q. Did you know who was shooting pool tonight?

A. No.

Q. Do you know Alfred Clark?

A. No.

Q. Are you a Muslim?

A. No.

Q. Are there many Muslim's that come into the pool room?

A. I really don't know.

Q. Did you see anyone get into an auto during the fight?

A. No.

75-483 A

TilleryDAOFiles466

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |

NAME: William Henry Bullock

PAGE: 7

CASE NO.

Q: Did the men that were fighting, did they take the pool sticks with them?

A: They were chasing someone.

Q. Did you see who was being chased?

A. A small guy, he looked fairly small

Q. Could you tell how many men were being chased?

A. It looked like it was one guy.

Q. Can you recall what the man was wearing, that was being chased.

A. It looked like a light colored overcoat.

Q. Did you see which way they went at 11th St.?

A. They turned south on 11th St.

75-483 A

MGT COPY

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT | |
|---|---|---|
| NAME<br>William Henry Bullock | PAGE<br>8 | CASE NO. |

Q. Did you hear, or did anyone tell you who got shot?

A. No.

Q. Did you see who did the shooting on the street?

A. No.

Q. Did you see anyone with a gun?

A. No.

75-483 A

MGT COPY

# EXHIBIT "N"

## 11/23/1976 Statement of P/O William Norton

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H76-315 |
|---|---|---|
| | | INTERVIEWER Vales |

**NAME**
William Norton #6498

| AGE | RACE | DOB |

**ADDRESS**
ACT II  44th & Parkside Ave.

| APARTMENT NO. | PHONE |

**NAME OF EMPLOYMENT/SCHOOL**
Phila. Police Department

| | SOC. SEC. NO. |

**ADDRESS OF EMPLOYMENT/SCHOOL**

| | PHONE |

**PLACE OF INTERVIEW**
Room 104 Police Administration Buildibg

**DATE AND TIME**
10-23-76 1:25 Pm

**BROUGHT IN BY**
Self

**DATE AND TIME**

**WE ARE QUESTIONING YOU CONCERNING**
The shooting Death of Joseph Hollis, inside 1008 W. Huntingdon St.

**WARNINGS GIVEN BY**

**DATE AND TIME**

**ANSWERS**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

I am assigned to ACT II, 1 squad, working 6PM to 2AM in the North Phila. area.

I am assigned to N 120 unmarked vehicle, with Pol. William McAllister#9893

and George Minter#2816.


At approximately 9:50 PM received information form police radio that at 11th

and Huntingdon St. in the pool hall, fight shooting and a hospital case.

I knew that the ppol hall was located at Warnock and Huntingdon Street so

we went to the scene, 1008 Huntingdon St. When we arrived along with uniformed

police, an unidentified negro male told us that there were a couple people

shot and that one of them was in the pool hall and one had run down 11th

street. Policeman Minter was able to peep into the window of the pool hall

and he informed the rest of us that there was a body inside the building.

Myself and Policeman McAllister then were able to force the door open and

gained entrance to the ppol hall. When we entered the pool hall we found the

the dad body of a negro male lying just behind the front door, with his head

toward the East wakl lying on his right side facing the door. The body had

a hat partially off his head, and there appeared to be blood in his hat.

**RECORD**  ☐ Yes  ☐ No

**CHECKED BY**

**REVIEWED BY**

75-483 (Rev. 8/75)

TilleryDAOFiles350

| INVESTIGATION INTERVIEW RECORD<br>*CONTINUATION SHEET* | CITY OF PHILADELPHIA<br>**POLICE   DEPARTMENT** | |
|---|---|---|
| NAME<br>  William Norton | PAGE<br>2 | CASE NO. |

His left hand was clutching his hat. We checked the building for other persons,
but found no one. Ater we went through the pool hall we noticed a yellow
cadillac, which we knew to belong to Alfred Clark, parked approximately in
front of 1005 W. Huntingdon Street. We went over to the Cadillac, and found it
to be empty. After checking the car we returned to in front of 1008, and we
saw Rudolph Thomas 26, n/m of 2328 N. Chadwick St., who we picked up and later
sent into Nroth Central Det. Div. After leaving the font of the pool hall
myself Pol. Minner, XXXXXXXX walked down to the corner of 11th & Huntingdon
Street to a restanrant which we know is owned by the same male who owns the
pool hall. When we got to the restaurant we saw Fred Rainey 24, n/m of 1448 n
Dover St. and Eugenia Jones 26 n/m, 2230 N. 11th Street. We took these males
to Warnock and Huntingdon Street, and at that time we noticed that the cadillac
belonging to Alfred Clark was missing. George Minner put out a description of
the Cadillac, aoong with a partiall lic. # Pa. 77P---. The car was described
as a 75 Cadillac yellow with a black convertible top. The EPW#2200 came to our
location and took the three to North Central Detective Division. Then we sent
them into room 104 Police Aminstration Building. The witness was identified
as William Arnold 23, of 5853 Rodman Street.

Q. How did you know that the car belonged to Alfred Clark?

A. I have seen him on several occassions driving the car.


Q. Is there anything else you can add?

A. Yes, while in the pool hall when the body was found I obseved on the pool
   table nearest the door, a set of General motors car keys, with a leather
   key case.

TilleryDAOFiles351

# EXHIBIT "O"
### 10/22/1976 Interview of P/O McGarvey

| YR. | DIST. OF OCCUR. | DC No. (2-7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (1-8-9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|
| | | | | SUPPLEMENTAL (52) | ☐ Status Change | | |
| PREVIOUS CLASSIFICATION | | CODE | | Continuation (51) | ☐ Additional Info. | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| | | | | Sheet    of | ☐ Court Disposition | | |
| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | | J.A.D. INVESTIGATIONS (35) | Juvenile Offenders Adult Offenders |
| | | | | | | 1. ☐ Male    2. ☐ Female | |
| COMPLAINANT (Use firm name) (36-52) | | | AGE (80-81) | RACE (82) 1. ☐ W 3. ☐ N 4. ☐ PR 5. ☐ O | SEX (83) 1. ☐ M 2. ☐ F | ADDRESS | PHONE |
| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | | REPORTED BY | | | ADDRESS | |
| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) ☐ Yes  ☐ No | STATUS (67) | 1. ☐ Active 2. ☐ Inactive – not cleared | 3. ☐ Arrest – cleared 4. ☐ Exceptionally cleared | UNIT |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos   A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Live Stk. | | | ☐ No | ☐ Out |

D. INTERVIEWS:

On 10-22-76 at about 11:45pm Pol. William McGarvey #3142 was interviewed inside room 104 PAB by Det Formicola #9029 and related to him the follwoing:

On 10-22-76 , Friday, I was assigned to N-121, working the 6pm to 2am tour of duty with Pol. Albert Martin #3750. We were in plainchothes driving a 1976 Dod e Pick Up truck, unmarked. At about 7:30pm, 7:45pm  I observed a 1976 Yellow body, bkack convertable top Cadillac parked in the driveway off of Cumberland St., between Warndck and 11th.  eated inside the car was Alfred Clark, on the passenger side, and behind the wheel was Frank Junius. I did not speak to or question the men at this time.
At about 9:54pm we were at Broad and Lehigh St when we received a radio call SHOOTING AND HOSPITAL CASE AT WARNOCK AND HUNTINGDON, and than radio changed the location to Warnock and Huntingdon.  We went directly to that location and observed on the S.E. corner of  Warnock and Huntingdon police oficers taking a hospital case  and placing the hospital case into an EPW.  (2203) At this time Sgt. Raymond Brown #266 arrived in 22-A.  Officers McCallister and Norton , both assigned to ACT 2 were also on the scene.  These officers and Sgt. Brown had information that there was another male injured inside the pool room at 1008 W. Huntingdon St. The officers forced the door of the poolroom and there was a male lying inside the door to the left in a pool of blood. He appeared to be injured in the upper body.  At this time EPW 2203 arrived and took this  ale directly to thehospital. As we left the pool room we observed parked across the street from the pool room, at approximatly 1009 Huntingdon, the same yellow Caddillac convertable that we had seen earlier at Cumberland St.  The auto was unoccupied.
We got back into our vehicle and began to patrol our area for possible suspects. Wew were at 16th and York when we heard over police radio that this yellow Caddillac had ;eft the scene and for all  vehicles to be on the lookout vor this vehicle, and the first three digits were 77P, about 1 minute later we heard officer  on 228 inform radio that he was behind the auto at 16th and Huntingdon. We proceeded directly to Huntingdon St., and observed Officer Pressley stop the auto, as the Cadillac stopped, a male, later identified as Frank Junius  got out of the drivers side and began to run. he got about 15 feet and officer Press ey coight him.  Myself and my partner went to the passenger side just as Alfred Clark got out of the auto in a fast manner and was walking moving very quickly away from the auto.  We stopped h m before he could go several feet and placed him against the auto.  We patted him down and he did not have any weapons but did have a large amount of money in his pants pocket.  He stated that he had about 1800 dollars. We did not check his money. We called for a wagon and placed Clark in the wagon and Junius in an police auto for transportation.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| | | |

75-49 (Rev. 12/74)

TilleryDAOFiles359

**STAFF SERVICES DIVISION**

# EXHIBIT "P"
**10/23/1976 Statement of Frank Junius**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER Strohm 9164 |

| NAME Frank Junius | AGE 25 | RACE N | DOB 8-24-51 |
|---|---|---|---|
| ADDRESS 925 W. York Street | APARTMENT NO. | | PHONE 978-4914 |
| NAME OF EMPLOYMENT/SCHOOL American Photo Engraving Co. | | | SOC. SEC. NO. 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 |
| ADDRESS OF EMPLOYMENT/SCHOOL Jun. Pen + Arch St. | | | PHONE |
| PLACE OF INTERVIEW Rm 104 P.A.B. Homicide Div. | | | DATE AND TIME 10-23-76 12:15 AM |
| BROUGHT IN BY Police | | | DATE AND TIME |

WE ARE QUESTIONING YOU CONCERNING
The shooting death of Joseph Hollis

| WARNINGS GIVEN BY | DATE AND TIME |
|---|---|

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q  Who were you with when Police stopped you?

A.  Alfred Clark.

Q.  Where were you stopped at?

A.  between 16th and 17th on Huntingdon street.

Q  Where were you coming from?

A.  I was coming from home.

Q.  Did Alfred Clark pick you up?

A.  Yes, at my home.

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|
| REVIEWED BY | |

75-483 (Rev. 8/75)

TilleryDAOFiles340

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
|---|---|---|
| Frank Junius | 2 | |

Q  What time did he pick you up?

A  Alfred picked me up 15 or 20 min. before the police stopped us.

Q.  Where were you and Alfred going?

A.  I was driving I was going to 27th and Somerset start a girl friend house.

Q  Were you at the pool hall at 1008 W. Huntingdon start?

A.  No.

Q  Do you know where the Pool hall is?

A  Yes.

Q  Have you ever been there?

A.  Yes.

TilleryDAOFiles341

75-483 A

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME: Frank Junius

PAGE: 3.

CASE NO.:

Q. When was the last time you were there?

A. About a month or a month and a half.

Q. Do you know where Alfred was prior to his picking you up at home?

A. No.

Q. When you were home was anyone else home?

A. My family.

Q. Can they verify that you were home tonight?

A. Yes.

Q. Who would know?

A. My mother.

MGT COPY

TilleryDAOFiles343

75-483 A

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE  DEPARTMENT |

| NAME  Frank Junius | PAGE 4 | CASE NO. |

(Q) Who was driving the Yellow Caddy when the police stopped you.

(A) I was.

(Q) How long were you driving the car before the police stopped you.

(A) About 10 minutes.

(Q) Did you drive the car earlier in the night.

(A) No— cause Alfred just come around.

(Q) Were you driving Raineys car earlier in the day.

(A) Earlier I was, but the car wasn't moved tonight cause I tried to start it at 6 o'clock and it was dead. The alternator is shot.

75-483 A

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| NAME Frank Jenkins. | PAGE 5 | CASE NO. |

② Where is the auto (Rainey's)

Ⓐ In front of my house

② Where are the keys.

Ⓐ I gave them back to Rainey at the Mosque. about 7 P.M.

② What do the keys look like.

Ⓐ 2 keys on chain - a silver chain.

MGT COPY

75-483 A

# EXHIBIT "Q"
## Search Warrant for Fred Rainey's Green Cadillac

# Commonwealth of Pennsylvania

SS.

CITY AND COUNTY OF PHILADELPHIA

## SEARCH WARRANT
### AND AFFIDAVIT

| | | | |
|---|---|---|---|
| Joseph Bross | 980 | Homicide Division | WARRANT CONTROL NO. |
| Floyd Gills | 9065 | | 35411 |
| (Name of Affiant) | (Badge No.) | (District/Unit) | |

ISSUED TO DIST./UNIT  Homicide

DATE OF APPLICATION  10-24-76

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED *(Be as specific as possible)*:

Any guns and ammunition

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED *(Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)*:

1976 Cadillac, Pa. Lic. 666D27, Mfg. serial # 6D47S6Q3086X.

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED *(If proper name is unknown, give alias and/or description)*:

Fred Rainey, 1444 Dover Street.

VIOLATION OF *(Describe conduct or specify statute)*:

Murder, 2502; PIC, 907; TOR, 908; and VUFA.

YEAR/DIST./COMPLAINT NO.

1976-22-03238

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES

On Friday, October 22, 1976, at about 9:54PM, Police responded to a call of a report of shooting and hospital case at the pool hall, 11th and Huntingdon Streets. Upon their arrival they found Joseph Hollis, 20, N/M residence of 5812 Christian Street, lying inside the pool hall with gunshot wounds of the back, left arm and buttocks. Police also found John Pickens, 28, N/M, residence 5138 N 8th Street, inside 2527 N 11th Street with gunshot wounds of the stomach and neck. Pickens tells Police that he was with Hollis when he was shot and he ran to 2527 N 11th Street from the pool hall. Hollis was transported to Temple Hospital where he was pronounced dead at 10:15pm, October 22, 1976, by Doctor Dawkins. Pickens is presently in critical condition in Temple hospital.
Investigation at the scene disclosed a set of General Mortors car keys lying on a pool table in the pool room. A check of the immediate area disclosed that the key fits a 1976 Green Cadillac, Green in color, parked in front of 925 N York Street. Vehicle registration disclosed that the Cadillac is

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY  ☐ CHECK HERE IF ADDITIONAL PAPER IS USED.

| SIGNATURE OF AFFIANT | BADGE NO. | DIST./UNIT | Sworn to (or affirmed) and subscribed before me this _____ |
|---|---|---|---|
| | | | day of _____ 19___ |
| COURT LOCATION | | | _____ (SEAL) |
| | | | (Signature of Issuing Authority) |
| | | | Date Commission Expires |

| RESULT OF SEARCH | DATE AND TIME OF SEARCH | ☐ A.M. | ARREST | JUDGE'S DISPOSITION | |
|---|---|---|---|---|---|
| | 10/24/__ | ☐ P.M. | ☐ Yes ☐ No | ☐ Disc. ☐ Held for Court | ☐ Further Hearing  ☐ Fined or Committed |
| PROPERTY SEIZED | | | | | |
| ☐ Yes  ☐ No | *(If "Yes" list inventory below)* | | | | |

IF ADDITIONAL SPACE REQUIRED USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT

| SIGNATURE OF PERSON SEIZING PROPERTY | BADGE NO. | OTHER OFFICERS PARTICIPATING IN SEARCH |
|---|---|---|
| SIGNATURE OF WITNESS TO INVENTORY *(Name & Address)* | | |

TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

| * ☐ This Warrant should be served as soon as practicable but in no event | ** ☐ This Warrant should be served as soon as practicable but in no event |
|---|---|
| later than _____ ☐ A.M. ☐ P.M. _____, 19___ and shall be served only during daytime hours of 6 A.M. to 10 P.M. | later than _____ ☐ A.M. ☐ P.M. _____, 19___ and may be served anytime during day or night. |
| issued under my hand this _____ day of _____ | issued under my hand this _____ day of _____ |
| 19___, at _____.M o'clock. *(Issue time must be stated)* | 19___, at _____.M o'clock. *(Issue time must be stated)* |
| (SEAL) _____ | (SEAL) _____ |
| (Signature of Issuing Authority) | (Signature of Issuing Authority) |
| Court location _____ | Court location _____ |
| Date Commission Expires _____ Title of Issuing Authority _____ | |

* The issuing authority should specify a date not later than two (2) days after issuance. PA. R. Crim. P. 2005(d).
** If issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavits and wishes to issue a nighttime search warrant, only this section shall be completed. PA. R. Crim. P. 2006(b).

75-175 (Rev. 3/75)

JP Crim.

OWNER / OCCUPANT / PREMISES

MGI COPY

none

MGT COPY

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | | ☐ Class. Change | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | SUPPLEMENTAL (52) | | ☐ Status Change | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| | | | | Continuation (51) | | ☐ Additional Info. | | | |
| PREVIOUS CLASSIFICATION | | CODE | | Sheet        of | | ☐ Court Disposition | | | |
| | | | | PLACE OF OCCURRENCE (18-34) | | | J.A.D. INVESTIGATIONS (35) | Juvenile Offenders Adult | |
| CLASSIFICATION | | CODE (14-17) | | | | | 1. ☐ Male    2. ☐ Female | 3. ☐ Offenders | |
| COMPLAINANT (Use firm name) (36-52) | | | AGE (80-81) | RACE (82) 1. ☐ W   2. ☐ N   4. ☐ PR 3. ☐ C   5. ☐ O | SEX (83) 1. ☐ M 2. ☐ F | ADDRESS | | PHONE | |
| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | | REPORTED BY | | | ADDRESS | | | |
| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) ☐ Yes  ☐ No | STATUS (67) | 1. ☐ Active 2. ☐ Inactive – not cleared | | 3. ☐ Arrest – cleared 4. ☐ Exceptionally cleared | | UNIT |
| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. 2. ☐ T.V., Radio, Stereo 3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals 5. ☐ Household Items (Furniture, Washers) 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs 8. ☐ Clothing B. ☐ Misc. 9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69-73) $ | | RECOVERED VALUE (74-78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out | |

CONTINUATION OF SEARCH AND SEIZURE WARRANT 35411

registered to Fred Rainey, res. 1448 N Dover Street.
P/O George Minner, #2816, ACT-II, was interviewed by Det. Peterson, #9085,
on 10-22-76, and he stated that he was working the 6pm x 2 am tour of duty
with P/O William Norton, #6498, and P/O William McAllister, when they respond-
ed to a radio call reporting the shooting at 11th and Huntington Sts. and
found the decedant shot inside the pool room, 1008 W Huntington St.  P/O
Minner went to a restaurant located at the Southeast Corner of 11th and
Huntington Streets, and took into custody for investigation Fred Rainey,
24, N/M, res. 1448 N Dover Street, and Eugihavia Jones, 27, N/M, res.
2032 N 11th Street, whom he knows to frequent the pool hall and has been
involved in drug related homicides.
Fred Rainey, 24, N/M, was interviewed on 10-22-76, by Det. Daniel Lynch, and
after being warned of his Constitutional Rights, he refused to make a state-
ment.
The affiant believes that the keys found inside the poolroom where the body
of the decedant was found belong to the 1976 Cadillac owned by Fred Rainey
and request that a search warrant be granted to search the auto for any
weapons and ammunition.

Affiant                                              Date

(seal)

Issuing authority

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| | | |

75-49 (Rev. 12/74)

TilleryDAOFiles486

# EXHIBIT "R"

## 1/31/1977 Homicide Investigation Report

INVESTIGATION REPORT                                          PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (8–9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 22 | 63238 | ☒ SUPPLEMENTAL (52) | ☐ Status Change | 22nd | | |

| | | | | ☐ Continuation (51) | ☐ Additional Info. | DIST./UNIT PREPARING | CODE (11–12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|
| PREVIOUS CLASSIFICATION | | CODE | | Sheet 1 of 7 | ☐ Court Disposition | Hom. | 75 | 1-31-77 |
| WILLFUL KILLING | | 111 | | | | | | |

| CLASSIFICATION | CODE (14–17) | PLACE OF OCCURRENCE (18–14) | | J.A.D. INVESTIGATIONS (33) | Juvenile Offenders Adult |
|---|---|---|---|---|---|
| WILLFUL KILLING | 111 | 11th and Huntingdon Streets | | 1. ☐ Male   2. ☐ Female   3. ☐ Offenders | |

| COMPLAINANT (Use firm name) (36–32) | AGE (80–81) | RACE (22) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| HOLLIS, Joseph | 20 | 2. ☒ N  4. ☐ PR   1. ☐ W  5. ☐ D   3. ☐ C | 1. ☒ M   2. ☐ F | | Unknown |

| TYPE OF PREMISES (51–55) | DATE AND TIME REPORTED | REPORTED BY | | ADDRESS |
|---|---|---|---|---|
| | 10-22-76  10:05 PM | Unknown Person | | |

| DATE OF OCCURRENCE (56–61) | DAY CODE (62) | TIME (63–65) | FOUNDED (66) | STATUS (67) | 1. ☒ Active   3. ☐ Arrest – cleared | UNIT |
|---|---|---|---|---|---|---|
| 10-22-76 | 5 | 10:05 PM | ☒ Yes  ☐ No | | 2. ☐ Inactive – not cleared   4. ☐ Exceptionally cleared | |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos  A. ☐ Furs | PROPERTY VALUE (69–73) | RECOVERED VALUE (74–74) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Live Stk. | | | ☐ No | ☐ Out |

### A.  ORIGIN:

On Friday, October 22, 1976, at 10:05 PM, Police Officer Colletta, of Police Radio, notified Lieutenant John Malone #348, that a negro male was taken from a Pool Room Hall, 11th and Huntingdon Streets, shot.  Negro male was pronounced dead at Temple Hospital.

### B.  ASSIGNMENT:

1.  **Homicide:**

At 10:20 PM, Detective Floyd Gallo #9065 was assigned by Lieutenant John Malone #348, and he immediately proceeded to the scene.

2.  **Division:**

Detective Hugh Finnerty #9176 was assigned by Sergeant John O'Leary #8611, of North Central Detective Division.

3.  **Crime Lab:**

Technician Jeffery Parker and Police Officer Edward Little #5834 were assigned by Sergeant John Fitzhenry #296, in charge of the Mobile Crime Detection Unit, at 10:20 PM.

### C.  SCENE:

1.  **Arrival:**

Detective Floyd Gallo #9065, in company with Detective Joseph Flanagan #787, arrived at the scene at 11:20 PM, on October 22, 1976.

2.  **Present:**

Technician Jeffery Parker, Mobile Crime Detection Unit

Police Officer Edward Little #5834, Mobile Crime Detection Unit

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75-49 (Rev. 12-74)

**STAFF SERVICES DIVISION**

MCT COPY

INVESTIGATION REPORT             PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (8–9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 ⋮ 63238 | | SUPPLEMENTAL (52) | ☐ Status Change * | 22nd | | |
| PREVIOUS CLASSIFICATION | | CODE | | Continuation (51) | ☐ Additional Info. | DIST./UNIT PREPARING | CODE (11–12) | REPORT DATE |
| | | | | Sheet  2  of  7 | ☐ Court Disposition | Hom. | 75 | |
| CLASSIFICATION | | CODE (14–17) | PLACE OF OCCURRENCE (18–34) | | | J.A.D. INVESTIGATIONS (33) | | Juvenile Offenders Adult |
| WILLFUL KILLING | | 111 | | | | 1. ☐ Male    2. ☐ Female | | 3. ☐ Offenders |
| COMPLAINANT (Use firm name) (36–52) | | AGE (80–81) | RACE (82) | SEX (83) | ADDRESS | | | PHONE |
| HOLLIS, Joseph | | 20 | 1. ☐ W  2. ☒ N  4. ☐ PR  3. ☐ C  5. ☐ O | 1. ☒ M  2. ☐ F | | | | |
| TYPE OF PREMISES (53–55) | DATE AND TIME REPORTED | REPORTED BY | | | ADDRESS | | | |
| DATE OF OCCURRENCE (56–61) | | DAY CODE (62) | TIME (63–65) | FOUNDED (66) ☐ Yes  ☐ No | STATUS (67) 1. ☐ Active  2. ☐ Inactive – not cleared | 3. ☐ Arrest – cleared  4. ☐ Exceptionally cleared | | UNIT |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos  A. ☐ Furs | PROPERTY VALUE (69–73) | RECOVERED VALUE (74–78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Live Stk. | | | ☐ No | ☐ Out |

C.   SCENE:      (Continued)

    2.   Present:      (Continued)

       Later Arrivals

       Lieutenant John Malone #348, Homicide Division, 11:45 PM

       Detective Michael Chitwood #710, Homicide Division, 11:45 PM

    3.   Outside Description:

       Does not apply.

    4.   Inside Description:

       As you enter the Pool Room located at 11th and Huntingdon Streets, the front door is broken inward. This door opens to the left. The north wall of the pool room is a window. In the northwest corner of the room there is a bar add on the west wall there is a large window, and two (2) smaller windows, these windows are broken. On the east wall, approximately 2' from the door, there appears to be a bullet hole. Also on this east wall, approximately 10' from the front door, there is another door. This door is locked from the stairwell side. There appears to be a bullet hole in this door. In the center of the pool room there is a pool table. On this pool table there are a set of car keys. Heading south, through the front room there is an archway leading into another room. Inside this room there are two (2) pool tables. In the southwest corner of this room there is a door that leads into a bathroom. Inside this bathroom there is a door that leads to the outside. This door is closed with a gate and cannot be open. In the northwest corner of this room there is a door that leads to the outside. This door is closed with a gate and cannot be open. In the northwest corner of this room there is a doorway that leads to the basement.

       See Mobile Crime Detection Unit reports and photographs and sketches for further details.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75–49 (Rev. 12/74)

TilleryDAOFiles165

INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | | | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 | 63238 | SUPPLEMENTAL (52) | ☐ Class. Change | | 22nd | | |
| | | | | Continuation (51) | ☐ Status Change | | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| PREVIOUS CLASSIFICATION | | | CODE | Sheet 3 of 7 | ☐ Additional Info.<br>☐ Court Disposition | | Hom. | 75 | |

| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | J.A.D. INVESTIGATIONS (35) | Juvenile Offenders Adult |
|---|---|---|---|---|---|---|
| WILLFUL KILLING | | 111 | | | 1. ☐ Male   2. ☐ Female | 3. ☐ Offenders |

| COMPLAINANT (Use firm name) (36-52) | | AGE (80-81) | RACE (82) | SEX (X1) | ADDRESS | | PHONE |
|---|---|---|---|---|---|---|---|
| HOLLIS, Joseph | | 20 | 2. ☒ N  4. ☐ PR<br>1. ☐ W  3. ☐ C  5. ☐ O | 1. ☒ M<br>2. ☐ F | | | |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS | |
|---|---|---|---|---|

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66)<br>☐ Yes  ☐ No | STATUS (67) | 1. ☐ Active<br>2. ☐ Inactive - not cleared | 3. ☐ Arrest - cleared<br>4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc.<br>2. ☐ T.V., Radio, Stereo<br>3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals<br>5. ☐ Household Items (Furniture, Washers)<br>6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs<br>8. ☐ Clothing B. ☐ Misc.<br>9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69-73)<br>$ | RECOVERED VALUE (74-78)<br>$ | INSURED<br>☐ Yes<br>☐ No | OCCURRENCE (79)<br>☐ Inside<br>☐ Out |
|---|---|---|---|---|---|---|---|

C.   SCENE:        (Continued)

5.   Body:

The body was observed by Detective Michael Chitwood #710 at Temple Hospital Emergency Ward.  The body was a negro male, 6'3", 170 pounds, lying on his back, clean shaven, short hair, medium brown complexion.  The body was covered with a sheet.  There was no clothing on the body and his head was tilted to the right. His eyes were open.  His right arm was over his right leg and his left arm was down by his side.  There is an apparent bullet hole that looks like an entrance wound at the left scapela.  There is no exit wound at this point.  There is another apparent wound on the left buttocks area.

6.   Crime Lab:

(a)   Direction:

Technician Jeffery Parker and Police Officer Edward Little #5834 were directed at the scene by Detective Floyd Gallo #9065, to take a total of fifteen (15) Photographs; also to make a sketch of the scene, search the scene for latent prints and preserve evidence found at the scene and submit same.

(b)   Latent Prints:

There were no latent prints.

(c)   Other Action:

There was no other action at this time.

7.   Operation and Supervision:

This entire investigation was under the direction of Lieutenant John Malone #348, Homicide Division.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75-49 (Rev. 12/74)

STAFF SERVICES DIVISION

TilleryDAOFiles166

**INVESTIGATION   REPORT**  PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | Class. Change | DISTRICT (8-9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 | 63238 | SUPPLEMENTAL (52) | Status Change | 22nd | |
| PREVIOUS CLASSIFICATION | | CODE | | Continuation (51) | Additional Info. | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| | | | | Sheet 4 of 7 | Court Disposition | Hom. | 75 | |
| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | | J.A.D. INVESTIGATIONS (33) | Juvenile Offenders |
| WILLFUL KILLING | | 111 | | | | 1. ☐ Male   2. ☐ Female | Adult 3. ☐ Offenders |
| COMPLAINANT (Use firm name) (36-52) | | | AGE (80-81) | RACE (82) | SEX (X1) | ADDRESS | PHONE |
| HOLLIS, Joseph | | | 20 | 1.☐W 3.☐C 2.☒N 4.☐PR 5.☐O | 1.☒M 2.☐F | | |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | | ADDRESS | |
|---|---|---|---|---|---|

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) ☐ Yes ☐ No | STATUS (67) | 1. ☐ Active   2. ☐ Inactive - not cleared | 3. ☐ Arrest - cleared   4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc.   2. ☐ T.V., Radio, Stereo   3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals   5. ☐ Household Items (Furniture, Washers)   6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs   8. ☐ Clothing B. ☐ Misc.   9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69-73) $ | RECOVERED VALUE (74-78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |
|---|---|---|---|---|---|---|---|

D.   **INTERVIEWS:**

**Police Officers**

1.   Police Officer Craig BAKER #5501, assigned to the 22nd District.

     See Statement/Interview C-#3

2.   Police Officer John BURKE #1492, assigned to the 22nd District.

     See Statement/Interview C-#5

3.   Police Officer William NORTON #6498, assigned to Act II.

     See Statement/Interview C-#8

4.   Police Officer William McCALLISTER #9893, assigned to Act II.

     See Statement/Interview C-#9

5.   Police Officer William McGARVER #3142, assigned to Act II.

     See Statement/Interview C-#10

6.   Police Officer Richard MOSS #5705, assigned to the 22nd District.

     See Statement/Interview C-#12

7.   Police Officer James PRESSLEY #1375, assigned to the 22nd District.

     See Statement/Interview C-#13

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det-F.J.Gallo 9065   Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75-49 (Rev. 12/74)

**STAFF   SERVICES   DIVISION**

TilleryDAOFiles167

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (8–9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 | 63238 | SUPPLEMENTAL (52) | ☐ Status Change | 22nd | |

PREVIOUS CLASSIFICATION: CODE — Continuation (51) — Sheet **5** of **7** — ☐ Additional Info. ☐ Court Disposition

DIST./UNIT PREPARING: **Hom.** — CODE (11–12): **75** — REPORT DATE

| CLASSIFICATION | CODE (14–17) | PLACE OF OCCURRENCE (18–34) | J.A.D. INVESTIGATIONS (35) | Juvenile Offenders |
|---|---|---|---|---|
| WILLFUL KILLING | 111 | | 1. ☐ Male   2. ☐ Female | Adult 3. ☐ Offenders |

| COMPLAINANT (Use firm name) (36–52) | AGE (80–81) | RACE (82) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| HOLLIS, Joseph | 20 | 2. ☐ N  4. ☐ PR   1. ☐ W  3. ☐ C  5. ☐ O | 1. ☐ M  2. ☐ F | | |

| TYPE OF PREMISES (53–55) | DATE AND TIME REPORTED | REPORTED BY |
|---|---|---|

| DATE OF OCCURRENCE (56–61) | DAY CODE (62) | TIME (63–65) | FOUNDED (66) ☐ Yes ☐ No | STATUS (67) | 1. ☐ Active  2. ☐ Inactive – not cleared  3. ☐ Arrest – cleared  4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc.  2. ☐ T.V., Radio, Stereo  3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals  5. ☐ Household Items (Furniture, Washers)  6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs  8. ☐ Clothing B. ☐ Misc.  9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69–73) $ | RECOVERED VALUE (74–78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |
|---|---|---|---|---|---|---|---|

D.   **INTERVIEWS:**    (Continued)

**Informative Witnesses**

1.   ARNOLD, William 22/N/M, residence ~~████████~~, was interviewed by Police Officer Roger Harmon #5753, Juvenile Aid Division.

   See Statement/Interview C–#2

2.   BULLOCK, William 42/N/M, residence ~~████████~~, was interviewed by Detective Hugh Finnerty #9176, North Central Detective Division.

   See Statement/Interview C–#4

3.   CLARK, Alfred 24/N/M, residence ~~████████~~, was interviewed by Detective James Vales #651, Homicide Division.

   See Statement/Interview C–#6

4.   JUNIUS, Frank 25/N/M, residence ~~████████~~, interviewed by Detective John Strohm #9164, Homicide Division.

   See Statement/Interview C–#7

5.   THOMAS, Rudolph 26/N/M, residence ~~████████~~ interviewed by Detective William Holley #926, Homicide Division.

   See Statement/Interview C–#14

E.   **DEFENDANT:**

   None at this time.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gello #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75–49 (Rev. 12/74)

**STAFF SERVICES DIVISION**

TilleryDAOFiles168

INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | | ☐ Class. Change | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 | 63238 | SUPPLEMENTAL (52) | | ☐ Status Change | 22nd | | |
| | | | | Continuation (51) | | ☐ Additional Info. | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| PREVIOUS CLASSIFICATION | | CODE | | Sheet 6 of 7 | | ☐ Court Disposition | Hom. | 75 | |
| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | | | J.A.O. INVESTIGATIONS (35) | | Juvenile Offenders Adult |
| WILLFUL KILLING | | 111 | | | | | 1. ☐ Male   2. ☐ Female   3. ☐ Offenders | | |

| COMPLAINANT (Use firm name) (36-52) | AGE (80-81) | RACE (82) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| HOLLIS, Joseph | 20 | 1. ☐ N   4. ☐ PR 2. ☐ C   5. ☐ O | 1. ☒ M 2. ☐ F | | |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|---|

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) ☐ Yes ☐ No | STATUS (67) | 1. ☐ Active   3. ☐ Arrest – cleared 2. ☐ Inactive – not cleared   4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. 2. ☐ T.V., Radio, Stereo 3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals 5. ☐ Household Items (Furniture, Washers) 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos   A. ☐ Furs 8. ☐ Clothing B. ☐ Misc. 9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69-73) $ | RECOVERED VALUE (74-78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |
|---|---|---|---|---|---|---|---|

F.   **EVIDENCE:**

1.   Cartridges and Projectiles:

Two (2) live Western .38 caliber cartridges. One (1) spent projectile found on floor. One (1) spent projectile found in hallway to second floor. One (1) spent projectile found in east wall.

See Property Receipt and Lab Report D-#1

2.   Bullet:

One (1) bullet taken from body of deceased.

See Property Receipt and Lab Report D-#1

3.   Eyeglasses, Hat, Pool cue, Pool cue case, and Coat:

One (1) pair eyeglasses, one (1) gray hat with red stains, one (1) pool cue, one (1) black vinyl pool cue case, one (1) tan men's long coat. Above taken from crime scene.

See Property Receipt and Lab Report D-#2

4.   Decedent's Clothing:

One (1) black leather jacket, one (1) pair of black shoes, one (1) striped shirt, one (1) pair black pants, one (1) white undershirt, one (1) pair black shoes, and one (1) pair undershorts.

See Property Receipt and Lab Report D-#2

G.   AUTOPSY:

1.   Pronouncement:

At 10:15 PM, on October 22, 1976, Joseph Hollis was pronounced dead inside Temple Hospital by Doctor Dawkins.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75-49 (Rev. 12/74)

STAFF SERVICES DIVISION

TilleryDAOFiles169

**INVESTIGATION REPORT**                                      PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | | Class. Change | DISTRICT (8–9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|
| 76 | 22nd | 22 | 63238 | SUPPLEMENTAL (52) | | Status Change | 22nd | |

| PREVIOUS CLASSIFICATION | CODE | Continuation (51) | | Additional Info. | DIST./UNIT PREPARING | CODE (11–12) | REPORT DATE |
|---|---|---|---|---|---|---|---|
| | | Sheet 7 of 7 | | Court Disposition | Hom. | 75 | |

| CLASSIFICATION | CODE (14–17) | PLACE OF OCCURRENCE (18–34) | J.A.D. INVESTIGATIONS (33) | Juvenile Offenders |
|---|---|---|---|---|
| WILLFUL KILLING | 111 | | 1. ☐ Male   2. ☐ Female | Adult 3. ☐ Offenders |

| COMPLAINANT (Use line name) (36–52) | AGE (20–21) | RACE (82) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| HOLLIS, Joseph | 20 | 1. ☐ W  2. ☒ N  4. ☐ H  5. ☐ C  3. ☐ PR  0 | 1. ☒ M  2. ☐ F | | |

| TYPE OF PREMISES (53–55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|---|

| DATE OF OCCURRENCE (56–61) | DAY CODE (62) | TIME (63–65) | FOUNDED (66) | STATUS (67) | | UNIT |
|---|---|---|---|---|---|---|
| | | | ☐ Yes  ☐ No | 1. ☐ Active  2. ☐ Inactive – not cleared | 3. ☐ Arrest – cleared  4. ☐ Exceptionally cleared | |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc.  2. ☐ T.V., Radio, Stereo  3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals  5. ☐ Household Items (Furniture, Washers)  6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  8. ☐ Clothing  9. ☐ Firearms | A. ☐ Furs  B. ☐ Misc.  C. ☐ Live Stk. | PROPERTY VALUE (69–73) $ | RECOVERED VALUE (74–78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |
|---|---|---|---|---|---|---|---|---|

---

G.  **AUTOPSY:**        (Continued)

2.  **Transporting of Body:**

The body was transported from Temple Hospital to morgue by Emergency Patrol Wagon #2203.

3.  **Post:**

A post mortem examination was conducted at 1:25 PM, on October 23, 1976, inside the Office of the Medical Examiner by Doctor Fillinger.

4.  **Findings:**

See Medical Examiner's Report.

---

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd Gallo #9065 | Sgt. Robert Snyder #8619 | Lt. James Myers #319 |

75–49 (Rev. 12/74)

**STAFF SERVICES DIVISION**

TilleryDAOFiles170

# EXHIBIT "S"
### 10/27/1976 Ballistics Report

POLICE
CITY OF PHILADELPHIA
DC-22-63238
DATE 10/27/76

# MEMORANDUM

TO : COMMANDING OFFICER HOMICIDE DIVISION

FROM : FIREARMS IDENTIFICATION UNIT

FIU NO. 763476

SUBJECT: HOMICIDE OF JOSEPH HOLLIS, 20, 5911 WEBSTER ST.
INSIDE GOLDIE'S BILLIARDS, 1008 HUNTINGDON ST.
OCTOBER 22, 1976
NO ARREST AT THIS TIME.

1.      Examination has been made October 26, 1976 of the following evidence
        received from Policeman Edward Little #5834, Mobile Crime Detection
        Unit on October 23, 1976 at 1:39 AM.
        PROPERTY RECEIPT NO. 636494.

C1. C2   Found on counter top 5'3" South of North wall and 3'2" East of
         West wall.
         Two (2) Western cartridges, caliber .38 Special.

B1       Found on the floor 2'2" West of East wall and 12' South of North
         wall.
         ONE (1) BULLET SPECIMEN, marked 763476x1 for identification;
         uncoated lead, caliber .38 Special; weighing 152.1 grains; bearing
         portion of two knurled cannelures; nose area and major portion of
         circumference surface sheared, gouged, mutilated and distorted,
         bearing numerous foreign markings, destroying that portion of the
         rifling markings, base edge distorted out of round.
         GENERAL RIFLING CHARACTERISTICS:  Indeterminable.

B2       Found on floor of hallway to second floor at West wall and 11'6"
         South of hallway entrance door.
         ONE (1) BULLET SPECIMEN, marked 763447x2 for identification;
         uncoated lead, cupped base, caliber .38 Special; weighing 156.5
         grains; bearing portion of two knurled cannelures; portion of
         nose area and circumference surface gouged, mutilated and distorted,
         bearing numerous foreign markings, destroying that portion of the
         rifling markings, base edge distorted out of round.
         GENERAL RIFLING CHARACTERISTICS:  Five lands and five grooves with
         a right hand direction of twist.

B3       Removed from East wall 4'7" South of North wall.
         ONE (1) BULLET SPECIMEN, marked 763447x3 for identification;
         uncoated lead, cupped base, caliber .38 Special; weighing 151.6
         grains; bearing portion of one knurled cannelure; nose area and
         portion of circumference surface mutilated and distorted, bearing
         numerous foreign markings, destroying that portion of the rifling
         markings, base edge distorted out of round.
         GENERAL RIFLING CHARACTERISTICS:  Six lands and six grooves with
         a right hand direction of twist.

-1-

82-S-1 (Rev. 3/59)        RESPONSE TO THIS MEMORANDUM MAY BE MADE HEREON IN LONGHAND

TilleryDAOFiles385

MGT COPY

TilleryDAOFiles386

**MEMORANDUM**

TO  :

FROM  :

SUBJECT:

FIU NO. 763476

CONCLUSIONS:

1.  Microscopic comparative examination of evidence bullet specimens
    B1 and B2 against each other has shown that bullet specimen B1
    has shown an insufficient amount of individual characteristic
    to permit a positive identification.

2.  Evidence bullet specimen B3 was not fired from the same firearm as
    bullet specimens B1 and B2 due to different rifling characteristics.

3.  Bullet specimens B1, B2 and B3 were checked against outstanding
    Homicide cases for the previous year from date of occurrence with
    negative results.

JAMES G. O'HARA
POLICEMAN #6385
FIREARMS EXAMINER

WILLIAM CARLIN
POLICEMAN #1356
FIREARMS EXAMINER

gl/

ANTHONY L. PAUL, SUPERVISOR
FIREARMS IDENTIFICATION UNIT

MGT COPY

-2-

82-S-1 (Rev. 3/59)          RESPONSE TO THIS MEMORANDUM MAY BE MADE HEREON IN LONGHAND

# MEMORANDUM

POLICE
PHILADELPHIA
DC-22-63238
DATE 12/10/76

FIU NO. 763476

TO      : COMMANDING OFFICER HOMICIDE DIVISION

FROM    : FIREARMS IDENTIFICATION UNIT

SUBJECT : HOMICIDE OF JOSEPH HOLLIS, 20, 5911 WEBSTER ST.
INSIDE GOLDIE'S BILLIARDS, 1008 HUNTINGDON ST.
OCTOBER 22, 1976
NO ARREST AT THIS TIME.

2.  Examination has been made November 23, 1976 of the following evidence
    received from Detective Gallo #9065, Homicide Division on October 27,
    1976 at 7:47 PM.
    PROPERTY RECEIPT NO. 637880.

B4      ONE (1) BULLET SPECIMEN, marked 763476x4 for identification;
        uncoated lead, cupped base, caliber .38 Special; weighing
        156.4 grains; bearing portion of one knurled and one smooth
        cannelure; nose area and portion of circumference surface
        gouged and distorted, bearing numerous foreign markings,
        destroying that portion of the rifling markings, base edge
        distorted out of shape.
        GENERAL RIFLING CHARACTERISTICS:  Five lands and five grooves
        with a right hand direction of twist.

CONCLUSIONS:

1.  Microscopic comparative examination of evidence bullet specimen
    B4 against evidence bullet specimens B1 and B2 has shown an
    insufficient amount of individual characteristic markings to
    permit a positive identification.

2.  Evidence bullet specimen B4 was not fired from the same firearm
    as bullet specimen B3 due to different rifling characteristics.

3.  Bullet specimen B4 was checked against outstanding Homicide cases
    for the previous year from date of occurrence with negative results.

JAMES G. O'HARA
POLICEMAN #6385
FIREARMS EXAMINER

WILLIAM CARLIN
POLICEMAN #1356
FIREARMS EXAMINER

g1/

ANTHONY L. PAUL, SUPERVISOR
FIREARMS IDENTIFICATION UNIT

82-S-1 (Rev. 3/59)      RESPONSE TO THIS MEMORANDUM MAY BE MADE HEREON IN LONGHAND

TilleryDAOFiles388

# EXHIBIT "T"
**Pool Hall Diagram**

DOOR

COUNTER

SODA
MACHINE

W
A
R
N
O
C
K

S
T
.

25'

POOL
TABLE

STOOLS

DOORS

14'

HALLWAY &
STAIRS TO
2nd FLOOR

DOOR

N

W          E

S

POOL TABLE

POOL TABLE

SKETCH: GOLDIE'S BILLIARDS 1008 W. HUNTINGDON ST.
MEASURED BY: J. PARKER, 10-22-76
DRAWN BY: J. PARKER, ML76-1527
APPROX. SCALE: ¼" EQUALS 1'

0  1  2  3  4

DAO:000454

# EXHIBIT "U"

## Front Door of Goldie's Billiards



# EXHIBIT "V"

**Interior Door on East Wall**



DAO:000440

# EXHIBIT "W"

**East Wall Door Ajar**





DAO-000442

# EXHIBIT "X"

**10/23/1976 Statement of John Pickens**

JOHN PICKENS

Interviewed on 10-23-76 at 11:45 AM
inside Respiratory ICU, Temple Hospital
By Det. McGrath.

I was with Hollis. We went into
the poolhall. We was shooting pool
with Rickie. They locked the door
and wouldn't let us out. They all
pull guns. Rickie had a 38 Magnum
He shot us.

Q. What is Rickie's full Name + Address?
A. I Don't Know. I just know him by
His Face.

MGT COPY

TilleryDAOFiles098

Q. How many people besides you and Hollis were in the pool Hall?

A. 4

Q. How many had guns and How many did the shooting?

A. All four had guns, two did the shooting.

Q. What were the names of the other males?

A. Apples and Dave. I don't know the other one.

Q. Can you tell me the full names or address of the other males?

A. No I just know them by their faces.

Q. WHY DID THEY SHOOT YOU?

A. THEY LOCKED THE DOOR AND WOULDN'T
Let us out.

Q. DID THEY SAY ANYTHING OR TAKE
ANYTHING FROM YOU?

A. THEY took $300 FROM ME.

Q. DID THEY TAKE ANYTHING FROM
HOUSE?

A. YEAH I Don't KNOW WHAT.

Q. WHAT DID RICKIE LOOK LIKE AND WHAT
WAS HE WEARING?

A. HE WAS AS tall AS ME (6'2"), Dark Skin,
BLUE Hat, BLUE Sports suit, BLUE SUEDE SHOES,
BLUE HANKY, BLUE TIE. GOLD WATCH AND RING

MGT COPY

TilleryDAOFiles099

TilleryDAOFiles100

He Had a Gold Chain Around
His Neck. He Had a gold chain
Around His Neck. He Had a Black
Raincoot. He Had a light green
77 Cod parked across the street
on 11th Street.

John Perkins shown photos: Alfred
Clark PP# 437509, William Franklin PP# 467285
Mark Garrick PP# 403490 Fred Rainey PP# 444252
Donald Day PP# 39338 Bobby James PP# 431890
Michael Styles PP# 465709 James Ravenhill PP# 421674
Frank Junius PP# 439086 James Taylor PP# 413409
Rudolph Thomas PP# 465838 Eughin Jones PP# 406757
States not any of the above DD Shooting.
Admits to knowing Clark, Rainey, Junius Jones
by Face.

TilleryDAOFiles101

Chyrc Jackson 26 N/F

5928 Christian St. 747-1268

Arrived Temple Hospital ICU at
12:35 pm with Her sister Tamara.
Interviewed by McGrath when
She stated she wanted to know
if John Perkins Had keys to Her
car, a Maroon Charger, which was
Now parked at 11th & Hunting Don.
She didn't know Perkins last name.
She states that she lent Her car
to Joe Hollis on 10-22-76 Between
6:30-7 pm. He came to Her House to
Borrow Auto to go to Mosque. He
usually goes to 46th & Haverford.

Hollis was alone at that time.
Auto is Now at 11H & Huntingdon,
unlocked. Jackson not actually
owner of auto, But has rented the
car from Avis for a week.
Doesn't know who shot Hollis
or why.

MGT COPY

TilleryDAOFiles102

10:45 am Kiuwiz Pilgain, Minister from
Mosque, inquired about Perkins. (city wide)

11:35 - Told Pickins asked
to write "who shot you"

MGT COPY

TilleryDAOFiles103

TilleryDAOFiles104

JOHN PERKINS

INTERVIEWED AT 11:35 BY DET McGRATH

Q. DO YOU KNOW WHO SHOT YOU?
A. YES.

Q. CAN YOU WRITE THE NAMES OF THE
persons who SHOT YOU ON A PIECE
OF PAPER?
A. YES.

Q.

TilleryDAOFiles105



MGt COPY

# EXHIBIT "Y"

**10/23/1976 Notes re: Information From Reggis Hollis**

INFRO   Received From         10-23-76
6 P.M.
Reggie Hollis Dir. of Dec.
Dave - is Diana. lives with
Francine in Winfield.
Francine maybe girlfriend of
John Pickins. C Dave beat Francine
with a bat about 1 wk ago

INFRO Cheryle Jackson.
747-12-68- Rent car from Avis 18th & Marshal
Rented - 10-22-76
Car; Maroon Charger with N.J. Tag.
Floral interior.

INFRO. Received From John Pickins in
Temple Hosp. 10-23-76 Det. McGraf.
Richey - Shooter
Apple
Dave - see item 1 st This Page.

MGT COPY

# EXHIBIT "Z"

**1/17/1977 Statement of Marvin Dyson**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER Mc Gowan #4 |

| NAME Marvin Dyson | AGE 24 | RACE N/m | DOB 3/10/52 |
|---|---|---|---|
| ADDRESS 2918 N. 59th St | APARTMENT NO. | | PHONE GR3-3807 |

| NAME OF EMPLOYMENT/SCHOOL Un-employed | SOC. SEC. NO. Unknown |
|---|---|
| ADDRESS OF EMPLOYMENT/SCHOOL | PHONE |

| PLACE OF INTERVIEW Room # 104 PAB | DATE AND TIME 1/17/77 @ 3:35 P.M. |
|---|---|
| BROUGHT IN BY | DATE AND TIME |

WE ARE QUESTIONING YOU CONCERNING

| WARNINGS GIVEN BY | DATE AND TIME |
|---|---|

ANSWERS

(1)    (2)    (3)    (4)    (5)    (6)    (7)

Q- What do you know about the murder of Joe Holley which occured at 7008 W Huntingdon on 10/22/76 ?

A- Just what everybody on the street talks about Larry & Pie shot shot Joe Holley and killed him and packed Jenny Cakes

Q- Who is Larry & Pie ?

A- Larry Goodman they called him Dana Goodman there brothers 2119 N 59th St.

Q- Why was they suppose to shoot Joe Holley ?

A- Behind some drugs, and Dana wife

Q- Where were you on 10-22-76 ?

A- I was working at the Star 5900 Merion I got out of Graterford on 10-19-76 or the 20th.

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|
| REVIEWED BY | |

MGT COPY

-483 (Rev. 8/75)

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME Marion Dyson                    PAGE 2      CASE NO.

Q - Do you know Larry & Pie good enough to talk to?

A - Yes I know them good.

Q - When was the last time you talked to Larry or Dana?

A - I haven't talked to Dana since I have been home, I talked to Larry at about a month ago, he just asked me how I was doing, I was coming out of a hardware store on 58th St.

Q - Who said that Larry & Pie shot Hollis?

A - Ernest Name 27 W/M lives on 7100 [Melvin] 1st house from the corner of Malvern.

Q - What did Dana say?

A - He was the first one that told me Dana on the temple & he said they knew that they did it.

Q - Who else told you Pie & Larry killed Hollis

MGT COPY

75-483 A

| INVESTIGATION  INTERVIEW  RECORD | CITY  OF  PHILADELPHIA |
| CONTINUATION  SHEET | POLICE   DEPARTMENT |

NAME Marvin Dyson

PAGE 3

CASE NO.

A - Alot of people I just know to see

Q - Did anyone tell you that Rice & Lenny told them that they killed Holly?

A - No can.t nobody told me that

Q - Do you know anything about any the murders?

A - No

Q - When did Ernest Rice tell you about Holly getting killed?

A - It was sometime in October in the store where I worked.

Q - Did you know Holly?

A - No, I knew Cake, I havn't seen him

TilleryDAOFiles090

75-483 A

# EXHIBIT "AA"
## 8/22/1980 Continued Investigation Report

INVESTIGATION REPORT                                    PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | | ☐ Class. Change | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 | 22-63238 | X | | ☐ Status Change | 22nd | | F |

Initial (49) X
Supplemental (52)
Continuation (51)  //1
Sheet 1 of 4
☐ Class. Change
☐ Status Change
☐ Additional Info.
☐ Court Disposition

DIST./UNIT PREPARING: Hom.  CODE (11-12): 15  REPORT DATE: 8/12/18

| PREVIOUS CLASSIFICATION | CODE |
|---|---|
| Willful Killing | //1 |

| CLASSIFICATION | CODE (14-17) | PLACE OF OCCURRENCE (18-14) |
|---|---|---|
| Willful Killing | //1 | 1008 W. Huntington St. |

J.A.D. INVESTIGATIONS (35)   1. ☐ Male   2. ☐ Female   Juvenile Offenders / Adult Offenders

| COMPLAINANT (Use firm name) (36-52) | AGE (80-81) | RACE (82) | SEX (83) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| Hollis  Joseph | 20 | 2  1. ☐ W  4. ☐ PR  5. ☐ O  3. ☐ C | 1. ☐ M  2. ☐ F | 5812 Christian St. | unk. |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|---|
| | 10/22/76  945Pm | unk. | |

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) | STATUS (67) | UNIT |
|---|---|---|---|---|---|
| 10/22/76 | 5 | 945pm | ☒ Yes ☐ No | 1. ☐ Active  2. ☐ Inactive – not cleared  3. ☒ Arrest – cleared  4. ☐ Exceptionally cleared | Hom. |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Live Stk. | | | ☐ No | ☐ Out |

N. **Continued Investigation:**

A. On 5/15/80 a N/male Emanuel Claitt 25yrs. res. 5148 Greene St. was
arrested for Robbery by Nwdd. Det. Gerrard of Homicide interviews
Mr. Claitt for information about open Homicides. Mr. Claitt indicated
that he had information about the Murder of Joseph Hollis on 10/22/76.

B. On 5/20/80 Det. Kuhar and Det. Grace make arrangements to have Mr.
Emanuel Claitt brought down from Detention Center for further interviews
on open Homicides.

On 5/20/80 at aprox. 6pm Mr. Claitt is brought down from the detention
Center and is interviewed by Det. Kuhar & Det. Grace.
Mr. Claitt in his interviewed stated that he was present when Joseph
Hollis was shot inside the pool room 1008 W. Huntington St. He said
Hollis and Alfred Clarke had an argument over dupe and that Hollis had
struck Alfred Clarke across the face with a gun. Major Tillery who was
present when this happen told Alfred Clarke after Hollis left that he
would have to be killed.
Major Tillery told Sylvester White (who was killed in 1977) to bring
Joseph Hollie and Jonny Oakes to xxxxx the pool hall on Friday 10/22/76.
Major Tillery told Sylvester that for doing this he would spare his life
because Major Tillery through that Sylvester White was the one that
sent Joseph Hollie to the meeting where Alfred Clare got smacked across
the face by Joseph Holliw.
In his statement Emanuel Claitt who was present in the pool room at the
time that Major Tillery shot and killed Joseph Hollie identified everyone
who was present and what part they played in this crime.

Mr. Claitt was polygraphed by Pol. Women Riley on the following questions:
Do you know for sure who Murder Joseph Hollin?
Did you see Major Tillery shoot Joseph Hollis?
Where you present when Joseph Hollis was shot?
Mr. Claitt was NDi on all questions.

The statement of Emanuel Claitt was also taped by Det. Kuhar & Det. Grace.
On 5/21/80 Lt. Shelton &Det. Lubiejewski go to 5725 Wyndale St. res. of
Carolyn Clark nf30yrs. who is an associate of Major Tillary.

Carolyn Clark and unk.nm arrive in Cadillac Eldorado NJ lic.315KXJ.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd J. Gallo | | Lt. A. Woody #302 |

75-49 (Rev. 12/74)

**DISTRICT ATTORNEY**

TilleryDAOFiles679

MGT COPY

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | | Class. Change | DISTRICT (8–9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 22-63238 | X | Continuation (51) | | Status Change | 22 | F |

| | | | SUPPLEMENTAL (52) | | Additional Info. | DIST./UNIT PREPARING | CODE (11–12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|
| PREVIOUS CLASSIFICATION Willful Killing | CODE 111 | Sheet 2 of 4 | | | Court Disposition | Hom. | 75 | 8/5/80 |

| CLASSIFICATION Willful Killing | CODE (14–17) 111 | PLACE OF OCCURRENCE (18–54) 1008 W. Huntington St. | J.A.D. INVESTIGATIONS (55) 1. ☐ Male   2. ☐ Female | Juvenile Offenders Adult 3. ☐ Offenders |
|---|---|---|---|---|

| COMPLAINANT (Use first name) (36–52) Hollis Joseph | AGE (80–81) 20 | RACE (82) 1. ☒ W  2. ☐ N  4. ☐ PR  3. ☐ C  5. ☐ O | SEX (83) 1. ☒ M  2. ☐ F | ADDRESS 5812 Christian St. | PHONE unk. |
|---|---|---|---|---|---|

| TYPE OF PREMISES (53–55) hwy | DATE AND TIME REPORTED 10/22/76 945pm | REPORTED BY unk. | ADDRESS |
|---|---|---|---|

| DATE OF OCCURRENCE (56–61) 10/22/76 | DAY CODE (62) 5 | TIME (63–65) 945pm | FOUNDED (66) ☒ Yes  ☐ No | STATUS (67) 1. ☐ Active  2. ☐ Inactive – not cleared | 3. ☒ Arrest – cleared  4. ☐ Exceptionally cleared | UNIT Hom |
|---|---|---|---|---|---|---|

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. 2. ☐ T.V., Radio, Stereo 3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals 5. ☐ Household Items (Furniture, Washers) 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos  A. ☐ Furs 8. ☐ Clothing B. ☐ Misc. 9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69–73) $ | RECOVERED VALUE (74–78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |
|---|---|---|---|---|---|---|---|

H. Continued Investigation: Page no.2

Registration checked out to 1st Penna. bank auto leasing PO box 13539

Det. Lubiejewski updating files ,assembling criminal extracts and photoes of all suspects in this case. Det. Lubiejewski also researching relatives of Major Tillary also a Harrisburg MV check is made on Tillary.

Det. Kane & Det. Gerrard check outsoursces and find out that Porky who was present during the killing of Joseph Hollie is William Franklin res. 2612 N. Sartain St. PH.67285.

On 5/22/80 Lt. Shelton & Det. Garrard go to the 35th dist. to talk to witnesses on this case.
Probable Cause affidavits prepared to obtain Murder warrants for William Franklin and Major Tillary by Det. Kuhar.
Det. Bracey goes to Fort Washington Pa. Sheraton Hotel to ascertain if Major Tillary or George Hose or any of Major Tillary associates are registered.

On 5/23/80 Lt. Shelton &Det. Lubinjewski to the area Ashdale & Mascher Sts. trying to locate auto of Major Tillery wife.

On 5/27/80 Lt. Shelton sets up Surveilance through out City trying to locate Major Tillary or his associates. Lt. Shelton, Det. Bethea, Det. Lubiejewski, Det. Kuhar.

On 5/28/80 Lt. Shelton, Dets. Grace, Kuhar, Bethea, Lubiejewski set up surveillance and pick up Carolyn Clark she is interviewed.
Hit is made for Major Tillary at 4937 Morris St. He no longer ownes this residence.
Hit is made for William Franklin 2612 N. Sartain St. Wife is home states she has not seen him for a week.
Check is made a Kerbeck Motors for all auto purched by Major Tillary thru 1980.
Check if made at gas co, and P.E. on any change of addres on Tillary
Post Office is checked for change of address.
Harrisburg check is made for all auto registered to Tillary.

On 5/29/80 William Franklin surrendered to Det. Lubiejewski. He is charged with Murder of Joseph Hollis and held WO'ail .He is also charge with another shooting and held in $10,000 bail for that.

| INVESTIGATOR (Type and Sign Name) Det. Floyd J. Gallo | SERGEANT | LIEUTENANT Lt. Moody 310 |
|---|---|---|

75–49 (Rev. 12/74)

TilleryDAOFiles680

**DISTRICT ATTORNEY**

INVESTIGATION REPORT     PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. (2-7) | DC NO. (2-7) | | | INITIAL (49) | | ☐ Class. Change | DISTRICT (8-9) | | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 22-63238 | X | | SUPPLEMENTAL (52) | | ☐ Status Change | 22nd | | F |

| PREVIOUS CLASSIFICATION | | CODE | Continuation (51) | | ☐ Additional Info. | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
|---|---|---|---|---|---|---|---|---|
| Willful Killing | | 111 | Sheet 1 of 4 | | ☐ Count Disposition | Hom. | 75 | 8/18/80 |

| CLASSIFICATION | | CODE (14-17) | PLACE OF OCCURRENCE (18-34) | | | | J.A.D. INVESTIGATIONS (55) | Juvenile Offenders |
|---|---|---|---|---|---|---|---|---|
| Willful Killing | | 111 | 1008 W. Huntingdon St. | | | | 1.☐ Male  2.☐ Female | 3.☐ Adult Offenders |

| COMPLAINANT (Use firm name) (36-52) | | AGE (80-47) | RACE (82) | SEX R5) | ADDRESS | PHONE |
|---|---|---|---|---|---|---|
| Hollis  Joseph | | | 1.☐ W  2.☒ N  4.☐ PR  3.☐ C  5.☐ O | 1.☒ M  2.☐ F | ▮▮▮▮▮▮▮▮▮▮ | unk. |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | ADDRESS |
|---|---|---|---|
| | 10/22/76  9:45PM | unk. | |

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) | STATUS (67) | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) | UNIT |
|---|---|---|---|---|---|---|---|---|---|
| 10/22/76 | 5 | 9:45PM | ☒ Yes  ☐ No | 1.☐ Active  2.☐ Inactive – not cleared | 3.☒ Arrest = cleared  4.☐ Exceptionally cleared | $ | $ | ☐ Yes  ☐ No | ☐ Inside  ☐ Out | Hom. |

| STOLEN PROPERTY (68) | 1.☐ Currency, Bonds, etc. | 4.☐ Jewelry, Precious Metals | 7.☐ Autos  A.☐ Furs |
|---|---|---|---|
| | 2.☐ T.V., Radio, Stereo | 5.☐ Household Items (Furniture, Washers) | 8.☐ Clothing  B.☐ Misc. |
| | 3.☐ Office Equipment | 6.☐ Consumer Items (Liquor, Cigarettes, etc.) | 9.☐ Firearms  C.☐ Live Stk. |

**H. Continued Investigation:**

A. On 5/15/80 a white Emanuel Claitt 25yrs. res. 5148 Greene St. was arrested for robbery by Imed. Det. Gerrard of Homicide interviews Mr. Claitt for information about open homicides. Mr. Claitt indicated that he had information about the murder of Joseph Hollis on 10/22/76.

B. On 5/20/80 Det. Kuhar and Det. Grace make arrangements to have Mr. Emanuel Claitt brought down from Detention Center for further interviews on open homicides.

On 5/20/80 at 3 p.m. 8pm Mr. Claitt is brought down from the detention center and is interviewed by Det. Kuhar & Det. Grace. Mr. Claitt in his interviewed stated that he was present when Joseph Hollis was shot inside the pool room 1008 W. Huntingdon St. He said Hollis and Alfred Clarke had an argument over dope and that Hollis had struck Alfred Clarke across the face with a gun. Major Tillery who was present when this happen told Alfred Clarke after Hollis left that he would have to be killed.
Major Tillery told Sylvester White (who was killed in 1977) to bring Joseph Hollis and Johny Oakes to xxing the pool hall on Friday 10/22/76. Major Tillery told Sylvester that for doing this he would spare his life because Major Tillery through that Sylvester White was the one that sent Joseph Hollis to the meeting where Alfred Clare got smacked across the face by Joseph Hollis.
In his state ent Emanuel Claitt who was present in the pool room at the time that Major Tillery shot and killed Joseph Hollis identified everyone who was present and what part they played in this crime.

Mr. Claitt was polygraphed by Pol. Woman Riley on the following questions:
Do you know for sure who murder Joseph Hollis?
Did you see Major Tillery shot Joseph Hollis?
Where you present when Joseph Hollis was shot?
Mr. Claitt was NDI on all questions.

The statement of Emanuel Claitt was also typed by Det. Kuhar & Det. Grace.
On 5/21/80 Lt. Shelton & Det. Lubiejewski go to 5725 Wyndale St. res. of Carolyn Clark 18yrs. who is an associate of Major Tillery.

Carolyn Clark and which arrive in Cadillac Eldorado Md lic.315KAD.

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Floyd S. Carlo | | Lt. A. Woody #302 |

75-49 (Rev. 12/74)

DAO:000348

INVESTIGATION REPORT                                    PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2-7) | | INITIAL (49) | ☐ Class. Change | DISTRICT (8-9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 2-63238 | X | SUPPLEMENTAL (52) | ☐ Status Change | 22 | F |
| PREVIOUS CLASSIFICATION | | CODE | Continuation (51) | | ☐ Additional Info. | DIST./UNIT PREPARING (11-12) | CODE | REPORT DATE |
| Willful Killing | | 111 | Sheet 2 of 41 | | ☐ Court Disposition | Hom. | 75 | 8/5/80 |
| CLASSIFICATION | | CODE | PLACE OF OCCURRENCE (13-14) | | | J.A.D. INVESTIGATIONS (15) | Juvenile Offenders |
| Willful Killing | | 111 | 1008 W. Huntington St. | | | 1. ☐ Male   2. ☐ Female | 3. ☐ Adult Offenders |
| COMPLAINANT (Use firm name) (36-52) | | | AGE (80-81) | RACE (82) | SEX (83) | | PHONE |
| Hollis Joseph | | | 20 | 1. ☒ W | 2. TN 3. C | 4. PR 5. O | SEX: 1. ☒ M 2. ☐ F | | unk. |
| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | | ADDRESS | | | |
| mfy | 10/22/76 945 m | unk. | | | | | |
| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (61-65) | FOUNDED (66) | STATUS (67) | 1. ☐ Active   3. ☒ Arrest - cleared | | UNIT |
| 10/22/76 | 5 | 945 m | ☒ Yes  ☐ No | | 2. ☐ Inactive - not cleared   4. ☐ Exceptionally cleared | | Hom |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Vine Stk. | | | ☐ No | ☐ Out |

**H. Continued Investigation:** Page no.2

Registration checked out to 1st Penna. bank auto leasing PO box 13539

Det. Lubiejewski updating files ,assembling criminal extracts and photoes of all suspects in this case.Det. Lubiejewski also researching relatives of Major Tillary also a Harrisburg BMV check is made on Tillary.

Det. Kane & Det. Gerrard check outsources and find out that Porky who was present during the killing of Joseph Hollis is William Franklin res. 2018 N. Bartain St. HP467285.

On 5/24/80 Lt. Shelton & Det. Gerrard go to the 35th. dist. to talk to witnesses on this case.
Probable cause affidavits prepared to obtain murder warrants for William Franklin and Major Tillary by Det. Kuhar.
Det. Decey goes to Fort Washington Pa. Sheraton Hotel to ascertain if Major Tillary or Broege Rose or any of Major Tillary associates are registered.

On 5/23/80 Lt. Shelton &Det. Lubiejewski to the area Ashdale & Fischer ~ts. trying to locate auto of Major Tillary wife.

On 5/27/80 Lt. Shelton sets up surveilance through out City trying to locate Major Tillary or his associates.Lt. Shelton ,Det.Bethea, Det. Lubiejewski,Det. Kuhar.

On 5/28/80 Lt. Shelton,Dets.Grace,Kuhar,bethea,Lubiejewski set up surveilance and pick up Carolyn Clark she is interviewed.
Hit is made for Major Tillary at 4937 Morris st. he no longer owns this residence.
Hit is made for William Franklin 2018 N. Bartain St. wife is home states she has not seen him for a week.
Check is made a Herbeck Motors for all auto purched by Major Tillary thru 1980.
Check if made at gas co. and P.E. on any change of addres on Tillary.
Post office is checked for change of address.
Harrisburg check is made for all auto registered to Tillary.

On 5/29/80 William Franklin surrendered to Det. Lubiejewski.He is charged with murder of Joseph Hollis and held no bail .He is also charge

| INVESTIGATOR (Type and Spell Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| Det. Lloyd J. Gallo 6-616 PCER | | Lt. Murry 316 |

75-49 (Rev. 12 74)

DAO:000349

# INVESTIGATION REPORT

PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. | | INITIAL (49) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 | 22-63238 | ☒ SUPPLEMENTAL (52) | ☐ Class. Change | DISTRICT (8-9) 22 | SECTOR (10) F |

| | | INITIAL (49) | | ☐ Class. Change | |
| PREVIOUS CLASSIFICATION Willful Killing | CODE 111 | Continuation (51) Sheet 3 of 4 | ☐ Status Change ☐ Additional Info. ☐ Court Disposition | DIST./UNIT PREPARING Hom. | CODE 75 | REPORT DATE 8/28/80 |

| CLASSIFICATION Willful Killing | CODE 111 | PLACE OF OCCURRENCE (18-34) 1508 N. Huntington St. | | J.A.D. INVESTIGATIONS (35) 1. ☐ Male   2. ☐ Female | Juvenile Offenders 3. ☐ Adult Offenders |

| COMPLAINANT (Use firm name) (36-52) Hollis Joseph | AGE (80-81) 20 | RACE (82) 1. ☐ W   2. ☒ N   5. ☐ PR | SEX (83) 1. ☐ M   2. ☐ F | | PHONE unk. |

| TYPE OF PREMISE (53) Hwy | DATE AND TIME REPORTED 10/22/76 945pm | REPORTED BY Unk. | ADDRESS |

| DATE OF OCCURRENCE (56-61) 10/22/76 | DAY CODE (62) 5 | TIME (63-65) 945pm | FOUNDED (66) ☒ Yes ☐ No | STATUS  1. ☐ Active   2. ☐ Inactive – not cleared   3. ☐ Arrest – cleared   4. ☐ Exceptionally cleared | UNIT Hom. |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. 2. ☐ T.V., Radio, Stereo 3. ☐ Office Equipment | 4. ☐ Jewelry, Precious Metals 5. ☐ Household Items (Furniture, Washers) 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 7. ☐ Autos   A. ☐ Furs 8. ☐ Clothing B. ☐ Misc. 9. ☐ Firearms C. ☐ Live Stk. | PROPERTY VALUE (69-73) $ | RECOVERED VALUE (74-78) $ | INSURED ☐ Yes ☐ No | OCCURRENCE (79) ☐ Inside ☐ Out |

H. **Continued Investigation:** Page no.3

Mr. Emanuel Claitt is brought down from the detention center and reinterviewed about other jobs and Major Tillary.
Mr. Emanuel Claitt is moved from detention center to Bucks Co. prison for his protection.

Lt. Shelton contacts Harrisburg P.D. for information regarding phone numbers in that area pretaining to Major Tillary.
Lt. Shelton contacts Pittsburg P.D. for information regarding phone numbers in that area pretaining to Major Tillary.
Det.s Dace,Kunar Lubiejewski,Rethea,thru out city trying to locate autos and associates of Major Tillary.

On 5/30/80 George Rose an associate of Major Tillary is arrested and charged with murder in another case which also involves Major Tillary. Hits are made for Tillary.

On 6/3/80 Hit are made thru out city for Major Tillary.

On 6/4/80 Hit are made for Tillary,s girlfriend.

On 6/5/80 Court rooms in City Hall where Major Tillary has case are checked to see if he shows up.
Warrants are obtained against Major Tillary for murder in additional cases.

On 6/6/80 Associate of Major Tillary is arrested in Nwod for a shooting there is also a warrant for Major Tillary in this case.

On 6/7/80 Crm sent on the wanted for Major Tillary .

On 6/9/80 George Rose an associate of Major Tillary is held in high bail and a hearing is set for 6/19/80. Tillary is also involved in this case (bombing)

On 6/11/80 Contact is made with Emanuel Claitt again and he states that he has no more info on Tillary.

On 6/17/80 Information is received that girlfriend of Tillary Regina Johns is to pick up bpa check. Surveilance is set up.

| INVESTIGATOR (Type and Signature) Det. F.J. Gallagher 65 | SERGEANT | LIEUTENANT Lt. A. Brody 310 |

75-49 (Rev. 12/74)

DISTRICT ATTORNEY

DAO:000350

Case 2:20-cv-02675-PBT   Document 28-1   Filed 06/02/22   Page 232 of 387

# INVESTIGATION REPORT
PHILADELPHIA POLICE DEPARTMENT

| YR. | DIST. OF OCCUR. | DC NO. (2–7) | | INITIAL (49) | | Class. Change | DISTRICT (8–9) | SECTOR (10) |
|---|---|---|---|---|---|---|---|---|
| 76 | 22 | 76 | 22- 63238 X | SUPPLEMENTAL (52) | | Status Change | 22 | F |

| PREVIOUS CLASSIFICATION | CODE | Continuation (51) | | | Additional Info. | DIST./UNIT PREPARING hom. | CODE 75 | REPORT DATE 8/28/80 |
|---|---|---|---|---|---|---|---|---|
| Willful Killing | 111 | Sheet 4 of 4 | | | Court Disposition | | | |

CLASSIFICATION: Willful Killing CODE 0442

PLACE OF OCCURRENCE (18–31): 1008 W. Huntington St.

J.A.D. INVESTIGATIONS (15): Juvenile Offenders Adult Offenders

COMPLAINANT: Hollis Joseph  AGE 18–20  RACE W

TYPE OF PREMISES: many  DATE AND TIME REPORTED: 10/22/76 945pm  REPORTED BY: unk.

DATE OF OCCURRENCE: 10/...76  DAY CODE 5  TIME 945pm  STATUS: Arrest – cleared  UNIT hom.

STOLEN PROPERTY: all boxes unchecked

## H. Continued investigation:      Page no.4

On 6/20/80 William Long, M/B Res. 2409 Cleveland St. brought into office Tillary was at his house as per info. He denied that Tillary was at his house. Polygraphed and r...

On 6/4/80 Lt. Shelton receives info that Tillary has a house in Harrisburg.

On 6/26/80 info received that Tillary has papers from Phila. Mobile, 103 Geiger Rd. It is learned that friend of Tillary purchased 3 and pays rent on them every month. Photos of Tillary showed no I-D.

On 6/4/80 attempt made to locate witness in Hollis case.

On 7/4/80 info that girlfriend of Tillary will pick up SSA check on 7/11-7/18. Attempt made to pick up witness in this case.

On 7/3/80 info received that Tillary owns house 2811 Greenwood.

On 7/6/80 info received that Tillary is staying in Va. and coming back to Phila. with drugs.

On 7/11/80 surveillance is made on Regina Combs girlfriend of Tillary. She picks up check and is relieved.

On 7/12/80 Det. Lane & Garrard check apt. at Front & Godfrey for Tillary.

On 7/10/80 surveillance is made of John's apt.

On 7/13/80 apts. on Roosevelt Blvd. are checked for Tillary.

On 7/1/80 wanted flyer is made up for Tillary.

On 8/6/80 Det. Harrelson FBI contacts Det. Garrard with phone number in Detroit. Detroit PD contacted and hit is made. Tillary not there. FBI requests package on Tillary.

This investigation continues under the direction of Lt. Shelton Homicide Division. Additional reports to follow.

INVESTIGATOR: Det. P.J. Carlo, Hom.  LIEUTENANT: Lt. A. Moody.

75-49 (Rev. 12-74)

DISTRICT ATTORNEY   DAO:000351

# EXHIBIT "BB"

**5/22/1980 Statement signed by Emanuel Claitt re "Porky"**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER Gerrard |

| NAME Emanuel Claitt | AGE 25 | RACE N | DOB 2-7-54 |
|---|---|---|---|

| ADDRESS 5148 Greene St | APARTMENT NO. | PHONE VI-9-3890 |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. 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 |
|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | PHONE |
|---|---|

| PLACE OF INTERVIEW Rm 104   PAB. | DATE AND TIME 5-22-80   12 15 PM |
|---|---|

| BROUGHT IN BY | DATE AND TIME |
|---|---|

WE ARE QUESTIONING YOU CONCERNING THE Homicide by Shooting of Joseph Hollis 20 B/M which occured AT 1008 W. Huntingdon Street on 10/22/76

| WARNINGS GIVEN BY | DATE AND TIME |
|---|---|

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. Emanuel, in a statement given to Det Nuban #734 on May 20, 1980 you stated that the males who did the shooting in the poolroom on 10/22/76 at 1008 W. Huntingdon St were Major Tilley and a male known to you as "Porky" or "Brother William". I am going to Show you a photo spread consisting of 9 photo's to see if the male you saw shoot in the poolroom known as Porky is among them?

A. This is William or Porky. - P# 467285 signed back of photo.
Emanuel Claitt

| RECORD   ☐ Yes   ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

MGT COPY
TilleryDAOFiles770

75-483 (Rev. 8/75)

# EXHIBIT "CC"

**5/8/1980 Bring Down Order for Emanuel Claitt**

# MEMORANDUM

TO      Deputy D.A. Michael Stiles

DATE 5/7/80

FROM    Commanding Officer, Homicide Division

SUBJECT: <u>BRING DOWN REQUEST — EMANUEL CLAITT, PP#439759</u>

1. Request bring down be issued for Emanuel Claitt, 26 Years, Negro male, residence 5148 Green Street for Thursday, May 8, 1980.  This subject is presently confined at the Detention Center on Auto Theft charges.

2. The purpose of this bring out is to interview and polygraph above named subject in connection with an investigation being conducted by the Homicide Division.

3. Investigation by Homicide Division, Detective Bennie Bracey #9109, assigned.

4. No known attorney.  Subject to be brought to Room 104, Police Administration Building, Homicide Division.

_James C. Murray_ #104

CAPTAIN JAMES MURRAY #104
Commanding Officer
Homicide Division

JM:mz

RESPONSE TO THIS MEMORANDUM MAY BE MADE HEREON IN LONGHAND

MGT COPY
TilleryDAOFiles646

# EXHIBIT "DD"

**5/22/1980 Statement of Emanuel Claitt re Firebombing**

**INVESTIGATION INTERVIEW RECORD**

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO.

INTERVIEWER
Gerrard

NAME Emanuel Claitt

AGE 25   RACE N   DOB 2/7/54

ADDRESS 5148 Greene St.

APARTMENT NO.   PHONE

NAME OF EMPLOYMENT/SCHOOL

SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL

PHONE

PLACE OF INTERVIEW Rm. 104 PAB.

DATE AND TIME 5/22/80  1 PM  00

BROUGHT IN BY Det. Gerrard #9189  & Lt. Shelton #357

DATE AND TIME

WE ARE QUESTIONING YOU CONCERNING Two Bombings which occured on March 4, 1950
AT 6473 Musgrave St. and 2014 Church Lane.

WARNINGS GIVEN BY Det. Gerrard #9189

DATE AND TIME 5/22/80  1  05 PM

ANSWERS   (1) Yes  (2) Yes  (3) No  (4) Yes  (5) Yes  (6) No  (7) Yes.

Q Emanuel, in a statement you give me on May 15, 1980,
in reference to murder of Samuel Goodwin you briefly
mentioned some knowledge of a bombings. I want you
to go on in your own words and in detail tell me
what you know about these bombings.

A. The first bomb that was set was about maybe 2
months before the 2 that went off. I happened on
Wister St. near Nebro. What happened was Major
Tillery who came out of there house in Morris St.
and he noticed 3 guys stabbing holes in Majors tires
and cutting holes in the vinyl roof of his Lincoln.
    Major got angry behind this and he took for granted
that Sultan (Kenny Washington) was responsible for
this. He (major) called Amar that same day (Sam Goodwin)
and told him to pick me up and bring both of us to
his house on Morris St.  When we got there
Major was outside in his car and I seen that the tires

RECORD  ☐ Yes  ☐ No

CHECKED BY  Emanuel Claitt

REVIEWED BY

75-483 (Rev. 8/75)

TilleryDAOFiles532

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME Emanuel Claitt | PAGE 2 | CASE NO. |

in the car were flat. Major said "See Omar You always say Sutton is cool but them mother fuckers sent someone over here to fuck up my car. That motherfucker got to get it now."

Then Tahlid - (George Rose) and Gazzu drove up in Majors wife's car. So we all went into Majors house and went down the cellar. Major told Tahlid and Gazzu "Tonite were going to blow up that house on Water St."

Major told me and Godwin to go find out where Sutton is at. So me and Godwin left. On the way over I was telling Omar that we didn't even know if Sutton had done that to Majors car. We went over by Water and Wedro and seen that Suttons car was in the parking lot. We went to Omars house and Omar called Major and told him that Suttons car was in the parking lot but we went to the house and Sutton wasn't there.

Major told us to stay at Godwins house and he would pick us up when it got dark. He didn't pick us up til late that night. It was Major Tahlid and Gazzu, from Godwins house we went to Tahlids apartment on Wayne Ave. and Telrochter and Tahlid and Gazzu got out of Majors car and got into Majors 'wifes Monarch. The stuff for the bomb

PerryDAOFiles203

Emanuel Claitt

75-483 A

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME Emanuel Claitt     PAGE 3     CASE NO.

was already in the Monarch. We proceed up Wayne Ave and made a left on School house lane to Church lane & Wister and made a right. The Monarch was in front of us. We made a left on Wister and Church lane and parked the cars Late Wister and Calljon St about a block from where the bomb was set.

We walked across Wister to the Childrens home and Major, Omar and me climbed the fence into there and Tahlid and Gizza stayed on the side of the street where Sultan house was. Gizza went up to the door and knocked and asked for Sultan but the girl said he wasn't there. His car was still in the parking lot though so Major figured he was in there. He signaled for Gizza and Tahlid to hook the bomb up. They hooked it up Gizza had the battery and Tahlid had the Dynamite Caps and he hooked it up to some metal on the door.

What happened they came back across the street and climbed the fence where we were. So then Major said "We Wait". About 40 minutes or an hour went by. Then Major said "Fuck it I'm going to blow it". Tahlid gave major a 45 caliber automatic and just then a 1972 Buick pulled up and Sultan got out of the car on the passenger side. Major waited because there was a girl driving him. When the car

Emanuel Claitt

75-483A

NOT COPY

TilleryDAOFiles535.1

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |

NAME **Emanuel Claitt**     PAGE **4**     CASE NO.

pulled off. He waited till Sutan got up on the top of the Steps and then he (Major) started firing at the front. So Sutan ran straight into the house like ducking down. So Major had fucked up and missed. Major said "Get him". So Tahlid and Gaggia they had guns so they ran across the street after him with there guns drawn. Goodwin and I ran to the back of the house. When we got to Lambert St. and Medro we seen Sutan running out of the alley and Goodwin started firing at him. I hollered to Major "He got away". Then Major waved to us to come back and said "Fuck it." We left the front and everything and got in the Cars and left. Major dropped me off at 19th and George and Omar off at home and told us to set tight.

Q  Where did Major get the dynamite Caps for the bomb?

A  From a Guy named Jimmy ~~Brage~~ *E.C.* Bryant. he has a Contracting Company a small place at Medro and Kemble St. I went and got them I picked them up at his old ladys house at Bouvier St near Godfrey Ave. its a house with green aluminum siding. Everything was set up ahead of time. Jimmy is a big monster dealer for Major the Construction Company is

75-483A

*Emanuel Claitt*

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Emanuel Claitt | PAGE 5 | CASE NO. |
|---|---|---|

just a front for the drugs.

Q. What about the bomb that went off at 6773 Musgrove St?

A. What happened was Major Got shot coming out of Woodrows house on Stenton Ave. Major didn't see who shot him So the day after he got out of the hospital he called a meeting. This was at Regina Johns house on Elaine St. It was LarRue (Garnet Smith) Raheem (Thomas Watkins) Major Tilley, me (Emanuel Claitt) Tahlid (George Rose) and Omar (Samuel Goodwin) and Gazzie. We was discussing the options about who could have shot him. Major said all he could Remember was that the car was white and he just caught a glimpse of that. Tahlid said "It was that fucking Sultan" Omar said he didn't think it was Sultan and Tahlid was saying why you always taking up for him. Then Tahlid said "It don't make no f difference. Major got shot and somebody got to die."

Major said he thought it was David Cook. So Gazzie said "Since we aint sure lets get both of them" So then everybody left and we went to the Sheraton Hotel in Fort Washington and we stayed up there all day doing some cocaine

Emanuel Claitt

75-483A

TilleryDAOFiles536

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Emanuel Clitt | PAGE 6 | CASE NO. |
|---|---|---|

and eating and talking and watching Television. Then Major called Buffy and she bought us a rented car a 1979 Silver and Gray cutlass. Major gave his car to Buffy. She left with Majors Car. Say around 9pm or 8:30pm that night we all left to come back to the City. We were back to Regina Johns house at Elaine St. and Cheltenham Ave. We got Regina's 978 Maroon Cutlass.

Major sent Gazzie and Tablie to pick up the explosives. Tablie was holding the explosives over at the apartment on Wayne Ave. So when they got back Major said who was going to go with who. Major said he needed Joe and Omar with him so the we could show him where Sultan's brother lived. The was were Sultan was supposed to be staying because after the incident on Water at the Girl had with Sultan aunt.

He said for Nadeem and Jarrett to wait at the house on Elaine St. because if something went wrong they could call Mozenten for him. Gazzie and tablie were to go to Davids house on Musgrove St. So before we left Major and we were going to do a test run to see how the house on Church Lane looked and the house on Musgrove St.

Goodwin, Major and I got in the rented silver

COPY

75-483A

Tillery/AOPllas537

Emanuel Clitt

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME  Emanuel Claitt          PAGE 7     CASE NO.

Cutlass and Gazzia and Tabbil got in the Burgundy Cutlass. We went to the house on Church Lane first and Major turned around and asked me "Mal, where does Steve live at." I said "I don't know" I said "I don't be with him Omar knows better then I do". Then I nudged Goodwin meaning for him not to point out the right house. So Goodwin pointed out the house next door to Steves house. The house he pointed out some old lady lives in it. Then we went down ½ block to Lambert St to a little grassy area and Tabbil and Gazzia took out the stuff they needed to blow that house up. They hid the stuff behind an old Audi that belonged to Omar. The car is on the side of a house at Lambert and Church Lane. Then we went up to David Cook's Grandmother's house at Musgrove and either Hollis St or Hartley St. The house is on Musgrove St. We pulled over in the middle of the block. Major told Tabbil and Gazzia to stay at Musgrove St and give him twenty minutes and then for them to start setting up shop. He meant set up the bomb to blow up Davids house. We were going back down to Church Lane. Major knows how to set up bombs himself so on the way down I told Major to drop me off at 17th & Grange St. He said OK, but he had to hurry because they had

NOT COPY

Tillery/AOF1/66538

Emanuel Claitt

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME Emanuel Claitt     PAGE 8     CASE NO.

Synchronized there watches. I got out at the house and Goodwin come in behind me and said he wanted to use the phone. He called Steve and asked "where is your mother and father?" she said they was asleep and Omar told him "Cut out all your lights and dont come out of the house." Then Omar said. We'll be back for you Moe. Major kept blowing the horn so Goodwin ran out of the house.

About an hour went by and they came back and picked me up and Omar said "we took care of business." We didn't say much in the car but when we got back up to Elaine St. Tahlil and Gayin hadn't got back there yet. We sat around for a while and then Major woke Regina up and told her that when Gayin and tahlil got there to tell them to meet us at the Pancake house in Glenside. Garnet, Asheem, Major and Omar and me went there and about 5:00 am or 5:30 am Gayin and tahlil showed up. We were eating and they got something to go and we all went back up to the Sheraton Inn in Fort Washington and waited for the Daily News to come out the next day.

While we were in the Pancake house in Glenside Omar said to me "You should have seen the way that thing blew up on Church Lane. It blew the screen door all the way across the street to where

NOT A COPY

TilleryDAOFile4539

Emanuel Claitt

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

MGT COPY

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME _Emanuel Claitt_   PAGE _10_   CASE NO.

Q. Show you Phila Photo # 512171 who is this person?

A. Thats Buffy - Carolyn Clark.

Q. Who was the girl that lived at 5935 Wister St the scene of the first bomb attempt?

A. All I know is that Sutan used to live there with a girl and a couple of children. I know that one time Major and Tactical went to the house one time before the bomb and she answered the door and they ran all through the house looking for Sutan.

Q. Have you now told me everything you know about the bombings?

A. Yes.

Q. How far did you go in school?

A. 12th Grade.

Q. Can you read and write the English language?

A. Yes.

Signature _Emanuel Claitt_
Date and Time _May 22, 1980 - 5:22 P.M._

COPY
MGT

75-483A

TilleryDAOFiles541

# EXHIBIT "EE"

**1/5/1981 Letter from ADA Ross to Judge Katz re Claitt**

Case 2:20-cv-09276-DEU Document 1 Page: 410 Date Filed: 05/20/2037

### DISTRICT ATTORNEY'S OFFICE
#### 2300 CENTRE SQUARE WEST
#### PHILADELPHIA, PENNSYLVANIA 19102

**EDWARD G. RENDELL**
DISTRICT ATTORNEY

January 5, 1981

DIRECT DIAL (215) MU 6-

Honorable Leon Katz
Judge, Court of Common Pleas
Trial Division, Philadelphia County
111 One East Penn Square
Philadelphia, Pa.    19107

Re:  Emmanuel Claitt

Dear Judge Katz:

This letter is written pursuant to your request regarding Mr. Claitt's cooperation with the Commonwealth.

Mr. Claitt's cooperation began in January, 1980, with discussions regarding the homicide investigation of Tae Bong Cho, a Korean grocer killed allegedly by Robert "Sugar Bear" Lark. Later, in May of 1980, Mr. Claitt was interviewed, while incarcerated in the Detention Center, about his knowledge concerning the death of his business partner and close friend, Samuel "Omar" Goodwin.

During that interview, Mr. Claitt mentioned that he believed George Rose killed "Omar" and that Rose had also killed Alfred Clark in April of 1979. Mr. Claitt was subsequently brought to the Homicide Division of the Police Department to give a formal statement about the death of Alfred Clark. This statement led to the arrest of George Rose. Mr. Claitt gave additional statements regarding the activities of the drug traffickers in North Philadelphia. Part of this information led to the arrest of William Franklin for a murder which occured in 1976, and warrants being issued for George "Major" Tillery for the same offense. Warrants were also issued for Tillery for a series of bombings in late 1979 and early 1980. Rose was also implicated and was arrested for these bombings. Tillery is presently a fugitive.

Mr. Claitt gave police background information regarding other homicides under investigation as well as the drug traffic in Philadelphia. Information was supplied by Mr. Claitt in the investigation of the death of Philadelphia Police Officer Ernest Davis in July 1980.

Case 2:20-cv-04675-JFL Document 1 Page: Filed 06/05/21 Filed 05/25/2020 7

Honorable Leon Katz
Page 2
January 5, 1981

Re: Emmanuel Claitt


Mr. Claitt testified at the preliminary hearings and trials
of George Rose and William Franklin in the homicide charges. He
testified at the preliminary hearings of George Rose and a
co-defendant, James Brand, in the bombings. These matters are
still pending. He has agreed to testify against Tillery, once
he is captured.

I hope this letter answers some of the questions that
the Court had. I will be present at sentencing on February 3, 1981,
and of course, if the Court has any additional questions, I am
available at your convenience.

Sincerely,

Leonard N Ross

LEONARD N. ROSS
Assistant District Attorney
Homicide Unit

LNR:cm

cc: Myron H. Deutsch, Esquire

# EXHIBIT "FF"
### 5/4/2016 Verified Declaration of Emanuel Claitt

## DECLARATION OF EMANUEL CLAITT
### PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

Emanuel Claitt makes the following verified declaration:

I submit this declaration stating that I lied when I testified at the trial of Major Tillery in May 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured.

I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.

I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.

I was in prison in 1980 on serious charges and I was approached by Philadelphia detectives Larry Gerrard and Ernest Gilbert. They threatened to charge me with the murder of Samuel Goodwin. I had eight or nine open cases, at least three of them were felonies with a lot of years of prison time.

I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder.

Detectives and prosecutors ADA Roger King and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I

Pa 272

E. C.    1

Case 2:20-cv-04116-PBT Document 1 Filed 06/08/20 Page 5 of 22 Case 2:20-cv-04116-PBT Document 1 Filed 06/08/20 Page 5 of 22

wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

I was also allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in hotel rooms, in exchange for my cooperation.

Detectives Larry Gerrard and Ernest Gilbert, and Lt. Bill Shelton with the knowledge and direction of ADAs Roger King and Barbara Christie, promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

Major Tillery couldn't be found when the prosecution wanted to arrest him and Franklin. So Franklin was tried in December 1980 and I falsely testified against William Franklin at his trial for the 1976 murder of Hollis and attempted murder of Pickens. In truth, I wasn't in or near the pool hall when the shootings happened.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

At Major Tillery's trial in 1985, I testified about a meeting and an argument that supposedly took place on October 20, 1976 between Alfred Clark the leader of North Philadelphia drug selling and those in charge of drug selling in West Philadelphia, including Joseph Hollis and John Pickens. This

Pa 273

$\mathcal{E}.\mathcal{E}.$  2

E.C.
Dana Goodwin

argument supposedly took place in the home of ~~Samuel~~ Goodwin. I testified

that Major Tillery was there and after an argument and pistol slapping of Clark

by Hollis, Major Tillery said that "Hollis would have to die for what he did."

This was not true. I was not at any such meeting and I didn't have any

personal knowledge of this supposed argument and threat made by Major

Tillery.

E.C. I also testified at Major Tillery's trial that after the argument in

Goodman's
~~Goodwin~~'s house a group that included me as well as Clark and Major Tillery

met at a mosque in North Philadelphia and drove a few blocks to a poolroom

owned by William Franklin to demand Sylvester White, the head of the West

Philadelphia drug selling, arrange a meeting with Hollis and Pickens.

None of this testimony was true. I had no involvement, if any of this

actually happened.

I falsely testified that on October 22, 1976, I was standing by the door

inside the pool hall during the meeting to prevent anyone from entering or

leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I heard a gunshot/gunshots in the pool hall, saw

Pickens and Hollins shot and that Major Tillery and Franklin were in the pool

hall and that they were the shooters.

E.C.

3

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery. I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Street, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

I knew Robert Mickens before this and lied at Major Tillery's trial when I testified I had never met or spoken with him.

I also falsely accused Major Tillery of placing a fire bomb on the front porch of Frank Henderson on Church Lane.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide
*Ross E.C.*
detectives Gerrard and Gilbert and being prepped by ADAs Christie and King to testify against Major Tillery and William Franklin.

Detectives Larry Gerrard, Ernest Gilbert and ADAs Barbara Christie , *Len Ross &* *E.C.*
Roger King interviewed me, and worked over my testimony to make sure

*E.C.*

Pa 275

4

Major Tillery and William Franklin were convicted of murder and attempted murder.

false E.C.

In exchange for my testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison, to~ something I d.d + do + framed by the ADA E.C.

In 2014 I was given help by the prosecution in getting all my bond judgements dismysed money returned to me for cases going back over 23years. E.C.

I am now giving this verified declaration because I want to free my conscience. I need to be able to live with myself. It is vital I correct this. I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I am ready to testify in court for Major Tillery and William Franklin and tell the truth that I lied against them at their trials, coerced by police and prosecutors.

DATED: May 4, 2016

EMANUEL CLAITT

## **VERIFICATION**

I verify that the statements made in the above Declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

Date: May 4 , 2016

EMANUEL CLAITT

6

# EXHIBIT "GG"

**6/3/2016 Verified Declaration of Emanuel Claitt**

## SUPPLEMENTAL DECLARATION OF EMANUEL CLAITT
### PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

Emanuel Claitt makes the following verified declaration:

I submit this supplemental declaration about my false, manufactured

testimony against Major Tillery and William Franklin in the November 1980

and May 1985 trials for the murder of Joseph Hollis and attempted murder of

John Pickens on October 22, 1976.

The police detectives and prosecutors I met with knew I didn't have any

personal knowledge that Major Tillery and William Franklin were involved or

part of those shootings. They manufactured the lies I gave against Tillery and

Franklin and coached me before the trials.

It was clear they knew I didn't have any direct knowledge about the

shootings at the poolroom on October 22, 1976, that I wasn't there then or at

the argument at Dana Goodman's house or meetings before the October 22,

1976 shootings. ~~They said things to me~~ like: For example In our meetings I
said you know I wasn't there — you have to fill
in the blanks. Detectives Gerrard, Gilbert, Det
Lubiejewski and ADA Lynn Ross would tell
me —"you've got to say it this way,"
I was told "we've got to bring him down —
you've got to help us," That meant I should lie
Barbara Christie told me, "your the best, you should
have been a lawyer." That meant I knew how to lie.

Emanuel Claitt

1

Case 2:20-cv-04246-HTTM Document 12 Page: 284 06/05/20 Filed 05/07/20 287

The prosecutor against William Franklin in 1980 was Lynn Ross. I met with him as well as ADAs who worked with Barbara Christie. soon after I met with Lt. Bill Shelton and Detectives Gerrard and Gilbert + Lubiejewski E. C. I met with ADA Roger King als who had me lie in another case.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then. ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. But I had been promised the DA's recommendation to receive no more than 10 years. In fact I got one and a half-years. When I was questioned about this at Major Tillery's case I repeated the lie that I had no plea deal about length of sentencing. ADA Christie knew that wasn't true.

2

I was scheduled to go to trial on my robbery case soon after the Tillery trial was over. ADA Christie coached me to stick to saying that the robbery case was "open" and that there were no agreements about leniency and sentencing. She coached me to just say I knew the judge would be told about my cooperation in Major Tillery's case and other cases. That's what I stuck to. But my testimony that there was no plea deal was a lie and ADA Christie knew that. She told me ~~I would get very little time.~~ the robbery charges other charges would be nolle prossed. And they were.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing/firebombing in 1979 and 1980 that I testified to in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

I wasn't willing to tell the truth about the lies I testified to at these trials and that my false testimony was manufactured by the ADAs and police until now. It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

3

I am now ready and willing to testify in court for Major Tillery and

William Franklin and tell the truth that I lied against them at their trials,

coerced by police and prosecutors.

DATED: 6/3/16

EMANUEL CLAITT

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct
to the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: June 3, 2016

EMANUEL CLAITT

# EXHIBIT "HH"

**Transcript of 8/3/2016 Video Statement of Emanuel Claitt**

# Transcript – Video Taped Statement of Emanuel Claitt, August 3, 2016

**Emanuel Claitt:**

I am Emanuel Claitt and I affirm the truthfulness of my verified declarations dated May 4, 2016 and June 3, 2016.

I lied when I testified at the trials of William Franklin in November 1980 and of Major Tillery in 1985 for the murder of Joseph Hollis and attempted murder of John Pickens on October 22, 1976.

I wasn't in the pool hall when Joseph Hollis was shot and killed and John Pickens shot and injured. I wasn't anywhere near Joseph Hollis and John Pickens when they were shot.

I lied when I testified that Major Tillery and William Franklin were in the pool hall and shot Hollis and Pickens.

Everything I testified to at Major Tillery's trial and William Franklin's trial about witnessing an argument between Alfred Clark and Joseph Hollis, threats made by Major Tillery against John Pickens and the shootings at the pool hall a few days later was false.

My testimony was made up while being questioned by homicide detectives Larry Gerrard, Ernest Gilbert and Lt. Bill Shelton and being prepped by ADAs Ross, Christie and King to testify against Major Tillery and William Franklin.

They worked over my testimony to make sure Major Tillery and William Franklin were convicted of murder and attempted murder.

I was in prison in 1980 on serious charges and I had a lot of open cases. At least three of them were felonies with a lot of years of prison time.

Detectives and prosecutors ADA Lynn Ross and Barbara Christie promised if I said that Major Tillery and William Franklin were the shooters in the 1976 murder of Joseph Hollis and the attempted murder of John Pickens I wouldn't get state time in my many pending criminal charges and I wouldn't be charged in the murder of Samuel Goodwin, that I had nothing to do with.

I was threatened that I would get maximum prison time if I didn't cooperate to get Tillery and Franklin.

The detectives with the knowledge and direction of ADAs Lynn Ross, Barbara Christie and Roger King promised me leniency, threatened me and allowed me private time for sex with girlfriends in the homicide interview rooms and hotel rooms.

After Franklin's trial I tried to recant but Lt. Shelton threatened me and said I would be framed on another murder.

None of my testimony was true. I falsely testified that on October 22, 1976, I was standing by the door inside the pool hall during the meeting to prevent anyone from entering or leaving and that both Franklin and Pickens were in the pool hall.

I lied when I testified I saw Major Tillery and William Franklin shoot Pickens and Hollins.

Before Major Tillery's trial, detectives instructed me to persuade Robert Mickens to become a witness against Major Tillery.

I was put in a police van to ride alone with Mickens back and forth from homicide up to the county holding prison on State Road, to make it clear to Mickens that he really had no choice, except to testify against Major Tillery.

It was also a lie, known to ADAs Ross, Christie, King that Major Tillery and George Rose were involved in bombing -firebombings in 1979 and 1980 that I testified to that in August 1985.

It was also a total fabrication that Major Tillery pulled a gun on me and threatened to shoot me in Philadelphia in early 1983.

The police detectives and prosecutors I met with knew I didn't have any personal knowledge that Major Tillery and William Franklin were involved or part of those shootings. They manufactured the lies I gave against Tillery and Franklin and coached me before the trials.

I was coached by ADA Barbara Christie before Major Tillery's trial. She was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door.

ADA Christie coached me how to answer the defense attorney's questions about whether I had plea deals or any agreements for leniency in sentencing for all the charges I faced back in 1980 when I first gave a statement about the shootings of Hollis and Pickens and since then.

ADA Christie coached me on this like ADA Lynn Ross did before I testified against William Franklin.

Back in 1980 when I testified at Franklin's trial I lied when I said that the only plea agreement was that my sentences on three cases would run concurrently. In fact I got one and a half-years.

In exchange for my false testimony many of my cases were not prosecuted. I got probation. I was sentenced to just 18 months for fire bombing and was protected when I was arrested between the time of Franklin's and Tillery's trials.

At Major Tillery's trial I testified that there was no plea deal. That was a lie and ADA Christie knew that. She told me the robbery charge and other charges would be nolle prossed. And they were.

At Major Tillery's trial I was forced by ADA Barbara Christie to testify about the "black mafia" and that they were run by Black Muslims in Philadelphia.

After Major Tillery's trial I was told I hadn't done good enough, that I "straddled the fence." In 1989 I was convicted of felony charges and spent 13 ½ years in prison for something I didn't do and framed by the ADA.

In 2014 I was given help by the prosecution in getting all my bond judgments dismissed on cases going back over 23 years.

I testified falsely against Major Tillery and William Franklin because I was threatened by the police and prosecutors with a murder prosecution for a crime I didn't commit. I was promised no state time for crimes I did commit if I lied.

I wasn't willing to tell the truth about the lies I testified to at these trials and that my false testimony was manufactured by the ADAs and police until now.

I gave my verified declarations because I want to free my conscience. I need to be able to live with myself.

It has taken me all these years to be willing and able to deal with my conscience and put aside my fears of retaliation by the police and prosecution for telling what really happened at those trials.

I am now ready and willing to testify in court for Major Tillery and William Franklin and tell the truth, the whole truth, that I lied against them at their trials, coerced by police and prosecutors. That is the end of the statement.

**Emanuel Claitt**:  I get so much energy talking to you and knowing that you are the one that is going to fight the beat to get them out. They deserve to be out. They didn't do that crime and I didn't do the crime that they said I committed. The same thing I did to them the DA did to me—and got somebody to lie and I did 13½ years in prison and I lost a lot of time away from my family. Tillery and Franklin done did triple the time I did and I just think that they need to be free.

If right is right, right gonna prevail because the DA knows that they lied and got me to lie. I want to free my conscience. I can't live with myself knowing that I did that.

Transcript checked against Video Taped Statement
By Rachel Wolkenstein

# EXHIBIT "II"

**4/18/2016 Verified Declaration of Robert Mickens**

## DECLARATION OF ROBERT MICKENS
PURSUANT TO PA C.C. § 4904 AND 28 U.S.C. § 1746

ROBERT MICKENS affirms the following under penalty of perjury:

In May 1985 I falsely testified as a witness for the Philadelphia County

District Attorney in the prosecution of Major George Tillery (CP-51-CR-

0305681-1984) on murder charges.

The testimony I gave at that trial was false, manufactured by the

prosecutor, Assistant District Attorney Barbara Christie.

I was coerced and promised favors if I falsely testified against Major

Tillery.

I was arrested on February 28, 1984 on charges of robbery and rape and

faced twenty-five years of imprisonment if convicted.

ADA Christie told me that if I "worked with [her] on the Major Tillery

case" she "guaranteed" I wouldn't be sent upstate on my robbery and rape case

and would be "protected."

ADA Christie and her homicide detectives, John Cimino and James

McNeshy, repeatedly brought me in for questioning on a number of robbery

and murder cases, asking me to become a prosecution witness against Major

Tillery. On one occasion ADA Christie showed me what looked like a paper

signed by Major Tillery saying that I was going to be an alibi witness for him. I

told her I was.

Pa 2906. M.

1

I was brought down by homicide detectives to tell me that co-defendants Kenneth Pernell and Darry Workman were accusing me of being involved in the murder of Abe Green, a neighbor of the men. When I agreed to become a witness against them, because Darry Workman had confessed to me that he had shot Abe Green, I was transferred out of the Philadelphia area to a prison in Easton, PA, Northampton County Prison for my protection.

Before the preliminary hearing and my cooperation with the prosecution was publicly known, this information was released and an article appeared in the *Philadelphia Daily News* saying that I was a witness against Pernell and Workman. This put me at risk as a known "snitch." I complained to ADA Christie and she promised to take care of me.

I was brought down from Easton, supposedly to meet with the homicide detectives in Philadelphia. Instead I was put in a police van with Emanuel Claitt, who already testified against Major Tillery's co-defendant. I rode back and forth from police headquarters to the county prison on State Street with Claitt, but never taken from the van. Claitt told me I was "pretty hemmed up" and that Major Tillery was a "slime," that Major Tillery had been spreading the word that I was a snitch and that I should testify against Major Tillery.

I told detectives Cimino and McNeshy that I missed my girlfriend Judy Faust. I was given an hour and a half private visit with her in an interview room in the police headquarters so that we could have sex.

Pa.29 B. M.

2

I was a secret witness for the prosecution at trial.

My identity as a prosecution witness was kept from Major Tillery and his lawyer before I was called as a witness at the trial on the false grounds that I needed a protective order to protect me from Major Tillery.

That was not true. I had told Major Tillery that I would be a witness for him at the murder trial of John Hollis. He had no reason to think I would be a witness *against* him. I had no contact with Major Tillery once I was sent to Northampton County Prison. I did not fear him or ask for protection from Major Tillery.

At the trial I falsely testified that I was a look-out during the shooting of John Hollis and John Pickens. That was totally false. My entire testimony was scripted and rehearsed by ADA Barbara Christie.

I agreed to give this false testimony because I was I promised no prison time on the rape and robbery charges and that I would be protected by the prosecution. I was given sexual favors in exchange for my false testimony.

When I was sentenced on October 10, 1985 after my guilty plea of rape and criminal conspiracy, I didn't get prison time. I was sentenced to five years probation.

I didn't come forward earlier to recant and explain because of my own guilt for falsely testifying against Major Tillery and my fear of retaliation by the prosecution and police.

Page 2 of 3. *M*

3

Much in my life has changed. I want to make amends for falsely

testifying against Major Tillery. I am willing and ready to be a witness in any

proceeding brought to challenge his conviction.

Dated: April /8, 2016

Mr. Robert R. Mickens

ROBERT MICKENS

## VERIFICATION

I verify that the statements made in the above Declaration are true and correct
to the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: April /8, 2016

Mr. Robert B. Mickens

ROBERT MICKENS

4



# EXHIBIT "JJ"
### Emanuel Claitt Arrest Record

# EXTRACT OF CRIMINAL RECORD

SS#172444500

**CITY OF PHILADELPHIA**
**POLICE DEPARTMENT**

| PHILA. NO. | 439759 |
| P.S.P. NO. | 1005526 |
| F.B.I. NO. | 576192N2 |

| NAME | CLAITT Emanuel Michael | ALIASES | Barry Harmon<br>Manny<br>Barry Rivers<br>Barry Mansfield<br>Lawrence Claton |
|---|---|---|---|

| ADDRESS | 1123 Catherine St.<br>5148 Greene St.<br>1214 N. Broad St. | | |

DATE OF BIRTH: 2-7-51/52/53
SEX: M   RACE: N

| ARRESTED | CHARGE | DISPOSITION | JUDGE |
|---|---|---|---|
| 12-20-72<br>Thornton Del | Burg, Larc, Robb, RSG<br>Consp Firearms Viol<br>A&B | rG ray $100 & Costs<br>Rest $600 & 2 Yrs St Prob | |
| 8-4-70<br>17-28460 | Larc,Robb,RSG,Consp F/A<br>Viol | Trans to 1801 Vine St. | Mongelluzzo |
| 7-8-71<br>17-35511 | VUFA | Min Les 1 Yr Max 2 Yrs | Dwyer 1-18-73 |
| 12-14-71<br>17-41243 | Fraud Conv & RSG | Prob 2 to 3 Yrs $100 Fine | Kumor 3-3-72 |
| 7-8-72<br>14-7117 | Oper MV Def Ser Number | Waiver verd Not/Glty | Sporkin<br>8-18-72 |
| 12-20-72<br>14-77158 | Burg,Mal Misch,Consp,Fug | Not Glty | Salus 5-16-73 |
| 10-23-73<br>14-64318 | Agg Aslt,Simp Aslt,PIC,rCW | Disch WOr | Zagorski 11-29-73 |
| 10-26-73<br>14-75237 | Burg,Theft,RSr,Forg,Consp | Dismissed | Quinn 12-13-73 |
| 10-15-74<br>14-96094 | Poss CS w/i Del<br>K/I ross CS | Waiver Ver NG | Jenkins 4-9-75 |
| 4-7-77<br>35-20304 | ross W/I Del CS<br>K/I ross CS | Pros W/D With Prej | N/L 6-3-77 |
| 12-13-78<br>35-100223 | ross CS<br>U/U Auto<br>Theft of Serv<br>Agg Aslt<br>Simp Aslt<br>PIC & rOW<br>REAr<br>VUFA 6106 & 6108 | Pros.W/Drawn W.O.P. | N/L<br>5-2-79 |
| 8-11-75<br>35-16432 | Burg,Robb,Theft,Threats,<br>VUFA,rIC,rOW,Consp | Dism Grand Jury | N/L 4-8-75 |
| 5-8-75<br>35-26970 | VUFA 6105,06,08,10<br>rIC & rOW | Prob 5 to 6 Yrs | Caesar 10-20-75 |

# EXTRACT OF CRIMINAL RECORD

PAGE 2

### CITY OF PHILADELPHIA
### POLICE DEPARTMENT

| | |
|---|---|
| PHILA. NO. | 439759 |
| P.S.P. NO. | 1005526 |
| F.B.I. NO. | 576192N2 |

| NAME | ALIASES | DATE OF BIRTH |
|---|---|---|
| Plaitt Emanuel | | 2-7-51/52/53 |
| ADDRESS 5148 Greene St. | | |

| SEX | RACE |
|---|---|
| M | N |

| ARRESTED | CHARGE | DISPOSITION | JUDGE |
|---|---|---|---|
| 1-1-75<br>35-84987 | Theft By Extort, RSP, Consp, Terr Threats | Pros W/D    WOP | Biunno<br>2-11-76 |
| 7-15-76<br>14-42690 | Agg & Simp aslt.,REAP, Consp, PIC & POW | Pros W/D | Reed 10-29-76 |
| 12-29-78<br>35-99548 | K/I Poss CS | NOLLE PROSSE | SIMMONS 5-18-79 |
| 3-15-79<br>81-391<br>PCC-2632 | CON. OF CRT.<br>35-84987<br>14-42690 | 682 CITY HALL | |
| 3-30-79<br>35-20793<br>PCC 1801 | POSS W/I TO DEL CNTR SUB<br>K/I POSS CNTR SUB | N/G plea waived-Min les 2yrs<br>Max 7 yrs. | Katz<br>9-17-81 |
| 34-6-79<br>CC 721<br>4-13546 | THEFT<br>RSP<br>UNAUTH USE AUTO | N/G plea waived-Nolle Pross | Katz<br>9-17-81 |
| 1-5-80<br>14-991<br>PC-1501 | 1811 Possess with intent to deliver controll substance<br>1821 Knowing/Intentional possession controll substance<br>Violation PUFA 6106<br>Violation PUFA 6108<br>Possess instrument crime<br>Prohibit offensive weapon | N/G plea waived-Min les 6mos Max 1 yr. | Katz<br>9-17-81 |
| 5-1-80<br>6-26046<br>726 PCC | Theft 3921 F3<br>RSP 3925 F3<br>U/U Auto 3928 M2 | N/G plea waived-Nolle Pross | Cain<br>9-28-81 |
| 5-15-80<br>15-25356<br>PC-700 | Robbery 3701 F-1<br>Theft 3921 M-1<br>RSP 3925 M-1<br>Agg Aslt 2702 F-<br>Simple aslt 2701 M-2<br>REAP 2705 M-2<br>Terr threats 2706 M-1<br>PIC 907 M-1<br>PUFA 6103 M-16105,6108<br>Conspiracy 903 F-2 | PTC-Nolle Pross witness unav. | Anderson<br>4-13-82 |

# EXTRACT OF CRIMINAL RECORD

Page # 3

### CITY OF PHILADELPHIA
### POLICE DEPARTMENT

PHILA. NO. 439759

P.P.B. NO. 1005326

F.B.I. NO. 57619212

| NAME | ALIASES | DATE OF BIRTH |
|---|---|---|
| CLAITT  Emanuel Michael | | 2-7-51 |

| ADDRESS | | SEX | RACE |
|---|---|---|---|
| 5148 Greene St. 7-30 | | M | N |

| ARRESTED | CHARGE | DISPOSITION | JUDGE |
|---|---|---|---|
| 7-9-80<br>15-56963<br>PC-1501 | PIC 907 & POW 908 M-1<br>PUFA 6106,6108 M-1 | Fines W/D    LEW | Rose<br>10-15-80 |
| 7-10-80<br>6-43251<br>PC-3124 | Arr O/Juris.( Auto Theft ) | | |
| -8-80<br>15-97848<br>702 PCC | Crim Att Arson 901 F2<br>Risk Catasrophe 3302 F3<br>Crim Misch 3304 F3<br>Crim Consp 903 F3<br>PIC 907 & POW 908 M1 | PTC-Min less 2 yrs Max 5 yrs<br>on Crim Consp. Nolle Pross<br>all others. | Katz<br>9-17-81 |
| 8-10-80<br>14-55497<br>pc-1821 | K/I poss contr subs | Tres W/D    WCP | Silberstein<br>10-21-80 |
| 9-10-80<br>35-71776<br>PC 214 | Ags Assault 2702 F2<br>Simp Asslt 2701 M1<br>REAP 2705 M1<br>PIC  907  M1<br>POW  908   M1 | N/G plea waived-Waiver verd<br>Not/Glty | Ivanoski<br>12-5-80 |
| -4-81<br>-8-31 | Contempt of Court | | |
| 4-12-83<br>8-14002<br>PC619 | M1465693<br>Retail Theft | | |
| 4-20-83<br>39-20000<br>PC 303 | M1474292<br>Robbery 3701<br>Theft 3921<br>RSP 3925<br>PIC 907<br>VUFA 6106<br>VUFA 6108<br>Consp. 903 | TRIAL<br>Room 256<br>1-17-84 | |
| 10-84<br>0-44238<br>0-2648 | Prob. Viol. | | |

MGT COPY

# EXTRACT OF CRIMINAL RECORD

| | |
|---|---|
| | **PHILA. NO.** 439759 |
| | **P.S.P. NO.** |
| CITY OF PHILADELPHIA | **F.B.I. NO.** |
| POLICE DEPARTMENT | |

SS#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    SS#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   4/89

| NAME CLAITT, Emanuel Michael | ALIASES CLAITT, Emanuel Michel, 4/89 | DATE OF BIRTH 02-07-53 |
|---|---|---|
| | | 2/7/51   4-89 |
| ADDRESS 2067 Medary 09-85 | | SEX **M** | RACE **N** |
| 3148 Green St.(09-85) | | |

| ARRESTED | CHARGE | DISPOSITION | JUDGE |
|---|---|---|---|
| 09-06-85 35-61661 PC-720 | M240355-3 Theft 3921 F3 RSP 3925 F3 Unauth Use 3928 M2 | | |
| 2-19-89 (illegible) 15 1 01 | (illegible) | | |
| 4/30/89 14-31724 Pcc 300 | M395039-1 ROBBERY 3701 F1 CONSP 903 F1 PIC 907 M1 POW 908 M1 REAP 2705 M2 RSP 3925 M2 THEFT 3921 M2 SIMP ASSLT 2701 M3 | | |

# EXHIBIT "KK"
**Emanuel Claitt Docket Entries**

**First Judicial District of Pennsylvania**

**Court Summary**

**Claitt, Emmanuel**
Philadelphia, PA 19144
Aliases:
Barry Rivers
EMANUAL CLAITT
Emanuel Clait
Emanuel Claitt
Emanuel M. Claitt
Emanuel M. Cliatt
Emanuel M. Elaitt
Emanuel Michael Claitt
Emmanuel Claitt
Emmanuel Cliatt
Emmanuel M. Claitt

DOB: 02/05/1955

Sex: Male
Eyes: Brown
Hair: Unknown or Completely Bald
Race: Black

**Closed**

**Philadelphia**

| CP-51-CR-0904461-1972 | Proc Status: Completed | DC No: 7117035511 | | OTN: |
|---|---|---|---|---|

Arrest Dt: 08/16/1972    Disp Date: 01/18/1973    Disp Judge: Dwyer, William A. Jr.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 6106 | | | CARRYING FIREARMS WITHOUT LICENSE | | Guilty |
| | 01/18/1973 | Confinement | | | | |

| CP-51-CR-0108261-1973 | Proc Status: Completed | DC No: 7235077158 | | OTN: |
|---|---|---|---|---|

Arrest Dt: 12/29/1972    Disp Date: 05/17/1973    Disp Judge: Salus, Herbert W.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3502 | | BURGLARY | Not Guilty |
| 2 | Migration § Migration | | | Demurrer Sustained |

| CP-51-CR-1210971-1974 | Proc Status: Completed | DC No: 7414066094 | OTN:Z4758633 |
|---|---|---|---|

Arrest Dt: 10/15/1974    Disp Date: 04/09/1975    Disp Judge: Jenkins, Norman
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 35 § 780-113 §§ A16 | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Not Guilty |
| 2 | 35 § 780-113 §§ A30 | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Not Guilty |

| CP-51-CR-0400383-1975 | Proc Status: Completed | DC No: 7535016432 | OTN:Z4758644 |
|---|---|---|---|

Arrest Dt: 03/12/1975    Disp Date:    Disp Judge:

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3502 | | BURGLARY | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 329

**Claitt, Emmanuel (Continued)**
 **Closed (Continued)**
  **Philadelphia (Continued)**

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| 2 | 18 § 903 | | | CRIMINAL CONSPIRACY | |
| 3 | 18 § 3701 | | | ROBBERY | |
| 4 | 18 § 6106 | | | CARRYING FIREARMS WITHOUT LICENSE | |
| 5 | 18 § 6108 | | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | |
| 6 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | |
| 7 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | |

---

**CP-51-CR-1222231-1975**     Proc Status: Completed              DC No: 7514026970              OTN:Z4758655
Arrest Dt: 05/08/1975     Disp Date: 07/12/1976     Disp Judge: Kubacki, Stanley L.
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 18 § 6108 | | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty |
| | 07/12/1976 | Probation | | | |

---

**CP-51-CR-0408091-1979**     Proc Status: Completed              DC No: 7904013546              OTN:
Arrest Dt: 04/07/1979     Disp Date: 09/17/1981     Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| 1 | 18 § 3928 | | | UNAUTH USE AUTO AND OTHER VEHICLES | Nolle Prossed |
| 2 | 18 § 3921 | | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 3 | 18 § 3925 | | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |

---

**CP-51-CR-0510241-1980**     Proc Status: Completed              DC No: 8006026046              OTN:Z4758736
Arrest Dt: 05/02/1980     Disp Date: 09/28/1981     Disp Judge: Cain, Herbert R. Jr.
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | Disposition |
|---|---|---|---|---|---|
| 1 | 18 § 3921 | | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 2 | 18 § 3925 | | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |
| 3 | 18 § 3928 | | | UNAUTH USE AUTO AND OTHER VEHICLES | Nolle Prossed |

---

CPCMS 3541                                                  2                                      Printed: 6/12/2016 12:28 PM

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

**Claitt, Emmanuel (Continued)**
  **Closed (Continued)**
    **Philadelphia (Continued)**

**CP-51-CR-0810671-1980**    Proc Status: Completed               DC No: 7935020793         OTN:
Arrest Dt: 03/31/1979      Disp Date: 09/17/1981     Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|--------|---------|--|-------|-------------|--|-------------|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 35 § 780-113 §§ A16 | | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 2 Year(s) | |
| 2 | 35 § 780-113 §§ A30 | | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 2 Year(s) | |

**CP-51-CR-0813281-1980**    Proc Status: Completed               DC No: 8014000991         OTN:
Arrest Dt: 01/06/1980      Disp Date: 09/17/1981     Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|--------|---------|--|-------|-------------|--|-------------|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | | Nolle Prossed |
| 2 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | | Nolle Prossed |
| 3 | 35 § 780-113 §§ A16 | | | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | | Guilty Plea |
| | 09/17/1981 | Confinement | | | | |
| 4 | 35 § 780-113 §§ A30 | | | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | | Nolle Prossed |
| 5 | 18 § 903 | | | CRIMINAL CONSPIRACY | | Nolle Prossed |

**CP-51-CR-0820931-1980**    Proc Status: Completed               DC No: 7935097848         OTN:Z4758795
Arrest Dt: 08/08/1980      Disp Date: 09/17/1981     Disp Judge: Katz, Leon
Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | | Grade | Description | | Disposition |
|--------|---------|--|-------|-------------|--|-------------|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 3301 | | | ATT ARSON ENDANGERING PERSONS | | Nolle Prossed |
| 2 | 18 § 3301 | | | ATT ARSON ENDANGERING PROPERTY | | Nolle Prossed |
| 3 | 18 § 3304 | | | CRIMINAL MISCHIEF | | Nolle Prossed |
| 4 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | | Nolle Prossed |
| 5 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME WEAPON | | Nolle Prossed |

---

CPCMS 3541                    3                    Printed: 6/12/2016 12:28 PM

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

**Claitt, Emmanuel (Continued)**

**Closed (Continued)**

**Philadelphia (Continued)**

| Seq No | Statute | | Grade | Description | | Disposition |
|--------|---------|---|-------|-------------|---|-------------|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 6 | 18 § 908.1 | | | PROHIBITED OFFENSIVE WEAPONS | | Nolle Prossed |
| 7 | 18 § 3302 | | | CAUSING/RISKING CATASTROPHE | | Nolle Prossed |
| 8 | 18 § 903 | | | CRIMINAL CONSPIRACY | | Guilty Plea |
| | 09/17/1981 | Confinement | | | Min: 1 Year(s) | |

**CP-51-CR-0916561-1980**     Proc Status: Completed     DC No: 8035071776     OTN:Z4758806

Arrest Dt: 09/10/1980     Disp Date: 12/05/1980     Disp Judge: Ivanoski, Leonard A.

Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 2702 | | AGGRAVATED ASSAULT | Not Guilty |
| 2 | 18 § 2701 | | SIMPLE ASSAULT | Not Guilty |
| 3 | 18 § 2705 | | RECKLESSLY ENDANGERING ANOTHER PERSON | Not Guilty |

**CP-51-CR-1107131-1980**     Proc Status: Completed     DC No: 8035025356     OTN:

Arrest Dt: 05/16/1980     Disp Date: 04/13/1982     Disp Judge: Anderson, Levy

Def Atty: Deutsch, Myron H. - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 2705 | | RECKLESSLY ENDANGERING ANOTHER PERSON | Nolle Prossed |
| 2 | 18 § 2706 | | TERRORISTIC THREATS | Nolle Prossed |
| 3 | 18 § 903 | | CRIMINAL CONSPIRACY | Nolle Prossed |
| 4 | 18 § 2702 | | AGGRAVATED ASSAULT | Nolle Prossed |
| 5 | 18 § 2701 | | SIMPLE ASSAULT | Nolle Prossed |
| 6 | 18 § 6106 | | CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed |
| 7 | 18 § 6106 | | FIREARMS WITHOUT LICENSE-IN AUTO | Nolle Prossed |
| 8 | 18 § 6108 | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed |
| 9 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed |
| 10 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed |
| 11 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 12 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |
| 13 | 18 § 3701 | | ROBBERY | Nolle Prossed |

---

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report Information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.



**Claitt, Emmanuel (Continued)**
**Closed (Continued)**
    **Philadelphia (Continued)**

| CP-51-CR-0537641-1983 | Proc Status: Completed | | DC No: 8339002000 | OTN:M1474292 |
|---|---|---|---|---|
| Arrest Dt: 04/21/1983 | Disp Date: 12/16/1987 | | Disp Judge: Manfredi, William J. | |
| Def Atty: Williams, Brian R. - (CA) | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 6106 | | CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed |
| 2 | 18 § 6108 | | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed |
| 3 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed |
| 4 | 18 § 907 | | POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed |
| 5 | 18 § 903 | | CRIMINAL CONSPIRACY | Nolle Prossed |
| 6 | 18 § 3701 | | ROBBERY | Nolle Prossed |
| 7 | 18 § 3921 | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed |
| 8 | 18 § 3925 | | THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed |

| CP-51-CR-0513651-1989 | Proc Status: Completed | | DC No: 8914031724 | OTN:M3950391 |
|---|---|---|---|---|
| Arrest Dt: 05/01/1989 | Disp Date: 10/23/1991 | | Disp Judge: Guarino, Angelo A. | |
| Def Atty: Defender Association of Philadelphia - (PD) | | | | |

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 1 | 18 § 2705 | | | RECKLESSLY ENDANGERING ANOTHER PERSON | | Nolle Prossed |
| 2 | 18 § 907 | | | POSSESSING INSTRUMENTS OF CRIME | | Nolle Prossed |
| 3 | 18 § 907 | | M1 | POSSESSING INSTRUMENTS OF CRIME WEAPON | | Guilty Plea |
| | 10/23/1991 | Confinement | | | Min: 1 Year(s) Max: 2 Year(s) | |
| 4 | 18 § 3921 | | | THEFT BY UNLAWFUL TAKING OR DISPOSITION | | Nolle Prossed |
| 5 | 18 § 3925 | | | THEFT BY RECEIVING STOLEN PROPERTY | | Nolle Prossed |
| 6 | 18 § 3701 | | F1 | ROBBERY | | Guilty Plea |
| | 10/23/1991 | Confinement | | | Min: 5 Year(s) Max: 10 Year(s) | |
| 7 | 18 § 2701 | | | SIMPLE ASSAULT | | Nolle Prossed |
| 8 | 18 § 903 | | F2 | CRIMINAL CONSPIRACY | | Guilty Plea |
| | 10/23/1991 | Confinement | | | Min: 1 Year(s) Max: 2 Year(s) | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Pa 333

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 1 of 3

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-1222231-1975

| | | |
|---|---|---|
| Judge Assigned: Caesar, Berel | Date Filed: 05/08/1975 | Initiation Date: 05/08/1975 |
| OTN: Z 475865-5 | LOTN: | Originating Docket No: |
| Initial Issuing Authority: | Final Issuing Authority: Berel Caesar | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant | |

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 7514026970 |
| District Control Number | 7514026970 |
| Legacy Docket Number | M7505053111 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 05/08/1975 |
|---|---|---|---|---|---|
| | | 12/01/1975 | Completed | | |
| | | 05/08/1975 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 05/08/1975 |

## DEFENDANT INFORMATION

| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |
|---|---|---|

Alias Name
Clait, Emanual
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | CLAITT, EMANUAL |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 6105 | POSSESSION ARMS-CONV CRIME OF VIOLENCE | 05/08/1975 | Z 475865-5 |
| 2 | 2 | | 18 § 6106 | CARRYING FIREARMS WITHOUT LICENSE | 05/08/1975 | Z 475865-5 |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 2 of 3

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | 18 § 6108 | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 05/08/1975 | Z 475865-5 |
| 4 | 4 | | 18 § 6110 | VUFA DEL TO MINOR-DRUG ADDICT ETC | 05/08/1975 | Z 475865-5 |
| 5 | 5 | | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 05/08/1975 | Z 475865-5 |
| 6 | 6 | | 18 § 908.1 | PROHIBITED OFFENSIVE WEAPONS | 05/08/1975 | Z 475865-5 |

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|--|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

**Guilty**          Defendant Was Not Present

| | | | |
|--|--|--|--|
| Migrated Dispositional Event | 12/01/1975 | Final Disposition | |
| 1 / POSSESSION ARMS-CONV CRIME OF VIOLENCE | Guilty | | 18 § 6105 |
| Caesar, Berel | 12/01/1975 | | |
| Probation | 5.00 Years | | |
| 2 / CARRYING FIREARMS WITHOUT LICENSE | Demurrer Sustained | | 18 § 6106 |
| Caesar, Berel | 12/01/1975 | | |
| 3 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty | | 18 § 6108 |
| Caesar, Berel | 12/01/1975 | | |
| Probation | 5.00 Years | | |
| 4 / VUFA DEL TO MINOR-DRUG ADDICT ETC | Dismissed | | 18 § 6110 |
| Caesar, Berel | 12/01/1975 | | |
| 5 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Dismissed | | 18 § 907 |
| Caesar, Berel | 12/01/1975 | | |
| 6 / PROHIBITED OFFENSIVE WEAPONS | Dismissed | | 18 § 908.1 |
| Caesar, Berel | 12/01/1975 | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0505311-1975**
# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 3 of 3

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Myron H. Deutsch |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | 215-567-2693 (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA 19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA 19103 |
| | Representing: CLAITT, EMANUAL |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 05/08/1975 | | |
| PARS Transfer | | | |
| 1 | 12/01/1975 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 12/01/1975 | | |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1222231-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 1 of 3

### CASE INFORMATION

| | | |
|---|---|---|
| Judge Assigned: Kubacki, Stanley L. | Date Filed: 12/29/1975 | Initiation Date: 12/29/1975 |
| OTN: Z 475865-5 LOTN: | Originating Docket No: MC-51-CR-0505311-1975 | |
| Initial Issuing Authority: | Final Issuing Authority: | |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant | |
| Complaint/Incident #: | | |

Case Local Number Type(s)     Case Local Number(s)

| | |
|---|---|
| District Control Number | 7514026970 |
| PSI Microfilm Number | 761141 |
| Police Incident Number | 7514026970 |
| Legacy Microfilm Number | 76021081 |
| Legacy Docket Number | C7512222311 |

### STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 05/08/1975 |
|---|---|---|---|---|---|
| | | 07/12/1976 | Completed | | |
| | | 12/29/1975 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 12/29/1975 |

### DEFENDANT INFORMATION

| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |
|---|---|---|

Alias Name
Clait, Emanual
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

### CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | CLAITT, EMANUAL |

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 18 § 6108 | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 05/08/1975 | Z 475865-5 |

CPCMS 9082          Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case 2:20-cv-04675-PBT Document 1 Page 1 of 1 Filed 05/27/2037

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1222231-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 2 of 3

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | | |
|---|---|---|---|---|
| Sequence/Description | Offense Disposition | | Grade | Section |
| Sentencing Judge | Sentence Date | | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | | Start Date |
| Sentence Conditions | | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 07/12/1976 | Final Disposition | |
|---|---|---|---|
| 1 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Guilty | | 18 § 6108 |
| Kubacki, Stanley L. | 07/12/1976 | | |
| Probation | 5.00 Years | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:** Philadelphia County District Attorney's Office | **Name:** Myron H. Deutsch |
| Prosecutor | Private |
| **Supreme Court No:** | **Supreme Court No:** 012362 |
| **Phone Number(s):** | **Rep. Status:** Active |
| 215-686-8000 (Phone) | **Phone Number(s):** |
| **Address:** | 215-567-2693 (Phone) |
| 3 South Penn Square | **Address:** |
| Philadelphia, PA 19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA 19103 |
| | Representing: CLAITT, EMANUAL |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 12/29/1975 | | Unknown Filer |
| Appeal | | | |
| 1 | 07/12/1976 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 07/12/1976 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 07/12/1976 | | Migrated, Filer |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1222231-1975**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanual Claitt

Page 3 of 3

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Page 290

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 4

## CASE INFORMATION

Judge Assigned: Katz, Leon          Date Filed: 08/12/1980          Initiation Date: 08/12/1980

OTN:                    LOTN:          Originating Docket No: MC-51-CR-0330461-1979

Initial Issuing Authority:          Final Issuing Authority:

Arresting Agency: Philadelphia Pd          Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Legacy Microfilm Number | 81026823 |
| PSI Microfilm Number | 801557 |
| PSI Microfilm Number | 811899 |
| Police Incident Number | 7935020793 |
| District Control Number | 7935020793 |
| Legacy Docket Number | C8008106711 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | | Arrest Date: | 03/31/1979 |
|---|---|---|---|---|---|---|
| | | 09/17/1981 | Completed | | | |
| | | 08/12/1980 | Migrated Case (Active) | | | |
| | | | | | Complaint Date: | 08/12/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth:          02/05/1955          City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

CPCMS 9082          Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 4

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 35 § 780-113 §§ A16 | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 11/30/1978 | |
| 2 | 2 | | 35 § 780-113 §§ A30 | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | 11/30/1978 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition | |
|---|---|---|---|
| 1 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Guilty Plea | | 35 § 780-113 §§ A16 |
| Katz, Leon | 09/17/1981 | | |
| Confinement | Min of 1.50 Years | | |
| 2 / MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Guilty Plea | | 35 § 780-113 §§ A30 |
| Katz, Leon | 09/17/1981 | | |
| Confinement | Min of 1.50 Years | | |

## COMMONWEALTH INFORMATION

**Name:** Philadelphia County District Attorney's Office
Prosecutor

**Supreme Court No:**

**Phone Number(s):**
215-686-8000     (Phone)

**Address:**
3 South Penn Square
Philadelphia, PA  19107

## ATTORNEY INFORMATION

**Name:** Myron H. Deutsch
Private

**Supreme Court No:** 012362

**Rep. Status:** Active

**Phone Number(s):**
215-567-2693     (Phone)

**Address:**
Deutsch, Larrimore & Farnish
2100 Arch Street 5th Floor
Philadelphia, PA  19103

Representing: Claitt, Emanuel M.

## ENTRIES

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 4

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/12/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel M. |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0810671-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 4 of 4

## CASE FINANCIAL INFORMATION

Last Payment Date:                                                                                  Total of Last Payment:

| Claitt, Emanuel M. | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| Defendant | | | | | |
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $900.00 | $0.00 | ($900.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $2,700.00 | $0.00 | ($2,700.00) | $0.00 | $0.00 |
| Grand Totals: | $2,700.00 | $0.00 | ($2,700.00) | $0.00 | $0.00 |

\*\* - Indicates assessment is subrogated

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 1 of 3

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-0813281-1980

| | | | |
|---|---|---|---|
| Judge Assigned: Colins, James | | Date Filed: 01/06/1980 | Initiation Date: 01/06/1980 |
| OTN: | LOTN: | Originating Docket No: | |
| Initial Issuing Authority: | | Final Issuing Authority: James Colins | |
| Arresting Agency: Philadelphia Pd | | Arresting Officer: Affiant | |

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Legacy Docket Number | M7912348811 |
| District Control Number | 8014000991 |
| Police Incident Number | 8014000991 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 01/06/1980 |
|---|---|---|---|---|---|
| | | 08/11/1980 | Completed | | |
| | | 01/06/1980 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 01/06/1980 |

## DEFENDANT INFORMATION

| Date Of Birth: | 02/05/1955 | City/State/Zip: PHILA., PA 19144 |
|---|---|---|

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | 35 § 780-113 §§ A16 | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 01/05/1980 | |
| 2 | 2 | | 35 § 780-113 §§ A30 | MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | 01/05/1980 | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 2 of 3

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | **18 § 903** | CRIMINAL CONSPIRACY | 01/05/1980 | |
| 4 | 4 | | **18 § 907** | POSSESSING INSTRUMENTS OF CRIME WEAPON | 01/05/1980 | |
| 5 | 5 | | **18 § 908.1** | PROHIBITED OFFENSIVE WEAPONS | 01/05/1980 | |
| 6 | 6 | | **18 § 6106** | CARRYING FIREARMS WITHOUT LICENSE | 01/05/1980 | |
| 7 | 7 | | **18 § 6108** | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 01/05/1980 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|--|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

| | | | |
|---|---|---|---|
| **Held for Court** | Defendant Was Not Present | | |
| Migrated Dispositional Event | 08/11/1980 | Final Disposition | |
| 1 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Held for Court | | 35 § 780-113 §§ A16 |
| Colins, James | 08/11/1980 | | |
| 2 / MFG/DEL/ OR POSS W/I MFG OR DEL CONTRL SUBS | Held for Court | | 35 § 780-113 §§ A30 |
| Colins, James | 08/11/1980 | | |
| 3 / CRIMINAL CONSPIRACY | Held for Court | | 18 § 903 |
| Colins, James | 08/11/1980 | | |
| 4 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Held for Court | | 18 § 907 |
| Colins, James | 08/11/1980 | | |
| 5 / PROHIBITED OFFENSIVE WEAPONS | Held for Court | | 18 § 908.1 |
| Colins, James | 08/11/1980 | | |
| 6 / CARRYING FIREARMS WITHOUT LICENSE | Held for Court | | 18 § 6106 |
| Colins, James | 08/11/1980 | | |
| 7 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Held for Court | | 18 § 6108 |
| Colins, James | 08/11/1980 | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-1234881-1979**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 3 of 3

| COMMONWEALTH INFORMATION | | ATTORNEY INFORMATION | |
|---|---|---|---|
| <u>Name:</u> | Philadelphia County District Attorney's Office | <u>Name:</u> | Myron H. Deutsch |
| | Prosecutor | | Private |
| <u>Supreme Court No:</u> | | <u>Supreme Court No:</u> | 012362 |
| <u>Phone Number(s):</u> | | <u>Rep. Status:</u> | Active |
| | 215-686-8000    (Phone) | <u>Phone Number(s):</u> | |
| <u>Address:</u> | | | 215-567-2693    (Phone) |
| | 3 South Penn Square | <u>Address:</u> | |
| | Philadelphia, PA  19107 | | Deutsch, Larrimore & Farnish |
| | | | 2100 Arch Street 5th Floor |
| | | | Philadelphia, PA  19103 |
| | | | |
| | | Representing: Claitt, Emanuel | |

| ENTRIES | | | |
|---|---|---|---|
| Sequence Number | CP Filed Date | Document Date | Filed By |
| 1 | 01/06/1980 | | |
| PARS Transfer | | | |
| 1 | 08/11/1980 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 08/11/1980 | | |
| Migrated Sentence | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 1 of 3

## CASE INFORMATION

Judge Assigned: Katz, Leon      Date Filed: 08/14/1980      Initiation Date: 08/14/1980

OTN:      LOTN:      Originating Docket No: MC-51-CR-1234881-1979

Initial Issuing Authority:      Final Issuing Authority:

Arresting Agency: Philadelphia Pd      Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Legacy Microfilm Number | 81026824 |
| Police Incident Number | 8014000991 |
| District Control Number | 8014000991 |
| Legacy Docket Number | C8008132811 |

## STATUS INFORMATION

Case Status:    Closed

| | Status Date | Processing Status | | Arrest Date: | 01/06/1980 |
|---|---|---|---|---|---|
| | 09/17/1981 | Completed | | | |
| | 08/14/1980 | Migrated Case (Active) | | | |
| | | | | Complaint Date: | 08/14/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth:      02/05/1955      City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel |

CPCMS 9082      Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 2 of 3

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 3 | 3 | | 35 § 780-113 §§ A16 | KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | 01/05/1980 | |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date | |
| Sentence Conditions | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition | |
|------------------------------|------------|-------------------|---|
| 3 / KNOWING/INTENTIONALLY POSS CONTROLLED SUBST | Guilty Plea | 35 § 780-113 §§ A16 | |
| Katz, Leon | 09/17/1981 | | |
| Confinement | | | |

## COMMONWEALTH INFORMATION / ATTORNEY INFORMATION

| COMMONWEALTH INFORMATION | | ATTORNEY INFORMATION | |
|--------------------------|---|----------------------|---|
| Name: | Philadelphia County District Attorney's Office | Name: | Myron H. Deutsch |
| | Prosecutor | | Private |
| Supreme Court No: | | Supreme Court No: | 012362 |
| Phone Number(s): | | Rep. Status: | Active |
| | 215-686-8000 (Phone) | Phone Number(s): | |
| Address: | | | 215-567-2693 (Phone) |
| | 3 South Penn Square | Address: | |
| | Philadelphia, PA 19107 | | Deutsch, Larrimore & Farnish |
| | | | 2100 Arch Street 5th Floor |
| | | | Philadelphia, PA 19103 |
| | | Representing: Claitt, Emanuel | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|-----------------|---------------|---------------|----------|
| 1 | 08/14/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0813281-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel Claitt

Page 3 of 3

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 3

## CASE INFORMATION

Judge Assigned: Katz, Leon     Date Filed: 08/26/1980     Initiation Date: 08/26/1980

OTN: Z 475879-5     LOTN:     Originating Docket No: MC-51-CR-0805451-1980

Initial Issuing Authority:     Final Issuing Authority:

Arresting Agency: Philadelphia Pd     Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 7935097848 |
| Legacy Microfilm Number | 81027198 |
| District Control Number | 7935097848 |
| Legacy Docket Number | C8008209311 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | | Arrest Date: | 08/08/1980 |
|---|---|---|---|---|---|---|
| | | 09/17/1981 | Completed | | | |
| | | 08/26/1980 | Migrated Case (Active) | | | |
| | | | | | Complaint Date: | 08/26/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

Date Of Birth:     02/05/1955     City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 3

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|--------------------|-------------|-----|
| 8 | 8 | | 18 § 903 | CRIMINAL CONSPIRACY | 11/11/1979 | Z 475879-5 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|------------|-----------------|-------------------|
| Sequence/Description | Offense Disposition | Grade      Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

| Migrated Dispositional Event | 09/17/1981 | Final Disposition |
|------------------------------|------------|-------------------|
| 8 / CRIMINAL CONSPIRACY | Guilty Plea | 18 § 903 |
| Katz, Leon | 09/17/1981 | |
| Confinement | Min of 1.00 Years | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|--------------------------|----------------------|
| **Name:**  Philadelphia County District Attorney's Office | **Name:**  Myron H. Deutsch |
| Prosecutor | Private |
| Supreme Court No: | Supreme Court No:  012362 |
| Phone Number(s): | Rep. Status:  Active |
| 215-686-8000  (Phone) | Phone Number(s): |
| Address: | 215-567-2693  (Phone) |
| 3 South Penn Square | Address: |
| Philadelphia, PA  19107 | Deutsch, Larrimore & Farnish |
| | 2100 Arch Street 5th Floor |
| | Philadelphia, PA  19103 |
| | Representing: Claitt, Emanuel M. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|-----------------|---------------|---------------|----------|
| 1 | 08/26/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 09/17/1981 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/17/1981 | | Migrated, Filer |
| Disposition Filed | | | |

CPCMS 9082

Printed:  04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0820931-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 3

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 09/17/1981 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emanuel M. |
| Motion to Vacate Bail Judgment Filed | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

## CASE FINANCIAL INFORMATION

Last Payment Date:                                                     Total of Last Payment:

| **Claitt, Emanuel M.** | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| Defendant | | | | | |
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $27,000.00 | $0.00 | ($27,000.00) | $0.00 | $0.00 |
| Grand Totals: | $27,000.00 | $0.00 | ($27,000.00) | $0.00 | $0.00 |

** - Indicates assessment is subrogated

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**
# CRIMINAL DOCKET
**Court Case**

| | |
|---|---|
| Commonwealth of Pennsylvania | Page 1 of 5 |
| v. | |
| Emmanuel Claitt | |

## CASE INFORMATION

| | |
|---|---|
| Judge Assigned: Anderson, Levy | Date Filed: 11/07/1980     Initiation Date: 11/07/1980 |
| OTN:     LOTN: | Originating Docket No: MC-51-CR-0512961-1980 |
| Initial Issuing Authority: | Final Issuing Authority: |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant |
| Complaint/Incident #: | |

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 8035025356 |
| Legacy Microfilm Number | 82015467 |
| District Control Number | 8035025356 |
| Legacy Docket Number | C8011071311 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 05/16/1980 |
|---|---|---|---|---|---|
| | | 04/13/1982 | Completed | | |
| | | 11/07/1980 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 11/07/1980 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Bail Forfeiture- Filed | 06/06/2014 | 9:00 am | | | Scheduled |
| Bail Forfeiture- Review | 06/30/2014 | 9:00 am | | | Scheduled |

## DEFENDANT INFORMATION

| | |
|---|---|
| Date Of Birth:     02/05/1955 | City/State/Zip: PHILA., PA 19144 |

**Alias Name**
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel M.
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emmanuel |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 2 of 5

### CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|------|-----------|-------|---------|---------------------|-------------|-----|
| 1 | 1 | | 18 § 2705 | RECKLESSLY ENDANGERING ANOTHER PERSON | 04/05/1980 | |
| 2 | 2 | | 18 § 2706 | TERRORISTIC THREATS | 04/05/1980 | |
| 3 | 3 | | 18 § 903 | CRIMINAL CONSPIRACY | 04/05/1980 | |
| 4 | 4 | | 18 § 2702 | AGGRAVATED ASSAULT | 04/05/1980 | |
| 5 | 5 | | 18 § 2701 | SIMPLE ASSAULT | 04/05/1980 | |
| 6 | 6 | | 18 § 6106 | CARRYING FIREARMS WITHOUT LICENSE | 04/05/1980 | |
| 7 | 7 | | 18 § 6106 | FIREARMS WITHOUT LICENSE-IN AUTO | 04/05/1980 | |
| 8 | 8 | | 18 § 6108 | CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | 04/05/1980 | |
| 9 | 9 | | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME | 04/05/1980 | |
| 10 | 10 | | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 04/05/1980 | |
| 11 | 11 | | 18 § 3921 | THEFT BY UNLAWFUL TAKING OR DISPOSITION | 04/05/1980 | |
| 12 | 12 | | 18 § 3925 | THEFT BY RECEIVING STOLEN PROPERTY | 04/05/1980 | |
| 13 | 13 | | 18 § 3701 | ROBBERY | 04/05/1980 | |

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|------------|------------------|-------------------|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date | |
| Sentence Conditions | | | |

**Migrated Disposition**

| Migrated Dispositional Event | 04/13/1982 | Final Disposition | |
|---|---|---|---|
| 1 / RECKLESSLY ENDANGERING ANOTHER PERSON | Nolle Prossed | | 18 § 2705 |
| Anderson, Levy | 04/13/1982 | | |
| 2 / TERRORISTIC THREATS | Nolle Prossed | | 18 § 2706 |
| Anderson, Levy | 04/13/1982 | | |
| 3 / CRIMINAL CONSPIRACY | Nolle Prossed | | 18 § 903 |
| Anderson, Levy | 04/13/1982 | | |
| 4 / AGGRAVATED ASSAULT | Nolle Prossed | | 18 § 2702 |
| Anderson, Levy | 04/13/1982 | | |
| 5 / SIMPLE ASSAULT | Nolle Prossed | | 18 § 2701 |
| Anderson, Levy | 04/13/1982 | | |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 3 of 5

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |
| 6 / CARRYING FIREARMS WITHOUT LICENSE | Nolle Prossed | | 18 § 6106 |
| Anderson, Levy | 04/13/1982 | | |
| 7 / FIREARMS WITHOUT LICENSE-IN AUTO | Nolle Prossed | | 18 § 6106 |
| Anderson, Levy | 04/13/1982 | | |
| 8 / CARRYING FIRE ARMS/PUBLIC STREET OR PLACE | Nolle Prossed | | 18 § 6108 |
| Anderson, Levy | 04/13/1982 | | |
| 9 / POSSESSING INSTRUMENTS OF CRIME | Nolle Prossed | | 18 § 907 |
| Anderson, Levy | 04/13/1982 | | |
| 10 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Nolle Prossed | | 18 § 907 |
| Anderson, Levy | 04/13/1982 | | |
| 11 / THEFT BY UNLAWFUL TAKING OR DISPOSITION | Nolle Prossed | | 18 § 3921 |
| Anderson, Levy | 04/13/1982 | | |
| 12 / THEFT BY RECEIVING STOLEN PROPERTY | Nolle Prossed | | 18 § 3925 |
| Anderson, Levy | 04/13/1982 | | |
| 13 / ROBBERY | Nolle Prossed | | 18 § 3701 |
| Anderson, Levy | 04/13/1982 | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office <br> Prosecutor | Name: Myron H. Deutsch, Esq. <br> Private |
| Supreme Court No: | Supreme Court No: 012362 |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | 215-567-2693 (Phone) |
| 3 South Penn Square <br> Philadelphia, PA 19107 | Address: |
| | Deutsch, Larrimore & Farnish <br> 2100 Arch Street 5th Floor <br> Philadelphia, PA 19103 |
| | Representing: Claitt, Emmanuel |

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 4 of 5

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 11/07/1980 | | Unknown Filer |
| Held for Court | | | |
| 1 | 04/13/1982 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 04/13/1982 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 04/13/1982 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 11/16/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 11/30/2010 | | Court of Common Pleas - Philadelphia County |
| Payment Plan Introduction Letter | | | |
| 1 | 02/02/2011 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 52 Days Overdue | | | |
| 1 | 06/06/2014 | | Claitt, Emmanuel |
| Motion to Vacate Bail Judgment Filed | | | |
| Motion to Vacate Bail Judgment Filed on behalf of Emmanuel Claitt. | | | |
| 1 | 07/24/2014 | | Bozzacco, Glenn |
| Order Granting Motion to Vacate Bail Judgment Filed | | | |

On 07/24/2014, upon consideration of the Motion to Vacate or Reduce Bail Judgment filed on 06/06/2014, it is ordered that the bail forfeiture and bail judgment are vacated in full. The defendant attests under penalty of falsification to authorities that the defendant failed to appear on the above date because the defendant was incarcerated, and incarceration records are not available.

This Order will become final unless within 30 days of the date the Order was docketed and mailed the Petitioner files a request for a hearing by a Court Designated Bail Authority Reviewing Officer with the Clerk of Courts, Room 310, 1301 Filbert St, Phila. PA 19107.

Honorable Sheila A. Woods-Skipper, President Judge, Court of Common Pleas
For the Court: Glenn S. Bozzacco, Esq., Reviewing Officer

CPCMS 9082

Printed: 09/04/2016

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-1107131-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel Claitt

Page 5 of 5

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| | | | |

## CASE FINANCIAL INFORMATION

Last Payment Date:                 Total of Last Payment:

| **Claitt, Emmanuel** | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| Defendant | | | | | |
| **Costs/Fees** | | | | | |
| Bail Assessment (Philadelphia) (UDS) | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $22,500.00 | $0.00 | -$22,500.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $67,500.00 | $0.00 | -$67,500.00 | $0.00 | $0.00 |
| Grand Totals: | $67,500.00 | $0.00 | -$67,500.00 | $0.00 | $0.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0910651-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel M Claitt

Page 1 of 2

## CASE INFORMATION

Cross Court Docket Nos: CP-51-CR-0916561-1980

| | |
|---|---|
| Judge Assigned: Cadran, Francis P. | Date Filed: 09/10/1980     Initiation Date: 09/10/1980 |
| OTN: Z 475880-6     LOTN: | Originating Docket No: |
| Initial Issuing Authority: | Final Issuing Authority: Francis P. Cadran |
| Arresting Agency: Philadelphia Pd | Arresting Officer: Affiant |
| Complaint/Incident #: | |

Case Local Number Type(s)     Case Local Number(s)

| | |
|---|---|
| Police Incident Number | 8035071776 |
| District Control Number | 8035071776 |
| Legacy Docket Number | M8009106511 |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 09/10/1980 |
|---|---|---|---|---|---|
| | | 09/18/1980 | Completed | | |
| | | 09/10/1980 | Migrated Case (Active) | | |
| | | | | Complaint Date: | 09/10/1980 |

## DEFENDANT INFORMATION

Date Of Birth:     02/05/1955     City/State/Zip: PHILA., PA 19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel M.
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Cliatt, Emanuel M.
Cliatt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emmanuel M. |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 4 | 4 | | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 08/20/1980 | Z 475880-6 |
| 5 | 5 | | 18 § 908.1 | PROHIBITED OFFENSIVE WEAPONS | 08/20/1980 | Z 475880-6 |

CPCMS 9082

Printed: 04/13/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: MC-51-CR-0910651-1980**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emmanuel M Claitt

Page 2 of 2

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | | |
| --- | --- | --- | --- | --- |
| Sequence/Description | Offense Disposition | | Grade | Section |
| Sentencing Judge | Sentence Date | | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | | Start Date |
| Sentence Conditions | | | | |

**Held for Court**    Defendant Was Not Present

| Migrated Dispositional Event | 09/18/1980 | Final Disposition | | |
| --- | --- | --- | --- | --- |
| 4 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Held for Court | | 18 § 907 | |
| Cadran, Francis P. | 09/18/1980 | | | |
| 5 / PROHIBITED OFFENSIVE WEAPONS | Held for Court | | 18 § 908.1 | |
| Cadran, Francis P. | 09/18/1980 | | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
| --- | --- |
| **Name:**   Philadelphia County District Attorney's Office | **Name:**   Myron H. Deutsch |
|    Prosecutor |    Private |
| **Supreme Court No:** | **Supreme Court No:**   012362 |
| **Phone Number(s):** | **Rep. Status:**   Active |
|    215-686-8000    (Phone) | **Phone Number(s):** |
| **Address:** |    215-567-2693    (Phone) |
|    3 South Penn Square | **Address:** |
|    Philadelphia, PA 19107 |    Deutsch, Larrimore & Farnish |
| |    2100 Arch Street 5th Floor |
| |    Philadelphia, PA 19103 |
| | Representing: Claitt, Emmanuel M. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
| --- | --- | --- | --- |
| 1 | 09/10/1980 | | |
| PARS Transfer | | | |
| 1 | 09/18/1980 | | |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 09/18/1980 | | |
| Migrated Sentence | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 1 of 4

## CASE INFORMATION

Judge Assigned: Guarino, Angelo A.   Date Filed: 05/10/1989  Initiation Date: 05/10/1989

OTN: M 395039-1  LOTN:      Originating Docket No: MC-51-CR-0500271-1989

Initial Issuing Authority:        Final Issuing Authority:

Arresting Agency: Philadelphia Pd    Arresting Officer: Affiant

Complaint/Incident #:

| Case Local Number Type(s) | Case Local Number(s) |
|---|---|
| Police Incident Number | 8914031724 |
| Legacy Microfilm Number | 91060193 |
| District Control Number | 8914031724 |
| Legacy Docket Number | C8905136511 |

## RELATED CASES

| Related Docket No | Related Case Caption | Related Court | Association Reason |
|---|---|---|---|
| **Joined Codefendant Cases** | | | |
| CP-51-CR-0822791-1989 | Comm. v. Morgan,jr., Thomas | CP-01-51-Crim | Joined Codefendant Cases |

## STATUS INFORMATION

Case Status: Closed

| | Status Date | Processing Status | | Arrest Date: | 05/01/1989 |
|---|---|---|---|---|---|
| | 10/23/1991 | Completed | | | |
| | 05/10/1989 | Migrated Case (Active) | | | |
| | | | | Complaint Date: | 05/10/1989 |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Payment Plan Conference | 04/08/2015 | 1:00 pm | 1104 | | Scheduled |

CPCMS 9082

Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

| DOCKET |
|---|



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 2 of 4

| DEFENDANT INFORMATION |
|---|

Date Of Birth:      02/05/1955      City/State/Zip:   PHILA., PA  19144

Alias Name
CLAITT, EMANUAL
Clait, Emanuel
Claitt, Emanuel
Claitt, Emanuel Michael
Claitt, Emanuel Michael
Claitt, Emmanuel
Claitt, Emmanuel M.
Claitt, Emanuel M.
Claitt, Emmanuel
Elaitt, Emanuel M.
Rivers, Barry

| CASE PARTICIPANTS |
|---|

| Participant Type | Name |
|---|---|
| Defendant | Claitt, Emanuel M. |

| CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
| 3 | 3 | M1 | 18 § 907 | POSSESSING INSTRUMENTS OF CRIME WEAPON | 04/30/1989 | M 395039-1 |
| 6 | 6 | F1 | 18 § 3701 | ROBBERY | 04/30/1989 | M 395039-1 |
| 8 | 8 | F2 | 18 § 903 | CRIMINAL CONSPIRACY | 04/30/1989 | M 395039-1 |

| DISPOSITION SENTENCING/PENALTIES |
|---|

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Grade    Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

| Migrated Dispositional Event | 10/23/1991 | Final Disposition |
|---|---|---|
| 3 / POSSESSING INSTRUMENTS OF CRIME WEAPON | Guilty Plea | M1    18 § 907 |
| Guarino, Angelo A. | 10/23/1991 | |
| Confinement | Min of 1.00 Years | |
| | Max of 2.00 Years | |
| 6 / ROBBERY | Guilty Plea | F1    18 § 3701 |
| Guarino, Angelo A. | 10/23/1991 | |
| Confinement | Min of 5.00 Years | |
| | Max of 10.00 Years | |

CPCMS 9082

Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 3 of 4

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | | Start Date |
| Sentence Conditions | | | |

| 8 / CRIMINAL CONSPIRACY | Guilty Plea | F2 | 18 § 903 |
|---|---|---|---|
| Guarino, Angelo A. | 10/23/1991 | | |
| Confinement | Min of 1.00 Years | | |
| | Max of 2.00 Years | | |

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| Name: Philadelphia County District Attorney's Office | Name: Defender Association of Philadelphia |
| Prosecutor | Public Defender |
| Supreme Court No: | Supreme Court No: |
| Phone Number(s): | Rep. Status: Active |
| 215-686-8000 (Phone) | Phone Number(s): |
| Address: | Address: |
| 3 South Penn Square | |
| Philadelphia, PA 19107 | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 05/10/1989 | | Unknown Filer |
| Held for Court | | | |
| 1 | 10/23/1991 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 10/23/1991 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 10/23/1991 | | Migrated, Filer |
| Migrated Sentence | | | |
| 1 | 07/12/2009 | | Court of Common Pleas - Philadelphia County |
| Delinquency Notice Filed - 925 Days Overdue | | | |
| 1 | 12/01/2011 | | Claitt, Emanuel M. |
| Refer to New Agency - Collections Continued | | | |

CPCMS 9082

Printed: 04/15/2020

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0513651-1989**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Emanuel M Claitt

Page 4 of 4

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 12/07/2012 | | Claitt, Emanuel M. |
| Return Case From Collection Agency - Court Request/Order | | | |

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 51-2006-P100348439 | Monthly | 12/30/2006 | Yes | $641.00 |
| | | | No | $10.00 |

| | Payment Plan History: | Receipt Date | | Payor Name | Participant Role | Amount |
|---|---|---|---|---|---|---|
| | | 09/11/2007 | Payment | State Correctional Institution | Payor | $30.00 |
| | | 06/01/2009 | Payment | CVCF | Payor | $60.00 |

## CASE FINANCIAL INFORMATION

Last Payment Date: 09/11/2007                    Total of Last Payment: -$30.00

| Claitt, Emanuel M.<br>Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Crime Victims Compensation (Act 96 of 1984) | $15.00 | ($15.00) | $0.00 | $0.00 | $0.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Judicial Computer Project | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Crimes Commission Cost (Act 96 of 1984) | $15.00 | ($15.00) | $0.00 | $0.00 | $0.00 |
| Collection Fee (Philadelphia) | $2.52 | $0.00 | ($2.52) | $0.00 | $0.00 |
| Bail Assessment (Philadelphia) (UDS) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Attorney Collection Fee 9 (Philadelphia) | $2,253.75 | $0.00 | ($2,253.75) | $0.00 | $0.00 |
| Bail Forfeiture - Municipality | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Bail Judgment (Philadelphia) | $9,000.00 | $0.00 | ($9,000.00) | $0.00 | $0.00 |
| Costs/Fees Totals: | $29,301.27 | ($30.00) | ($29,256.27) | $0.00 | $15.00 |
| Grand Totals: | $29,301.27 | ($30.00) | ($29,256.27) | $0.00 | $15.00 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# EXHIBIT "LL"

**Transcript of Emanuel Claitt's Sentencing Hearing Before
Judge Leon Katz, September 17, 1981 (Excerpts)**

IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

| | |
|---|---|
| COMMONWEALTH | : APRIL TERM, 1979 |
| | : NO.809-UNAUTH USE AUTO<br>810-THEFT, RSP |
| | : - - - |
| | MAY TERM, 1980 |
| | : |
| | : 1024-THEFT, RSP<br>1025-UNAUTH USE AUTO |
| | : - - - |
| | : AUGUST TERM, 1980 |
| | : NO.2093-ATT ARSON PERS<br>ATT ARSON PROP |
| | : 2094-ATT CRIM MISCH<br>2095-PIC GEN |
| | : PIC WEAPON<br>PROHIB OFF WEAPON |
| EMANUEL M. CLIATT | : 2096-RISK CAT<br>2097-CONSPIRACY |

- - -

Room 615, City Hall

Philadelphia, Pennsylvania

- - -

September 17, 1981

- - -

BEFORE:

HONORABLE LEON KATZ, J.

Stanley L. Goldstein
Official Court Reporter
Court of Common Pleas
Philadelphia, Pa. 19107

RECEIVED
FEB 22 1982
CITY OF PHILA STMENT

PRESENT:

        LEONARD ROSS, ESQUIRE
        Assistant District Attorney
        For the Commonwealth

        MYRON DEUTSCH, ESQUIRE
        Court Appointed Counsel
        For the Defendant

- - -

as to one of those bills, and t
with regard to that case, will

The other two cases that remain,
that are open, are 7904-809 and 810, which
will be nol-prossed upon sentencing, and 8005,
1024 to 1025, which will be nol-prossed--

THE COURT:  80 what?

MR. ROSS:  8005, 1024 and 1025.
That will also be nol-prossed after Your
Honor sentences Mr. Cliatt.

Those two cases, Your Honor, both
involve the possession and use of stolen
automobiles.  Those are the two cases that
the Commonwealth is going to nol-pros.

Mr. Cliatt will be pleading guilty
to the one bills that's remaining, number,
that's Bill 2097, Judge, August of 1980.

THE COURT:  What's the charge?

MR. ROSS:  Charing the defendant
with criminal conspiracy, where the object is
arson, risking catastrophe; overt act, did
possess an explosive device.  Co-defendants
in the case are George Rose, George Tillary,
and Douglas Smith, and George Grant.

THE COURT: Are there any other cases other than the ones you mentioned that are open or pending against this defendant?

MR. ROSS: No. Is that right?

MR. DEUTSCH: No.

MR. ROSS: I believe.

MR. DEUTSCH: The only thing is--

MR. ROSS: Montgomery County.

THE COURT: I'm talking about Philadelphia.

MR. DEUTSCH: In Philadelphia, no, sir.

MR. ROSS: This is it, Judge.

MR. DEUTSCH: It involves an automobile.

THE COURT: Are you saying to me that if and when he pleads guilty to 2097, and the others are nol-prossed at the time of sentencing, then all of the cases pending against him are completed in Philadelphia County?

MR. ROSS: Yes, that's my understanding, Judge.

MR. DEUTSCH: That's right.

THE COURT: Any you're prepared
for sentencing on the other matters today?

MR. DEUTSCH: If I may, Your Honor--

(Conference by defense counsel with
defendant off the record.)

THE COURT: I don't want to have
a piecemeal sentence because this case has
been kicking around a long time.

MR. ROSS: I agree with Your Honor.
I think the sentence should all be imposed
on one day. The Commonwealth has no objection
to however it's done. If Mr. Cliatt wants
to plead guilty today and be sentenced on all
of them, that's fine. If he wants to be con-
tinued, that's fine. Whatever Mr. Cliatt
wants.

THE COURT: How about the matter
that we discussed earlier, matters that are
pending, without going into detail?

MR. ROSS: Without going into
detail, Mr. Cliatt has continued his cooper-
ation, Your Honor.

THE COURT: You feel confident that
that cooperation will continue even after

raise that on appeal and say you should not
have pled guilty because at the time you had
a defense available to you, whether it was
true or not, doesn't make any difference. So,
that you could not raise on appeal the fact
that you wanted to raise a defense. Do you
understand that?

THE DEFENDANT: Yes.

MR. ROSS: Do you have any questions
now, Mr. Cliatt, with regard to your guilty
plea?

THE DEFENDANT: No.

MR. ROSS: Does Your Honor have any
additional questions?

THE COURT: No.

MR. DEUTSCH: I have no questions.

THE COURT: Do you understand there
are no promises?

MR. ROSS: I'm sorry.

THE COURT: Here, as there aren't
in the other cases, as to what your sentence
would be. You've been told there's a poss-
ibility of a maximum of five to ten years
plus a fine. And although that's the maximum,

Case 2:20-cv-04675-JMG Document 1-1 Filed 09/57/2020 Page 22 of 37

the name of Kenneth Washington.  At that time
the device did not explode.

It was subsequently taken by the
Philadelphia bomb squad and subsequently
exploded at the Police Academy in an area
that they have designed specifically for
the exploding of explosives that have been
confiscated.

Some time in 1980 Mr. Cliatt came
forward, after a number of statements that
he gave to the police regarding other cases,
he gave the police a statement indicating his
involvement in the attempted bombing of the
home that was owned by Kenneth Washington.
In that he indicated that he made an agreement,
if not oral, certainly a tacit agreement with
George Tillary, who was a business associate,
George Rose, who was a business associate,
and Douglas Smith, who was a business associate
of Mr. Cliatt's, and all of them were part of
the same business conspiracy at the time to
get even with Mr. Washington for certain
wrongs that had been committed against Major
Tillary.

Pa 374

In the statement Mr. Cliatt in-
dicated to the police that he was instrumental
in picking up certain explosives from an in-
dividual named George Grant. He was also
present at the time the explosive device was
placed at Mr. Washington's home, was there
at the time, although he didn't participate
other than being there. That when the ex-
plosive device did not go off, several gun
shots were fired at it in an attempt to make
it explode, which it didn't. And eventually
they left the scene.

Mr. Cliatt has reiterated the state-
ment he gave to the police at two separate
preliminary hearings involving George Rose
and Douglas Smith, who have been apprehended
and their cases are pending before this Court
with regard to the bombings.

That in brief summary, Your Honor,
is the matter that Mr. Cliatt is pleading
guilty to.

Mr. Cliatt, do you understand the
facts as I've just basically summarized them
to the Judge?

Pa 375

I pronounce sentence, and of course, I assume
we all agree at this time that both defense
counsel, the D.A., has examined the pre-sentence
investigation, mental health evaluation, and
unless I hear to the contrary I will assume
that there are no corrections as far as the
factual and history contained therein.

MR. DEUTSCH: I think there was just
one correction that Mr. Cliatt is the father
of three children. I noticed it said two
children.

THE COURT: All right.

MR. DEUTSCH: And that's the only
thing I saw.

THE COURT: Also the drug evaluation
which I didn't mention.

MR. DEUTSCH: Yes, we have read it.
That was provided before this hearing and we
have read it.

THE COURT: I also want to put on
the record that I have received from Leonard
N. Ross, assistant district attorney of the
homicide unit, a letter dated January 5th,
1981, and without being specific, for reasons

that I think we all concur, Mr. Ross has
outlined a pattern of cooperation of a mean-
ingful nature on the part of the defendant.
And, that in response to my question, Mr.
Ross has indicated that he's confident that
that cooperation will continue. Is that correct,
sir?

MR. ROSS: Yes, Your Honor. And
if it doesn't there's, I'm confident--

THE COURT: For whatever reason
you're confident, you are confident it will
continue.

MR. ROSS: Yes, sir.

THE COURT: Am I to understand
from the defendant and/or counsel, that the
defendant has been incarcerated for a period
of three months on this case, or on one of
these cases as a result of a bench warrant
that I issued?

MR. DEUTSCH: That's correct. That's
as a result of a bench warrant alone.

THE COURT: Whatever time I give
him, he has approximately three months credit.

MR. ROSS: Judge, actually, to be

Pa 377

honest, he's probably got close to a year
on these cases. What was basically happening,
Judge, is just to be very quick about it,
and it's hard to distinguish exactly what,
he had so many cases open and so many detainers
and bench warrants, that's something the prison
may have to figure out. He was released for
a period of time and then he wouldn't show
up when he was supposed to and he would be
arrested for a while--

THE COURT: We're not going to get
involved in that mathematics. It's not
germaine to what the sentence is.

MR. ROSS: Whatever the sentence
Your Honor gives, if you just add the words
"To be given credit for whatever time he's
served on these cases," and if that's a problem
we can certainly straighten it out at a later
date.

MR. DEUTSCH: I understand--I
recognize the seriousness of the charges to
which the defendant has pled guilty. And,
I'm sure the district attorney shares that with
me as does his counsel. I also recognize the

importance of the cooperation that he's
extended.

THE COURT:  Must keep in mind that
although one cooperates with the Commonwealth,
we cannot wash out the fact that he's been
convicted of at least nine crimes, possibly
more, including the crimes to which he pled
guilty today, because as of the time of the
pre-sentence investigation, as stated on the
face sheet, he was convicted of seven crimes
and he's pled guilty today to another one,
so it's at least eight.

He's had two commitments.  He's had
one probation violation, without any juvenile
record.

The recommendation of the pre-sentence
investigator is incarceration.  And, if it
were not, if it were not for the cooperation
extended to the Commonwealth, I would think
that full justification that this defendant
should receive a maximum sentence of seven
and a half to fifteen years on the drug charge,
namely 1067, manufacture, sale, and delivery
of drugs.  Not that I'm minimizing the other

charges, such as the conspiracy to fire bomb the house and the possession of the drugs.

However, I'm taking that into consideration because I think, in the field of law enforcement, that there are many times when we cannot prosecute career criminals or criminals who commit acts of violence without the cooperation of either co-defendants or others who have information. And that's, I think, what is present in this case.

MR. ROSS: Judge, might I just comment briefly on that one fact for the record, so Your Honor will have some--

THE COURT: Please do.

MR. ROSS: In these particular cases, Your Honor, none of those cases could have been brought to trial without Mr. Cliatt's statements. The two homicide matters, as well as the bombings, although we basically knew who was involved, Judge, we had no hard evidence to present to a Court until Mr. Cliatt made his statements. Everything that you said in general terms is specifically true in this particular case. Those five

cases or so that have been presented, and people have been arrested for, could not have happened without Mr. Cliatt's statements and cooperation.

THE COURT: I think that the defendant should be subject to the parole authorities.

What happened in the probation cases? Didn't he have three probations pending?

MR. DEUTSCH: As I understand it, Your Honor, we tried a case a number of years ago before Judge Kubacki and he's the one that put him on the probation. Although, there's been some arrests and detainers and back and forth, it's always been with Judge Kubacki. It was a five year probation and we got through about three and a half, almost four without too much trouble, and it was only in the last year of the probation that it began to break down from these other matters. The actual date of expiration was July 10th, 1981. If you take it into five annual years.

MR. ROSS: The other judge, Judge Caesar, was the Municipal Court case of which

Mr. Cliatt appealed and then Judge Kubacki had the exact same case. So, there really is only one judge in terms of probation, and the only one that's active is Judge Kubacki. And I would say for the record, Judge Kubacki's indication was that probably, regardless of what Your Honor did, he would terminate his probation since you would have him under some kind of supervision, either your own personal supervision or state parole supervision if Your Honor were to sentence him.

THE COURT: Do you have anything to say, Mr. Cliatt, yourself?

MR DEUTSCH: Could we start, Your Honor, with my discussing that matter with you at side bar, and then--

THE COURT: What matter, sentencing matter?

MR. DEUTSCH: No, having to do originally when we talked about some cooperation, there was something I wanted to say off the record.

THE COURT: All right. .

(Conference in chambers off the

record.)

(The following is in open court:)

THE COURT: All right, Mr. Cliatt,
for the reasons that I've stated, and upon
analysis of the pre-sentence report, mental
health evaluation, the drug evaluation, the
letter from Mr. Ross that I alluded to dated
January 5th, 1981, sentence of the Court is
as follows--

MR. ROSS: Judge, excuse me for
just one second, before you do that, the
question that you asked Mr. Cliatt, whether
he had anything to say remained unanswered.

THE COURT: Do you have anything
to say, sir, before I sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Please say it.

MR. DEUTSCH: He did want to address
the Court.

THE COURT: Go ahead.

THE DEFENDANT: What I wanted to
say was, that as far as my life, as far as
my life of being involved in crime, you know,
I think, not only think, I know that, you know,

I'm through with crime as far as I'm concerned because, you know, I'm not accepted amongst the hustlers and people in the street, doing the things that are wrong, because I have told and testified on these people. My type is not accepted amongst that type no more. I'm saying whatever you sentence me to today, Your Honor, like, you know, after this, you know, this is it.

THE COURT: What you're saying to me is you really don't have any choice because you're not going to be trusted, in a way. That's a hard way of walking the straight and narrow, but apparently that's, whatever reason it is, we should all be thankful that you're going to get out of the field of crime.

THE DEFENDANT: Yes, sir.

THE COURT: For your own sake, it would have been better if you never got in as deeply as you did. Nevertheless, is there anything else you want to say?

THE DEFENDANT: No, Your Honor.

THE COURT: On Bill 1067, which is the drug bill that I mentioned, wherein the

maximum is fifteen years, sentence of the
Court is to undergo a period of incarceration
of not less than eighteen months nor more
than seven years.

On Bill 1329, which is the possession,
where the maximum is one year, the sentence
of the Court is six to twelve months to run
concurrently with the bill imposed on 1067.

On Bill 2097, which is the conspiracy
and fire bombing case, where the maximum is
ten years, the sentence of the Court is to
undergo a period of incarceration of not less
than one nor more than five years. And that
sentence is to run concurrently with the sen-
tence imposed on 1067.

I will entertain a motion to nol-pros
all other bills.

MR. ROSS: Judge, I will move to
nol-pros all the remaining bills that are
before you.

THE COURT: Motion is granted.
All other bills are nol-prossed.

Mr. Ross, would you advise him as
to his rights to appeal any or all of the

Pa 385

sentences imposed today?

MR. ROSS: Mr. Cliatt, you have
thirty days from today in which to appeal
the sentences that have just been handed
down on all these cases. Since you pled
guilty, as I indicated, you're appellat rights
are severely limited.

If you do not notify that you wish
to appeal within thirty days, your right to
appeal will be considered to be waived.

You have, however, ten days also
for you to file a motion with this Court to
modify the sentence that was imposed upon you,
and you must do that prior to your perfecting
your appeal or notice of appeal to the Superior
Court.

If you cannot afford to have a
lawyer to represent you, one will be appointed
for you free of charge. Mr. Deutsch will
notify the appellate court if you wish to
appeal, if you want to do so, and then a
lawyer will be appointed for you if you could
not afford one and wanted one. Do you under-
stand that?

# EXHIBIT "MM"

**1/31/1984 Unsigned Cooperation Agreement Between Emanuel Claitt and Philadelphia DA**

# A G R E E M E N T

Between Defendant ___EMANUEL CLAITT___ , CP/MC No. __83-05-3764-3768__ .

represented by ___Defender Association___ , and the District Attorney's Office

by Unit Chief ___Arnold Gordon___ , Dated ___January 31, 1984__ .

### Defendant agrees to do the following:

Emanuel Claitt will testify fully and truthfully in all criminal proceedings (1) against George Major Tillery concerning the homicide of Joseph Hollis and the shooting of John Pickins, both of which occurred on October 22, 1976 inside 1003 W. Huntington Street, Phila., Pa. ; and (2) against George Major Tillery and/or George A. Rose, Jr. concerning:

(A). an attempted dynamiting /firebombing of the occupied residence at 5935 Vister St. (Phila., Pa) on November 11, 1979;

(B). a dynamiting/firebombing of the occupied residence at 2014 Church Lane, (Phila.,Pa.) on March 4, 1980; and

(C). a dynamiting/firebombing of the occupied residence at 6773 Musgrave Street (Phila.,Pa.) later on March 4, 1980.

### Commonwealth agrees to do the following:

To take all steps necessary to cause Emanuel Claitt to be released upon his own recognizance pending disposition of his open charges, to include taking steps necessary to lift a state parole detainer. It is understood that this is to be accomplished by the time Emanuel Claitt testifies at the Preliminary Hearing in the Tillery case (listed February 9, 1984), thus allowing Mr. Claitt's release on that date. It is expressly understood and agreed that the District Attorney's Office makes no promises of any kind regarding either the disposition or sentence in any of Emanuel Claitt's open cases.

### A copy of this Agreement is to be included in the following District Attorney's Office trial files:

Commonwealth v. Emanuel Claitt,/C.P. 83-05-3764-3768

Commonwealth v. George Major Tillery and William Franklin ✓ (See 80-06-561-565)

Commonwealth v. George Major Tillery -M.C. 83-12-0431,0432 and 0433.

Commonwealth v. George A. Rose, Jr. - C.P. 80-07-0846-0859

**DEFENDANT:**    **I have discussed this Agreement with my attorney and understand and agree to abide by its provisions.**

TilleryDAOFiles935

A copy of this Agreement is to be included in the following
District Attorney's Office trial files:

Commonwealth v. Emanuel Claitt, / C.P. 23-05-3764-3768

Commonwealth v. George Major Tillery and William Franklin
(See 80-04-561-574)

Commonwealth v. George Major Tillery -M.C. 83-12-0431,0432 and 0433.

Commonwealth v. George A. Rose, Jr. - C.P. 80-07-0846-0859

DEFENDANT:            I have discussed this Agreement with my attorney
                     and understand and agree to abide by its provisions.

                     (Signed)_____ Date_____

DEFENSE COUNSEL:     I have fully discussed the provisions of the Agree-
                     ment with my client and am satisfied that s/he
                     understands its terms.

                     (Signed)_____ Date_____

FOR THE DISTRICT
ATTORNEY'S OFFICE:   (Signed)_____ Date_____

# EXHIBIT "NN"

**1/31/1984 Letter from Homicide Chief Gordon to Parole Board
re Emanuel Claitt**



### DISTRICT ATTORNEY'S OFFICE
1300 CHESTNUT STREET
PHILADELPHIA PENNSYLVANIA 19107

ELWARD G. RENDELL
DISTRICT ATTORNEY

January 31, 1984

Mr. Herman Tartler
Secretary, Pennsylvania Board
  of Probation and Parole
P.C. Box 1661
Harrisburg, Pennsylvania 17120

     Re:    Emanuel Claitt, Police No. 439759
           <u>Birth Date 2-7-51</u>

Dear Mr. Tartler:

    The above-captioned individual is presently on
Pennsylvania State Parole as a result of a 1980 conviction
in Philadelphia Common Pleas Court (C.P. 80-08-1067).  He
is awaiting trial here on charges of robbery and related
offenses (C.P. 83-05-3764-3768) and remains in custody
because of a state parole detainer.

    Mr. Claitt is our only eyewitness in the very serious
homicide case of <u>Commonwealth v. Major Tillery</u>.  This case
cannot be successfully prosecuted without his testimony.

    Although Claitt has already testified, without any
promises whatsoever, against a co-defendant in the same case,
he now, through counsel, seeks his release on bail as a
condition of further cooperation.  <u>He does not seek any
promises or consideration with respect to his open charges.</u>

    In view of the fact that this witness subjects himself
to considerable risk in testifying against Tillery, we do **not**
believe his request is unreasonable.  We ask, therefore, that
the parole board remove his detainer.  With this done, we will

TilleryDAOFiles937

take necessary steps to have him released on bail and
will ensure that he is present for all further hearings
before the board.

The preliminary hearing in the <u>Tillery Case</u> is listed
for February 9, 1984.  Mr. Claitt will not be available as
a Commonwealth witness on that date unless the above
arrangements have been completed.  We therefore ask that
the matter be expedited.

Your cooperation is greatly appreciated.

Very truly yours,

ARNOLD GORDON
Chief, Homicide Unit

/ktm

MGT COPY

# EXHIBIT "OO"
**2/18/1984 Letter from DA Rendell to Judge Chiovero**

Case 2:10-cv-02027-MMB Document 22 Filed 07/21/10 Page 342 of 387

February 18, 1984

Honorable John J. Chiovero
105 One East Penn Square Building
Juniper and Market Streets
Philadelphia, Pa. 19107

Re: Commonwealth v. Emanuel Claitt
C.P. 8305-3764 to 3768

Dear Judge Chiovero:

The defendant in the above matter, which has been assigned to you for trial, is an essential Commonwealth witness in the case involving one George Major Tillery. Mr. Claitt is presently in custody in lieu of $2000.00 bail. Our office requests that he be permitted to sign his own bail and in that amount, for the reasons that follow.

George Major Tillery is charged with murder and aggravated assault as to an incident of October 22, 1976. He is also charged with three separate fire bombings of occupied residences. In the opinion of our office, Tillery is a major figure in organized crime in the City of Philadelphia. The testimony of Emanuel Claitt is essential to the successful prosecution of all of these cases against Tillery. Claitt has not requested nor has this office promised him any consideration with respect to the disposition of the open matter before you. He has, however, through counsel, requested his release on bail as a condition to his testifying against Tillery.

Since Major Tillery presents an enormously greater threat to this community than does Emanuel Claitt, we believe the Court will further the interests of justice by granting our request.

Very truly yours,

Edward G. Rendell
EDWARD G. RENDELL
District Attorney

# EXHIBIT "PP"

**10/25/1984 Letter from Asst. Homicide Chief Brodkin to
Parole Board re Emanuel Claitt**

October 25, 1984

Hermann Tartler, Board Secretary
PA. Board of Probation and Parole
P.O. Box 1661
3101 North Front Street
Harrisburg, PA 17120

RE: EMANUEL CLAITT

Dear Mr. Tartler:

Emanuel Claitt is scheduled to have a hearing, I believe on
November 2, 1984, concerning his violation of parole.

Mr. Claitt has appeared for the Commonwealth as a witness in
approximately four homicide trials. He is scheduled to appear for
the Commonwealth in the case of Commonwealth v. Major Tillery.

Mr. Claitt is obviously in danger anywhere in the Pennsylvania
Prison System. In fact, to place him in jail would most surely
place him in jeopardy.

Although we are aware that Mr. Claitt has violated his parole
on numerous occassions, it it our opinion that Mr. Claitt's viola-
tions are clearly outweighed by the potential danger to his person.
Therefore, we request that you continue Mr. Claitt's parole.

Sincerely yours,

JEFFREY A. BRODKIN
Assistant District Attorney
Assistant Chief, Homicide Unit

JAB:cde

cc: Fred W. Jacobs, Chairman

*P.S. If there are any questions concerning this request please
feel free to contact me at any time at (215) 875-6466.

TilleryDAOFiles940

# EXHIBIT "QQ"

**5/20/1980 Statement signed by Emanuel Claitt re Pool Room Shooting**

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|---|
| | | | INTERVIEWER KUHAR/GRACE |

| NAME EMANUEL CLAITT | AGE 25 | RACE N | DOB 2-7-54 |
|---|---|---|---|

| ADDRESS 5148 GREENE STREET | APARTMENT NO. | PHONE VI-9-3890 |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. 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 |
|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | PHONE |
|---|---|

| PLACE OF INTERVIEW Room #104 PAB | DATE AND TIME 5-20-80 12:35PM |
|---|---|

| BROUGHT IN BY | DATE AND TIME |
|---|---|

WE ARE QUESTIONING YOU CONCERNING Homicide by shooting of Joseph Hollis 20/N/M which occured at 1008 W. Huntington Street on 10/22/76.

| WARNINGS GIVEN BY | DATE AND TIME |
|---|---|

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q.  EMANUEL YOU HAD TOLD DET. GERRARD THAT YOU HAD SOME INFORMATION ON THE

MURDER OF JOSEPH HOLLIS, WILL YOU GO ON IN YOUR OWN WORDS & TELL ME WHAT

YOU KNOW ABOUT HIS DEATH?

A.  LET ME START AT THE BEGINNING, IT ALL STARTED ON WEDNESDAY OCT. 20, 1976,

WE WERE OUT DANA GOODMANS HOUSE, IT WAS ME, MAJOR TILLERY, ALFRED CLARK,

FRED RAINEY AND JAMES RAVENELL. WE WERE SITTING AROUND TALKING THE

DISCUSSION WAS ABOUT ALFRED & MAJOR TAKING SOME NARCOTICS FROM A MARK

GARRICK. THE DOOR BELL RANG IN CAME JOHNNY CAKES, JOE HOLLIS AND GREGORY

HILL, THEY CAME INTO THE KITCHEN WHERE WE WERE SITTING AROUND THE TABLE.

JOHNNY CAKES ASKED ALFRED & MAJOR HOW COME THEY TOOK MARKS PACKAGE.

MAJOR SAID WHY YOU WANT TO KNOW, JOHNNY SAID I WAS PARTNERS ON HIM WITH

THAT PACKAGE THAT YOU TOOK.  ALFRED SAID IT IS TO LATE NOW, WE DONE PUT

IT OUT ON THE STREET.  JOHNNY CAKES THEN SAID TO MAJOR AND ALFRED, YOU

MEAN THAT I AM GOING TO TAKE THE LOSS THEN, ALFRED SAID THAT IS THE BREAKS,

JOHNNY CAKES, JOE HOLLIS, GREGORY HILL THEY DREW GUNS, JOE HOLLIS SAID

TO ALFRED "YOU NOT NO REAL GANGSTER", THEN HE TOOK THE GUN AND GRABBED

ALFRED BY THE COLLAR, SMACKED ALFRED IN THE FACE WITH THE GUN.  AFTER HE

HIT HIM HE POINTED THE GUN AT HIM AND STARTED TO SHOOT HIM BUT JOHNNY

| RECORD ☐ Yes  ☐ No | CHECKED BY Emanuel Claitt |
|---|---|
| REVIEWED BY | |

TilleryDAOFiles759

75-483 (Rev. 8/75)

| INVESTIGATION  INTERVIEW  RECORD | CITY  OF  PHILADELPHIA |
|---|---|
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME          Emanuel Claitt | PAGE  2 | CASE NO. |
|---|---|---|

A.  ANSWER CONTINUED......

CAKES STOPPED HIM. HE TOLD HIM TO HOLD UP BROTHER, WE CAN TALK THIS

ALL OUT. THEN DANNS GOODMAN SAID, YOU ALL ARE GOING TO HAVE TO LEAVE

MY HOUSE WITH THEM GUNS. THEY KEPT THERE GUNS DRAWN BUT BACKED OUT OF

THE HOUSE, AS THEY WERE BACKING OUT JOHNNY CAKES SAID "THIS AIN'T THE

END OF IT". THEN THEY ALL LEFT. AFTER THEY LEFT MAJOR THEN SAID "HE

HAS TO DIE", MEANING JOE HOLLIS THE GUY WHO SMACKED ALFRED WITH THE GUN.

FROM THERE WE WENT TO THE MOSQUE 13TH & SUSQUEHANNA, WE ALL STAYED IN THE

CARS BUT MAJOR GOT OUT AND HE WENT INTO THE MOSQUE. A SHORT TIME LATER

HE CAME OUT WITH FRANK RAVENELL, THE BROTHER OF JAMES RAVENELL AND ANDREW

WRIGHT (AKA LITTLE PEANUT) AND SYLVESTER WHITE THE GUY WHO GOT KILLED

IN 1977, OUT IN WEST PHILLY. HE BROUGHT THEM ALL OVER TO THE CAR, ALFRED

SAID THAT HE WANTED TO CALL A MEETING, SYLVESTER WAS THE BIG BOSS OVER

JOHNNY CAKES AT THAT TIME, ALFRED SAID THERE WOULD BE A MEETING AT THE

POOL ROOM AT 11TH & CUMBERLAND, SYLVESTER SAID OK. EVERYBODY GOT IN THERE

CARS & WE WENT OVER TO THE POOLROOM. WE GOT INTO THE POOLROOM AND STARTED

TALKING AROUND ONE OF THE POOLTABLES, MAJOR ASKED SYLVESTER HOW COME HE

SENT JOHNNY CAKES & JOE & THEM OUT DANAS HOUSE TO MAKE THE MOVE LIKE THEY

DID. SYLVESTER SWORE TO GOD THAT HE DIDN'T KNOW WHAT THEY WERE TALKING

ABOUT. MAJOR SAID THAT HE DIDN'T BELIEVE HIM, HE SAID I SHOULD KILL YOU

NOW AND MAJOR DREW HIS GUN. ALFRED STOPPED MAJOR THIS TIME, HE SAID WE

DON'T HAVE TO KILL HIM, WE WANT JOSEPH (HOLLIS). THEN ALFRED SAID TO

SYLVESTER "WE ARE GOING TO SPARE YOUR LIFE BUT WE WANT YOU TO BRING

JOHNNY CAKES & JOE HOLLIS HEAR FOR A MEETING. HE SAID TO HAVE THEM HEAR

FRIDAY AFTER THE MOSQUE MEETING. SYLVESTER SAID "ANYTHING YOU SAY ALFRED"

THAT WAS IT FOR THEN, THEN EVERYBODY LEFT. *Emanuel Claitt*

75-483 A

TilleryDAOFiles760

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT | |
|---|---|---|
| NAME   Emanuel CLAITT | PAGE 3 | CASE NO. |

A.   ANSWER CONTINUED....

NOTHING HAPPENS THE NEXT DAY, FRIDAY WE ALL GO TO THE MEETING, THEN

ALL OF A SUDDEN DURING THE MEETING THE MAJOR & PORKY LEFT THE MOSQUE.

AFTER THE MEETING WE ALL MET OUTSIDE, IT WAS ME, ANDRE WRIGHT, FRANK &

JAMES RAVENELL, FRED RAINEY, AL RED CLARK, SYLVESTER, JOE HOLLIS, AND

JOHNNY CAKES.   WE ALL WENT TO OUR CARS, SYLVESTER & ALFRED SAID, EVERYBODY

GOT TO GIVE UP THERE GUNS, SYLVESTER COLLECTED JOHNNY CAKES & JOSEPH GUNS,

THEY WERE THE ONLY TWO FROM WEST PHILLY, ALFRED WAS SUPPOSED TO HAVE

TAKEN ALL OF OURS, HE TOOK MINE, ANDRES, FRANK RAVENELL AND HIS OWN,

FRED RAINEY & JAMES RAVENELL KEPT THERES.   EVERYBODY GOT IN THERE CARS

AND WENT DOWN TO THE POOL HALL.   WHEN WE DROVE UP ON THE POOL ROOM MAJORS

CAR WAS PARKED OUTSIDE.   EVERYBODY GOT OUT OF THERE CARS, JOSEPH HOLLIS

SAID THAT HE DIDN'T TRUST GOING INTO THE POOL ROOM, SYLVESTER SAID DON'T

WORRY ABOUT IT, WE ARE ALL BROTHERS.   JOHNNY CAKES SAID TO SYLVESTER,

"THIS BETTER NOT BE NO CROSS!"   SYLVESTER SAID "I WOULDN'T DO THAT MAN"

WE ALL WENT INTO THE POOLROOM & EVERYBODY SURROUNDED THE POOL TABLE,

MAJOR & PORKY CAME FROM OUT OF NOWHERE, ALFRED TOLD ME TO PADLOCK THE

DOORS WHICH I DID.   A DISCUSSION STARTED ALFRED BROUGHT UP TO JOSEPH,

ABOUT WHAT HE DID THE OTHER NITE, HOLLIS SAID WHAT ABOUT IT, ALFRED SAID

THAT YOU KNOW I AIN'T FORGOTTEN, JOHNNY CAKES SAID TO HOLD UP, I THOUGHT

WE CAME DOWN HERE TO TALK A PEACE TREATY.   MAJOR & PORKY BENT DOWN, THEY

WENT UNDERNEATH THE POOL TABLE, WHEN MAJOR WAS UNDER THERE HE SAID "THAT

IS WHAT WE THOUGHT WHEN YOU HAD US ALL OUT IN WYNFIELD!"   MAJOR STOOD BACK

BUT HE HAD THE GUN BEHIND HIS BACK, MAJOR SAID ALFRED IS THE BOSS, HE

SAID NONE OF US EVER SMACKED HIM WITH A GUN, HOLLIS THEN SAID "SO WHAT";

BUT AT THAT TIME HOLLIS DIDN'T REALIZE MAJOR HAD THE GUN BEHIND HIS BACK

*Emanuel Claitt*

75-483 A

TilleryDAOFiles762

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION  SHEET* | POLICE  DEPARTMENT |

| NAME EMANUEL CLAITT | PAGE 4 | CASE NO. |
|---|---|---|

A. CONTINUED.....

MAJOR WAS STANDING AT ONE END OF THE POOL TABLE, PORKY WAS AT THE OTHER

LONG END OF THE TABLE. I WAS STANDING WITH MY BACK AGAINST THE DOOR THAT

I HAD PADLOCKED JUST OBSERVING. PORKY AND MAJOR NODDED TO EACH OTHER,

MAJOR THEN SHOT JOE HOLLIS IN THE BACK, JOHNNY CAKES YELLED OUT "YOU

CROSSED US SYLVESTER" AND PORKY TOLD HIM TO SHUT UP MOTHERFUCKER AND

THEN PORKY SHOT HIM. JOSEPH FELL TO THE FLOOR, JOHNNY CAKES RAN RIGHT

THRU THE GLASS DOOR. I COULDN'T BELIEVE IT, HE RAN RIGHT THRU THE GLASS

JOSEPH WAS SLUMPED OVER THE TABLE, THEN MAJOR SHOT HIM A COUPLE MORE

TIMES. THEN EVERYBODY STARTED RUNNING, I OPENED THE PADLOCK AGAIN AND

WE ALL SPLIT. ME, ANDRE AND SOME GUY NAMED LONZO WHO WAS STANDING OUT-

SIDE ALL GOT INTO MY CAR. WE WENT TO MY HOUSE IN MT AIRY & STAYED THERE

THAT WAS IT AS FAR AS THE SHOOTING WAS CONCERNED.


Q. NOW EMANUEL, YOU HAVE LOOKED THRU A COUPLE OF HUNDRED PHOTOS AND PICKED

OUT SOME THAT WERE INVOLVED IN THIS CASE, I WANT YOU TO IDENTIFY EACH

ONE FOR ME AND TELL ME WHO THEY ARE?

A. IDENTIFIES PP421374, THAT IS THE JAMES RAVENELL I WAS TALKING ABOUT, HIS

BROTHER IS FRANK RAVENELL BUT HIS PICTURE WAS NOT IN THE GROUP. I.D.'S

PP386906 GREGORY T. HILL, HE IS THE ONE WHO CAME WITH JOHNNY CAKES &

JOE HOLLIS TO GOODMANS HOUSE, ALFRED DIDN'T WANT HILL TOUCHED BECAUSE

HILL IS WITH BLACK INCORPORATED & ALFRED DIDN'T WANT NO PART OF THEM.

IDENTIFIES PP403490 MARK GARRICK, HE IS THE GUY THAT ALFRED & MAJOR

TOOK THE PACKAGE FROM, IT ALL STARTED OVER THIS, THE PACKAGE WAS A HALF

KILO OF HEROIN. IDENTIFIES PP444252 FRED RAINEY, HE IS THE GUY RAINEY

I WAS TALKING ABOUT IN THIS STATEMENT. IDENTIFIES PP412163 PHOTO OF

75-483 A

TilleryDAOFiles764

| INVESTIGATION INTERVIEW RECORD<br>*CONTINUATION SHEET* | | CITY OF PHILADELPHIA<br>**POLICE   DEPARTMENT** | |
|---|---|---|---|
| NAME       Emanuel CLAITT | | PAGE   5 | CASE NO. |

A. CONTINUED.....MAJOR GEORGE TILLERY, HE IS THE GUY WHO SHOT JOE HOLLIS.
PP449904 DANA GOODMAN, THAT IS WHOSE HOUSE WE WERE AT 58TH & MALVERN
WHEN HOLLIS SMACKED ALFRED WITH THE PISTOL.  IDENTIFIES PP440309,
LEVAUN ENRICO RIVERA, AFTER THE SHOOTING AND ALL, ANDRE WRIGHT TOLD ME
THAT LEVAUN PUT THE GUNS UNDER THE POOL TABLE AND GOT RID OF THEM AFTER
THE SHOOTING, MAJOR & PORKY WENT DOWN TO HIS HOUSE BEFORE & GOT HIM BECAUSE
HE HAD THE KEYS TO THE POOL ROOM.  IN A COLORED PHOTO CONTAINING 4 MALES
IDENTIFIES THEM LEFT TO RIGHT AS #1 JAMES, #2 RICK RODA, #3 ANDRE WRIGHT,
#4 MARK GARRICK.  IDENTIFIES PP437509 AS ALFRED CLARK, THAT IS THE GUY
WHO HOLLIS SMACKED.

Q. WHAT CAN YOU TELL ME ABOUT PORKY?

A. I KNOW THAT HE HAS BEEN LOCKED UP TWICE FOR WEAPONS, HE TOLD ME HE WAS
CONVICTED OF THE LAST ONE & IS AWAITING SENTENCE.  HE WAS ALSO LOCKED
UP AS A JUVENILE FOR MURDER, IT WAS A GANG THING.  PORKY IS ABOUT 34
YEARS OLD, 5'8", 165 LBS, BROWN SKIN, SHORT HAIR, HE IS CLEAN SHAVEN,
BUILT LIKE JAMES RAVENELL, ALWAYS HANGS WITH HIM ALSO, THEY GO TO BASEBALL
& BASKETBALL GAMES.  YOU MIGHT CATCH HIM UP JAMES RAVENELLS HOUSE ON
WILLIAMS AVENUE, OR THE DEW DROP INN AT 11TH & CUMBERLAND STREET.  HE
LIVES RIGHT OFF OF GLENWOOD AVENUE AROUND LEHIGH, I KNOW HE LIVES IN A
RED HOUSE, ROW HOUSE, IT IS ON A LITTLE STREET CLOSER TO LEHIGH.  HE
DRIVES A 1973 BUICK RIVERA, GOLD, BLACK VINYL TOP, TWO DOOR, IT HAS PA.
TAGS ON IT, IT HAS BLACK INTERIOR.  HE USUALLY CARRIES A .38 WITH HIM,
HE KEEPS IT STRAPPED UNDER  THE HOOD OF THE CAR.

Q. I SHOW YOU PP569438 (JOHN PICKENS) DO YOU RECOGNIZE HIM?    *Emanuel Claitt*

75-483 A

TilleryDAOFiles766

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| **CONTINUATION SHEET** | **POLICE DEPARTMENT** |

| NAME | EMANUEL CLAITT | PAGE 6 | CASE NO. |
|---|---|---|---|

A.   THAT IS JOHNNY CAKES, THAT IS THE GUY PORKY SHOT.


Q.   I SHOW YOU PP413409 DO YOU RECOGNIZE HIM?  (JAMES TAYLOR)

A.   THAT IS LONZO, HE IS WITH BLACK INCORPORATED, HE DIDN'T HAVE ANYTHING

TO DO WITH THIS JOB HE JUST SPLIT WITH US AND WENT HOME WITH ME.


Q.   DID YOU TELL HIM ABOUT WHAT HAPPENED INSIDE?

A.   YES.


Q.   CAN YOU DESCRIBE THE GUN THAT MAJOR SHOT HOLLIS WITH?

A.   NOT REALLY, I DIDN'T SEE THAT MUCH OF IT, I DO KNOW IT WAS A REVOLVER,

IT MADE A FUNNY SOUND LIKE POP FOR  THEN HE HESITATED AND WHEN HE WAS

LEANING OVER THE POOL TABLE HE WENT POP POP AGAIN.  WHEN PORKY SHOT IT

SOUNDED LIKE A .45, LIKE A BOLT OF LIGHTNING, I DIDN'T SEE THE GUN THOUGH.

OH YEAH, BOTH PORKY AND MAJOR HAD ON GLOVES WHEN THEY DID THE SHOOTING.


Q .   EMANUEL I WANT YOU TO READ THESE SIX PAGES OVER  SIGN THEM IF YOU WILL?

*Emanuel Claitt*

MGT COPY

75-483 A

# EXHIBIT "RR"

**9/26/1984 Statement of Robert Mickens re Pool
Room Shooting**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO: H76-315 |
|---|---|---|

INTERVIEWER: McNesby - Cimino

| NAME Robert Mickens | AGE 32 | RACE N/M | DOB 5-28-52 |
|---|---|---|---|

| ADDRESS 1507 W. Master St. | APARTMENT NO. 203 | PHONE NO. None |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL | | SOC. SEC. NO. |
|---|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE: Regina Belser ( Common Law Wife)

| ADDRESS 1507 W. Master St. | PHONE NO. None |
|---|---|

| PLACE OF INTERVIEW Inside Room 104 PAB | DATE 9-26-84 | TIME 1630 AM/PM |
|---|---|---|

| BROUGHT IN BY Police | DATE 9-26-84 | TIME AM/PM |
|---|---|---|

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Joseph Hollis, 20N/M, who was shot and killed inside the pool room 1008 W. Huntingdon St. 10-22-76 about 9:50PM

WARNINGS GIVEN BY _____ DATE _____ TIME _____

ANSWERS

(1)    (2)    (3)    (4)    (5)    (6)    (7)

Q- What is your full and correct name?

A- Robert Mickens.

Q- Are you known by any other name or nickname?

A- Bobby.

Q- Can you read and write the English language?

A- Yes.

Q- Are you now under the influence of any drugs or alcohol?

A- No.

Q- How far did you go in school?

A- 11th Grade.

Q- Did you know the deceased in this case Joseph Hollis?

A- I didn't now him personally but used to see him around.

Q- Go on in your own words and tell me what you know of his death.

A- I was at Germantown and Huntingdon Sts. by myself. It was dark out and the

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

75-483 (Rev. 7/82)

MGT COPY

TilleryDAOFiles047

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | | |
|---|---|---|
| Robert Mickens | PAGE 2 | CASE NO. H76-315 |

A- Continued..........

stores were closed. It had to be 9:30 PM or a little later and was walking

west on Huntingdon St. towards Warnock St. When I got t o the corner of Warnock & Huntingdon St. I ran into Alfred Clark and I saw William Franklin and

Major Tillery on the steps of Goldies poolroom. Askir (Alfred Clark) asked

me where I was gone at. I said what's up. He said we are supposed to be having

a meeting here and a couple of guys are supposed to be coming from West Philly.

Askir said, " You know how the police is if they see all these cars out here

they will start asking questions and knocking on doors". He was referring to

his car a white cadilac and Major Tillery's car which was a Lincoln. The cars

were parked up on the pavement of Warnock St. Askir asked me to look out to

see if the police came and if they did to tap on the glass. I said "How long

do you want me to lay here" and he said to hold fast, the guys that were

supposed to come should be there in a few minutes. I sat by there on the

step and maybe 15 or 20 minutes went by and a couple more cars pulled up

one of them parked on the 2600 block of Warnock St. Two guys got out and

went inside the poolroom. I did not catch who that was, then another car

pulls up, it pulled on the 1000 block of Huntingdon St. I stood up and went

back to the corner where the pool room is at, on the southwest corner. These

two guys walked past me and they went into the poolroom too. I was getting

ready to knock on thedoor of the poolroom to ask Askir if everything was okay

cause I was getting ready to go, but he had come out the door already and he

told me everything was cool, for me to stay there and look out for the

police. I went back to the side step and sat down again. Maybe 20 minutes

went by and I heard a couple shots. I heard some glass break so I jumped

up. I ran behind a car there and this guy ran past me, he ran west on

75-483A

TilleryDAOFiles048

*Robert Mickens*

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT | |
|---|---|---|---|
| NAME<br>Robert Mickens | | PAGE<br>3 | CASE NO. |

Huntingdon.  William Franklin was behind this dude, he was chasing him.
By this time I got into a little panic so I started going towards
Cumberland St., then I went west and came back up 11th and as I was
approaching Huntingdon, I seen William go back towards the poolroom,
he was walking fast.  I got to the corner of 11th & Huntingdown and
I seen Alfred and the Major getting in different cars.  Alfred got in
his Caddy and the Major got in the Lincoln.  I turned back around and
I seen the police coming with their lights on.  I went back in my house,
I was staying at 2547 N. 11th St then.  I took my jacket off and layed
it down and came back to the door and I seen the police half way in the
middle of the block.  People was saying somebody got shot and ran to
Miss Brown's house where he fell in the door.

Q.  Do you know who was being chased by William Franklin?

A.  I don't know who he was, I just saw him by the side as he was running.

Q.  Did William Franklin have anything in his hands as he was chasing this man

A.  He had a gun in his right hand.  I don't know what kind though.  It was
a revolver.

Q.  Was William Franklin saying anything when he was chasing the man?

A.  No

Q.  How many shots did you hear coming from the poolroom when you were
sitting on the steps?

A.  About 4

75-483 A

TilleryDAOFiles049

*Robert Mickens* (signature)

| INVESTIGATION INTERVIEW RECORD<br>*CONTINUATION SHEET* | | CITY OF PHILADELPHIA<br>**POLICE  DEPARTMENT** | |
|---|---|---|---|
| NAME<br>    Robert Mickens | | PAGE<br>4 | CASE NO. |

Q. Did you hear any other shots, other than the ones you heard come from the poolroom?

A. No

Q. How far was William Franklin in back of the dude when he was chasing him?

A. Less than 10 feet.

Q. Did you ever talk with William Franklin, the Major or Alfred Clark about this killing?

A. I talked with the Major about 2 days later. I met him at Broad and Cumberland and he told me that if the police should pick me up to say that I was at the Mosque that night and that he, the Major, was on post in the Mosque too. He also told me to say that he brought me and my girlfriend hom that night, he said that way the police could not place him at thescene of the killing. Also about a month and a half ago I seen him in Holmesburg. He told me he was going to give my name to his lawyer so that I could say he was at the Mosque with me on the night of the killing. He also told me to make sure I said that he brought me and my girlfried home about 11:30PM or 12:00 midnight. Then he gave me his prison number which he said was M9786. Then he gave me a name, Jonci Major, he said she was his lady, he gave me her phone number but I don't have it now, I got it back at my room, I can get it for you. He told me to keep in contact with Jonci and he told me she could tell me where he be at.

75-483 A

TilleryDAOFiles050

*Robert Mickens*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | **POLICE  DEPARTMENT** |

| NAME | | PAGE | CASE NO. |
|---|---|---|---|
| Robert Mickens | | 5 | |

Q. Did you talk with William Franklin?

A. Within a few days after the killing he told me nobody was going to give
him that body cause it was found in the pool room. He did tell me
though that "I found out the mother fucker that I shot, the one that
went in Miss Brown's house, was trying to get to his car". The man's
car had been parked in front of my house, the Homicide Detectives got it
the next day.

Q. Do you know who the guy that was found in Miss Brown's house was with in
the poolroom?

A. He was with Joseph Hollis. They was the last two to go into the poolroom
then Alfred Clark told me everything was okay, that they was going to
start the meeting.

Q. Who is Major and where does he stay?

A. He used to be from 49th & Woodland, we called him Slime. We also called
him Major Tillery.

Q. Who is Alfred Clark and where does he stay?

A. His street name is Beesley, he is dead now, he was shot and killed.

Q. Who is William Franklin and where does he stay?

A. They call him Pork, he used to live on the 2600 block of Sartain St.

Q. How many cars were at the meeting?

A. There was 5, Beesleys car which was parked on the pavement, 2500 block

75-483 A

TilleryDAOFiles051

*Robert Mickens*

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME Robert Mickens | PAGE 6 | CASE NO. |

N. Warnock St., Major Tillery's was parked right behind Beesley's car, there was a car parked on the 2600 block of N. Warnock St., one parked on the 1000 block Huntingdon St., then one on the 2500 block N. 11th St.  These last three cars must have been from the guys from West Philly because all the people from these cars went into the poolroom.

Q.   Do you know what glass was broken when  you said earlier in your statement you heard breaking glass when the shooting started?

A.   I didn't know at that time but I found out later that it was the glass on the door of the poolroom.

Q.   Do you know what this meeting was about inside the Pool Room?

A.   It was about Alfred Clark getting smacked in the face. See some-time before this meeting, there was another meeting out in West Philly and Hollis smacked Clark in his face.  Clark could not do nothing out there so they let it cool for awhile and then they set the meeting up in the Pool Room in North Philly in the pool room.  The Major set the meeting up.

75-483 A

Robert Mickens

# EXHIBIT "SS"

**"Corrected" 9/26/1984 Statement of Robert Mickens re
Pool Room Shooting**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT H    E DIVISION | CASE NO. H76-315 |
|---|---|---|
| | | INTERVIEWER McNesby - Cimino |

| NAME Robert Mickens | AGE 2 | RACE N/M | DOB 5-28-52 |
|---|---|---|---|

ADDRESS 1507 W. Master St. — T. NO. 203 — PHONE NO. None

PLACE OF EMPLOYMENT/SCHOOL — SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL — DEPARTMENT — PHONE NO.

DATES OF PLANNED VACATIONS    1

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE    Regina Belser ( Common Law Wife)

ADDRESS    1507 W. Master St.    PHONE NO. None

PLACE OF INTERVIEW    Inside Room 104 PAB    DATE 9-26-84    TIME 1630 PM

BROUGHT IN BY    Police    DATE 9-26-84    TIME PM

WE ARE QUESTIONING YOU CONCERNING The homicide by shooting of Joseph Hollis 20N/M, who was shot and killed inside the pool room 1008 W. Huntingdon St. 10-22-76 at 9:50 PM

WARNINGS GIVEN BY    DATE    TIME

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q- What is your full and correct name?

A- Robert Mickens.

Q- Are you known by any other name or nickname?

A- Bobby.

Q- Can you read and write the English language?

A- Yes.

Q- Are you now under the influence of any drugs or alcohol?

A- No.

Q- How far did you go in school?

A- 11th Grade.

Q- Did you know thedeceased in this case Joseph Hollis?

A- I didn't now him personally but used to see him a round.

Q- Go on in your own words and tell me what you know of his death.

A- I was at Germantown and Huntingdon Sts. by myself. It was dark out and t

RECORD ☐ Yes ☐ No    CHECKED BY

Pa 322

Case 2:20-cv-01076-DEU Document 12 Page 361 of 387 Filed 06/05/20 Pa 323

1- Continued............

stores were closed. It had to be 9:30 PM or a little later and was walking east west on Huntingdon St. towards Warnock St. When I got t o the corner of War-nock & Huntingdon St. I ran into Alfred Clark and I saw William Franklin and Major Tillery on the steps of Goldies poolroom. Askir (Alfred Clark) Major Tillery asked me where I was gone at. I said what's up. He said we are supposed to be havi a meeting here and a couple of guys are supposed to be coming from West Phil Askir Major said, " You know how the police is if they see all these cars out here they will start asking questions and knocking on doors". He was referring to his car a white cadilac and Major Tillery's Askir Car car which was a Lincoln. The car were parked up on the pavement of Warnock St. Askir asked me to look out to see if the police came and if they did to tap on the glass. I said "How lor do you want me to lay here" and he said to hold fast, the guys that were supposed to come should be there in a few minutes. I sat by there on the step and maybe 15 or 20 minutes went by and a couple more card pulled up one of them parked on the 2600 block of Warnock St. Two guys got out and went inside the poolroom. I did not catch who that was, then another car pulls up, itpulled on the 1000 block of Huntingdon St. I stood up and went back to the corner where the pool room is at, on the southwest corner. The two guys walked past me and they went into the poolroom too. I was getting ready to knock on thedoor of the poolroom to ask Askir if everything was ol cause I was getting ready to go, but he had come out the door already and l told me everything was cool, for me to stay there and look out for the police. I went back to the side step and sat down again. Maybe 20 minute went by and I heard a couple shots. guns shooting R.M I heard some glass break so I jumped

Pa 323

west on

Case 2:20-cv-02675-JRM Document Page Filed Page 53/31/20207

Huntingdon. William Franklin was behind this dude, he was chasing him.
By this time I got into a little panic so I started going towards
Cumberland St., then I went west and came back up 11th and as I was
approaching Huntingdon, I seen William go back towards the poolroom,
he was walking fast. I got to the corner of 11th & Huntingdown and
I seen Alfred and the Major getting in different cars. Alfred got in
his Caddy and the Major got in the Lincoln. I turned back around and
I seen the police coming with their lights on. I went back in my house,
I was staying at 2547 N. 11th St then. I took my jacket off and layed
it down and came back to the door and I seen the police half way in the
middle of the black. People was saying somebody got shot and ran to
Miss Brown's house where he fell in the door.

Q. Do you know who was being chased by William Franklin?.

A. I don't know who he was, I just saw him by the side as he was running.

Q. Did William Franklin have anything in his hands as he was chasing this

A. He had a gun in his right hand. I don't know what kind though. It wa
a revolver.

Q. Was William Franklin saying anything when he was chasing the man?

A. No

Q. How many shots did you hear coming from the poolroom when you were
sitting on the steps?

Pa 324

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

|  | PAGE | CASE NO. |
|---|---|---|
| • Robert Mickens | 4 |  |

Did you hear any other shots, other than the ones you heard come from the poolroom?

• No

---

Q. How far was William Franklin in back of the dude when he was chasing him?

A. Less than 10 feet.

---

Q. Did you ever talk with William Franklin, the Major or Alfred Clark about this killing?

A. I talked with the Major about 2 days later. I met him at Broad Warnock K.M and Cumberland and he told me that if the police should pick me up to say that I was at the Mosque that night and that he, the Major, was on post in the Mosque too. He also told me to say that he brought me and my girlfriend hom that night, he said that way the police could not place him at the scene of the killing. Also about a month and a half ago I seen him in Holmesburg. He told me he was going to give my name to his lawyer so that I could say he was at the Mosque with me on the night of the killing. He also told me to make sure I said that he brought me a my girlfried home about 11:30PM or 12:00 midnight. Then he gave me hi prison number which he said was M9786. Then he gave me a name, Jonci Major, he said she was his lady, he gave me her phone number but I do have it now, I got it back at my room, I can get it for you. He told to keep in contact with Jonci and he told me she could tell me where be at.

Pa 325 Robert A Melus

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA | |
|---|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT | |

Robert Mickens

<table>
<tr><td colspan="2">PAGE</td><td>CASE NO.</td></tr>
<tr><td></td><td>5</td><td></td></tr>
</table>

Did you talk with William Franklin?

Within a few days after the killing he told me nobody was going to give him that body cause it was found in the pool room. He did tell me though that "I found out the mother fucker that I shot, the one that went in Miss Brown's house, was trying to get to his car". The man's car had been parked in front of my house, the Homicide Detectives got it the next day.

Q. Do you know who the guy that was found in Miss Brown's house was with in the poolroom?

A. He was with Joseph Hollis. They was the last two to go into the poolroom then Alfred Clark told me everything was okay, that they was going to start the meeting.

Q. Who is Major and where does he stay?

A. He used to be from 49th & Woodland, we called him Slime. We also calle him Major Tillery.

Q. Who is Alfred Clark and where does he stay?

A. His street name is Beesley, he is dead now, he was shot and killed.

Q. Who is William Franklin and where does he stay?

A. They call him Pork, he used to live on the 2600 block of Sartain St.

Q. How many cars were at the meeting?

there was 5, Beesleys car which was parked on the pavement, 2500 bl

Pa 326

*Robert Micken*

## INVESTIGATION INTERVIEW RECORD
### CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| Robert Mickens | 6 | |

N. Warnock St., Major Tillery's was parked right behind Beesley's c:

there was a car parked on the 2600 block of N. Warnock St., one

parked on the 1000 block Huntingdon St., then one on the 2500 block

N. 11th St. These last three cars must have been from the guys

from West Philly because all the people from these cars went into

the poolroom.

Q. Do you know what glass was broken when you said earlier in your

statement you heard breaking glass when the shooting started?

A. I didn't know at that time but I found out later that it was the

glass on the door of the poolroom.

Q. Do you know what this meeting was about inside the Pool Room?

A. It was about Alfred Clark getting smacked in the face. See some-

time before this meeting, there was another meeting out in West

Philly and Hollis smacked Clark in his face. Clark could not do

nothing out there so they let it cool for awhile and then they

set the meeting up in the Pool Room in North Philly in the pool

room. The Major set the meeting up.

# EXHIBIT "TT"

**4/1/1985 Notes of ADA Christie**

TilleryDAOFiles934

Mon
4-1-88

① Checedna — try bill
    — see Carlo

② Parker → McDry
    reo & Sketch —
    Call broken glass

③ Muchens — Hot
    Sur dep
        precate

④ 8×105 — Guess Canary

CAR PLACEMENT IN TILLERY'S
    CHECKING!

⑤ ... Mersky/ Cumins —
    Call Muchens re
    ① SMT present
    ② SMT & s/ Sr smson
    Clenning ② SMT & Muchens
    ③ buy ph # SMT
    Gord — Call Jonci
    Mayor
    ④ That down —
    glass broken )

Not Copy — Met Copy (watermark)

# EXHIBIT "UU"

## 4/2/1985 Notes of ADA Christie

TilleryDAOFiles271

In Mr Orrards
Orchrst

4/2/85 Chas Harris

1008 W Huntingdon —
sruld be elce bulb.
for um Frankln

to + wf Xmas 1975
bug presto "C Davis
tuen to Bulluck
@ 7/76 — wf
proud to Bulluch
— 3 keys —

poolroom fronl door glass
fixel @ 4/76 .

B door glass – uskey

pallo glass 1/2 vrsht
us pokeng – there
to ice of b00
8 uot

Us lock ed on – poolroom door
— Bulluck had key

3 keys tot Park w Maunch
side door key +
2 Glass frund door keys )

# EXHIBIT "VV"

**January 1980 Motion for Bail Reduction for Claitt**

FEINBERG, DEUTSCH, FELGOISE, HARRISON & McERLEAN

BY: **MYRON H. DEUTSCH, ESQ.**
IDENTIFICATION NO. 12362                    ATTORNEY FOR: DEFENDANT
1212-14 ONE EAST PENN SQUARE
11 NORTH JUNIPER STREET
PHILADELPHIA, PENNSYLVANIA 19107
LO 7-2693

---

COMMONWEALTH OF PENNSYLVANIA

    vs.

EMANUEL CLAITT a/k/a
BARRY RIVERS

*COURT OF COMMON PLEAS*

CRIMINAL   *TRIAL DIVISION*

*NO.* MC 7812-1168
    MC 7812-1170
    MC 7912-3488

## APPLICATION FOR THE REDUCTION OF BAIL

TO THE HONORABLE, THE JUDGES OF THE SAID COURT:

The Motion of Emanuel Claitt, defendant in the above stated
cases, by his attorney, Myron H. Deutsch, Esquire, respectfully
represents:

1. That the defendant was arrested on January 6, 1980, on
charges of possessing a controlled substance, intent to manufacture
or deliver a controlled substance, conspiracy, P.I.C., P.O.W., and
carrying a firearm without a license, all under the last listed

-1-

caption above, MC 7912-3488.

2.  Bail was fixed on said charges in the amount of $5000.

3.  That the defendnat is currently being held in the Detention Center on those charges, as well as the first two above listed cases, on which bail had been fixed in the amount of $1500 on each.

4.  That the defendant is 28 years of age and has resided in Phildelphia for his entire life, most recently at 5148 Green Street in Philadelphia.

5.  That the defendant has regularly appeared in Court when required in the past, except for occasions when there was some confusion as to the correct date when he should be appearing.

6.  That the defendant is cooperating fully with the Philadelphia Police Department and the District Attorney's Office on several open items and due to that cooperation they have no objection to this reduction in bail.

7.  That the defendant is unable to post surety in the amount fixed in the above captioned matters.

8.  That the amount of bail demanded is excessive and contrary to the requirements of the Constitution of Pennsylvania, Article 1, Section 13.

9.  That the defendant has already posted surety totalling $600 on bails totalling $6500 on two additional cases, those being MC 7903-3046 and CP 7904-809.

-2-

10.  That a reasonable and adequate bail in the cases at bar would be $500 on each of the first two above-listed cases and $1000 on the last above listed case, for a total of $2000 for all three cases, an amount that would assure the presence of the defendant at the trial and still be within his economic means.

WHEREFORE, the defendant prays that bail in these matters be reduced to the sum of $2000 total, an amount consistent with the likelihood that the defendant will appear at all times as required.

MYRON H. DEUTSCH,
Attorney for Defendant

-3-

JAN 28 1980

CLERK OF QUARTER SESSIONS

1-25-80
784

8000 - 1244

FEINBERG, DEUTSCH, FELGOISE, HARRISON & McERLEAN
BY:   MYRON H. DEUTSCH, ESQ.
IDENTIFICATION NO.  12362                    ATTORNEY FOR:    DEFENDANT
1212-14 ONE EAST PENN SQUARE
11 NORTH JUNIPER STREET
PHILADELFHIA, PENNSYLVANIA 19107
LO 7-2693

COMMONWEALTH OF PENNSYLVANIA

   vs.

EMANUAL CLAITT a/k/a
BARRY RIVERS

COURT OF COMMON PLEAS

CRIMINAL    TRIAL DIVISION

TERM,  197

NO. MC 7812-1168

O R D E R

AND NOW, to wit, this         day of              , 1980, after

consideration of defendant's Application and upon hearing, bail is

reduced in the above captioned matter from $1500 to_____

BY THE COURT:

_____
                                                    J.

1-25-80 Rm 784
Hon E.H. Durham

Petition's (Withdrawn)
By the Court
Durham J.

# EXHIBIT "XX"
## Emanuel Claitt Diagram of Pool Room

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME | PAGE | CASE NO. |



75-483 A

# EXHIBIT "YY"

**Police Administration Building Visitor Logs**

IN THE COMMON PLEAS COURT OF PHILADELPHIA

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CRIMINAL TRIAL DIVISION

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0305 |
| ANDRE HARVEY | : | |

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0309 |
| HOWARD WHITE | : | |

- - -

| | | |
|---|---|---|
| COMMONWEALTH | : | PCRA |
| VS. | : | CP 83-07-0314 |
| RUSSELL WILLIAMS | : | |

- - -

PHILADELPHIA, PENNSYLVANIA

- - -

FEBRUARY 18TH, 1997

- - -

BEFORE:     HONORABLE GENECE E. BRINKLEY, JUDGE

- - -

Pa 308

PAUL J. PARIS

Detective Agency
P.O. BOX 296
CROYDON, PA 19021-0948

LICENSED & BONDED
IN PA & NJ

FAX
215-673-0326

May 15, 1995

Andre Harvey #AM9119
S.C.I. Mahanoy
301 Morea Rd.
Frackville, Pa. 17932

Dear Andre:

Enclosed, please find copies of 17 pages taken from the sign-in &
out logs at the Roundhouse. Also enclosed, please find copies of the
statements taken from Maxie Harris-Jiles and Sharon Artis. Plus,
find my breakdown of the entries on the 17 pages. You will see my
notes at the bottom of the breakdown page.

As of this date, Jeremy is waiting to receive the logs for May,
1983, from the Roundhouse. Also, he is waiting for the sign-in & out
logs from the Detention Center and Holmesburg, covering May 1 to
December 31, 1983. Give me a call after you have reviewed this stuff.
I will be in Pittsburgh on Derrick's case next week, not this
week.

Sincerely,

Paul J. Paris

PJP/lms
Encl.

Case 2:20-cv-09276-DSF Document Page Filed 05/07/2021

REVIEW OF THE SIGN IN & OUT LOGS OBTAINED FROM THE P.A.B., COVERING
THE PERIOD FROM 6-1-83 to 12-31-83. THE FOLLOWING ENTRIES ARE LISTED
BY PAGE NUMBER, NAME OF VISITOR, DETECTIVE, AND DATE.

Page 110, McClain, Det. Gerrard #9189, 6-2-83.

Page 117, McClain, Gerrard, 6-16-83.

Page 120, McClain, Gerrard, 6-23-83.

Page 122, Maxie Harris & Douglas Atwell, Gerrard, 6-28-83

Page 123, McClain, Gerrard, 6-30-83.

Page 128, Maxie Harris, Gilbert #9148, 7-14-83.

Page 131, Maxie Harris, Gerrard, 7-20-83 & Thelma & Constance Martin,
Gilbert, also 7-20-83.

Page 135, Maxie Harris, Charles Atwell, & Jerry Fields, Gerrard, 8-3-
83.

Page 137, McClain, Gilbert, 8-9-83.

Page 140, Maxie Harris, Gilbert, & Jerry Fields, Gerrard, 8-17-
83.

Page 149, Maxie Harris, Gerrard, & Gertrude & Sarah Martin, Gilbert,
9-7-83.

Page 161, Maxie Harris, Gilbert, Thelma Fields, Gilbert, and
Constance Fields, (Girard), 10-7-83

Page 169, Rochelle Jackson (anyone?), Gilbert, 10-27-83.

Page 183, Maxie Harris, Gerrard, 11-23-83 & Lettie Randolph
(anyone?), Gerrard, 11-23-83.

Page 189, Theresa Burrell (anyone?), Gilbert, 12-7-83.

Page 192, Annie Edmonds, Nancy Claitt?, & Denise Certain (any of
these mean anything?), Gilbert & Gerrard, 12-13 & 12-14-83.

Page 199, Mary Whach & Floretta Caudle (mean anythng?), Gerrard, 12-
29-83.

The other pages had none of our people. It would appear that Atwell
was being brought down by a wagon, meaning he would come in a
different entrance and therefore, would not show on this log. We need
to put these dates & times together with the logs from the Detention
Center & Holmesburg.

- FIND NO SIGN-INS FOR: SHARON ARTIS, GLONDENNA REDDICK,
  CHARMAINE PASCHALL, OR DARLENE PARKER.

| Date | Name | | | | |
|---|---|---|---|---|---|
| 12/13/83 | Daniel Thomas | I.D. | | | |
| 12/13/83 | Wm. Hayward | I.D. | | | |
| 12/13/83 | Tyrone Brown | Hom | 1:5 p | J1c. | |
| 12/13/83 | Barry Zumaett | Poly | | | |
| 12/13/83 | Rosemary Cafalere | Narc | | | |
| 12/13/83 | Christine J. Cineú | Narc | | | |
| | A.B. Palmer Grup | Scu. | 45pm | 11:55 pm | Ocley Bryant Annie Redcloud |
| 12/13/83 | Frank Delia | Son | 4:30 | | Doug Hem |
| 12/13/83 | Linda Lizzyone | Hom | 7:05 | | Grace/Bruce |
| 12/13/83 | Steve Loysler | Hom | | | |
| 12-13-83 | Annie Edmonts | Hom | | | Genard |
| | Carmelo Riera | Hom | 9:00p | 10:10 | Deyn |
| | Doris Bonns | | 9:05p | | |
| | Mike Bonns | | | | |
| | Milton | | | | |
| | Willie De Carter | | | | |
| 12-14-83 | Henry Clark | Hom | 40a | | |
| 12-14-83 | John McConele | Hom | | | |
| 12-14-83 | Richard Mikay | I.D. | 9:10 | 9:45 | |
| 12-14-83 | Denise Certain | Narc | 9:45 | 1-A. | Portoit McConell |
| 12-14-83 | Efrain Nunes | Hom | 11:45pm | 1:30pm | Genard |
| | Lois Torres | Hom | 12 | 1:44 | Sgt Fry |
| 12/14/83 | George Henyes | Hom | 2:00 | 6:27p | Nachgust |
| 12:34pm | Ceasor Baez | Hom | 2:15 | 6:25p | Nachgust |
| | Calvin Butter | I.D. | | | |
| 12-14-83 | Marilyn Kilson | Hom | 4:15p | 7:00 | Jaglia |
| 12-14-83 | Cristino Valle | Hom | 5:00p | | McCant Deyn |
| 12-14-83 | Angel Frisneda | Poly | 5:35pm | 8:34p | Lt. McC |
| 12-14-83 | 3. Edmonds | Hom. | 5:45p | | |
| 12-14-83 | Alvin McHan | Hom | 6:00p | 7:25 | |
| 12-14-83 | George Felder | Garbage | 6:05 | 9:15 | Kinsey |
| " " | Eula Bry | " | " | 9:15p | |

192

# EXHIBIT "ZZ"

**9/16/2016 Verified Declaration of Rachel Wolkenstein**

DECLARATION OF RACHEL WOLKENSTEIN
PURSUANT TO PA C.S. § 4904 AND 28 U.S.C. § 1746

RACHEL WOLKENSTEIN, declares the following under penalty of perjury:

I am an attorney at law, admitted to practice in the State of New York since 1974, residing in Brooklyn, NY.

This declaration is submitted in support of the Supplemental Petition filed by Petitioner.

Since approximately February 2015, I have assisted Major Tillery *pro bono,* in his efforts to overturn his conviction, to obtain and review his court records, and those of the witnesses against him, to conduct limited investigation and help him find *pro bono* legal representation in upcoming legal proceedings. In April 2016 I had phone call with Robert Mickens in which he said that he would provide an affidavit and was willing to testify on behalf of Major Tillery.

We met on April 18, 2016 and for the first time described why he had lied when he testified against Major Tillery at his trial. Robert Mickens recounted to me the combination of threats and favors he received from detectives and prosecutors to coerce and induce him to testify falsely. He described how the prosecutors coached him to answer questions about what he supposedly saw on the night of the shootings and to deny he received any plea deals.

I typed up the key points of what he told me. This was reviewed by Mr. Mickens and he signed his verified declaration that same day.

1
Pa 302

Mr. Mickens disclosed why his false testimony was sought by the prosecution and police and how it was obtained. He disclosed the van ride with Emanuel Claitt between the Roundhouse and the county prison on State Road during which Mr. Claitt pushed him to testify against Major Tillery. Mr. Mickens also disclosed that homicide detectives arranged for his girlfriend to join him in the Roundhouse for a sexual encounter. Mr. Mickens was quite emotional in describing this and expressed pain and regret about his role in Major Tillery's conviction.

It was a surprise when shortly after this a lead resulted in learning that Emanuel Claitt, whose testimony was the sole evidence against Major Tillery, was willing to meet and indicated that he needed to finally tell the truth about his false testimony against Major Tillery and William Franklin, who was the co-defendant in the case and tried three years earlier than Petitioner.

I met with Emanuel Claitt on May 3, 2016 and he told me that his trial testimony against Major Tillery and William Franklin was totally false, that he [Claitt] wasn't even in or near the poolroom that night and he had no personal knowledge of the who shot Joseph Hollis and John Pickens. Emanuel Claitt described the process of the detectives and prosecutors obtaining his false statement and preparing him to testify. I took notes in speaking with Mr. Claitt and met him the next morning, May 4, 2016 with a typed up declaration. He made some corrections and signed the declaration under penalty of perjury. I spoke with

him again on the phone and in person on June 3, 2016 and he signed a supplemental declaration.

I met with Emanuel Claitt again on August 3, 2016. During this meeting he gave me the names of three of the women who he had sex with while in police custody. One woman, Barbara Claitt is deceased. He also told me that Helen Ellis, who is the mother of three of his children, saw him in the Roundhouse a number of times for the purposes of having sex. A third woman, Denise Certain ("De De") was another woman who he saw at the Roundhouse.

On August 3, 2016, Emanuel Claitt agreed to be videotaped. I taped Emanuel Claitt as he reaffirmed his sworn declarations and read a statement that is a composite of his two verified declarations. This videotape is submitted as an exhibit to the Supplemental Declaration. [Exhibit A]

I located Helen Ellis on August 4, 2016 outside her home and spoke with her briefly. She acknowledged that she had sex with Emanuel Claitt in the Roundhouse homicide interview rooms and that arrangements were made with detectives who brought her up to him.

Based on the information received from Emanuel Claitt, I located Denise Certain.

With the information received from Robert Mickens, that included being put in a police van alone with Emanuel Claitt to give Claitt the opportunity to persuade Mickens to falsely testify against Major Tillery, and that homicide detectives had facilitated private sexual encounters for both men with their

respective girlfriends in the Roundhouse, I attempted to obtain documentary corroborative evidence.

This included research in public records and the filing of requests pursuant to the RTKL for: Roundhouse log-in records for periods from 1980 through 1985, covering Emanuel Claitt's and Robert Mickens' periods of incarceration; and prisoner transport records between the PAB building and the detention center on State Road; and regarding Robert Mickens, transport records between the Northhampton County prison and Philadelphia in late 1984-1985. These requests were denied, appealed and reviewed. Both the Philadelphia Police Department and Northhampton County state they have searched and cannot locate these records and were likely not retained. [Exhibit B]

I learned of other murder convictions from the same years (mid-80s) that involved the same detectives as those who worked with Emanuel Claitt, Det. Lawrence Gerrard and Ernest Gilbert and a similar modus operandi in obtaining convictions – providing sexual favors to prisoner informants.

On August 25, 2016 I visited Andre Harvey, a lifer imprisoned at SCI Graterford, and he gave me documents that he had acquired when he challenged his conviction in a 1995 PCRA, in part on grounds that the prosecution witnesses against him had been provided sexual favors to falsely testify against him. Detectives Gerrard and Gilbert were central to that.

Andre Harvey gave me copies of the 17 pages of "sign-in and out logs at the Roundhouse" secured by his then investigator Paul J. Paris. This was just 17

4
Pa 305

pages of 80 from the period of June 1-December 31, 1983. In looking over those

pages, I saw that on page 192, the log-in sheet for December 14, 1983, Emanuel

Claitt signed in under Det. Gilbert and his girlfriend Denise Certain signed in

under Det. Gerrard. [Exhibit C]

Andre Harvey said that doesn't have any other portion of the Roundhouse

log in sheets.

On behalf of Petitioner, Major Tillery, I am continuing in the search for

additional records that corroborate the Commonwealth misconduct that permeates

the conviction of Major Tillery for crimes he did not commit. on August 3, 2016

Dated: September 6, 2016

_s/_____
RACHEL WOLKENSTEIN

**VERIFICATION**

I verify that the statements made in the above Declaration are true and correct to
the best of my knowledge, information and belief. I understand that false
statements herein are subject to the penalties of 18 Pa.C.S. §4904 and 28 U.S.C. §
1746, relating to unsworn falsification to authorities.

Date: September 6, 2016

__s/_____
RACHEL WOLKENSTEIN