**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MAJOR GEORGE TILLERY, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | No. 20-2675 |
| KENNETH EASON, et al., | : | |
| Respondents. | : | |

**PETITIONER'S REPLY**

## I.  PRELIMINARY STATEMENT

Extraordinary circumstances are required to justify a petition of this kind, and this Petition presents the kind of extraordinary developments that warrant relief. Emannual Claitt and Robert Mickens did not merely admit that they lied, they disclosed to the public *more* evidence of police and prosecutorial misconduct that occurred in the 1980s. Therefore, the recantations and other new evidence submitted more are reliable, corroborated and prove that Major Tillery is actually innocent.

The recantations of Claitt and Mickens are reliable and corroborated by every single piece of direct and circumstantial evidence available now and presented over the past four decades. This is not a case where mistakes were made. At the time of trial, the Commonwealth portrayed Major Tillery as a significant player in the Philadelphia "Black Mafia," a man the public should be interested in keeping off the streets. The DAO and Homicide Files are not only absent any evidence to support Tillery's conviction, these files are absent any evidence to support Tillery's involvement in any criminal organization.

Specifically, the Commonwealth argues that the recantations are not reliable while being unable to point to anything in the record that discounts their credibility and despite spending at least a year examining the record. The absence of any evidence to corroborate these now

recanted testimonies lends no support for their reliability at the time of trial. Notably, no evidence to support Tillery's conviction was presented within the Commonwealth's brief despite **requesting five (5) continuances** amounting to more than eleven (11) months of time provided for the purpose of reviewing the same files made available to Tillery's counsel.

## II.    PROCEDURAL HISTORY

1.      Petitioner Major George Tillery filed a third PCRA petition pro se in the Court of Common Pleas of Philadelphia County on June 15, 2016. This petition was predicated on obtaining sworn statements from the two prosecution witnesses, recanting the entirety of their testimonies and asserting that their respective inculpatory statements were the result of police and prosecution threats and coercion as well as plea deals and other inducements, including "sex for lies" in exchange for their false testimony. This PCRA petition was dismissed by the Court of Common Pleas on September 26, 2016, on timeliness grounds.

2.      The Superior Court of Pennsylvania affirmed on appeal on June 11, 2018. *Commonwealth v. Tillery*, 193 A.3d 1063 (Pa. Super. 2018) (unpublished memorandum), *allocatur denied*, *Commonwealth v. Tillery*, 201 A.3d 729 (Pa. Feb. 6, 2019). Tillery's Application for Reconsideration of the Denial of Allowance of Appeal was denied on May 1, 2019.

3.      On May 7, 2020, Tillery filed his *pro se* application for leave to file a successive petition pursuant to 28 U.S.C. § 2244(b) with the Third Circuit Court of Appeals. That application was granted on June 5, 2020, and on that same day the *Pro Se* Successive Habeas Corpus Petition was filed with this Court.

4.      On February 5, 2021, the Commonwealth filed their opposition to the *Pro Se* Petition, arguing that the new evidence discovered in 2016 did not meet the criteria for a

2

successive petition and was time-barred. On June 6, 2021, Tillery filed a Reply Brief to show, *inter alia*, the Third Circuit decisions in *Dennis v. Secretary of Pennsylvania Department of Corrections*, 834 F.3d 263 (3d. Cir. 2016), *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274 (3d. Cir. 2021), and *Howell v. Superintendent Albion SCI*, 978 F.3d 54 (2020) were precedential, but not applied in the Commonwealth's arguments in opposition to the Petition.

5.      On December 7, 2021, undersigned counsel entered their appearances on behalf of Tillery.

6.      On December 15, 2021, the Commonwealth filed a Motion for Stay that explicitly acknowledged they "relied on four main arguments that are foreclosed under controlling law," agreeing that their arguments made in their Response in Opposition (Doc. #13) were not supported by the precedents which Tillery cited in his Reply Brief (Doc. #16). Further, the Commonwealth "determined that the bottom-line position it took in its prior response— immediate dismissal-- is incorrect." The Commonwealth explicitly stated that it took no position on the question of granting Tillery's Habeas Petition and opted to engage in voluntary discovery (Doc. #23). Tillery did not oppose the Motion for Stay which the Court granted on January 10, 2022. (Doc. #26).

7.      On March 1 and March 3, 2022, Tillery was given an opportunity to review portions of the homicide file and the District Attorney's file regarding this case. Tillery designated portions of those files to be duplicated. The Commonwealth provided the designated portion of the file to Tillery pursuant to a Confidentiality Agreement on March 28, 2022.

8.      On June 2, 2002, Tillery filed his Amended Counseled Petition (ECF No. 28) with a substantial appendix including documents found during the discovery process that were in the

Homicide File investigation of the death of Joseph Hollis and the prosecution files of William Franklin and Major Tillery.

9.      This Court ordered the Commonwealth to respond in 60 days. In the first of five requests for extension of time to file its response, the Commonwealth requested a 90 extension on grounds of a heavy workload and reduced staff. Tthe 2nd extension request was for 30 days, stating "the claims in the petition involved complex factual and legal issues, as evidenced by the length of Tillery's amended petition (ECF No. 28) and the quantity of exhibits included…and the developments in relevant federal law as addressed in part in Respondents' earlier motion to stay."  (ECF No. 38).

10.      A third extension request was made for another 60 days by the Commonwealth based on Tillery's lengthy legal filings and also its need to investigate a trial witness who had been involved in other cases, including homicides in the 1980s and the issue of suppression of information. The Commonwealth also had obtained 20 boxes of files on other cases related to those cases that it was reviewing (ECF No. 40).

11.      Tillery opposed this extension, objecting to the delay caused by the Commonwealth obtaining other case material without informing Tillery in the process, although it was aware of these cases since Tillery filed his *pro se* petition in June 2020. (ECF No. 41). The Commonwealth responded stating that it "had concluded that they view it as a difficult question whether Tillery is entitled to relief based on the *Brady* claim that counsel opted to raise based on incomplete discovery."  In this filing, the Commonwealth offered Tillery the opportunity to review those files based on its "open files policy" (ECF No. 42).

12.      This Court granted the Commonwealth the 60-day extension. (ECF No. 43). Tillery reviewed those files on January 4 and 6, 2023. and received the requested copies from the

Commonwealth on January 19, 2023. On February 8 and 9, 2023, Tillery filed a two-page letter and attachment asserting that some of those materials support Tillery's claims (ECF Nos 44, 45).

13.     On February 10, 2023 the Commonwealth made its fourth extension for another 45-days, until March 27, 2023 "to review the material counsel for Tillery argues supports support his claims." (ECF No. 46) Tillery opposed this extension arguing that the material referred to in it's February 8, 2023 were materials the Commonwealth had just reviewed and previous filings indicated that they were otherwise prepared to file its response (ECF No. 47).

14.     On March 17, 2023 Tillery requested leave of this Court to conduct the deposition of witness Robert Mickens to preserve his testimony, with no objection from the Commonwealth ECF No. 50. This Court granted leave to conduct a videotaped deposition ECF No. 52.

15.     The Commonwealth requested a fifth extension on March 27, 2023 for thirty-five days so that it could take account of the scheduled April 17, 2023, deposition of Robert Mickens and file its response by May 1, 2023. (ECF No. 52).

16.     The Commonwealth filed its response on April 29, 2023. (ECF No. 54).

17.     Tillery filed a request for a 7-day extension of time to file his Reply, to June 6, 2023. (ECF No. 55). This Court granted that extension. (ECF No. 56).

## III.     STANDARD OF REVIEW

The Commonwealth's response asserts that Tillery's petition fails to provide new evidence of actual innocence and therefore fails the gateway requirements to overcome the substantive limits on successive habeas petitions under §2244 (b)(2). It argues that there is insufficient supporting evidence and circumstances to demonstrate the reliability of Claitt's and Mickens' sworn recantation statements to be considered new evidence of Tillery's actual

innocence per *Howell* and *Reeves*. *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 61 (3d Cir. 2020); *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018).

This conclusion is erroneous because it ignores the evidence presented in the Amended Habeas Petition that demonstrates the reliability of the recantations and misapplies legal precedent, while requesting that the petition to be dismissed without a hearing and without any consideration of Tillery's *Brady* and *Napue* claims.[1] But, legally and factually, Tillery's case satisfies the requirements of 28 U.S.C. § 2244, which requires that:

> [T]he facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B)(ii).

This Court's inquiry under § 2244(b)(2)(B) is identical to the miscarriage of justice exception dictated in *Schlup v.Delo*, 513 U.S. 298 (1995), otherwise known as the actual innocence gateway. *See also McQuiggen v. Perkins*, 569 U.S. 383. 395-96 (2013).

The Third Circuit recognized in *Howell*, which was relatively recently decided, that conclusory invocations of the supposed unreliability of recantations are not grounds for denying a *Schlup* hearing, the essence of which is a claim of innocence. *Howell*, 978 F.3d at 61. This was a reversal of a long-standing presumption of the unreliability of witness recantations. In its initial response, the Commonwealth applied the pre-*Howell* law to Tillery's *pro se* habeas petition. ECF No. 13. Recognizing this legal error, the Commonwealth withdrew its previous response without acceding that Tillery met the bar for filing a successive petition or sufficientl pleaded his

---

[1] The Commonwealth goes further to state that Tillery did not specifically identify *any* evidence as germane to the issue of reliability nor did he satisfy the gateway requirements for a successive habeas petition.

substantive *Napue* and *Brady* claims. The Commonwealth petitioned this Court for a stay of the

proceedings and to undergo voluntary discovery, which was granted by this Court. ECF No. 23.

The Commonwealth Response effectively nullifies the considerations set forth in *Reeves v.*

*Fayette, supra*, at 160-61 (3d Cir. 2018) in evaluating Tillery's Amended Petition:

> As part of the reliability assessment of the first step, the court "may consider how
> the timing of [the petitioner's] submission and the likely credibility of the
> [witnesses] bear on the probable reliability of that evidence," as well as the
> circumstances surrounding the evidence and any supporting corroboration.

*Reeves*, 897 F.3d at 160-61.

The *Howell* court endorsed those considerations. *Howell*, 978 F.3d at 60 (citing *Reeves v.*

*Fayette SCI, supra*, at 161). Thus, if a petitioner presents new evidence promptly to the state

court, this weighs in favor of finding the evidence reliable. *Id.* The sworn recantations of Claitt

and Mickens were filed in state court within 60 days of obtaining that new evidence.

Their recantations, "if credited, 'undermine[s] the trial evidence pointing to the identity

of the [perpetrator]," and therefore can "suffice to show actual innocence." *Howell*, 978 F.3d at

61 (citing *Reeves*, 897 F.3d at 161.

Specifically, under *Schlup*, there is no boundary or limit on what evidence can be

considered in an actual innocence claim.[2] In light of that broad scope, the recantations are

corroborated by each fact presented within the Amended Petition. *Schlup*, 513 U.S. at 331-32.

Given the absence of genuine review of the evidence presented in Tillery's petition and

erroneous references to testimony by the Commonwealth, this Reply summarizes the

corroborative evidence supporting the reliability of the recantations. Put another way, the

recantations of Emanuel Claitt and Robert Mickens prove that Tillery has met the standard for a

---

[2] The Commonwealth agrees however that under *Schlup*, the court is to consider "all evidence, old and
new, incriminating or exculpatory, without regard to whether it would necessarily be admitted under rules
of admissibility that would govern at trial." *Reeves*, 897 F.3d at 161 (quoting *House*, 547 U.S. at 538).

successive petition because they establish new, corroborated evidence of Tillery's actual innocence. This corroborative evidence of the reliability of the recantations also supports and proves Tillery's *Brady* and *Napue* claims.

The Commonwealth's Response argues in support of the reliability of Claitt and Mickens' *trial testimony* without pointing to any evidence in the record to corroborate what they testified to at Tillery's trial. Foundationally, the Commonwealth's argument is grounded by nothing other than the fact that Tillery was convicted. On the contrary, the Amended Petition is supported by the evidence from the homicide and prosecution files, the trial record and other newly reviewed discovery material.

This evidence, already presented in Tillery's Amended Petition, is summarized below to support the reliability of Claitt and Mickens recantations because these statements credibly establish "by clear and convincing evidence" that Tillery is actually innocent. *Schlup*, 513 U.S. at 331.

**IV.    DISCUSSION—THE AMENDED PETITION PRESENTS NEW EVIDENCE OF MAJOR TILLERY'S ACTUAL INNOCENCE AND CORROBORATION FOR THE RECANTATIONS OF EMANUEL CLAITT AND ROBERT MICKENS.**

The Preliminary Statement of the Amended Counseled Petition is an introduction to the over 70 pages of evidence presented supporting Major Tillery's actual innocence, corroborating the reliability of the recantations of Emanuel Claitt and Robert Mickens. ECF No. 28, at 22-24. The factual predicate of these recantations is that their false inculpatory police statements and trial testimony against Major Tillery were the direct result of police and prosecution misconduct. **This is the core of Tillery's new evidence of actual innocence**. Tillery's actual innocence claim is not rooted in impeachment evidence—his testimony was entirely false, manufactured by

8

the Commonwealth, which knowingly and intentionally presented it to the jury. Accordingly, the very facts that underly the *Brady* and *Napue* claims corroborate the reliability of the recantations.

The Amended Petition is qualified with evidence of prosecutorial and police misconduct which proves that the initial statements and testimony from Claitt and Mickens during the investigation and trial are patently false. In fact, there could be no prosecution (or trial) without the police statements and subsequent testimonies of Claitt and Mickens. Consequently, no reasonable juror could find Tillery guilty because there is no other evidence that he committed this crime or was even present on the night of the shooting. Notably, the recantations are also corroborated by a record that is absent any evidence supporting the notion that either Claitt or Mickens told the truth during Tillery's case.

To facilitate this Court's consideration of Tillery's petition and viability of actual innocence, the evidence corroborating the reliability of the recantations are summarized below:

**A. The Hollis Homicide Investigation and the Case Presented Against Major Tillery at Trial in 1985 In Fact Corroborates Claitt and Mickens' Recantations.**

The Commonwealth's evidence that Tillery (and William Franklin) was inside the pool room and shot either Hollis and/or Pickens relied completely on the testimony from career jailhouse informant Emanuel Claitt. The arrest warrants and subsequent wrongful convictions were initiated by Claitt's May 20, 1980, statement to homicide detectives. DAO 759-70. Claitt's statement came three and a half years after the October 22, 1976, pool hall shootings and was the only evidence establishing probable cause to arrest either Tillery or Franklin. Without Claitt's testimony, there was **no** case against Tillery. More than four years later, Robert Mickens became a witness against Tillery with his statement in September 26, 1984, claiming that he was asked

by Tillery and Alfred Clark to be a "lookout" outside the pool hall. DAO 47-52; Reply Ex. A.[3]

He had no knowledge of what transpired inside.

      The surviving victim, John Pickens, gave a verbal and written statement to homicide

detectives at the hospital on the morning after the shooting. Pickens told homicide Det. McGrath

that "Dave" and "Rickie" committed the shooting. MT 13:56. Included in Det. McGrath's notes,

Pickens said there were four shooters, all with guns, and they locked the pool room door, took

money from him and Hollis. Pickens described Rickie as tall, wearing a black coat, gold jewelry

and that Rickie drove a green Cadillac that was parked nearby. Ex. XX. Pickens was shown 11

police mug shots for possible identification. This included a photo of William Franklin, who

Pickens said was not involved. Ex. X.

      Despite his descriptive identifications, Pickens did not testify at William Franklin's trial

in December of 1980, nor at Tillery's trial in May of 1985; and, the prosecution never tried to

subpoena Pickens as a witness.[4]

    **B.  Potential Alternative Suspects Not Disclosed to Tillery at the Time of Trial Supports the Reliability of Claitt and Mickens' Recantations.**

      The Third Circuit emphasizes the impact of evidence that works to undermine support for

the identity of the perpetrator and qualifies the importance of evidence that points to the identity

of another perpetrator. Here, the Commonwealth ignores the evidence pointing to alternate

suspects while citing the very cases that state how impactful this evidence is, e.g., *Reeves* and

*Howell*. For example, in *Reeves*, the Third Circuit specifies that "new, reliable evidence that

---

[3] Importantly, there are two statements signed by Mickens: The first (cited above and attached as Reply Exhibit A) is a clean copy; however, another (which is edited to change names and other details) is attached to this Reply as Exhibit B.
[4] Tillery requested that his trial attorney subpoena Pickens to no avail. His trial attorney's failure to do so was the basis of Tillery's post-conviction proceedings in State and Federal courts for his ineffective assistance and a conflict-of-interest claims.

'undermines the trial evidence pointing to the identity of the perpetrator and the motive for the crime' can suffice to show actual innocence." *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018) (*citing Goldblum v. Klem*).

Alternate suspects were known to the Commonwealth; but were not pursued in the months following the October 1976 shootings.  This evidence that supported theories about the shootings that inculpated anyone other than Tillery and Franklin were withheld from the defense prior to and during their prosecutions. Claitt's May 20, 1980, police statement, ADA Christie's opening statement and Claitt's testimony include many details referencing Dana Goodman and Mark Garrick, the theft of Garrick's drug delivery and the meeting to adjudicate this dispute that took place in Dana Goodman's home in Wynnefield.

Alternate suspects were identified during the investigation of the pool room shooting and new evidence was found to inculpate alternate suspects including a statement by Reggie Hollis (the decedent's brother) who identifies the same suspect named by Pickens, i.e., Dana Goodman. Ex. Y. This statement from the decedent's own brother was not disclosed to Tillery (or William Franklin) prior to or during trial. Specifically, Reggie told Det. Gallo, that the "Dave" named by John Pickens was *Dana Goodman,* "who lives with Francine in Winnfield [sic]. Francine may be the girlfriend of John Pickens. Dave beat Francine with a bat about 1 week ago." Ex. Y.

Another report dated January 17, 1977, was also discovered with the homicide file from a "24 year-old Negro male," Marvin Dyson, who reported that "talk on the street" was that Larry Goodman and Dana Goodman (brothers) shot Hollis and Pickens over "some drugs and Dana's wife." ECF No. 28, at 45-46. Ex. Y; Ex. Z.

These are corroborative of Pickens' identification of the shooters; however, there is no record of police follow-up to explore Pickens' very specific description of Rickie—there was no

11

follow-up with Dana Goodman, his brother Larry Goodman or John Pickens. Also, there was no inquiry into "Francine's" involvement even though she was mentioned as the root of the noted feud between Goodman, Pickens and Hollis. In light of the additional "Francine" evidence, Claitt's testimony that the dispute "was really about a woman that [Goodman and Pickens] were involved with" becomes particularly relevant in light of Reggie Hollis' statement referencing Francine. M.T. 14:26.

More significantly, both statements point to the same person, i.e., Dana Goodman. Because both statements were made by individuals who were substantially harmed by the shooting, they were made with a high incentive to identify the real shooter and thus highly indicative of reliability. Given the aforementioned examples of corroboration for the statements made by Pickens, the initial testimonies of Claitt and Mickens become less credible, and their subsequent recantations become even more reliable.

Accordingly, failing to disclose alternative suspects corroborates that the trial testimonies of Claitt and Mickens were *unreliable*, i.e., false, since evidence pointing to alternative suspects inherently discredits their testimony.  Moreover, this failure to disclose potential alternative suspects is a serious violation of *Brady*.

## C. The Claitt and Mickens Recantations are Corroborative of Each Other Pursuant to *Howell*.

Analogous to each other, both Mickens and Claitt stated that their respective police statements were manufactured by homicide detectives and prosecutors. This supports the recently uncovered truth apparent upon review, that neither Claitt nor Mickens were at the scene of the shooting and neither had any direct knowledge about what occurred.

Furthermore, upon review of the homicide files and DAO files, it becomes evident that the police and prosecution were entirely focused on obtaining inculpatory testimony against

Tillery. For example, Claitt stated, "I was threatened about the murder of Samuel Goodwin. The detectives really wanted information to get Major Tillery for murder." Ex. GG. Akin to this statement by Claitt, Mickens said, "I was repeatedly brought in for questioning …asking me to become a prosecution witness against Major Tillery." Ex. II.

Similarly, Claitt and Mickens provide comparable descriptions of the coercive practices used to obtain their false police statements and to ensure their false testimony. Examples include but are not limited to threats of false homicide charges, plea deals reducing prison time and being carefully coached to deny any deals and to instead say that they faced "open" sentencing.

Likewise, both Claitt and Mickens provided statements while faced with a similar situation, e.g., imprisoned with pending felony charges that could result in decades of prison time. Overall, Claitt and Mickens' recantations are more than corroborative of each other, they detail independent experiences of police and prosecutorial misconduct that are not only congruent, but also portray a *modus operandi*. The details of these coercive tactics in this case represents a pattern of misconduct by the police and prosecution to falsely secure convictions in violation of *Napue* and *Brady*.[5]

### 1. New Evidence Includes the Fact that Mickens and Claitt Were Transported to the PAB Together in a Van for the Purpose of Coercing Mickens to Testify Against Tillery with Claitt's Support.

The transportation of Mickens with Claitt in the same van is a substantially corroborative detail because the evidence shows that they were transported together, purposefully, to provide

---

[5] In its penultimate word on the credibility of the recantation statements, the Commonwealth resorts to impeaching Claitt and Mickens by asserting that they both have *crimen falsi* convictions in years prior to their sworn recantation declarations. ECF No 54 at 17, fn. 9. This is striking (could say the ultimate *chutzpah*!) given that the Commonwealth sought and defended homicide convictions and over thirty-five years of imprisonment of men who have asserted their actual innocence from the time of their arrests. The Commonwealth had absolutely no evidence against Tillery and Franklin but for the trial testimony of Claitt, and Mickens who had multiple *crimen falsi* convictions when they testified for the prosecution.

Claitt the opportunity to discuss the Tilley case with Mickens and persuade him to cooperate.

Mickens and Claitt independently and without collaboration describe this event similarly. For

instance, Claitt stated in his 2016 Declaration:

> I was put in a police van to ride alone with Mickens back and forth from homicide
> to the county holding prison, to make clear to Mickens that he really had no
> choice, except to testify against Major Tillery.

Ex. GG.

> Mickens describes an identical experience during his 2016 Declaration:

> I was brought down supposedly to meet with the homicide detectives in
> Philadelphia. Instead I was put in a police van with Emanuel Claitt, who had
> already testified against Major Tillery's co-defendant. I rode back and forth from
> the police headquarters to the county prison with Claitt, but never taken from the
> van. Claitt told me I was 'pretty hemmed up' and …. that I should testify against
> Major Tillery.

Ex. II.

This is not an occurrence likely to have been invented separately by these men. Both men

speak to the purpose of that encounter which was orchestrated by homicide detectives and

prosecutors. ECF No. 28 at 58-59. The reliability of both recantations is exemplified by their

independent attestations of this van ride which also validates the claim that the police and

prosecution colluded to obtain Tilley's wrongful conviction.

Significantly, the Commonwealth does not dispute that detectives arranged for Claitt and

Mickens to be put together alone in a police van. In fact, the Commonwealth concedes that the

independent statements describing this encounter corroborate each other and are indicative of

this event's occurrence. Com. Response at 16. Furthermore, this van ride is the *only time* Claitt

and Mickens are described as being *together*. Neither Claitt nor Mickens mention each other in

their respective police statements and there is nothing in their trial testimonies to suggest that

they interacted with or even saw each other that night. Notably, Mickens said that this van ride

was the last time he ever communicated with Claitt. Dep. at 21.

As stated by the Third Circuit in *Howell,* "one the plausible reason tha the affidavits [of

two recanting witnesses] are so similar is that they are both telling the truth."  *Howell*, at 61.


    2.    **Congruent With the 'Sex for Lies' Scandal, both Claitt and Mickens
          Disclosed That They Received Uninhibited Access to Female
          Companionship While Incarcerated.**

Both Claitt and Mickens state they were given inducements for their cooperation. Put

frankly, they were able to have sex with women at the PAB as a reward for their cooperation.

Acknowledging *Commonwealth v. Lester*, conjugal visits were a well-known, regularly available

inducement to those capable and willing to falsely testify.[6] For instance, Claitt stated, "I was

allowed to have sex with my girlfriends (four of them) in the homicide interview rooms and in

hotel rooms, in exchange for my cooperation." Ex. GG. Similarly, Mickens stated, "I told

detectives Cimino and McNesby that I missed by girlfriend…. I was given an hour and a half

private visit with her in an interview room in the police headquarters so we could have sex." Ex.

II. Mickens confirmed this in his deposition:

> Q.    Have we talked about all of the –I can't think of a better word than perks
>       that were offered to you in connection with your testimony and your
>       statement against Major Tillery?
> A.    Yes, there was—there were a lot of perks involved, you know what I
>       mean. They – they would let me – bring me down to the PAB and I could
>       – I could spend time with my lady down there. And it wasn't always
>       intimacy. It was just time, you know. You know. Expecially the days that
>       they brought me down, that was my visiting day, they would let her come
>       down there at the prison. Other times they would just bring me – bring me
>       down if I wanted to see here, you know. And even when I went to court to
>       a couple of hearings or whatever, John Cimino, at the old City Hall, before
>       they had the new building, he would – after they had the hearing, he would
>       walk me from City Hall to the DA's office on Chestnut Street. It was on

---

[6] *Commonwealth v. Lester*, 572 A.2d 694, 697 (Pa. Super. 1990) (finding that "the fact that the women
were provided to Lester *after* his confession strengthens his case, not damages it.").

Chestnut Street at the time. Now, he was a big guy. He's –he kind of a big guy. **If I wanted to run, I could have ran easily, but I felt my protection was where I was at**. Where was I going to go, you know what I mean.

Dep. at 38-39.

The Amended Petition more thoroughly details this form of inducement and further corroborates the evidence supporting Tillery's actual innocence. ECF No.28, at 97-99. Fortunately, Tillery was able to obtain some pages of the official PAB visitors' log covering the last months of 1983. Ex. YY. The record for December 14,1983, shows that both Claitt and "Denise," a woman he named as a girlfriend, were brought into the PAB by **Detectives Ernest Gilbert and Lawrence Gerrard** at the same time. *Id.* According to PPD policy, no one except witnesses or suspects are allowed in the PAB homicide interview rooms.

The evidence of these visits was not disclosed at Tillery's trial. Review of the homicide and prosecution files for *Com. v. Phillip Frazier* led to discovery of a visitors' record for Emanuel Claitt, who was a prosecution witness against Frazier and incarcerated at the County Detention Center. His visitors were "Denise" and "Helen" [DAOFiles380-81]. There are at least 17 identifiable visits for Denise and 1 identifiable visit for Helen. ECF No.44, 45. Denise and Helen were named by Claitt as women who were brought to the PAB to have private sexual liaisons within homicide division interview rooms at the direction of homicide detectives.[7]

The Commonwealth's Response acknowledge that "a factor that arguably weighs in favor of the recantations' reliability is that they, to some extent, corroborate each other." ECF No.52, at 16 ftnote 8. Those were references to the van ride as and the PAB login sheet, e.g. the van ride

---

[7] Admittedly, there is no current verification as to whether Claitt and his female visitors were given the same accommodations at the County Detention Center, or if the visiting schedules instead identified dates of transport to the PAB for these conjugal visits. Nonetheless, it is extraordinary evidence because it was in violation of standard visiting procedure for a prisoner to be allowed that number of personal visits per month.

as not presented as corroboration of reliabiity. The December 14, 1983 PAB login is discounted because it is three years after he gave his statement. *Id.* However, that PAB visit by Claitt with Denise was **one week after** Tillery was arrested and brought to Philadelphia to face trial. The Commonwealth did not have a case against Tillery without Claitt's cooperation. This visit was an inducement for that cooperation.[8]

To suggest, as the Commonwealth did, that these instances are merely "limited corroboration," is shortsighted because there is a vast amount of support in the Amended Petition to infer that these revelations are corroborated extensively. Instead of acknowledging the corroboration evidence in the record and pleaded in the Amended Petition, the Commonwealth concluded that these instances were interposed with "other markers of unreliability," without identifying what these "markers" are. Com. Response at 16.

### D. The Hollis Homicide Investigation Results Are Corroborative of Claitt and Mickens Recantations and Tillery's Actual Innocence.

New evidence from the Hollis Homicide File No.76-315, dated January 16, 1977, reveals that detectives and police found *nothing* connecting Tillery or Franklin to the poolroom shooting.[9] Nor was there any information connecting Claitt or Mickens to the scene or the shooting. In fact, Pickens' statement on the shooting implicitly and explicitly refutes any

---

[8] This pattern and practice of homicide detectives to induce prisoners to obtain prosecution witnesses has been dubbed **"Sex for Lies"** by the *Philadelphia Inquirer* and recently officially recognized and denounced by the Philadelphia District Attorney's Office in a press release issued on January 3, 2022. ECF No.28, at 99.

[9] William Bullock, who owned the building where the pool room was located and lived in the upstairs apartment testified at Franklin's trial. He said that the first-floor pool hall was rented and operated by Charles Harris, who was also known as "Goldie." W.F. 2:105. Harris had the keys to the poolroom and Bullock didn't. W.F. 2:111. He also testified that he had known William Franklin for several years prior to October 1976 and had seen Franklin playing pool there; but didn't have any knowledge of what association, if any, Franklin had with the poolroom. W.F. 2:106. In the record is a police interview of Bullock the night of the shooting and allegedly signed by him. Ex. E. At the trial, Bullock acknowledged that he was interviewed but denied that he had answered "yes" when asked if Franklin ran the poolroom. He also testified that the signature on the write up of the interview was not his. The Commonwealth agreed that Mr. Bullock did not sign the statement. W.F. :113.

participation by Franklin or Tillery. No investigation followed the identification of possible suspects per Pickens' statement or alternate suspects and motive provided by Hollis' brother.

The "Continued Homicide Investigation" report covers May 15, 1980-August 22, 1980. ECF No. 28, at 47-51. This report begins with Claitt's May 15, 1980, arrest for of robbery charges and the first *reported* interview of homicide detective Lawrence Gerrard with Claitt, leading to Claitt's statement in May 20, 1980.

The substance of several police interviews with Claitt prior to his statement are not disclosed. ECF No. 28. Also, there is no indication of any investigation of Claitt's story of the events preceding the October 22, 1976 pool hall shootings as retailed in the police statement.

There is no corroborative evidence, no record of attempts to interview any of the 6 people, in addition to Claitt, Hollis, Pickens, Tillery, Franklin; who were supposedly in the poolroom or immediately after the shootings per Claitt's May 20,1980, police statement. According to Claitt's story: inside the poolroom were Fred Rainey, Sylvester White, James Ravenell, Frank Junius, Andre Wright; outside the poolroom was Alonzo Robinson. Also named was Levaun Enrico Rivera as the keeper of key to poolroom. Notably, Sylvester White and Alfred Clark were deceased when Claitt gave his statement.

In sum, none of Claitt's statement was corroborated prior to Claitt's testimonies against Franklin in 1980 or Tillery in 1985.

### E. New Evidence Discovered Within the Hollis 1976 Homicide Investigation Are Corroborative of Claitt and Mickens' Recantations and Tillery's Actual Innocence.

The entirety of the files reviewed in open discovery is absent any evidence to suggest that Tillery was a person of interest prior to Claitt's statement, yet Claitt admits knowing that Tillery was already a target. Ex. GG. After reviewing the homicide and DAO files and finding nothing to even hint at Tillery being present during the pool room shooting, Claitt's admission that

detectives identified Tillery as a suspect before Claitt gave his statement is corroborative, new evidence of *Brady* and *Napue* violations. *Id.*

Significantly, new evidence from the Hollis Homicide File No.76-315, dated January 16, 1977, reveals that detectives and police found *nothing* connecting Tillery or Franklin to the poolroom shootings. On the contrary, there is evidence that contradicts Claitt and Mickens' initial statements and testimonies. For example, there is no sighting of Tillery's car but there is evidence that Fred Rainey's Cadillac was near the scene. There is no evidence of Franklin being the manager of the pool room, but there is a statement by the surviving victim specifically excluding Franklin as a participant in the shooting. ECF No. 28, at 29-47. Additional missing evidence is that associating Tillery with the alleged motive. Regardless of whether the story was that there was dispute was over a woman, stolen drugs or revenge for disrespecting Alfred Clark, nothing associates Tillery to either theory on motive for the shooting

### F.  Claitt's Descriptions of the Scene and Shooting in his Police Statements are Contrary to the Forensic and Investigation Reports.

Discovery found within the Homicide File No. 76-315 includes the *Continued Homicide Investigation* report which documented the investigative efforts made between May and August of 1980. ECF No. 28, at 47-51; 34-40. The report begins with Claitt's May 15, 1980, arrest for **robbery** resulting in the first reported interview by Det. Lawrence Gerrard. **Five days later**, on May 20, 1980, Claitt provides his statement incriminating Tillery (and Franklin). An arrest warrant was issued for Tillery and Franklin only **three days later** on May 23, 1980.

Claitt's 2016 recantation is made more reliable because of how unreliable his initial statements appear when presented with the newly discovered evidence. Several of these inconsistencies showing the unreliability of Claitt's initial story are summarized below:

First, Claitt describes Pickens being shot and then immediately running through a glass door. "Johnny Cakes (Pickens) ran right through the glass door. I couldn't believe it, he ran right through the glass door." But there was no glass door, nor was there any broken glass at the scene, per the MCDU report and as testified to by Detectives Gallo and Chitwood.[10]

Second, Claitt's statement and trial testimony exposed that he had no familiarity with the pool hall. He said it was at 11th and Cumberland, not Huntingdon and Warnock (the actual location). On three occasions, Claitt refers to the door having a padlock despite no evidence of a padlock according to the police investigation.[11]

Finally, the shooting could not have happened as Claitt portrayed. He described everyone standing around the pool table with Tillery and Franklin at opposite ends and Claitt standing by the "padlocked" door. In trial testimony, Claitt put Hollis and Pickens standing on the long side of the table along the West side wall with Sylvester Johnson and Alfred Clark along the East side wall. But the ballistics and crime scene analysis revealed that the **shooters were along the West wall, not the victims, firing West to East**. Ex. "S."

The investigation was also absent any evidence that Tillery was involved in a criminal organization or drug dealing. At trial, the Commonwealth's tunnel vision in prosecuting Tillery is apparent by ADA Christie's consistent portrayal of Tillery as a gangster involved in a criminal organization. The alleged motive for the killing was that there was a fight over a drug package resulting in the planning of a peace meeting after Hollis pistol-whipped Alfred Clark in the face

---

[10] ADA Christie's concern with the missing glass corroborates Claitt's recantation where he said, "I was coached by ADA Barbara Christie . . . she was worried about my first statement that John Pickens had gone through a glass door. She coached me to testify about a second door leading out of the poolroom and that it had been a glass door." Ex. "GG."

[11] Claitt described padlocking the door per Clark's instructions to keep everyone inside the pool hall. Ex. T. After the shooting, "then everybody started running and I opened the padlock again." Ex. T. The pool hall entrance door had a double cylinder key, requiring a key to lock and open inside and out, but Claitt's statement said nothing about having a key. ECF No. 28.

at Dana Goodman's house. This alleged motive was reiterated during ADA Christie's opening

statement as she presented that the shooting was due to a drug package being stolen from

Sylvester White's crew by Alfred Clark crew. M.T. 9:22-23. Absent any evidentiary support to

suggest that Tillery was involved in a criminal organization and absent any prior drug arrests for

Tillery, ADA Christie opens her case by painting Tillery as a drug dealing gangster:

> Emanuel Claitt will tell you Alfred Clark's right-hand man was this defendant.
> Major George Tillery, who worked with Clark and subdeveloped, shall we say a
> specialty into methamphetamine drug part of the organization.

M.T. 9:22.

Upon reviewing the open discovery material, no evidence was found to support the

allegation that Tillery was involved in drug dealing. For example, there was no naming of Tillery

by any assigned police units who were investigating drug trafficking in the area at that time. In

line with the fact that no direct or physical evidence exists to suggest that Tillery was involved

with this criminal organization, Claitt recanted his statement putting Tillery at the scene. Robert

Mickens recanted his statement putting Tillery at the scene, as well. During his deposition,

Mickens reiterated that he never saw Tillery that night and that he saw Frank Junius not William

Franklin running behind Pickens:

> Q.    So you heard the shots, you saw Junius, you saw Pickens. At any
>       time that night did you see Tillery?
> A.    No.

Dep. At 23.

### G. Claitt's Testimonies Were Not Consistent Between Court Proceedings as the Commonwealth's Brief Contends.

During Franklin's trial, Claitt said a meeting took place at Alfred Clark's house on

***Thursday***, October 21, 1976. [W.F. 3:54]. But, according to his initial statement, "Nothing

happened the next day, Friday we all go to the meeting. . .." Ex. BB. Claitt was cross-examined

on this inconsistency at Tillery's trial, but the recantation makes Claitt's excuse for this inconsistency less credible—Claitt's excuse was that he went to Clark's on that Thursday to drop off $3,000 for heroin. [M.T. 15:71]. Claitt never testified with solid footing. From the beginning, when Claitt testified against Franklin, he failed to include Tillery's name on the list of people present at Dana Goodman's house during the October 20 meeting until ADA Ross led Claitt into saying Tillery's name. [W.F. 3:46-47]. Reiterating some of the inconsistencies in Claitt's story is done in response to the Commonwealth's contention that Claitt testified consistently.

### H. The Commonwealth Suppressed Material Information and Denied the Inducements Used to Obtain Claitt's False Police Statements Which Were Used to Substantiate His False Testimony.

Claitt's "price" for providing false testimony against Tillery included the prosecution securing his release from jail while charges were pending, keeping him out of jail while he testified against Franklin and Tillery, and lifting detainers for probation and parole violations.

On that, the Commonwealth disputes the reliability of Claitt's and Mickens' recantations, "especially" because "Tillery does not present reliable evidence supporting that *undisclosed deals existed* and induced the men's cooperation."  ECF No. 54, at 14. (emphasis added).

Instead, this Court is referred to the section in Tillery's Amended Petition, ECF No. 28 at 60-78, which provides the chronology of Claitt's extensive criminal record; the interventions of the prosecution to facilitate plea deals; Claitt's release from jail by signing his own bail; and getting probation and parole detainers lifted. The DAO assistance came from its highest levels including then District Attorney Edward Rendell. The history of Claitt's cooperation with the Commonwealth and the surrounding circumstances of his signing the police statement and repeatedly testifying for the prosecution is corroborative of the reliability of his recantation.

Moreover, in its argument to dismiss the evidence that Claitt was induced to falsely testify against Tillery, the Commonwealth misrepresents that his criminal charges and inducements to cooperate were fully disclosed at trial. Not so. Even if the support letter sent to Judge Katz was fully disclosed prior to his 1981 sentencing and those sent to the Parole Board prior to Claitt testifying against Tillery in 1984-5, this is not dispositive of the legal issue most immediately before the Court. These promises and actions by the Commonwealth were *inducements* for Claitt's false police statement and subsequent testimonies and is therefore corroborative evidence of the reliability of Claitt's recantation.

Recognizing that Tillery has highlighted the suppression of the new May 16, 1980, arrest for **13 robbery and other charges**, he faced days before signing his police statement, the prosecution attempts to say these charges were repeatedly disclosed and discussed during the trial.  However the Commonwealth misrepresents the trial record.
ECF No. 29 at 61.

In footnote 7 of its Response, the Commonwealth includes numerous transcript references to verify that this disclosure was made, e.g., statements in ADA Christie's opening, Claitt's direct and cross examinations of his criminal record, including prior sentencing and the Commowealth's communications to judges and the Parole Board on behalf of Claitt. ECF No. 54, at 14-15.

On the contrary, there is absolutely **no reference to the existence of those robbery charges of May 15, 1980 during the trial of Major Tillery, direct or cross.** Rather, the trial record provides evidence of the conscious, intentional concealment of those charges by the prosecution.

Additionally, there is evidence supporting the conclusion that Tillery's trial counsel was provided with a partial "Criminal Record of Emanuel Claitt" that does **NOT** include the May 15, 1980 robbery charge. ECF No. 28 at 61-62. It includes the cases that were part of the November 28, 1980, plea and sentencing on September 17, 1981, before Judge Leon Katz. The inclusion of the May 15, 1980, arrest would have been in the midst of cases that were disposed of on September 17, 1981. *Id.*[12]

A review of the cross examination of Claitt at Tillery's trial shows his lawyer conducted extensive questioning about Claitt's record, and that it follows the content of this (partial) Criminal Record. However, there are *no questions* regarding the May 15/16, 1980, robbery arrest just days before Claitt signed his police statement, corroborating Tillery's assertion that these charges were suppressed.

The Commonwealth recounts that ADA Barbara Christie in her jury opening discussed that "Claitt was being held *specifically on robbery* and related charges when he gave his police statement, M.T. 9:20-21, *the same charges* Tillery appears to now claim were not disclosed. ECF No. 28, at 62, 111-112." ECF No. 54, at 14-15. (*emphasis added*). However, **these are not the same charges**. What ADA Christie actually said was, "In May of 1980, they encountered an individual by the name of Emanuel Claitt… in custody on his own theft and robbery charges." M.T. 9:20-21. This was a general reference; Christie did not *specifically* disclose or discuss Claitt's serial arrests, violation of probation or the timing of these arrests.

---

[12] This criminal record is discussed in the Amended Petition, but through error, it was not included as intended as exhibit LL. ECF No. 28 at 62. It is attached to this Reply. Ex. XX.

Not mentioned was that Claitt had violated his 5-year probation from a 1976 fire arms guilty plea, which put him back in prison in April 1980, after which Det. Gerrard and other homicide detectives began interviewing Claitt on open homicide cases. M.T. 14:8.

The Commonwealth goes on to say that Claitt was "heavily questioned and cross-examined as to… his extensive criminal history," M.T. 14:5-14. It also notes that "he was in custody just prior to his statement;" however, Claitt's incarceration prior to being questioned was never disputed. M.T. 14:9-10.

This cross examination cited by the prosecution is primarily a review of Claitt's plea on November 28, 1980, and the September 17, 1981, sentencing before Judge Leon Katz. Claitt testified that he had a deal of concurrent sentences in 3 separate cases –sales of narcotics, attempted arson, and possession of an instrument of crime. *Id*., at 5. Three other cases—2 car thefts, possession of drugs and weapons possession would be nolle prossed.  NT 14:86-87, also ECF No. 28 at 66-69.

Judge Katz asked the prosecutor whether this sentencing would cover *all* of Claitt charges pending in Philadelphia County. The Com answered "yes." This was false—the May 1, 1980, robbery charges were still open before a different judge. September 17, 1981. Sentencing Transcript p.5 Ex. LL.

As to the "letter to the judge, *id*. at 84-86; NT19:20," Claitt was merely questioned about the letter during Tillery's trial but a copy was never provided. Judge Katz found the letter compelling and credited Claitt's cooperation for setting Claitt's lenient sentence of 18 months-7 years. Otherwise, "it would have been full justification to sentence this defendant to seven and a half to fifteen years" on the drug charge alone. Sentencing Transcript at 30-31. Ex. LL. The

prosecutor made additional remarks to the judge at the sentencing hearing, emphasizing that Claitt's testimony was critical to bring "two homicides" to trial. *Id.*

Claitt was released a little more than a year after this sentence, with five years parole. The Commonwealth references the prosecution's notification to the parole board but this reference is actually direct examination of Claitt about his incarceration for a parole violation on a different robbery arrest from April 1983-February 1984. Tillery's trial counsel raised the issue of whether Claitt had an agreement, to which ADA Christie adamantly states that there is "no deal". CITE. Then the prosecutor continues: "He is currently in custody for violating his parole. His understanding of any agreement he has with the Commonwealth is that Commonwealth will make the Parole Board aware of his cooperation in this and in his other cases. He's due to testify. [In the 1983 robbery case.] That's the end of the direct testimony of this witness." NT 14:98-99 The aforementioned is all that is said regarding letters to the Parole Board on the page cited by the Commonwealth. The actual reason for the Commonwealth letters were not disclosed. Copies of those letters were not turned over to Tillery.

These letters to the Parole Board established that Claitt *conditioned* his willingness to testify at Tillery's preliminary hearing on the Commonwealth's promise to write these letters to the parole board, especially because, within four months of release on parole, he committed another robbery and theft on April 13, 1982. ECF No. 28 at 71-72. The two letters prior to Tillery's preliminary hearing further establish Claitt's contingent cooperation: The first, dated January 31, 1984, from Arnold Gordon, Chief of the Philadelphia District Attorney Homicide Unit, and the second, dated February 18, 1984, from Edward Rendell, District Attorney of Philadelphia are explicit that "Claitt will not be available as a witness" and "Claitt requested release on bail….as a condition to his testifying against Tillery. Exhibits NN and OO.

Claitt was re-incarcerated on a parole violation on September 19, 1984, and the prosecution again intervened to have Claitt released on bail, sending a letter to the Parole Board and to Judge Chiovero requesting Claitt's release on bail despite a parole violation so that Claitt would be out when he testified against Tillery in May of 1985. ECF No. 28 at 71-72. None of those letters were made available to Tillery, which were evidence of Claitt's threatened refusal to testify unless the Commonwealth arranged his release from prison.

I.     **Claitt's Trial Testimony Is Corroborative Of His Recantation Statements That He Was Given Deals As Inducement For His False Testimony Against Tillery.**

Claitt's testimonies at the trials of Franklin (December 1980), Phillip Frazier (1983) and Major Tillery (May 1985) corroborate that Claitt sought and was given indications from both detectives and prosecutors that, in exchange of testimony he would get "deals" for bail, for dismissals of charges and for lenient sentences.

For example, in the Franklin trial, before his May 20, 1980, statement Claitt said he "was looking for something [a deal]. Sure." W.F. 3:15. Claitt was arrested on new charges between the preliminary hearing on June 4 and testimony against Franklin on December 3, 1980. Before his guilty plea on four charges in January of 1981,"there was [an] agreement to drop the rest of the five or six charges. W.F. 3:106.

Then, in the Frazier trial, Claitt acknowledged that his record of cooperation, presented by ADA Leonard Ross to Judge Leon Katz in 1981 led to his plea deal and dismissal of a number of cases. [Dec 6:162/024]. He testified that he had "expectations" that he would get favorable sentencing treatment including nolle pross of charges, and assistance in getting out of jail, despite parole detainers. [Dec 6:176/038]. His expectation for providing information on Frazier's case was to get dismissal of his open robbery and firearm case pending before Judge

27

Chivero. Claitt stated this to both Det. Michael Cohen and ADA Roger King. [Dec 6:181-2/043-4]. ***This is the robbery case that was open when Claitt testified against Tillery.*** This is not the May 16, 1980 charges, but a 1983 robbery charge.

Lastly, at Tillery's trial, the record shows that Claitt demanded being released on bail and having his VOP detainer lifted as a *pre-condition* of his testimony against Tillery. After a series of letters from the DAO, including from DA Ed Rendell, the parole detainer was lifted prior to Tillery's preliminary hearing. Regarding the still pending robbery charge in front of Judge Chivero, Claitt at first testified, "there was no agreement at all." M.T. 14:7. But then he acknowledged, "Well, as to the agreement—the District Attorney merely mentioned that they.. were going to make [the judge] aware of my cooperation…" M.T. 14:94.

The withheld evidence of deals was described in Claitt's sworn recantation declaration on June 3, 2016, "ADA Christie told me the robbery charges and other charges would be nolle prossed. And they were. (Exhibit GG). Despite this corroborative evidence, the Commonwealth's position throughout Tillery's trial and throughout the post-conviction proceedings was that there were "no deals," and "no agreements made" to induce and obtain Claitt's false testimony.

However, Claitt's testimony for the prosecution at the trials of Franklin, Frazier and Tillery, supports his recantation statement that he sought bail and plea deals in exchange for testimony, that he believed he was receiving them from the Commonwealth in exchange for testimony and that he did in fact receive those inducements and accommodation.

**J.      Claitt's Known Cooperation and Extensive Criminal History Required the Commonwealth to Rehabilitate His Credibility with Testimony from Another Jailhouse Informant, Robert Mickens.**

Considering Claitt's extensive criminal record and favorable treatment by the prosecution, Robert Mickens was brought in to support Claitt's false testimony. ADA Barbara Christie manufactured testimony from Mickens, identifying him as being a *lookout* for Tillery.

More than just a seasoned snitch, there was good reason for Mickens to be brought in and questioned—Mickens lived on the 2500 block of North 11th Street in close proximity to the pool hall. Dep. at 29. This effort to weaponize eyewitnesses like Mickens, is not mere conjecture, it is corroborated by Mickens:

> Q.    And what occurred during that conversation with Barbara Christie, John Cimino and Mr. Officer McNesby?
> A.    She told me that Emanuel Claitt claimed I was around there when something happened and that I would be a good witness for her. And that's how the conversation started. She wanted me to be a witness or get information. She said, I need your information and I'll let you know if I'm—if your information is valuable to me or if I'm going to need you as a witness.

Dep. at 22.

Like Claitt, Mickens also described how he was coached by ADA Christie and how he was motivated to lie for mare than just a plea deal:

> By this time, the word had spread through the prisons on State Road that I was a snitch. I went back down to the PAB building. My mindset was, okay, if they saying I'm a snitch, maybe what Major—this rumor that Claitt said Major was talking about me being a snitch, maybe it's true. So now my mindset is everybody saying I'm telling, so I might as well protect myself. And I got a little vindictive. I did. I got, you know, vindictive and I went back down to the PAB and I told Barbara I would be willing to do whatever she needed me to do in this particular case.

Dep. At 23.

In addition to being assaulted in prison. Mickens learned of a *Daily News* article that reported he was a snitch in a criminal case (not the Hollis murder). He complained about this to Barbara Christie because he felt threatened and then Mickens went to ADA Christie promising "to do whatever she needed." Dep. At 23.

The fact that Mickens lived around the corner made him a key witness to the shooting, but his pending charges made him even more useful. Knowing Mickens whereabouts at the time of the shooting along with the enormous pressure on him to get out of prison made him the perfect tool to manufacture a conviction.

## V.    CONCLUSION

This Reply is necessary because the Commonwealth's Response ignores the vast amount of corroborative evidence supporting the reliability of Claitt and Mickens' recantations. Specifically, the Response ignores the substance and merits of the Amended Petition because the Commonwealth cannot dispute that the evidence and recantations support Tillery's innocence, without reserve. Put another way, if the Commonwealth acknowledged what truly occurred during Tillery's prosecution, then the reliability of the new evidence and recantations cannot be ignored. Essentially, without reference to any physical, direct or circumstantial evidence to support Claitt and Mickens' initial statements or testimony, the Commonwealth requests for the Amended Petition to be dismissed without a hearing based on a conclusion that is legally and factually insufficient.

Respectfully submitted,

**MARRONE LAW FIRM**

By____/s/Michael D. Pomerantz_____
*MICHAEL D. POMERANTZ, ESQUIRE*
Attorney for Petitioner

30